# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: NIASPAN ANTITRUST LITIGATION** | **No. MDL 2460**<br><br>**MASTER FILE NO.: 13-MD-2460** |
| **This Document Relates to:**<br><br>**ALL ACTIONS** | |

**PLAINTIFFS' JOINT OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINTS**

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ..................................................................................................................1

FACTS ................................................................................................................................2

LEGAL STANDARD............................................................................................................8

ARGUMENT ......................................................................................................................9

    A.    Plaintiffs allege that Kos and its successors provided large, unjustified, and
unlawful payments to Barr and Teva to delay entry of generic competition...........9

        1.    Plaintiffs allege Kos and its successors paid Barr and Teva in cash to
improperly delay generic competition. ....................................................10

            a.    Plaintiffs allege side deals not for fair value..................................10

            b.    Defendants improperly base their Rule 12 motion on denials of
Plaintiffs' factual allegations. ......................................................12

        2.    Plaintiffs also allege that Kos and its successors paid Barr and Teva via
the No AG clause to improperly delay generic competition......................14

    B.    Plaintiffs properly allege Defendants caused antitrust injury. ..............................19

    C.    Statutes of limitations do not bar Plaintiffs' claims.............................................21

        1.    The continuing violation doctrine applies.................................................22

        2.    Defendants' fraudulent concealment of the unlawful agreements tolls the
statutes of limitations. ............................................................................29

    D.    Laches has no application here. ..........................................................................31

    E.    End-Payor Plaintiffs have standing to pursue their state law claims.....................34

        1.    End-Payor Plaintiffs have Article III standing..........................................34

        2.    Because they have Article III standing, Rule 23 determines whether End-
Payor Plaintiffs may pursue claims of absent class members in other
states....................................................................................................35

    F.    End-Payor Plaintiffs have properly pled claims under state law. ..........................36

    G.    End-Payor Plaintiffs have properly pled claims for unjust enrichment.................40

CONCLUSION...................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adidas Am., Inc. v. Payless Shoesource, Inc.*,
  546 F. Supp. 2d 1029 (D. Or. 2008) ........................................................................33

*Allen v. Dairy Farmers of America*,
  748 F. Supp. 2d 323 (D. Vt. 2010)............................................................................24

*Am. Fed'n of State Cnty. Mun. Emp. v. Ortho-McNeill-Janssen Pharms., Inc.*,
  2010 WL 891150 (E.D. Pa. Mar. 11, 2010)..............................................................37

*Am. Needle, Inc. v. N.F.L.*,
  560 U.S. 183 (2010)...................................................................................................16

*Am. Soc. of Mech. Eng., Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982)...................................................................................................34

*American Tobacco Co. v. U.S.*,
  328 U.S. 781 (1946)...................................................................................................26

*Andrx Pharm. Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) .............................................................................20, 26

*Arreola v. Godinez*,
  546 F.3d 788 (7th Cir. 2008) ....................................................................................35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................................8

*Assoc. Gen. Cont. of Cal., Inc. v. Cal. State Council of Carp.*,
  459 U.S. 519 (1983)...................................................................................................32

*Aurora Ent. Inc. v. Nat'l Broad. Co., Inc*,
  688 F.2d 689 (9th Cir. 1982) ....................................................................................25

*Barnett v. Strom*,
  265 F. Supp. 2d 946 (N.D. Ill. 2003) ......................................................................18

*Barnosky Oils, Inc. v. Union Oil Co. of California*,
  665 F.2d 74 (6th Cir. 1981) ......................................................................................24

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007)....................................................................................................8

*Benger Labs v. R.K. Laros Co.*,
  209 F. Supp. 639 (E.D. Pa.1962) .............................................................................19

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)........................................................................23, 27, 28

*Berkson v. Del Monte Corp.*,
743 F.2d 53 (1st Cir. 1984)........................................................................24

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ........................................................................35

*Busche v. Monaco Coach Corp.*,
2006 WL 3302477 (E.D. Pa. Nov. 13, 2006) ........................................................................22

*Calif. Dental Ass'n v. FTC*,
526 U.S. 756 (1999)........................................................................28

*ConMed Corp. v. Larson & Taylor*,
49 Fed. Appx. 455 (4th Cir. 2002)........................................................................21

*Cont'l Ore Co. v. Union Car. & Carbon Corp.*,
370 U.S. 690 (1962)........................................................................26

*Cont'l-Wirt Elec. Corp. v. Lancaster Glass Corp.*,
459 F.2d 768 (3d Cir. 1972)........................................................................23

*Country Floors, Inc. v. Gepner*,
930 F.2d 1056 (3d Cir. 1991)........................................................................31

*Cyberworld Enter. Tech., Inc. v. Napolitano*,
602 F.3d 189 (3d Cir. 2010)........................................................................31

*Dixon Ticonderoga Co. v. Estate of O'Connor*,
248 F.3d 151 (3d Cir. 2001)........................................................................21

*Eichman v. Fotomat Corp.*,
880 F.2d 149 (9th Cir. 1989) ........................................................................25

*Exxon Co., USA v. Sofec, Inc.*,
517 U.S. 830 (1996)........................................................................20

*FTC v. Actavis, Inc.*,
133 S. Ct. 2223 (2013)........................................................................ passim

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*,
60 F.3d 770 (Fed. Cir. 1995)........................................................................31

*Global Network Communs., Inc. v. City of New York*,
458 F.3d 150 (2d Cir. 2006)........................................................................9

*Goodman v. Lukens Steel Co.*,
   777 F.2d 113 (3d Cir. 1985), *aff'd*, 482 U.S. 656 (1987) .......................................35

*Gordon v. Lewistown Hosp.*,
   423 F.3d 184 (3d Cir. 2005)...........................................................................11

*Group Health Plan, Inc. v. Phillip Morris Inc.*,
   621 N.W.2d 2 (Minn. 2001).............................................................................36

*Gunn v. Minton*,
   133 S. Ct. 1059 (2013)....................................................................................21

*Hanover Shoe, Inc. v. United Shoe Machinery Corporation*,
   392 U.S. 481 (1968)..................................................................................22, 27

*Harbour Capital Corporation v. Allied Capital Corporation*,
   2009 WL 2185449 (D.N.H. July 22, 2009) ...............................................36, 37

*Harold Friedman Inc. v. Thorofare Markets Inc.*,
   587 F.2d 127 (3d Cir. 1978).............................................................................22

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
   316 F. Supp. 2d 186 (E.D. Pa. 2004) ................................................................23

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
   423 F.3d 374 (3d Cir. 2005).............................................................................23

*Hayward v. Bor. of Sharon Hill*,
   2013 WL 5777293 (E.D. Pa. Oct. 24, 2013).....................................................21

*Hearing Comp., Inc. v. Shure Inc.*,
   600 F.3d 1357 (Fed. Cir. 2010)........................................................................33

*Helmbrecht v. St. Paul Ins. Co.*,
   362 N.W.2d 118 (Wis. 1985)............................................................................21

*Hemstreet v. Comp. Entry Sys. Corp.*,
   972 F.2d 1290 (Fed. Cir. 1992)........................................................................33

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)........................................................................................32

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
   906 F.2d 679 (Fed. Cir. 1990)..........................................................................20

*Imperial Point Colonnades Condo. Inc., v. Mangurian*,
   549 F.2d 1029 (5th Cir. 1977) .........................................................................23

*In re Actiq Sales and Mktg. Practices Litig.*,
   790 F. Supp. 2d 313 (E.D. Pa. 2011) ...................................................................37

*In re AndroGel Antitrust Litig.*,
   2014 WL 1600331 (N.D. Ga Apr. 18, 2014) .........................................................26

*In re Aspartame Antitrust Litig.*,
   2007 WL 5215231 (E.D. Pa. Jan. 18, 2007) .....................................................23, 27

*In re Auto. Parts Antitrust Litig.*,
   2013 WL 2456612 (E.D. Mich. June 6, 2013)........................................................38

*In re Blood Reagents Antitrust Litig.*,
   283 F.R.D. 222 (E.D. Pa. 2012)..............................................................................29

*In re Buspirone Patent & Antitrust Litig.*,
   185 F. Supp. 2d 363 (S.D.N.Y. 2002)............................................................ passim

*In re Cardizem CD Antitrust Litig.*,
   105 F.Supp. 2d 618 (E.D. Mich. 2000)...................................................................26

*In re Cardizem CD Antitrust Litig.*,
   332 F.3d 896 (6th Cir. 2003) ............................................................................20, 28

*In re Choc. Confec. Antitrust Litig.*,
   602 F. Supp. 2d 538 (M.D. Pa. 2009) .....................................................................38

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
   261 F. Supp. 2d 188 (E.D.N.Y. 2003) ............................................................ passim

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
   363 F. Supp. 2d 514 (E.D.N.Y. 2005) .............................................19, 21, 25, 30

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012)....................................................................39

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ..................................................................................36

*In re Dyn. Random Access Memory (DRAM) Antitrust Litig.*,
   536 F. Supp. 2d 1129 (N.D. Cal. 2008) ..................................................................38

*In re Elec. Carbon Prods. Antitrust Litig.*,
   333 F. Supp. 2d 303 (D.N.J. 2004) .........................................................................29

*In re Fasteners Antitrust Litig.*,
   2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) .........................................................29

*In re Ford Motor Co. E-350 Van Prods. Liability Litig. (No. II),*
   2008 WL 4126264 (D.N.J. Sept. 2, 2008) ......................................................................21, 40

*In re Hypodermic Prods. Antitrust Litig.,*
   2007 WL 1959225 (D.N.J. Jun. 29, 2007) ..............................................................................35

*In re Ins. Brokerage Antitrust Litig.,*
   618 F.3d 300 (3d Cir. 2010) ....................................................................................................11

*In re K-Dur Antitrust Litig,,*
   338 F. Supp 517 (D.N.J. 2004). ...............................................................................................23

*In re K-Dur Antitrust Litig.,*
   686 F.3d 197 (3d Cir. 2012) ............................................................................................ passim

*In re Katz Interactive Call Proc. Patent Litig.,*
   2009 U.S. Dist. LEXIS 131920 (C.D. Cal. May 1, 2009) .......................................................33

*In re Lamictal Direct Purchaser Antitrust Litig.,*
   2012 WL 6725580 (D.N.J. Dec. 6, 2012) ................................................................................17

*In re Lamictal Direct Purchaser Antitrust Litig.,*
   2014 WL 282755 (D.N.J. Jan. 24, 2014) ............................................................................17, 18

*In re Linerboard Antitrust Litig.,*
   2000 WL 1475559 (E.D. Pa. 2000) ....................................................................................23, 27

*In re Linerboard Antitrust Litig.,*
   305 F.3d 145 (3d Cir. 2002) ...............................................................................................28, 29

*In re Lipitor Antitrust Litig.,*
   2013 WL 4780496 (D.N.J. Sep. 5, 2013) ................................................................................20

*In re Lipitor Antitrust Litig.,*
   2014 WL 282755 (D.N.J. Sept. 5, 2013) .............................................................................17, 18

*In re Lorazepam & Clorazepate Antitrust Litig.,*
   295 F. Supp. 2d 30 (D.D.C. 2003) ..........................................................................................40

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
   998 F.2d 1144 (3d Cir. 1993) .............................................................................................25, 26

*In re Mercedes-Benz Anti-Trust Litig.,*
   157 F. Supp. 2d 355 (D.N.J. 2001) ..........................................................................................29

*In re Mercedes-Benz Tele Aid Contract Litig.,*
   257 F.R.D. 46 (D.N.J. 2009) ....................................................................................................40

*In re Multidistrict Vehicle Air Pollution*,
   591 F.2d 68 (9th Cir. 1979) .........................................................................................24

*In re Nexium Antitrust Litig.*,
   968 F. Supp. 2d 367 (D. Mass. Sep.11, 2013) ................................................... passim

*In re Pitt. & Lake Erie R. Co. Sec. & Antitrust Litig.*,
   387 F. Supp. 906 (E.D. Pa. 1974) ...............................................................................31

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
   2006 WL 433891 (M.D. Pa. Jan. 3, 2006) ...................................................................29

*In re Relafen Antitrust Litig.*,
   286 F. Supp. 2d 56 (D. Mass. 2003) ............................................................................28

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   2013 WL 2181185 (E.D. Tenn. May 20, 2013) ................................................23, 27, 28

*In re Sugar Ind. Antitrust Litig.*,
   73 F.R.D. 322 (E.D. Pa. 1976) .....................................................................................32

*In re Terazosin Hydrochloride Antitrust Litig.*,
   164 F.Supp. 2d 1340 (S.D. Fla. 2000), .......................................................................26

*Int'l Ins. Co. v. Johns*,
   874 F.2d 1447 (11th Cir. 1989) ...................................................................................13

*Jersey Asparagus Farms, Inc. v. Rutgers Univ.*,
   803 F. Supp. 2d 295 (D.N.J. 2011) ................................................................................8

*Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
   677 F.2d 1045 (5th Cir. 1982) .....................................................................................25

*Kaiser Found. v. Abbott Labs.*,
   2009 WL 3877513 (C.D. Cal. Oct 8, 2009) ..................................................................28

*Kaw Valley Elec. Co-op. Co., Inc. v. Kansas Elec. Power Co-op., Inc.*,
   872 F.2d 931 (10th Cir. 1989) .....................................................................................24

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
   702 F. Supp. 2d 514 (E.D. Pa. 2010) ...........................................................................20

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997).......................................................................................2, 23, 25

*Krell v. Prudential Insurance Company of America*,
   148 F.3d 283 (3d Cir. 1998)...................................................................................35, 36

*Lancianese v. Bank of Mount Hope*,
  783 F.2d 467 (4th Cir. 1986) ................................................................24

*Landgraf v. Usi Film Prods.*,
  511 U.S. 244 (1994)................................................................................38

*Levi Case Co. v. ATS Prods., Inc.*,
  788 F. Supp. 428 (N.D. Cal. 1992) ........................................................18

*Lum v. Bank of Am.*,
  361 F.3d 217 (3d Cir. 2004).....................................................................9

*Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*,
  2014 WL 533425 (D. Del. Feb. 7, 2014) ...............................................33

*Mandel v. M & Q Pack. Corp.*,
  2013 WL 1899809 (M.D. Pa. May 7, 2013)......................................32, 33

*Mannington Mills, Inc. v. Congoleum Indus., Inc.*,
  610 F.2d 1059 (3d Cir. 1979)..................................................................19

*Marcus Corp. v. Am. Express Co.*
  2005 WL 1560484 (S.D.N.Y. July 5, 2005) ...........................................22

*Martin v. Ford Motor Co.*,
  765 F. Supp. 2d 673 (E.D. Pa. 2011) .....................................................22

*Masimo Corp. v. Philips Elecs. North America Corp.*,
  2013 WL 1332606 (D. Del. Apr. 2, 2013).........................................32, 33

*McKesson Info. Sol. LLC v. Trizetto Grp., Inc.*,
  426 F. Supp. 2d 203 (D. Del. 2006)........................................................31

*Meijer, Inc. v. 3M*,
  2005 WL 1660188 (E.D. Pa. July 13, 2005).......................................23, 27

*Melo-Sonics Corp. v. Cropp*,
  342 F.2d 856 (3d Cir. 1965).....................................................................8

*Merck & Co., Inc. v. Louisiana Wholesale Drug Co., Inc.*,
  133 S. Ct. 2849 (2013)..............................................................................1

*Meyers v. Asics Corp.*,
  974 F.2d 1304 (Fed. Cir. 1992)...........................................................32, 33

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
  392 F.3d 265 (8th Cir. 2004) ..................................................................24

*Molecular Diagnostics Laboratories v. Hoffmann–La Roche Inc.*,
    402 F. Supp. 2d 276 (D. D.C. 2005)...................................................24

*Moraine Prods. V. ICI America, Inc.*,
    538 F.2d 134 (7th Cir. 1976) .....................................................18

*Morrow v. Microsoft*,
    499 F.3d 1332 (Fed. Cir. 2007).................................................19

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
    198 F.3d 823 (11th Cir. 1999) ...................................................23

*Mylan v. FDA*,
    454 F.3d 270 (4th Cir. 2006) .....................................................14

*Nyce v. Sterling Credit Corp.*,
    2013WL 1388051 (E.D. Pa. Apr. 2, 2013) .................................23

*Ocean Ships, Inc. v. Stiles*,
    315 F.3d 111 (2d Cir. 2002)......................................................21

*Oshiver v. Levin Fishbein Sedran & Berman*,
    38 F.3d 1380 (3d. Cir. 1994)....................................................29

*Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*,
    815 F.2d 270 (3d Cir. 1987)................................................26, 27

*Pfizer, Inc. v. Gov't of India*,
    434 U.S. 308 (1978)..................................................................34

*Piazza v. Ebsco Indus.*,
    273 F.3d 1341 (11th Cir. 2001) .................................................35

*Poster Exch. Inc. v. Nat'l Screen Serv. Corp.*,
    517 F.2d 117 (5th Cir. 1975) .....................................................24

*Rail-Trailer v. ACF Indus., Inc.*,
    358 F.2d 15 (7th Cir. 1966) .......................................................18

*Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*,
    708 F. Supp. 2d 257 (E.D.N.Y. 2010) .......................................23

*Roselink Inv., L.L.C. v. Shenkman*,
    386 F. Supp. 2d 209 (S.D.N.Y. 2004).......................................13

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)........................................................9

*Rycoline Prods. v. C & W Unlimited,*
    109 F. 3d 883 (3d Cir. 1997)................................................................21

*Shahid v. Bor. of Eddystone,*
    2011 WL 4573521 (E.D. Pa. Oct. 3, 2011)..........................................21

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,*
    737 F. Supp. 2d 380 (E.D. Pa. 2010) ..............................................36, 37

*Singer v. AT&T Corp.,*
    185 F.R.D. 681 (S.D. Fla. 1998) .........................................................40

*Smith Int'l, Inc. v. Kennametal, Inc.,*
    1987 U.S. Dist. LEXIS 7087 (N.D. Ohio Jan. 7, 1987)........................18

*Smith Int'l, Inc. v. Kennametal, Inc.,*
    621 F. Supp. 79 (N.D. Ohio 1985).......................................................18

*Sosna v. Iowa,*
    419 U.S. 393 (1975)............................................................................35

*Standard Oil Co. v. U.S.,*
    283 U.S. 163 (1931)............................................................................17

*State Cont. & Eng. Corp. v. Condotte Am., Inc.,*
    346 F.3d 1057 (Fed. Cir. 2003)...........................................................32

*Stearns v. Ticketmaster Corp.,*
    655 F.3d 1013 (9th Cir. 2011) ............................................................35

*Sullivan v. DB Invest. Inc.,*
    667 F.3d 273 (3d Cir. 2011)...........................................................34, 35

*Synergistic Int'l, LLC v. Korman,*
    402 F. Supp. 2d 651 (E.D. Va. 2005) ..................................................39

*Teva v. Crawford,*
    410 F.3d 51 (D.C. Cir. 2005)...............................................................14

*Toledo Mack Sales & Serv. v. Mack Trucks, Inc.,*
    530 F.3d 204 (3d Cir. 2008).............................................11, 24, 26, 27

*U.S. v. Dentsply Int'l, Inc.,*
    399 F.3d 181 (3d Cir. 2005)................................................................16

*U.S. v. Studiengesellschaft Kohle,*
    675 F.2d 1341 (D.C. Cir. 1982) ..........................................................19

*United States ex rel. Spay v. CVS Caremark Corp.,*
    2013 U.S. Dist. LEXIS 58273 (E.D. Pa., Apr. 23, 2013) ......................................................31

*United States v. Borden Co.,*
    308 U.S. 188 (1939)..................................................................................................................26

*United States v. Brown Univ. in Providence in State of R.I.,*
    5 F.3d 658 (3d Cir. 1993) ...................................................................................................11, 18

*United States v. Kissel,*
    218 U.S. 601 (1910)..................................................................................................................26

*United States v. Line Material Co.,*
    333 U.S. 287 (1948)..................................................................................................................17

*United States* v. *New Wrinkle, Inc.,*
    342 U.S. 371 (1952)..............................................................................................................17, 19

*United States v. Sealy, Inc.,*
    388 U.S. 350 (1967)..................................................................................................................28

*United States v. Singer Manufacturing Co.,*
    374 U.S. 174 (1963)..................................................................................................................17

*United States v. U.S. Gypsum Co.,*
    333 U.S. 364 (1948)..................................................................................................................17

*Univac Dental Co. v. Dentsply Int'l, Inc.,*
    702 F. Supp. 2d 465 (M.D. Pa. 2010)......................................................................................25

*W. Penn Allegheny Health Sys. v. UPMC,*
    627 F.3d 85 (3d Cir. 2010).......................................................................................8, 24, 25, 27

*Waddell v. Small Tube Prods., Inc.,*
    799 F.2d 69 (3d Cir. 1986)........................................................................................................31

*Warren Gen. Hosp. v. Amgen, Inc.,*
    643 F.3d 77 (3d Cir. 2011)..........................................................................................................8

*Werner v. Werner,*
    267 F.3d 288 (3d Cir. 2001)........................................................................................................9

*White v. N.F.L.,*
    766 F. Supp. 2d 941 (D. Minn. 2011).......................................................................................13

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990)..................................................................................................................21

*Winfree v. N. Pac. Ry. Co.*,
    227 U.S. 296 (1913) ............................................................38

*Wyeth Holdings Corp. v. Sandoz, Inc.*,
    2012 WL 600715 (D. Del. Feb. 3, 2012) .....................................8

*Zenith Radio Corp. v. Hazeltine Research, Inc*,
    401 U.S. 321 (1971) ............................................................23

**STATUTES**

35 U.S.C. § 261 ...................................................................18, 19

Minn. Stat. §8.31 ....................................................................36

O.R.S. §646.780 .....................................................................37

O.R.S §646.725 ......................................................................37

R.I. Gen. Laws § 6-36-7(d) ........................................................38

R.I. Gen. Laws § 6-36-2 ............................................................38

R.I. Gen. Laws § 6-36-4 ............................................................38

R.I. Gen. Laws § 6-36-5 ............................................................38

R.I. Gen. Laws § 6-13.1-2 ..........................................................37

S.D. Codified Laws § 37-24-6(1) ..............................................38, 39

Utah Code Ann. §76-10-919(1)(a) ................................................39

Va. Code Ann. § 59.1-200(14) .....................................................39

**OTHER AUTHORITIES**

60 Am. Jur. 2d *Payment* § 30 (2013) ...........................................16

12 Areeda & Hovenkamp, Antitrust Law ¶ 2046 (3d ed. 2012) ...............19

III Areeda & Hovenkamp, Antitrust Law ¶ 65 (2d ed. 2002) ..................20

11 Herbert Hovenkamp, Antitrust Law ¶ 1909b (2d ed. 2005) .................11

1 W. Rubenstein, A. Conte & H. Newberg, *Newberg on Class Actions* § 2:3 (5th ed.
    2011) ..............................................................................36

Black's Law Dictionary (8th ed. 2004) ...........................................18

Black's Law Dictionary (9th ed. 2009)..............................................................................16

7AA Charles Alan Wright, et al., *Federal Practice and Procedure* § 1785.1 (3d ed. 2010) ........36

Julian O. von Kalinowski, Antitrust Laws and Trade Regulation § 162.02[2][d].......................28

*Restatement of Restitution* § 1, Comment (1937) .........................................................40

Fed. R. Civ. P. 12..............................................................................................8, 12

Fed. R. Civ. P. 23.........................................................................................34, 35, 36

*Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics*, June 2009 ............................................................15

## INTRODUCTION

Defendants[1] unlawfully colluded and kept less-expensive generic forms of the prescription drug Niapsan off the market for as much as eight years longer than would have occurred absent their illegal conduct.  Kos and its successors, the brand manufacturer, paid Barr and its successor, the generic manufacturer, for this delay.  The Supreme Court's decision in *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013), says this reverse payment requires antitrust scrutiny.

Defendants continuously violated the antitrust laws through March 2014, with Kos and its successors continuing to pay Barr and its successor to stay off of the market and Barr continuing to stall launching its generic product.  Plaintiffs, both direct purchasers and end-payors, paid overcharges of hundreds of millions of dollars.

Kos's payments to Barr for delay took two forms: cash and a reciprocal agreement not to compete for generic sales once Barr finally entered in 2013.  Kos's promise not to launch a competing generic product when Barr eventually did launch is a "payment" and subject to antitrust scrutiny.  Defendants cannot escape liability by pretending otherwise.

The Supreme Court's *Actavis* decision, echoing the Third Circuit's decision in *In re K-Dur Antitrust Litigation*,[2] is unequivocal that antitrust questions surrounding reverse payments can be decided "without forcing a court to conduct a detailed exploration of the patent's

---

[1] Defendants are Abbott Laboratories ("Abbott") and AbbVie Inc. ("AbbVie"), Barr Pharmaceuticals Inc. ("Barr") and Teva Pharmaceuticals USA, Inc., Teva Pharmaceuticals Industries, Ltd., Teva Women's Health, Inc. f/k/a Duramed Pharmaceuticals Inc., and Duramed Pharmaceuticals Sales Corp. (collectively "Teva").  While not a named defendant, Kos Pharmaceuticals, Inc. ("Kos") helped initiate the unlawful scheme at issue here and merged into Abbott in 2006.

[2] *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 218 (3d Cir. 2012) (internal quotations omitted), judgment vacated *sub nom.* on other grounds, *Upsher-Smith Labs., Inc. v. Louisiana Wholesale Drug Co., Inc.*, 133 S. Ct. 2849 (2013) and *Merck & Co., Inc. v. Louisiana Wholesale Drug Co., Inc.*, 133 S. Ct. 2849 (2013), reinstatement as to class certification granted, No. 10-2077, 2013 WL 5180857 (3d Cir. Sept. 9, 2013).

validity."[3]  Accordingly, Defendants also fall flat in their efforts to falsely complicate this action by arguing that this Court must re-litigate Kos's patent infringement suit with Barr.

Because Plaintiffs suffer injury and their claims for damages accrue each time they purchased brand Niaspan at an unlawful supracompetitive price, each purchase "starts the statutory period running again"[4] and Defendants' statute of limitations challenge fails.  In addition, Defendants actively continued their conspiracy through this year, including through continued sales of Niaspan at monopoly prices, additional payments by Kos and its successors to Barr and Teva, Abbott's filing and "settling" half a dozen additional patent suits against other would-be generic competitors, and Abbott and AbbVie's forbearance from competing against Teva for sales of generic extended-release niacin – conduct that did not cease until March 2014.  These continuing violations, along with Defendants' concealment of and misrepresentations about material terms of their reverse payment agreement, make Plaintiffs' allegations timely.  Defendants cannot stand on their deception to prevent purchasers from bringing suit.  And Defendants' remaining arrows – a defense of laches and assorted challenges to the end-payors' state law challenges – also fall well short of their targets.

Plaintiffs' allegations of Defendants' multi-year conspiracy more than exceed the plausibility standard required at this stage.  This Court should deny the motions to dismiss.

## FACTS

Niacin pills, a version of vitamin B3 used to help treat mixed lipid disorders and boost HDL ("good") cholesterol and lower LDL ("bad") cholesterol, have been used since the 1930s. Kos, and later Abbott and AbbVie, following various corporate mergers and restructuring, have

---

[3] *FTC v. Actavis, Inc.*, 133 S. Ct. 2222, 2226 (2013).

[4] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997).

sold extended-release niacin as a prescription drug under the brand name Niaspan since 1997. Although Kos could not patent the active ingredient in Niaspan (because niacin was not an innovative chemical compound), Kos obtained nine patents (purchasing two) to cover the formulation and methods-of-use for Niaspan.[5]

In October 2001, Barr, the first would-be generic competitor, filed an Abbreviated New Drug Application ("ANDA") with the U.S. Food and Drug Administration ("FDA"), seeking approval to market a generic equivalent of the 1000 mg dosage of Niaspan.  By filing the first ANDA, Barr hoped to secure the statutorily-mandated 180 days of market semi-exclusivity for the first generic manufacturer, free from competition from other ANDA-filers.[6]  Generic manufacturers typically make approximately 80% of their total income on a given generic product during the 180 day semi-exclusivity period; as such, this period is highly valuable.[7]

Three months later, Barr provided Kos with a Paragraph IV certification, a statutory requirement for ANDA approval, stating its extended-release niacin did not infringe any of Kos's patents or that the patents were invalid.  A Paragraph IV certification provides a brand company standing to sue for patent infringement and Kos sued Barr in March 2002.  By law, Kos's suit halted the FDA's ability to issue final approval of Barr's ANDA until the earlier of (i) the passage of thirty months (the "thirty month stay") or (ii) a court decision that the subject patents are invalid or not infringed by Barr's ANDA.  Barr later filed supplemental Paragraph IV

---

[5] Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint ("DPP Complaint") at ¶¶ 1, 59-64; End-Payor Plaintiffs' Consolidated Amended Class Action Complaint ("EPP Complaint") at ¶¶ 52, 54-55, 57.

[6] The statute provides only *semi*-exclusivity because during the 180 days, an "authorized generic" – a generic sold by the brand company itself – may also be sold.

[7] DPP Complaint at ¶¶ 46-47, 50, 67-68; EPP Complaint at ¶¶ 37, 60-61.

certifications for extended-release niacin and Kos ultimately filed five patent infringement suits against Barr.  These later filings extended the stay on FDA final approval until March 31, 2005.[8]

The FDA, however, did give Barr "tentative approval" for its 1000 mg extended-release niacin in May 2003 and for its 500 mg and 750 mg products in June 2003.  The FDA issues tentative approval when it determines an ANDA is otherwise ready for final approval but for the thirty month stay.[9]

The litigation between Kos and Barr, consolidated in the Southern District of New York, continued; on December 3, 2004, the court scheduled trial for January 2006.  As 2004 closed, Barr prepared to launch its generic before the patent litigation was over, awaiting only FDA approval once the thirty month stay expired.  Launching while patent litigation is ongoing is referred to as launching "at-risk" because the generic manufacturer risks infringement damages if the brand manufacturer later wins.  But Barr was confident of winning, expected final FDA approval, and began building inventory to fill expected orders for its generic upon launch.[10]

Kos, in response, prepared to launch an "authorized generic" version of Niaspan when Barr entered the market.  The 180 days of market semi-exclusivity for the first ANDA filer has one important caveat: the brand manufacturer is free to, and typically does, launch its own generic version of its own brand drug.  This authorized generic (or "AG") is the brand drug – manufactured the same way and sold under the brand name product's approval from the FDA – but sold and priced like a generic.  Launching an authorized generic during a generic manufacturer's 180 days of market exclusivity lets the brand company recoup some of the sales and profits it would otherwise lose to the generic competitor.  The authorized generic helps

---

[8] DPP Complaint at ¶¶ 44-45, 67-68, 70-78; EPP Complaint at ¶¶ 61-68.

[9] DPP Complaint at ¶¶ 45, 78; EPP Complaint at ¶ 68.

[10] DPP Complaint at ¶¶ 71-80, 86; EPP Complaint at ¶¶ 69-70, 73.

consumers by pushing down the generic price (because of the increased competition); generic companies hate them for this same reason and because AGs cut their sales in half.  Rather than capturing 100% of generic sales during the first 180 days, the generic manufacturer can expect only 50% of total generic sales, and at lower prices because of the increased competition. Consequently, a brand manufacturer's promise not to launch an authorized generic hands huge sums to the generic manufacturer - doubling its revenues - and more than enough to induce the generic manufacturer to delay its launch.[11]

In early 2005, Kos began manufacturing an authorized generic to sell once Barr launched at-risk.  But Niaspan constituted the bulk of Kos's revenue from 2001 through 2005 and Kos wanted to prevent generic competition for as long as possible.  On March 7, 2005, Kos sought a preliminary injunction to prohibit Barr from launching at-risk upon final FDA approval.  A few days later, before the court ruled but knowing Barr was ready to launch, Kos and Barr "settled" the patent litigation, foreclosing generic competition for Niaspan until September 2013.[12]

Under the agreement not to compete (the "Exclusion Payment Agreement"), Kos agreed to make continuing substantial unlawful payments to Barr until 2013 and to forgo launching an authorized generic to compete with Barr's generic product when Barr ultimately did come to market; in exchange, Barr unlawfully agreed to refrain from launching its generic until 2013.  On April 12, 2005, Kos and Barr reduced the Exclusion Payment Agreement to writing in three contracts: a settlement and licensing agreement, a co-promotion agreement, and a license and manufacturing agreement.[13]

Under the contracts, Kos agreed to:

---

[11] DPP Complaint at ¶¶ 48-50, 84; EPP Complaint at ¶¶ 45-48, 71-72.

[12] DPP Complaint at ¶¶ 84-85, 87, 89, 91; EPP Complaint at ¶¶ 58, 72-73, 75.

[13] DPP Complaint at ¶¶ 92, 94; EPP Complaint at ¶¶ 2, 76-77.

- Pay Barr, the alleged patent infringer, hundreds of millions in cash, primarily based on a percentage of overall sales of Niaspan;

- License its patents to Barr; and

- Abstain from launching authorized generic versions of Niaspan and Advicor (another Kos drug) and thus sacrifice substantial sales of the drugs.

Under the contracts, Barr agreed to:

- Delay launch of its generic extended-release niacin product until 2013;

- Stand by as a back-up supplier or manufacturer for Niaspan and Advicor; and

- Use its slight sales force to co-promote branded Niaspan and Advicor to a small segment of doctors specializing in women's health.[14]

Kos recognized the substantial likelihood that its patents would be invalidated or that Barr's generic would be found non-infringing. Barr's agreement to delay generic entry resulted not from the strength of Kos's patents but from the strength of Kos's wallet – its large and unjustified cash payments purportedly for minimal "services" and its forgoing launch of its own authorized generic. And because Barr kept its 180 days of exclusivity, Defendants created a "bottleneck" that significantly impaired the ability of any *other* generic extended-release niacin to enter the market during that time.[15]

Further, when Kos and Barr announced the Exclusion Payment Agreement, they concealed or misrepresented its material terms. First, Kos and Barr repeatedly asserted that the Exclusion Payment Agreement hastened, rather than delayed, generic entry. Second, they concealed the extent of the payments by Kos to Barr, thus masking whether the payments were large and unjustified.[16]

---

[14] DPP Complaint at ¶¶ 94-99, 103; EPP Complaint at ¶¶ 77, 82.

[15] DPP Complaint at ¶¶ 91, 100; EPP Complaint at ¶¶ 3, 75-76, 83-87, 97.

[16] DPP Complaint at ¶¶ 105-07; EPP Complaint at ¶¶ 87, 163.

Shortly after Kos and Barr entered the Exclusion Payment Agreement, the FDA granted final approval for Barr's generic extended-release niacin.  Barr had approval, had inventory, and would have been able to launch but for its agreement to delay the launch in exchange for large, unjustified payments by Kos.[17]

In late 2006, Abbott acquired Kos and continued paying Barr to delay launching its generic extended-release niacin.  In late 2008, Teva acquired Barr and continued the delay in exchange for Abbott's continued cash payments and promise not to launch a competing authorized generic.  Effective January 1, 2013, Abbott passed its Niaspan business to AbbVie, a spin-off company; AbbVie followed in Abbott's footsteps, continuing the unlawful payments.[18]

Following Abbott's acquisition of Kos, other potential generic competitors filed ANDAs seeking to sell generic extended-release niacin and served Paragraph IV certifications on Abbott that their products would not infringe Abbott's patents or that the patents were invalid.  In March 2009, Abbott continued the conspiracy by filing the first of its patent infringement actions against these other generic manufacturers, ultimately suing eight more manufacturers.  Between June 2012 and September 2013, Abbott settled seven of the eight actions, all before any substantive decisions.  The last action remains pending, again without any substantive decisions.  Abbott's settlements prevented any other generic from coming to market, (which would have triggered Barr/Teva's 180 day semi-exclusivity and thus its market entry)  and unlawfully protected Niaspan from generic competition.[19]

No generic entered the market until September 20, 2013, when Teva belatedly launched its generic.  Following Teva's launch, in yet another overt, unlawful act in furtherance of the

---

[17] DPP Complaint at ¶¶ 108-09; EPP Complaint at ¶¶ 73, 75, 80, 106-07.

[18] DPP Complaint at ¶¶ 110-17, 125-26; EPP Complaint at ¶¶ 2, 86, 88-89, 93-95.

[19] DPP Complaint at ¶¶ 118-24; EPP Complaint at ¶¶ 98-100.

conspiracy, Abbott and AbbVie withheld, rather than launched, an authorized generic version of Niaspan, continuing to adhere to Defendants' ongoing conspiracy and injuring purchasers. Without Defendants' adherence to the Exclusion Payment conspiracy, both a generic and an authorized generic extended-release niacin would have entered the market earlier, and Plaintiffs would have paid less.[20]

## LEGAL STANDARD

"[A] motion to dismiss [under Rule 12(b)(6)] may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility."[21]  *Twombly* "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element.'"[22]  And the Third Circuit warns that for antitrust cases, district courts are *not* to subject complaints "to heightened scrutiny."[23]

Any judicially noticed documents must also be viewed in the light most favorable to the plaintiffs.[24]  Courts may take judicial notice of documents beyond the complaint for only limited purposes – *e.g.*, as evidence that a party took a particular position or that a court made certain

---

[20] DPP Complaint at ¶¶ 127, 133-35; EPP Complaint at ¶¶ 2, 4-5, 104, 107-09, 129-33.

[21] *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).  A plaintiff's claim "is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Wyeth Holdings Corp. v. Sandoz, Inc.*, 2012 WL600715 at *3 (D. Del. February 3, 2012) (quoting *Iqbal*, 556 U.S. at 678).

[22] *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (citation omitted).

[23] *Id.*; *see also Jersey Asparagus Farms, Inc. v. Rutgers Univ.*, 803 F. Supp. 2d 295, 304 (D.N.J. 2011).

[24] *Melo-Sonics Corp. v. Cropp*, 342 F.2d 856, 858 (3d Cir. 1965).

findings – but "*not to prove the truth of their contents*."[25]  It is especially improper to rely on material outside the pleadings to "make a finding of fact that *controvert[s]* the plaintiff's own factual assertions set out in its complaint."[26]  Using outside documents "to find facts converts a motion to dismiss into a motion for summary judgment,"[27] something clearly premature here.[28]

## ARGUMENT

**A.**   **Plaintiffs allege that Kos and its successors provided large, unjustified, and unlawful payments to Barr and Teva to delay entry of generic competition.**

Plaintiffs allege Barr and Teva agreed to delay launching generic extended-release niacin for *eight* years in exchange for large, unjustified payments from Kos and its successors in two forms: cash and the highly lucrative promise not to launch an "authorized generic" when Barr finally did enter the market (the "No AG" clause).  Through these payments, Defendants shared the supracompetitive profits from Barr's agreement to delay marketing its generic Niaspan.   The cash payments alone were worth hundreds of millions to Barr; the No AG clause was worth hundreds of millions more.[29]

These allegations easily satisfy the Supreme Court's watershed decision in *FTC v. Actavis*, which held that a brand manufacturer's payment to the generic manufacturer in exchange for quitting its challenge to the patent – a "reverse payment"[30] – is "likely" unlawful

---

[25] *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis in original).  *See Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("Taking judicial notice of the truth of the contents of a filing from a related action could reach, and perhaps breach, the boundaries of proper judicial notice.").

[26] *Global Network Communs., Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (emphasis in original).

[27] *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004).

[28] Plaintiffs do not oppose the relief sought (judicial notice) in the Joint Motion for Judicial Notice in Support of Joint Motion to Dismiss but deeply disagree with Defendants' assertion that Plaintiffs must prove what the outcome of the underlying patent litigation would have been.

[29] DPP Complaint at ¶¶ 2, 7, 97(b), 103; EPP Complaint at ¶¶ 2, 86.

[30] In a typical patent infringement case, the alleged infringer pays the patent holder in settlement; in a "reverse payment" agreement (also called "pay for delay" or "exclusion" agreements) between brand and generic drug companies, the patent holder (here Kos) pays the alleged infringer (here Barr), exactly reverse the normal course.

and certainly subject to antitrust scrutiny under the rule of reason.[31]  The Court so held while specifically scrutinizing a brand manufacturer's payment of cash to its generic competitors ostensibly in exchange for (unnecessary) "co-promotion" services – one of the types of reverse payments alleged here.[32]  And the Court's analysis makes clear that other forms of payment, such as a No AG clause, warrant the same antitrust scrutiny.[33]

Defendants argue that the cash payments here were "fair value" for the co-promotion and other services that Barr purportedly provided, but *Actavis* rejected that exact argument, holding that whether the payments reflected fair value for services must be determined as part of the rule of reason analysis, and therefore "that possibility does not justify dismissing the … complaint."[34] Defendants also argue that the No AG clause escapes scrutiny because *Actavis* purportedly applies only to cash payments, but *Actavis* and a whole line of authority make abundantly clear that antitrust analysis rests not on the form a payment takes, but on its economic substance.[35]

### 1.    Plaintiffs allege Kos and its successors paid Barr and Teva in cash to improperly delay generic competition.

Plaintiffs allege that Kos and Barr entered into exactly the kind of reverse payment agreement that *Actavis* held is subject to scrutiny under the rule of reason.

### a.    Plaintiffs allege side deals not for fair value.

Collusion among competitors is "the supreme evil of antitrust."[36]  *Actavis* therefore held that a patent holder (such as Kos) may not "pay a competitor [such as Barr] to respect its patent

---

[31] *Actavis*, 133 S. Ct. at 2229, 2237-38.

[32] *Id*. at 2229, 2237-38.

[33] *Id*. at 2237.

[34] *Id*. at 2236 (writing that the defendant bears the burden to "explain [] the challenged term").

[35] *See, e.g., id*. at 2232-33.

[36] *Actavis*, 133 S. Ct. at 2233 (quoting *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (U.S. 2004)).

and quit its patent invalidity or noninfringement claim without any antitrust scrutiny[.]"[37]  Such an agreement can "unreasonably diminish competition in violation of the antitrust laws."[38]

A reverse payment has the "potential for genuine adverse effects on competition" because it "amounts to a purchase by the patentee of the exclusive right to sell its product."[39]  "[I]f the basic reason" for the brand manufacturer's payment to its generic competitor "is a desire to maintain and to share patent-generated monopoly profits, then, in absence of some other justification, the antitrust laws are likely to forbid the arrangement."[40]  The fact-dependent rule of reason test determines whether Defendants can offer cognizable, pro-competitive justifications for the payment that outweigh its anticompetitive effects.[41]  Such weighing is for the jury.[42]

Plaintiffs allege that Kos paid Barr hundreds of millions to delay generic Niaspan.[43]  As in *Actavis*, Defendants claim that part of that payment was for Barr's providing co-promotion

---

[37] *Id.* at 2233.

[38] *Id.* at 2227; *see also id.* at 2232 ("[T]his Court's precedents make clear that patent-related settlement agreements can sometimes violate the antitrust laws.").

[39] *Id.* at 2234 (citing *FTC v. Indiana Fed'n of Dentists*, 746 U.S. 447, 460-61 (1986)).

[40] *Id.* at 2236-37.

[41] *Id.* at 2236-37.

[42] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 316 n.12 (3d Cir. 2010) (citing *Ariz. v. Maricopa Co. Med. Soc'y*, 457 U.S. 332, 343 (1982) and 11 Herbert Hovenkamp, ANTITRUST LAW ¶ 1909b (2d ed. 2005) ("once the court decide[s] that the rule of reason should apply, disputed factual questions about reasonableness should be left to the jury.")); *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008) ("[w]hen conducting a rule of reason inquiry, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition") (reversing directed verdict for defendants); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) ("Application of the traditional 'rule of reason' requires that a factfinder look at the totality of the circumstances in order to determine whether a business combination constitutes an unreasonable restraint of trade"); *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 668 (3d Cir. 1993) ("The rule of reason requires the fact-finder to weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.") (quotation omitted).

[43] DPP Complaint at ¶¶ 2, 7, 93-94, 97-98, 103, 165; EPP Complaint at ¶¶ 2, 86.

services.[44]  As in *Actavis*, Plaintiffs allege that "those payments far exceeded the value of the promotion efforts that Barr provided."[45]  Indeed, the Co-Promotion Agreement required Kos to pay Barr royalties from the sale of Niaspan and Advicor even though Kos, not Barr, held the patents to these products.  The Agreement required Barr's marketing force to promote Niaspan to a small percentage of physicians, yet paid Barr a percentage of *total sales* of all Niaspan prescribed by *all physicians* in the United States.[46]

Similarly, Plaintiffs allege that Kos paid Barr via a License and Manufacturing Agreement to provide "standby" services – to be ready to supply Niaspan to Kos only if needed.[47]  Plaintiffs again allege that these payments "far exceeded the value that Barr provided by remaining ready to manufacture and supply Niaspan."[48]  Like the Co-Promotion Agreement, this was another way to disguise millions in payments intended to compensate Barr for delaying generic Niaspan.[49]  Indeed, all of Kos's periodic payments would stop if Barr launched its generic before September 20, 2013.[50]

### b.    Defendants improperly base their Rule 12 motion on denials of Plaintiffs' factual allegations.

Defendants insist that these payments were "fair value" for services that Barr purportedly rendered to Kos.  That simply contradicts Plaintiffs' factual allegations and defies *Actavis*, where the defendants similarly "described these payments as compensation for other services the

---

[44] DPP Complaint at ¶¶ 94, 97, 103, 113; EPP Complaint at ¶¶ 76, 77, 82, 86 (as in *Actavis*, the brand manufacturer paid the generic manufacturer not to compete and disguised the illegal agreement as a co-promotion agreement). *See Actavis*, 133 S. Ct. at 2229.

[45] DPP Complaint at ¶¶ 93, 94(b), 97, 113; EPP Complaint at ¶¶ 2, 82, 163.

[46] DPP Complaint at ¶¶ 94(b), 97; EPP Complaint at ¶¶ 77, 82, 86.

[47] DPP Complaint at ¶¶ 97, 103; EPP Complaint at ¶¶ 82, 86, 163.

[48] DPP Complaint at ¶ 97; EPP Complaint at ¶¶ 2, 82, 86.

[49] DPP Complaint at ¶ 97; EPP Complaint at ¶¶ 2, 82, 86.

[50] Settlement and License Agreement Sec. 10.

generics promised to perform."[51]  The Court noted that the FTC's complaint alleged the contrary – that the payments' "true point … was to compensate the generics for agreeing not to compete."[52]  Therefore "th[e] possibility [that the payments would ultimately be shown to be fair value for other services] does not justify dismissing the FTC's complaint."[53]  The same is true here: Plaintiffs specifically allege that the payments were *not* fair value for other services, and Defendants' mere denial "does not justify dismissing the … complaint."[54]

Nor can Defendants circumvent *Actavis* by suggesting that the Complaints fail to allege that the payments fell "outside the scope of the business judgment rule."[55]  *Actavis* expressly set the standard for judging whether payments ostensibly for other services can be justified under the rule of reason: whether they reflect "fair value" for those services.[56]

---

[51] *Actavis*, 133 S. Ct. at 2229.

[52] *Id.*

[53] *Id.* at 2236.

[54] *Actavis* puts the burden on Defendants to prove the payments were for fair value.  *See, e.g.*, *id*. at 2236 (referring to fair-value-for-services as a potential "redeeming virtue" or "justification" and noting that "[a]n antitrust defendant may show in the antitrust proceeding that legitimate justifications are present").  The Court need not resolve the burden-of-proof issue now, because the Complaints affirmatively allege that the payments do not reflect fair value for other services.

[55] Defs. Mem. at 27.

[56] *Actavis*, 133 S. Ct. at 2236.  The business judgment rule – which aims to insulate directors' business decisions from shareholder attack – would not apply to antitrust claims regardless. Defendants cite *Int'l Ins. Co. v. Johns,* 874 F.2d 1447, 1458 n.20 (11th Cir. 1989), but there the court acknowledged that the purpose of this rule is "to safeguard the corporate law policy that assures stockholders the right to vote directors out of office if they disagree with their decisions."  And in *Roselink Inv., L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 224 (S.D.N.Y. 2004), the rule was applied to creditors who "were informed of all the risks" and "were even afforded an opportunity to withdraw from their agreements…yet [] chose not to walk away." This is not an intra-corporate dispute between directors and shareholders as to the corporation's best interests; this is a dispute as to whether two would-be competing corporations unlawfully colluded at the expense of consumers. *See, e.g.*, *White v. N.F.L.*, 766 F. Supp. 2d 941, 949-50 (D. Minn. 2011) ("[t]he rationale for the business-judgment rule" did not apply because "unlike corporate directors and stockholders, whose interests generally align" the interests of plaintiffs (football players) and defendants (NFL owners) were "adversarial").

### 2. Plaintiffs also allege that Kos and its successors paid Barr and Teva via the No AG clause to improperly delay generic competition.

In addition to hundreds of millions in cash, Kos also paid Barr to delay entry by abandoning plans to launch and instead agreeing to withhold its "authorized generic" once Barr did enter.[57]  This pledge effectively doubled Barr's revenues during the 180 day period.

As the generic "first-filer," Barr was entitled under the Hatch-Waxman Act to a period of 180 days as the only *ANDA-based* generic Niaspan on the market.[58]  But that exclusivity did not prohibit Kos from marketing its *NDA-based* "authorized generic" Niaspan during that period.[59] Before Defendants entered their unlawful agreement, Kos was actively planning to launch an authorized generic to compete against Barr's generic.[60]  Kos's (or its successor's) entry with an authorized generic would have halved Barr's sales of generic Niaspan or more and driven the generic price down, costing Barr/Teva hundreds of millions in profits and delivering commensurate savings to consumers.[61]  Kos's No AG pledge has the same economic effect as a

---

[57] DPP Complaint at ¶¶ 7, 90-91, 93-94, 98; EPP Complaint at ¶¶ 2, 4, 5, 76-77, 82-83, 89.

[58] *See* Facts at 3.

[59] *See* Facts at 3, 4.  *See Teva v. Crawford*, 410 F.3d 51 (D.C. Cir. 2005); *Mylan v. FDA*, 454 F.3d 270 (4th Cir. 2006).  These cases affirmed a decision by the FDA rejecting citizen petitions filed by two generic drug companies (Teva and Mylan) seeking to bar launch of AGs.  *See* FDA Response to Mylan and Teva's Citizens' Petitions, FDA Docket Nos. 2004P-0075/CPI & 2004P-0261/CPI (July 2, 2004), available at http://www regulations.gov/#!documentDetail;D=FDA-2004-P-0400-0003.  Brand manufacturers challenged the petitions, arguing that blocking AGs is anticompetitive.  *See, e.g.*, Comment of Pfizer, Docket No. 2004P-0261, at 6-7, 3 (June 23, 2004), available at http://www fda.gov/ohrms/dockets/dailys/04/June04/062904/062904 htm#04P0261 ("Teva's petition [to prevent launch of an AG] is a flagrant effort to stifle price competition – to Teva's benefit and the public's detriment" and would be "directly contrary to one of the central goals of Hatch Waxman – to promote price competition in prescription drugs"); Comment of Johnson & Johnson, FDA Docket No. 2004P-0075, at 1-2 (May 11, 2004), available at http://www.fda.gov/ohrms/dockets/dailys/04/June04/060404/04p-0075-c00002-vol1.pdf (blocking AGs would be "anticompetitive" and "contrary to the public interest.").

[60] DPP Complaint at ¶¶ 84, 94, 97; EPP Complaint at ¶¶ 72,107, 130.  Kos had manufactured launch quantities and was ready to launch after Barr entered the market.  DPP Complaint at ¶ 84; EPP Complaint at ¶ 72.  After entering the agreements, Kos destroyed its authorized generic supply.  DPP Complaint at ¶ 109; EPP Complaint at ¶ 81.

[61] Brand industry group PhRMA sponsored a study that concludes an authorized generic causes generic prices to be about 16% lower as compared to when there is no authorized generic.  IMS Consulting, Assessment of Authorized Generics in the U.S., Spring 2006, available at http://208.106.226.207/downloads/IMSAuthorizedGenericsReport_6-22-06.pdf.

cash payment: compensating Barr to delay entry, at consumers' expense.  As explained by the

then-Chairman of the FTC:

> Because the impact of an authorized generic on first-filer revenue is so sizable,
> the ability to promise not to launch an AG is a huge bargaining chip the brand
> company can use in settlement negotiations with a first-filer generic. It used to be
> that a brand might say to a generic, "if you go away for several years, I'll give
> you $200 million." Now, the brand might say to the generic, "if I launch an AG,
> you will be penalized $200 million, so why don't you go away for a few years and
> I won't launch an AG."[62]

Defendants' reciprocal pledges not to compete harmed consumers twice over.  Barr's

pledge not to enter the market before September 2013 transformed that time from a period of at

least two-supplier – and likely three-supplier – rivalry (the brand, Barr's generic, and Kos's AG)

into a period with just one seller; Kos's pledge not to launch an AG during Barr's 180 day

exclusivity transformed the six months after Barr entered from a period of at least three-supplier

rivalry (the brand, Barr's generic, and Kos's AG) into a duopoly.[63]   Barr delayed entering in

---

[62] *Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics*, June 2009, http://www.ftc.gov/os/2009/06/P062105authgenstatementLeibowitz.pdf.  See FTC, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact (2011) at vi, available at http://www.ftc.gov/reports/authorized-generic-drugs-short-term-effects-long-term-impact-report-federal-trade-commission ("There is strong evidence that agreements not to compete with an authorized generic have become a way for brand-name companies to compensate generic competitors for delaying entry…. Because the first-filer's revenues will approximately double absent an authorized generic, its revenue will be much larger by agreeing to delay than if it litigated, won, and faced AG competition.  The generic firm benefits from greater profits during its 180-day exclusivity; the brand-name firm benefits from later generic entry; but consumers suffer from delay of generic competition.").  The FTC recently filed a brief as *amicus curiae* in another reverse payment drug case stating that: (1) *Actavis* does not require payments to be in cash and (2) no AG agreements are a form of unlawful payment.  *See In re Effexor Antitrust Litig.*, No. 11-cv-05479, Doc. No. 236 (D.N.J.) (the "FTC *Effexor* Amicus Brief"), *available at* http://www.ftc.gov/sites/default/files/documents/amicus_briefs/re-effexor-xr-antitrust-litigation/130816effexoramicusbrief.pdf.  The FTC points out that no AG agreements "raise the same type of antitrust concern that the Supreme Court identified in *Actavis*" and have the same "potential for genuine adverse effects on competition."  *See* FTC *Effexor* Amicus Brief, at 2, 15-16.

[63] DPP Complaint at ¶¶ 50, 57, 100-01, 103; EPP Complaint at ¶¶ 2, 44, 48, 77.

exchange for Kos's restraining competition once Barr finally did enter.[64]  These reciprocal non-compete promises were worth millions to Barr, all at the expense of consumers.[65]

Defendants' reasoning would make any non-cash consideration *per se* lawful but *Actavis* rejected such antitrust immunity and does not limit the form of a suspect "payment" to cash. Instead, a payment is anything of value to the generic that can induce it to "give up the patent fight."[66]  The Court addressed the FTC's "alleg[ation] that, *in substance*, the plaintiff agreed to pay the defendants many millions of dollars."[67]  By inducing the generic to stop challenging the patent, "the payment ... likely seeks to prevent the risk of competition," and "that consequence constitutes the relevant anticompetitive harm."[68]

Of course, *Actavis* does not condemn the patent litigants' compromising on something the generic could have obtained by winning the patent case – entry into the market or damages from a counterclaim.[69]  But giving the generic something of value that it *could not have obtained even by winning the patent case* "is unusual" and can "have significant adverse effects on

---

[64] DPP Complaint at ¶¶ 91, 93, 97, 100, 103, 116, 133, 186; EPP Complaint at ¶¶ 3, 4, 75-77, 84, 86-87, 96-97, 129.

[65] DPP Complaint at ¶¶ 2, 7, 12, 97, 103; EPP Complaint at ¶¶ 2, 75, 82, 86.

[66]  *Actavis*, 133 S. Ct. at 2233.  *See generally* Black's Law Dictionary (9th ed. 2009) (defining "payment" as the "[p]erformance of an obligation by the delivery of money *or some other valuable thing* accepted in partial or full discharge of the obligation") (all emphases added unless stated otherwise); 60 Am. Jur. 2d *Payment* § 30 (2013) ("A payment can refer to a transfer of something of value *other than money*[.]").

[67] *Actavis*, 133 S. Ct. at 2231.  *See U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189 (3d Cir. 2005) ("The Supreme Court on more than one occasion has emphasized that economic realities rather than a formalistic approach must govern review of antitrust activity.").  The Supreme Court has rejected a "form over substance" approach to antitrust law generally.  *See, e.g., Am. Needle, Inc.* v. *N.F.L.*, 560 U.S. 183, 191 (2010) ("we have eschewed ... formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate.").

[68] *Actavis*, 133 S. Ct. at 2236.

[69] *Id.* at 2233, 2237.

16

competition."[70]  Even by winning the patent case, Barr could not have prevented Kos from

launching an authorized generic: the No AG clause was a suspect "payment" under *Actavis*.

    Three district courts and the FTC have concluded that a No AG pledge requires antitrust

scrutiny under *Actavis*.[71]  Indeed, *Actavis* relies on cases involving *non-cash* payments under

which a patentee's misconduct is subject to antitrust scrutiny.[72]  Immunizing this form of

payment from antitrust scrutiny would simply encourage brand and generic manufacturers to

engage in "'a sophisticated version of three-drug monte' designed to evade antitrust scrutiny."[73]

    Defendants cite the *Lamictal Direct Purchaser Antitrust Litigation*[74] decision but

(respectfully), that court got it wrong.  There, the court concluded that the No AG clause was *per*

---

[70] *Id.* at 2231.

[71] *In re Lipitor Antitrust Litig.*, 2014 WL 282755 (D.N.J. Sept. 5, 2013) ("[N]othing in *Actavis* strictly requires that the payment be in the form of money"); *In re Wellbutrin XL Antitrust Litig.*, 08-cv-02431 Doc. No. 534 (E.D. Pa. Jan. 17, 2014) (McLaughlin, J.) ("The Court is not prepared at this point to accept [defendant's] argument that only a large cash payment from the patentee to the generic is subject to antitrust analysis under Actavis."); *In re Nexium Lit..*, 968 F. Supp. 2d 367, 376 (D. Mass. 2013) ("[n]owhere in *Actavis* did the Supreme Court explicitly require some sort of monetary transaction to take place for an agreement between a brand and generic manufacturer to constitute a reverse payment.").  *See supra* n.61.

[72] *Actavis* cites *United States v. Line Material Co.*, 333 U.S. 287 (1948), which involved no cash payment; the accused misconduct was cross-licensing agreements.  *Actavis,* 133 S. Ct. at 2232.  *Actavis* also cites *United States v. Singer Manufacturing Co.*, 374 U.S. 174, 189 (1963), where the misconduct included several sewing machine companies making non-cash agreements to achieve anticompetitive results.  *Actavis,* 133 S. Ct. at 2225.  The three other cited cases follow this pattern.  *United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948), did not involve a cash payment.  *See also United States* v. *New Wrinkle, Inc.,* 342 U.S. 371, 378 (1952) ("patent license contracts which are a part of a plan to restrain commerce" have "no protection from the prohibitions of the Sherman Act... when the licenses are used, as here, in the scheme to restrain"); *Standard Oil v. U.S.,* 283 U.S. 163, 175 (1931) (where control was allegedly exerted by means of cross-licensing agreements and division of royalties, it was necessary for the court to "examine the evidence to ascertain the operation and effect of the challenged contracts").  While the latter of these examples includes a financial exchange, it does not include an upfront cash payment.

[73] FTC *Effexor* Amicus Brief, at 18 (citation omitted).

[74] 2012 WL 6725580 (D.N.J. Dec. 6, 2012); 2014 WL 282755 (D.N.J. Jan. 24, 2014), appeal docketed, No. 14-11243 (3d Cir. Jan. 30, 2014).  The *Lamictal* court originally dismissed the complaint on December 6, 2012.  *See Lamictal*, 2012 WL 6725580, at *8.  Plaintiffs appealed and the Third Circuit remanded the case to the district court in light of *Actavis*.  *See Lamictal*, 2014 WL 282755, at *1 (D.N.J. Jan. 24, 2014).  The *Lamictal* court's second opinion is on appeal to the Third Circuit.  *See King Drug Co. of Florence v. Smithkline Beecham Corp.*, No. 14-1243 (3d Cir. filed Jan. 30, 2014).  Among others, the FTC, National Association of Chain Drug Stores, Inc., the American Antitrust Institute, and the Attorneys General of 28 states have filed *amicus curiae* briefs in support of the plaintiffs, urging reversal of the district court's decision holding that a no AG clause is not a payment because it is not cash. *In re Lamictal Direct Purchaser Antitrust Litig.*, No. 14-1243, FTC, ECF No. 45; National Association of

*se* lawful, seemingly resurrecting the "scope of the patent" test that *Actavis* rejected and wrongly invading the province of the factfinder.[75]

Defendants also label the No AG clause an "exclusive license," as if a label could confer antitrust immunity.  It cannot.  First, the clause is not an exclusive license because in such a license "even the patentee [here, Kos] is prohibited from practicing the art disclosed by the patent."[76]  But Kos is not prohibited from selling Niaspan and instead continues to do so.  Second, Kos did not merely grant a "license" to Barr; Kos granted the "license" *in exchange for Barr agreeing to delay marketing* its generic Niaspan.  The question is not, as Defendants would have it, whether it was unlawful for Kos to grant an exclusive license to Barr;[77] the question is

---

Chain Drug Stores, Inc., ECF No. 34;  American Antitrust Institute, ECF No. 38; State Attorneys General, ECF No. 36;  (3d Cir. April 25 & 28, 2014).

[75] *See Lamictal*, 2014 WL 282755, at *11 ("It follows then that the settlement would survive *Actavis* scrutiny and is reasonable.").

[76] *Barnett v. Strom*, 265 F. Supp. 2d 946, 949 (N.D. Ill. 2003) ("one of the most basic fundamentals of patent law and practice [is that w]hen a patentee has granted an exclusive license, even the patentee is prohibited from practicing the art disclosed by the patent.") (citation omitted);  *see also* Black's Law Dictionary (8th ed. 2004) ("exclusive license" is "a license that gives the licensee the sole right to perform the licensed act").  Under the No AG clause here, Kos did not agree to refrain from selling brand Niaspan. DPP Complaint at ¶¶ 91, 93, 94, 97; EPP Complaint at ¶¶ 2, 4, 5, 77, 82, 86.

[77] None of the cases Defendants cite involves patent settlements or reverse payment claims.  Moreover, these cases recognize the potential for anticompetitive effects flowing from an exclusive license, and distinguish the licenses at issue accordingly.  *Rail-Trailer v. ACF Indus., Inc.*, 358 F.2d 15 (7th Cir. 1966) stands for the proposition that "[t]he exclusive license, *by itself*, does not constitute an illegal restraint under the antitrust laws."  *Levi Case Co. v. ATS Prods., Inc.* 788 F. Supp. 428, 432 (N.D. Cal. 1992).  Moreover, *Rail-Trailer* has not generally been held to confer immunity to exclusive licenses.  *See Smith Int'l, Inc. v. Kennametal, Inc.*, 1987 U.S. Dist. LEXIS 7087 (N.D. Ohio Jan. 7, 1987) (upholding Section 1 restraint of trade counterclaim arising from exclusive license, despite *Rail-Trailer*); *Smith Int'l, Inc. v. Kennametal, Inc.*, 621 F. Supp. 79, 84, 90 (N.D. Ohio 1985) (rule of reason applied to antitrust counterclaim arising from exclusive license; rejecting patentee's arguments that 35 U.S.C. § 261 and *Rail-Trailer* compelled dismissal).  In fact, a later panel of the Seventh Circuit specifically held that exclusive licenses are not immunized under the antitrust laws but are instead subjected to analysis under the rule of reason, without so much as mentioning *Rail-Trailer*, suggesting that the meaning Defendants purport to attach to *Rail-Trailer* is simply incorrect.  *See Moraine Prods. V. ICI America, Inc.*, 538 F.2d 134, 143 (7th Cir. 1976) ("we are not aware of any language specifically creating a theory of unswerving supremacy of patent law over antitrust law nor establishing in a patent licensing situation an absolute immunity from antitrust law.  . . .  The bare language of § 261 does allow a patentee or his assignee to grant an exclusive license to make, use, or sell the patented invention. But the statutory language must be construed in connection with antitrust law").  And in *Benger Labs. v. R.K. Laros Co.*, the court noted that (unlike here) the exclusive license at issue did not amount to an unlawful monopoly because "there is no actual competition between the plaintiff and the licensees and there is no evidence whatever of any prospect that there

whether Kos could grant that "license" – or anything else of value – in exchange for delaying

generic entry.  The answer is no.[78]  Nothing in the Patent Act authorizes the kind of "license" at

issue here, nor the kind of No-AG-for-delay exchange alleged here.[79]  Rather, patent licenses,

including true exclusive ones, are subject to antitrust scrutiny under the rule of reason.[80]  The

Third Circuit has long recognized that "[w]here the license restriction results primarily in

benefits for the licensees rather than the patentee, the anticompetitive restriction cannot be

justified as a subsidy for the patentee's inventive activity.  In such cases, there is no sound reason

to immunize the patentee's conduct from antitrust scrutiny."[81]  Indeed, *Actavis* reviewed a litany

of cases where such licenses were held to be illegal.[82]

## B.    Plaintiffs properly allege Defendants caused antitrust injury.

Defendants argue that the Complaints lack sufficient allegations of causation.  First,

Defendants cannot ask the Court to decide this disputed issue of fact on a motion to dismiss.[83]

---

ever would be."  209 F. Supp. 639, 648 (E.D. Pa.1962).  *U.S. v. Studiengesellschaft Kohle*, 675 F.2d 1341 (D.C. Cir. 1982), involved an appeal of a jury verdict and applied the "scope of the patent test" which was expressly rejected by *Actavis*.  *Morrow v. Microsoft* is not on point, as it was a decision reversing a grant of summary judgment on a question of standing.  499 F.3d 1332, 1339-40 (Fed. Cir. 2007).  Finally, Defendants cite *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 538 (E.D.N.Y. 2005) but while the case involved a reverse-payment claim, the court applied the "scope of the patent test" which *Actavis* flatly rejected.  In addition, *In re Ciprofloxacin* denounced agreements which "create a bottleneck that indefinitely excludes subsequent generic challengers[,]" and Plaintiffs allege that the Kos-Barr agreements created such a bottleneck.  *Id.* at 527.  *See also* DPP Complaint at ¶¶ 100, 101; EPP Complaint at ¶¶ 96-98.

[78] Even if the No AG clause were an exclusive license – which it is not – courts have held that such licenses are not immune from antitrust scrutiny and can, and often do, violate the Sherman Act.  Patent licenses that are a part of a plan to restrain commerce are illegal: "Patents give no protection from the prohibitions of the Sherman Act … when the licenses are used, as here, in the scheme to restrain."  *See New Wrinkle*, 342 U.S. at 378.  *See also* 12 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2046 at 330 (3d ed. 2012) ("the Patent Act expressly permits exclusive licenses, but this fact alone does not render them immune from antitrust scrutiny").

[79] *See* 35 U.S.C. § 261.

[80] *New Wrinkle*, 342 U.S. at 377.

[81] *Mannington Mills, Inc. v. Congoleum Indus., Inc.*, 610 F.2d 1059, 1071 (3d Cir. 1979).  The No AG clause benefits Barr – the licensee – by shielding it from competition for generic sales.

[82] *See Actavis*, 133 S. Ct. at 2231-33.

[83] *Exxon Co., USA v. Sofec, Inc.,* 517 U.S. 830, 840-41 (1996) ("[t]he issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review"); *King Drug Co. of*

19

Second, on causation questions in antitrust cases, "the defendant must bear the risk of the

ignorance created by its own misconduct."[84]  "No government seriously concerned about the evil

of monopoly" would deem causation too speculative when the defendant's own conduct caused

the uncertainty.[85]

Nor is it true that, absent the unlawful agreement, "[generic] competition would have

been prohibited by law."[86]  Three potential paths to *lawful* generic entry existed: (1) Barr could

have entered as "at-risk" but perfectly lawful competition;[87] (2) Barr could have won the patent

litigation;[88] or (3) Barr and Kos could have settled the patent case lawfully – without a reverse

---

*Florence, Inc. v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 537 (E.D. Pa. 2010) (denying motion to dismiss in pay-for-delay case despite similar "causation" argument); *In re K-Dur*, 338 F. Supp. 2d 517, 535 (D.N.J. 2004) ("[a]ccepting the facts alleged by Plaintiffs as true and drawing all reasonable inferences in the light most favorable to Plaintiffs, this Court finds that a reasonable trier of fact could conclude that but for the allegedly anti-competitive agreements, generic drugs may have entered the market sooner").

[84] III Areeda & Hovenkamp, Antitrust Law ¶ 65 (2d ed. 2002).

[85] *Id.*

[86] Def. Mem. at 28.

[87] Absent a preliminary injunction, an accused infringer has a "right to compete."  *See, e.g., Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 684 (Fed. Cir. 1990).  Accordingly, courts have consistently held that plaintiffs establish "antitrust injury" by alleging that the generic manufacturer would have launched at risk.  *See, e.g., In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 911 (6th Cir. 2003) (finding antitrust injury because "a trier of fact may well find that the [brand's] $89 million payment *renders incredible* the defendants' claim that [the generic] would have refrained from marketing [during the patent litigation] simply because of its fear of infringement damages"); *Andrx Pharm. Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 813 (D.C. Cir. 2001) (reversing dismissal based on antitrust injury, because "HMRI's $10 million quarterly payments were presumably in return for something that Andrx would not otherwise do, that is, delay marketing of its generic"); *In re Nexium*, 968 F. Supp. 2d at 389 (reverse payment action including at-risk launch theory of damages); *In re Lipitor*, 2013 WL 4780496, at *23-24 (Sept. 5, 2013) (same); *In re Ciprofloxacin*, 261 F. Supp. 2d 188, 202-04 (E.D.N.Y. 2003) (damages may be premised on an at-risk launch in part because "unlicensed market entry is 'infringing' only if the patent holder ultimately prevails," and Barr "accept[ed] cash in exchange for an agreement to halt the process by which a court would make such a determination").

[88] Defendants say that *Whitmore v. Arkansas*, 495 U.S. 149 (1990), prohibits plaintiffs from proving who would have won the patent case. Defs. Mem. at 30; Defendants' Motion for Judicial Notice in Support of Joint Motion to Dismiss the Consolidated Amended Complaints, *In re: Niaspan Antitrust Litigation*, 13-MD-2460, (E.D. Pa. March 17, 2014) (D.I. 68) at 3 ("Plaintiffs' theory of antitrust injury turns on whether Barr would have been prevented by law from marketing its generic…").  But *Whitmore* did not hold as a matter of law that proving the outcome of a litigation is too speculative; it held only that the plaintiff there "provide[d] no *factual* basis for us to conclude" who would have won.  495 U.S. at 157.  Once a plaintiff has proven *liability*, she is free to prove *causation* by proving, if necessary, who would have won a lawsuit.  *See, e.g., ConMed Corp. v. Larson & Taylor*, 49 Fed. Appx. 455 (4th Cir. 2002) (deciding how, but for attorney's error, Federal Circuit would have decided infringement lawsuit); *Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 120 (2d Cir. 2002) ("[i]n legal malpractice actions, courts are frequently required

payment – with an agreement permitting Barr's entry long before September 2013.[89]  The

Complaints support all three of these possible entry scenarios.[90]

## C.       Statutes of limitations do not bar Plaintiffs' claims.

"Because '[a] statute of limitations defense is an affirmative one,' [a defendant] must

show that it is clear from the face of the complaint that [a plaintiff]'s action is time-barred to

justify dismissal at this stage."[91]  A claim can be dismissed on this ground only if it is "beyond

doubt that the complaint, on its face" shows that the claim is time-barred.[92]  Defendants cannot

lift that heavy burden here.

---

to value lost claims"); *Helmbrecht v. St. Paul Ins. Co.*, 362 N.W.2d 118, 126 (Wis. 1985) (plaintiff permitted to recreate outcome of prior litigation to establish malpractice damages).  In any event, *Actavis* held the merits of the patent suit irrelevant to whether a reverse payment is lawful.  *Actavis*, 133 S. Ct. at 2236 ("[I]t is normally not necessary to litigate patent validity to answer the antitrust question." That is, "[a]n unexplained large reverse payment… suggests that the payment's objective is to maintain supracompetitive prices.") To the extent it is even necessary to consider the underlying merits, "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of the validity of the patent itself." *Id.* at 2236-37.

[89] Legal malpractice cases are again instructive: *Gunn v. Minton*, 133 S. Ct. 1059, 1065 (2013) ("In cases like this one, in which the attorney's alleged error came in failing to make a particular argument, the causation element requires a 'case within a case' analysis of whether, had the argument been made, the outcome of the earlier litigation would have been different.") (citations omitted); *Dixon Ticonderoga Co. v. Estate of O'Connor*, 248 F.3d 151, 175 n.15 (3d Cir. 2001) (legal malpractice case involved "a straightforward example of the case-within-a-case phenomenon that often arises in professional malpractice litigation").  *See Actavis*, 133 S. Ct. at 2237 ("[The patent litigants] may, as in other industries, settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point.").  In *In re Ciprofloxacin*, the court denied the defendants' motion to dismiss because it found that one of the plaintiffs' causation theories – licensed entry – was not unduly speculative.  261 F. Supp. 2d at 209-10.

[90] *See* DPP Complaint at, *e.g.*, ¶¶ 80-88, 92, 98, 101, 145; EPP Complaint at, e.g., ¶¶ 61, 75, 84, 107-08, 129.

[91] *Shahid v. Bor. of Eddystone*, 2011 WL 4573521, at *2 (E.D. Pa. Oct. 3, 2011) (quoting *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 400, n.14 (3d Cir. 2006)).  *See Rycoline Prods. v. C & W Unlimited*, 109 F. 3d 883, 886 (3d Cir. 1997) (internal quotation omitted); *Hayward v. Bor. of Sharon Hill*, 2013 WL 5777293, at *2 (E.D. Pa. Oct. 24, 2013) (motion to dismiss based on statute of limitations can only be granted when "the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading") (internal quotation omitted).

[92] *Busche v. Monaco Coach Corp*., 2006 WL 3302477, at *1 (E.D. Pa. Nov. 13, 2006); *see also Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673, 686 (E.D. Pa. 2011) ("The 'Third Circuit Rule' requires that it be clear, from the face of the Complaint, that the claim is barred by the statute of limitation").

### 1.     The continuing violation doctrine applies.[93]

Under the "continuing violation" rule, an antitrust purchaser plaintiff may assert claims for all overcharge damages incurring within the limitations period regardless of whether the defendant's anticompetitive conduct occurred earlier.  Plaintiffs describe numerous acts undertaken by Defendants that continued their multiyear anticompetitive scheme and conspiracy at least through the beginning of 2014, and Plaintiffs suffered injury – and a cause of action accrued – each time they purchased Niaspan at an inflated price.[94]

In *Hanover Shoe, Inc. v. United Shoe Machinery Corporation*, defendant refused to sell equipment it instead leased to the plaintiff, who sued in 1955, seeking overcharge damages.[95] Defendant contended that the statute of limitations started to run when it initiated its lease-only policy in 1912 and had lapsed before 1955; the Supreme Court disagreed, holding the defendant's conduct "constituted a continuing violation of the Sherman Act and … inflicted continuing and accumulating harm" (*i.e.*, overcharges) on the plaintiff.[96]  Although the plaintiff

---

[93] Plaintiffs' claims are timely even under the "basic accrual" rule, which provides that antitrust claims first accrue when the defendant's unlawful conduct first injures the plaintiff.  *Harold Friedman Inc. v. Thorofare Markets Inc.*, 587 F.2d 127, 137 (3d Cir. 1978).  Simply put, "two events must occur in order *to begin the running of the limitations period: the act and the injury.*"  *Marcus Corp. v. Am. Express Co.,* 2005 WL 1560484, at *2 (S.D.N.Y. July 5, 2005).  Though the continuing violation doctrine applies, even under Defendants' argument, no claim could first accrue until a generic would have entered, and that is a jury question.  Although Barr was ready in 2005 to launch its generic, and Kos was ready to launch an AG, the jury could conclude, for example, that Defendants would have settled the patent case lawfully, with a payment-free agreement that allowed Barr to enter the market in, for example, 2010.  The Complaints therefore allege in the alternative that "but for the substantial payments Kos made to Barr, Kos and Barr would have settled their patent litigation with an agreement that provided for Barr to enter with generic Niaspan far earlier than September 20, 2013, on a date to be proven at trial."  EPP Complaint at ¶ 108. *See* DPP Complaint at ¶ 101.  Accordingly, Defendants cannot achieve dismissal on this affirmative defense based on the pleadings.

[94] DPP Complaint at, *e.g.*, ¶¶ 91, 94, 99, 101, 103, 111, 115, 125, 127, 131, 135, 137, 172, 174-75; EPP Complaint at, *e.g.*, ¶¶ 77, 82, 86, 89, 93, 96-101, 104, 106-09, 129-33, 140-45, 166, 168.

[95] 392 U.S. 481, 502 (1968).

[96] *Id.* at 502 n.15.

"could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in

1955."[97]

   As the Supreme Court explained in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, "[i]n

the context of a continuing conspiracy to violate the antitrust laws … each time a plaintiff is

injured by an act of the defendants a cause of action accrues to him and … as to those damages,

the statute of limitations runs from the commission of the act."[98]  And as the Supreme Court

stated in *Klehr v. A.O. Smith Corporation*,

> in the case of a "continuing violation," say a price-fixing conspiracy that brings
> about a series of unlawfully high priced sales over a period of years, "each overt
> act that is part of the violation and that injures the plaintiff," e.g., *each sale to the
> plaintiff*, "starts the statutory period running again, regardless of the plaintiff's
> knowledge of the illegality at much earlier times."[99]

   These principles apply here fully; Plaintiffs are suing as purchasers, not competitors,[100]

and a new claim accrued to them each time they purchased Niaspan at a supracompetitive

---

[97] *Id.*

[98] *Zenith Radio Corp.*, 401 U.S. 321, 338 (1971).  *See also Cont'l-Wirt Elec. Corp. v. Lancaster Glass Corp.*, 459 F.2d 768, 770 (3d Cir. 1972) ("in the context of a continuing conspiracy to violate the antitrust laws, each time a plaintiff is injured by the act of the defendant, a cause of action accrues to him to recover damages caused by that act"); *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 316 F. Supp. 2d 186, 204 (E.D. Pa. 2004), *aff'd*, 423 F.3d 374 (3d Cir. 2005) (same); *Nyce v. Sterling Credit Corp.*, 2013WL 1388051, at *2 (E.D. Pa. April 2, 2013) (DuBois, J.) (when a defendant's conduct is part of a continuing practice, "an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred") (citations omitted).

[99] *Klehr*, 521 U.S. 179, 190 (1997) (quotations and citations omitted).  *See, e.g.*, *In re Linerboard Antitrust Litig.*, 2000 WL 1475559, at *6 (E.D. Pa. 2000) (quoting *Klehr*); *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) ("[E]ach time a customer purchases that product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues…. As a cause of action accrues with each sale, the statute of limitations begins to run anew.") (citations omitted); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979); *Imperial Point Colonnades Condo. Inc., v. Mangurian*, 549 F.2d 1029, 1043-44 (5th Cir. 1977); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 2181185 (E.D. Tenn. May 20, 2013); *Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 263-64 (E.D.N.Y. 2010); *In re Aspartame Antitrust Litig.*, 2007 WL 5215231, at *3 (E.D. Pa. Jan. 18, 2007); *Meijer, Inc. v. 3M*, 2005 WL 1660188, at *4 (E.D. Pa. July 13, 2005); *In re K-Dur*, 338 F. Supp. at 551; *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 380 (S.D.N.Y. 2002).

[100] *See Molecular Diagnostics Labs. v. Hoffman-La Roche Inc.*,  402 F. Supp. 2d  276, 286 (D.D.C. 2005) ("That [plaintiff] is litigating this action as a purchaser, not a competitor, is a critical distinction . . . . Because [plaintiff] is a purchaser, not a competitor, each time [plaintiff] was allegedly forced to pay a supra-competitive price as a result of [defendants'] anticompetitive conduct, a separate injury accrued") (citation omitted). Defendants' attempt to rely on

price.[101]  And they accrue anew on each purchase.  Putting aside the issue of fraudulent

concealment, addressed below, direct purchaser plaintiffs – at a minimum – may recover for all

overcharges on purchases made during the four years before the filing of the first complaint on

April 5, 2013.[102]  The same is true for end-payors, who may recover all damages within the

applicable limitations periods for their causes of action – ranging from three to six years – prior

to their initial April 3, 2013 filing.[103]

Plaintiffs allege that Defendants engaged in a continuing conspiracy and a continuing

violation of the antitrust laws that caused "continuing and accumulating harm" well into the

limitations period.  In addition to inflicting overcharges (an overt act under *Klehr*), Defendants

committed numerous additional overt acts in furtherance of their conspiracy within the

---

cases involving antitrust *competitors* – not antitrust *purchasers* – fails; such cases are inapposite.  *See Kaw Valley Elec. Co.-op. Co., Inc. v. Kansas Elec. Power Co-op., Inc.*, 872 F.2d 931, 934 (10th Cir. 1989);  *Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 470 (4th Cir. 1986); *Berkson v. Del Monte Corp.*, 743 F.2d 53 (1st Cir. 1984); *Barnosky Oils, Inc. v. Union Oil Co. of California*, 665 F.2d 74 (6th Cir. 1981); *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 71-72 (9th Cir. 1979).

[101] The cases Defendants cite do not help them.  Several *rejected* Defendants' position here.  In *West Penn Allegheny Health System Inc. v. UPMC*, the Third Circuit rejected defendant's proposed "mere manifestations" limitation, and underscored that in the Third Circuit the continuing violation doctrine must be applied just as it was discussed in the Supreme Court's *Zenith* decision.  627 F.3d 85, 108 (3d Cir. 2010).  In *Toledo Mack Sales & Servs.*, the Third Circuit confirmed that a plaintiff is "not required to prove an illegal conspiracy with evidence restricted to the limitations period," and may present evidence that during the limitations period, a defendant has committed "overt acts in furtherance of an illegal conspiracy or conspiracies, even if the conspiracies began before the limitations period."  530 F. 3d at 217.  *Poster Exch. Inc. v. Nat'l Screen Serv. Corp.* held that "[e]mploying the limitations statute additionally to immunize recent repetition or continuation of violations and damages occasioned thereby not only extends the statute beyond its purpose, but also conflicts with the policies of vigorous enforcement of private rights through private actions."  517 F.2d 117, 128 (5th Cir. 1975).  In *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 270-71 (8th Cir. 2004), the Eighth Circuit declined to apply the doctrine to a Section 7 challenge to a merger while noting that it did apply to Section 1 or 2 claims.  *Allen v. Dairy Farmers of America* recognized that "the 'every-purchase-equals-a-new-violation-theory *is* applicable to Plaintiffs' price-fixing claims."  748 F. Supp. 2d 323, 349 (D. Vt. 2010).  Defendants repeatedly cite *In re Buspirone Patent & Antitrust Litig.*, which held that "claims by the generic competitors… are barred by the four year statute of limitations," but claims of "the *purchaser plaintiffs*… survive this motion to dismiss to the extent that the claims are based on allegations of injury arising from purchases of Buspar at allegedly inflated prices beginning four years prior to the filing of their respective Complaint[s]."  185 F. Supp. 2d 363, 380 (S.D.N.Y. 2002).

[102] *Rochester Drug Co-Op., Inc. v. Abbott Labs., et al.*, 13-cv-1820 (E.D. Pa. April 5, 2013); *Professional Drug Co., Inc. v. Abbott Labs., et al*, 13-cv-01792 (E.D. Pa. April 5, 2013).

[103] *United Food & Commercial Workers Union Midwest Health Benefits Fund v. AbbVie, Inc.*, 2:13-cv-1747 (E.D.Pa. April 3, 2013).

limitations period,[104] including:

- Abbott/AbbVie making payments to Teva.[105]  Even where the overt acts could be viewed as "manifestations of decisions made or acts done outside the limitations period," each payment constitutes an overt act justifying the application of the continuing violation doctrine.[106]

- Teva refraining from selling a generic equivalent of Niaspan and Abbott/AbbVie refusing to sell an authorized generic version of Niaspan.[107]  When an unlawful agreement calls for a seller to take steps not to compete, such forbearance constitutes a continuing violation.[108]

- Abbott filing *eight* and "settling" *seven* suits against generic competitors to prevent any generic launch before September 2013.[109]  Even otherwise lawful acts "lose that character when they become constituent elements of an unlawful scheme."[110]  But regardless of whether the later lawsuits or settlements are independently actionable,

---

[104] There is "no merit" to any proposed "narrow rule that a plaintiff must tie all damages to specific overt acts within the limitations period" because "continuing and accumulating damage may result from intentional, concerted inaction" which "obviously constitutes an injurious act, although perhaps not an overt one in the commonly-understood sense."  *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993).

[105] DPP Complaint ¶¶ 93, 97, 99, 103, 111, 115, 125; EPP Complaint ¶¶ 2, 76, 82, 86, 89, 93, 101.

[106] *West Penn.*, 627 F.3d at 106, 108.  Defendants' antitrust tying case law does not address payments furthering unlawful collusion between competitors and is thus beside the point.  *See Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) (franchisee alleged contract with franchisor constituted unlawful tying); *Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1048 (5th Cir. 1982) (subcontractor alleged agreement with contractor constituted unlawful tying); *Aurora Ent. Inc. v. Nat'l Broad. Co., Inc.*, 688 F.2d 689, 693 (9th Cir. 1982) (television producer alleged contract with television station constituted unlawful tying). The holdings in *In re Ciprofloxacin* and *In re Buspirone* that payments between competitors in furtherance of an anticompetitive scheme are not overt acts justifying application of the continuing violation doctrine are in direct conflict with the Third Circuit's controlling holding in *West Penn.  Compare West Penn.*, 627 F.3d at 105-108 *with In re Ciprofloxacin*, 261 F. Supp. 2d at 229-30 and *In re Buspirone*, 185 F. Supp. 2d at 379.

[107] DPP Complaint ¶¶ 91, 93, 97, 99, 101, 111, 115, 125, 127; EPP Complaint ¶¶ 2, 76, 82, 89, 93, 101.  AbbVie's withholding an authorized generic in September 2013 or at any time during Teva's 180 days of exclusivity was plainly an overt act within the limitations period.

[108] *Lower Lake Erie*, 998 F.3d at 1172-73.  *See Univac Dental Co. v. Dentsply Int'l, Inc.,* 702 F. Supp. 2d 465, 481 (M.D. Pa. 2010) (agreeing that "maintenance of its anti-competitive [policy] and … to sell to dealers that sold its competitors' teeth is sufficient evidence to trigger the continuing violations exception to the statute of limitations").

[109] DPP Complaint at ¶¶ 118-124; EPP Complaint at ¶¶ 96-100.

[110] *Cont'l Ore Co. v. Union Car. & Carbon Corp.*, 370 U.S. 690, 707 (1962) (citations omitted); *American Tobacco Co. v. U.S.*, 328 U.S. 781, 808 (1946) ("It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful.... Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.").

they are more than sufficient to establish continuing overt acts in the furtherance of the conspiracy.[111]

The Third Circuit has repeatedly applied the "continuing violation" doctrine. For example, in *In re Lower Lake Erie Iron Ore Antitrust Litigation*, the court found that the defendants' argument that their concerted refusal to deal with rivals was mere inaction resulting from an agreement reached beyond the statute of limitations

> has no merit because it fails to recognize, in circumstances such as here, that continuing and accumulating damage may result from intentional, concerted inaction. The purposeful nature of the inaction – here an ongoing refusal to sell or lease – obviously constitutes an injurious act, although perhaps not an overt one in the commonly-understood sense.[112]

In *Toledo Mack Sales*, the Third Circuit held a plaintiff is "not required to prove an illegal conspiracy with evidence restricted to the limitations period," and may present evidence that during the limitations period, a defendant committed "overt acts in furtherance of an illegal conspiracy or conspiracies, even if the conspiracies began before the limitations period."[113] And

---

[111] Defendants' invocation of *Noerr-Pennington*, which protects petitioning, is a red herring. First, the district court on remand in *Actavis* itself has held that "the holding in *Actavis* indicates that *Noerr-Pennington* should not protect the reverse payment settlement." *In re AndroGel Antitrust Litig. (No. II)*, 2014 WL 1600331, at *7 (N.D. Ga Apr. 18, 2014.). Courts recognize that generic delay agreements do not become petitioning simply because they relate to ongoing patent disputes. *See, e.g.*, *Andrx Pharms.*, 256 F.3d at 817-819; *In re Nexium* 968 F. Supp. 2d. at 393-96; *In re Terazosin Hydrochloride Antitrust Litig.*, 164 F.Supp. 2d 1340, 1353-54 (S.D. Fla. 2000), *rev'd on other grounds*, 344 F.3d 1294 (11th Cir. 2003); *In re Cardizem CD Antitrust Litig.*, 105 F.Supp. 2d 618, 642 (E.D. Mich. 2000); *In re Ciprofloxacin* 261 F. Supp. 2d at 212-213. A challenge to settlements, rather than the underlying lawsuits, does not implicate *Noerr-Pennington*. Indeed, "the source ... of the anticompetitive restraint at issue is the parties'…agreement itself… [P]rivate agreement[s] should not be due *Noerr-Pennington* immunity." *In re AndroGel*, *)*, 2014 WL 1600331, at *33-*34 (internal citations and quotation marks omitted.).

[112] 998 F.2d 1144, 1172 (3d Cir. 1993) ("in circumstances such as here … continuing and accumulating damage may result from intentional, concerted inaction"). *See United States v. Borden Co.*, 308 U.S. 188, 202 (1939) ("[a] conspiracy thus continued is in effect renewed during each day of its continuance"); *United States v. Kissel*, 218 U.S. 601, 608 (1910) ("If [defendants] do continue such efforts in pursuance of the plan, the conspiracy continues up to the time of abandonment or success."); *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 815 F.2d 270, 278 (3d Cir. 1987) ("The summary judgment record as it now stands would permit a factfinder to conclude that the conspiracy charged by Blue Shield is a continuing one and that its effects continued well into the four-year period.... Most of the offending [agreements] have never been rescinded.").

[113] 530 F. 3d at 217. *See also Pa. Dental Ass'n*, 815 F.2d at 278 ("each time a plaintiff is injured by a continuing conspiracy to violate the antitrust laws a new cause of action for damages accrues") (citation omitted); *In re Aspartame Antitrust Litig.*, 2007 WL 5215231, at *3 (claims accrue "when the plaintiff purchases the product at a price inflated due to anti-competitive conduct. Harm resulting from each purchase is viewed individually to

in *West Penn*, the Third Circuit recognized that in "*Hanover Shoe* … the plaintiff's suit was timely even though the acts that occurred within the limitations period were reaffirmations of decisions originally made outside the limitations period."[114]

Moreover, numerous courts have upheld the continuing violation doctrine in analogous cases.  For example, the district court's *K-Dur* decision and *In re Buspirone Patent & Antitrust Litigation* (on which Defendants rely) rejected the argument that purchasers' claims were time barred and permitted the plaintiffs to seek overcharges occurring within the limitation period.[115] And the most recent district court decisions on the issue are in accord.[116]

Defendants' arguments otherwise fail.  Defendants suggest *Berkey Photo*'s holding was premised upon "the speculative nature of damage" present there.[117]  But *Berkey Photo*'s observance that "at the time a monopolist commits anticompetitive conduct it is entirely speculative how much damage that action will cause its purchasers in the future," was simply one of the bases for its conclusion that a cause of action accrues each time a monopolist charges

---

determine its timeliness") (citation omitted); *Meijer, Inc. v. 3M*, 2005 WL 1660188, at *4  ("[I]n purchaser antitrust actions, the requisite injurious act within the limitations period can include being overcharged as the result of an unlawful act which took place outside the limitations period but continues to allow the defendant to maintain market control"); *In re Linerboard*, 2000 WL 1475559 (applying continuing violation doctrine to price-fixing conspiracy that continued into the limitations period).

[114] 627 F.3d at 107.

[115] *See K-Dur,* 338 F. Supp. 2d at 551 ("Here, plaintiffs have alleged that they were overcharged and paid supra-competitive prices for K-Dur as a result of Defendants' settlement agreements. As such it appears that plaintiffs' claims are not time barred by the statute of limitations to the extent that they bought and overpaid for K-Dur within the applicable time limitations"); *In re Buspirone*, 185 F. Supp. 2d at 378 ("[I]f a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings").

[116] *See In re Nexium*, 968 F. Supp. 2d at 399-400 (concluding that a plaintiff suffers injury each time it is overcharged within the limitations period, despite the fact that the continuing conspiracy might have originated outside the limitations period.); *In re Skelaxin*, 2013 WL 2181185, at *29 (same).

[117] *See* Defs. Mem. at 16.

an inflated price.[118]  *Berkey Photo* does not suggest that injury is negated simply because a plaintiff provides a method for estimating its overcharge damages.[119]

Defendants' attempt to distinguish continuing violation cases purportedly involving price-fixing or other forms of antitrust violations fails.  First, *K-Dur, Nexium* and *Skelaxin*, all of which applied the continuing violations doctrine, involved claims of overcharges stemming from a reverse payment agreement in violation of Section One of the Sherman Act.  Second, through a reverse payment agreement with its competitor, the brand manufacturer can continuously set and charge supracompetitive prices, which is akin to price-fixing.[120]  In any event, the same statute-of-limitations rules apply to market allocation agreements and price-fixing agreements.[121]

---

[118] *See Berkey Photo*, 603 F. 3d at 295 (it is only when the monopolist is able to charge supracompetitive prices that a purchaser "feels the adverse impact of the violation") (internal quotation omitted).

[119] While Defendants argue that *Berkey Photo* (and its progeny) conflicts with decisions of other circuits, Defendants do not point to any appellate authority in support of that proposition.  Indeed the weight of authority is in accord with *Berkey Photo*.  Additionally, Defendants misconstrue *In re Relafen Antitrust Litigation*, which held that the plaintiffs complained of a single, rather than continuing, violation.  *In re Relafen*, 286 F. Supp. 2d 56, 62 (D. Mass. 2003) ("The instant case is very different. The 'act' complained of is the filing of the lawsuit; the plaintiffs do not assert…that [the defendant] was engaged in a series of discrete acts…").  In *Kaiser Found. v. Abbott Labs.*, 2009 WL 3877513, at *7 (C.D. Cal. Oct 8, 2009), the plaintiff had not purchased the product at issue within four years of bringing suit so the continuing violation doctrine was not presented.  *Relafen* specifically recognized the application of the continuing violation doctrine where a defendant "repeatedly invade[s] the plaintiffs' interests," such as "price-fixing conspiracies that endure over periods of time."   286 F. Supp. 2d at 62.

[120] *See United States v. Sealy, Inc.*, 388 U.S. 350, 358 n.5 (1967) (noting Justice Harlan's statement that "I have been unable to discern any tenable reason for differentiating [price fixing] from a case involving, as here, alleged boycotting[,]" and determining that "[t]he same conclusion would seem to apply with respect to an alleged market division, which, like price-fixing, group boycotts, and tying arrangements…"); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir. 2002)( "an agreement on output … is equivalent to a price-fixing agreement."); *accord In re Cardizem*, 332 F.3d at 908 ("There is simply no escaping the conclusion that the Agreement, all of its other conditions and provisions notwithstanding, was, at its core, a horizontal agreement to eliminate competition in the market for Cardizem CD throughout the entire United States, a classic example of a *per se* illegal restraint of trade.").

[121] *See, e.g., Calif. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999) (in general, "raising price, reducing output, and dividing markets have the same anticompetitive effects") (citation omitted); Julian O. von Kalinowski, Antitrust Laws and Trade Regulation § 162.02[2][d] (2d ed. 2003) (same statute-of-limitations rules apply to claims "involv[ing] price fixing, or some other form of cartel behavior that raises prices, such as dividing markets or customers").

2.     **Defendants' fraudulent concealment of the unlawful agreements tolls the statutes of limitations.**

Fraudulent concealment tolls the running of the statute of limitations until the fraud or misrepresentation should have been discovered based on reasonable due diligence. A plaintiff must plead that: (i) there was a fraudulent concealment; (ii) the plaintiff did not discover its cause of action; and (iii) the failure to discover occurred despite due care by the plaintiff.[122] The first element – the fact of concealment – is the most important factor.[123]

On a motion to dismiss, a plaintiff's allegations of affirmative concealment are taken as true and all reasonable inferences are drawn in the plaintiff's favor. Accordingly, resolution on a motion to dismiss is generally inappropriate.[124] Defendants' suggestion that the Court should decide "who knew what when" is improper.[125]

Moreover, Defendants ignore Plaintiffs' well-pled allegations. Specifically, Plaintiffs allege that: (i) Kos and Barr structured their agreement to cloak the payments under pretextual promotion and supply arrangements, (ii) when Kos and Barr announced their agreement, they made false statements, claiming that they were *expediting* generic entry, knowing they were actually *delaying* generic entry, (iii) when executives from Kos and Barr were asked how much

---

[122] *See In re Linerboard*, 305 F.3d at 160.

[123] *Id.* at 162. *See also In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222, 246 (E.D. Pa. 2012) ("[I]n Linerboard, the Third Circuit held that, in general, '[i]t is the fact of concealment that is the polestar in an analysis of fraudulent concealment.' *Linerboard*, 305 F.3d at 163. The weight of authority is in accord with that holding.").

[124] *See Oshiver v. Levin Fishbein Sedran & Berman*, 38 F.3d 1380, 1391-92 (3d. Cir. 1994).

[125] *See In re Fasteners Antitrust Litig.*, 2011 WL 3563989, at *5 (E.D. Pa. Aug. 12, 2011) ("inherently factual inquiry that is usually not ripe for resolution on a motion to dismiss") (citations omitted); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 2006 WL 433891, at *4 (M.D. Pa. Jan. 3, 2006) ("As a general rule, rejection of a fraudulent concealment claim on the pleadings for failure to allege due diligence is not appropriate.") (citation omitted); *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 317 (D.N.J. 2004) ("The question of whether the plaintiffs exercised due diligence to uncover their claim 'implicates factual questions as to when plaintiff discovered or should have discovered the elements of the cause of action.'") (quoting *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 250 (3d Cir.2001)); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 373 (D.N.J. 2001) ("It is apparent that any serious consideration of this issue would take the Court well outside the boundaries of the pleading and beyond that which is even arguably before the Court on this motion to dismiss.").

money changed hands, they refused to answer, (iv) when Kos filed copies of the settlement documents with the SEC, Kos redacted the dollar figures to hide the size of its large payments to Barr, and (v) in those same publicly-filed documents, the parties repeated their false statements that their agreement would expedite generic entry.[126]

Defendants argue that they publicly disclosed the agreements, but Defendants (i) redacted material terms, thus masking the size of the payments (a key component of rule of reason analysis),[127] (ii) made affirmative misrepresentations in the publicly-disclosed versions of the agreements, and (iii) accompanied their disclosures with false public statements designed to conceal that the agreements delayed generic entry.[128]

Glossing over the most important element of fraudulent concealment – their own conduct – Defendants ask the Court to find that Plaintiffs must have, or should have, discovered the conspiracy earlier.[129]  But Plaintiffs pled both that they did not know about the conspiracy and that Defendants withheld pertinent facts that would prompt a reasonably diligent person to investigate the existence of a conspiracy.[130]

---

[126] DPP Complaint at ¶¶ 93, 97, 105-07; EPP Complaint at ¶¶ 82, 87, 163.

[127] *Actavis,* 133 S. Ct. at 2237 ("[T]he likelihood of a reverse payment bringing about anticompetitive effects depends" among other things "upon its size, [and] its scale in relation to the payor's anticipated future litigation costs").

[128] DPP Complaint at ¶¶ 105, 107; EPP Complaint at ¶¶ 87, 163.

[129] Defendants rely on *In re Ciprofloxacin* and *In re Buspirone*, but neither  case involved conduct by a defendant to disguise and conceal its agreement.  In *In re Ciprofloxacin*, the terms of the settlement were fully disclosed, but there were no allegations of false statements and no efforts to disguise the terms of the transaction.  *See In re Ciprofloxacin*, 261 F. Supp. 2d at 223-25. Similarly, in *In re Buspirone*, while the settlement was a "well-publicized fact," there were no allegations that the parties had used false statements or redactions or any other pretexts to disguise the terms of their agreement.  *See In re Buspirone*, 185 F. Supp. 2d at 380.

[130] DPP Complaint at ¶ 129; EPP Complaint at ¶¶ 162, 164.

### D.   Laches has no application here.

Defendants' purported "laches" defense is a non-starter.  First, courts recognize that laches is not available to defeat a claim under the federal antitrust laws for monetary damages.[131] Second, laches applies only when (i) plaintiffs' delay in bringing suit was inexcusable, and (ii) defendants suffered material prejudice attributable to that delay.[132]  Neither exists here.

Even if laches were cognizable here, the intensely factual nature of the issues, and the broad balancing of equitable factors required, typically renders laches inappropriate for resolution at summary judgment, much less on a motion to dismiss.  As the Third Circuit explained, laches "usually requires the kind of record only created by full trial on the merits" because "the correct disposition of the equitable defense of laches can only be made 'by a close scrutiny of the particular facts and a balancing of the respective interests and equities of the parties, as well as of the general public.'"[133]

"[A] court need not bar a plaintiff's suit" "[e]ven if the elements of laches are established.…  The application of the laches defense is discretionary, and as an equitable matter, the district court is to look to all the facts and circumstances of the case and weigh the equities of the parties."[134]  The balance of equities favors Plaintiffs here.  The policy favoring private

---

[131] *See, e.g.*, *In re Pitt. & Lake Erie R. Co. Sec. & Antitrust Litig.*, 387 F. Supp. 906, 911 (E.D. Pa. 1974) ("it having been earlier held that the common law defenses of laches, waiver and estoppel have no application in a federal antitrust action") (citation omitted).  *Accord United States ex rel. Spay v. CVS Caremark Corp.*, 2013 U.S. Dist. LEXIS 58273 (E.D. Pa. April 23, 2013) ("laches generally does not apply when a claim is brought at law, that is only for monetary damages.").

[132]  *Cyberworld Enter. Tech., Inc. v. Napolitano*, 602 F.3d 189, 200 (3d Cir. 2010).

[133] *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1066 (3d Cir. 1991).  Defendants cite to case law acknowledging that laches "can rarely be resolved without some preliminary evidentiary inquiry." *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 74 n.2 (3d Cir. 1986) (citation omitted).

[134] *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) (citation omitted).  *See also McKesson Info. Sol. LLC v. Trizetto Grp., Inc.*, 426 F. Supp. 2d 203, 209 (D. Del. 2006) ("the court must consider all of the facts and circumstances of the case and weigh the equities of the parties").

enforcement of the antitrust laws,[135] along with the Supreme Court's recognition of the anticompetitive harm of reverse payment agreements,[136] weigh heavily against a novel application of laches. Defendants' argument that they bought the benefits of the unlawful agreement over four years before the filing of the complaints, have continued to perform under the agreement, have continued to protect the agreement through additional patent litigation preventing generic competition, and continued to enjoy hundreds of millions of dollars in undeserved profits under the agreement, hardly tilts the equities in their favor.

Economic prejudice requires a defendant to suffer economic harm *resulting from* plaintiffs' delay in bringing suit.[137] Defendants' arguments pertaining to delay and diligence fail and they have not sustained material or relevant economic prejudice.[138] Abbott's purchase of Kos in 2006 occurred a mere year after the challenged settlement. Prejudice could not and did not arise from any delay by Plaintiffs: if Plaintiffs sued then, Abbott could and would have faced liability even if it did not know of the claim when it purchased Kos.[139] An argument based on

---

[135] *Assoc. Gen. Cont. of Cal., Inc. v. Cal. State Council of Carp.*, 459 U.S. 519, 546 (1983) ("'Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violation.'") (quoting *Blue Shield of Va. v. McCready,* 457 U.S. 465, 472 (1982)); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745 (1977) ("longstanding policy of encouraging vigorous private enforcement of the antitrust laws"); *In re Sugar Ind. Antitrust Litig.,* 73 F.R.D. 322, 357 (E.D. Pa. 1976) ("[T]he United States Supreme Court has called the private civil action a bulwark of antitrust enforcement, whereby the purposes of the federal antitrust laws are best served by the ever-present threat of these types of lawsuits to deter anyone contemplating business misbehavior.") (citing *Perma Life Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134 (1968)).

[136] *E.g.*, *Actavis*, 133 S. Ct. at 2236.

[137] *See, e.g.*, *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992) ("There is no dispute that defendants have suffered an economic detriment, the question is whether this prejudice *resulted from* [plaintiffs'] delay.") (emphasis in original). Although prejudice can be either economic or evidentiary, Defendants concede that evidentiary prejudice cannot be shown at this stage.

[138] *See, e.g.*, *Mandel v. M & Q Pack. Corp.*, 2013 WL 1899809, at *13 (M.D. Pa. May 7, 2013) ("significant injury from the delay in the claim"); *Masimo Corp. v. Philips Elecs. North America Corp.*, 2013 WL 1332606, at *81 (D. Del. Apr. 2, 2013) (material prejudice).

[139] *See, e.g.*, *State Cont. & Eng. Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1066 (Fed. Cir. 2003) ("A nexus must be shown between the … delay in filing suit and the expenditures; the alleged infringer must change his position

growth in Niaspan sales, even if it reflects Abbott's investment in Niaspan, fares no better for "[i]t is not enough that [defendant] changed his position – *i.e.*, invested in production…. The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity."[140]  Expenditure does not establish economic prejudice resulting from Plaintiffs' delay.[141]  Even assuming Defendants invested in Niaspan, they did so to maximize supracompetitive profits.  This is not cognizable economic prejudice.  Defendants offer no evidence that they would have done anything differently had an antitrust suit for damages been filed earlier or that they have changed their conduct since the filing of the current actions;[142] indeed, Abbott and AbbVie continued to adhere to the agreement and refused to launch an authorized generic when Teva entered the market in September 2013, after the filing of Plaintiffs' Complaints.  And courts routinely dismiss increased damages as an element of economic prejudice because "[i]t is not economic prejudice to pay damages from [unlawful] sales of products generating a profit over a longer period of time resulting from delay."[143]

---

'because of and as a result of the delay.'") (citation omitted).  Similarly, Teva purchased Barr in 2008, just three years after the unlawful agreement began.

[140] *Hemstreet v. Comp. Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992); *Masimo Corp. v. Philips Elecs. North Am. Corp.*, 2013 WL 1332606 (D. Del. April 2, 2013) ("[t]he change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity.").

[141] *See Meyers*, 974 F.2d at 1308 (economic prejudice not established where defendants "spent substantial amounts of money to design, develop and promote many new and different" products).

[142] *In re Katz Interactive Call Proc. Patent Litig.*, 2009 U.S. Dist. LEXIS 131920, at *66-*67 (C.D. Cal. May 1, 2009) ("[a]lthough [defendant] says it *could have* acted differently, it fails to present any evidence that suggests that its decisions *would have* been different had [plaintiff] sued earlier") (emphasis in original); *Meyers*, 974 F.2d at 1308 ("None of the defendants submitted evidence that they curtailed design and development … in response to [plaintiff's] suit once it was actually filed.").

[143] *Hearing Comp., Inc. v. Shure Inc.*, 600 F.3d 1357, 1376 (Fed. Cir. 2010) (citation omitted).  *See, e.g.*, *Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, 2014 WL 533425, at *10 (D. Del. Feb. 7, 2014) ("cannot simply infer economic prejudice from the possibility of damages pursuant to a finding of liability for infringement"); *Mandel*, 2013 WL 1899809, at *13 (possible increase in award for emotional and punitive damages does not demonstrate economic prejudice); *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1074 (D. Or. 2008) ("[defendants'] potential liability for damages attributable to a finding of liability for infringement cannot constitute economic prejudice ….  Such a rule would result in material prejudice in every infringement action").

Finally, Defendants' argument that laches bars this antitrust case for damages because it "would be contrary to a central purpose of the treble damage rule" lacks any merit.[144]  The Supreme Court recognizes that trebling "has two purposes: to deter violators and deprive them of 'the fruits of their illegality,' and 'to compensate victims of antitrust violations for their injuries.'"[145]  Applying laches to bar an antitrust claim for monetary relief favors violators at the expense of victims and contravenes the purposes of the treble damages rule.

**E.      End-Payor Plaintiffs have standing to pursue their state law claims.**

End-Payor Plaintiffs purchased or reimbursed for Niaspan in fourteen states and U.S. territories.[146]  Arguing that End-Payor Plaintiffs lack standing to pursue claims in those states in which they did not make purchases, Defendants ignore directly contrary governing law in this Circuit and elsewhere.[147]  They also conflate Article III standing and Rule 23's class certification requirements.

**1.      End-Payor Plaintiffs have Article III standing.**

Defendants do not challenge the named End-Payor Plaintiffs' Article III standing, nor could they.  Each End-Payor Plaintiff: (1) purchased and/or reimbursed their members' claims for Niaspan in at least one state; (2) suffered overcharges because Defendants unlawfully

---

[144] Defs. Mem. at 21.

[145] *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 314 (1978) (citations omitted); *see also Am. Soc. of Mech. Eng., Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 575-76 (1982) ("treble damages serve as a means of deterring antitrust violations and of compensating victims").

[146] *See* EPP Complaint at ¶¶ 173, 183, 191.  Defendants list only claims brought under the following states' laws for dismissal: Alaska, Arkansas, the District of Columbia, Hawaii, Idaho, Kansas, Louisiana, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, and Washington.

[147] *See*, *e.g.*, *Sullivan v. DB Invest. Inc.*, 667 F.3d 273, 305-07 (3d Cir. 2011).

delayed market entry of generic Niaspan; and (3) seeks compensation for injuries and other relief.[148]  This is all that is required to establish the named Plaintiffs' individual standing.[149]

> **2.    Because they have Article III standing, Rule 23 determines whether End-Payor Plaintiffs may pursue claims of absent class members in other states.**

Once a class representative establishes standing to assert his or her own claim, the ability to advance claims of absent class members is determined solely under Rule 23.[150]  The Third Circuit endorsed this longstanding rule in *Krell v. Prudential Insurance Company of America*, holding that "whether an action presents a 'case or controversy' under Article III is determined vis-à-vis the named parties," and "[o]nce threshold individual standing by the class representatives is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense."[151]  In other words, "once the named parties have demonstrated they are properly before the court, 'the issue [becomes] one of compliance with the provision of Rule 23, not one of Article III standing.'"[152]

---

[148] EPP Complaint at ¶¶ 1-6, 11-19.

[149] *See In re Nexium*, 968 F.Supp.2d at 405 ("[E]ach of the named end-payor plaintiffs has claims against each of the defendants based on their alleged overpayments for Nexium. . . . [and] have therefore made out their Article III requisite of an ordinary case or controversy [of] an injury to the plaintiff traceable to the defendant.") (internal quotation marks and citation omitted).  *See also Sullivan*, 667 F.3d at 307 n.35.

[150] *See Sosna v. Iowa*, 419 U.S. 393, 403 (1975) (once a named plaintiff establishes that he has suffered an injury from the challenged conduct, it "shift[s] the focus of examination from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class'") (citation omitted).  *See also In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225 (D.N.J. June 29, 2007).

[151] 148 F.3d 283, 306-07 (3d Cir. 1998); *see also Goodman v. Lukens Steel Co.*, 777 F.2d 113, 122 (3d Cir. 1985), *aff'd*, 482 U.S. 656 (1987) ("[C]ontrary to the defendants' contentions, the issue here is one of compliance with the provisions of Rule 23, not one of Article III standing.  Each of the named plaintiffs has presented claims of injury to himself and has alleged facts which present a case or controversy under the Constitution."): *Sullivan*, 667 F.3d at 305-06.

[152] *Prudential*, 148 F.3d at 307 (citing *Goodman* 777 F.2d at 122); *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020-21 (9th Cir. 2011) ("[O]ur law keys on the representative party, not all of the class members, and has done so for many years . . . . In a class action, standing is satisfied if at least one named plaintiff meets the requirements . . . .") (internal quotation marks and citations omitted); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592 (8th Cir. 2009) (district court erred by "conflating" Article III with the question whether plaintiff could pursue claims of absent class members); *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008) (once plaintiff establishes standing to pursue his own claims "[w]hether he is entitled to relief on any or all of those claims and whether he may serve as an adequate class representative for others asserting such claims are separate questions"); *Piazza v.*

The Third Circuit follows *Prudential*'s well-established authority and thus rejects a separate

standing inquiry outside of Rule 23's requirements.[153]  Indeed, the Fifth Circuit recently

confirmed that this is a correct reading of *Prudential*.[154]  End-Payor Plaintiffs have standing to

pursue their state law claims.

## F.        End-Payor Plaintiffs have properly pled claims under state law.

Minnesota: End-payors can recover for antitrust violations under Minnesota's Consumer

Fraud Act.[155]  Antitrust violations such as those made here have been sustained.[156]

New Hampshire: The New Hampshire Consumer Protection Act ("NHCPA") does not

require unfair or deceptive conduct to occur within New Hampshire.  In *Harbour Capital*

*Corporation v. Allied Capital Corporation*, the court held that a defendant who "injure[s] trade

---

*Ebsco Indus.*, 273 F.3d 1341, 1351 (11th Cir. 2001) (where named plaintiff has standing to assert his own claim, whether he can adequately represent the class is determined solely by Rule 23).

[153] Legal scholarship agrees with the rule as stated in *Prudential*: absent members of a class "need not make any individual showing of standing because the standing issue focuses on whether the named plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court." 1 W. Rubenstein, A. Conte & H. Newberg, *Newberg on Class Actions* § 2:3 (5th ed. 2011); *see also id.* at §§ 2:4-6; 7AA Charles Alan Wright, et al., *Federal Practice and Procedure* § 1785.1 (3d ed. 2010) (once named plaintiff establishes his own standing, "whether he will be able to represent the putative class . . . depends solely on whether he is able to meet the additional criteria encompassed by Rule 23").

[154] *See In re Deepwater Horizon*, 739 F.3d 790, 800-01 (5th Cir. 2014) (citing *Prudential* and identifying the Third, Seventh, Ninth and Tenth Circuits as adopting the rule that whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions.") (internal quotation marks and citation omitted).

[155] *Group Health Plan, Inc. v. Phillip Morris Inc.*, 621 N.W.2d 2, 11 (Minn. 2001) (noting that Minn. Stat. §8.31 authorized "any person" injured by a violation of the misrepresentation in sales laws to bring an action for damages, and concluding as a result that "as long as the plaintiff alleges an injury by conduct that violates one or more of the substantive statutes, it is not necessary under subdivision 3a to plead that it is a purchaser of the defendants' products.").

[156] *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380 (E.D. Pa. 2010) (finding that "under the broad construction of the Minnesota statutes adopted by the Minnesota Supreme Court" indirect purchaser plaintiffs had stated a claim).

or commerce in New Hampshire" does not "escape liability under [the NHCPA] by remaining outside the state."[157]

Oregon: Subsequent to the cases cited by Defendants, the Oregon Legislature passed a statute allowing indirect purchasers to bring antitrust claims.[158]  Thus, End-Payor Plaintiffs' claims based on Oregon antitrust law after January 1, 2010 must be sustained.

Pennsylvania: Federal courts construing Pennsylvania's consumer law have routinely held that end payors have standing under the statute.[159]  In an analogous case, the court denied the motion to dismiss a claim brought by welfare benefit plans, such as those here, under the Pennsylvania consumer protection act.[160]

Rhode Island: Under the broad language of the Rhode Island Deceptive Trade Practices Act ("RIDTPA"), any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."[161]  Illegal anticompetitive conduct squarely fits within the broad language of an unfair method of competition.  And Defendants' citation to *State v. Piedmont Funding Corporation* is misplaced: private prescription pharmaceutical pricing is not regulated by any governmental entity.  End-Payor Plaintiffs'

---

[157] 2009 WL 2185449, at *8-*9 (D.N.H. July 22, 2009).  The *Harbour* court also noted, "[i]n *Pacamor [cited by Defendants]*, the court denied the defendant's motion to exclude evidence relative to conduct outside of New Hampshire because the territoriality requirement was satisfied by the fact that the defendant conducted business within New Hampshire." *Id*. at *8.

[158] Oregon law provides a "*person*, the state or any political subdivision in the state injured in its business or property by a violation of ORS 646.725 or 646.730 may sue for the injury and shall recover three times the damages sustained. An action authorized by this paragraph may be brought regardless of *whether the plaintiff dealt directly or indirectly with the adverse party*."  O.R.S. § 646.780.

[159] *See, e.g.*, *In re Actiq Sales and Mktg. Practices Litig.*, 790 F. Supp. 2d 313, 326-27 (E.D. Pa. 2011); *Am. Fed'n of State Cnty. Mun. Emp. v. Ortho-McNeill-Janssen Pharms., Inc.*, 2010 WL 891150, at *3-4 (E.D. Pa. Mar. 11, 2010).

[160] *Sheet Metal Workers Local 441*, 737 F. Supp. 2d at 422 (end-payors "purchased or reimbursed their plan members for purchases of Wellbutrin SR for the members' personal use").

[161] R.I. Gen. Laws § 6–13.1–2.

defined Class also excludes governmental regulatory entities.[162]  And Rhode Island's *Illinois Brick*- repealer antitrust statute,[163] a remedial one, expressly grants end-payors antitrust standing to sue and is entirely consistent with existing judicial determinations.[164]  Remedial statutes may be retroactively applied.[165]  In *Nexium*, Judge Young considered retroactivity and allowed claims not barred by the statute of limitations to proceed, reasoning that "the addition of claims under Rhode Island law is permitted due to the similarity of those provisions to federal antitrust law."[166]  Thus, the Rhode Island claims prior to July 15, 2013 should not be dismissed.

South Dakota: Under South Dakota's Deceptive Trade Practices Act ("SDDTPA"), it is a violation to "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or ... conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been mislead, deceived, or damaged."[167]  Under SDDTPA, "any person who claims to have been adversely effected by any act or a practice declared to be unlawful by §37-24-6 shall be permitted to bring a civil action for the recovery of actual

---

[162] EPP Complaint at ¶ 148, "The following persons or entities are excluded from the proposed Class: . . . b. All federal or state government entities other than cities, towns or municipalities with self-funded prescription drug plans."

[163] R.I. Gen. Laws 6-36-7(d) enacted July 15, 2013.

[164] *See In re Dyn. Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1145 (N.D. Cal. 2008); *see also In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *27 (E.D. Mich. June 6, 2013); *In re Choc. Confec. Antitrust Litig.,* 602 F. Supp. 2d 538 (M.D. Pa. 2009).

[165] *Winfree v. N. Pac. Ry. Co.*, 227 U.S. 296, 301 (1913); *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 273 (1994) (noting that "application of statutes passed after the events in suit is unquestionably proper in many situations").

[166] *In re Nexium*, No. 12-md-02409, Slip Op. at 3-4 (D. Mass. Oct. 23, 2013).  Indeed, Rhode Island's antitrust law provides for claims for both restraint of trade (R.I. Gen. Laws § 6-36-4) and monopolization (R.I. Gen. Laws § 6-36-5), and it is intended to "complement the laws of the United States governing monopolistic and restrictive trade practices." (R.I. Gen. Laws § 6-36-2).

[167] S.D. Codified Laws § 37–24–6(1).

damages suffered as a result of such act or practice."[168]  This language has been interpreted to sustain a violation of South Dakota law on behalf of indirect purchasers.[169]

Utah:  Defendants argue that the Utah claim must be dismissed because Utah permits claims only by citizens or residents of Utah.[170]  Defendants ignore that the End-Payor Plaintiffs have brought Utah claims based only on purchases in Utah by class members who are Utah citizens or residents.[171]  That claim is consistent with the scope of the Utah statute.[172]

Virginia: The Virginia Consumer Protection Act ("VCPA") prohibits numerous "fraudulent acts or practices," including the use of "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."[173]  Anticompetitive conduct falls within the ambit of the VCPA.[174]

---

[168] *Id.* § 37–24–31.

[169] *In re DDAVP Indirect Purchaser Antitrust Litig.,* 903 F. Supp. 2d 198, 229 (S.D.N.Y. 2012) (Plaintiffs were "adversely affected" by Defendants' actions within the meaning of the SDDTPA "when they relied on such representations and paid supra-competitive prices for the drug").

[170] Defs. Mem. at 32.

[171] EPP Complaint at ¶ 173(s).

[172] The relevant language in the Utah statute provides that a "person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant. This remedy is in addition to any other remedies provided by law. It may not diminish or offset any other remedy." Utah Code Ann. §76-10-919(1)(a). *See also In re Nexium*, Civ. No. 12-md-02409-WGY (D. Mass Oct. 23, 2013) (order regarding end-payor's motion for leave to amend) ("End-Payors properly remedied their pleading deficiencies under Utah requirements, by limiting their putative class to 'citizens or residents of Utah,' which the Court accepts today").

[173] Va. Code Ann. § 59.1-200(14).

[174] *Synergistic Int'l, LLC v. Korman*, 402 F. Supp. 2d 651, 664 (E.D. Va. 2005), *aff'd in part, rev'd in part on other grounds*, 470 F.3d 162 (4th Cir. 2006).  End-Payor Plaintiffs are withdrawing their claims under the Delaware consumer protection statute (EPP Complaint at ¶ 183(b)) and under the Tennessee consumer protection statute (EPP Complaint at ¶ 183(p)).

**G.      End-Payor Plaintiffs have properly pled claims for unjust enrichment.**

State law claims of unjust enrichment are "universally recognized causes of action that are materially the same throughout the United States."[175]  To state a claim for unjust enrichment, a plaintiff must allege: (1) at plaintiff's expense; (2) the defendant received a benefit; and (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it.[176]  End-Payor Plaintiffs have sufficiently pled each of these elements: Defendants received a benefit in the "nature of profits resulting from unlawful overcharges and monopoly profits";[177] the financial benefits received by Defendants rightfully belong to End-Payor Plaintiffs and the Class;[178] and it would be inequitable to allow Defendants to retain their ill-gotten gains.[179]

## CONCLUSION

The motion to dismiss should be denied.

DATED this 1st day of May, 2014.

/s/Jeffrey L. Kodroff                        /s/ David F. Sorensen
Jeffrey L. Kodroff                           David F. Sorensen
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.       Susan S. Thomas
1818 Market Street, Suite 2500               Nicholas  Urban
Philadelphia, PA 19103                       BERGER & MONTAGUE, P.C.
Tel: (215)496-0300                           1622 Locust Street

---

[175] *Singer v. AT&T Corp.,* 185 F.R.D. 681, 692 (S.D. Fla. 1998); *see also In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58-59 (D.N.J. 2009); and *In re Ford Motor Co. E-350 Van Prods. Liability Litig.*, (No. II), 2008 WL 4126264, at *21 (D.N.J. Sept. 2, 2008).

[176] *See Restatement of Restitution* § 1, Comment (1937); *see also K-Dur*, 338 F. Supp. 2d at 544; *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 50 (D.D.C. 2003).

[177] EPP Complaint at ¶ 226.

[178] EPP Complaint at ¶ 230.

[179] EPP Complaint at ¶ 231.  End-Payor Plaintiffs' attached Appendix A: Unjust Enrichment responds to Defendants' appendix with state-by-state citations.

Email: jkodroff@srkw-law.com

Michael M. Buchman
John A. Ioannou
MOTLEY RICE LLC
600 Third Ave, 21st Floor
New York, NY 10016
Tel: (212)577-0051
Email: mbuchman@motleyrice.com
      jioannou@motleyrice.com

Kenneth A. Wexler
Amber M. Nesbitt
Thomas A. Doyle
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tele. (312)346-2222
Email: kaw@wexlerwallace.com
      amn@wexlerwallace.com
      tad@wexlerwallace.com

Steve D. Shadowen
HILLIARD & SHADOWEN LLP
39 West Main Street
Mechanicsburg, PA 17055
Tel: (855)344-3298
Email: steve@hilliardshadowenlaw.com

Marvin A. Miller
Loris A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Tel: (312) 332-3400
Email: mmiller@millerlawllc.com
      lfanning@millerlawllc.com

*Interim Liaison Counsel for the End-Payor Plaintiffs*

Philadelphia, PA 19103
Tel:.(215)875-3000
Email: dsorensen@bm.net
      ecramer@bm.net
      sthomas@bm.net
      nurban@bm.net

Thomas M. Sobol
Lauren Guth Barnes
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Tel: (617) 482-3700
Fax: (617) 482-3003
Email: tom@hbsslaw.com
      lauren@hbsslaw.com

Bruce E. Gerstein
Joseph Opper
Kimberly Henningjerzyk
GARWIN GERSTEIN AND FISHER LLP
1501 Broadway, Suite 1416
New York, NY 10036
Tel: (212)398-0055
Email: bgerstein@garwingerstein.com
      khennings@garwingerstein.com

*Interim Co-Lead Class counsel For Direct Purchaser Plaintiffs*

John Radice
RADICE LAW FIRM, P.C.
34 Sunset Blvd.
Long Beach, NJ 08008
Tel: (646)386-7688
Email: jradice@radicelawfirm.com

Joseph H. Meltzer
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Tel: (610)667-7706
Email: jmeltzer@ktmc.com

Don Barrett
Brian Herrington
BARRETT LAW GROUP, P.A.
404 court Square
Lexington, MS 39095
Tel: (662)834-2488
Email: dbarrett@barrettlawgroup.com
        bherrington@barrettlawgroup.com

*Additional Attorneys for Professional Drug
Company, Inc. and the Class*

Barry Taus
Archana Tamoshunas
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, suite 1204
New York, NY 10036
Tel: (646)873-7651
Email: btaus@tcllaw.com
        atamoshunas@tcllaw.com

Peter Kohn
Joseph T. Lukens
FARUQI & FARUQI, LLP
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Tel: (215)277-5770
Email: pkohn@faruqilaw.com
        jlukens@faruqilaw.com

*Additional Attorneys for Rochester Drug Co-
Operative, Inc. and the Class*

Stuart Des Roches
Andrew Kelly
Chris Letter
ODOM & DES ROCHES, LLP
650 Proydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504)522-0077
Email: stuart@odrlaw.com

42

Howard J. Sedran
Keith J. Verrier
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215)592-1500
Email: hsedran@lfsblaw.com
        kverrier@lfsblaw.com

David C. Raphael
Brian D. Brooks
SMITH SEGURA & RAPHAEL, LLP
3600 Jackson Street, Suite 111
Alexandria, LA 71303
Tel: (318)-445-4480
Email: draphael@ssrllp.com

*Additional Attorneys for Value Drug Company
and the Class*

**APPENDIX A: UNJUST ENRICHMENT**

| STATE | DEFENDANTS' ARGUMENT | END-PAYORS' RESPONSE |
|---|---|---|
| **Alabama** | No UE claim or end-run around antitrust law | Federal courts have presupposed that a plaintiff may challenge anticompetitive conduct under a theory of unjust enrichment under Alabama law. *In re Terazosin Hydrochloride Antitrust Litig.,* No. 99-MDL-1317, Dkt. 873 (S.D. Fla. September 12, 2002) (denying motion to dismiss UE Claims and hold that because Alabama allows indirect purchaser claims, if only in *intrastate* commerce, UE claims would be allowed – not an end run); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* (*In re Wellbutrin SR Antitrust Litig.*), 263 F.R.D. 205, 216-17 (2009) (denying motion for judgment on the pleadings on Alabama unjust enrichment claims); *In re Cardizem CD Antitrust Litig.*, 105 F.Supp. 2d 618, 668-71(E.D. Mich. 2000)(holding similar case that plaintiffs had claim under Alabama UE law); *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, *5, 16 (D.N.J. June 29, 2007) (denying motion to dismiss indirect purchasers' UE claims) |
| **Alaska** | No UE claim or end-run around antitrust law | Under Alaska law, unjust enrichment is not in and of itself a theory of recovery but is a prerequisite to recover restitution, which is a remedy for other causes of action, such as a claim on a quasi-contract theory. *Alaska Sales & Serv., Inc. v. Millet,* 735 P.2d 743, 746 (Alaska 1987). Alaska recognizes "quasi-contract" theories as "judicially-created obligations to do justice." *Reeves v. Alyeska Pipeline Serv. Co.,* 926 P.2d 1130, 1143 (Alaska 1996) (quotation omitted). The elements of quasi-contract are: "1) a benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value |

| | | |
|---|---|---|
| | | thereof." *Alaska Sales & Serv., Inc.,* 735 P.2d at 746. *Bennett v. Artus,* 20 P.3d 560, 563 (Alaska 2001); *In re K-Dur Antitrust Litig.,* 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **Arizona** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Arkansas** | No UE claim or end-run around antitrust law | *In re Horizon Organic Milk Plus DHA Omega-3 Marketing and Sales Practice Litig.,* 955 F.Supp.2d 1311 (S.D. Fla. 2013) (Under Arkansas law, "[t]o find unjust enrichment, a party must have received something of value, to which he was not entitled and which he must restore."); *Varner v. Peterson Farms,* 371 F.3d 1011, 1018 (8th Cir. 2004) (citing *Guar. Nat. Ins. Co. v. Denver Roller, Inc.,* 313 Ark. 128, 854 S.W.2d 312, 317 (1993)); *see also In re K-Dur Antitrust Litig.,* 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico); *In re Chocolate Confectionary Antitrust Litig.,* 749 F.Supp.2d 224, 236 (M.D. Pa. 2010) (sustaining Arkansas unjust enrichment claim) |
| **California** | Other | *In re Processed Egg Prods. Antitrust Litig.,* F.Supp.2d , 2012 WL 935669, at *19 (E.D. Pa. Mar. 20, 2012) (holding that restitution available for violation of UCL); *In re Cardizem CD Antitrust Litig.,* 105 F.Supp.2d 618, 670 (E.D. Mich. 2000) (holding in similar case that plaintiffs had claim under California unjust enrichment law (citing *Lectrodryer v. SeoulBank,* 91 Cal.Rptr. 2d 881, 883 (Cal. App. 2000) (court identified the elements of unjust enrichment claim as "receipt of a benefit and unjust retention of the benefit at the expense of another")); *In re Hypodermic Prods. Antitrust Litig.,* 2007 WL 1959225, *5, 16 (D.N.J. June 29, 2007) |

| | | (denying motion to dismiss indirect purchasers' unjust enrichment claims) |
|---|---|---|
| **Colorado** | No UE claim or end-run around antitrust law | *In re G-Fees Antitrust Litig.*, 584 F.Supp.2d 26, 46 (D.D.C. 2008) (finding "no reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy" and denying a motion to dismiss unjust enrichment claims under Colorado law) |
| **Connecticut** | No UE claim or end-run around antitrust law | *In re G-Fees Antitrust Litig.*, 584 F.Supp.2d 26, 46 (D.D.C. 2008) (finding "no reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy" and denying a motion to dismiss unjust enrichment claims under Connecticut law); *F.T.C. v. Mylan*, 99 F.Supp.2d 1, 5-6 (D.D.C. 1999) (reinstated Connecticut's claim for restitution on behalf of indirect purchasers) |
| **Delaware** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **Florida** | UE claim not stated | *In re G-Fees Antitrust Litig.*, 584 F.Supp.2d 26, 46 (D.D.C. 2008) (finding "no reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy" and denying a motion to dismiss unjust enrichment claims under Florida law); *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, *5, 16 (D.N.J. June 29, 2007) |

A-3

| | | |
|---|---|---|
| | | (denying motion to dismiss indirect purchasers' unjust enrichment claims); *Florida Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1242 n.4 (Fla. 2004) (holding that elements of an unjust enrichment claim under Florida Law are simply a "benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit under the circumstances that make it inequitable for him to retain it without paying the value thereof"); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702(S.D. Fla. 2004) (in similar case Florida unjust enrichment claim certified); *In re Flash Memory Antitrust Litig.*, 643 F.Supp.2d 1133, 1163 (N.D. Cal 2009) (Florida unjust enrichment claim survived motion to dismiss); *In re Processed Egg*, 2012 WL 1959225. *5, 16 (D.N.J. June 29, 2007) (denying motion to dismiss indirect purchasers' unjust enrichment claims finding no direct benefit required for Florida unjust enrichment claim); *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, *5, 16 (D.N.J. June 29, 2007) (denying motion to dismiss indirect purchasers' Florida unjust enrichment claims |
| **Georgia** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **Hawaii** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Idaho** | UE claim not stated | *In re G-Fees Antitrust Litig.*, 584 F.Supp.2d 26, 46 (D.D.C. 2008) (finding "no reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy" |

| | | and denying a motion to dismiss unjust enrichment claims under Idaho law); *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico in similar case because "[p]laintiffs' purchase of [drug] constituted a benefit conferred on Defendant [drug company], in the form of monetary payments") |
|---|---|---|
| **Illinois** | No UE claim or end-run around antitrust law | *Raintree Homes, Inc. v. Village of Long Grove*, 807 N.E.2d 439, 445 (Ill. 2004) (recognizing unjust enrichment claims under Illinois law); *HPI Health Care Svcs.,Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E. 2d 672, 679 (Ill. 1989) (articulating elements of unjust enrichment claim without reference to separate underlying claim in tort, contract or statute); *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) (unjust enrichment is a common law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment and this retention is unjust); *Sheet Metal Workers Local 441 Heath & Welfare Plan v. GlaxoSmithKline, PLC*, (*In re Wellbutrin SR Antitrust Litig.*), 263 F.R.D. 205, 216-17 (2009) (denying motion for judgment on the pleadings on Illinois unjust enrichment claims); *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, Dkt. 873 (S.D. Fla. September 12, 2002) (denying motion to dismiss UE Claims and holding that because Illinois allows indirect purchaser claims, UE claims would be allowed – not an end run); *In re Cardizem CD Antitrust Litig.*, 105 F.Supp. 2d 618, 668-71(E.D. Mich. 2000) (holding similar case that plaintiffs had claim under Illinois unjust enrichment law) |
| **Indiana** | Plaintiffs did not bring this claim. See Complaint at ¶191. Indiana not listed. | |

| | | |
|---|---|---|
| **Iowa** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Kansas** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Kentucky** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **Louisiana** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **Maine** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Maryland** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (in a similar case, the court sustained indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico); *Bank of Am. Corp. v. Gibbons*, 918 A.2d 565, 571 (Md. Ct. Spc. App. 2007) (Maryland unjust enrichment claim sustained); *In re ConAgra Peanut Butter Prods. Liability Litig.*, 2008 WL 2132233, *3 (N.D. Ga. May 21, 2008) (holding that, where defendant directly profited from purchasers' demand, fact that defendant sold products through retailers, i.e., indirectly to plaintiffs, constituted sufficient direct benefit) |
| **Massachusetts** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Michigan** | **NO ARGUMENTS** | |

| | RAISED ON MOTION TO DISMISS | |
|---|---|---|
| **Minnesota** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Mississippi** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Missouri** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Montana** | No UE claim or end-run around antitrust law | *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, *5, 16 (D.N.J. June 29, 2007) (denying motion to dismiss indirect purchasers' Montana unjust enrichment claims) |
| **Nebraska** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Nevada** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **New Hampshire** | Other | *In re Chocolate Confectionary Antitrust Litig.*, 749 F.Supp.2d 224, 240 (M.D. Pa. 2010) (sustaining Arkansas unjust enrichment claim); *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **New Jersey** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **New Mexico** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |

| New York | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
|---|---|---|
| **North Carolina** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **North Dakota** | UE claim not stated | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **Ohio** | **Plaintiffs did not bring this claim. See Complaint at ¶191. Ohio not listed.** | |
| **Oklahoma** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **Oregon** | No UE claim or end-run around antitrust law | *In re TFT-LCD Antitrust Litig.*, 2011 WL 2790179 (N.D. Cal. July 12, 2011) (Oregon unjust enrichment claim authorized by statute); *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **Pennsylvania** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico.); *In re G-Fees Antitrust Litig.*, 584 F.Supp.2d 26, 46 (D.D.C. 2008) (finding "no reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy" and denying a motion |

| | | to dismiss unjust enrichment claim under Pennsylvania law) |
|---|---|---|
| **Rhode Island** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5094289 (N.D. Cal Dec. 8, 2010)(denying summary judgment on Rhode Island unjust enrichment claim) |
| **South Carolina** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **South Dakota** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Tennessee** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Texas** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico); *In re G-Fees Antitrust Litig.*, 584 F.Supp.2d 26, 46 (D.D.C. 2008) (finding "no reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy" and denying a motion to dismiss unjust enrichment claim under Texas law) |
| **Utah** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |

| | | |
|---|---|---|
| **Vermont** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Virginia** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **Washington** | No UE claim or end-run around antitrust law | *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004) (sustaining indirect purchasers' claims under the unjust enrichment laws of fifty states, the District of Columbia and Puerto Rico) |
| **West Virginia** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Wisconsin** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Wyoming** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **District of Columbia** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |
| **Puerto Rico** | **NO ARGUMENTS RAISED ON MOTION TO DISMISS** | |

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2014, I electronically filed the Plaintiffs' Joint Opposition to Defendants' Joint Motion to Dismiss the Consolidated Amended Complaints by CM/ECF system, which will serve notification of such filing to the e-mail addresses of all counsel of record in this action.

Respectfully submitted,

/s/ David F. Sorensen