**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

IN RE:                                          MDL NO. 2460
NIASPAN ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:            MASTER FILE NO. 13-MD-2460
ALL ACTIONS

DuBois, J.                                                September 5, 2014

**M E M O R A N D U M**

## I.    INTRODUCTION

This multidistrict litigation concerns what has come to be known as a "pay-for-delay," or "reverse payment," settlement — a practice in which a brand-name drug manufacturer brings a patent-infringement action against a generic-drug manufacturer and then compensates the generic-drug manufacturer for its agreement to refrain from entering the market with a competing generic version of the brand-name drug until a specified date.  The term "reverse payment" derives from the fact that the payment flows in the direction opposite to what one would normally expect in patent-infringement litigation; in other words, the patentee pays the alleged infringer to settle the lawsuit, rather than the other way around.

In this case, plaintiffs aver that the brand-name manufacturer Kos Pharmaceuticals, Inc. ("Kos") entered into anticompetitive settlement agreements in March of 2005 with the generic manufacturer Barr Pharmaceuticals, Inc. ("Barr") in order to terminate patent-infringement litigation brought by Kos against Barr in the U.S. District Court for the Southern District of New York.  Presently before the Court is defendants' Joint Motion to Dismiss the Direct-Purchaser Plaintiffs and End-Payor Plaintiffs' Consolidated Amended Complaints ("Motion to Dismiss") and defendants' Joint Motion for Judicial Notice in Support of Joint Motion to Dismiss the

Consolidated Amended Complaints ("Motion for Judicial Notice"), on which the Court heard

oral argument on June 24, 2014.  For the reasons set forth below, defendants' Motion to Dismiss

is granted in part and denied in part, and defendants' Motion for Judicial Notice is denied.

## II.    BACKGROUND

### A.    <u>Regulatory Background</u>

Prior to marketing or selling a new drug (i.e., a "pioneer drug" or "brand-name drug") in

the United States, a potential drug manufacturer must obtain a grant of approval from the Food &

Drug Administration ("FDA").  To do so, an applicant must file a New Drug Application

("NDA"), which contains, <u>inter alia</u>, information about safety and efficacy of the drug, the

components of the drug, and any patents issued on the composition of the drug or methods for its

use.  21 U.S.C. § 2552(b)(1).  Upon approval of an NDA, the FDA publishes the drug and patent

information in its directory of <u>Approved Drug Products with Therapeutic Equivalence</u>

<u>Evaluations</u>, commonly known as the "Orange Book."  <u>Apotex Inc. v. UCB, Inc.</u>, -- F.3d --, No.

2013-1674, 2014 WL 397498, at *2 (Fed. Cir. Aug. 15, 2014).

In an effort to speed up the approval process for generic versions of already FDA-

approved brand-name drugs, Congress passed the Hatch-Waxman Act ("Hatch-Waxman") in

1984.  <u>See</u> Pub. L. No. 98-417, 98 Stat. 1585 (1984).  Under Hatch-Waxman, a potential generic

manufacturer only needs to file an Abbreviated New Drug Application ("ANDA") if it can

establish that its generic is the bioequivalent of an FDA-approved brand-name drug.  <u>See</u> 21

U.S.C. § 355(j)(2)(A).  The process for filing an ANDA is considerably more streamlined than

that for an NDA because it allows the applicant to "piggyback" on the safety and efficacy

findings made by the FDA in the course of approving the brand-name drug, rather forcing the

applicant to conduct the time-consuming and costly trials anew.  Teva Pharm., USA, Inc. v. Leavitt, 548 F.3d 103, 104 (D.C. 2008).

An ANDA applicant must, inter alia, make one of four "paragraph certifications": (1) no patent information for the brand-name drug has been filed with the FDA (paragraph I); (2) the patent has expired (paragraph II); (3) the patent will expire on a specifically identified date (paragraph III); or (4) the "patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted" (paragraph IV).  21 U.S.C. § 355(j)(2)(A)(vii).[1]  Pay-for-delay cases, such as the one before this Court, invariably involve the last of these four certifications, the so-called "paragraph IV certification."

An applicant that makes a paragraph IV certification must send prompt notice to the patent holder of its position that the patent is invalid or will not be infringed by the applicant's generic drug.  Id. § 355(j)(2)(B).  This notification triggers a forty-five day period during which the patent holder may file an infringement lawsuit against the ANDA applicant to prevent the FDA from proceeding with the ANDA application process.  Id. § 355(j)(5)(B)(iii).  The ANDA thus gives the brand-name manufacturer a jurisdictional basis on which it may bring an infringement suit without the generic having yet come to market.  Teva Pharm. USA, Inc. v. Sebelius, 595 F.3d 1303, 1305 (D.C. Cir. 2010).  If the patentee files an infringement suit, the FDA stays the ANDA approval process either for thirty months or until the generic manufacturer has obtained a final judgment of non-infringement or invalidity, whichever occurs first.  Id. § 355(j)(5)(B)(iiii).  During this stay, however, the FDA can grant tentative approval provided

---

[1] If the applicant certifies under paragraphs I or II, the FDA may approve the ANDA after its review of the application.  See 21 U.S.C. § 355(j)(5)(B)(i). If the applicant certifies under paragraph III, the FDA will not approve the application until after the patent for the listed drug has expired.  See id. § 355(j)(5)(B)(ii).

that the applicant meets the scientific, labeling, and other approval criteria.  <u>Id.</u>

§ 355(j)(5)(B)(iv)(II)(dd).

Consumers benefit if generic manufacturers routinely make paragraph IV

certifications — more invalid patents are challenged, non-infringing generics are marketed, and

competition is increased.  Thus, to encourage generic entry and to compensate ANDA filers for

the expense and risk of a potential infringement lawsuit, federal law grants the first generic

manufacturer to file a paragraph IV ANDA application (i.e., the "first-filer") a 180-day period of

exclusive marketing rights.  <u>Sebelius</u>, 595 F.3d at 1305; <u>see also</u> 21 U.S.C. § 355(j)(5)(B)(iv).

The start of this period, during which the FDA may approve no other ANDA with respect to that

brand-name drug, begins to toll upon either: (1) the commercial marketing of the generic by the

first-filer, or (2) a final court decision of invalidity or non-infringement.  21 U.S.C.

§ 355(j)(5)(B)(iv).

While termed an "exclusivity period," the 180-day period is "exclusive" only with

respect to other ANDA applicants.  In other words, the statutory scheme, as interpreted by the

courts, does "not prohibit the holder of an approved NDA from marketing . . . its own 'brand-

generic' version of its drug."  <u>Teva Pharm. Indus. Ltd. v. Crawford</u>, 410 F.3d 51, 55 (D.C. Cir.

2005).  This type of generic — one that is marketed by the holder of an approved NDA — is

called an "authorized generic" or "AG."  Launch of an AG allows the brand-name drug

manufacturer to recover some of the sales and profits it would otherwise lose when an ANDA

applicant begins to market and sell a generic version of that manufacturer's brand-name drug.

B.     **Factual Background**[2]

AbbVie Inc. ("AbbVie"), a drug manufacturer that spun off of Abbott Laboratories ("Abbott"), markets and sells Niaspan, a brand-name prescription drug, primarily used in the treatment of lipid disorders, such as high cholesterol.  Direct Purchasers' Consolidated Am. Compl. ¶ 59 [hereinafter DP Compl.]; End Payors' Consolidated Am. Compl.  ¶ 52 [hereinafter EP Compl.].  The active ingredient in Niaspan is niacin.  DP Compl. ¶ 59; EP Compl. ¶ 52.  Although niacin has been sold as a dietary supplement in the United States since the early 20th century, "at high levels, niacin causes a patient's skin to flush with redness, and it may cause liver toxicity."  EP Compl. ¶ 52; see also DP Compl. ¶ 59.  In the early 1990s, Kos, a company later acquired by Abbott, developed a therapeutically-effective time-release version of niacin, which does not cause the side-effects previously associated with niacin.  DP Compl. ¶ 60; EP Compl. ¶ 53.  The U.S. Patent Office issued seven patents to Kos for the development of 500, 750, and 1000 mg dosages of Niaspan,[3] and Kos purchased two others.  DP Compl. ¶ 61.  Niaspan has been marketed and sold — first by Kos and then by Abbott and AbbVie — since September of 1997.  DP Compl. ¶ 64; EP Compl. ¶ 57.

"[A]fter conducting extensive research and analysis regarding the patents that Kos had registered," Barr filed an ANDA with the FDA in October 2001, seeking to manufacture and sell a generic equivalent of the 1000 mg dosage of Niaspan.  DP Compl. ¶ 67; EP Compl. ¶ 60.  As part of the ANDA, Barr filed a paragraph IV certification, stating that its generic product did not

---

[2] As required on a motion to dismiss, the Court takes all plausible factual allegations contained in plaintiffs' Complaints to be true.

[3] There is a discrepancy in the end-payor plaintiffs and direct-purchaser plaintiffs' Complaints on this point.  The direct-purchaser plaintiffs allege that "Kos sought and received seven patents to cover the formulation and method-of-use for Niaspan," DP Compl. ¶ 61, while the end-payor plaintiff aver that "Kos sought and eventually received a series of [five] patents to cover the formulation and method-of-use for Niaspan," EP Compl. ¶ 54.

infringe any of the patents listed with the FDA covering Niaspan and/or that these patents were invalid and unenforceable.  DP Compl. ¶¶ 67-68; EP Compl. ¶¶ 60, 61.   As the first-filer, "Barr would be entitled to a 180-day period of market exclusivity once it received final approval from the FDA to enter the market."  EP Compl. ¶ 61; see also DP Compl. ¶ 68.  Thereafter, Barr filed additional ANDA applications with respect to 500 and 750 mg dosages of Niaspan.  DP Compl. ¶ 72; EP Compl. ¶ 68.

In March 2002, within the statutorily-specified forty-five day period following Barr's initial paragraph IV certification, Kos initiated the first of a series of patent-infringement lawsuits against Barr in the U.S. District Court for the Southern District of New York, alleging infringement of its Niaspan patents.  DP Compl. ¶ 70; EP Compl. ¶ 62.  Filing of this lawsuit triggered the thirty-month stay provided for in Hatch-Waxman, during which the FDA could not approve any other ANDA seeking to market and sell a generic version of Niaspan.  DP Compl. ¶ 70; EP Compl. ¶ 62.  In Kos's infringement lawsuits, Barr filed several counterclaims against Kos, seeking declaratory judgments that Kos's Niaspan patents were invalid and/or unenforceable.  DP Compl. ¶ 76; EP Compl. ¶ 65.  After consolidating the various suits, U.S. District Court Judge Lewis Kaplan, the assigned judge, scheduled trial for January 2006.  DP Compl. ¶¶ 71-77, 79; EP Compl. ¶¶ 63-66.

Under Hatch-Waxman, the FDA could not issue a final approval of Barr's ANDA until March 31, 2005 — the date that the last of the statutory stays was to expire.  DP Compl. ¶ 78; EP Compl. ¶ 63.  Nevertheless, in May and June of 2003, the FDA gave Barr tentative approval to market its 500, 750, and 1000 generic versions of Niaspan.  DP Compl. ¶ 78; EP Compl. ¶¶ 61-68.  Barr expected to receive final FDA approval with respect to each of these dosages shortly after March 31, 2005.  DP Compl. ¶ 78; EP Compl. ¶ 68.  As this date grew nearer, Judge Kaplan

6

had yet to make any rulings on the merits of the Kos or Barr claims.  DP Compl. ¶ 79; EP Compl. ¶ 69.  Faced with the prospect of impending FDA approval, yet no ruling on whether it could legally market its generics, Barr decided that it would launch "at risk," meaning that it would put its generics on the market prior to resolution of the outstanding lawsuits against it.  DP Compl. ¶ 80; EP Compl. ¶ 70.  Such a launch would be deemed to be "at risk" because Barr would face possible exposure to treble damages for willful infringement.[4]  "But Barr was so sure of the rightness of its actions — that Kos' [sic] Niaspan patents were invalid, unenforceable, or not infringed by Barr's product — that Barr planned to launch its generic . . . as soon as the FDA gave the final green light."  DP Compl. ¶ 5.

Having decided to launch at-risk rather than wait until the infringement lawsuit was decided, Barr began to aggressively accumulate inventory of its tentatively approved generics in the winter of 2004.  DP Compl. ¶¶ 80-81; EP Compl. ¶¶ 69-70, 73.  Kos realized that Barr was serious, and its stockholders took note.  In December of 2004, reports of Barr's impending at-risk launch caused Kos's shares to drop thirteen percent.  DP Compl. ¶ 81.  Recognizing that Barr's impending at-risk launch posed "a real competitive threat," Kos "acted swiftly in response" to Barr's plans.  EP Compl. ¶ 71; <u>see also</u> DP Compl. ¶ 83.  On March 7, 2005, Kos filed an application for a preliminary injunction in the U.S. District Court for the Southern District of New York to halt Barr's market entry.  DP Compl. ¶ 85; EP Compl. ¶ 73.  But because Kos "knew there was a substantial risk that it would lose the patent litigation," EP Compl. ¶ 75; <u>see also</u> DP Compl. ¶ 91, Kos could not rely on its application for a preliminary injunction alone.  Kos therefore began manufacturing an AG to compete with Barr's generic versions of Niaspan

---

[4]  <u>See</u> Grace Lillian Wang, <u>Teva v. Eisai: What's the Real "Controversy"?</u>, 66 Food & Drug L.J. 631, 638 n.46 (2011) ("Launching **at risk** means the generic manufacturer knows it may be liable for patent infringement but chooses to enter the market anyway. If a generic loses the infringement suit, a court may award treble damages for willful infringement.").

should Barr's plans of an at-risk launch come to fruition.  DP Compl. ¶ 84; EP Compl. ¶ 72.  By the end of the first quarter of 2005, Kos had accumulated more than $1.3 million in inventory in anticipation of launching an AG.  EP Compl. ¶¶ 45-48, 71-72.

On March 18, 2005, Judge Kaplan held a hearing on Kos's application for a preliminary injunction.  DP Compl. ¶ 85; EP Compl ¶ 73.  At the time of the hearing, "Barr was ready to launch its generic equivalent of Niaspan, [a]t-[r]isk."  EP Compl. ¶ 73; see also DP Compl. ¶ 86. With Judge Kaplan yet to rule on Kos's application, on March 30, 2005 — the day before the thirty-month stay was set to expire — Kos and Barr announced that they had reached a settlement.  DP Compl. ¶ 89; EP Compl. ¶ 74.  Postponing any ruling on Kos's application for a preliminary injunction in order to allow the parties to formalize their settlement, Judge Kaplan issued a Conditional Order of Discontinuance on March 30, 2005.  DP Compl. ¶ 89; EP Compl. ¶ 74.

Thereafter, Kos and Barr entered into three separate but interrelated contracts dated April 12, 2005: (1) a settlement and licensing agreement ("the Licensing Agreement"); (2) a co-promotion agreement ("the Co-Promotion Agreement"); and (3) a license and manufacturing agreement ("the Manufacturing Agreement").  DP Compl. ¶¶ 93-94; EP Compl. ¶ 77.  The Direct Purchaser Plaintiffs' Consolidated Amended Complaint describes the terms of these settlement agreements as follows:

> **Settlement and Licensing Agreement.**  Kos and Barr agreed to drop all claims and counterclaims pending against each other in the patent lawsuits.  Kos gave Barr a license for all of the patents arguably covering Niaspan on the condition that Barr would not bring a generic equivalent of Niaspan to market until September 20, 2013 (or such earlier time as may be required to preserve Barr's right to market a generic exclusively for 180 days).  Kos also agreed that it would not launch an authorized generic version of Niaspan after Barr ultimately entered the market with generic extended-release niacin even though it would make economic sense for Kos to launch an authorized generic and Kos had been planning to do so; of course, the harm to Barr of Kos' [sic] launching of an

authorized generic would have been substantial.  And, Barr explicitly agreed that it would not launch a generic equivalent of Niaspan until September 20, 2013.

**Co-Promotion Agreement.**  For as long as Barr kept its generic equivalent of Niaspan off the market, as provided in the Settlement and Licensing Agreement, Kos agreed to pay Barr (through Duramed and DPSC, two Barr subsidiaries, which later became Teva Women's Health, Inc.) a royalty on all of Kos' [sic] sales of Niaspan and Advicor, another Kos drug.  Barr, Duramed, and DPSC agreed to promote Niaspan and Advicor to obstetricians, gynecologists, and other doctors specializing in women's health.  The royalty that Kos agreed to pay to Barr was to be based upon overall sales of Niaspan and Advicor, regardless of whether the sales were generated by Barr's sales force, and provided another incentive for Barr not to disrupt brand Niaspan sales.

**License and Manufacturing Agreement.**  Kos (and its subsidiary, Kos Life Sciences Inc.) made a non-refundable lump-sum payment to Barr, ostensibly as compensation for Barr's investment in developing FDA-approved manufacturing processes for Niaspan and Advicor.  Kos (and Kos Life Sciences Inc.) also agreed to make quarterly payments to Barr for every quarter that Barr remained ready to manufacturer [sic] Niaspan and Advicor.  Barr agreed to serve as a ready back-up supplier to Kos for those products, and agreed to sell them to Kos at an agreed-upon contract price.  If Barr sold a generic equivalent to Niaspan to any third-party before September 20, 2013, Kos would have no further obligation to make quarterly payments to Barr.

DP Compl. ¶ 94 (footnote omitted).

In April 2005, Kos and Barr issued a joint press release, announcing the settlement of their litigation and describing the three agreements.  EP Compl. ¶¶ 87, 163.  The settlement was just in time to thwart Barr's planned at-risk launch.  On April 26, 2005, the FDA granted final approval to Barr to manufacture and market generic Niaspan in all dosages.  DP Compl. ¶ 108; EP Compl. ¶ 80.  Barr subsequently disposed of its inventory of the generics, and Kos did the same for its inventory of the AG.  DP Compl. ¶ 109; EP Compl. ¶ 81.  In August 2005, Kos publicly filed all three agreements with the SEC, disclosing the structure of the agreed-upon payments.  DP Compl. ¶ 107; EP Compl. ¶ 87(c).  The publicly filed versions of the agreements redacted the specific financial terms and the specific number of Barr sales representatives to be utilized in implementing the Co-Promotion Agreement.  DP Compl. ¶ 107.  Thereafter, in March

9

2007 and February 2008 filings, Barr disclosed that, under the settlement agreements, it had earned $45 million in royalty payments from Kos for the 2006 calendar year and $37 million for the 2007 calendar year and that it expected to make a "substantially similar" amount in 2008. EP Compl. ¶¶ 86-87.

In December 2006, Abbott acquired Kos. DP Compl. ¶¶ 110-111; EP Compl. ¶¶ 88-89, and in December 2008, Teva Pharmaceuticals Industries, Ltd. ("Teva") acquired Barr. DP Compl. ¶ 115. As Kos and Barr's respective successors, Abbott and Teva continued to adhere to the Kos-Barr settlement agreement. DP Compl. ¶ 115; EP Compl. ¶ 93. In January 2013, Abbot spun off its pharmaceutical business into AbbVie, a new publicly-traded company, to which the settlement agreements were assigned. DP Compl. ¶ 125; EP Compl. ¶¶ 101-102. No generic entered the market until September 20, 2013, when Teva launched its generic, triggering the start of its 180-day exclusivity period. DP Compl. ¶¶ 127, 134; EP Compl. ¶¶ 2, 4-5, 104, 107-109, 12-133. In compliance with the settlement agreements, AbbVie withheld an AG. Id.

### C.    **Procedural Background**

In April 2013, the first of seventeen putative class-action lawsuits[5] in this matter was filed against defendants in this Court. The Judicial Panel on Multidistrict Litigation transferred eight of these seventeen actions to this Court by Order filed on September 17, 2013. On December 23, 2013, this Court issued a Practice and Procedure Upon Transfer Order Pursuant to 28 U.S.C. § 1407(a) ("Practice and Procedure Order"), in which the Court, inter alia: (1) directed that the eight transferred actions be coordinated for pretrial purposes with nine tag-along actions pending in this Court; and (2) consolidated all pending End-Payor Actions for pretrial purposes

---

[5] Sixteen of these lawsuits were filed in the U.S. District Court for the Eastern District of Pennsylvania and one lawsuit was filed in the U.S. District Court for the District of Rhode Island.

and all pending Direct-Purchaser Actions for pretrial purposes.  Pursuant to the Practice and

Procedure Order, and by agreement of the parties, the direct-purchaser plaintiffs and end-payor

plaintiffs each filed a Consolidated Amended Class Action Complaint ("the Complaints") on

January 15, 2014 and January 16, 2014, respectively.

The direct-purchaser plaintiffs' Complaint alleges: (1) defendants violated Section Two

of the Sherman Act, see 15 U.S.C. § 2, by "allocat[ing] all sales of extended-release niacin in the

United States to Kos; delay[ing] the sales of generic Niaspan products; and fix[ing] the price at

which the direct purchaser plaintiffs and members of the [putative] class would pay for extended-

release niacin at the higher, brand name price" (Count I), see DP Compl. ¶ 179; and

(2) defendants violated Section One of the Sherman Act, see 15 U.S.C. § 1, by "enter[ing]

into . . . a continuing illegal contract, combination and conspiracy in restraint of trade under

which Kos (and later Abbott/AbbVie) paid Barr/Teva substantial consideration in exchange for

Barr/Teva's agreement to delay bringing its generic version of Niaspan to the market" (Count II),

see DP Compl. ¶ 186.

The end-payor plaintiffs' Complaint alleges: (1) defendants violated the antitrust statutes

of twenty-one states and the District of Columbia (Count I); (2) defendants violated the

consumer-protection statutes of sixteen states and the District of Columbia (Count II); and

(3) defendants are liable under a theory of unjust enrichment under the laws of forty-eight states,

the District of Columbia, and unspecified U.S. territories (Count III).

On March 17, 2014, defendants jointly filed the pending Motion to Dismiss and the

pending Motion for Judicial Notice.  Plaintiffs filed a Joint Opposition to defendants' Motion to

Dismiss on May 1, 2014, and defendants filed a Joint Reply in Support of Their Motion to

Dismiss on June 2, 2014.  On June 24, 2014, the Court heard extensive oral argument on the

pending Motions, which are now fully briefed and ripe for adjudication.

## III.   STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a defense of "failure to state a claim upon which relief can be granted" may be raised by motion to dismiss.  In analyzing such a motion, the Court "accept[s] all factual allegations as true, [and] construe[s] the complaint in the light most favorable to the plaintiff."  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231, 233 (3d Cir. 2008) (internal quotation marks omitted).

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level . . . .'"  Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  To satisfy the plausibility standard, a plaintiff's allegations must show that defendant's liability is more than "a sheer possibility."  Id.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Id. (quoting Twombly, 550 U.S. at 557).

## IV.   ANALYSIS

### A.   **Statute of Limitations**

The Court first addresses defendants' argument that plaintiffs' federal antitrust claims are time-barred.  Plaintiffs do not dispute that the applicable limitations period is four years, however, they argue that their claims are nonetheless timely under the continuing-violation and/or fraudulent-concealment doctrines.  The Court addresses each doctrine in turn.

1.      Continuing-Violation Doctrine

Under the continuing-violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (quoting Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1295 (3d Cir. 1991)).  Plaintiffs allege that this doctrine applies, inter alia, on the ground that Abbott and AbbVie continued to sell Niaspan to consumers at an above-market price "at least through the beginning of 2014."  DP Compl. ¶ 95.

The Court agrees with plaintiffs that Abbott/AbbVie's alleged ongoing sales of Niaspan at a supracompetitive price constitute a continuing violation.  Every court to have considered this issue in the pay-for-delay context has held that a new cause of action accrues to purchasers upon each overpriced sale of the drug.  See, e.g., In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 549 (D.N.J. 2004) ("Plaintiffs' claims are not barred by the statute of limitations to the extent that they bought and overpaid for K-Dur within the applicable time limitations."); In re Buspirone Patent Litig., 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002) ("[I]f a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings."); In re Skelaxin (Metaxalone) Antitrust Litig., No. 12-md-2343, 2013 WL 2181185 (E.D. Tenn. May 20, 2013) (holding that the plaintiffs' claims were timely because they were "overcharged for metaxalone well into the limitations period").  Defendants have cited no persuasive case authority to the contrary.[6]

---

[6] U.S. District Judge William Young's decision in In re Relafen Antitrust Litigation, 286 F. Supp. 2d 56 (D. Mass. 2003), on which defendants rely, is inapposite.  In that case, Judge Young refused to apply the continuing-violation doctrine to a suit brought by a generic drug

Moreover, while it has yet to consider the issue in the context of a pay-for-delay lawsuit, in other antitrust cases, the U.S. Court of Appeals for the Third Circuit has specifically rejected the argument that an allegedly anticompetitive agreement must have occurred within the limitations period for the continuing-violation doctrine to apply.  For instance, in In re Lower Lake Eerie Iron Ore Antitrust Litigation, the Third Circuit rejected a "narrow rule that a plaintiff must tie all damages to specific overt acts within the limitations period," citing the fact that "continuing and accumulating damage may result from intentional, concerted inaction."  998 F.2d 1144, 1172 (3d Cir. 1993).  Likewise, in West Penn Allegheny Health System, Inc. v. UPMC, the court held that a cause of action may "accrue[] based on injurious acts that allegedly occurred during the limitations period," even if those acts were "merely 'reaffirmations' of acts done or decisions made outside the limitations period."  627 F.3d 85, 106 (3d Cir. 2010). Accordingly, the Court concludes that plaintiffs' claims are timely under the continuing-violation doctrine and that plaintiffs may recover damages for overcharges incurred during the four years preceding the filing of these lawsuits.[7]

---

manufacturer against a competitor for "litigat[ing] a sham lawsuit," but he expressly distinguished such a claim from a claim in which a purchaser sues for "the continuing act of charging higher prices."  Id. at 62.  In the latter type of case, Judge Young explained, "[t]he continuing act of charging higher prices [would be a] continuing violation, and a plaintiff [would] not be limited by the initial acts of predatory pricing by the defendant."  Id. To the extent there is any ambiguity as to Judge Young's position in In re Relafen, in In re Nexium (Esomeprazole) Antitrust Litigation, Judge Young expressly held that "every time the Direct Purchasers were overcharged for brand Nexium, they suffered a cognizable injury."  968 F. Supp. 2d 367, 400 (D. Mass. 2013).

    [7] The parties have not briefed, and thus the Court will not decide at this juncture, what filing date(s) applies.  Furthermore, although defendants have attached to their Motion to Dismiss an appendix containing a chart with the limitations periods applicable to the end-payor plaintiffs' various state-law claims, absent briefing on the applicable tolling and accrual rules, the Court declines to address the timeliness of the end-payor plaintiffs' state-law claims at this time on the ground that consideration of this issue would be premature.

2.     Fraudulent Concealment

Because the continuing-violation doctrine only allows a plaintiff to sue for overcharges incurred during the four years preceding its lawsuit, the Court must separately address whether plaintiffs are entitled to equitable tolling under the doctrine of fraudulent concealment.  To adequately plead fraudulent concealment, "a plaintiff must allege particularized facts sufficient to suggest '(1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts.'"  In re Processed Egg Prods. Antitrust Litig., MDL No. 2002, 2011 WL 5980001, at *3 (E.D. Pa. Nov. 30, 2011) (quoting Cetel v. Kirwan Fin. Grp., Inc., 460 F.3d 494, 509 (3d Cir. 2006)).  Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead fraudulent concealment with particularity.  See Byrnes v. DeBolt Transfer, Inc., 741 F.2d 620, 626 (3d Cir. 1984).

In asserting that they have alleged sufficient facts to sustain their heightened pleading burden under Rule 9(b), plaintiffs principally rely on four categories of allegations in the Complaints: (1) "Kos and Barr structured their agreement to cloak the payments under pretextual promotion and supply agreements"; (2) "when Kos and Barr announced their agreement, they made false statements, claiming that they were expediting generic entry, knowing they were actually delaying generic entry"; (3) "when executives from Kos and Barr were asked how much money changed hands, they refused to answer"; and (4) "when Kos filed copies of the settlement documents with the SEC, Kos redacted the dollar figures [and material terms] to hide the size of its large payments to Barr."  Opp'n to Mot. to Dismiss at 29-30 (citing DP Compl. ¶¶ 93, 97, 105-107; EP Compl. ¶¶ 82, 87, 163, 164).  With respect to the third prong, that of diligence,

plaintiffs argue that they have "plead[ed] both that they did not know about the conspiracy and that [d]efendants withheld pertinent facts that would prompt a reasonably diligent person to investigate the existence of a conspiracy." Id. at 30.

The Court concludes that plaintiffs have not pleaded fraudulent concealment with particularity as required by Federal Rule of Civil Procedure 9(b). As in the vast majority of pay-for-delay suits, "not only were the material terms of the settlement not concealed, [but] defendants affirmatively disclosed these terms to the public," including in press releases and in SEC filings. In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 223 (E.D.N.Y. 2003). While plaintiffs do aver that defendants redacted specific dollar amounts in public filings, refused to disclose certain details about their arrangements, and falsely characterized the settlement agreements as procompetitive, these facts, even if true, are insufficient to establish that plaintiffs were actively mislead. Tomlinson v. Goldman, Sachs & Co., 682 F. Supp. 2d 845, 848 (N.D. Ill. 2009) (noting that "mere denials of liability . . . do not support tolling of the limitations period"), aff'd sub nom. Premium Plus Partners, L.P. v. Goldman, Sachs & Co., 648 F.3d 533 (7th Cir. 2011); Donahue v. Pendleton Woolen Mills, Inc., 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986) (noting that a plaintiff does not need to learn the "intimate details" of an anticompetitive agreement for reasonable suspicion to arise). On this issue, the Court also notes that these dollar amounts were disclosed in 2007 — only two years after the settlement agreements were executed and six years before the filing of the Complaints.

Finally, even had plaintiffs adequately alleged that defendants took steps to conceal facts underlying plaintiffs' causes of action, there are no allegations that plaintiffs exercised

"reasonable diligence . . . within the limitations period."[8]  In re Ciprofloxacin, 261 F. Supp. 2d at

226.  "Generally, a plaintiff who fails to allege any due diligence is virtually foreclosed from

invoking the fraudulent concealment doctrine."  In re Processed Egg Prods., 2011 WL 5980001,

at *14.  Included in this pleading requirement is that a plaintiff "allege[] the [specific] date on

which she learned of her injury," In re Processed Egg Prods. Antitrust Litig., 931 F. Supp. 2d

654, 658 (E.D. Pa. 2013); see also White v. PNC Fin. Servs. Grp., Inc., No. 11-cv-7928, 2013

WL 3090823, at *7 (E.D. Pa. June 20, 2013), and "the circumstances of the discovery," Pension

Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc., No. 10-cv-

898, 2011 WL 4550191, at *5 (D.N.J. Sept. 29, 2011); see also In re Magnesium Oxide Antitrust

Litig., No. 10-cv-5943, 2011 WL 5008090, at *27 (D.N.J. Oct. 20, 2011).  In this case, plaintiffs

have alleged neither.  Accordingly, the Court concludes that plaintiffs are not entitled to

equitable tolling as a matter of law.[9]

## B.    Laches

Next, defendants argue that, notwithstanding application of the continuing-violation

doctrine, the defense of laches bars plaintiffs' claims because plaintiffs have failed to exercise

---

[8] Moreover, the Court rejects plaintiffs' argument that they have satisfied this prong by
alleging that the conspiracy was "self-concealing."  "Reasonable diligence . . . remains a separate
element for tolling even when there is a so-called 'self-concealing conspiracy,' which only
makes it unnecessary to show affirmative acts of concealment."  Quigley v. E. Bay Mgmt., Inc.,
No. 13-cv-3998, 2014 WL 2765076, at *3 (E.D. Pa. June 18, 2014).  Moreover, the alleged
conspiracy in this case "cannot be characterized as a self-concealing fraud" given that, inter alia:
(1) "the challenged agreements [did not] require secrecy to take effect," (2) with the exception of
certain details noted above, "the agreements . . . were immediately disclosed to the public," and
(3) "the 'scheme' established by defendants would not, and in fact did not, dissolve once the
agreements were made public [in full]."  In re Ciprofloxacin Hydrochloride Antitrust Litig., 261
F. Supp. 2d 188, 224 (E.D.N.Y. 2003).

[9] Defendants have moved the Court to take judicial notice of various public filings in
order to establish that plaintiffs were on notice of the facts underlying their causes of action well
before plaintiffs filed suit.  In light of the Court's conclusion that plaintiffs' allegations are
insufficient to plead fraudulent concealment with particularity, this part of defendants' Motion
for Judicial Notice is moot.

diligence in bringing timely suits, and defendants have been prejudiced as a result.  See, e.g., Mot. to Dismiss at 1 ("As a result of Plaintiffs' lack of diligence, Kos and Barr have suffered economic prejudice.  As Plaintiffs sat idle, Abbot purchased Kos, invested in Niaspan, and caused sales to more than double.").  The elements of laches are (1) lack of diligence by the plaintiff(s), and (2) prejudice to the defendant(s) as a result of the delay.  E.E.O.C. v. Great Atl. & Pac. Tea Co., 735 F.2d 69, 80 (3d Cir. 1980).

Whether the doctrine of laches can bar a pay-for-delay suit for antitrust damages is a matter of first impression.  Regardless, the Court need not decide this issue at this time because "facts evidencing unreasonableness of the delay, lack of excuse, and material prejudice to the defendant[s]" are not clearly set forth in plaintiffs' Complaints.  Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 988 F.2d 1157, 1161 (Fed. Cir. 1993).  As is typically the case with the defense of laches, the Court must defer ruling on this issue until it has a complete record.  Id. (holding that "[t]he strictures of Rule 12(b)(6) . . . are not readily applicable to a determination of laches"); Wright & Miller, Federal Practice & Procedure § 1277 (3d ed. 2007) ("[A] complaint seldom will disclose undisputed facts clearly establishing the defense of laches and a motion to dismiss generally is not a useful vehicle for raising the issue.").  Thus, the Court declines to dismiss plaintiffs' Complaints based on laches without prejudice to defendants' right to raise this issue by motion for summary judgment.

**C.    Existence of a Reverse Payment**

The third ground on which defendants move to dismiss the Consolidated Amended Complaints is that plaintiffs have not alleged the existence of a "large" and "unjustifiable" "reverse payment," as defined by the Court in FTC v. Actavis, 133 S. Ct. 2223 (2013).  In

response, plaintiffs argue that their "allegations easily satisfy" the pleading hurdle posed by Actavis. Opp'n to Mot. to Dismiss at 9.

In their briefing, defendants examine each of the three settlement agreements in turn. With respect to the Licensing Agreement, defendants argue that the no-AG provision does not constitute a reverse payment because it "involved only non-monetary transfers from Kos to Barr" and, thus, is akin to a non-suspect "license from the patent holder to the [alleged patent infringer] to enter [the market] prior to the patent's expiration." See Mot. to Dismiss at 23. Plaintiffs disagree with defendants' assertion that a "reverse payment" must take the form of cash consideration. Under plaintiffs' definition of the term, a "reverse payment" is "anything of value to the generic that can induce it to 'give up the patent fight.'" Opp'n to Mot. to Dismiss at 16 (quoting Actavis, 133 S. Ct. at 2233). Plaintiffs assert that a no-AG provision qualifies as a "reverse payment," citing their allegations that this type of provision "has tremendous value to the generic manufacturer," EP Compl. ¶ 48; see also DP Compl. ¶ 58, and "can be worth several hundreds of millions of dollars," EP Compl. ¶ 49; see also DP Compl. ¶ 58.[10]

Since Actavis, only three courts have ruled on whether a "reverse payment" must involve the exchange of cash, and they have reached divergent conclusions.[11] Defendants rely heavily on

---

[10] Indeed, the Supreme Court in FTC v. Actavis recognized the value of a no-AG provision to a generic manufacturer. 133 S. Ct. 2223, 2229 (2013) (noting that "th[e]180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" (quoting C. Scott Hemphill, Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem, 81 N.Y.U. L. Rev. 1553, 1579 (2006))); see also id. at 2235 ("[T]he special advantage of 180 days of an exclusive right to sell a generic version of the brand-name product . . . can be worth several hundred million dollars.").

[11] While declining to definitively rule on whether a no-AG provision can constitute a reverse payment, two other U.S. district courts, both in this Circuit, have expressed skepticism of the argument that defendants advance in this case. See In re: Wellbutrin XL Antitrust Litig., No. 08-cv-2431, slip op. at 4 (E.D. Pa. Jan. 17, 2014) (stating that the "[t]he Court is not prepared at this point to accept [the] argument that only a large cash payment from the patentee to the generic is subject to antitrust scrutiny under Actavis"); In re Lipitor Antitrust Litig., MDL No.

In re Lamictal Direct Purchaser Antitrust Litigation, in which Judge William Walls of the U.S. District Court of the District of New Jersey concluded "that the Supreme Court [in Actavis] considered a reverse payment [to be limited to] an exchange of money."  No. 12-cv-995, 2014 WL 282755, at *7 (D.N.J. Jan. 24, 2014).  In contrast, plaintiffs cite In re Nexium (Esmprazole) Antitrust Litigation, in which Judge William Young of the District of Massachusetts declined to "limit [the] principles [in Actavis] to monetary-based arrangements alone."  968 F. Supp. 2d 367, 392 (D. Mass. 2013).  Noting that "[n]owhere in Actavis did the Supreme Court explicitly require some sort of monetary transaction," Judge Young held that "[a]dopti[on of] a broader interpretation of the word 'payment' . . . [better] serves the purpose of aligning the law with modern-day realities."  Id.  In the third case, In re Loestrin 24 Fe Antitrust Litig., decided on September 4, 2014, Chief Judge William E. Smith of the U.S. District Court for the District of Rhode Island ruled that Actavis "requires cash consideration in order to trigger rule of reason scrutiny."  MDL No. 13-2472-S-PAS, 2014 WL 4368924, at *13 (D.R.I. Sept. 4, 2014).

    The Court agrees with Judge Young that the term "reverse payment" is not limited to a cash payment.  Far from requiring cash consideration, Black's Law Dictionary expansively defines "payment" as "performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation."  Bryan Garner, Black's Law Dictionary 1309 (10th ed. 2014) (emphasis added).  Consistent with this broad definition, courts have refused to limit the term "payment" to an exchange of cash in numerous areas of the law.  See, e.g., United States v. Juan-Manuel, 222 F.3d 480, 485 (8th Cir. 2000) ("[W]e hold that the words 'payment' and 'expectation of payment,' as used in the November 1997 commentary [to the U.S. Sentencing Guidelines], can refer to something other than money."); United States v.

2332, 2013 WL 4780496, at *26 (D.N.J. Sept. 5, 2013) ("[N]othing in Actavis strictly requires that the payment be in the form of money.").

Perez-Ruiz, 169 F.3d 1075, 1076 (7th Cir. 1999) ("Compensation is payment, and whether in specie or in some other form does not matter."); Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n, 878 F.2d 742, 751-52 (3d Cir. 1989) (holding that, under the 1984 "Repo Amendments," the term "'settlement payment' does not only mean payment of cash to the dealer by the purchaser, but also encompasses transfer of the purchased securities"). To read Actavis as so limited would be particularly anomalous in the context of antitrust law, in which "economic realities rather than a formalistic approach must govern." United States v. Densply Int'l, Inc., 399 F.3d 181, 189 (3d Cir. 2005).

Moreover, the Court rejects defendants' argument that a no-AG provision has the same economic effect as the grant of an exclusive license to enter the market prior to the expiration of a patent. The statement of the Supreme Court in Actavis on which defendants rely in making this argument is premised on the theory that, when bargaining for an early entry date alone, the parties are likely to agree on a date that reasonably approximates each party's relative strength in the infringement litigation.[12]  In contrast, a reverse payment of cash by the brand-name manufacturer to the potential generic manufacturer is likely to induce the generic to agree to enter the market at a date later than that to which it would otherwise agree based solely on the estimated strength of its litigation position. In this respect, a no-AG provision works exactly as would a payment of cash. One can logically infer that, all else equal, with a no-AG provision, a

---

[12] Transcript of Oral Argument Transcript at 10, Actavis, 133 S. Ct. 2229 (No. 12-416) (Malcolm L. Stewart, Deputy Solicitor General) ("[T]he kind of settlement that we would regard as legitimate[ is] where the parties simply agree to a compromise date of generic entry, then the parties would certainly take into account their own assessment of what would likely happen at the end of the suit. . . . And the problem with the reverse payment is that it gives the generic an incentive to accept something other than competition as a means of earning money."); id. at 20 (Malcolm L. Stewart, Deputy Solicitor General) (noting that "the natural effect of [a reverse] payment is not to facilitate . . . a picking of a point between the dates that the parties would otherwise insist on. . . . [I]t is very likely to cause the parties to agree to an entry date that's even later than the one brand name would otherwise find acceptable").

generic would be willing to agree to a later entry date than it would otherwise agree to in order to settle a patent-infringement case.

Finally, even assuming that the no-AG clause itself is not a reverse payment (and the Court concludes that it is), defendants may not improperly "dismember" plaintiffs' Consolidated Amended Complaints by examining each of the three settlement agreements in isolation.  See, e.g., In re Blood Reagents Antitrust Litig., 756 F. Supp. 2d 623, 631 (E.D. Pa. 2010) (DuBois, J.) (rejecting defendants' attempt "to dismember plaintiffs' Complaint in order to show how each allegation, in isolation, fails to sufficiently aver plausibility"); In re Processed Egg Prods. Antitrust Litig., 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011) (likening such an approach to "the parable of the blind men and the elephant in which a group of blind men try to agree on a description of an elephant solely on the basis of their own, individual limited perception"). Rather, the Licensing Agreement must be read in conjunction with the Co-Promotion and Manufacturing Agreements executed that same day.[13]

Although during oral argument, counsel for defendants attempted to distinguish the Co-Promotion and Manufacturing Agreements in this case from those deals at issue in Actavis, the allegations in the two cases are very similar.  Just as the payments for delayed entry in Actavis were alleged to be disguised as compensation to three generic manufacturers for backup-manufacturing assistance and for promoting brand-name AndroGel to urologists and primary care doctors,[14] FTC v. Watson Pharm., Inc., 677 F.3d 1298, 1305 (11th Cir. 2012), rev'd and

---

[13] That the three contracts must be read together is also consistent with the principle of contract law that "where separate writings are made as part of a single transaction relating to the same subject matter, they may be read together as one agreement."  Mannington Mills, Inc. v. Congoleum Indus., Inc., 610 F.2d 1059, 1066 (3d Cir. 1979); see also Mountaintop Ltd. P'ship v. Colombian Emeralds Int'l, Inc., CIV. 908/1993, 2001 WL 883585 (Terr. V.I. July 18, 2001).

[14] One generic manufacturer, Watson, "agreed to promote branded AndroGel to urologists," and another, Par, "agreed to promote it to primary care doctors."  FTC v. Watson

remanded sub nom. Actavis, 133 S. Ct. 2223, in this case, plaintiffs have alleged that Kos and Barr cloaked the reverse payments behind two spurious contracts — the Co-Promotion Agreement and the Manufacturing Agreement — under the guise of compensating Barr for serving as a backup manufacturer and for promoting Niaspan to obstetricians, gynecologists, and other physicians specializing in women's health, see DP Compl. ¶ 93; EP Compl. ¶ 2.  In support of this assertion, plaintiffs specifically allege that: (1) Kos did not need the standby services that Barr agreed to provide; (2) the Co-Promotion Agreement required Kos to pay Barr royalties based on a percentage of all sales of Niaspan and Advicor, despite that Barr was only required to promote the products to obstetricians and gynecologists; and (3) "the stand-by payment far exceeded the value that Barr provided to Kos by being ready to manufacture and supply Niaspan."  EP Compl. ¶ 82; see also DP Compl. ¶¶ 93-97, 103.

       The plausibility of plaintiffs' allegations concerning the true nature and purpose of these payments is bolstered by the fact that these agreements were expressly contingent on Barr's promise to delay generic entry.  Specifically, plaintiffs assert that, under the Co-Promotion Agreement, Kos was only obligated "to pay Barr a royalty on all of Kos'[s] sales of Niaspan and Advicor," "[for] as long as Barr kept its generic equivalent of Niaspan off the market."  DP Compl. ¶ 94, and that, under the Manufacturing Agreement, "[i]f Barr sold a generic equivalent of Niaspan to any third-party before September 20, 2013, Kos would have no further obligation to make quarterly payments to Barr."  Id. (emphasis added).  These allegations are consistent with the contention that the payments provided for in the Co-Promotion and Manufacturing Agreements did not "reflect[] traditional settlement considerations," Actavis, 133 S. Ct. at 2236,

---

Pharm., Inc., 677 F.3d 1298, 1305 (11th Cir. 2012), rev'd and remanded sub nom. Actavis, 133 S. Ct. 2223.

but rather the desire to ensure that Barr would not market its generic version of Niaspan or otherwise challenge the validity of Kos's Niaspan patents.

In concluding that plaintiffs' allegations are sufficient, the Court rejects defendants' attempt to discredit these allegations as "conclusory assertions" akin to the "formulaic recitation of the elements of a cause of action."  See Mot. to Dismiss at 25 (quoting Iqbal, 556 U.S. at 678). While plaintiffs' allegations in this case may lack the exquisite detail of those in the Actavis Complaint, "factual allegations . . . do not become impermissible labels and conclusions simply because the additional factual allegations explaining and supporting the articulated factual allegations are not also included."  Lamar v. Home Depot, No. 12-cv-552, 2013 WL 5718995, at *4 (S.D. Ala. Oct. 2013); see also In re Blood Reagents, 756 F. Supp. 2d at 632 (noting that Twombly does not "require 'heightened fact pleading of specifics'" (quoting Twombly, 550 U.S. at 555)). While it possible that defendants will be able to supply evidence to rebut plaintiffs' allegations regarding the true value of the services that Barr agreed to provide, Twombly does not require an antitrust plaintiff to plead facts that, if true, definitively rule out all possible innocent explanations.  See, e.g., In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 341 n.42 (3d Cir. 2010) ("[T]he Twombly standard does not . . . require as a general matter that the plaintiff plead facts supporting an inference of defendant's liability more compelling than the opposing inference.").

Accordingly, the Court concludes that plaintiffs have plausibly alleged the existence of a reverse payment for delayed entry with no legitimate procompetitive justification.  The Motion to Dismiss plaintiffs' Complaints on this ground is denied.

D.     **Antitrust Injury**

The final ground on which defendants have moved to dismiss plaintiffs' federal antitrust claims is that plaintiffs have failed to allege antitrust injury, which "is a necessary . . . condition of antitrust standing." Barton & Pittinos, Inc. v. Smithkline Beecham Corp., 118 F.3d 178, 182 (3d Cir. 1997). "To plead antitrust injury[,] [p]laintiff[s] must allege facts showing 1) that they suffered the type of injury or harm the antitrust laws were intended to prevent (i.e., type of injury) and 2) that the injury flows from the [D]efendants' unlawful or anti-competitive acts (i.e., causation)." In re K-Dur, 338 F. Supp. 2d at 534.

In asserting that antitrust injury was insufficiently pleaded, defendants focus on the second prong, that of causation. Defendants make two arguments. First, defendants assert "[p]laintiffs [have] made no factual allegations that, if true, would support the conclusion that Barr would have prevailed in the litigation and established that Kos's patents were invalid, unenforceable or not infringed." Mot. to Dismiss at 29. Second, defendants contend that, even if plaintiffs had so alleged, "the record from that litigation . . . . of which the Court may take judicial notice . . . . strongly suggests that Barr would have lost." Id. at 30-31. The Court first addresses the issue of judicial notice. It will then turn to the sufficiency of the allegations of antitrust injury in plaintiffs' Complaints.

1.     Judicial Notice of Facts in Underlying Patent Litigation

First, defendants assert that "[h]istorical facts concerning the [underlying] patent litigation, of which the Court may take judicial notice . . . . compel the conclusion that Barr would not have prevailed in that litigation, and thus would have been prevented by law from marketing a generic version of Niaspan." Reply in Supp. of Defs.' Mot. to Dismiss at 11. Specifically, defendants argue that these documents reveal that, in opposing Kos's application

25

for a preliminary injunction, Barr relied on a faulty theory of what constitutes an "invalidating public use," which the U.S. Court of Appeals for the Federal Circuit rejected just weeks after the settlement.  See Mot. to Dismiss at 30-31 (citing SmithKline Beecham Corp. v. Apotex Corp., 365 F.3d 1306 (Fed. Cir.), vacated by 403 F.3d 1328, 1329 (Fed. Cir. 2005) (en banc)).

"[A] district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings," except in limited circumstances.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997), none of which are applicable to this case.  Although a court may take judicial notice of court documents to establish the fact of the litigation or of the filings themselves, see Mohamed v. Donald J. Nolan, Ltd., 967 F. Supp. 2d 647, 652 (E.D.N.Y. 2013), in this case, defendants ask the Court to find a fact in dispute based on these documents, namely Barr's chances of prevailing in the underlying litigation.  This is a plainly improper use of the doctrine.  See, e.g., Brody v. Hankin, 145 F. App'x 768, 772 (3d Cir. 2005) ("[A] court that examines a transcript of a prior proceeding to find facts converts a motion to dismiss into a motion for summary judgment."); Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir. 2001) (holding that the district court erred in taking judicial notice of the transcript of an extradition hearing and considering disputed facts contained therein in deciding a motion to dismiss).  Accordingly, defendants' Motion for Judicial Notice is denied.

2.    Sufficiency of the Allegations in the Complaints

Because the Court will not take judicial notice of the contents of the documents in the underlying infringement litigation, the question becomes whether plaintiffs have plausibly averred that they have suffered an antitrust injury that flows from the allegedly anticompetitive settlement agreements.  Defendants argue that plaintiffs have failed to do so, asserting that the Complaints lack "factual allegations that, if true, would support the conclusion that Barr would

26

have prevailed in the [patent] litigation."  Mot. to Dismiss at 28 (quoting Areeda & Hovenkamp,

Antitrust Law ¶ 338 (3d ed. 2007)).  The Court rejects defendants' argument and concludes that

plaintiffs' allegations are sufficient.

     As an initial matter, the Court is not convinced that the hurdle of "antitrust injury" is as

high as defendants contend.  Under defendants' definition of the term, plaintiffs must allege —

and ultimately prove — that, but for the settlement agreements between Kos and Barr, Barr

would have secured a judgment of non-infringement, invalidity, and/or uenforceability of Kos's

patents.  In Actavis, however, the Supreme Court identified "prevent[ion of] the risk of

competition" as "the relevant anticompetitive harm."  133 S. Ct. at 2237; see also id. at 2236

(discussing the "concern that a patentee is using its monopoly profits to avoid the risk of patent

invalidation or a finding of noninfringement" (emphasis added)); id. (noting that the failure to

"face what might have been in a competitive market" is "the very anticompetitive consequence

that underlies the claim of antitrust unlawfulness"); id. at 2244 (Roberts, J., dissenting) ("The

majority seems to think that even if the patent is valid, a patent holder violates the antitrust laws

merely because the settlement took away some chance that his patent would be declared invalid

by a court.").  Moreover, while there is considerable scholarly debate on this subject in the

context of pay-for-delay suits,[15] the fact that probabilistic harm may constitute injury-in-fact is

---

[15] Compare Marc G. Schildkraut, Patent-Splitting Settlement and the Reverse Payment
Fallacy, 71 Antitrust L.J. 1033 (2004) (arguing that a probabilistic approach to assessing reverse-
payment settlement agreements is inconsistent with traditional burdens of proof), with Alden F.
Abbott & Suzanne T. Michel, The Right Balance of Competition Policy & Intellectual Property
Law: A Perspective on Settlements of Pharmaceutical Patent Litigation, 46 IDEA 1, 27 (2005)
("Consumers are always better off with the possibility of competitive entry and lower prices than
they are with the certainty of no entry."); James F. Ponsoldt & W. Henen Ehrenclou, The
Antitrust Legality of  Pharmaceutical Patent Litigation Settlements, 2006 U. Ill. J.L. Tech. &
Pol'y 37, 57 ("[T]he probability that consumers and retailers are deprived of the benefits of
competition as a result of reverse payments should suffice as antitrust injury."); Keith Leffler &
Christopher Leffler, Efficiency Trade-Offs in Patent Settlements: Analysis Gone Astray, 39 U. of

neither foreign to antitrust jurisprudence[16] nor to standing doctrine in other areas of the law.[17] That said, the Court need not delve into the merits of this debate at this time because plaintiffs' allegations are sufficient, even under defendants' definition of "antitrust injury," to survive the Motion to Dismiss.

Plaintiffs have plausibly alleged that, but for the anticompetitive settlement agreements, Barr would have prevailed in the underlying patent litigation against Kos.  First, a large, unexplained reverse payment "normally suggest[s] that the patentee has serious doubts about the patent's survival."  See id. at 2236 (majority).  One would expect that, had Kos been confident in the strength of its patent and/or the infringement of Barr's generic versions of Niaspan, Kos "w[ould have] proceed[ed] to trial, knowing that it c[ould] collect damages at the end."  In re Tamoxifen Citrate Antitrust Litig., 466 F.3d 187 (2d Cir. 2005) (Pooler, J., dissenting), abrogated by Actavis, 133 S. Ct. at 2236; see also Alden F. Abbott & Suzanne T. Michel, The Right Balance of Competition Policy & Intellectual Property Law: A Perspective on Settlements of Pharmaceutical Patent Litigation, 46 IDEA 1, 26 (2005); Herbert Hovenkamp et al., Anticompetitive Settlement of Intellectual Property Disputes, 87 Minn. L. Rev. 1719, 1758-59

_____

S. Fran. L. Rev. 33, 53 (2004) ("[I]t is anticompetitive for an incumbent manufacturer to enter into an agreement to eliminate potential competition based on the probability that the competition would in fact have occurred.").

[16] See, e.g., Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc., 518 F. Supp. 2d 1182 (C.D. Cal. 2007) (holding that "the loss of value of any chance of entering a contract with the city due to [a competitor's] bribery and collusion [with the city] qualifies as 'a thing of material value owned or possessed,'" and, thus, loss of this chance constitutes antitrust injury under the Clayton Act); Fishman v. Estate of Wirtz, 807 F.2d 520, 533 (7th Cir. 1986) ("Plaintiffs alleged that they were deprived of a fair shot at winning a legal monopoly.  There is no reason why this injury is not an antitrust injury . . . .").

[17] See, e.g., N. Shore Gas Co. v. E.P.A., 930 F.2d 1239, 1242 (7th Cir. 1991) ("[A] probabilistic benefit from winning a suit is enough 'injury in fact.'"); Sabine River Auth. v. U.S. Dep't of Interior, 951 F.2d 669, 674 (5th Cir. 1992)  (same) (quoting N. Shore Gas, 930 F.2d at 1242).

(2003) ("The less likely the patentee is to win, the more likely it is willing to pay a generic to stay out of the market.").  Instead, Kos did precisely the opposite, tendering a large reverse payment to Barr, the alleged infringer, to settle Kos's patent-infringement lawsuits.

Moreover, plaintiffs do not rely on allegations of a reverse-payment alone.  Plaintiffs also allege that prior to filing its ANDA applications, Barr spent "over $2.3 million" in conducting "extensive research analysis" and "legal due diligence . . . concerning the potential infringement or invalidity of Kos' [sic] patents,"  DP Compl. ¶ 67, and that "Kos knew there was a substantial risk that it would lose the patent litigation," id. ¶ 75.  See also id. ¶ 91 (alleging that Kos "[r]ecogniz[ed] the substantial likelihood that its Niaspan patents would be invalidated and/or that the generics' products would be adjudged non-infringing").  These factual allegations provide additional support for plaintiffs' position on antitrust injury.

Finally, Barr's willingness to launch at risk signifies that Barr was confident that it would ultimately prevail against Kos in the infringement litigation.  Launching a generic at-risk during the midst of patent litigation is risky; "if the court [subsequently] finds the subject patent(s) valid, enforceable, and infringed, the generic company may face substantial damages from its sales of an infringing product."  Id. ¶ 5.  Thus, because a generic manufacturer embroiled in patent-infringement litigation "must . . . be sure of its footing to plan for attempt an 'at risk' launch," id. ¶ 80, "preparations by a generic firm to launch 'at risk'" may allow a Court to "infer[ that] . . . . the patent protection is weak," C. Scott Hemphill, An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition, 109 Colum. L. Rev. 629, 650 (2009).

In this case, plaintiffs have alleged not only that Barr planned to launch at-risk before the conclusion of the infringement litigation, but also that "Barr was so sure . . . that Kos' [sic]

Niaspan patents were invalid, unenforceable, or not infringed by Barr's product . . . that Barr planned to launch its generic extended-release niacin" at the very first opportunity: "as soon as the FDA gave the final green light."  DP Compl. ¶ 5.  Further, the Court can infer that Barr's threat was credible.  Plaintiffs have alleged that, by December 2004, Kos's stock dropped by thirteen percent in anticipation of Barr's impending at-risk launch," and that, "[b]y the end of the first quarter of 2005, Kos had accumulated more than $1.3 million in inventory" in the event that Barr's plans came to fruition.  See EP Compl. ¶¶ 45-48, 71-72.

Finally, in concluding that plaintiffs' allegations are sufficient to pass muster, the Court rejects defendants' assertion that plaintiffs' allegations lack sufficient detail.  "Plaintiffs . . . are not required to plead detailed evidentiary matter in order to survive a motion to dismiss."  Direct Benefits, LLC v. TAC Fin. Inc., No. 13-cv-1185, 2014 WL 671616, at *8 (D. Md. Feb. 20, 2014) (quoting Keeney v. Larkin, 306 F. Supp. 2d 522, 528 (D. Md. 2003)).[18]  The test for whether to dismiss the case at this juncture turns on "the plausibility of the allegations," not whether plaintiffs have alleged sufficient facts to "compel" the inference that defendants are liable for the violations alleged.  See In re Text Messaging Antitrust Litig., 630 F.3d 622, 629 (7th Cir. 2010).  In this case, plaintiffs' allegations support an inference that they suffered an injury-of-fact flowing from defendants' allegedly unlawful conduct.  More is not required at the pleading stage, particularly given that antitrust injury "involves complex questions of fact," ill-suited for resolution on a motion to dismiss.[19]  See Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.,

---

[18] Nor are direct factual allegations of Barr's chances of litigation success required; "inferential allegations" can suffice.  Grp. Health Plan, Inc. v. Philip Morris USA, Inc., 344 F.3d 753, 765 (8th Cir. 2003).

[19] Citing this principle, numerous courts, when faced with similar allegations of delayed generic entry, have refused to accept the argument that antitrust injury was inadequately pleaded.  See, e.g., Rochester Drug Co-op., Inc. v. Braintree Labs., 712 F. Supp. 2d 308, 318 (D. Del. 2010) ("As 'the existence of antitrust injury is not typically resolved through motions to

113 F.3d 405, 417 (3d Cir. 1997); Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir.

1995).  Accordingly, the Court will not dismiss plaintiffs' Complaints on this ground.

## V.    ANALYSIS OF STATE-LAW CLAIMS

The end-payor plaintiffs collectively assert claims under the antitrust statutes of twenty-

one states and the District of Columbia and the consumer-protection statutes of sixteen states and

the District of Columbia.  The end-payor plaintiffs also bring common-law claims for unjust

enrichment under the laws of forty-eight states, the District of Columbia, and unspecified U.S.

territories.  Defendants move to dismiss certain of these claims on the grounds that plaintiffs lack

standing and/or that plaintiffs have failed to allege facts demonstrating a plausible right to relief.

### A.    Constitutional Standing

As the standing requirement is derived from Article III, it is a threshold inquiry in every

case, one for which "[t]he party invoking federal jurisdiction bears the burden of [proof]."  Lujan

v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  Although the parties in this case agree that

the named end-payor plaintiffs must have standing to assert their claims on behalf of the putative

class, they disagree as to the constitutional requirements of standing in the context of a putative

class action.  According to defendants, the end-payor plaintiffs "lack Article III standing to assert

any claims under the laws of states in which none of them every paid any portion of the price of

a Niaspan prescription."  Mot. to Dismiss at 31.  In contrast, the end-payor plaintiffs assert that

they have "standing to pursue claims in those states in which the[ named plaintiffs] did not make

---

dismiss,' the court declines to analyze any further disputes with respect to causation and injury
on this motion." (quoting Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405,
417 (3d Cir. 1997))); see also, e.g., In re Flonase Antitrust Litig., 798 F. Supp. 2d 619, 627 (E.D.
Pa. 2011); In re Neurontin Antitrust Litig., MDL No. 1479, 2009 WL 2751029, at *12 (D.N.J.
Aug. 28, 2009); In re Gabapentin Patent Litig., 649 F. Supp. 2d 340, 355 (D.N.J. 2009); Abraxis
Bioscience, Inc. v. Navinta LLC, No. 07-cv-1251, 2008 WL 2967034, at *6 (D.N.J. July 31,
2008); Biovail Corp. Int'l v. Hoechst Aktiengesellschaft, 49 F. Supp. 2d 750, 771 (D.N.J. 1999).

purchases," as long as they, inter alia, "purchased and/or reimbursed their members' claims in at least one state."  Resp. in Opp'n to Mot. to Dismiss at 34-35.

To establish Article III standing, the named plaintiffs in a putative class action "must allege and show that they personally have been injured."  Klein v. Gen. Nutrition Cos., 186 F.3d 338, 345 (3d Cir. 1999) (quoting Lewis v. Casey, 518 U.S. 343, 357 (1996)).  In performing this inquiry "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one plaintiff has suffered the injury that gives rise to that claim."  In re Wellbutrin XL Antitrust Litig., 260 F.R.D. 143, 152 (E.D. Pa. 2009) (quoting Griffin v. Dugger, 823 F.2d 1475, 1483 (11th Cir. 1987)).  It is not sufficient that the "injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  Klein, 186 F.3d at 345 (quoting Lewis, 518 U.S. at 357).  "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."  O'Shea v. Littleton, 414 U.S. 488, 494 (1974).

Because standing must be resolved on a claim-by-claim basis, the Court agrees with defendants that the "named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury."[20]  In re Packaged Ice Antitrust

---

[20] To the extent that plaintiffs are arguing that the Court should defer ruling on the issue of standing until class certification, the Court declines to do so.  As numerous courts have commented, deferring this standing determination would "allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union."  In re Magnesium Oxide Antitrust Litig., No. 10-cv-5943, 2011 WL 5008090, at *8 (D.N.J. Oct. 20, 2011) (quoting In re Wellbutrin XL Antitrust Litig., 260 F.R.D. 143, 154-56 (E.D. Pa. 2009)); In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig., No. 12-cv-169, 2013 WL 5503308, at *12 (D.N.J. Oct. 2, 2013) (same); In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig., No. 13-md-2451, 2014 WL 868827, at *13 (E.D.N.Y. Mar. 5, 2014) (same), on reconsideration, No. 13-md-2451, 2014 WL 1598017 (E.D.N.Y. Apr.

Litig., No. 08-md-01952, 2011 WL 891160, at *11 (E.D. Mich. Mar. 11, 2011).  The alleged injury in this case is paying too much for Niaspan; thus, the named plaintiffs may bring suit only under the laws of states in which they reside or in which they either purchased or made reimbursements for Niaspan.  See, e.g., In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010) ("Case law supports the position that Plaintiffs have suffered injury and have standing in states where they purchased a drug or reimbursed their members for purchases of a drug."); Sheet Metal Workers Local 441 Health & Welfare Plan v. Glaxosmithkline, PLC, 263 F.R.D. 205, 210 (E.D. Pa. 2009); In re Wellbutrin XL, 260 F.R.D. at 155-56; In re Terazosin Hydrochloride Antitrust Litig., 160 F. Supp. 2d 1365, 1370-71 (S.D. Fla. 2001).

The end-payor plaintiffs have not alleged that any one named plaintiff either resides in or made purchases and/or reimbursements in Alaska, Arkansas, the District of Columbia, Hawaii, Idaho, Kansas, Louisiana, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Washington, or the unspecified U.S. territories.  Accordingly, the end-payor plaintiffs' claims based on the laws of these states, the District of Columbia, and the unspecified U.S. territories are dismissed.

## B.   Claims Brought Under State Antitrust Statutes

Next, defendants move to dismiss the end-payor plaintiffs' claims brought under the antitrust statutes of Oregon, Rhode Island, and Utah for lack of statutory standing.  The Court addresses defendants' arguments in turn.

### 1.   Oregon and Rhode Island

First, defendants move to dismiss the end-payor plaintiffs' Oregon and Rhode Island antitrust claims on the ground that both "jurisdictions mirror federal law in prohibiting antitrust

---

21, 2014); McGuire v. BMW of N. Am., LLC, No. 13-cv-7356, 2014 WL 2566132, at *7 (D.N.J. June 6, 2014) (same).

claims by indirect purchasers."[21]  Mot. to Dismiss at 32.  In response, the end-payor plaintiffs

assert that, while both Oregon and Rhode Island once barred antitrust claims brought by indirect

purchasers, the Oregon and Rhode Island legislatures have since passed what are commonly

known as "Illinois Brick repealer statutes," authorizing indirect purchasers to recover for

violations of their respective state antitrust statutes.

    The end-payor plaintiffs are correct in their assertions that the Oregon legislature passed

an Illinois Brick repealer statute in 2010, see Or. Rev. Stat. § 646.770-780, and that the Rhode

Island legislature did so in 2013, see R.I. Gen. Laws § 6-36-7(d).  However, the repealer statutes

of both states are presumed to apply only prospectively, absent evidence of legislative intent to

the contrary.  Hydro-Mfg., Inc. v. Kayser-Roth Corp., 640 A.2d 950, 954 (R.I. 1994) ("It is well

established . . . that [Rhode Island] statutes and their amendments are presumed to apply

prospectively."); Strizver v. Wilsey, 150 P.3d 10, 12 (Or. 2006) (noting that "substantive

statutes" — those that "impair existing rights, create new obligations or impose additional duties

with respect to past transactions" — are presumed to apply prospectively).  The end-payor

plaintiffs have cited no such evidence.  Accordingly, the end-payor plaintiffs may not recover for

any overcharges incurred before the Oregon and Rhode Island repealer statutes took effect.

### 2.   Utah

    Defendants argue that the end-payor plaintiffs' claims brought under the Utah Antitrust

Act must be dismissed for failure to meet Utah's statutory citizenship or residency requirement.

See Utah Code § 76-10-3109(1)(a) ("A person who is a citizen of this state or a resident of this

---

    [21] In Illinois Brick Co. v. Illinois, the Supreme Court held that indirect purchasers are
precluded from recovery under Section Four of the Clayton Act, citing, inter alia: (1) the desire
to avoid "injecting extremely complex issues into the case," (2) the need to prevent "diffusing
the benefits of bringing a treble-damages action," and (3) the goal of reducing the "uncertainty of
how . . . overcharge[s] w[ill] be apportioned among the various plaintiffs."  431 U.S. 720, 745
(1977).

state and who is injured or is threatened with injured or is threatened with injury may bring an action for injunctive relief and damages . . . ." (emphasis added)).  In response, the end-payor plaintiffs assert that the statutory provision in question only requires that a member of the putative class, rather than one of the named end-payor plaintiffs, be a resident or citizen of Utah.

Although there is a dearth of case law on this point, the Court agrees with the conclusion of the court in In re Magnesium Oxide Antitrust Litigation that Utah's citizen/residency requirement is one of statutory standing.  2011 WL 5008090, at *8 n.10.  Accordingly, at least one named plaintiff must be a citizen or resident of Utah in order to seek classwide relief under the Utah Antitrust Act.  See Allen v. Hyland's Inc., No. 12-cv-01150, 2012 WL 1065578, at *38 n.25 (D. Mass. Mar. 27, 2012) (noting that at least one named plaintiff must satisfy each requirement of statutory standing).  Because no named plaintiff is a citizen and/or resident of Utah, the end-payor plaintiffs' Utah Antitrust Act claim is dismissed.

### C.  Claims Brought Under State Consumer-Protection Statutes

Defendants move to dismiss the end-payor plaintiffs' claims brought under the consumer-protection statutes of Delaware, Minnesota, New Hampshire, Pennsylvania, Rhode Island, Tennessee, and Virginia.[22]  The end-payor plaintiffs have agreed to withdraw their Tennessee and Delaware consumer-protection claims; thus, the Court dismisses these claims.  The Court addresses defendants' arguments with respect to the remaining states in turn.

#### 1.  Minnesota, Pennsylvania, and Virginia

Defendants argue that the consumer-protection laws of Minnesota, see Minn. Stat. § 325F.69(1), Pennsylvania, see 73 P.S. Trade & Commerce § 201-2, -3, and Virginia, see Va.

---

[22] Defendants also move to dismiss the end-payor plaintiffs' claim brought under South Dakota's consumer-protection statute for failure to state a claim, however, as discussed supra, the Court already has concluded that the named end-payor plaintiffs do not have constitutional standing to bring any claims under South Dakota law.

Code Ann. §§ 59.1-196 to -207, only apply to conduct that is <u>deceptive</u> or <u>fraudulent</u>, as opposed to merely anticompetitive.  <u>See, e.g.</u>, <u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 350 F. Supp. 2d 160, 189-90 (D. Me. 2004) (Minnesota, Pennsylvania, Virginia); <u>In re Polyurethane Foam Antitrust Litig.</u>, No. 10-md-2196, slip op. at 12 (N.D. Ohio July 19, 2011) (Pennsylvania).  In response, the end-payor plaintiffs do not dispute that these three consumer-protection statutes contain such a requirement, but cite a handful of cases, which the end-payor plaintiffs assert evince the fact that their allegations are sufficient.

Although there are some cases involving allegations of delayed generic drug entry in which courts have sustained claims brought under these and similar consumer-protection statutes, these cases are factually distinguishable.  Unlike in this case, those indirect-purchaser plaintiffs did allege deception and fraud as part of the alleged anticompetitive conspiracies, including the filing of sham-infringement lawsuits, <u>see</u> <u>Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC</u>, 737 F. Supp. 2d 380, 413 (E.D. Pa. 2010), the filing of false-citizen petitions, <u>see</u> <u>In re Flonase</u>, 692 F. Supp. 2d at 536 n.8; <u>In re DDAVP Indirect Purchaser Antitrust Litig.</u>, 903 F. Supp. 2d 198, 221 (S.D.N.Y. 2012), and the securing of patents by fraud, <u>see</u> <u>Abbott Labs. v. Teva Pharm. USA, Inc.</u>, 432 F. Supp. 2d 408, 434 (D. Del. 2006).  There are no such allegations of deceit in this case.  Accordingly, the end-payor plaintiffs' Minnesota, Pennsylvania, and Virginia consumer-protection claims are dismissed.

2.    <u>New Hampshire</u>

Defendants argue that the Court must dismiss the end-payor plaintiffs' claims brought under the New Hampshire Consumer Protection Act (NHCPA) because the end-payor plaintiffs have not alleged that unfair and/or deceptive conduct occurred within New Hampshire, as the statute requires.  <u>See</u> N.H. Rev. Stat. Ann. § 358-A:2 (rendering it "unlawful for any person to

use any unfair method of competition or any unfair or deceptive act or practice in the conduct of

any trade or commerce within th[e] state" (emphasis added)). In response, the end-payor

plaintiffs contend that they have satisfied this pleading requirement by alleging that consumers

purchased Niaspan — and, thus, incurred overcharges — within the state.

"[C]ourts interpreting New Hampshire's consumer protection law disagree as to whether

a nationwide scheme in which plaintiffs play a higher price in the state is sufficient to satisfy the

statute's requirements." In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust

Litig., No. 12-cv-169, 2013 WL 5503308, at *22 (D.N.J. Oct. 2, 2013). Compare In re

Chocolate Confectionary Antitrust Litig., 749 F. Supp. 2d 224, 234-35 (M.D. Pa. 2010)

(rejecting the defendants' argument that the indirect-purchaser plaintiffs had not alleged that a

violation of the NHCPA occurred "within th[e] state"), with In re Refrigerant Compressors II,

No. 09-cv-2042, 2013 WL 1431756, at *17-18 (E.D. Mich. Apr. 9, 2013) (dismissing the

indirect-purchaser plaintiffs' claims because the alleged conduct did not occur within the state).

Although the case law is admittedly mixed, the Court concludes that a broad construction

of the statute is consistent with the New Hampshire legislature's intent that "the CPA . . . be

construed broadly." LaChance v. U.S. Smokeless Tobacco Co., 931 A.2d 571, 579 (N.H. 2007).

Moreover, the statute "defines '[t]rade' and 'commerce' to 'include any trade or commerce

directly or indirectly affecting the people of this state." Id. at 96 (quoting N.H. Rev. Stat. § 358-

A:1, :2); see also id. (concluding that indirect purchasers had stated a claim because they alleged

"conduct which was part of trade or commerce that had direct or indirect effects on the people of

th[e] state"); Ciardi v. F. Hoffman-La Roche, Ltd., 762 N.E.2d 303, 308 (N.H. 2002)

(emphasizing that the statute "allows any person who has been injured by trade or commerce

indirectly affecting the people of th[e] Commonwealth [of New Hampshire] to bring a cause of action").

Finally, other courts have refused to dismiss allegations similar to those at issue in this case.  See In re Chocolate Confectionary Antitrust Litig., 749 F. Supp. 2d 224, 235 (M.D. Pa. 2010) (holding that a defendant's injection of price-fixed chocolates into the New Hampshire market satisfied this statutory requirement); In re DDAVP, 903 F. Supp. 2d at 231 (refusing to dismiss the plaintiffs' claim because "New Hampshire commerce and citizens of the state were affected by [the] [d]efendants' allegedly deceptive conduct").  Given that the statute is broadly worded, and in the absence of detailed briefing on this issue, the Court finds this line of cases persuasive on the record before it.  The Court therefore denies defendants' Motion to Dismiss the end-payor plaintiffs' NHCPA claim.

3.    Rhode Island

The final consumer-protection claim that defendants move to dismiss is the end-payor plaintiffs' claim brought under Rhode Island's Deceptive Trade Practices Act (DTPA).  Defendants assert that this "law [1] does not cover the challenged conduct and [2] does not create a claim for any business entity plaintiffs."[23]  Reply in Supp. of Mot. to Dismiss at 25.  In response, the end-payor plaintiffs maintain that their allegations meet the statutory requirements.

With respect to defendants' first argument — that the statute does not cover the type of anticompetitive conduct alleged in this case — numerous courts have sided with the end-payor

---

[23] In defendants' opening brief, they also cite a case for the proposition that Rhode Island's Deceptive Trade Practices Act "does not apply to 'all those activities and businesses which are subject to monitoring by state or federal regulatory bodies or officers.'"  Mot. to Dismiss at 33 n.21 (quoting State v. Piedmont Funding Corp., 382 A.2d 819, 822 (R.I. 1978)).  However, after the end-payor plaintiffs asserted in response that "private prescription pharmaceutical pricing is not regulated by any government entity," Opp'n to Mot. to Dismiss at 37, defendants did not address the issue in their Reply.  The Court declines to rule on this issue in view of that limited briefing.

plaintiffs' position.  See, e.g., In re Auto. Parts Antitrust Litig., No. 12-md-02311, 2014 WL 2993742, at *26 (E.D. Mich. July 3, 2014) ("The Court considered the viability of this claim in the wire harness cases and concluded that the [DTPA] protects consumers from price-fixing claims."); In re TFT-LCD (Flat Panel) Antitrust Litig., 586 F. Supp. 2d 1109, 1129 (N.D. Cal. 2008) ("find[ing] [the] plaintiffs' allegations sufficient to state a claim under the Rhode Island [consumer-protection] statute"); In re Aftermarket Filters Antitrust Litig., No. 08-cv-4883, 2010 WL 1416259, at *1 (N.D. Ill. Apr. 1, 2010) ("[A]llegations of a price fixing conspiracy have been held to be sufficient to state a claim under the Rhode Island Unfair Trade Practice and Consumer Protection Act . . . ."); In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 586 (M.D. Pa. 2009) ("[C]onsumers subject to collusive pricing possess a cognizable claim under the [DTPA].").  The Court finds the reasoning of these courts persuasive and denies defendants' Motion to Dismiss the end-payor plaintiffs' DTPA claim on this ground.

Defendants did not raise their second ground for dismissal — that the DTPA does not create a claim for any business-entity plaintiffs — until they filed their Reply.  Thus, the end-payor plaintiffs have not had an opportunity to respond.  The Court declines to rule on this issue under these circumstances[24] and denies defendants' Motion to Dismiss the end-payor plaintiffs' DTPA claim on this ground.

D.    **Unjust Enrichment Claims**

Defendants lastly move to dismiss the end-payor plaintiffs' claims for unjust enrichment brought under the laws of the following states: Alabama, California, Colorado, Connecticut,

---

[24] The Court notes that there is authority for the proposition that an issue raised for the first time in a reply is deemed to be waived.  See, e.g., United States v. Martin, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006) ("A reply brief is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues."); Bishop v. Sam's East, Inc., No. 08-cv-4550, 2009 WL 1795316, at *5 (E.D. Pa. June 23, 2009) (ruling that an issue raised for first time in a reply brief "is waived").

Delaware, Florida, Georgia, Illinois, Kentucky, Maryland, New Hampshire, Oregon,

Pennsylvania, Rhode Island, South Carolina, Texas, and Virginia.[25]   The Court addresses

defendants' arguments in turn.

    1.    <u>States Barring Statutory Recovery for Indirect Purchasers</u> (Colorado, Connecticut, Delaware, Georgia, Illinois, Kentucky, Maryland, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Virginia)

First, defendants argue that plaintiffs' unjust-enrichment claims should be dismissed if

allowing such a claim to proceed would constitute an "end-run" around state antitrust law.

Despite a handful of contrary case law cited by the end-payor plaintiffs, the vast majority of

courts have held that indirect purchasers may not bring state claims for unjust enrichment if they

otherwise would be barred from bringing a claim under that state's antitrust and consumer-

protection statutes, absent a showing that the common law of the state in question expressly

allows for such recovery.   <u>In re Terazosin</u>, 160 F. Supp. 2d at 1380 ("State legislatures and courts

that adopted the <u>Illinois Brick</u> rule against indirect purchaser antitrust suits did not allow 'an end

run around the policies allowing only direct purchasers to recover'" (quoting <u>Abbott Labs., Inc.</u>

<u>(Ross Labs. Div.) v. Segura</u>, 907 S.W.2d 503, 506 (Tex. 1995))); <u>In re Flonase</u>, 692 F. Supp. 2d

at 542; <u>In re K-Dur Antitrust Litig.</u>, No. 01-cv-1652, 2008 WL 2660780, at *5 (D.N.J. Feb. 28,

2008); <u>In re New Motor Vehicles</u>, 350 F. Supp. 2d at 209-212; <u>In re Microsoft Corp. Antitrust</u>

<u>Litig.</u>, 241 F. Supp. 2d 5563, 565 (D. Md. 2003); <u>In re TFT-LCD (Flat Panel) Antitrust Litig.</u>,

599 F. Supp. 2d 1179, 1192 (N.D. Cal. 2009).

---

[25] Defendants also move to dismiss the end-payor plaintiffs' Alaska, Arkansas, Idaho, Louisiana, Montana, North Dakota, Oklahoma, and Washington unjust-enrichment claims for failure to state a claim, however, as discussed <u>supra</u>, the Court already has concluded that the named end-payor plaintiffs do not have constitutional standing to bring any claims under laws of these states.

This Court joins this majority of courts in concluding that "allowing . . . unjust enrichment claims in those states that explicitly disallow indirect purchasers from pursuing antitrust [and] consumer-protection claims . . . would result in circumvention of the policies expressed by state legislatures through limitations inherent in those laws." Sheet Metal Workers, 737 F. Supp. 2d at 425. Thus, the Court dismisses the end-payor plaintiffs' unjust-enrichment claims brought under the laws of any state in which indirect purchasers may not bring an antitrust or a consumer-protection claim, absent authority that courts of that state would likely allow such a common-law claim to proceed. That said, among the states that currently allow indirect purchasers to bring statutory antitrust claims, some only allow indirect purchasers to do so pursuant to recently-enacted Illinois Brick repealer statutes. The parties have not briefed the issue of whether, in those states which have recently enacted Illinois Brick repealer statutes, the end-payor plaintiffs may recover damages for overcharges incurred prior to the adoption of the repealer statutes through their assertion of unjust-enrichment claims. Because this issue has not been briefed, the Court declines to rule on it.

The end-payor plaintiffs cite no authority for the proposition that indirect purchasers may bring an antitrust or consumer-protection claim under the laws of Colorado, Delaware, Georgia, Kentucky, Pennsylvania, South Carolina, Texas, or Virginia, or for the proposition that these states allow indirect purchasers to recover for an antitrust violation by way of an autonomous unjust-enrichment claim.[26] Accordingly, the Court dismisses the unjust-enrichment claims

---

[26] With respect to these eight states, plaintiffs only cite two cases both of which are inapposite. In In re K-Dur Antitrust Litigation, 338 F. Supp. 2d 517 (D.N.J. 2004), Judge Joseph Greenaway did not consider the end-run argument. Likewise, plaintiffs' citation to In re G-Fees Antitrust Litigation, 584 F. Supp. 2d 26 (D.D.C. 2008), is unavailing. That district-court case, which is not binding on this Court, is an outlier decision in which the court held "that a state's adherence to the rule of Illinois Brick . . . [does not necessarily] dispossess[] [a purchaser] of his right to pursue a common law equitable remedy." Id. at 46. The Court already has expressly

brought under the laws of these eight states.  However, because the end-payor plaintiffs cite

specific case law in support of their Connecticut, Illinois, Maryland, Oregon, and Rhode Island

unjust-enrichment claims, the Court will conduct a more detailed analysis of these five claims in

turn.

a)      Connecticut

Defendants argue that the end-payor plaintiffs' unjust-enrichment claim brought under

Connecticut common law should be dismissed because indirect purchasers cannot seek recovery

under either the Connecticut Antitrust Act or the Connecticut Unfair Trade Practices Act

(CUPTA).  The Court agrees.  In Vacco v. Microsoft Corp., the Supreme Court of Connecticut

held that indirect purchasers could not bring suit under either statute, citing "the same concerns

that the [C]ourt in Illinois Brick identified in declining to allow indirect purchasers to recover

damages under § 4 of the Clayton Act."  793 A.2d 1048, 1067 (Md. 2002).  Because the same

policies ostensibly apply to a common-law claim for unjust enrichment, allowing an unjust-

enrichment claim to proceed would subvert legislative intent.  See, e.g., In re Terazosin, 160 F.

Supp. 2d at 1380 (noting that "[t]he end payors' unjust enrichment claim raise[d] identical

concerns" to those expressly by the Supreme Court in Illinois Brick).

The end-payor plaintiffs' citation to FTC v. Mylan, 99 F. Supp. 2d 1, 5-6 (D.D.C. 1999)

does not alter the Court's analysis.  In Mylan, a federal district court ruled that, because the

Connecticut legislature authorized the State of Connecticut to "seek injunctive relief [on behalf

of indirect purchasers] for violations of [CUPTA]," allowing the State to bring a state-law claim

for restitution would not be inconsistent with legislative policy.  Id. at 5-6.  In this case, however,

---

rejected that position, as discussed supra.

it is private plaintiffs, not the State of Connecticut, that have brought suit.  Accordingly, the end-payor plaintiffs' Connecticut unjust-enrichment claim is dismissed.

> b)      Illinois

Defendants similarly argue that allowing the end-payor plaintiffs to bring an unjust-enrichment claim under the common law of Illinois would subvert the choice of the Illinois legislature to follow Illinois Brick.  The end-payor plaintiffs do not dispute that neither the Illinois Antitrust Statute nor the Illinois Consumer Fraud and Deceptive Business Practices Act authorizes them to bring suit.  They argue, however, that an unjust-enrichment claim is a separate cause of action under the common law of Illinois, and that such claim should be allowed to proceed.

The Court rejects the end-payor plaintiffs' argument.  First, the viability of an unjust-enrichment claim as "an independent cause of action . . . is unsettled in Illinois."  Reid v. Unilever U.S., Inc., 964 F. Supp. 2d 893, 923 (N.D. Ill. 2013).  Second, the fact that a plaintiff may be able to bring an independent unjust-enrichment claim in certain circumstances does not alter the Court's conclusion that allowing the end-payor plaintiffs to do so in this case "would undermine Illinois'[s] legislative choices regarding antitrust law."  In re Flonase, 692 F. Supp. 2d at 544; see also, e.g., Sheet Metal Workers, 737 F. Supp. 2d at 435 (dismissing an Illinois unjust-enrichment claim because indirect-purchaser plaintiffs are barred from asserting such claims under the Illinois antitrust and consumer-protection statutes).  Accordingly, the end-payor plaintiffs' Illinois unjust-enrichment claim is dismissed.

> c)      Maryland

Defendants argue that the end-payor plaintiffs may not pursue a claim for unjust enrichment under Maryland law because the legislature has not provided them with a statutory

cause of action. Defendants are correct that, with certain inapplicable exceptions, indirect

purchasers cannot recover under either the Maryland Antitrust Act or the Maryland Consumer

Protection Act for an antitrust violation.  See, e.g., Davidson v. Microsoft Corp., 792 A.2d 336,

344 (Md. Ct. Spec. App. 2002).

      Although the end-payor plaintiffs do not contest this point, they argue that Maryland

common law recognizes unjust enrichment as an independent cause of action.  The only state-

law case that the end-payor plaintiffs cite in support of this argument, Bank of America v.

Gibbons, 918 A.2d 565, 572 (Md. 2007), is not an antitrust case and, thus, offers no support for

the proposition that indirect purchasers may bring an autonomous unjust-enrichment claim for

anticompetitive conduct under Maryland law.  The end-payor plaintiffs' citation to In re

ConAgra Peanut Butter Products Liability Litigation in the U.S. District Court for the District of

Georgia is likewise unavailing, as it does not specifically examine, let alone rule on, Maryland

law.  MDL No. 1845, 2008 WL 2132233 (N.D. Ga. May 21, 2008).  Accordingly, the end-payor

plaintiffs' Maryland unjust-enrichment claim is dismissed.

d)      <u>Oregon</u>

      With respect to the end-payor plaintiffs' Oregon unjust-enrichment claim, this Court

ruled supra that, as of 2010, indirect purchasers may bring suit under the Oregon Antitrust Act in

light of passage of an Illinois Brick repealer statute by the Oregon legislature.  Accordingly, the

assertion of an unjust-enrichment claim by indirect purchasers is no longer contrary to Oregon

public policy.  See In re Flonase Antitrust Litig., 284 F.R.D. 207, 214 (E.D. Pa. 2012)

("Numerous states across the country have subsequently passed 'Illinois Brick repealers'

enabling an indirect purchaser to bring an antitrust claim under state law. Furthermore, in those

states with a repealer statute, indirect purchasers are not barred from recovery for unjust

44

enrichment damages.").  Moreover, the Court notes that it is unclear whether defendants continue to seek dismissal of the Oregon unjust-enrichment claim in view of the absence of any mention of this claim in defendants' Reply.  For these reasons, defendants' Motion to Dismiss the end-payor plaintiffs' unjust-enrichment claim is denied.

e)      Rhode Island

Finally, defendants argue that the Court should dismiss the end-payor plaintiffs' Rhode Island unjust-enrichment claim on the ground that Rhode Island also adheres the doctrine espoused by Illinois Brick.  However, as discussed supra, Rhode Island passed an Illinois Brick repealer statute in 2013, and the end-payor plaintiffs also have stated a claim under Rhode Island's DTPA.  For those reasons, the end-payor plaintiffs' Rhode Island unjust-enrichment claim may also proceed.

2.      State Whose Unjust-Enrichment Doctrine Applies Only to Intrastate Commerce (Alabama)

Defendants assert that the end-payor plaintiffs' Alabama unjust-enrichment claim should be dismissed because the Alabama antitrust statute requires that the allegedly anticompetitive conduct be intrastate in nature.  Defendants fail to address, however, whether a claim under Alabama's consumer-protection statute would be similarly barred,[27] and the mere fact that the end-payor plaintiffs have not brought a claim under the consumer-protection statute is not dispositive.  Accordingly, defendants' Motion to Dismiss the end-payor plaintiffs' Alabama unjust-enrichment claim is denied.

3.      State Requiring that a Benefit Be Directly Conferred (Florida)

---

[27] The sole case cited by defendants in support of their position, see Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F. Supp. 2d 380, 429 (2010), does not address this issue.

Defendants argue that, under Florida law, the end-payor plaintiffs must allege that they directly conferred a benefit upon defendants in order to state an unjust-enrichment claim.  Courts interpreting Florida law have ruled inconsistently on this issue.  Compare In re Flonase, 692 F. Supp. 2d at 544 (dismissing Florida unjust-enrichment claims for failure to allege a direct benefit), with In re DDAVP, 903 F. Supp. 2d at 234 (denying the defendants' motion to dismiss a Florida unjust-enrichment claim on the ground that the "[p]laintiffs [had] plausibly conferred some benefit on Defendants, albeit indirectly, by purchasing DDAVP at elevated prices").

The Court agrees with the end-payor plaintiffs that dismissal is inappropriate, at least at this juncture, given the persuasive reasoning of "several recent cases . . . that [have] permit[ted] [Florida] unjust enrichment claim[s] to stand where the benefit is conferred through an intermediary." Aceto Corp. v. TherapeuticsMD, Inc., 953 F. Supp. 2d 1269, 1288 (S.D. Fla. 2013); see also Williams v. Wells Fargo Bank, N.A., No. 11-cv-21233, 2011 WL 4901346, at *5 (S.D. Fla. Oct. 14, 2011) (reasoning that "[i]t would not serve the principles of justice and equity to bring an unjust enrichment claim merely because the 'benefit' based through an intermediary before being conferred on a defendant"); Romano v. Motorola, Inc., No. 07-cv-60517, 2007 WL 4199781, at *2 (S.D. Fla. Nov. 26, 2007); Stermer v. SCK Solutions, LLC, No. 08-cv-61751, 2009 WL 1849955, at *6 (S.D. Fla. June 26, 2009); Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC, 650 F. Supp. 2d 1213, 1229 (S.D. Fla. 2009).

That said, it has come to this Court's attention that the Supreme Court of Florida has recently granted review of a decision, in which a Florida intermediate appellate court held, inter alia, that "[u]njust enrichment requires that [a] benefit be direct to the litigant." See Kopel v. Kopel, 117 So. 3d 1147 (Fl. Dist. Ct. App.), review granted, No. SC13-992, 2014 WL 2730553 (Fl. 2013).  The Court will therefore grant defendants leave to file a second motion to dismiss the

end-payor plaintiffs' Florida unjust-enrichment claim if that case is decided in a way that conflicts with this Court's ruling that the end-payor plaintiffs have stated a claim.

        4.    <u>States that Do Not Recognize Unjust Enrichment as a Standalone Cause of Action</u> (California and New Hampshire)

Finally, defendants move to dismiss the end-payor plaintiffs' California and New Hampshire unjust-enrichment claims on the ground that neither state recognizes unjust-enrichment as an independent cause of action.  The Court addresses the law of each state in turn.

        a)    California

First, defendants argue that unjust enrichment is not a separate cause of action in California.  Although California law is not completely settled on whether a plaintiff may independently bring an unjust-enrichment claim, the Court finds persuasive the line of cases that have held that California law does not recognize unjust enrichment as a cause of action.  In California, unjust enrichment is instead "'a general principle, underlying various legal doctrines and remedies,'" which "is synonymous with restitution."  <u>Melchior v. New Line Prods., Inc.</u>, 131 Cal. Rptr. 2d 347, 357 (Cal. Ct. App. 2003) (quoting <u>Dinosaur Dev., Inc. v. White</u>, 265 Cal. Rptr. 525, 527 (Cal. Ct. App. 1989)); <u>accord</u> <u>In re iPhone Application Litig.</u>, 844 F. Supp. 2d 1040, 1075 (N.D. Cal. 2012); <u>Fraley v. Facebook</u>, 830 F. Supp. 2d 785, 814 (N.D. Cal. 2011); <u>Levine v. Blue Shield of Cal.</u>, 117 Cal. Rptr. 3d 262 (Cal. Ct. App. 2010); <u>Hill v. Roll Int'l Corp.</u>, 128 Cal. Rptr. 3d 109 (Cal. Ct. App. 2011).  Accordingly, the end-payor plaintiffs' California unjust-enrichment claim is dismissed.

        b)    New Hampshire

Finally, defendants argue that the end-payor plaintiffs' New Hampshire unjust-enrichment claim should be dismissed because "unjust enrichment is not an independent cause of action" under New Hampshire law.  Mot. to Dismiss app'x A-5.  However, the Court has

concluded that the end-payor plaintiffs' claim under the NHCPA may proceed, and courts have allowed indirect purchasers to bring parasitic unjust-enrichment claims based on defendants' violations of New Hampshire's consumer-protection statute.  See, e.g., In re Chocolate Confectionary, 749 F. Supp. 2d at 240  ("The court has held that the . . . complaint states a cognizable claim under the New Hampshire consumer protection law, . . . and, by pursuing equitable relief for the alleged consumer protection harms, the IEU plaintiffs are simply pleading alternative remedies.").  Accordingly, defendants' Motion to Dismiss the end-payor plaintiffs' New Hampshire unjust-enrichment claim is denied.

## VI.   CONCLUSION

For the reasons set forth above, defendant's Motion to Dismiss is granted in part and denied in part and defendants' Motion for Judicial Notice is denied.  An appropriate order follows.