# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: <br> **NIASPAN ANTITRUST LITIGATION** | MDL NO. 2460 |
| THIS DOCUMENT RELATES TO: <br> ALL ACTIONS | MASTER FILE NO. 13-MD-2460 |

DuBois, J.                                                                                          August 24, 2017

## M E M O R A N D U M

### I.     INTRODUCTION

This multidistrict litigation concerns what has come to be known as a "pay-for-delay," or "reverse payment," settlement—a practice in which a brand-name drug manufacturer brings a patent-infringement action against a generic drug manufacturer and then compensates the generic drug manufacturer for its agreement to refrain from entering the market with a competing generic version of the brand-name drug until a specified date. In this case, two putative classes—the Direct-Purchaser Plaintiffs ("DPPs") and the End-Payor Plaintiffs ("EPPs")—aver that the brand-name manufacturer of Niaspan, Kos Pharmaceuticals, Inc. ("Kos"), entered into anticompetitive settlement agreements in March of 2005 with the generic manufacturer of that drug, Barr Pharmaceuticals, Inc. ("Barr"), in order to terminate patent-infringement litigation brought by Kos against Barr in the United States District Court for the Southern District of New York. Kos was later acquired by defendant AbbVie Inc. ("AbbVie"), and Barr was later acquired by defendant Teva Pharmaceuticals, Inc. ("Teva").

The DPPs, on behalf of both putative classes, now move to compel the defendants to produce certain documents that defendants claim as privileged. By agreement, the parties have

selected 32 documents[1] as a representative sample. The Court agreed to examine the selected documents *in camera* and rule on the validity of defendants' privilege claims, and directed the parties to attempt to resolve plaintiffs' challenges to other entries in defendants' privilege logs without the need for Court intervention based on the guidance provided by such rulings.

## II.     APPLICABLE LAW

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Two privileges are relevant for purposes of this Motion—the attorney-client privilege and the work-product doctrine.

The attorney-client privilege "protects from disclosure confidential communications made between attorneys and clients for the purpose of obtaining or providing legal assistance to the client." *In re Grand Jury Subpoena*, 745 F.3d 681, 687 (3d Cir. 2014). The attorney-client privilege attaches to "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." *In re Chevron Corporation*, 650 F.3d 276, 289 (3d Cir. 2011) (internal quotations omitted). "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *In re Processed Egg Prod. Antitrust Litig.*, 278 F.R.D. 112, 117 (E.D. Pa. 2011). However, "[b]ecause the attorney-client privilege obstructs the truth-finding process, it is construed narrowly. The privilege protects *only* those disclosures—necessary to obtain informed

---

[1] The parties agreed that plaintiffs would select 15 documents from each defendant's privilege log for *in camera* review, and each defendant would select an additional five documents, for a total of 40 documents. However, the parties did not exercise all of their selections, and Teva withdrew its privilege claims for some of the challenged documents. Thus, there are a total of 32 documents submitted for *in camera* review.

legal advice—which might not have been made absent the privilege." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423–24 (3d Cir. 1991) (internal citations omitted). Recognizing that lawyers sometimes provide purely business advice, courts have held that the privilege applies only where the communication was made "the express purpose of securing legal not business advice." *Fed. Trade Comm'n v. Abbvie, Inc.* (*"AbbVie I"*), No. CV 14-5151, 2015 WL 8623076, at *10 (E.D. Pa. Dec. 14, 2015) (citing *Kramer v. Raymond Corp.*, No. CIV. 90-5026, 1992 WL 122856, at *1 (E.D. Pa. May 29, 1992).

"Communications between attorney and client are not privileged if made in the presence of or communicated to third parties." *Barr Marine Products, Co. v. Borg-Warner Corp.*, 84 F.R.D. 631, 634 (E.D. Pa. 1979). Further, "[d]isclosing a communication to a third party unquestionably waives the privilege." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007), *as amended* (Oct. 12, 2007). There numerous exceptions and nuances to this general rule, four of which are relevant in this case.

First, "intra corporate distribution of legal advice received from counsel does not vitiate the privilege . . . ." *Baltimore Scrap Corp. v. David J. Joseph Co.*, No. L-96-827, 1996 WL 72078, at *6 (D. Md. Nov. 20, 1996). This exception stems from the "recognition that since the decision-making power over the corporate client may be diffused among several employees, the dissemination of confidential communications to such persons does not defeat the privilege." *Id.* (internal quotations omitted).

Second, disclosures made to a third-party consultant do not constitute a waiver when the disclosure is "necessary for the client to obtain informed legal advice" or if the disclosure is made "to an 'agent' assisting the attorney in giving legal advice to the client." *Westinghouse*, 951 F.2d at 1424. Consultants are generally treated similarly to employees for purposes of the

3

waiver analysis. *King Drug Co. of Florence v. Cephalon, Inc.*, No. 2:06-CV-1797, 2013 WL 4836752, at *6 (E.D. Pa. Sept. 11, 2013).

Third, when privileged documents or communications are disclosed inadvertently, there is no waiver if "the holder of the privilege took reasonable steps to rectify the error." *Alers v. City of Philadelphia*, No. 08-4745, 2011 WL 6000602, at *2 (E.D. Pa. Nov. 29, 2011). District Courts in the Third Circuit consider the following five factors in determining whether such disclosures are inadvertent:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosure; and (5) whether the overriding interests of justice would or would not be serviced by relieving the party of its errors.

*Ciba-Geigy Corp. v. Sandoz Ltd.*, 916 F. Supp. 404, 411 (D.N.J. 1995); *Rotelli v. 7-Up Bottling Co. of Philadelphia*, No. CIV. A. 93-6957, 1995 WL 234171, at *2 (E.D. Pa. Apr. 19, 1995).

Fourth, "the community-of-interest privilege allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others." *Teleglobe*, 493 F.3d at 364. "[M]embers of the community of interest must share at least a substantially similar legal interest." *Id*. at 365. Although the doctrine was conceived with litigation in mind, it "comes into play when clients with separate attorneys share otherwise privileged information in order to coordinate [any] legal activities," and it applies "even in purely transactional contexts." *Id*. at 359, 364.

The second relevant privilege at issue in this case is the work-product doctrine. A party may claim as privileged any documents that contain attorney work product—"tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or

4

agent)." Fed. R. Civ. P. 26(b)(3). "[A] document satisfies Rule 26(b)(3) where in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1258 (3d Cir. 1993). In contrast to the attorney-client privilege, which is waived whenever a communication is disclosed to a third party, "a disclosure to a third party does not necessarily waive the protection of the work-product doctrine" unless the third party is an adversary. *Westinghouse*, 951 F.2d at 1428. As the party claiming work-product privilege in this case, defendants have the burden of establishing that the privilege applies. *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000).

## III. DISCUSSION

### a. AbbVie's Privilege Log Entries

The DPPs selected 14 entries from AbbVie's privilege log for *in camera* review, and AbbVie selected an additional five entries. The Court addresses each of these documents in turn, categorizing them where possible.

#### i. Properly Withheld Documents

The Court first concludes that sixteen of the documents at issue were properly withheld in their entirety: AbbVie privilege log entries 427, 434, 581, 595, 596, 612, 624, 635, 645, 658, 1572, 2145, 2155, 4054, 4055, and 4398. The Court addresses each such document in turn.

AbbVie privilege log entries 434, 595, 596, 624, and 4398 were properly withheld under the attorney-client privilege because those entries consist of communications in which attorneys request or are provided with information for the purpose of providing legal advice. Entry number 434 is an email chain between Kos's outside counsel, Kos's in-house counsel, and Kos

5

executives, in which the lawyers request input and specific information from the executives to assist them in drafting a declaration to attach to a legal filing. Entry number 595 consists of a string of emails: first, Kos's outside counsel sent a draft settlement agreement to Kos's then-general counsel Andrew Koven; second, Koven forwarded the draft to three Kos executives and requested their input; and finally, the three executives responded with their comments. Similarly, entry number 596 consists of an email from Kos's Chief Financial Officer Chris Kiritsy to Koven providing comments on a draft settlement agreement. Entry number 624 is an email string between Kos's Vice President for Marketing Aaron Berg, Kos's outside counsel, and Kos's general counsel, in which Berg provided detailed statistics and information regarding the potential of marketing Niaspan to women's health professionals. Koven asserted that the information was shared so that outside counsel, White & Case, could provide legal advice with respect to a co-promotion agreement relating to that marketing that was part of the ongoing settlement negotiations. *See* AbbVie Defs' Resp. to Mot. to Compel ("AbbVie Resp."), Ex. 2, Decl. of Andrew Koven ("Koven Decl.") at ¶¶ 10–11. And entry number 4398 is an email chain between Kos's outside counsel and Kiritsy, in which outside counsel requests information from Kiritsy to assist in writing a declaration to attach to a motion. The Court concludes that these emails, in which Kos executives gave "information to the lawyer to enable him to give sound and informed advice," *In re Processed Egg Prod. Antitrust Litig.*, 278 F.R.D. at 117, would "not have been made absent the privilege," *Westinghouse*, 951 F.2d at 1423–24. The communications were properly withheld under the attorney-client privilege.

Entries 427, 581, 635, 2145, 2155, and 612 were properly withheld under the attorney-client privilege because those communications clearly convey legal advice. Entry 427 is a portion of a draft legal agreement on which Kos general counsel Koven made handwritten

6

comments and edits. "Preliminary drafts of contracts are generally protected by attorney client privilege, since '[they] may reflect not only client confidences, but also legal advice and opinions of attorneys, all of which is protected by the attorney client privilege.'" *Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*, 174 F.R.D. 609, 633 (M.D. Pa. 1997) (quoting *Muller v. Walt Disney Productions,* 871 F.Supp. 678, 682 (S.D.N.Y.1994)). The Court concludes that entry 427 is precisely such a document, and is protected by the attorney-client privilege.

Entry 581 is an email chain between Kos's Chief Executive Officer Adrian Adams and Koven, in which Adams asked Koven about the status of ongoing litigation settlement negotiations. Koven's response conveyed his opinion on the status of those negotiations. Because that response communicated a legal opinion, it was properly withheld under the attorney-client privilege.

Entry 635 is a PowerPoint presentation assessing the terms of the Kos-Barr settlement. AbbVie's privilege log identifies the author of entry 635 as Joseph Suarez, a Kos executive. But the PowerPoint was initially prepared by Kos's outside counsel, White & Case attorney Rajeev Malik. *See* Young Decl. Ex. 15 (email from Malik describing the PowerPoint document); Ex. 16 (a version of AbbVie privilege log entry 635 attached to Ex. 15). Because the presentation was drafted by an attorney and provided a legal analysis of the Kos-Barr settlement, it was properly withheld under the attorney-client privilege.

Entry 2145 is an email from the General Manager of Abbott Laboratories' Dyslipidemia Franchise, Marianne Sutcliffe, to Abbot's Vice President of Sales and Marketing John Schilling. In the email, Sutcliffe relays to Schilling legal advice that Sutcliffe had acquired from Abbott's in-house counsel Perry Siatis. Because "intra corporate distribution of legal advice received from counsel does not vitiate the privilege," *Baltimore Scrap Corp.*, No. L-96-827, 1996 WL

72078, at *6, entry 2145 was properly withheld under the attorney-client privilege. Finally, entry 2155 is an email from Abbott Senior Counsel Karen Nelson to other Abbot lawyers, in which Nelson explicitly initiates a discussion of legal strategy.

Entry number 612 was also properly withheld under the attorney-client privilege. It is an email from Kos Vice President Juan Rodriguez to Kos executive Joseph Suarez. Rodriguez attached a draft agreement relating to ongoing litigation, and asked Suarez to "take a look" at a specific provision in the agreement. Importantly, another email on AbbVie's privilege log, the relevant portion of which was withheld as privileged, shows that general counsel Koven had previously asked Rodriguez to "take a look" at the same provision of the same version of the agreement. *See* AbbVie Resp., Decl. of Blanca Young in Supp. of Defs' Opp. to Mot. to Compel ("Young Decl."), Ex. 13. "In the case of a corporate client, privileged communications may be shared by non-attorney employees in order to relay information requested by attorneys." *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 477 (E.D. Pa. 2005). Thus, although Rodriguez is not an attorney, his request for information, made for the purpose of relaying said information to Koven, was properly withheld under the attorney-client privilege.

Plaintiffs' Motion also asks the Court to confirm that certain documents withheld under the work product doctrine were "prepared or obtained because of the prospect of litigation." *Martin*, 983 F.2d at 1258. The Court concludes that AbbVie entries 645, 658, and 1572 were properly withheld as attorney work product. Entry 645 is a spreadsheet, created by Kos executive Rodriguez, which compiled sales figures for two drugs. The spreadsheet was attached to an email from Rodriguez to outside counsel Malik, and the email began with the words "requested info," indicating that the spreadsheet was created at Malik's request. Young Decl. Ex. 17. At the time, outside counsel was assisting Kos in resolving the Kos-Barr litigation. The

spreadsheet, therefore, was created for purposes of litigation and was properly withheld.[2] *AbbVie I*, 2015 WL 8623076, at *10. Entry 658 is a memorandum drafted by general counsel Koven and addressed to eight Kos executives. There were four documents attached to the memorandum relating to the ongoing Kos-Barr settlement negotiations. Much of the memorandum consisted of Koven's legal advice to specific executives relating to that settlement. The memorandum and the attachments were plainly created for the purposes of resolving litigation.[3] And entry 1572 is an email from a consultant that Koven hired to create a report on an entity's compliance with an existing co-promotion agreement. Koven states that the report and email constitute legal advice, because if the entity was not in compliance, Kos planned to commence litigation. *See* Koven Decl. at ¶¶ 15–17. The email and the attached report were therefore prepared in anticipation of litigation, and even though they were prepared by a consultant, they were properly withheld as work product.[4] *See* Fed. R. Civ. P. 26(b)(3).

Finally, the Court concludes that AbbVie did not waive any privilege with respect to log entries 4054, 4055, and similar entries. Plaintiffs challenge entry 4054 on the basis that any privilege was waived because that document was disclosed to a third party, and plaintiffs

---

[2] The Court notes, however, that the underlying sales figures do not appear to be protected by any privilege. It is the communication that is privileged, not the information contained in the document.

[3] Although entry 658 is protected in its entirety by the work product privilege, the Court notes that one paragraph of entry 658 would not qualify as attorney-client privileged. Specifically, paragraph three of the memo, beginning "Richard . . . ," consists of business, not legal, advice.

[4] The Court notes that entry 1572 is covered by the attorney-client privilege. "The broad approach to determining whether an independent consultant is the functional equivalent of an employee [focuses] on whether the communications at issue were kept confidential and made for the purpose of obtaining or providing legal advice." *In re Flonase Antitrust Litig.*, 879 F. Supp. 2d 454, 459–60 (E.D. Pa. 2012). Here, Koven requested that the consultant prepare a report so that Koven could decide whether to initiate litigation. Thus, the communication conveying the report was made for the purpose of enabling Koven to provide legal advice.

challenge both entries on the basis that any privilege was waived because AbbVie produced these entries in one or more past cases. *See* Mot. to Compel, Ex. 7.

Entry 4054 is a report prepared by Trinity Partners that analyzes the terms of two agreements between Kos and Barr. Kos disclosed the report to an outside auditor, Ernst & Young, for accounting purposes, and plaintiffs argue that AbbVie thereby waived any applicable privilege. AbbVie argues that disclosure to an auditor, who is not an adversary, does not waive the privilege. Indeed, "[m]ost courts hold that to waive the protection of the work-product doctrine, the disclosure must enable an adversary to gain access to the information." *Westinghouse*, 951 F.2d at 1428. Ernst & Young was not Kos's adversary, and there is no indication that this disclosure allowed any of Kos's adversaries to "gain access" to entry 4054. The Court therefore concludes that Kos's disclosure of entry 4054 to Ernst & Young did not waive any applicable privilege.

Plaintiffs also argue that AbbVie waived any privilege claim with respect to entries 4054 and 4055 because it disclosed those documents in previous patent cases. As stated *supra*, District Courts in the Third Circuit use a five-factor test to determine whether such a disclosure waives the privilege, considering:

> (1) The reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production;
> (2) The number of inadvertent disclosures;
> (3) The extent of the disclosure;
> (4) Any delay and measures taken to rectify the disclosure; and
> (5) Whether the overriding interests of justice would or would not be served by relieving the party of its errors.

*See Paramount Fin. Commc'ns, Inc. v. Broadridge Inv'r Commc'n Sols., Inc.*, No. CV 15-405, 2016 WL 5404462, at *2 (E.D. Pa. Sept. 28, 2016). The Court considers each factor in turn.

First, the Court concludes that AbbVie took reasonable precautions to prevent the disclosure of privileged documents such as entries 4054 and 4055. The law firm Wilmer Cutler Pickering Hale and Dorr, LLP ("WilmerHale") represented AbbVie in various patent litigations relating to Niaspan. AbbVie's Resp., Decl. of Vinita Ferrara ("Ferrara Decl.") at ¶ 3. During the discovery phase in one of those cases, WilmerHale hired LawyerLink, a vendor that specializes in document review, to conduct a preliminary document review. *Id.* at ¶ 5. The LawyerLink team was tasked with identifying responsive documents and determining whether those documents were privileged or otherwise protected. *Id.* WilmerHale lawyers trained the LawyerLink team, and the WilmerHale litigation team was "in regular contact" with the LawyerLink team during the entire process. *Id.* at ¶¶ 5–6. In addition, at the conclusion of the document review by the LawyerLink team, six WilmerHale attorneys spent approximately 2,500 hours reviewing a "sample of documents" sorted by the LawyerLink team to ensure the quality of their review. *Id.* at ¶ 7. This extensive two-level review, the Court concludes, constitutes reasonable precautions against inadvertent disclosure.

Plaintiffs note that AbbVie failed to conduct a similar document review in later cases, including this case.[5] Instead, because later litigations "involved similar subject matter . . . document production that had been made in one Niaspan patent matter was sometimes re-

---

[5] Plaintiffs cite a number of cases in support of their position. Mot. at 20, n.86. The Court concludes that those cases are inapposite because they address situations in which a party took no precautions, at any stage, to prevent inadvertent disclosure. *See, e.g.*, *Advanced Med., Inc. v. Arden Med. Sys., Inc.*, No. CIV.A. 87-3059, 1988 WL 76128, at *4 (E.D. Pa. July 18, 1988) ("defendants' counsel took no precautions to protect these documents"); *Am. Hardware Mfrs. Ass'n v. Reed Elsevier, Inc.*, No. 03 C 9421, 2009 WL 331471, at *3 (N.D. Ill. Feb. 10, 2009) ("plaintiff still fails to explain what specific precautions were taken to prevent disclosure of the letter"). In contrast, in this case, defendants took reasonable precautions to prevent inadvertent disclosure during an earlier document review. The problem presented in this case stems from the fact that defendants elected to rely on that review in subsequent cases, a situation not addressed in the cases cited by plaintiff.

produced in a later Niaspan patent matter. In that event, *the production would not be re-reviewed.*" Ferrara Decl. at ¶ 8 (emphasis added). In addition, WilmerHale conflicted out of representing AbbVie in one later patent case involving Niaspan, and in that case, "because a privilege review had already been conducted by WilmerHale, the documents were not re-reviewed for privilege before being re-produced." *Id*. at ¶12. In short, rather than expending the resources necessary to duplicate its review of hundreds of thousands of documents in similar cases, AbbVie rested on its initial review. That decision, under the circumstances presented in this case, was reasonable. The Court therefore concludes that AbbVie's initial two-level document review was a reasonable precaution, and given the vast scope of discovery in subsequent cases, AbbVie's decision to avoid duplicative document review was also reasonable.

Second, the Court must consider the number of inadvertent disclosures. AbbVie has clawed back just five documents that were inadvertently disclosed in prior litigation. Young Decl. at ¶ 33. AbbVie has produced over 637,000 documents in this litigation. Ferrara Decl. at ¶ 10. The Court concludes that the inadvertent disclosure of five documents is miniscule when compared to the more than half a million documents produced.

Third, the Court considers the extent of the inadvertent disclosures. In the cases in which WilmerHale represented AbbVie, the inadvertently disclosed documents "were not attached as an exhibit to any court filing, declaration, or deposition in any of the Niaspan patent cases, and they were not listed on any trial exhibit list." Ferrara Decl. at ¶ 13. And in the case in which WilmerHale was conflicted out of representing AbbVie, none of the disputed documents were "attached as exhibits to any court filing, used for any purpose, or offered or admitted into evidence." AbbVie's Resp., Decl. of Mary B. Graham ("Graham Decl.") at ¶ 5. The Court concludes that the extent of the disclosure is *de minimis*.

Fourth, the Court considers any delay and the measures taken to recover the documents. AbbVie clawed back entries 4054 and 4055 "as soon as it discovered that the document[s] had been produced." *See* slip sheet for AbbVie Priv. Log Entries 4054 & 4055. AbbVie clawed back entry 4054 on October 17, 2016, and entry 4055 on December 19, 2016, each time with specific reference to a Protective Order in. *See* Young Decl., Ex. 19 & 20. The Court concludes that AbbVie's response was prompt and without delay, and that its clawback letters were appropriate to rectify the inadvertent disclosure.

Fifth, and finally, the Court considers whether the interests of justice favor either result. There is no indication that the interests of justice would be served by concluding that AbbVie had waived the privilege. There is no evidence, for example, that AbbVie strategically disclosed any of these documents in an effort to gain some advantage.

In sum, AbbVie's failure to conduct a new document review in each Niaspan case weighs in favor of waiver. However, the remaining considerations—WilmerHale's two-level document review process, the small number of inadvertently disclosed documents when compared to the enormity of the production in this case, the *de minimis* extent of the inadvertent disclosure, AbbVie's prompt and appropriate clawback, and the interests of justice—together weigh against a determination that AbbVie's inadvertent disclosure waived the privilege. The Court therefore concludes that AbbVie's inadvertent disclosure of the documents did not waive the privilege with respect to its privilege log entries 4054, 4055, and any similar inadvertently disclosed documents.

    ii. <u>Improperly Withheld Documents</u>

The Court further concludes that three AbbVie privilege log entries—476, 516, and 541—were improperly withheld, because part or all of those communications were not made

13

with "the express purpose of securing legal not business advice." *AbbVie I*, 2015 WL 8623076, at *10.

Entry 476 consists of a string of emails between Kos in-house counsel Koven and various Kos executives. AbbVie properly withheld as privileged some parts of that email string, because those parts explicitly provide or seek legal advice. However, the Court concludes that the last paragraph of the last email in the string, sent from Koven to numerous Kos executives, including Peter Ciano, on March 6, 2005, at 11:46:53 AM., was improperly withheld because it conveyed business, not legal, advice.

The paragraph referenced above reads as follows:

Peter, in order to make sure we retain as much leverage as possible, I think you should make it clear to Sandoz that we are waiting to see what their reaction is to our comments before we make a decision as to whom we will go with. In other words, they should remain under the impression that we still have an alternative AG.
Thank you for all your help with this very important matter.
Regards,
Andrew

Abbvie argues that the email from which the above paragraph is quoted was properly withheld as privileged because in it, Koven "sought information so that his department could provide legal advice to Kos." *See* slip sheet for AbbVie Priv. Log Entry 476. Koven solicited such information elsewhere in the email string, but he did not do so in the paragraph quoted above. Rather, in the above-quoted paragraph, Koven suggested that Ciano take a particular negotiating stance so as to retain leverage over Sandoz. On its face, that is business advice, and AbbVie has not articulated any explanation of how it could be construed as legal advice. AbbVie has failed to meet its burden of proving that the above-quoted paragraph provides primarily legal advice.

14

Entry 516 is an email from Ciano to two other Kos executives, with a copy to Kos in-house counsel Karen Bechtold. In the email, Ciano asked the executives for advice on two business issues. This entry was improperly withheld for two reasons. First, the topics addressed are business topics. AbbVie argues that "legal considerations predominate in this context," but fails to articulate why the topics discussed are legal rather than business. *See* slip sheet for AbbVie Priv. Log Entry 516. Second, entry 516 is a communication between business executives, not lawyers, and there is no evidence that a lawyer requested or used the information conveyed for the purpose of providing legal advice. AbbVie notes that general counsel Koven, in his declaration, asserted that entry 516 is an example of his "exercising the legal function" of "solicit[ing] information from Kos personnel" to assist him in planning the settlement and a contingency plan. But Koven himself is not copied on this email, and there is no evidence that he was even aware that the email was sent. The Court thus concludes that entry 516 is not privileged, and must be disclosed.

Similarly, entry 541 is an email string consisting of the following: (1) outside counsel Malik sent an email to Kos's then-general counsel Koven, attaching a draft of a term sheet, (2) Koven forwarded the email and attachment to two Kos executives, and (3) one of those executives, Kiritsy, forwarded the email and attachment to another executive, and asked "[a]ny visibility on accounting treatment or pruit?" The first two emails in this chain are plainly covered by the attorney-client privilege—they are emails from lawyers to their clients, and although they do not expressly request feedback, such a request is implicit when a draft legal document is attached. AbbVie asserts that the final email in the chain is privileged because in it, Kiritsy requested information that he would later relay to Koven for the purpose of obtaining legal advice. It is true that "privileged communications may be shared by non-attorney

15

employees in order to relay information requested by attorneys." *SmithKline Beecham Corp.*, 232 F.R.D. at 477. But an inquiry about accounting treatment is facially a business inquiry. The only evidence that Kiritsy's inquiry was made for the purpose of obtaining legal advice is Koven's blanket assertion that the communication in entry 541, and ten other privilege log entries, were made for that purpose. *See* slip sheet for AbbVie Priv. Log Entry 541; Koven Decl. at ¶ 12. AbbVie has simply not met its burden of showing that the inquiry was made for the purpose of obtaining legal advice, or that it would not have been sent absent the privilege. *Westinghouse*, 951 F.2d at 1423–24. The Court concludes that the final email in the chain shown in entry 541, from Chris Kiritsy to Juan Rodriguez, copying Peter Ciano, is not privileged.

### b. Teva's Privilege Log Entries

The DPPs selected 15 entries from Teva's privilege log for *in camera* review. Teva, in response, produced four of those documents with only confidentiality redactions, leaving eleven selections. Teva selected an additional two entries. The Court concludes that each of the thirteen entries at issue was properly withheld in its entirety: Teva entries 1375, 2547, 2554, 2561, 2563, 2580, 2639, 3115, 3137, 3259, 4496, 4606, and 5647.

A first set of three challenged entries—3137, 4496, and 5647—are plainly protected by the attorney-client privilege, because the communications are from lawyers and include explicit legal advice. Entry 3137 is an email from Barr's then-General Counsel, Fred Killion, to Barr's then-President and Chief Operating Officer, Paul Bisaro, attaching a legal document. The email itself is blank, but the fact that Killion attached a legal document implies that the communication was made for the purpose of providing legal advice. Entry 4496 consists of an email chain between Killion and various Barr executives. The body of the initial email includes a draft press release relating to the Kos-Barr co-promotion agreement, and in subsequent emails, Killion and

16

various Barr executives commented on the draft. The Court concludes that the emails in entry 4496 address the question of whether the press release accurately reflected the nuances of the settlement agreement, and included explicit legal advice from Killion. And entry 5647 is an email from Killion to two Barr executives, in which Killion attached a draft of a legal agreement and asked one recipient "did I fix your problem?" That communication makes clear that the email is intended to provide legal advice in response to that problem, solicit feedback for the purpose of providing legal advice, or both. The Court concludes that both of these communications were made "for the purpose of obtaining . . . legal assistance to the client." *In re Grand Jury Subpoena*, 745 F.3d at 687.

A second group of challenged entries—1375, 2547, 2554, 2561, 2563, 2580, 2639, and 4606—were properly withheld under the attorney-client privilege because they are communications between lawyers and Teva or Barr executives requesting or providing legal advice. Entry 1375 is an email string between various Teva lawyers and executives. Teva disclosed entry 1375 with three parts redacted as privileged. The redactions were made in an email from Teva executive Tina Guilder to numerous recipients, including Teva's then-IP Counsel for Women's Health, Gail Griffin. In those redacted parts, Guilder requested legal guidance from Griffin. Entry 2547 is a string consisting of two emails. The first email was from one Barr executive to three other Barr executives, and it attached a legal agreement and asked the recipients to send their comments to Barr's then-in-house counsel, Fred Killion. In the second email, one recipient sent his comments and a legal inquiry to Killion. Entry 2554, which consists of two emails, begins with an email from Killion to four Barr executives, requesting input on an attached legal agreement. In the second email, one executive responded to Killion with comments, and sent copies to additional executives, asking them to provide Killion with

17

feedback.  In entry 2561, a Barr executive sent Killion an email and attached a redline of a document including the executive's comments, which Killion had requested and which were provided for the purpose of obtaining legal advice.  Teva's Mem. of Law in Opp. to Pls' Mot. to Compel, Decl. of Frederick J. Killion in Supp. of the Teva Defs' Opp. to Pls' Mot. to Compel ("Killion Decl.") at ¶ 10.  And similarly, entry 2563 consists of a string of emails in which one Barr executive asked several other Barr executives to provide Killion with feedback on three attached legal agreements, and in a subsequent email, one executive responded with specific comments.

Entry 2580 is a longer email string, including four emails between Killion and various Barr executives, but each communication in the string either requests that the Barr executives send feedback on a legal agreement to Killion, or provides such feedback.  In entry 2639, one Barr executive emails Killion, attaching a redline of a legal agreement which includes the executive's specific comments.  And finally, entry 4606 consists of a string of emails in which Killion requests input from a Barr executive on a legal agreement, and the executive forwards the agreement to another executive to request additional feedback.  The Court concludes that these emails, in which Barr executives gave "information to the lawyer to enable him to give sound and informed advice," *In re Processed Egg Prod. Antitrust Litig.*, 278 F.R.D. at 117, would "not have been made absent the privilege," *Westinghouse*, 951 F.2d at 1423–24.

Teva entry 3115 was also properly withheld under the attorney-client privilege.  It is an email chain consisting of (1) an email from an outside auditor, Jeffrey Mraz, to Barr's then-General Counsel Killion, and (2) a response from Killion to Mraz, which copies two Barr executives.  Both emails attach a draft of a letter titled "Legal Matters" which outlines the status of all of Barr's ongoing litigation, and which was later distributed internally to Barr employees.

18

In the first email, Mraz provided his advice regarding the language of one section of the letter; in the second email, Killion attached an updated version of the letter and requested feedback from Mraz. The communications are plainly privileged because they conveyed and requested information for the purpose of providing legal advice. The fact that Mraz is an outside consultant does not impact this analysis, because consultants are treated similarly to employees for purposes of a privilege analysis. *King Drug Co.*, 2013 WL 4836752, at *6.

Finally, Teva entry 3259 was properly withheld because it is protected under the community-of-interest privilege. Entry 3259 is an email string between in-house counsel and outside counsel for Kos and Barr dated April 22, 2005. The email attaches a draft joint letter from the two companies to the Federal Trade Commission regarding the settlement agreement they had reached. Teva argues that the applicable privilege is the "the community-of-interest privilege [which] allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others." *Teleglobe*, 493 F.3d at 364. The shared interest "must be legal, not solely commercial." *King Drug Co. of Florence v. Cephalon, Inc.*, No. 2:06-CV-1797, 2011 WL 2623306, at *3 (E.D. Pa. July 5, 2011).

Plaintiffs argue that the community-of-interest privilege applies only when the clients face a current or imminent lawsuit. *Gelman v. W2 Ltd.*, No. CV 14-6548, 2016 WL 8716248, at *5 (E.D. Pa. Feb. 5, 2016) (stating that the doctrine applies "only to such inter-attorney communications or correspondence which occurred in anticipation of suit or after suit was commenced"). The Court disagrees. The *Gelman* court focused not on whether litigation had commenced or was imminent, but instead on the timing of the communications in question. *Id*. The governing case, *Teleglobe*, held that the community-of-interest privilege "comes into play when clients with separate attorneys share otherwise privileged information in order to

coordinate their *legal activities*," and applies "even in purely transactional contexts." *Teleglobe*, 493 F.3d at 359, 364 (emphasis added). On this issue, the United States District Court for the Northern District of Georgia concluded that "a draft of a letter to the FTC and Department of Justice, [which] was prepared by antitrust counsel and reflect[ed] antitrust advice, [was] protected under the work product doctrine because it is a draft that was prepared in anticipation of antitrust litigation and under the joint defense privilege because it concerns antitrust advice that was protected by the attorney client privilege and then shared among the Defendants." *In re: Androgel Antitrust Litig. (No. II)*, No. 1:09-CV-955-TWT, 2015 WL 9581828, at *4 (N.D. Ga. Dec. 30, 2015). In short, the community-of-interest privilege is not limited to actual litigation.

Thus, the Court concludes that after a settlement agreement was reached between Kos and Barr, they had a shared legal interest in obtaining FTC approval of the agreement. Entry 3259 is correspondence made in furtherance of that interest, and was properly withheld as privileged.

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part plaintiffs' Motion to Compel, as detailed *supra*.

An appropriate order follows.