UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: | . Case No.  2:13-md-02460 |
|  | . |
|  | . U.S. Courthouse |
| NIASPAN ANTITRUST | . 601 Market Street |
| LITIGATION, | . Philadelphia, PA 19106 |
|  | . |
| Debtor. | . Monday, December 10, 2018 |
| . . . . . . . . . . . . . . . . . . | . 5:01 p.m. |

TRANSCRIPT OF TELEPHONE STATUS CONFERENCE
BEFORE THE HONORABLE JAN E. DUBOIS
UNITED STATES DISTRICT COURT JUDGE

TELEPHONIC APPEARANCES:

| For the End-Payor Putative Class: | Wexler Wallace, LLP By:  KEN WEXLER, ESQ. 55 West Monroe Street Suite 3300 Chicago, IL 60603 (312) 346-2222 |
|---|---|
|  | Spector Roseman & Kodroff, PC By:  JEFFREY KODROFF, ESQ. 1818 Market Street, Suite 2500 Philadelphia, PA 19103 (215) 496-0300 |
| For CVS/Rite Aid Plaintiffs: | Hangley Aronchick Segal Pudlin & Schiller By:  BARRY L. REFSIN, ESQ. One Logan Square, 27th Floor Philadelphia, PA 19103 (215) 568-6200 |
| For Walgreen Plaintiffs: | Kenny Nachwalter P.A. By:  SCOTT E. PERWIN, ESQ. 1100 Miami Center 201 South Biscayne Boulevard Miami, FL 33131 (305) 373-1000 |

TELEPHONIC APPEARANCES CONTINUED.

| Audio Operator: | M. Hull, ESR |
|---|---|
| TRANSCRIBED BY: | Access Transcripts, LLC 10110 Youngwood Lane Fishers, IN 46038 (855) 873-2223 www.accesstranscripts.com |

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

```
APPEARANCES (Continued):

For the Direct            Berger Montague, P.C.
Purchaser Putative        By:  NICHOLAS URBAN, ESQ.
Class:                         DAVID F. SORENSEN, ESQ.
                          1818 Market Street, Suite 3600
                          Philadelphia, PA 19103
                          (215) 875-3000

                          Garwin Gerstein & Fisher LLP
                          By:  DAN LITVIN, ESQ.
                          88 Pine Street, 10th Floor
                          New York, NY 10005
                          (212) 398-0055

                          Heim, Payne & Chorush, LLP
                          By:  MIRANDA JONES, ESQ.
                          1111 Bagby, Suite 2100
                          Houston, TX 77002
                          (713) 221-2017

For Abbvie Defendants:    Drinker, Biddle & Reath LLP
                          By:  JOHN YI, ESQ.
                               PAUL H. SAINT-ANTOINE, ESQ.
                          One Logan Square, Ste. 2000
                          Philadelphia, PA 19103-6996
                          (215) 988-2700

                          Munger Tolles & Olson LLP
                          By:  STUART N. SENATOR, ESQ.
                               JONATHAN S. MELTZER, ESQ.
                          350 South Grand Avenue, 50th Floor
                          Los Angeles, CA 90071-3426
                          (213) 583-9528

For TEVA Defendants:      Kirkland & Ellis, LLP
                          By:  DEVORA ALLON, ESQ.
                               DMITRIY TISHYEVICH, ESQ.
                               THOMAS BURNETT, ESQ.
                          601 Lexington Avenue
                          New York, NY 10022-4611
                          (212) 446-4800

For Giant Eagle:          Marcus & Shapira, LP
                          By:  BRIAN HILL, ESQ.
                          One Oxford Centre, 35th Floor
                          Pittsburgh, PA 15219
                          (412) 338-5212
```

1    (Proceedings commence at 5:01 p.m.)

2        THE COURT:  This is Judge DuBois.  Good afternoon.

3        MR. SORENSON:  Good afternoon, Your Honor.

4        THE COURT:  We're going to conduct our previously

5  scheduled telephone conference in the Niaspan Antitrust

6  Litigation, MDL No. 13-2460.  I'm not going to take roll.  I

7  gather, and I just want to hear that counsel are present.

8        Counsel for the end-payor putative class, liaison

9  counsel?

10       MR. WEXLER:  Yes.

11       MR. KODROFF:  Yes, Your Honor.

12       THE COURT:  Direct purchaser putative class?

13       MR. SORENSON:  Yes, Your Honor.

14       THE COURT:  Interim counsel for Abbvie?  Interim

15  liaison counsel --

16       MR. SENATOR:  Yes.

17       THE COURT:  -- for Abbvie.

18       MR. SAINT-ANTOINE:  Yes, Your Honor.

19       THE COURT:  The Teva defendants?

20       MS. ALLON:  Yes, Your Honor.

21       THE COURT:  Walgreens plaintiffs?

22       MR. PERWIN:  Yes, Your Honor.

23       THE COURT:  CVS/Rite Aid plaintiffs?

24       MR. REFSIN:  Yes, Your Honor.

25       THE COURT:  And Giant Eagle plaintiffs?

1          MR. HILL:  Yes, Your Honor.

2          THE COURT:  All right.  Good.  I thought we would

3  pick up on several of the things that were addressed in the

4  last telephone conference.  First, the duplication of expert

5  witness evidence.  The effort to call experts was not in my

6  judgment successful at all.  And I'm wondering whether the

7  timing of my request that this be done was too early.  I

8  suspect that it was.

9          And my thought is that we ought to wait until rulings

10  on class certification and summary judgment and then sit down

11  and address the question of duplication of expert witness

12  evidence.  I can tell you now we will not have 32 expert

13  witnesses at this trial.  The number of experts called will be

14  far -- well, far less, I'll just put it that way, than 32.  I

15  can see now with parties now knowing which parties will remain

16  in the case having to duplicate expert testimony just to make

17  certain if another party's expert is unavailable that you will

18  have an expert available.  But we are not going to have experts

19  from different parties getting on the witness stand and saying

20  something that is either identical or practically identical.

21          Does anyone have any comments on that?

22          MR. SORENSON:  Your Honor, this is David Sorenson for

23  the direct purchaser class plaintiffs.  As the Court just

24  outlined its thinking speaking for the direct class, we agree

25  with what you said.  We understand your comments about

1 ultimately the number of experts at trial being lower than the

2 current list.  We understand that and hear you.  But we agree

3 that it is premature for all the reasons that you just

4 mentioned and outlined in our letter.

5          THE COURT:  Anyone else?

6          MS. SENATOR:  Your Honor, this is Stewart Senator for

7 the Abbvie defendants.  I certainly understand, Your Honor's --

8 you and we laid out our reasoning of why we thought it should

9 be a bit earlier in our letter.  But, obviously, it's the

10 Court's decision.  I would say that perhaps we could after

11 class certification figure out if that's the appropriate time

12 or after summary judgment if that's the appropriate time.  I

13 don't know if we need to settle on the exact appropriate time

14 today.

15          THE COURT:  No.  I don't think we do, and I hadn't

16 intended to do that.  And I agree with your suggestion,

17 Mr. Senator, that we see whether this can be pared after I rule

18 on the motion for class -- motions for class certification.

19 That's a good idea.  And we'll do that.  We'll revisit this.

20          There's really no limit on when we revisit things,

21 and this is not exactly a time sensitive issue.  It's something

22 we have to decide, and I didn't want you to start thinking

23 about it on the eve of the day on which we'll have to decide

24 it.  I want you to be thinking about it now.  And so that's

25 something we can place on the agenda for future telephone

1  conferences.

2          Anyone else have a comment on that issue?

3                      (Pause)

4          THE COURT:  Somewhat related to expert witness

5  evidence, I told you I thought I would need a tutorial on the

6  technology involved.  And I also mentioned the use of a

7  technical advisor.  I don't know enough about the patent

8  related issues to know now just what we should do on that

9  issue, the issue of a technology advisor.

10          Have the plaintiffs discussed that among themselves?

11          MR. SORENSON:  Your Honor, this is David Sorenson

12  again for the direct class.  No, we have not discussed that

13  issue.  One comment I would make is that similar to the expert

14  issue just discussed, this seems to be something that will come

15  up later.  In other words, if the next case event is class

16  certification of the two proposed classes, it's not apparent or

17  obvious to me that in that context patent issues at this level

18  of depth will become pertinent given, you know, what's -- what

19  the legal standards for classification and what should and

20  should not be delved into and decided.

21          The patent issues at in-depth would appear to me to

22  be more something that goes to the merits of the case, and so

23  is something that would come up more directly, let's say, at

24  summary judgment.  That's one reaction I have, but --

25          THE COURT:  Oh, I agree with you.

1          MR. SORENSON:  -- to directly again answer your --

2          THE COURT:  I agree with you, but --

3          MR. SORENSON:  Okay.  I'll stop there.

4          THE COURT:  -- I don't know -- I've done this in one

5  case and it took a little time to set things up.  And so I want

6  to try to anticipate to the extent I can.  But I agree with

7  you.  I see no need for a technical advisor in connection with

8  motions for class certification.  And that's what we'll do.  I

9  just want you to keep that issue in mind in the future.

10          Let me ask some questions about the technology.  Is

11  this a two-schools of thought case?  In other words, are there

12  two distinct schools of thought on the science involved?

13          MR. SORENSON:  Miranda Jones, are you on the phone?

14          MS. JONES:  Yes, I am.

15          MR. SORENSON:  I'm going to -- this is David

16  Sorenson.  I'm going to ask, not to put her on the spot, but

17  Ms. Jones is focused on patents, so I'd ask her in her the

18  first instance to response.

19          MS. JONES:  Your Honor, Miranda Jones from Heim,

20  Payne & Chorush.  I believe that this is not the case where

21  there is a substantial difference between the technical experts

22  but, of course, defendants' counsel can correct me if they

23  believe differently.  I think that it's not a truthful defraud

24  case.  I think the difference is they're more in the

25  application of the specific facts and the specific technology.

1          THE COURT:  Give me an example of the patent issues

2   that will have to be litigated.

3          MS. JONES:  So right now the central issue of dispute

4   relates to public use and whether or not the clinical trial

5   that Kos conducted in its preparation of Niaspan constituted a

6   public use.  And so there appears not to be a dispute that the

7   product that was used during this clinical trial met the

8   limitations of the claims that are asserted in the underlying

9   litigation.  And so there's not technical disputes as to the

10  science so much as technical disputes as to the circumstances

11  regarding whether or not that use was sufficiently public.

12         THE COURT:  And I've had those issues in other cases.

13  And I don't think they require a technical advisor.  Are there

14  any issues that you can anticipate now that would require a

15  technical advisor?

16         MS. JONES:  I think that there are some disputes as

17  to the treatment limitations of some of the patent claims,

18  specifically side effects and how those side effects relate to

19  the patent claims.  I suspect that there's more of a dispute in

20  the technical factual details there than there might be for

21  some of the composition limitations.

22         THE COURT:  And that issue that you've just

23  identified you think is critical to the question whether the

24  generic should have launched at risk.  Is that what you're

25  telling me?

1          MS. JONES:  Well, those questions are critical to
2    whether or not the patent claims were valid and infringed,
3    which I believe play into that decision.
4          THE COURT:  Okay.  All in all, it doesn't sound, I'm
5    going to use the phrase "that technical."  But it's something I
6    want you to keep in mind.  And in any event, I'm going to want
7    a tutorial.  And the question is whether we do it by lawyers or
8    with an expert or experts or -- and but I leave that for
9    another day as well.
10         You clarified, for now at least, for me the fact that
11   the patent issues do not appear to be nearly as technical as
12   they were in the last patent case I tried, a cell phone case.
13   I didn't realize how many patents there were in that slim cell
14   phone of mine but there are lots and they're very technical and
15   very difficult to grasp.
16         All right.  Is there anything that needs to be --
17   anything else that needs to be discussed with respect to expert
18   witness evidence or the patent issues?
19         Hearing nothing, I got your joint settlement report
20   on November 16th.  And I'm not certain whether you are in
21   disagreement.  Plaintiffs stated that ADR with an outside
22   mediator might be of assistance shortly after the close of
23   expert discovery on February 8th.  Defendants stated that ADR
24   with an outside mediator might at some point be useful but not
25   at this juncture.  Well, that juncture was November 16th.  And

10

1   what the plaintiffs have said is that they think an appropriate

2   time for exploring ADR would be after February 19th -- February

3   8th.

4          MS. ALLON:  Your Honor, this is Devora Allon for

5   Teva.  Perhaps I should speak to that for the defendants.

6          THE COURT:  Yes, you may.

7          MS. ALLON:  So I don't think the plaintiffs and the

8   defendants are on the same page.  The plaintiffs are of the

9   view that when expert discovery closes, that would be a good

10  juncture for alternative dispute resolution.  The defendants,

11  at least for Teva, are of the position that until we receive

12  revised and lowered settlement demands from the plaintiffs,

13  alternative dispute resolution will not be meaningful.  So it's

14  not a question of the passage of time or the close of expert

15  discovery that at issue for us.

16         THE COURT:  All right.  Anyone else from the defense

17  want to comment?  And then I'll hear from the plaintiffs?

18         MR. SAINT-ANTOINE:  Paul Saint-Antoine for Abbvie

19  defendants.  Our view is that we've -- counsel has dealt with

20  other cases before.  We've settled cases without a mediator.

21  We've settled cases with a mediator.  Sometimes we found that

22  it's helpful and other times -- frankly, I think more recently

23  -- we found that it was unnecessary or even a just more process

24  that was an impediment.  So our view is we believe we can --

25  it's not the type of situation where there's some sort of

1  animosity or feelings between the party and the counsel that

2  gets in the way of direct talks so we can -- we don't view this

3  as a case where one has to get a mediator involved.  We do

4  understand that sometimes there are circumstances that arise

5  that it just makes it easier.  But we believe we and plaintiffs

6  can identify such circumstances.  And if they arise, we know

7  what to do.

8         THE COURT:  Well, yes, you can say that in every

9  case.  But that doesn't really move the ball very far.  And

10 I've had a number of MDLs, as you no doubt know.  The last one

11 was not settled until the eve of trial, but that which

12 triggered the settlement was, well, a ruling on damages that I

13 issued after I ruled on summary judgment and a very fine

14 mediator.

15        I chaired the Court's ADR Committee for many years.

16 We've folded that committee into the civil business committee

17 as of now, but the bottom line, I think that saying that the

18 parties will get together and discuss settlement when they

19 think it's appropriate is not a way to settle very many cases.

20 And certainly not a way to settle a case where the demand is

21 what it is in this case.

22        And what I don't want to do because I think it's a

23 sign of poor case management, I don't want to let this case

24 kind of slip and slide through all the processes, get to the

25 point where we're just about ready to go to trial and then be

1   told, Judge, we're seriously pursuing settlement and think that

2   we have a settlement in principle or better yet a settlement, a

3   final settlement.  That's not swift.

4           The idea is to get people thinking realistically

5   about settlement at an appropriate time.  And the appropriate

6   time is not often -- well, not necessarily, I'll use that word,

7   the time that counsel think is appropriate.  Certainly wasn't

8   appropriate to settle the last MDL I settled in May, <u>Blood</u>

9   <u>Reagents</u>, three weeks before the start of the trial, which was

10  scheduled to last I guess three or four weeks.  That was too

11  late.  So we're going to do something about this, but I gather

12  there's absolutely no interest in pursuing it now.  And --

13          MR. WEXLER:  Your Honor, this is Ken Wexler for the

14  end-payors.  Am I interrupting you?  I don't want to.

15          THE COURT:  No.  No, I was about to say something

16  else and then decided not.  Go ahead.

17          MR. WEXLER:  Oh.

18          THE COURT:  Mr. Wexler?

19          MR. WEXLER:  I'm sorry.

20          THE COURT:  No, go ahead.

21          MR. WEXLER:  We're not going to jumpstart it if the

22  defendants say we will consider ADR if you the plaintiffs

23  negotiate against yourself.  I mean there doesn't really seem

24  to be any appropriate time under those circumstances.  And so

25  it's a little frustrating hearing Ms. Allon say that.  We've

1   heard it before.  But we at least from the end-payor side made

2   a very good faith demand, and we are not going to negotiate

3   against ourselves but are perfectly willing to sit with a

4   mediator and try to find some way to resolve it.

5           But to say that the other side has to come down or

6   change their number without anything from our adversary is just

7   not realistic at all.

8           THE COURT:  Well --

9           MR. WEXLER:  And it's not moving the ball.

10          THE COURT:  I don't know how realistic your -- well,

11  your demand, I don't think your demand is holding things up.

12  But I really think it might be the -- your counterparts, the

13  direct payor plaintiffs.  And the bottom line, I'm not going to

14  share the figures and I have to think on that because the

15  figures were submitted in confidence.  And I'm not certain how

16  that's working.

17          I do know that if I were to order mediation now, it

18  undoubtedly would be off to a rough start and I'm not going to

19  do that.  But I want to think about this, and I can tell you

20  I'm not satisfied with leaving the case in the status quo with

21  respect to settlement.  I'm going to do something that will

22  precipitate it or precipitate discussions.  And I'm not certain

23  now what that is, but I am certain that this is not the right

24  time or the right time to do so.

25          I don't know whether the -- anyone's figures are out

1  of line.  I really haven't given much thought to damages.  I

2  can tell you that the total figures are rather substantial, as

3  large as I've had in any case ever that I've had on my

4  calendar.  So for now, I'm going to -- well, I'm not going to

5  pursue mediation.

6          Have the plaintiffs' side, anyone on the plaintiffs'

7  side, given any thought to specific mediators?

8          MR. SORENSON:  Your Honor, this is David Sorenson.

9  We haven't discussed amongst ourselves names of mediators.

10  We've all been in mediation together, and there's what I'll

11  call a short list that the plaintiffs would probably be able to

12  come up with, you know, fairly quickly of, you know, between

13  one and three mediators that all the plaintiffs have used

14  probably on more than one occasion in recent cases.

15          So the short answer is no, we have not specifically,

16  but we could do that fairly quickly.

17          THE COURT:  Well, it's one thing to come up with a

18  name.  It's another thing to come up with a realistic schedule.

19  Some mediators are booked months in advance, the good ones are.

20  And it's very hard to schedule things.

21          Same question for defendants, have you given any

22  thought to the mediator?

23          MS. ALLON:  We have not, Your Honor.

24          THE COURT:  There have been some other pay-for-delays

25  cases.  Have any of the defendants been involved in any of

1  those cases?

2          MR. SENATOR:  We have, Your Honor.

3          THE COURT:  Is that --

4          MS. ALLON:  We have, as well, Your Honor.

5          THE COURT:  That's Teva and Abbvie?

6          MR. SENATOR:  Yes.

7          THE COURT:  Which ones?

8          MR. SENATOR:  For Abbvie, we were involved in

9  Niaspan.  I'm sorry, that's our case.  Hytrin.  We were

10  involved in --

11          THE COURT:  What was the --

12          MR. SENATOR:  -- Androgel, which is still going on.

13          THE COURT:  Mr. Senator, what was the first one?

14          MR. SENATOR:  Hytrin, or sometimes it's called

15  Terazosin --

16          THE COURT:  Yes.

17          MR. SENATOR:  -- Hydrochloride.

18          THE COURT:  Yes.

19          MR. SENATOR:  It was before a judge in Miami.

20          THE COURT:  Which one?

21          MR. SAINT-ANTOINE:  Judge Seitz, Your Honor.  Judge

22  Seitz.

23          THE COURT:  Okay.

24          MR. SENATOR:  Justice Seitz, yeah.

25          THE COURT:  Okay.  And --

1           MR. SENATOR:  We're also involved in <u>Androgel</u> in
2  Georgia before Judge Thrash.
3           THE COURT:  Have you considered mediators in either
4  of those cases?
5           MR. SENATOR:  Well, <u>Hytrin's</u> over and for many years.
6  We did use a mediator in that case with some of the same
7  counsel who are on the phone now.  <u>Androgel</u>, I'll let -- I'm
8  actually not personally involved in that case, but I know
9  Mr. Sorenson is so I'll let him -- I'll defer to him on a
10 particular mediator.
11          MR. SORENSON:  Your Honor, <u>Androgel</u> is not settled.
12 Maybe Scott or Barry can remind me, I don't recall any
13 mediations in that case.  Well, I think there was one -- we
14 take that back.  There was a meeting, but it was only counsel,
15 I believe.
16          MR. PERWIN:  That's my recollection, also.  This is
17 Scott Perwin, Your Honor.
18          THE COURT:  This is John Thrash's case in Georgia?
19          MR. SORENSON:  Yes.
20          MR. PERWIN:  That's correct, Your Honor.
21          THE COURT:  And that case is ongoing?
22          MR. PERWIN:  Correct.
23          THE COURT:  Mr. Senator, do you remember the name of
24 the mediator involved in <u>Hytrin Terazosin</u> case?
25          MR. SENATOR:  Yes.  It was Eric Green.

1          THE COURT:  And I gather he got it settled?

2          MR. SENATOR:  It did -- well, it settled as to all

3   but one plaintiff, and that plaintiff went to trial.  It was --

4   that one plaintiff was Kaiser Healthcare, and it did not

5   settle.  And they -- it was remanded -- you know, it was an

6   MDL, so their particular case is remanded to the Central

7   District of California here, and we tried that case.  And the

8   defendants prevailed at trail.

9          THE COURT:  Well, when was the Hytrin case mediation?

10  Do you have any recollection of the timing?

11         MR. SORENSON:  I think about 2002 or 2003.

12         THE COURT:  No, that's not what I was thinking of.

13  I'm thinking --

14         MR. SORENSON:  Oh, I'm sorry.

15         THE COURT:  -- when in the course of the case, before

16  summary judgment --

17         MR. SORENSON:  Oh, I'm sorry.

18         THE COURT:  -- after summary judgment?  No, my

19  question wasn't that clear.  Before summary judgment, after

20  summary judgment, or don't you remember?

21         MR. SORENSON:  I know there were summary judgment

22  rulings before settlement but what I don't recall is whether --

23  there may have been multiple mediation sessions.  I know it

24  settled after summary judgment rulings --

25         THE COURT:  Okay.

1           MR. SORENSON:  -- but before trial.  But I just

2     don't recall the precise progress of the mediations.

3           MR. PERWIN:  Right.  And in that case, Your Honor, I

4     also don't recall the precise sequence.  That case went up to

5     the Eleventh Circuit and then back down and continued on after

6     it went back down.  So I don't -- I also don't recall off the

7     top of my head exactly when it mediated.

8           THE COURT:  Well, I gather that the mediation didn't

9     occur while expert discovery was ongoing or at the end of

10    expert discovery.  In any event, it's an issue that I'm not

11    going to drop.  I'm not going to adopt Teva's position that

12    we're not discussing settlement because the demands are too

13    high and then hearing from the plaintiffs we're not bidding

14    against ourselves.  They're comments that lawyers utter all the

15    time and I take them with I'll say a grain of salt because

16    there is an appropriate time to address settlement in this

17    case.  And we'll have to find it, and we'll try to get there by

18    agreement.  We're not going to do it today.  But I want you to

19    be thinking about that.

20          And one thing I don't want you to do, and I'll remind

21    you of these telephone conferences in which we discuss that

22    point, I don't want to be end up settling this case as was the

23    case in <u>Blood Reagents</u> on the eve of trial after lots of money

24    was expended that really didn't have to be expended.  But that

25    means this issue which prompted the settlement was -- well, it

1  was a price-fixing case, and the issue was the lingering effect

2  damages.

3          Have any of you experienced any case in which

4  lingering effects damages were an issue?  Anyone know what they

5  are?

6          UNIDENTIFIED:  Not exactly, Your Honor.

7          THE COURT:  Well, I hadn't realized it was a case of

8  first impression.  I've been tempted to write on it, not an

9  opinion.  A lingering effects damages occur maybe after a

10  cartel is over.  In that case, I ruled that there was no

11  evidence of price-fixing after a certain date.  And the

12  lingering effects damages are the damages that follow at the

13  end of cartel.  The damages don't drop to zero.  The prices

14  don't become competitive overnight.  And the plaintiffs'

15  damages model is what I ruled on, but it was so absurd, it was

16  a piece of cake.  They should have reached the same conclusion.

17          The theory that was rejected, that I rejected was one

18  in which their expert said lingering effects damages continue

19  like forever.  And that was absurd.  He said the difference

20  between the bought-for price and the actual price should

21  continue.  And that's not true in real life, and we found some

22  authority for the contrary.  And that's what got that case

23  settled.

24          It doesn't seem to me as thought that is an issue

25  that would occur in this case.

1          MS. ALLON:  Your Honor?

2          THE COURT:  Yes?

3          MS. ALLON:  Actually --

4          UNIDENTIFIED:  Your Honor?

5          MS. ALLON:  -- I do think there's an analogous issue.

6   This is Devora Allon for Teva.  There is a disagreement

7   certainly with respect to the indirect purchaser's and the

8   defendants as to whether the effects of any allegedly

9   anti-competitive behavior continue after actual generic entry

10  and how long after that damages can occur.  And I think the

11  point that you just made is a similar point that they are

12  making in this case that they have damages essentially

13  continuing out that in the but-for world well beyond prices in

14  the actual world.  so those two prices never merge.  So I do

15  thikn there's an analgoous issue in this case.

16         THE COURT:  Sounds like it is.

17         MR. SORENSON:  Your Honor?

18         MR. KODROFF:  Your Honor, this is Jeff Kodroff.

19         MR. SORENSON:  Yeah, go ahead, Jeff.

20         MR. KODROFF:  Yes.  As counsel in both the blood

21  reagents case and in this case, there's some fundamental

22  factual differences between the generic suppression case before

23  you now and the traditional anti-trust conspiracy cases, a case

24  like blood reagents.  I don't need to get into an argument.  I

25  just wanted to note there are some --

1           THE COURT:  Oh, I think there are, but the concern in

2  blood reagents was continuing damages after the end of the

3  cartel.  And the Teva point is something that is ripe.  It's

4  certainly not on all fours, but it's related.

5           I was surprised at how little was written about it.

6  A former federal trade commissioner whose name escapes me --

7  begins with a K -- and we've talked about antitrust issues down

8  through the years, he's now a professor.  In any event, he

9  wrote on it.  But there's very little written on what I can

10  describe.

11           In any event, that's what got blood reagents settled.

12  And it should have settled earlier.  And I'm determined to do

13  what I can to cause this case to get into a settlement mode at

14  an appropriate time and to do what I can to put it there.  I

15  don't know that I can do anything else now.  The plaintiffs

16  certainly have a significant interest in settlement

17  discussions.  And if they think their separate demands to me

18  were high and not inclined to cause a response, then I for now

19  at least I leave to them the question whether they're going to

20  lower their demands.  And that applies to everyone.

21           But bidding against yourself makes absolutely no

22  sense when you're talking about a demand that's out of line.

23  If you think the demand is realistic, and you don't have to say

24  anything on this issue now, then don't budget.  But if it's out

25  of line and you agree it was just a starting point, then I

1  think it behooves you to say so when the time is right to begin

2  settlement discussions.

3         All right.  Anything else we have to discuss on the

4  question of settlement?

5         All right.  Hearing nothing, I'm awaiting receipt of

6  class certification motions.  I gather they'll be filed next

7  Wednesday.  Is that correct?  That's the schedule date,

8  December 19th.  Are we on target?

9         MR. SORENSON:  Yes, Your Honor.

10         THE COURT:  Good.

11         MR. SENATOR:  Yes, Your Honor.

12         THE COURT:  All right.  Well, then the rest of the

13  schedule is in place.  We've already talked about technology

14  advisor.  This isn't the time to press forward with that.  The

15  seventh amended scheduling order is in place, the corrected

16  seventh amended scheduling order.  I signed the order regarding

17  certain expert witnesses, I guess Kurt Karst and John Clark.

18  You got copies of that order?

19         MR. SORENSON:  Yes, Your Honor.

20         THE COURT:  Okay, Well, then that's done.  I see no

21  other issues except for the scheduling of the next telephone

22  conference.  Does anyone have any issues to present?

23         Hearing nothing, let's talk about the next

24  conference.  Let me play off what's set for in the schedule.

25  Expert depositions close February 8th.  Opposition to class

1  cert February 25th and replies March 25th.  What is the

2  thinking among the plaintiffs on the scheduling of another --

3  the next telephone conference?  Sometimes after --

4          MR. SORENSON:  Your Honor?

5          THE COURT:  Yes.  Go ahead.

6          MR. SORENSON:  Yeah.  This is David Sorenson.  Two

7  things that come to mind.  One would be after the close of

8  expert discovery, so the week of February 11th or the week of

9  February 18th or, alternatively, after the defendants have

10 filed their opposition to class on February 25th and then

11 Daubert motions something like February 26th to 27th might be

12 an appropriate time in case something has come up because of

13 defendants' filing, either they've raised or we perceive that

14 they've raised or something, might be a logical time.

15          So either -- I mean I don't have -- I'm not related

16 to either of these.  I just -- they sort of jump out of me from

17 just looking at the schedule.

18          THE COURT:  Let me hear from the defendants.  And by

19 the way, if any issues come up that you think require

20 adjudication and you need a telephone conference to present

21 them, you can do that.  You know that?

22          MR. SORENSON:  Yes, Your Honor.

23          THE COURT:  So you don't have to wait for the next

24 conference.

25          What do the defendants have to say on timing of the

24

1  next conference?

2          MS. ALLON:  Your Honor, this is Devora Allon.  I

3  think probably after the close of expert discovery makes sense.

4          THE COURT:  Okay.

5          MS. ALLON:  So the week of February 11th or February

6  18th.

7          THE COURT:  All right.  Let me look.

8                    (Pause)

9          THE COURT:  February 8th is a Friday.  February 11th,

10 let's see what I have on that week.  Right now not a trial.  I

11 just finished a month-long trial that sort of tracks what is

12 going on in the Southern District of New York.  It's an

13 election violation case, and it's much like Michael Cones case.

14 And I'm just sort of getting back.  I've been on trial for the

15 whole month of November.

16          I don't have anything on the week of the 11th or the

17 week of the 18th except the 18th's a holiday.  Why don't we

18 schedule this so that I can -- well, it doesn't really matter.

19 I'm not going to have to review anything.  Why don't we

20 schedule this for the end of the week of the 11th, Friday, the

21 15th?

22          MR. SENATOR:  Your Honor, could I -- this is Stewart

23 Senator.  I just -- if it's all the same to the Court, I'd

24 request not Friday because that's just the beginning of the

25 President's Day weekend.

1          THE COURT:  Oh.  You're right.  When do you start

2     that President's Day weekend?  Is that a Thursday start or a

3     Wednesday start?

4          MR. SENATOR:  So we celebrate early in California.

5          THE COURT:  Do you want to do it on Thursday?

6          MR. SENATOR:  That would be better.  Thank you, Your

7     Honor.

8          THE COURT:  My note says it's that --

9          MR. SORENSON:  Stewart, that's Valentine's Day, just

10    so you know.

11         MR. SENATOR:  That's Valentine's Day.

12         THE COURT:  Valentine's Day.

13         UNIDENTIFIED:  Thank you, Stewart.  We need you --

14         MR. SENATOR:  Well, now I'm getting in trouble with

15    somebody else.

16         THE COURT:  We can do it -- you want to do it

17    Wednesday at four o'clock?

18         MR. SENATOR:  Great.

19         MR. SORENSON:  That's fine.

20         THE COURT:  Wednesday, the 13th, February 13th,

21    four o'clock.  Who will initiate?

22         MR. SORENSON:  Your Honor, this is David Sorenson.

23    I'm happy to do it again.  I'm on a roll.

24         THE COURT:  All right.  Is there anything else we

25    have to talk about?  Speak up if there is.

1          Hearing nothing, I'll end the conference.  Thank you

2 all very much.  As I noted at the beginning -- well, I didn't

3 note at the beginning.  But we're recorded, so there's a

4 transcript of everything that we've decided.  There will be a

5 transcript of everything we've decided.  Have a good evening,

6 everybody.

7          MR. SORENSON:  Thank you, Your Honor.

8          UNIDENTIFIED:  Thank you, Your Honor.

9          THE COURT:  Bye now.

10     (Proceedings concluded at 5:42 p.m.)

11                    *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1              **C E R T I F I C A T I O N**

2

3          I, Dipti Patel, court-approved transcriber, certify

4  that the foregoing is a correct transcript from the official

5  electronic sound recording of the proceedings in the

6  above-entitled matter, and to the best of my ability.

7

8  *Dipti Patel*

9

10 _____

11 DIPTI PATEL, AAERT NO. 997     DATE:  December 14, 2018

12 ACCESS TRANSCRIPTS, LLC

13

14

15             **C E R T I F I C A T I O N**

16

17         I, Alicia Jarrett, court-approved transcriber, hereby

18 certify that the foregoing is a correct transcript from the

19 official electronic sound recording of the proceedings in the

20 above-entitled matter.

21

22 *Alicia J. Jarrett*

23 _____

24 ALICIA JARRETT, AAERT NO. 428     DATE:  December 18, 2018

25 ACCESS TRANSCRIPTS, LLC

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)