```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA


                                   .
                                   .  Case No.  2:13-md-02460
IN RE:                             .
                                   .
NIASPAN ANTITRUST                  .
LITIGATION,                        .  U.S. Courthouse
                                   .  601 Market Street
         Debtor.                   .  Philadelphia, PA 19106
                                   .
                                   .  Friday, March 8, 2019
                                   .  2:58 p.m.
. . . . . . . . . . . . . . .  .
```

               TRANSCRIPT OF TELEPHONE STATUS CONFERENCE
               **BEFORE THE HONORABLE JAN E. DUBOIS**
               **UNITED STATES DISTRICT COURT JUDGE**

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the End-Payor Putative Class: | Wexler Wallace, LLP By:  KEN WEXLER, ESQ.      JUSTIN N. BOLEY, ESQ. 55 West Monroe Street, Suite 3300 Chicago, IL 60603 (312) 346-2222 |
| For CVS/Rite Aid Plaintiffs: | Hangley Aronchick Segal Pudlin & Schiller By:  BARRY L. REFSIN, ESQ. One Logan Square, 27th Floor Philadelphia, PA 19103 (215) 496-7031 |
| For Walgreen Plaintiffs: | Kenny Nachwalter P.A. By:  ANNA T. NEILL, ESQ. Four Seasons Tower 1441 Brickell Avenue, Suite 1100 Miami, FL 33131 (305) 373-1000 |

TELEPHONIC APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Michael Cosgrove, ESR |
| TRANSCRIBED BY: | Access Transcripts, LLC 10110 Youngwood Lane Fishers, IN 46038 (855) 873-2223 www.accesstranscripts.com |

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

TELEPHONIC APPEARANCES (Continued):

For the Direct             Berger Montague, P.C.
Purchaser Putative         By:  NICHOLAS URBAN, ESQ.
Class:                          DAVID F. SORENSEN, ESQ.
                           1818 Market Street, Suite 3600
                           Philadelphia, PA 19103
                           (215) 875-5705

                           Garwin Gerstein & Fisher LLP
                           By:  DAN LITVIN, ESQ.
                           88 Pine Street, 10th Floor
                           New York, NY 10005
                           (212) 398-0055

                           Odom & Des Roches, LLC
                           By:  DAN CHIOREAN, ESQ.
                                CHRISTOPHER T. STOW-SERGE, ESQ.
                           Suite 2020, Poydras Center
                           650 Poydras Street
                           New Orleans, LA 70130
                           (504) 522-0077

For AbbVie Defendants:     Drinker, Biddle & Reath LLP
                           By:  JOHN YI, ESQ.
                                PAUL H. SAINT-ANTOINE, ESQ.
                           One Logan Square, Ste. 2000
                           Philadelphia, Pennsylvania 19103-6996
                           (215) 988-2990

                           Munger Tolles & Olson LLP
                           By:  STUART N. SENATOR, ESQ.
                                JEFFREY Y. WU, ESQ.
                           350 South Grand Avenue, 50th Floor
                           Los Angeles, CA 90071-3426
                           (213) 683-9528

                           Munger Tolles & Olson LLP
                           By:  BLANCA FROMM YOUNG, ESQ.
                           560 Mission Street, 27th Floor
                           San Francisco, CA 94105
                           (415) 512-4019

                           Munger Tolles & Olson LLP
                           By:  JONATHAN S. MELTZER, ESQ.
                           1155 F Street Northwest
                           Washington, DC 20004
                           (202) 220-1105

3

```
TELEPHONIC APPEARANCES (Continued):

For TEVA Defendants:      Kirkland & Ellis, LLP
                          By:  DEVORA ALLON, ESQ.
                               DMITRIY TISHYEVICH, ESQ.
                               THOMAS S. BURNETT, ESQ.
                          601 Lexington Avenue
                          New York, NY 10022-4611
                          (212) 446-5967
```

4

1      (Proceedings commence at 2:58 p.m.)

2              THE COURT:  This is Judge DuBois.  Good afternoon.

3              UNIDENTIFIED:  Good afternoon, Your Honor.

4              UNIDENTIFIED:  Good afternoon, Your Honor.

5              THE COURT:  We're going to proceed with our

6   regularly-scheduled telephone status conference in the <u>In re</u>

7   <u>Niaspan Antitrust Litigation</u>, MDL Number 2460.  As is our

8   practice, the conference is being recorded.

9              I have your proposed agenda, and we will start with

10  that.  And if there are any other matters that you wish to

11  address, I'll hear you after we finish going over what is on

12  your joint proposed agenda.

13             At the outset, is there anything anyone wishes to

14  call to my attention?  Hearing nothing, we will proceed.  The

15  first item on the joint proposed agenda is an update on expert

16  discovery.  I'll hear from you on that issue.

17             UNIDENTIFIED:  Your Honor --

18             MR. SENATOR:  Your Honor, this is Stewart Senator.

19  This is just an informational item for the Court as per the

20  prior discussions with the Court and order.  Plaintiffs'

21  expert, Dr. McGuire, submitted his supplemental report on time

22  on, I believe it was, February 27th, and the depositions had

23  been set by mutual agreement based on schedules of counsel and

24  of the experts for the dates indicated in the joint proposed

25  agenda.

1          THE COURT:  And I gather that the one deposition, the
2   last of the two, May 2nd, 2019, is not going to conflict with
3   any other dates already on the schedule.
4          MR. SENATOR:  Correct, Your Honor.
5          THE COURT:  All right.  That's fine.  And there are
6   no problems that have been encountered with respect to those
7   expert depositions?
8          MR. SENATOR:  Right.
9          THE COURT:  All right.  Then, we'll proceed to the
10  second item on the agenda, the class certification hearing.
11  First, the format for the hearing.  And I gather the chief
12  issue is whether expert testimony will be required by me.  I
13  went back over the submissions sometime ago on expert
14  witnesses, and I can't tell at this time whether I will need
15  any expert testimony.  I rather think the answer might be no.
16  I think expert testimony is needed with complex technology, and
17  the last situation in which that arose was a patent
18  infringement case.  The technology was very, very complicated,
19  and expert witness testimony was required.
20          The only area which I -- in this case, the only area
21  of expert testimony which might fall into that category,
22  requiring testimony, is the -- well, the -- are the experts who
23  will testify on damages.  And because there are so many of
24  them, I think for now, unless you would -- well, convince me to
25  the contrary, I'll not order that any experts testify at the --

1  at least the May -- what are those dates, May 14th and 15th,

2  hearing on the motions for class certification.

3  　　　　　　Does anyone feel strongly to the contrary?

4  　　　　　　MR. WEXLER:  Yes, Your Honor.  This is Ken Wexler on

5  behalf of the end-payors.  We feel that expert testimony, given

6  the issues, number one, that are created by the Third Circuit

7  with respect to ascertainability and how this has played out in

8  end-payor class action and given the desire whether they

9  succeed or not -- I don't think so, but the defendant's

10 approach is to make things as complicated as possible.

11 　　　　　　We feel strongly that our experts can simplify

12 matters for the Court.  They are extremely credible.  We think

13 their credibility will shine compared to the defendants, and we

14 think their testimony should create a record.  Whether it goes

15 up or not, it is very important to us.

16 　　　　　　THE COURT:  Well, the question is whether you can

17 communicate all of that to me and whether the experts are

18 needed.  You've got too many experts.

19 　　　　　　MR. WEXLER:  Yes.

20 　　　　　　THE COURT:  And it's too -- it's really -- I was

21 going to say "too difficult," but that's not a correct

22 statement.  It's practically impossible to figure out from your

23 expert witness submissions to date which experts might --

24 underscore might -- be useful at the class certification

25 hearing.

1          MR. WEXLER:  Well, there's really -- I mean, we have

2     three experts that are relevant to this, one being

3     Meredith Rosenthal, who presented a report on impact and

4     damages.  The defendants have an expert who came in and said we

5     have no methodology for ascertainability, but we have an expert

6     that gave a methodology, and they came back and said, with

7     Mr. Dietz (phonetic), that he does not, and we have rebuttal on

8     experts that demonstrate the ease with which the data that's

9     maintained in this industry can be accumulated to identify

10    class members.

11          So it's really -- and we feel to put our best foot

12    forward, we would like our experts there.  I can certainly

13    argue these issues before Your Honor, and I'm happy to if

14    that's what Your Honor desires, but I do feel that -- you know,

15    there are -- you might have questions.  I'd like my experts

16    there to be able to answer them.

17          THE COURT:  Well, you -- number one --

18          MR. WEXLER:  It's been litigated very --

19          THE COURT:  Go ahead.

20          MR. WEXLER:  I'm sorry.  I mean, it's just that the

21    issues raised here have been litigated on a number of occasions

22    in the Third Circuit.  We feel that we have prepared and

23    submitted a fulsome record, one that has not been seen before,

24    and I want to be able to demonstrate that.  I'd like to do it

25    through witnesses if -- but that's -- you know, beyond that, I

1 mean, it's -- obviously, it's Your Honor's call.

2          THE COURT:  Well, the -- I'm not debating whether

3 it's important that you be permitted to present your best foot

4 forward, put your best foot forward, with respect to all

5 issues, including ascertainability.  I'm just not certain it

6 has to be done in the first instance.  My thought would be to

7 go through a hearing without expert testimony, and if I think

8 expert testimony is needed or if you can convince me at the

9 hearing after you presentation that you haven't been able to

10 convey to me what you think needs to be conveyed, then I will

11 certainly consider a request for an adjourned hearing.

12          We did that in -- I've forgotten what case.  But

13 Mr. Saint-Antoine would remember.  We needed expert testimony,

14 and I think the expert was not available on the date at which

15 -- on which we scheduled the hearing.  And so his -- what we

16 did, we presented that evidence by -- I'm not sure whether it

17 was video deposition, probably was, and I ruled.  And in that

18 case, I certified the class.  But --

19          MR. SAINT-ANTOINE:  Your Honor, this is Paul

20 Saint-Antoine.  You're correct.  That would be the first class

21 certification hearing in Blood Reagents.  The plaintiff's

22 expert, Dr. Beyer, was not available.  We went forward with the

23 hearing without his presence, and then about a month or so

24 later, he was -- he testified via videotaped deposition.

25          THE COURT:  Well --

1          MR. WEXLER:  Your Honor, it's Ken Wexler again.  In

2  that regard, I mean, our witnesses will be available, and I

3  would hate to prolong the hearing.  If Your Honor wants to go

4  that way, it's obviously your decision.  I mean, we can follow

5  up argument with expert testimony if I can convince you that

6  it's necessary if I even think it's necessary, but you set

7  aside two days for arguments.  That seems long for argument.  I

8  think we can put our evidence in and keep the schedule moving.

9  But again, I'll respect whatever Your Honor decides.

10          MR. SENATOR:  Your Honor, this is Stewart Senator for

11  the AbbVie defendants.  We think what Your Honor has laid out

12  is the sensible course of action.  You know, we've spoken with

13  counsel to the direct purchaser plaintiffs, and while we both

14  recognize and respect that it's the, you know, ultimately the

15  Court's decision, our -- I believe I'm speaking correctly that

16  neither we nor the direct purchaser plaintiffs on the direct

17  purchaser moment -- motion believe that live testimony is

18  necessary.

19          Now, Mr. Wexler is discussing, obviously, the

20  end-payor motion, and there, we also agree with the Court,

21  recognizing obviously that it's whatever's most useful to the

22  Court that's the controlling factor.  But just to respond a bit

23  specifically to Mr. Wexler's points, he's identified three

24  experts.  One is Professor Rosenthal, whose report has been put

25  in.  The others he referred to as rebuttal experts, and I

1 believe he's talking about Ms. Kraft (phonetic) and Mr. Miller

2 (phonetic).  They're the subject of our Daubert motion.

3          But totally apart from whether the Court grants the

4 motion or not, they have merely put into the record on

5 rebuttal, so having the last word, very short declarations.

6 Ms. Kraft's is ten paragraphs long.  Six of those paragraphs

7 are either her background or how her firm deals with

8 confidentiality or restatement of -- or quoting of the class

9 definition in this case, leaving only four paragraphs of any

10 substance whatsoever.  And Mr. Miller's declaration is similar.

11          So this isn't a situation where, one, the Court needs

12 to have that summarized or highlighted or anything of the sort.

13 They're limited to their declarations, and they are fully

14 understandable and comprehensible on their face on a rather

15 quick read.

16          THE COURT:  Well, I think for now --

17          MR. WEXLER:  I disagree, but I don't want to

18 interrupt, and --

19          MR. SORENSON:  Your Honor --

20          MR. WEXLER:  -- (indiscernible) for argument unless

21 you want to hear it.  I'm happy to state our position on that,

22 but if Your --

23          MR. SORENSON:  Your --

24          MR. WEXLER:  -- otherwise, we'll keep going.  Go

25 ahead.

1            MR. SORENSON:  Your Honor --

2            THE COURT:  Someone else --

3            MR. SORENSON:  -- this is David -- I'm sorry.  This

4   is David Sorenson from --

5            THE COURT:  Yes, go ahead, Mr. Sorenson.

6            MR. SORENSON:  This is David Sorenson for the

7   directs.  I just -- could I be heard very briefly?

8            THE COURT:  Absolutely.

9            MR. SORENSON:  I did speak with counsel, Stewart

10  Senator, about the hearing, and although we are inclined to

11  agree that we don't think in-person testimony is needed for the

12  direct hearing, I also agree with at least what I understand to

13  be the Court's statement earlier that it may develop at the

14  hearing that you will find it helpful to then take, you know,

15  for lack of a better way of putting it, followup testimony.  It

16  may be that during the course of that hearing, that develops,

17  and so I want to be clear that like the indirects, we want to

18  make sure that our best -- we can put our best foot forward.

19            So, you know, once the briefing is finished, then

20  it's not yet finished, and then we had the hearing with

21  lawyers, we -- I'm not saying this will happen, but you know,

22  it may develop that we think that it would be helpful to follow

23  up with testimony.  And I just wanted to clarify that.

24            THE COURT:  Well, and I think what I'm going to --

25  well, first of all, I've decided for now, I'm not going to

1  change the guidelines that I set for the class certification

2  hearing.  We'll proceed without expert testimony.

3          I agree with you, Mr. Sorenson, that I might be in a

4  better position -- maybe a different position, but a better

5  position -- because I will know more at the end of the briefing

6  relating to the class certification issues, and that will be

7  April 8th on the current schedule.  And what I will do, we'll

8  schedule the next telephone conference for a date soon after

9  April 8th, and I'll revisit the issue.

10          In the meanwhile, I'll read the submissions that

11  Mr. Wexler has referenced, the three submissions, and decide

12  whether they're necessary.  And if I think --

13          MR. WEXLER:  And I suggest --

14          THE COURT:  Yes?

15          MR. WEXLER:  I'm sorry.

16          THE COURT:  Go ahead, Mister --

17          MR. WEXLER:  It's hard when I can't see you.  I don't

18  mean to interrupt you.  There's a -- there is a fourth

19  declaration on the issue of ascertainability, and that's mine.

20  So (indiscernible) --

21          THE COURT:  I'm sorry, that's your --

22          MR. WEXLER:  -- the papers.

23          THE COURT:  -- your submission?

24          MR. WEXLER:  It's mine.

25          THE COURT:  Well, you'll be --

1          MR. WEXLER:  Yes, because I put forth our methodology

2   for ascertaining class members.

3          THE COURT:  A different methodology than that

4   submitted by your experts?

5          MR. WEXLER:  No, no, no.  The methodology we put

6   forth describes how we will obtain the data, who will process

7   the data, and who can identify class members, which is the test

8   under Carrera, Byrd, every case that has interpreted

9   ascertainability.  I set forth the end-payors' methodology.

10         THE COURT:  Well, doesn't that run counter to your

11  argument that your experts are necessary?

12         MR. WEXLER:  Only because the defense playbook is to

13  create complication and confusion.  I don't think it's

14  complicated or confusing, and you can view my declaration and

15  you'll see that, but the experts are, you know -- just from

16  past experience, you might have questions about how things are

17  done and how easy it is or how difficult it is.

18         THE COURT:  Well, knowing --

19         MR. WEXLER:  And for that, I would like to have a

20  fulsome record.  But I'm perfectly willing to go the route that

21  Your Honor has suggested, which is if it's necessary, that's

22  one thing, and right now, you don't think it is.

23         THE COURT:  No.

24         MR. WEXLER:  I don't think it is either.  I think we

25  have enough.  But I thought, for purposes of the hearing and

1  understanding that there was just a two-day evidentiary hearing

2  in the Wolester (phonetic) case on these issues, that it would

3  be -- I want to make sure that our record is full.  I think it

4  is and it will be, and it's belt and suspenders.

5          THE COURT:  Well --

6          MR. WEXLER:  If Your Honor then concludes that it

7  would be helpful, then we're prepared to present our witnesses.

8          THE COURT:  Fine.  And that's the way we'll proceed.

9  And I'm telling you to -- in -- not in an effort to raise your

10  comfort level, but I'm going to say something that will raise

11  your comfort level.  I've already said it.  We're going to

12  schedule the next telephone status conference for a short time

13  after the briefing on the class certification issues is

14  complete.  That date is April 8th.  We'll schedule the next

15  conference shortly thereafter.  In the interval, I'm going to

16  read the now four declarations relating to this issue, and I'll

17  tell you whether I think we need more.

18          MR. WEXLER:  Okay.

19          THE COURT:  But we're not trying -- you see, this is

20  not a trial.  We're not going to have mini trials on these

21  issues, and because you deluged me with expert reports, I think

22  we're up to 32, 32 experts you thought were essential to the

23  case, you've lost a little credibility on, quote, "what is and

24  what is not an essential expert," end of quote.

25          All right.  That's the way we'll proceed on the

1  formatting of the class certification hearing.

2          MR. WEXLER:  Thanks, Your Honor.

3          THE COURT:  I have an open mind, and we'll certainly

4  address it at the next conference.

5          MR. SORENSON:  Your Honor, before we leave -- this is

6  David Sorenson.  Before we leave class, just one item.  It's no

7  need for a decision immediately, but in terms of the two days,

8  the 14th and the 15th, my suggestion -- and I don't know what

9  you -- what the Court already had in mind was that the directs

10 go first on the 14th and then followed by the indirects on the

11 15th.  I don't know whether you had an order in mind or not,

12 but, you know, whenever you think convenient, if you wanted to

13 -- if you could tell us, just for planning purposes, what order

14 you'd like to take these in.

15         THE COURT:  Well, I think --

16         MR. SENATOR:  Your Honor --

17         THE COURT:  Yes, Mr. Senator?

18         MR. SENATOR:  I'm sorry.

19         THE COURT:  Mr. Senator, go ahead.

20         MR. SENATOR:  Yeah, this is Stewart Senator.  I fully

21 agree we should set a schedule whenever the Court is ready.  I

22 do think it will -- we should wait until April because if there

23 is going to be live testimony, we may have witness availability

24 issues as between the two days.  That just frankly, for us,

25 would mean that we'd, on one witness -- Professor Dietz, whose

1   son is getting married later in the week, can only be available

2   on Tuesday, the first day of the Court's schedule.  So if we

3   were to go that route -- and I understand the Court is not

4   inclined to go that route, but if we were to go the route of

5   live testimony on the EPP, the end-payor plaintiffs', motion,

6   then I was going to request that the end-payor one actually

7   start the two days because of that witness issue.

8           THE COURT:  Well, the only reason I ordinarily would

9   go the other way is because the end-payor plaintiffs' issues

10  are more complex.  They've had more trouble with the courts

11  than the direct payors.  And so I -- and I'm just now sure how

12  I'll go on that, but however I decide that issue, if your

13  expert is not available and you need him and I'm convinced you

14  need him, then we'll reschedule.  You've heard me say things

15  like that over and over again.

16          I really wanted to get this case tried this summer,

17  but on your proposed schedules, even the tighter schedule --

18  and the tighter schedule can be tightened up a bit.  But even

19  on that schedule, it would be difficult.  And I think on that

20  tight schedule, for example, oral argument on the motions for

21  summary judgment is scheduled for mid-August.  That's -- I can

22  tell you does not work for us.  The law clerk who is working on

23  the case now will be leaving, I think, the third week in

24  August, and so that's a no-brainer.  That's not going to

25  happen.  I'm not going to have one law clerk participate in the

1   oral argument and have another law clerk pick it up cold.

2         The goal to be desired seems to be a fleeting one

3   now, and that was to complete everything in sufficient time to

4   try the case in the summer -- this summer, 2019.  Doesn't seem

5   like we'll be able to go there.  But we'll take a look at that.

6   That's really the next item on the agenda.

7         Is there anything else that needs to be addressed

8   with respect to class certification?  I want to leave you with

9   the thought that on that issue and whether we have testimony or

10  the order of the presentation, I'm flexible.  I have a

11  preference for proceeding with the direct -- directs, I'll

12  start shortening that, as opposed to the indirects -- the

13  directs first because I think their issues will be less

14  complicated and we'll have more time for the indirects.  Okay.

15        MR. WEXLER:  You know, Your Honor -- it's Ken Wexler.

16  I think ours are not as complicated as you think, but we're

17  used to having the directs go first.  And on that basis, it's

18  okay.

19        THE COURT:  Well, I think yours are more complicated.

20  You've got more issues.  You've got a wide variety of law.

21  You've got dilemmas for --

22        MR. WEXLER:  Yes.

23        THE COURT:  -- dilemmas for the trial judge

24  because --

25        MR. WEXLER:  Yeah.

1           THE COURT:  -- to say they're not difficult issues.

2           MR. WEXLER:  Understood.

3           THE COURT:  To say they're not difficult issues, I

4  think --

5           MR. WEXLER:  No, it's been very difficult.  There's

6  no denying it.  But I feel that at this point, we've given you

7  the best record that will ever be given, so --

8           THE COURT:  Well, we'll see whether you're right, but

9  I'm not --

10          MR. WEXLER:  Right.

11          THE COURT:  -- I'm not prepared to comment on that

12  now.

13          I have your proposed schedules.  The next item on the

14  agenda is scheduling further proceedings, and the key is when

15  we proceed with the filing of dispositive motions.  And I think

16  what I'm going to do is wait on that until I get the final

17  briefing on the class certification motions and the related

18  Daubert motions.  Fortunately, you've cut replies to the last

19  round of Daubert motions.  So that date is April 8th, and we'll

20  address the schedule at that time.  But I have some questions

21  about your proposals.

22          First, plaintiffs.  I think I was the one who

23  suggested that we consider the filing of dispositive motions

24  before I ruled on class certification, and so I'm certainly not

25  critical of that.  I don't know whether it will work, but we'll

1  see.  The plaintiff, in its -- in their proposed schedule,

2  plaintiffs want, I think it's six weeks, roughly six weeks, to

3  respond to dispositive motions and then another three-plus

4  weeks to file replies.  Why is that much time needed?

5          MR. SORENSON:  Your Honor, this is David Sorenson.

6  You know, our anticipation is that we -- although we may be

7  filing our own affirmative motion, typically what has happened

8  is the defendants, whether they have -- whether I'd argue they

9  have grounds or not, they filed dispositive motions in these

10  cases.  And frankly, you know, it's the whole case, obviously.

11  They're seeking dismissal of the entire case or large chunks of

12  it.  The briefs and the associated exhibits and the associated

13  statements of facts sometimes run, you know, to the

14  multi-hundred paragraphs of facts and exhibits.  The briefing

15  is often lengthy and truly just a -- you know, based on

16  experience and having gone through this now a number of times,

17  six weeks to respond to that kind of motion is about what we've

18  taken, in some cases, longer than that.  We are conscious of

19  trying to move this case along, which is why we suggested the

20  beginning of the briefing made sense, and we just thought that,

21  you know, in light of the stakes in the dispositive motion and

22  what -- on the ground, what it needs, hundreds of paragraphs of

23  asserted facts accompanied by often running into over 100

24  exhibits.  We're talking about that kind of briefing.  It's

25  really just trying to be practical, you know, to respond to

1  that.  That's our view.

2          THE COURT:  Well -- and you've explained it.  My

3  overarching view is that in cases like this, the parties

4  overcomplicate the issues and submit very, very lengthy briefs.

5  The briefing on class certification -- and it's not an easy

6  decision, but the briefing, in one case, it was more than 100

7  pages.  If it takes 100 pages to say something, that means

8  something is wrong.  You've got to do a better job than that.

9  And apparently , lawyers are of the view that the more you

10  submit to the Court, the better the changes of prevailing turn

11  out to be.  I don't think that's so.  I really don't.  It's

12  much harder to write a good, short brief than a good, long

13  brief.  And that's what I --

14          MR. SORENSON:  Your Honor?

15          THE COURT:  Yes?

16          MR. SORENSON:  Yeah.  Your Honor, I completely agree

17  with all of what you just said.  I am more sort of just talking

18  out of experience that we can't control -- again, I'm talking

19  about what we anticipate receiving from the defendants.

20  Whether we think it's advisable for them to, you know, hit us

21  with, you know, a very voluminous filing or not, we have then a

22  responsibility to respond to it.  And for every paragraph of an

23  asserted fact they put in, unless we're going to move to strike

24  it, you could -- you know, if Your Honor will grant that, we

25  have to -- you know, we have to respond to it.  We're

1  obligated.  And --

2       THE COURT:  Well, the question is how you respond.

3  And just remember, there are maybe 30 of you and there are two

4  of us, and that makes it a little uneven.  And what that does

5  is slows down the proceedings.  All of this really is related

6  to my interest in trying the case.  And I'm just sharing these

7  views with you.  I have a suspicion that they're not going to

8  become the rule by which the case is -- proceeds, but I really

9  think less is more.  And so far in this case, except for the

10 limitation of trial briefs in page to 20 pages, I don't think

11 we've done that.

12      The other question I have for you, Mr. Sorenson, is

13 you've gone through all the briefing on summary judgment, and

14 you've provided for private mediation afterwards.  Is it

15 contemplated -- do you contemplate that there will be a

16 decision on the dispositive motions before the mediation?

17      MR. SORENSON:  No, not necessarily, more that we just

18 don't think it will be productive until after the briefing is

19 finished so that, basically, everyone's cards are on the table

20 on these motions.  In terms of the mediation occurring before

21 or after the decision, in fact, it probably makes more sense to

22 have the mediation before the decision, where everyone is in a

23 maximum state of uncertainty, frankly, than afterwards.  You

24 know, obviously, if the mediation doesn't work, that -- you

25 know, that is what it is and we'll go forward.  But no, to

1 answer your question, I think that the mediation, to be most

2 productive, would occur at a time when the motions have been

3 fully briefed, arguments have occurred, but no decision has

4 been yet rendered.

5         THE COURT:  And you think that --

6         MR. SORENSON:  So --

7         THE COURT:  -- will give the parties an opportunity

8 to explore the -- their strengths and their opponents'

9 weaknesses and hopefully focus on a settlement based on the

10 real chances of recovering or winning -- recovering as a

11 plaintiff or winning as a defendant?

12         MR. SORENSON:  Yes, Your Honor.  That's in our view.

13         THE COURT:  Okay.  The only -- and I'm looking at

14 ways to cut the schedule.  It seems to me you don't need two

15 months, which you've allowed, to digest the submissions on

16 summary judgment, and I might cut there.  But I -- that's an

17 interesting concept.  And I guess in a case like this, it makes

18 senses.  In many cases, it does not, but in this case, it does.

19         I'm not going to go over the other issues presented

20 by your proposal -- I'll turn to the defendants in just a

21 minute -- except to say that the August 8th submission of a

22 trial plan before the hearing on dispositive motions does not

23 seem to work.  In my judgment, I think that should be done

24 later.  Not too much later, but later.

25         All right.  Now, I'm going to turn to the defendants'

1  proposed schedule.  And really, it's not controversial.  You

2  want more time to submit summary judgment and the remainder of

3  the Daubert motions.

4        MS. ALLON:  Your Honor, this is Ms. Allon for TEVA.

5  You know, we did take to heart Your Honor's comments at the

6  last conference that you have a desire to see the case move

7  forward.  As I'm sure you recall at the last conference, we did

8  take the position that there should be no briefing on summary

9  judgment until a decision on class certification, but we took

10 your guidance and we instead proposed a schedule teed off of

11 the hearing.  So this way, even while the Court is working on

12 its decision, we're moving the case forward and working on the

13 summary judgment briefing so there's no lag time.  But we do

14 feel that given the complexity of the issues, given the huge

15 amount that's at stake here, we do need time to fully prepare

16 for summary judgment, and we don't think it would be fair for

17 us to have to be working on summary judgment while also

18 preparing for the class certification hearing.

19        THE COURT:  Well, but forgetting that your schedule

20 doesn't do that, so you're not being subjected to an unfair

21 procedure.  But under your schedule, briefing on summary

22 judgment is not completed until mid-October.  My goal -- I'm

23 not rushing this case to trial.  I want you to have all the

24 time you reasonably need.  My goal was to try the case this

25 summer, and under your schedule -- I've heard everything you've

24

1  said, but your schedule does not accomplish that at all.  It --

2           MS. ALLON:  It does not, Your Honor.  I will tell you

3  just for reference, so we have proposed a ten-, eight-,

4  four-week briefing schedule.  That is in line with the schedule

5  that we all did for class certification.  So class

6  certification briefs were due eight-and-a-half weeks after

7  expert reports.  There were nine-and-a-half weeks for replies

8  for oppositions in the class cert, and then four weeks for

9  replies.  And again, just to reiterate, you know, in our view,

10 summary judgment and Daubert is more complex.  I completely

11 agree with Your Honor that shorter briefs are better.  I would

12 suggest it takes more time to write a shorter brief than a

13 longer brief.  So I would have no problem with page limits, we

14 -- but we need that time to be able to distill our argument to

15 the clearest and simplest form to be able to accomplish that.

16 And given the range of issues that are left to be narrowed

17 before trial, the number of experts potentially submit to

18 Daubert, and again, the billions and billions of dollars at

19 stake, this is the time that we feel we need to adequately

20 defend our interests.

21           THE COURT:  Well, I'm going to give you that time,

22 and I'm going to pick up on something that you said.  I'm not

23 certain your colleagues would be appreciative.  And that is

24 page limits.  That would make our job a little easier and would

25 eliminate the unfairness involved in the 20 or 30 of you

1  submitting things that require a decision by us with only two

2  of us available to respond.

3        We've got a lot of different documents.  Have you

4  given any thought to page limits?

5        MS. ALLON:  Your Honor, I have not talked to our

6  co-defendants, but for TEVA, we would be fine with page limits.

7  We would suggest -- you know, typically, there are multiple

8  issues for summary judgment.  I anticipate -- you know,

9  plaintiffs can speak for themselves, but in my experience, the

10 plaintiffs also tend to move on at least several issues

11 affirmatively on summary judgment, so we could agree either

12 just to an omnibus total page limit or we could agree to a, you

13 know, kind of per-issue page limit and per-Daubert page limit.

14 Either of those would be fine with us.

15       THE COURT:  Well, I'm not going to rule on that

16 today.  I'm not -- I've never limited pages to issues.  I've

17 never linked the two.  It reminds me of some of my colleagues

18 who use an hourglass to make sure that the witness isn't

19 testifying beyond the allocated time or to make sure that one

20 side doesn't have more time than the other.  I don't do that.

21       But I think what we'll do is have you submit to me a

22 proposal for the next conference on page limits for everything

23 that has to be submitted, and that will be obviously after the

24 April 8th -- I think that's the date -- yeah, it's the

25 April 8th opposition to plaintiffs' Daubert motions relating to

1  class certification.  You should be mindful of what I said in

2  those submissions, but we're not going to change the rules

3  relating to those submissions.  We will adopt different rules

4  to try to address the issue regarding summary judgment

5  practice.  So that's on the agenda for the next telephone

6  conference.

7        Let me see if defense raised anything else.  I gather

8  the defense -- and I want to hear to the contrary if there is a

9  contrary view.  I gather the defense agrees with the plaintiffs

10  that going back to mediation or settlement discussions -- or

11  other settlement discussions before a ruling on summary

12  judgment is appropriate.

13        MS. ALLON:  We do, Your Honor.  I think we disagree

14  as to whether there should be a prescribed format, which is why

15  our schedule suggests a settlement report, but the idea was

16  that obviously before the date of that report, the parties

17  would have seriously engaged in those discussions through one

18  format or another.

19        THE COURT:  Does the defense agree that exposure to

20  the briefs on summary judgment, the arguments of counsel on

21  summary judgment, goes a long way toward facilitating the

22  settlement?

23        MS. ALLON:  I agree it goes a way towards

24  facilitating settlement.  I'm not sure I would say a long way,

25  but it certainly sharpens the issues and let's the parties see

1  what's on the table.

2        THE COURT:  Okay.  Well, I've heard your views on

3  that.  Before I leave the defense settlement report, is there

4  any reason why you referred to me on the signature line as

5  Jan E. DuBois, Jr.?

6        MS. ALLON:  Your Honor, not to shift any blame, but

7  the plaintiff made this submission.

8        THE COURT:  No, no.

9        MR. SORENSON:  Your Honor, I have no knowledge about

10  how that happened.

11        THE COURT:  No, no.

12        MR. SORENSON:  We apologize, Your Honor.

13        THE COURT:  I'm looking -- but I'm looking at

14  defendant's proposed eighth amended --

15        MS. ALLON:  Yeah, but it's at the bottom of the

16  plaintiffs' one, too.

17        THE COURT:  It is?  Yes, it is.  Well, I'm not a

18  junior.  I wish I were.  I wish I were and could shave off a

19  few years.

20        That's all I have on the schedule.  I think it's been

21  -- our discussion has been very informative, and I direct that

22  you proceed in accordance with the discussion.  So we have at

23  least two significant items for the next telephone conference:

24  the last one, page limits for the summary judgment submission,

25  and the first one, the structure of the hearing on the motion

1  for class certification.

2       There's nothing else on your proposed schedule, so --
3  but before we leave the scheduling of further proceedings, does
4  anyone have anything to add?  Hearing nothing, is there
5  anything else you wish to address during this conference,
6  except for the scheduling of the next conference?  Hearing
7  nothing, we'll go to the scheduling of the next conference.  I
8  said shortly after April 8th.

9       (Court and clerk confer)

10      THE COURT:  I'm just advised -- and this puts in
11 context what it is district judges do, I have a trial starting
12 on April 8th.  It is a case brought by State Farm Insurance
13 Company.  It arises out of a fire.  The damages are about
14 $350,000, and they won't -- well, they say they won't, but
15 whatever, they can't settle it, and it promises to be
16 controversial.  Having said that --

17      MS. ALLON:  Your Honor, I think even Mr. Sorenson and
18 I would agree that State Farm should mediate.

19      THE COURT:  Boy, I do, too.  I had the State Farm rep
20 here.  I'm just a little frustrated.  I like to get those cases
21 settled.  I like to get a case like this settled, but working
22 through this is both challenging and interesting.  It's really
23 great.  Working through a State Farm fire case, not so
24 challenging or interesting or great.  But that's on for
25 April 8th.  I don't want to put this off too far, and I'll

1  probably kick myself for scheduling this tight, but let's do it

2  Friday, April 12th.

3          Now, last --

4          MR. SORENSON:  Your Honor, this is David Sorenson.

5  If it's going to be April 12th, just due to my own conflicts,

6  could it be later in the day, four o'clock, or in the morning?

7  Either one.

8          THE COURT:  Later in the day presents a problem for

9  someone because of the Shabbos.  Am I --

10         MR. SENATOR:  This is Stewart Senator.  As the West

11 Coast contingent, I'm fully willing to get up early for that

12 because I actually have a conflict later in the day, as well,

13 and I know I'm usually the -- one of the reasons for scheduling

14 it a little later in the day, but that's not applicable on

15 April 12th.  Just the opposite is applicable.

16         THE COURT:  Well, you have every reason to have

17 scheduling conflicts, but you've been rather good about them.

18 We haven't had any problems with scheduling early.  Maybe it's

19 because we picked later in the day, and I picked later in the

20 day just in case I have a case on trial.  I didn't want to keep

21 the jury sitting in the box -- or sitting in the jury room.  I

22 don't like that.

23         How early could you do that -- could you do it,

24 Mr. Sorenson?

25         MR. SORENSON:  Well, I'm on the East Coast, so, you

1  know, ten o'clock is fine with me.  11 is pushing it, but I

2  could do 11.  I'd prefer something like ten o'clock.  That

3  makes it a bit early for Mr. Senator, and so I'll sort of defer

4  to him.

5            MR. SENATOR:  It's no problem at all.

6            THE COURT:  I think ten o'clock works better for me

7  in that event -- in the event State Farm is not over, I'll tell

8  the jury to come in later.  A trial judge doesn't want the jury

9  sitting in the jury room while he's doing other things, and so

10 we'll schedule it for ten o'clock on Friday, April 12th.

11           Who will --

12           MR. SORENSON:  Thank you, Your Honor.

13           THE COURT:  We can't burden Mr. Senator.  He'll be --

14           MR. SENATOR:  Your Honor --

15           THE COURT:  He might be more pliable.  Senator might

16 be more pliable that early in the day.

17           MR. SENATOR:  Actually, I'm up early most days and do

18 my best work then.

19           THE COURT:  Okay.  So be it.

20           Who will initiate?

21           MR. SORENSON:  Your Honor, this is David Sorenson.

22 We can.

23           THE COURT:  All right.  Good.

24           Is there anything else we have to address?  Anyone

25 want to say anything?  Hearing nothing, this has been a very

1  fruitful conference, a very good conference.  It's even been

2  enjoyable.  And on that note, we'll end the conference.  Thank

3  you all very much.  Have a great weekend.

4          MR. SENATOR:  Thank you, Your Honor.

5          MS. ALLON:  Thank you, Your Honor.

6          UNIDENTIFIED:  Thank you, Your Honor.

7          THE COURT:  Bye now.

8      (Proceedings concluded at 3:45 p.m.)

9

10                        * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8    

9    _____

10   ALICIA JARRETT, AAERT NO. 428      DATE:  March 18, 2019

11   ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25