```
                        UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF PENNSYLVANIA

                                      .  Case No.  2:13-md-02460
IN RE:                                .
                                      .  U.S. Courthouse
NIASPAN ANTITRUST                     .  601 Market Street
LITIGATION                            .  Philadelphia, PA 19106
                                      .
                                      .  April 29, 2019
. . . . . . . . . . . . . . . . . .   3:09 p.m.


                  TRANSCRIPT OF TELEPHONE STATUS CONFERENCE
                    BEFORE THE HONORABLE JAN E. DUBOIS
                    UNITED STATES DISTRICT COURT JUDGE


TELEPHONIC APPEARANCES:
For the End-Payor          Wexler Wallace, LLP
Putative Class:            By:  KEN WEXLER, ESQ.
                                JEFFREY KODROFF, ESQ.
                           55 West Monroe Street
                           Suite 3300
                           Chicago, IL 60603
                           (312) 346-2222


For CVS/Rite Aid           Hangley Aronchick Segal Pudlin &
Plaintiffs:                Schiller
                           By:  BARRY L. REFSIN, ESQ.
                           One Logan Square, 27th Floor
                           Philadelphia, PA 19103
                           (215) 568-6200


For Walgreen               Kenny Nachwalter P.A.
Plaintiffs:                By:  SCOTT E. PERWIN, ESQ.
                           One Congress Plaza
                           111 Congress Avenue, Suite 1060
                           Austin, TX 78701
                           (305) 373-1000


TELEPHONIC APPEARANCES CONTINUED.


Audio Operator:            M. Hull, ESR


TRANSCRIBED BY:            Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com


                  Proceedings recorded by electronic sound
            recording, transcript produced by transcription service.
```

2

APPEARANCES (Continued):

For the Direct              Berger Montague, P.C.
Purchaser Putative          By:  DAVID F. SORENSEN, ESQ.
                            1818 Market Street, Suite 3600
                            Philadelphia, PA 19103
                            (215) 875-3000


For TEVA Defendants:        Kirkland & Ellis, LLP
                            By:  DEVORA ALLON, ESQ.
                            601 Lexington Avenue
                            New York, NY 10022-4611
                            (212) 446-4800


For Giant Eagle:            Marcus & Shapira, LP
                            By:  BRIAN HILL, ESQ.
                            One Oxford Centre, 35th Floor
                            Pittsburgh, PA 15219
                            (412) 338-5212


For AbbVie Defendants:      Munger Tolles & Olson LLP
                            By:  STUART N. SENATOR, ESQ.
                            350 South Grand Avenue, 50th Floor
                            Los Angeles, CA 90071-3426
                            (213) 583-9528

1    (Proceedings commence at 3:09 p.m.)

2         THE COURT:  This is Judge DuBois.  Good afternoon.

3         UNIDENTIFIED:  Good afternoon, Your Honor.

4         THE COURT:  We're going to conduct our regular status

5    conference in the Niaspan Antitrust Litigation, MDL No 13-2460.

6         You've talked among yourselves since you've come on

7    the line.  Is every defendant and every plaintiff -- well, the

8    two plaintiff classes represented?  Everyone on the record?

9         ALL:  Yes, Your Honor.

10        THE COURT:  All right.  Maybe we should start with an

11   item that is not on your agenda.  We talked about it very

12   briefly at the last conference and it concerns the most recent

13   conditional transfer order.  That order was docketed.  I've

14   received no objections.  I'm referring to the tagalong case,

15   MSP Recovery Claims Series LLC, et al v. AbbVie, transferred

16   from the Southern District of Ohio.

17        Is there any objection to treating that tagalong case

18   in the same way as the others and to issuing the order that I

19   issued -- the same order that I issued with respect to the

20   other tagalong actions?  I hear --

21        MR. WEXLER:  Your Honor --

22        THE COURT:  Yes?

23        MR. WEXLER:  -- this is Ken Wexler.  Jeff Kodroff and

24   I have spoke with counsel for the MSP plaintiffs.  They stayed

25   their case and I don't know how that impacts what you just

1  suggested.

2          THE COURT:  I'm sorry.  You said they what?

3          MR. WEXLER:  They want to stay their case because the

4  -- in -- they are really -- they come under the umbrella of the

5  end-payor class action.  And so they are willing to stay their

6  case and let us just proceed.

7          THE COURT:  Well, the typical order consolidates that

8  case with the end-payor actions.  It -- I'm just -- it encloses

9  their individual case.  It consolidates their case with the

10 end-payor actions, as I said, and closes their individual case.

11 Maybe we ought to wait to hear from them.

12         Did anyone tell them about this conference?  We did

13 not.  We did not notify them of the conference.

14         MR. WEXLER:  We did, but we didn't invite them.  I

15 didn't know that they were invited, particularly since they

16 want to not really proceed, but I think stand on the sidelines

17 while we do.  But we'll -- if Your Honor wants to hear from

18 them, we will convey whatever Your Honor likes.

19         THE COURT:  Well, I'm just looking to see what the

20 docket discloses.  I have the docket entries, so I know who

21 they are, I think.  It's a very -- yes, I do.  We have their --

22         MR. KODROFF:  Your Honor, this is Jeffrey Kodroff.  I

23 was with Ken on the call.  We gave them copies of the case

24 management order, the initial case management orders, and the

25 leadership structure, so they had full knowledge of what's

1  going on.  They apparently looked at the docket themselves as

2  well and they recognize that they were simply another class

3  complaint.  They are a member of the end-payor class and

4  whatever, you know -- they're willing to stay their case.  If

5  you want to consolidate it in, I think the bottom line is

6  they're not going to cause any delays in what is taking --

7  currently taking place amongst all the parties.

8            THE COURT:  The practice and procedure order that I

9  issued a long time ago, December of 2013, covering all cases

10 and all tagalong cases, provides, and I'll quote:  "Any case

11 which is hereinafter filed in this court or transferred from

12 another court related to the direct purchaser action" -- and

13 then it goes on to cover the end-payor cases.  Same thing.

14 They're both treated the same way and they're consolidated,

15 unless an objection is filed within 14 days of notice to

16 counsel for the plaintiffs.

17           We'll have to send them a copy of the order, give

18 them a chance to object, so I'll take no further action with

19 respect to the MSP case.

20           All right.  Now I'll turn to your agenda.  Well,

21 before I do, is there anything else that needs to be said about

22 the MSP case?

23      (No audible response.)

24           THE COURT:  Hearing nothing, we'll turn to your

25 agenda.  The parties' report on the completion of expert

1  discovery is the first item.

2        MR. SENATOR:  Your Honor, this is Stuart Senator for

3  the AbbVie defendants.  The deposition of plaintiff's expert

4  (indiscernible) McGuire was completed on the schedule set by

5  the Court.  The deposition of Tier Canu (phonetic), defense

6  expert, was set by the Court for this Thursday and we've had to

7  move that one week to next week because of a medical issue in

8  Mr. -- in Dr. Canu's family that required his attention without

9  delay.

10        THE COURT:  Well, I --

11        MR. SENATOR:  We've agreed on a new date.  I believe

12  it's May 8th; next week, May 8th.  And that should not

13  interfere with any other proceedings in this case, a one-week

14  delay.

15        THE COURT:  All right.  And that's fine, Mr. Senator.

16  Except you said the deposition set by the Court.  They were

17  included in my order, but the dates were set by the parties.

18  I --

19        MR. SENATOR:  You're absolutely correct, Your Honor.

20  I didn't mean to suggest otherwise.  All I was intending to

21  convey was that they were in a court order.

22        THE COURT:  All right.  Yeah, well, they were after

23  you advised me of the dates.  And the --

24        MR. SENATOR:  Absolutely.

25        THE COURT:  It's actually a six-day delay is

1 appropriate.  I'm just concerned with anything that holds up

2 our existing schedule.  All right.  Anything else on the

3 completion of expert discovery?

4        (No audible response.)

5        THE COURT:  Hearing nothing, let's go to the second

6 item on your agenda:  time limits and order of argument.  I

7 think the end-payor plaintiffs' class certification motion

8 presents a myriad of issues.  And I'm afraid that if we start

9 there, the direct-payor purchasers are not going to get their

10 day in court.  And so what I think we should do is start with

11 the direct -- the DPP motion.  And I have your proposals and

12 they don't differ by much.  The difference is an additional

13 hour proposed by the plaintiffs to handle the Daubert motions.

14 The total is four hours, two hours per side for the end-payor

15 plaintiffs' motion, and the Daubert motions.  No additional

16 time according -- from the defense -- in the defense proposal.

17 And one additional hour in the plaintiffs' proposal.  We'll go

18 the plaintiffs' route and allocate a total of seven hours.  I'm

19 sorry, five hours, and two hours for the direct -- for the DPP

20 motion.

21        You were identical -- your recommendations were

22 identical with respect to that motion, so we'll allocate seven

23 hours.  I hope this hasn't been too complicated.  Four-hour

24 total for the EPP motion and one hour for the Daubert motions

25 related to the EPP motion, and then --

1          MR. SENATOR:  Your Honor --

2          THE COURT:  -- two hours for the DPP motion, one hour

3 per side.

4          Yes, Mr. Senator?

5          MR. SENATOR:  On the EPP motion can we allocate

6 within our argument of the total of two and a half hours per

7 side how we see fit or how it becomes apparent from the hearing

8 that the Court wants to proceed?

9          THE COURT:  The answer is yes.  I'm not going to

10 stick to these arguments.  I've -- I have to tell you, the -- I

11 find the arguments presented rather complicated.  And they

12 present a myriad of issues.  And the -- I have not come close

13 to deciding what to do.  The ascertainability issues and the

14 damages issues and -- well, I'm just picking those two -- were

15 troublesome and I'm not sure how I'm going to resolve them, but

16 I am not going to cut you short.  I'm not going to sit there

17 with an hourglass.  I want to get it right.  And I think then

18 we'll keep the two days.  We're not going to finish in one day.

19          As far as experts are concerned, I don't know now

20 which experts are going to be required.  I think you -- and I

21 told you this before, you've identified many, many more experts

22 than we'll use at trial.  I mean, the -- let me just go to my

23 list.  The -- with respect to the EPP motions, the -- on the

24 ascertainability issue, the defendants' and the plaintiffs'

25 motions, two separate experts, of course, but then the end-

1  payor plaintiffs have two experts they identify, first of all,

2  as ascertainability experts on rebuttal.  So the end-payor

3  plaintiffs have three experts on ascertainability.  I suppose

4  it was absolutely necessary to do that, but I fail to see the

5  reason why.  And I'm not going to -- I haven't decided now that

6  we need any experts.  I'm going to rely on you at the first

7  instance.

8          If I decide at the end of the argument, the

9  presentations, that we need expert testimony, we'll schedule

10 it.  We'll schedule it then.  But I'm not -- and I'm not going

11 to go forward with the summary judgment scheduling or

12 limitation now.  I have no idea whether I'm going to grant any

13 of the motions for class certification.  And if we need another

14 hearing, I don't know how long it will take to schedule.

15         And I note also that the end-payor plaintiffs seek

16 additional discovery on the issue of ascertainability, which

17 the defendants say will throw any schedule in place out of

18 sync.

19         MR. WEXLER:  Your Honor, this is Ken Wexler.  We

20 really don't seek additional discovery at all for

21 ascertainability, but obviously isn't coming through and --

22         THE COURT:  I thought -- just let me turn to my

23 notes.

24         MR. WEXLER:  Sure.

25         THE COURT:  I'm just looking.  I thought -- I'm

1  looking at my notes.  Somewhere in the mass of papers I have,

2  end-payor plaintiffs asked the Court -- asked me to open --

3  reopen fact discovery so they can serve --

4           MR. WEXLER:  No.  No.

5           THE COURT:  -- 31 new subpoenas to PBNs, pharmacies,

6  and TPPs to try to satisfy the ascertainability requirement.

7  The defense --

8           MR. WEXLER:  Now, can I explain, Your Honor?  I

9  mean --

10          THE COURT:  Well, let me just finish.  The defense

11 says --

12          MR. WEXLER:  Okay.

13          THE COURT:  -- the existing evidence does not show

14 that the class is ascertainable.  Defense also argues that

15 reopening discovery would, and I'm quoting, "completely derail

16 the schedule for the case."  So all I'm doing is responding to

17 what you had submitted to me.

18          Now you can explain.

19          MR. WEXLER:  Okay.  What we've done is, you know, as

20 Your Honor knows, under existing ascertainability law, we have

21 to show that we can identify class members.  And what we

22 provide is a reliable and administratively feasible methodology

23 for serving that purpose.  We can identify them through the

24 issuance of subpoenas, as we described.  There -- the -- every

25 case has said over and over again it is not required that we

1   actually do at this time.  But what we have done through our

2   experts is try to demonstrate that it can be.  If we were

3   required to do it, we can do it, but the law says we are not

4   required to do it at this time, only to show you that it can be

5   done.

6          So I know the defendants argued and that we're trying

7   to reopen discovery, but we really don't want to reopen

8   discovery.  We don't want to issue subpoenas now.  The subpoena

9   process is part of our methodology to show you that we can do

10  it.  That's all.

11         THE COURT:  Is there some issue regarding the

12  position of the PBMs?  You have -- you're going to issue

13  subpoenas to PBMs, pharmacies, and others.

14         MR. WEXLER:  Well, that's what we would do.  That's

15  what we would do to identify people.  That's what we would do.

16  We can do it and that's why we have on-point analytics that

17  says if you subpoenaed this data, we could analyze it and come

18  up with a list of class members.  It's a --

19         THE COURT:  Now, what is the evidence -- I'm sorry.

20  What is the evidence of how the PBMs and the pharmacies would

21  respond?  PBMs first.

22         MR. WEXLER:  Well, that's a good question.  And

23  that's why we put in a declaration from a claims administrator

24  who has said we've actually received this kind of data

25  (indiscernible) subpoena previously and used it to identify

1   class members in a claim process.  So we've shown that it has

2   been done and that we can do it if need be.

3          I mean, our named plaintiffs also have produced data

4   from their PBMs which show their identities and the identities

5   of class members to the extent possible, given what the

6   document requests were.  But we can do it, that's all we're

7   trying to show you, that we can do it.  That every transaction

8   in the pharmaceutical area involving Niaspan is recorded and

9   the purchasers are recorded and can be identified.  That's it.

10  We don't want to go out and do it; it's not required.

11         THE COURT:  Well, this was an explanation about the

12  need for further proceedings.  We might very well have to

13  reschedule hearings if I decide that we need additional --

14  well, it would be testimony.  We could certainly get through

15  argument in the two days we've allocated; we'll have more than

16  enough time.  If we need experts, I'll decide that as we go

17  along.

18         Right now, because you've got some 30 experts, I'm

19  not picking and choosing.  I want to see how the argument

20  unfolds.  It would be good if we could get through the class

21  certification hearing without th need for experts, but if I

22  decide -- and perhaps you'll decide, you'll argue to me that we

23  need expert testimony.  I'll certainly consider that.  I want

24  to have the record as complete as it needs to be to enable me

25  to rule appropriately.  But for now --

1          MR. WEXLER:  Your Honor, Ken Wexler again.

2          THE COURT:  Yes.

3          MR. WEXLER:  I think our anticipation, or the -- or

4    setting aside additional time in the event you heard expert

5    testimony was with respect to the Daubert motion which puts

6    certain experts' credibility into question.  That was all we

7    were referring to.  Not all the experts, just these class

8    certification folks.

9          THE COURT:  Right.

10          MR. WEXLER:  And there's three Dauberts pending on

11   class -- well, all involving -- one on the so-called premium

12   pass-through and two of our ascertainability experts, so that's

13   all we were referring to there.

14          THE COURT:  Well, as far as the -- but I wasn't

15   referring to that, although we might very well --

16          MR. WEXLER:  Okay.

17          THE COURT:  I might very well decide after the

18   argument that we need the testimony of the experts who were

19   challenged by Daubert motions, and -- but I was thinking of

20   experts to more fully develop the record on the major class

21   certification issues.  And I'm not -- I don't have a grip on

22   that now, and I'm concerned about damages.

23          I know what the cases say about damages, and I know

24   how you disagree over the proof of anti-trust injury and

25   aggregate damages, but I'm concerned about proof of damages at

1 the end of the road. I've been there just recently and found

2 it almost brick wall like. There was just no way of proving

3 damages by common evidence, and we never resolved the question

4 and the case was settled.

5        But that's what I have in mind, so we'll go forward

6 on the dates we selected. The dates are May 13th and 14th?

7 Let me get the calendar. I think 13th and 14th. I don't have

8 my calendar. I'll get it.

9        MR. WEXLER: I think it's the 14th, Your Honor, 14th

10 and 15th.

11        THE COURT: You're right. It's the 14th and 15th,

12 Tuesday and Wednesday.

13        MS. ALLON: Your Honor, what time should we plan to

14 start on the 14th?

15        THE COURT: What -- well, you're obviously not coming

16 in the morning of the 14th. I thought we'd schedule that for

17 ten o'clock.

18        MS. ALLON: I don't think any of the orders specified

19 a time. I think we had talked about it, so I just wanted to

20 confirm.

21        THE COURT: Well, does ten o'clock work for you? Do

22 you guys want to talk first, coordinate first in person? Do

23 you want to start at 10:30? I'll leave it to you.

24        MR. SORENSON: Your Honor, this is David Sorenson. I

25 think 10 is fine, and it's been suggested before and I haven't

1  heard any objection.  Obviously, if someone has a particular

2  issue, they can speak up, but I think 10 is fine.

3      THE COURT:  Okay.  Then we'll convene on -- ten

4  o'clock on Tuesday the 14th, and plan to go the whole day.  We

5  will recess for lunch, not a long, luxurious lunch.  We'll

6  recess for lunch and we'll go as late as we need to go that

7  night and pick up the next day.

8      If during the course of the proceedings we decide we

9  need expert witnesses either on your request or because I think

10  it's necessary, we'll address that issue and go through a

11  schedule for any experts who will be called.

12      All right.  Is there anything else we need to address

13  on scheduling of the class certification here?  Hearing

14  nothing, we'll proceed.  I told you as far as scheduling

15  further proceedings, I have no idea where we'll go and when

16  we'll do that.  I don't want to schedule in such a way that we

17  have to interrupt and amend, and the scheduling has dragged on

18  -- I use that -- those words in quotes -- to the point where

19  any motion for summary judgment will have to be handled by a

20  new law clerk.  Not optimum.

21      We have one law clerk now up to speed.  He leaves.

22  The goal that we set initially was a goal that would have

23  enabled him to address the class certification issues and to

24  handle motions for summary judgment, as well.  Not so now.

25  Your suggestions tell me that you want at least six or eight

1    weeks aside, and if we start that time -- that clock running at

2    the time of the hearing on class certification, we're at the

3    end of August, and my clerks leave beginning mid-August.  And I

4    don't want to assign a brand spanking new clerk to this case.

5    So there's no rush to do it now.

6         My thought is I'll have a better grasp of the issues

7    after we complete the hearing on class certification and I'll

8    consider setting a schedule for the summary judgment motions at

9    that time.  I don't think you'll be working -- had planned to

10   work on summary judgment in the next two weeks, although you

11   don't have to answer that question.  You might very well have.

12   All right.  Is there anything else that needs to be said about

13   summary judgment motions and further scheduling?

14        Hearing nothing, the fourth item on your agenda is

15   the status of settlement discussions.  What kind of news do you

16   have to impart?

17        MR. SORENSON:  Your Honor, this is David Sorenson.  I

18   think that this item is on the agenda pursuant to your

19   direction that you wanted us to address it.  I believe that's

20   the case.  In any event, at least in terms of the direct class,

21   there's nothing new to report.  The situation is the same as we

22   previously described it to Your Honor.  That is we made a

23   demand some time ago.  We have not gotten a response from

24   either defendant.

25        I think, at least based on prior statements on prior

1  calls, I think the plaintiffs and the defendants, at least the

2  direct class plaintiffs and the defendants are of a similar

3  view that it might be most productive to have discussions after

4  summary judgment briefs are in.  The plaintiffs are -- you

5  know, we're willing to talk at any time, but I agree that in

6  terms of how productive that would be, I think it's probably

7  true that it will be most productive after the briefing.

8            I think the parties disagree in terms of method.  The

9  plaint -- the direct plaintiffs I think had previously said

10 that a mediator would be useful.  At least previously the

11 defendants had indicated, if not opposition, that they did not

12 support it, but obviously they can speak for themselves on this

13 call.  But the bottom line is, Your Honor, nothing from the

14 direct classes' perspective has changed since previous reports

15 of this subject.

16            THE COURT:  Thank you.

17            MR. KODROFF:  Your Honor, this Jeffrey Kodroff for

18 the end payors.  Just to lay it out quickly, we are in a very

19 similar position.  We made a very reasonable -- what we felt

20 obviously was a reasonable demand.  Defendants have not decided

21 to respond.  My only difference from Mr. Sorenson's comment is

22 based on some experience my firm has had with Mr. Saint-Antoine

23 and Your Honor in another case, sometimes things could be

24 resolved sooner and don't need all the orders, but obviously it

25 takes two to tango.  If defendants are not ready to go, then

1   there's not much we can do.

2          THE COURT:  Well, I think we'll turn to the defense

3   now.  I think you're right, Mr. Sorenson.  You refreshed my

4   recollection I was the one who asked that this be placed on the

5   agenda.  And I was mindful of what had been said at a prior

6   conference, and that was that it might be appropriate to

7   address settlement again after the summary judgment briefing

8   was complete but before I decided summary judgment motions.

9   That was set at one time.

10          Let me hear from the defense.  Mr. Senator, are you

11   going to speak for the defense to lead or someone else?

12          MR. SENATOR:  I'm happy to start, Your Honor.  And

13   our view hasn't changed either that it does make sense to

14   target the end of summary judgment briefing or the summary

15   judgment oral argument period as the most productive time to

16   have significant settlement discussions.

17          THE COURT:  Well, I have to tell you that, knowing

18   how you worked this case, how all of you worked this case, I

19   really don't see how summary judgment briefing is going to make

20   that much of a difference.  I think you know what will be in

21   one another's motions and responses and can address the

22   question of settlement when you make up your minds to sit down

23   and seriously look at the issues and talk settlement.  I don't

24   see how summary judgment briefing is going to make that much of

25   a difference, and I can -- I do know that it will be

1  frightfully expensive.

2        Now, I know how much -- I know what the demands are,

3  and when I say frightfully expensive, it will be expensive, but

4  in contrast to the demands, certainly not a turnoff.  Has that

5  moved anyone to suggest that we move on settlement sooner?  I

6  guess that would be you, Mr. Senator, or another person

7  representing defendants.  I guess the answer is no.

8        MS. ALLON:  Your Honor, this is Devora Allon for

9  TEVA, and our position is the same.  Until we get revised,

10 significantly lower demands from the plaintiffs, we do not feel

11 there is a basis for mediation.

12       THE COURT:  Well, let's not -- that has --

13       MR. SORENSON:  Your Honor, this is David Sorenson.

14 I'm sorry, I didn't mean to interrupt you.

15       THE COURT:  I was going to say that hasn't been said

16 yet, Ms. Allon, not today.  I think you said that at time one

17 when we got the demands last fall, but it wasn't said today

18 and --

19       MS. ALLON:  And I just meant, Your Honor, it remains

20 unchanged from the day after we received their demands.

21       THE COURT:  Okay.  All right.  Well, this might be a

22 case we'll try, and if that remains your position, but I don't

23 think it will.  And I'm not sure what the plaintiffs propose.

24 Let -- these comments on settlement raise two issues.  What is

25 the defense position on mediation at an appropriate time?

1          MS. ALLON:  Your Honor, I think our position is we're

2    not going to rule it out at an appropriate time, but we've also

3    settled many cases just dealing directly with these same

4    lawyers.  So we feel pretty confident in our ability, if and

5    when the parties are ready to have settlement talks, to do

6    those lawyer-to-lawyer and not necessarily need a mediator to

7    help facilitate those discussions.

8          MR. SORENSON:  Your Honor, this is David Sorenson.

9    May I comment on that?

10          THE COURT:  Absolutely.

11          MR. SORENSON:  I think that while it may be true in

12    some abstract sense that the lawyers on this call can talk to

13    each other about settlement either in person or over the phone,

14    I think the presence of a mediator, at least in our experience,

15    can help both sides in the sense that an outside mediator,

16    presumably one that both sides agree on and therefore respect,

17    can basically talk bottom-line issues to both sides and sort of

18    tell the plaintiffs, if appropriate, that the demand should be

19    lower or that your expectations should be lower.  And by the

20    same token, tell the defendants, if appropriate in the

21    mediator's view, you have to get more realistic about your

22    exposure.

23          And then that process can then help both sets of

24    lawyers speaking -- to speak to their respective clients,

25    right, so that for the plaintiffs, and we talk to the

1  representative plaintiffs and other large class members, here's

2  -- you know, here's an outside realistic view that we're being

3  given by a mediator, and the same goes for the defendants.

4  They can talk to their clients and say, regardless of what they

5  may have said to them previously, here's what an outside

6  mediator is telling us about your exposure.

7          And so it's that element that I think can be very

8  helpful.  Not always, but it has proven to be helpful in our --

9  in my view certainly in the past, so that's what I wanted to

10 say about that.

11         MR. SENATOR:  This is Stewart Senator.  I don't

12 disagree with what Mr. Sorenson has said.  In some cases that

13 is helpful.  We have found in cases we've dealt with these

14 plaintiffs on that sometimes it is helpful and sometimes we can

15 get there without it.  And so that's why we're not ruling it

16 out, but we're at the same point not agreeing to it now because

17 we think that's premature and we should see how things play

18 out.  Then we all know how to agree to it and how to choose a

19 mediator together if and when that looks like it's going to

20 move things forward.

21         THE COURT:  Well, I will have more to say on this.  I

22 chaired the Court's ADR committee and -- for years, during the

23 entire time we had a separate ADR committee.  We folded it into

24 our civil business committee, and although I'm still active,

25 there is no longer a separate chairperson.  The idea of a

1 mediator is to facilitate a settlement, and I think

2 Mr. Sorenson said it very well.  If the plaintiffs choose not

3 to quickly flex on their demands, it will take a mediator to

4 tell them they're too high.

5         And I certainly don't think -- well, we should give

6 the lawyers I think in every case an opportunity to explore

7 settlement on their own.  But failing that, particularly where

8 the stakes are this high, I think it appropriate to start

9 thinking of an appropriate mediator early on, earlier, sooner

10 rather than later.

11         But based on everything I've heard today, it's now

12 too soon.  And we'll see how things unfold on May 14th and

13 15th.  Maybe the argument and discussion will lead you to a

14 change of minds, but for now I understand your positions.  I

15 can tell you that I favor mediation and will be -- I don't want

16 to say pushing it because it's voluntary.  You're going to have

17 to go there.  You're going to have to agree.  But I think that

18 might be the way to get the case settled.  It was the way in

19 which my two prior anti-trust MDLs settled, mediators in both.

20         All right.  I think we've explored the issue of

21 settlement.  Unless someone has anything else to say, anyone

22 else want to comment on settlement?

23         All right.  The last item on your agenda is

24 scheduling of the next telephone status conference.  I think

25 what we'll do is defer on this until the class certification

1  hearing.  We'll see how that unfolds.  What happens will
2  certainly impact the scheduling of the telephone conference,
3  and we'll decide then what's appropriate.

4          For example, if we determine there's a need for
5  expert testimony, we'll schedule that first and schedule the
6  telephone conference around that.  But I don't think anything
7  can be gained by scheduling the next telephone conference
8  today.  I assure you, though, we won't adjourn the class
9  certification hearing without another telephone conference
10 scheduled.

11         All right.  Is there anything else that we need to
12 address today?  I'll hear from the end-payor plaintiffs first.

13         MR. WEXLER:  No, Your Honor, nothing.

14         THE COURT:  Direct purchaser plaintiffs.

15         MR. SORENSON:  No, Your Honor.

16         THE COURT:  How about Abbvie, Mr. Senator or anyone
17 else?

18         MR. SENATOR:  No, Your Honor.

19         THE COURT:  Ms. Allon?

20         MS. ALLON:  No, Your Honor.

21         THE COURT:  Mr. Perwin?

22         MR. PERWIN:  Nothing, Your Honor.

23         THE COURT:  Mr. Refsin?

24         MR. REFSIN:  No, Your Honor.

25         THE COURT:  Mr. Hill, anything?

24

1            MR. HILL:  No, Your Honor.

2            THE COURT:  All right.  On that note I'll end the

3    conference.  I'll see you all 10 a.m. on Tuesday the 14th.

4    Look forward to it.

5            MR. HILL:  Thank you.

6            THE COURT:  Thank you all very much.

7            MR. ALLON:  Thank you.

8            MR. WEXLER:  Thank you, Your Honor.

9       (Proceedings concluded at 3:36 p.m.)

10                           *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T I O N**

2

3         I, Lisa Luciano, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9    _____

10   LISA LUCIANO, AAERT NO. 327     DATE:  May 7, 2019

11   ACCESS TRANSCRIPTS, LLC

12

13

14   **C E R T I F I C A T I O N**

15

16        I, Ilene Watson, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   ILENE WATSON, AAERT NO. 447     DATE:  May 7, 2019

24   ACCESS TRANSCRIPTS, LLC

25