<pre>
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

                                 .  Case No.  2:13-md-02460
IN RE:                           .
                                 .  U.S. Courthouse
NIASPAN ANTITRUST                .  601 Market Street
LITIGATION                       .  Philadelphia, PA 19106
                                 .
                                 .  Tuesday, July 23, 2019
. . . . . . . . . . . . . . . .  .  10:10 a.m.


                 TRANSCRIPT OF SECOND MOTION HEARING
                BEFORE THE HONORABLE JAN E. DUBOIS
                UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the End-Payor          Wexler Wallace, LLP
Putative Class:            By:  KEN WEXLER, ESQ.
                                JUSTIN N. BOLEY, ESQ.
                           55 West Monroe Street, Suite 3300
                           Chicago, IL 60603
                           (312) 346-2222


For the Direct             Berger Montague, P.C.
Purchaser Putative         By:  DAVID F. SORENSON, ESQ.
Class:                     1818 Market Street, Suite 3600
                           Philadelphia, PA 19103
                           (215) 875-3000


                           Faruqi & Faruqi, LLP
                           By:  PETER KOHN, ESQ.
                           1617 John F. Kennedy Boulevard #1550
                           Philadelphia, PA 19103
                           (215) 277-5770


APPEARANCES CONTINUED.


Audio Operator:            Michael Cosgrove, ESR


TRANSCRIBED BY:            Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com


              Proceedings recorded by electronic sound
        recording, transcript produced by transcription service.
</pre>

APPEARANCES (Continued):


For TEVA Defendants:       Kirkland & Ellis, LLP
                           By:  DEVORA ALLON, ESQ.
                           601 Lexington Avenue
                           New York, NY 10022-4611
                           (212) 446-4800

For AbbVie Defendants:     Munger Tolles & Olson LLP
                           By:  STUART N. SENATOR, ESQ.
                           350 South Grand Avenue, 50th Floor
                           Los Angeles, CA 90071-3426
                           (213) 583-9528

1       (Proceedings commence at 10:10 a.m.)

2               THE COURT:  Good morning, everyone.

3               UNIDENTIFIED:  Good morning.

4               MS. ALLON:  Good morning, Your Honor.

5               MR. SORENSON:  Good morning, Your Honor.

6               THE COURT:  Please be seated.

7               I call the case of In re Niaspan Antitrust

8    Litigation, MDL Number 2460.  We have scheduled part two of the

9    hearing on pending past certification motions for this morning.

10

11              Are counsel prepared to proceed?

12              MR. SORENSON:  Yes, Your Honor.

13              MS. ALLON:  Yes, Your Honor.

14              THE COURT:  Fine.  I think we ought to start with the

15   direct purchaser motions, and I'm going to go to my letter of

16   July 18th.  The issue that concerns me most with respect to

17   those motions is the Comcast-Behrend issue, and I think it

18   turns on how we define the theories of antitrust impact or

19   injury and whether Comcast-Behrend directs that we look to the

20   three types of injury that are identified in the motion papers

21   of brand-brand, brand-generic, and generic-generic, but whether

22   instead we can look to the overarching injury issue, and that

23   is unlawful delayed entry of the generic resulted in an

24   antitrust violation.  That's the major issue with respect to

25   the direct purchaser motion.

1        For the end payor motions, the issue is -- the major

2  issue for me is ascertainability.  I wonder what we did before

3  the Third Circuit decided to move ascertainability to the

4  forefront in deciding class-action motions.  We certainly

5  didn't spend the time that I have been spending trying to wade

6  through the cases and the evidence presented.

7        What I want to do with the direct purchasers, and I

8  want you to detail for me your argument.  If I have specific

9  questions, I'll ask them.

10        MR. SORENSON:  Thank you, Your Honor.

11        Your Honor, we have -- David Sorenson for the direct

12  purchaser class plaintiffs.  We have a few new slides, which

13  will be on the screen, but if I may approach and give the Court

14  hard copies, if that's okay?

15        THE COURT:  Fine.  That's fine.

16        MR. SORENSON:  Your Honor, turning right to your

17  first question, are plaintiffs required to prove antitrust

18  injury for the three theories of antitrust impact referenced in

19  the motion papers, brand-brand, brand-generic, and

20  generic-generic caused by plaintiffs' theory of antitrust

21  liability, --plaintiff -- defendants' unlawful conduct that

22  delayed the entry of lower-priced, generic Niaspan.

23        The short answer is, no.  If what you're asking is

24  whether we need to have common evidence that is capable of

25  proving all three in order for you to certify the class, but,

1  yes, we can prove all three through common evidence.  So it's

2  no, it's not required, but, yes, we can.  It's also --

3              THE COURT:  What is required?

4              MR. SORENSON:  I'm sorry?

5              THE COURT:  What is required?

6              MR. SORENSON:  What's required is that we have a

7  method -- not that we prove, but we have a method of proving

8  impact on a predominantly common basis, the fact of injury for

9  not all, but nearly all members of the class as a class.

10  That's what we need to show.  I mean, as a technical matter,

11  depending on the case, you don't even need to show that.

12              What we need to show is predominance of common

13  issues, right?  And in a trial of this case, let's say it's a

14  six-week trial, which is the kind of typical estimate that has

15  been presented in a number of similar cases.  Nexium was six

16  weeks, for example.  What we really have to prove under the law

17  is that the common issues were predominant.  In that kind of

18  trial, for this kind of case, virtually all of it on violation

19  on the agreement, it's history, it's what it says, and what it

20  did to delay generics is common and will dominate any trial.

21              So under the law, it's not even necessarily required,

22  in my view, that we necessarily can prove impact on a

23  predominantly common basis.  The case law that talks about that

24  as a, quote, "requirement," I think, tends to reference much

25  larger classes where if you could not do that, the trial could

1    devolve at the impact -- at the level of proving impact into a
2    highly individualized, unmanageable trial.
3            THE COURT:  I don't think that's clearly stated in
4    Comcast.
5            MR. SORENSON:  That -- what I just said is -- I'm not
6    deriving it from Comcast.  Hydrogen Peroxide --
7            THE COURT:  Well, Comcast sets the rule that I am
8    concerned about.
9            MR. SORENSON:  Sure.  Your Honor, in terms of
10   Comcast, I will get right to Comcast.  I'll jump to it.
11           Move to Slide 2, please.
12           So what was going on in Comcast?  There were four
13   theories of unlawful conduct that Comcast was alleged to have
14   engaged in.
15           THE COURT:  How many theories of unlawful conduct?
16           MR. SORENSON:  One.  We have one.  They have four
17   different types of conduct that Judge Padova articulates and
18   discusses.
19           THE COURT:  And he only approved one.
20           MR. SORENSON:  And -- right.  The court said,
21   basically, you have no evidence as to three of them.  In fact,
22   the court used the words "wholly unsupported," "unsupported,"
23   and "non-supported" as to three of them.  There were theories
24   about underlying conduct that Comcast was alleged to have
25   engaged in that the plaintiffs' experts were saying would have

1  an ultimately, an anti-competitive and, hence, unlawful effect.

2          Judge Padova went through it carefully and said,

3  well, no.  This theory is unsupported.  The evidence is

4  contradictory to your theory.  The evidence -- there is no

5  evidence, and he threw out three of the four as is depicted on

6  the screen on Slide 2.

7          If we can, go to Slide 3, please.

8          The Third Circuit -- well, first, the Supreme Court.

9  The Supreme Court summarized the problem that existed once

10 Judge Padova -- this is on Slide 3, if you have it in front of

11 you, Your Honor.

12         THE COURT:  I have it.

13         MR. SORENSON:  And it's on the screen.  The Supreme

14 Court crystallized what the problem was.  The plaintiffs had a

15 damage model.  Let's say it had a million-dollar number.  It

16 was larger.  I think it was about 600 million or so, but a

17 million dollars.  That's their number.

18         Judge Padova then said, well, three of the alleged

19 forms of unlawful conduct, you have no evidence of.  They're

20 gone, but the million-dollar number was still left, and it was

21 predicated on all four being unlawful and contributing.  The

22 Supreme Court, on Page 37, identified the problem after the

23 district court had thrown out three or four is this,

24 plaintiffs' damage model, quote, "identifies damages that are

25 not the result of the wrong," closed quote. That's on Page 37.

1            The Third Circuit in the <u>Modafinil</u> case, although

2    primarily thought of as a bout in morosity, also has a

3    discussion of <u>Comcast</u> in that particular case and said in

4    describing the Supreme Court's decision in <u>Comcast</u> -- and this

5    is on the top of our Slide 3, that the plaintiffs' damage model

6    in <u>Comcast</u> was rejected by the Supreme Court because the

7    model -- quote, and I'm quoting the Third Circuit -- "reflected

8    injury from four alleged antitrust violations," closed quote,

9    even though three had been rejected.

10           We have one theory of an antitrust violation with one

11   agreement that the --

12           THE COURT:  Which is?

13           MR. SORENSON:  I'm sorry?

14           THE COURT:  Articulate it for me.

15           MR. SORENSON:  Yes.  That the brand and the generic

16   in the midst of a patent litigation brought by the brand

17   against the generic were headed towards a -- what we view as an

18   average launch.  In other words, Barr was announcing that they

19   were not afraid of the patent of Kos and were going to launch,

20   and Kos filed a motion for preliminary injunction.  It wasn't

21   decided, and instead of allowing the court to decide it and

22   watching Barr launch at-risk, they entered into a

23   reverse-payment agreement where Kos agreed to paid hundreds of

24   millions of dollars to Barr.  These payments then played out

25   over a period of time, including by the successors of -- paid

1    by Kos and received by the successors of Barr and kept generics
2    off the market from 2005 to 2013.  That, we allege, is unlawful
3    under Activus, and that it delayed the entry of generic
4    Niaspan.  That's the theory.
5            THE COURT:  And that's your single theory of
6    antitrust liability?
7            MR. SORENSON:  That's it.  Every -- every dollar in
8    Dr. Leitzinger's damage model, the numbers that he has in his
9    reports that are part of the record, his damage model keys off
10   of different buffer entry dates, right, at-risk launch in 2005,
11   if Barr had won the litigation in 2007, and an alternative
12   settlement model in 2009.  Each number is directly traceable to
13   allegedly unlawful conduct.  There is not a dollar in those
14   models, in those numbers, that reflects potentially lawful
15   conduct.
16           I understand the defendants are claiming that what we
17   claimed is unlawful is lawful.  Understood.  And if they win
18   that, they win the case, but there is no other source of the
19   damages at play.  It's not like Comcast.  We don't have four
20   theories of unlawful conduct.  We have one.  They're not saying
21   this billion-seven that Dr. Leitzinger comes up with, well, a
22   third of it, you know, is attributable to conduct that has
23   nothing to do with the agreement you're challenging.  It has to
24   do with whatever.
25           That's not what they're saying at all, nothing like

1   it.  They're saying it's inflated or it has problems and they

2   have their own expert.  And, obviously, they're challenging

3   liability on the agreement, but that's the -- it's one thing.

4   It's one theory, and it's one form of, in fact, that we cite is

5   unlawful, not like Comcast.

6          There is no danger that if the jury awards an

7   aggregate number, let's say, it credits Dr. Leitzinger, there

8   is zero risk that some dollars in that are attributable to

9   lawful conduct, because obviously by definition, if the jury

10  has found 1.7 billion in damages, they have already found a

11  violation of Section 1.

12         So in terms of injury, Your Honor, the class here has

13  48 class members.  Now, it is -- as we laid out in the earlier

14  papers and the earlier slides, there are 21 who bought the

15  brand and the generic, two who bought the brand only who went

16  out of business before the generic launched, and then 25 who

17  bought only the generic.  We can prove with common evidence

18  that the entire class, not just virtually all but actually the

19  entire class, suffered injury impact from one theory of

20  unlawful conduct, the violation that I just described.

21         If you took BB, that is brand-brand, that theory,

22  which I think has occupied a lot of the last call on the

23  telephone and the defendants' focus, even if you remove BB,

24  let's say you -- they move for summary judgment on that and you

25  granted it.  It was removed from the case.  It would have zero

1 effect on the definition of the class, zero effect on the

2 membership of the class.  All 48 members who are in the class

3 would remain members of the class and have zero effect under

4 ability to certify the class.

5          THE COURT:  Well, why is it included?

6          MR. SORENSON:  I'm sorry?

7          THE COURT:  Why is it included?

8          MR. SORENSON:  It is included --

9          THE COURT:  Did you include it to avoid the <u>Modafinil</u>

10 numerosity issue?

11          MR. SORENSON:  No.  Not at all.  It has -- as I just

12 said, if you remove brand-brand entirely, again, hypothetical,

13 let's say they move for summary judgment and they win on that

14 claim, it's removed from the case going forward.  No effect on

15 the class.  We still have the same 48 class members.  It has no

16 effect on the class size.  It was not included to deal with the

17 morosity.

18          It's included because, based on Dr. Leitzinger's

19 study of the data and our study of the date of the documents,

20 it occurred.  That is -- and the defendants, interestingly, at

21 the last hearing, admitted this in part.  And what do I mean by

22 that?

23          Their -- they stood up, and this is -- I'm quoting

24 the transcript on Page 39, Line 8, we're talking about this

25 exact theory of damage, brand-brand, quote:  "So AbbVie knew

1 that when the generic entered the market it was going to face
2 competition, and it chose to react to that competition by
3 offering steep discounts," closed quote.  That's on Page 39 of
4 the May 14th transcript.

5          So the defendants are not saying this didn't happen.
6 They're not saying when the generic entered, some brand prices
7 didn't go down.  They just, in fact, told you it did happen.

8          THE COURT:  Well, I'm not so sure about that.  I
9 understand the price of the -- the WAC price went up, and so
10 even with discounts, the price did not go down.  There is
11 evidence that the price did not go down.  Is that correct?

12          MR. SORENSON:  There is evidence that the absolute
13 price went up, that is correct, but let's talk about the
14 discounts too.

15          Go to Slide 4, please.

16          The theory of looking at impact and damages with
17 increased discounts has come up before.  Your Honor, if I may
18 hand up the recent Loestrin opinion that just became public
19 last week.  If I may approach?

20          THE COURT:  Yes.

21          MR. SORENSON:  So in Loestrin, very similar case, I
22 think, a very similar class.  I think it was 47 in that case.
23 That was certified a couple of weeks ago, the court kept it
24 under seal pending the parties' review of it, and just unsealed
25 the opinion last week, and now it is available on Westlaw and

1  LEXIS.

2          The theory of increased discounting was part of that

3  case, and the Slide 4 gives you the pinpoint quote concerning

4  that.  It also came up in the Celebrex case, that's the second

5  case on Slide 4, and, in fact, the first case in this line of

6  cases of generic delay, the Cardizem case way back in 2001.  So

7  it has come up before, and the math, of course, works, right?

8  If you take a larger discount which results from generic entry

9  and you move it back in time to an earlier, lower brand price,

10  you get a lower price.

11          Now, the defendants --

12          If you can, go to Slide 5, please.

13          The defendants' main argument in response to this on

14  the merits -- and this is why I said earlier, we don't have to

15  prove this, that is, all three, but we can.  Their main

16  response in the merits of BB is that -- or brand-brand -- was

17  that it was not across all brand purchasers who continued to

18  buy the brand.  They had that chart that you've alluded to

19  where it shows that in absolute terms, some brand prices went

20  up after generic competition.

21          THE COURT:  Eleven.

22          MR. SORENSON:  Right.  And we have not contested

23  those numbers, nor -- but by the same token, nor they contested

24  our counter chart that we submitted at the last hearing showing

25  that all 11 plus the others obtained increased discounts.  They

1  haven't contested those numbers either.

2          If you move those increased discounts back, you get

3  lower prices in a world in which generic entry occurs earlier.

4  They have two -- well, their main merits response besides they

5  say it wasn't classwide, well, is wait a second, in the actual

6  world generic competition began September 2013, AbbVie engaged

7  in a strategy to hike the brand price even more than it

8  normally did, knowing that it was about to face generic

9  competition, knowing that it was about to lose all of its sales

10 anyway, basically, a "let's get as much money from our monopoly

11 as we can before we lose it" strategy.

12          That's what they say happened, and their expert, Dr.

13 Stangle, talks about this.  And on Slide 5, we summarize this

14 argument.  At the top is -- are some basic facts, the

15 settlement in '05 that we challenge, TEVA's launch in September

16 2013, and AbbVie increasing of the WAC price several times

17 leading up to 2013, and that's what they rest on.  They say,

18 aha, if you you assume or the jury finds that with a generic

19 entry the brand, whether its Kos or AbbVie, would have done the

20 same kind of thing, that is, with an earlier generic launch,

21 they would have hiked the brand price.  That increasing brand

22 price, according to them, could, in theory, negate your

23 increased-discounting effect, and they presented you a draft in

24 the last hearing that purports to show that.  Well, as a matter

25 of theoretical math, that is correct.  You can come up with

1  numbers to support their argument.

2          Let's take a step back.  First, they have to prove

3  that that would have happened.  That's -- they have to prove

4  it's their contention that the brand price would have been

5  jacked up, hiked in anticipation of early generic entry.  The

6  record on that, they cite some documents, the testimony of

7  30(b)(6) witness is not that clear on this point, but more to

8  the point, we have three theories of but-for causation in terms

9  of the dates, s I mentioned earlier.

10          The first is at-risk.  That means that Barr, rather

11  than being paid off, would have done what it was saying it was

12  going to do, which is, we're launching.  In that situation,

13  they launched back in June '05.  There is no time for Kos to

14  react by hiking the price in anticipation of generic entry.  No

15  time.  Their expert admits that.

16          This at the bottom of Slide 5, we quote Dr. Stangle

17  admitting it, meaning, this main response that they have, which

18  is, oh, wait a second.  The brand price could go up.  They

19  don't even claim it applies to the first of our three but-for

20  theories.  It's out.  They're not even going to try to prove

21  it.

22          Let's go to the second one, litigation victory.  We

23  say had they not entered into a reverse-payment settlement, if

24  Barr had not launched at-risk, they would have -- the

25  litigation would have continued and Barr would have won.  And

1  we say, and we intend to prove, that in that situation, the

2  launch would have occurred approximately September '07.

3         Well, yes.  That's a little bit further away in time

4  from -- from March '05, but here's the problem for them.  The

5  theory that they're presenting to -- on the merits of BB is if

6  generic competition is coming, we know it's coming, we're going

7  to lose our sales, we're going to raise the brand price a lot,

8  even more than we usually do, to get every last dollar we can

9  before it all goes away.  Right?

10        Well, think about a litigation-victory scenario.

11 They are litigating in '05 and '06 and into '07, actively

12 litigating.  They say they have experts who want to testify,

13 and they want to say that AbbVie would have won that case.

14 Right?  That's their position.  They say it in their class

15 brief.  They say it in other places.  That's what they're going

16 to try to prove to a jury.

17        I don't think it's compatible for them to stand up in

18 front of a jury and say, we were confident we were going to

19 win.  Oh, but, actually, we thought we were going to lose, and

20 we were going to engage in a -- we were -- we know we're going

21 to lose strategy and hike the brand price, because they've

22 already argued and the documents indicate that this whole hike

23 the brand price is an end-of-life-cycle strategy.  That is, the

24 brand is ending.

25        I sincerely doubt, Your Honor, that they are going to

1  argue to the jury simultaneously we would have won, but we also

2  would have engaged in end-of-life-cycle strategy.  I don't even

3  think they're going to try it, and if they try it, the jury

4  certainly doesn't have to buy it.

5          THE COURT:  Are you saying that hiking the price is

6  only an end-of-life-cycle strategy?

7          MR. SORENSON:  Is what?  I'm sorry.

8          THE COURT:  Only an end-of --

9          MR. SORENSON:  No.  At this level, it is.  In other

10 words, they have normal price hikes, which they had all through

11 this period from '05 all of the way to '13 that were already

12 factored in.  In other words, Dr. Leitzinger's model and using

13 of discounts already factors in the actual progression of WAC

14 prices, and they go up at different times, 5 percent here and 6

15 percent there at different times.

16          What I'm saying is that what they say happened here,

17 is that in anticipation of losing the brand in September 2013,

18 in the year or so leading up to it, they enacted much higher

19 than normal price hikes, like 9 percent or so, rather than the

20 5 percent, and did more of them on purpose because they knew

21 they were going to -- generic entry was coming.  That's their

22 contention.

23          And Dr. Stangle says Dr. Leitzinger -- he criticizes

24 Dr. Leitzinger and says, you can't just use the actual

25 progression of the brand WAC price to look at BB.  You have to

1  import these much higher brand WAC hikes that occurred at the
2  end of generic competition if you're going to move things back.
3  And that's their argument.

4          But, again, what that kind of strategy requires is a
5  knowledge that generic entry is coming on this date.  We know
6  it's coming, so let's start thinking about the end of life
7  cycle -- that's what it means, end of life cycle means our
8  brand is ending.  Our monopoly is ending.  Generic is coming.

9          It all depends on knowing that generic is coming
10 here, and then you use -- we use that period to hike the price
11 even more.  We're not conceding that this is what happened in
12 terms of that they purposely did this and it has to be
13 imported.  That's Dr. Stangle's claim based on a few documents.
14 But even conceding it for purposes of argument that, all right,
15 you have an argument, their expert concedes the whole thing
16 doesn't apply to an at-risk launch.  Right?

17         He -- we quoted his own report, and why?  Again,
18 because it requires a lot of lead-up time knowing the generic
19 entry is coming.  So you sort of sit down and say, all right.
20 We're going to lose the brand and so we're going to start
21 planning out much larger than usual price hikes just before
22 generic comes in.  That's the argument.

23         They acknowledge -- their expert admits it doesn't
24 apply to at-risk launch.  There is no time.  They're litigating
25 with each other over the Niaspan patent in '05, and boom, Barr

1 launches at-risk.  There is no lead-up, and so their expert

2 admits this entire argument that they make on the merits of BB,

3 where they're trying to respond by saying the math doesn't work

4 if you have a much higher brand price.  They don't even claim

5 it applies.  Forget about issues of -- that they -- the jury

6 may not even accept it at all and we don't admit it, they

7 themselves admit it doesn't apply.

8        That's one of our three theories.  Now we go to

9 theory two, and we have three.  Under theory two, litigation

10 victory.  As I said, we say our experts have analyzed the

11 patent case and come to two conclusions, the generic would have

12 won, and the case would been -- would have had -- that victory

13 would have occurred by September '07, and that's when the

14 launch occurs.

15        Well, in this world, they're actively litigating with

16 each other.  There's no settlement back in '05, and there's no

17 at-risk launch, perhaps, they're litigated and it's over and

18 the generic wins, and then there's a launch.  How is it that

19 the brand can consciously say to itself the end of the life

20 cycle is coming, and we are going to implement our strategy of

21 hiking the brand price much more than normal?

22        How can they say that to a jury and ask the jury to

23 believe that that's what would have happened when they are

24 simultaneously wanting to say to the jury, oh, the brand

25 Kos/AbbVie would have won that case?  The plaintiffs were

1    wrong.  The generics would not have won.  The brand would have

2    won.

3            Okay.  If the brand is sitting around saying it was

4    going to win, how can they also be telling the jury, but we

5    were also knowing we were going to lose, we would have hiked

6    these prices.  Those are completely contradictory arguments.  I

7    don't think they're going to try to make them to the jury.  If

8    they do, if we get that far and they try to make both, the jury

9    will make of that what it will.  It can certainly reject the

10   entire idea.

11           And so we left -- that's two of three theories.  The

12   only theory that we proffer where their argument even has a

13   theoretical connection is the alternative-settlement theory.

14   That is that absent the reverse payment that we challenged,

15   there would have been a settlement but without a payment and

16   earlier entry date.  We say entry into that theory would have

17   occurred in '09, and as a theoretical matter, perhaps that

18   might have given them time to do something like what they say

19   they did later, but they still have to prove it would have

20   happened.

21           That's their argument.  It's a cross-examination

22   point of Dr. Leitzinger.  It's a point for their expert.  Their

23   jury doesn't have to accept it.

24           And moreover, that's -- moreover, the chart that they

25   presented you the last time that had a red, dotted line that

1  purported to show that, well, if you have a high enough but-for
2  brand price, the BB effect with discounts won't work.  That's
3  made up.  What I mean by that is they just created that to
4  illustrate the argument.  Those are not real numbers.  They
5  didn't -- there is no mathematical presentation by their expert
6  showing this at all.  What they're illustrating with that chart
7  is a theoretical construct, that is, if you had enough of a
8  price hike and if you move that back.  If, if, if, the math may
9  work out to rebut our point, and that's true.

10         You can come up with numbers to make their point, but
11  those are just made-up numbers in their charts.  There is no
12  expert report by them purporting to show that.  It doesn't
13  exist.  It's just a demonstrative, which if they tried to use
14  it at trial, we would object to it, but putting that aside,
15  it's not evidence of anything.

16         Our evidence on the brand effect is common and
17  classified.  Virtually the entire set of purchases of brand
18  after generic entry have increased discounts.  99 percent of
19  purchases of the brand after generic entry in 2013 obtained
20  larger discounts.  Now they say, well, but you have three large
21  class members or some large class members, and that's a lot of
22  that.  99 percent is more than that.  It's more than that.

23         You combine that with the size of the increased
24  discount, it went from about 12 percent to nearly 60.  It was a
25  large jump, and you combine that -- I just lost my place for a

1  moment, Your Honor.  They -- again, they agree that the generic

2  entry had an effect on discounts.  I read you the quote

3  earlier.  And if you take the discounts that apply to the

4  entire class, because they don't dispute that it -- the

5  increase discounts applied to all those class members,

6  including the 11 that they've pointed out that you have cited

7  that had higher absolute prices.

8          They don't contest that those 11 also got larger

9  discounts.  You move that back you get lower brand prices.

10 Now, I'll note that Dr. Leitzinger's approach is not -- is a

11 little more nuanced than that.  You -- he doesn't simply take

12 the actual discounts in that way individually and move them

13 back, but that individual analysis was a response to their

14 point.

15         Dr. Leitzinger applies a ratio of brand-to-generic

16 discounts.  It's laid out in his report.  The principal is the

17 same.  That is, you take an increased discount and you move it

18 back.  So what I'm saying to Your Honor is, one, just to sort

19 of summarize, the answer to your first question is we do not

20 have to prove that we have a method of common proof for all

21 three theories of damage.  It's enough that we have common

22 evidence that is capable of proving BG and GG theories of

23 damage as to the all or nearly all class members, and we do.

24         That's sufficient, but we can also prove BB,

25 brand-brand injury, and damages on a common, class-wide basis.

1   And if Your Honor disagrees with that, again, at most, this is

2   a damage dispute issue.  That is, they say if -- and if Your

3   Honor is troubled or has questions about in terms of common --

4   evidence of -- common evidence of BB injury, then it's just

5   simply it's a damage issue.  That is, at trial, their expert

6   will criticize Dr. Leitzinger's model as having too high -- as

7   being too high, among other reasons, because the brand-brand

8   component is too high.

9          THE COURT:  How do you envisage handling challenges

10  to your proposition that everyone or certain class members were

11  injured, the defense says no?  How will that play out at trial?

12         MR. SORENSON:  Sure.  Your Honor, first, the

13  defendants' challenge on fact of injury is limited to three

14  class members.  That is, that of the members of the class, they

15  say that -- three who are all GG class members, they say that

16  the evidence would suggest they were not injured.  That's it, 3

17  to 48.

18         So one -- their -- I think a couple of options.  One

19  is post-trial, that is, if the class is certified it's a class,

20  we got to trial as a class, the jury is asked about violation

21  impact as to the class, and then damages in the aggregate, and

22  after trial, an allocation either by special master or

23  magistrate or another proceeding if the defendants still have

24  an interest in trying to prove three class members were not

25  injured, it can be done then.

1            Once the damage number is set --

2            THE COURT:  What about their right to jury trial?

3            MR. SORENSON:  The right to jury is preserved.  The

4    jury will set the damage number.  If they want to argue --

5            THE COURT:  That's the -- their aggregate damages?

6            MR. SORENSON:  Yes.  That's their liability.  At that

7    point, they have no interest in how it's divided at all.  The

8    sum that they are liable for has been fixed, and which class

9    members get what as a practical matter is of no concern to

10   them.  If they, for some reason, convince Your Honor that they

11   still have a desire to prove the three class members shouldn't

12   partake in that aggregate number, they can do that at that time

13   post-trial.

14           I doubt that they're going to bother.  We're talking

15   about three class members who collectively have point -- 0.2

16   percent of damages, but, okay.  Let's say they want to continue

17   their challenge.  That's one way of handling it.

18           Another way of handling it -- and by the way, in the

19   Tyson Foods case, one of the arguments in the Supreme Court was

20   there were uninjured class members, and the Supreme Court did

21   not send it back for a new trial.  It sent it back for the

22   district court to allocate damages and deal with the claims of

23   uninjured class members at that time, and that's exactly what

24   happened on remand.

25           So -- but another way of dealing with it is at trial.

25

1  We could have, potentially, if they persist at trial and try to

2  make this argument in front of a jury, ladies and gentlemen, we

3  might have violated the law and there might be a lot of

4  damages, but, hey, these three class members didn't suffer.

5  Okay.  If they try to do that at trial and they're allowed to,

6  the jury could be asked about violation, classwide impact, and

7  could be asked about those three class members.

8          There could be, even before trial, a motion for

9  summary judgment that they can raise with you.  After trial,

10 they could ask for a judgment as a matter of law as to those

11 three class members.  It's a -- those are other ways, or the

12 jury could be asked about it.  It would hardly turn a usually,

13 nearly completely common trial into one with many individual

14 issues.  It's, in fact, the same evidence.  We would have our

15 expert, Dr. Leitzinger on damages, discuss the GG effect, and

16 he will testify, as he did in his reports, that it was

17 classwide.

18          The defendants' expert will testify, presumably,

19 consistent with his reports.  If the defendants want to bring

20 out this issue about the three class members, if that's

21 permitted, if that's the way it's going to be handled, it's

22 just one witness, perhaps, rebuttal by Dr. Leitzinger, that's

23 it.  It's the -- nothing changes.  The common nature of the

24 evidence in the trial doesn't change.

25          THE COURT:  I heard the defendants arguing that there

1  are other class members, potential class members, who were not

2  injured other than the three.

3          MR. SORENSON:  No.  No.  They claim that the

4  brand-brand component damages is not sufficiently common that

5  it should be included in the class trial.  But as I said

6  earlier, even if you -- even if brand-brand were removed, let's

7  say we never brought it where you -- or you grant a motion for

8  summary judgment and it's removed, the class members stay the

9  same.  The class -- the 48 class members who are currently in

10 the class will stay in the class because there is no single

11 class member.  There's not one whose only claim, who's only

12 connection to any arguable claim of injury is BB.

13         So it has no effect on that at all, and as to the

14 other class members --

15         THE COURT:  In other words, you -- what about brand

16 loyalists?

17         MR. SORENSON:  That does not affect direct

18 purchasers.  That's more a consumer issue.  The -- it doesn't

19 really have any application to --

20         THE COURT:  Brand purchasers who would never have

21 purchased generics didn't or --

22         MR. SORENSON:  There are no brand purchasers who

23 would not purchase generics in the class.  All of the brand

24 purchasers in the class bought a generic.  That's 21.  Then,

25 there are two brand purchasers, Professional Drug and King

1   Drug, who bought the brand but went out of business before
2   September 2013, before the generic became available.

3            Our claim is that both of those companies, PDC and
4   King Drug, would have purchased the generic had it been
5   available before they went out of business, and we have two
6   methods of proving that.  One is common.  Dr. Leitzinger says
7   that because of the well-known, well-studied admitted effects
8   of generic competition, that is, generic could pretty take over
9   the market and lower the prices, these two companies also would
10  have bought some amount of generic had it been available before
11  either of them went out of business.  That's based on purely
12  common evidence.

13           Also, we have testimony and a declaration from the
14  same two companies saying, in effect -- worded somewhat
15  differently -- yes, what we do, when we were in business, we
16  buy and sell brand and generic.  And when generics come in,
17  we'd buy them, and we would have bought Niaspan.  King says it
18  very explicitly, PDC is not quite as explicit, but the jury
19  could come to the same conclusion.

20           And notably in Modafinil, in the Third Circuit, among
21  other things the court said is it acknowledged that that kind
22  of evidence, even if it was individualized, is acceptable.
23  That is, in the provincial case before Judge Goldberg, and then
24  up to the Third Circuit, one of the plaintiffs, one of the --
25  the main plaintiff -- that's why the case was called King

1 Drug -- was King Drug, and they had gone out of business at the
2 same time and did not buy generic Provigil, and there was a
3 challenge to King Drug.

4          And one of the things that we presented to get the
5 class certified was an affidavit, I believe it was an affidavit
6 in that case, it might have been a deposition, saying the same
7 thing that King Drug says here.  You know, we went out of
8 business.  I think it was 2011.  And had the generic drug, here
9 Niaspan, there Provigil, been available, we would have bought
10 it.  That was part of our evidence on class, and that went up
11 to the Third Circuit.

12          The defendants argued, as the defendants argue here,
13 well, wait a second, that's individualized.  And the Third
14 Circuit in a footnote -- this is at 836 F.3d at 250, note 8 --
15 acknowledged that the district court had included King Drug
16 based on that individual evidence and, you know, endorsed it.
17 It didn't criticize it.  It didn't tend -- it was fine, which
18 makes sense, because, again, the issue for a class
19 certification is not that every single thing that happens is
20 common classwide.  That's not the requirement or the test.
21 It's where the common issues will predominate.

22          And, again, in the trials that we've actually had and
23 gotten ready for, the Nexium trial, I've gotten ready for the
24 Provigil trial, the Solodyn trial, the Provigil and Solodyn
25 settled just before trial for the direct class.  You get --

1  when you actually get ready for one of these trials, it's

2  blindingly obvious that virtually the entire trial is common.

3          You spend -- both sides will spend a bulk of the time

4  on the agreement itself and the patent litigation, insofar as

5  it interrelates with causation, all of that evidence is common.

6  The numerous expert reports that the defendants have submitted,

7  that we've submitted, that Your Honor has -- you know, has --

8  has indicated are too many.  However many the Court allows to

9  go forward, they're all common.

10          It's all this is, you know, what the agreement says.

11  This is the negotiation.  This was -- this is what was

12  happening in the patent litigation.  This is -- these were the

13  issues.  And then you get to causation, this is what, you know,

14  <u>Barr</u> would have done if it hadn't done this, it would have done

15  that.  And all of that is common evidence, and that is the vast

16  bulk of the trial.

17          And when you get to impact, it is mostly experts who

18  talk about common evidence, forecasts, and research, and data,

19  which is all common, and their expert says, no, no, no, you

20  misinterpreted it, the numbers are wrong.  All common.  And

21  then you get to damages, and the same thing.  It's all common.

22  Again, that's how these trials really look.

23          So as to King Drug and PDC, they bought the brand,

24  did not buy the generic, circling back to your earlier

25  question, but our claim is they would have bought the generic.

1 Then we have 25, what we call GG or generic-only class members,

2 who are the same type of class members that were certified in

3 the Loestrin case that I just handed up to you, the Namenda

4 case, the Solodyn case, the Lidoderm case, where they buy the

5 generic, but because of the delay in generic competition and

6 the suppression of it, the price is higher.

7        So all of our evidence as to that is common.

8 They --again, they named three class members who were GG class

9 members whom -- who they claim were not injured.  That's the

10 extent of their fact-of-injury challenge.

11        THE COURT:  What about their position that you must

12 prove brand-brand injury sustained by the 11 members in that --

13        MR. SORENSON:  I'm sorry.  What is the question?

14        THE COURT:  Brand-brand injury.

15        MR. SORENSON:  Yes.  And the question is?

16        THE COURT:  Defend this position that you must prove

17 injury.

18        MR. SORENSON:  Well, we can prove it, in our view,

19 with class-wide evidence, which I outlined earlier, which is

20 that virtually the entirely set of brand purchases that

21 occurred after generic competition obtained increased

22 discounts, which is not to say that there are --

23        THE COURT:  That's your answer?

24        MR. SORENSON:  That's the answer, and that's common

25 evidence, and if you move the larger discounts back, you get a

1    lower, but-for brand price.  Regardless of the fact that the

2    absolute brand price for these 11 went up.  Those are not

3    incompatible mathematical facts.  They coexist at the same

4    time.  In other words, the absolute price, in fact, may have

5    gone up from $1 to $1.10, just -- I'm just making up numbers

6    for illustration, that may be, but if the discount went up and

7    you move that discount back to a time when the price was not $1

8    but, let's say, .80 cents, you know, five years ago, you get a

9    lower generic price.

10            THE COURT:  Is there any case or are there cases that

11   support that view?

12            MR. SORENSON:  Well, what -- yes, Your Honor.  The

13   cases that I cited earlier, that is, Loestrin that I just

14   handed up, Celebrex, and Cardizem all have this discounting

15   effect --

16            THE COURT:  All right.

17            MR. SORENSON:  -- being discussed in the cases.  And

18   as a matter of math, of course, it works.  I can go to the

19   board and illustrate if you want to see the math?

20            THE COURT:  No, that's not necessary.

21            MR. SORENSON:  And they don't challenge the math.

22   They -- again, they have this merits argument about, well, we

23   would have hiked the brand price a lot higher, which I already

24   discussed, but if the jury rejects that and doesn't accept

25   their argument that they would have tried to take advantage of

1  their monopoly even more so just before generic competition, if
2  they don't accept that, we're not challenging that the math
3  works, that increased discounts, moving back in time, end up
4  with a lower price.  It's straight math, and so we say we can
5  prove it.

6          And if we can't -- and if Your Honor concludes that
7  you have questions whether we can prove it on a classwide
8  basis, another point is, then it's just a damage issue.  That
9  is, just with common evidence of BG and GG injury, we have
10 impact as to the entire class.

11         So we have the first element of violation, the jury
12 checks off.  We have the second element, impact, checked off.
13 Now, we just get to a quantum of damages point.  That is, we
14 say the damage number is overall 1.7 billion.  It varies
15 depending on the scenario.  One of the points of criticism,
16 their expert says is, well, you know, you have BB in there, and
17 that should come out.  The jury can hear that, and the jury can
18 adjust the damage number as it sees fit, including if it
19 believes the defendants and thinks the BB component is too high
20 and can lower the damages.  Juries --

21         If we could, go to the last slide, please.  This is
22 Slide 6.

23         Juries have a lot of discretion to adjust damage
24 models.  We cited the Urethane case from the Tenth Circuit,
25 Scrap Metal from the Sixth Circuit, and US Airways from the

1  Southern District of New York.  Juries can't just, you know,

2  make stuff up, but they can listen to evidence, expert

3  evidence, expert modeling, complex-expert modeling, and in

4  light of the entire record that they hear, adjust the damage

5  model as they see fit.  They're not required to either accept,

6  yes or no, plaintiffs' number.

7          It's not as if they have to say, well, if we don't

8  agree with Dr. Leitzinger that it's 1.7, hmm, I guess we're

9  stuck with zero.  No.  That's not at all.  They can say, you

10 know, defendants' expert has some good points, and we think the

11 points that the defendants made that we agree with are X or Y,

12 including, potentially, BB, and say, hey, Dr. Stangle said that

13 the brand-brand component of those damages was whatever it was.

14 It's in the hundreds of millions depending on the scenario.

15         You know, we think maybe that's right, or maybe it's

16 partially right, and they adjust the number accordingly.  That

17 merely affects the total damage number.  And on damages, as the

18 law is very clear, any uncertainties that exist around it, the

19 defendants are not permitted to take advantage of.  The

20 requirements are not the same.  They're more forgiving of the

21 plaintiffs' proof.

22         The jury comes back with an aggregate number.  If

23 they agree with some of the defendants' points, they adjust the

24 numbers accordingly.  And once that's set, the defendants have

25 no interest anymore in how it's allocated.  They have the

1  number that they have to pay.  They pay it, and afterwards,

2  it's allocated among the class members.  That's it.

3         And to summarize, we can prove brand-brand on a

4  class-wide basis.  We don't have to, but we can.  And if you --

5  Your Honor concludes that we can't, that is, we can't prove

6  injury of BB on a classified basis, it does not affect your

7  ability to certify the same class that we're seeking to have

8  certified.  It has no effect on the class definition, no effect

9  on the class size, and it can become purely, simply a damage

10 issue.

11         Your Honor, I haven't addressed Modafinil numerosity,

12 which is one of your questions.

13         THE COURT:  I think that will be a brief argument.

14         MR. SORENSON:  Yes.

15         THE COURT:  And we can hear -- I'll hear you now, and

16 then I'll hear --

17         MR. SORENSON:  Sure.  Your Honor --

18         THE COURT:  -- defense on the two issues that you --

19         MR. SORENSON:  Sure.  Your Honor, in terms of

20 Modafinil, obviously, it has the quote that you included in

21 your questions.  However, the Court also says on Page 250,

22 quote:

23         "Our Court has said that, generally, if the named

24          plaintiff demonstrates that the potential number of

25          plaintiffs exceeds 40, the first prong of Rule 23 has

1          been met."

2          That's on Page 250.

3          They also said that the class there, when it went up

4   to the Third Circuit, was in the low 20s.  There was some

5   dispute between the parties as to whether it was 22 or 25, but

6   it was less than half the size of this class, and, indeed, the

7   Third Circuit reaffirmed what I just said, which is, if --

8   generally speaking, if you could get above 40, numerosity has

9   been met, on Page 250.  They said that in the (indiscernible)

10  case.

11         Now, yes, they note that in that case, three large

12  class members existed, as you pointed out, and those three same

13  class members are in this case, as they have been in every case

14  over the last 20 years that have been certified, including a

15  number of cases recently, since Modafinil, including the

16  Loestrin case, the Lidoderm, and Solodyn and Namenda.  They're

17  class members in all of those cases.

18         So the -- at no time did the Third Circuit say in its

19  opinion, you know what, there are three large class members. We

20  are telling you, district court, you can't certify this class

21  because of that, or you can't certify a class that includes

22  them.  They didn't say that.  They remanded back to Judge

23  Goldberg saying, you have to take another look at this.  There

24  is nothing in the Third Circuit's opinion that says you can't

25  have a class with these three large class members.

1        Just so that you're aware, a couple of other factual

2  differences.  The three large class members in this case did --

3  were subjected to discovery.  There was document production.  I

4  think Your Honor addressed this issue early on in this case.

5  They did cooperate and produce documents and data.  They did

6  all sit for depositions.  In this case, they weren't, quote,

7  "on the sidelines."

8        THE COURT:  I didn't quite understand the

9  significance of the, quote, "on the sidelines" issue.  I

10  understand -- I know what it means, but I don't see how that

11  affected the decision that they were having to make, and that

12  is, with this much of the purchases concentrated in such a

13  small group, should we allow the class to be certified?

14        MR. SORENSON:  Right.  I think it was just -- I can't

15  get into their heads on that particular point.  My point here

16  is that whatever significance the Third Circuit gave that,

17  here, the three national wholesalers have all participated, at

18  least insofar as discovery is concerned.  They did sit for

19  depositions.  They did produce documents.

20        Your Honor, the other thing about Provigil is let's

21  look at what happened in Provigil.  It's a very small -- it was

22  a small class in the low 20s.  It went back.  Judge Goldberg

23  did not certify.  The Third Circuit didn't tell him he

24  couldn't, right?  That's not what the opinion says.  It says

25  take another look.  He took another look and declined to

1  certify.

2         The case went forward, but about a third of the class

3  members did not proceed.  Only 16 of the original group

4  proceeded towards the next phase of that case, and it's not

5  because it wasn't a good case.  By the time that all of this

6  happened, there had already been a settlement with three of the

7  five defendants for $512 million, which at that time was the

8  largest single settlement in a case of this nature in history.

9  So it's not that the class members said, you know, that's a

10  tough case and it's not worth it.  That's not what happened.

11         Now, we argued that there are two basic, you know,

12  logical reasons why this would occur.  That is that even in a

13  good case, or a demonstrably very worthwhile case, they would

14  not proceed because they're too small.  These are very small

15  class members.  They're nothing like the -- they're not

16  behemoths.  They're very small, and you have the cost of

17  litigation they have to confront and the risk of retaliation.

18         The risk of retaliation, it has occurred in this

19  industry.  We cite a case in which the named plaintiff, in

20  fact, the named plaintiff in this case, RDC, was, in fact, cut

21  off in retaliation for bringing suit, and that had to be

22  litigated.  It does happen.  That's public.  It's not a secret.

23  It gets around, you know, in this industry that that occurs,

24  and there is an understandable fear, the courts have

25  recognized, of being cut off.

1          Now, I will acknowledge that Judge Goldberg heard
2     that, and in his opinion said, well, there's no evidence of
3     that in the record.  I'll observe that that's -- I think, you
4     know -- with all due respect to Judge Goldberg, I think what
5     was happening is that he was saying that small class members
6     who are scared of suing would have to show up in court and say
7     they're scared of suing.  That is putting too much of an -- in
8     my view, an unfair burden on these small class members.  The
9     whole point is they don't want to do that.  They don't want to
10    call attention to themselves.  They are scared of retaliation.
11    They're small. They depend on single-source companies, such as
12    the defendants, where the only company selling a particular
13    drug to supply them, and they can be cut off.

14         And to present -- and to create a requirement that
15    the same class members who are understandably scared of suing
16    have to come into court, announce themselves and say, I'm
17    scared of that defendant, seems an unfair burden, and I think
18    that there is enough commonsense, including the Supreme Court's
19    acknowledgment in Illinois Brick, when it created the direct
20    purchaser role, the Supreme Court acknowledged this.  They
21    understood that sometimes direct purchasers will not sue out of
22    fear of disrupting relations with suppliers.  That's in the
23    Supreme Court, and other courts have picked it up.  I think
24    it's common sense.  I think its -- and its -- and I think the
25    Court can -- is allowed to apply it.

1           But, also, you have the issue of size.  That is, a

2   number of these class members are quite small.  We discuss in

3   our brief our expert report that has gone unchallenged that

4   of -- in the class, if you take our damage numbers and then you

5   sort of allocate it out to the class members, even with the

6   highest damage number that we put forth, the top, we win

7   everything.  Fully a third of the class have trebled claims

8   each below $1 million.  Trebled.  That is, even if you take

9   their single damages and you assume they win everything, it's

10  less than $1 million.  A third of the class.  And if you raise

11  that number from a million to three million, it got -- it goes

12  up over half the class.  And why would I pick three million?

13  Well, it's been used in a number of briefs in cases, because in

14  the Nexium case, there was public information that of the

15  expenses that were put forth out of pocket by the direct class,

16  approximately three million were expert fees.  That was public

17  because there was a motion for, I think, payment of expenses.

18          And expert fees, notably, are not -- cannot be

19  shifted under the claim act.  You win, you don't get expert

20  costs.  You can get an award of attorneys' fees, but not expert

21  fees.  They are -- they're not covered, and it cost about three

22  million in that case, and that's -- we sort of looked at that

23  as a typical expense.  It can be higher depending on the case,

24  and it may come in lower, but it's certainly a benchmark to

25  look to.

1          And a huge swath of this class have claims below

2    that, below even a million, and you have 48 class members.  And

3    the Rule 23 says, whether joinder of all class members is

4    practical, it's -- the Third Circuit is saying, you look at

5    class and look at joinder of all.  And all is in the rule, and

6    I think it means what it says, which is, take a look at whether

7    you think it's practicable that all 48 class members were

8    joined.

9          I think the answer is no.  I think the answer is

10   plainly no given the small size of many claims, given the cost

11   of litigation, and given the understandable recognized fears of

12   retaliation, and given what actually happened in Provigil,

13   which isn't a case that had a huge settlement, this case has no

14   settlements yet.  Proportionally, a large portion of the class,

15   the small class members, dropped out.

16         I think that if you put that all together and plus

17   the presumption or the rule, however you want to characterize

18   it, that the Third Circuit recognized in Modafinil that above

19   40, generally speaking, numerosity is met.  You put all of

20   those together, and I think it's -- I think you have enough to

21   find that joinder here of all class members is not practicable.

22         And in terms of judicial economy, if you compare how

23   this case would have proceeded with 48 joined plaintiffs versus

24   the class, I don't think it's a close call.  You can't assume

25   that all 48 would have the same counsel, so you would have a

1   multiplication of counsel.  You can't assume that all 48 would

2   use the same expert, so you would have a multiplication of

3   experts.  You can't assume that at a trial they wouldn't have

4   divergent opinions, different counsel.  The defendants, I would

5   assume, are going to want to depose all 48.  They deposed the

6   named plaintiffs.  They even deposed some of the absent class

7   members.  If they were hit with a joinder action of 48

8   plaintiffs, they would certainly take 48 depositions, or maybe

9   two per plaintiff.  I don't know.  More discovery, more

10  testimony, the trial becomes much more protracted.  I don't

11  think -- in terms of judicial economy, I think it's clear that

12  the class is more economical.

13          And then another factor that the Third Circuit

14  continued to recognize is geographic dispersion, that is, the

15  class members disbursed across the United States.

16          THE COURT:  I'm aware of that.

17          MR. SORENSON:  And that's -- so, Your Honor, unless

18  you have questions about numerosity, that's --

19          THE COURT:  I have a question, and it's been -- it

20  relates to the first issue we addressed.  You've argued that I

21  can consider volume and must consider volume of purchases and

22  damages in addressing the Modafinil issues.  What about in

23  addressing the antitrust injury issue?  For example, with

24  respect to 11 purchasers, the defense have evidence that the

25  price went up and didn't go down with a generic entry, can I

1 consider the volume of those purchases, and with the argument I

2 would assume the plaintiffs would make, that they're voluminous

3 when looking at the overall claims?

4          MR. SORENSON:  I think you can, Your Honor.  In --

5          THE COURT:  What authority is there for that?

6          MR. SORENSON:  Well, I think the authority is a -- it

7 just comes from the authority, including K-Dur, including in

8 Linerboard, including in numbers of cases that our burden is

9 not to prove that all class members were injured, nor is it

10 even to prove that all -- we could prove that all were injured.

11 It's -- it is acceptable and not a barrier to class, even if

12 there is some uninjured class members.

13          I think it's a -- it's an extension of that, that if

14 99 percent of the brand volume, according to Dr. Leitzinger,

15 obtains greater discounts, a number they have not challenged,

16 that tells you that the overwhelming effect of generic entry

17 was to lower -- was to increase brand discounts.  That's on a

18 classwide basis.

19          And then, insofar as you are looking at those 11, not

20 only are they relatively small, but as to every single one of

21 them, they got higher discounts.

22          THE COURT:  Well, you made that point --

23          MR. SORENSON:  Right.

24          THE COURT:  -- over --

25          MR. SORENSON:  And so it -- I -- I'm --

43

1          THE COURT:  That's not where I'm going.

2          MR. SORENSON:  Sure.

3          THE COURT:  I hadn't read -- I haven't read a case,

4   and I don't know that you've cited one yet, I think you have

5   not, a case that says in determining that issue, whether in

6   looking at the overall class, there are uninjured class

7   members.  May I consider it or should I consider it, must I

8   consider it --

9          MR. SORENSON:  Your Honor, I --

10         THE COURT:  -- by --

11         MR. SORENSON:  You may be asking -- perhaps, I'm not

12  getting what you're looking at.  The class members who bought

13  the brand before and after not only obtained greater discounts,

14  they bought the generic.  And if they bought the generic, they

15  have BG injury, which is quite large.  And so we -- again,

16  regardless of the BB effect, it -- if you reject it on summary

17  judgment, if it's thrown out and doesn't go forward, it has no

18  effect.  You still have a BG injury as to all 11, and if you

19  include BB, even if you factor in their increased prices, it

20  doesn't change anything.  You still have the BG effect.  You

21  still have BG injury.

22         THE COURT:  Are there any cases that have said that

23  the uninjured class members, when you look at the total volume

24  of their purchases and their damages, are de minimis and --

25  even though they're a substantial number of the class?

1             MR. SORENSON:  Nothing comes immediately to mind that

2    says that precisely, other than the way I said it, which is,

3    the cases repeatedly say even if you have some uninjured class

4    members, that's not a problem.  I can certainly go back and

5    look at the class decisions in this area and look at that, but,

6    you know, Linerboard and K-Dur, both explicitly, K-Dur being a

7    reverse-payment case that went up to the Third Circuit and

8    class was affirmed in that case, K-dur, the Third Circuit

9    acknowledged the defendants' argument that some class members

10   were -- might have been uninjured.  That was the defendants'

11   argument.

12            The Third Circuit was not troubled by that.  They

13   said, that's not a problem for class certification.  I don't

14   remember off the hand whether the Third Circuit was also

15   talking about volume, but it was talking about a small number

16   of class members in that case, and Linerboard says the same

17   thing, as do other cases in other circuits.  So that's

18   certainly the law.

19            And, again, just -- I -- at the risk of just

20   repeating this point about discounts --

21            THE COURT:  Well, you don't have to repeat the part

22   about --

23            MR. SORENSON:  Okay.

24            THE COURT:  -- discounts.

25            MR. SORENSON:  Then I won't.

1          THE COURT:  No.  It -- the issue that I raised

2   specifically was 11 class members, according to the defendants,

3   were not injured.

4          MR. SORENSON:  No.  That's why -- I apologize, Your

5   Honor.  I'm jumping in.  No.  That is not their argument.  They

6   are not saying we have 48 class members, oh, and 11 have no

7   impact, and they should have no claim.  That is not what

8   they're saying.  They have never said that in their briefs,

9   their papers, their expert reports, in court.  They've never

10  said it.  That's not their position.  If they say it now, it

11  would be the first time they try it.

12         What they're saying is something very, very

13  different.  They're saying those 11 class members who bought

14  the brand, who bought the generic, you can't prove brand-brand

15  injury and damages as to those 11.  That has nothing to do with

16  proving the fact of impact for purposes of proving the claim.

17  Why?  Because the violation is common, and fact of injury is

18  just some injury.  The some injury requirement under Zenith is

19  BG.  Those same class members bought the generic, would have

20  bought it earlier, and they were overcharged.

21         That's the fact of injury.  We're done.  Right?

22  We're done.  That's why I keep saying remove BB.  You remove it

23  arguendo, remove it on summary judgment.  If that happens,

24  pretend we never brought -- just put it aside.  No effect on

25  those 11.  They still are in the class.  We still go forward,

1  and you can still certify a class that includes them because

2  their whole BB argument isn't that.

3          They make an injury argument about BB.  They say --

4  they have their take on <u>Comcast</u>, and they say, well, you have

5  to prove it on a common, classwide basis to include it, and you

6  can't, and it should come out, and their expert quantifies BB

7  and says that that should be deducted.  And, in fact, if -- at

8  some point, if that were to happen from Your Honor, we would, I

9  would imagine, seek leave to, you know, adjust Dr. Leitzinger's

10 numbers and take it out if that's what the Court orders.

11         But they already have the number which proves that

12 it's feasible.  It's not like they're saying, oh, no, it's

13 impossible to take BB out, quite the opposite.  They say it can

14 be done and it should be done.  So it's not a fact-of-injury

15 argument in the sense of to prevail on the claim, an antitrust

16 claim under Section 1, you have to prove fact of impact.

17 That's not the argument.

18         All 11 have impact injury on BG, all of them, with

19 common evidence, every single one of them.  This is not that.

20 I hope that, at this point, it's clear.

21         THE COURT:  It is.  You -- I'd still like to see a

22 case that addresses the volume of purchases.

23         MR. SORENSON:  Your Honor, it --

24         THE COURT:  That would be an additional reason if I

25 can consider it de minimis.  If they were the 11 largest

1  purchasers in the class, that would be one thing.  If they're

2  the 11 smallest, I think that's quite another, and I have not

3  seen a case that --

4          MR. SORENSON:  Sure.  But --

5          THE COURT:  -- addresses that point.

6          MR. SORENSON:  And we will go back and look, Your

7  Honor, but just to just sort of, you know, make this abundantly

8  clear, even if the 11 were large, even if they were very large,

9  it would not have an effect on their fact of impact.  They

10 have -- then they would have large BG fact-of-impact claims.

11 They would all have fact of impact with BG, the BG effect, no

12 change.  No change.

13         The size of these particular class members, you may

14 be getting at how that factors in or does not in terms of the

15 other arguments I've made about classwide proofs of damages on

16 BB and other things that you may be concerned about, but even

17 if they were large collectively, it has no effect on injury,

18 because they all had BG impact.  And, again, if they were all

19 large and we, again, stood up and -- you know, and BB was taken

20 out of the case on summary judgment or we never brought it, and

21 they're still -- and their 11, and now -- now we're

22 hypothesizing that they're large, we're back in the same place.

23         THE COURT:  Okay.

24         MR. SORENSON:  So --

25         THE COURT:  You've answered it.

1           MR. SORENSON:  -- if there's anything else, Your
2 Honor, I'll --
3           THE COURT:  No, that's -- that's fine.
4           MR. SORENSON:  Okay.  Thank you, Your Honor.
5           THE COURT:  Let's take a very short recess.  It's 18
6 after, let's recess for ten minutes.
7           THE CLERK:  All rise.
8      (Recess taken at 11:18 a.m.)
9      (Proceedings resumed at 11:30 a.m.)
10           THE COURT:  Be seated, everyone.  I'll hear from the
11 defense on those two issues.
12           MS. ALLON:  Thank you, Your Honor.  May I just hand
13 up some slides?  I -- they're actually the same as last time,
14 but I don't know if Your Honor had your copy available.
15           THE COURT:  I do.  Tell me what you're --
16           MS. ALLON:  I'm going to refer to specific slides.
17           THE COURT:  Tell me which slide, then.
18           MS. ALLON:  The defendants' direct purchasers
19 (indiscernible).
20           THE COURT:  Yeah, that's -- it's that one.  All
21 right.
22           MS. ALLON:  Good morning, Your Honor.
23           THE COURT:  Good morning.
24           MS. ALLON:  Devora Allon on behalf of the defendants.
25           I'd like to start with Your Honor's first question

1  of, whether the DPPs have to prove antitrust injury for each

2  theory of antitrust impact.  The Supreme Court has resolved

3  this issue in <u>Comcast</u>, and the answer is yes.  As the Supreme

4  Court made clear, a class can only recover damages for theories

5  of injury that plaintiffs can prove on classwide basis.  If the

6  DPPs want to pursue brand-generic damages, they need to prove

7  brand-generic injury using common evidence.  If they want to

8  pursue brand-brand damages, they need to prove brand-brand

9  injury using common evidence, and the same is true for

10  generic-generic damages.

11          Now, each of the DPPs' theories of injury depends on

12  a different set of factual assumptions.  Brand-generic injury

13  depends on the idea that brand purchasers would have switched

14  some of their brand Niaspan purchases to cheaper, generic

15  Niaspan, if generic entry had been earlier.  So that theory of

16  injury is about purchaser behavior.  Brand-brand injury, by

17  contrast, is about how brand manufacturers set prices.  Has

18  nothing to do with switching from the brand to the generic.

19  The idea is that brand purchasers would have continued to buy

20  some brand Niaspan, even after a generic entry, or that they

21  would have paid less, because AbbVie would have charged lower

22  prices.  And finally, generic-generic injury is based on the

23  theory that generic purchasers would have paid less for generic

24  Niaspan, had there been two generic manufacturers selling the

25  drug instead of one.  Now, many putative --

1           THE COURT:  Well, isn't the common theme throughout

2    that with the entry of the generic into the marketplace, the

3    brand price would have gone down?

4           MS. ALLON:  Yeah.  So that's --

5           THE COURT:  And the generic would have been offered

6    at a much lower price.

7           MS. ALLON:  The plaintiffs say that they're claiming

8    one anti-competitive action, that's the settlement, and one

9    type of injury.  That's the overcharge.  That is exactly the

10   same as Comcast.  In Comcast, the plaintiffs said that Comcast

11   engaged in anti-competitive clustering scheme that eliminated

12   cable competition and that the injury, which was an overcharge,

13   specifically that the misconduct increased cable subscription

14   rates.  And just like in this case --

15          THE COURT:  But there were a number of different

16   theories of liabilities in --

17          MS. ALLON:  There were four theories of injury in

18   Comcast.

19          THE COURT:  Different -- well -- theories of

20   liability in Comcast.

21          MS. ALLON:  I think particular to the Court's

22   decision was the plaintiffs identified four ways that the

23   alleged misconduct increased cable subscription rates.  So for

24   example, there was this overbuilder analysis.  There are fewer

25   overbuilders in the market.  That's one theory.

1           THE COURT:  That was the theory that Judge Padova

2    adopted.

3           MS. ALLON:  Exactly.  There were three other

4    theories.  They say a decreased market penetration by direct

5    broadcast satellite providers.  They said there was less

6    benchmark competition.  This is on Page 31 of the decision.

7           That is the same thing the DPPs are doing here by

8    saying the anti-competitive activity caused an overcharge in

9    different ways, by inflating brand prices, by preventing brand

10   purchasers from switching to the generic, by inflating generic

11   prices.  And that gets us to the key similarity between this

12   case and Comcast.  Just like here, where brand-generic injury

13   may be capable of common proof, but a brand-brand and

14   generic-generic injury are not.

15          In Comcast, only one of the four theories of

16   overcharged injury could be established with common evidence,

17   and I need to correct something that Mr. Sorenson said.

18   Mr. Sorenson suggested that Judge Padova rejected the other

19   three theories of injury.  That's not accurate.  The

20   Supreme Court makes very clear, this is a critical passage in

21   Footnote 3.

22              "The district court did not hold that the three

23              alternative theories of liability failed to establish

24              antitrust impact, but merely that those theories

25              could not be determined in a manner common to all

1             class plaintiff.  The other theories of liability may

2             well be available for the plaintiffs to pursue as

3             individual actions."

4       That's identical to the brand-brand and

5 generic-generic situation here.  Now, the problem for the

6 Comcast plaintiffs was that their calculation of damages

7 included overcharges from all four theories of injury, and I

8 think it's noteworthy how the Supreme Court put it.

9             "We start with an unremarkable premise."

10            This is Page 35 of the decision.

11            "If respondents prevail on their claims, they would

12            be entitled only to damages resulting from reduced

13            overbuilder competition, since that is the only

14            theory of antitrust impact accepted for class-action

15            treatment."

16       In other words, a class can only recover damages for

17 the theory of injury that's proved on a classwide basis.  The

18 Court went on to find in Comcast that the plaintiffs failed to

19 establish predominance because they failed to measure damages

20 resulting from the particular antitrust injury on which

21 petitioner's liability in this action is premised.

22       The DPPs here have the same problem.  They can't

23 prove brand-brand or generic-generic injury on a classwide

24 basis, but the calculation of those damages is baked into the

25 overcharge damages calculation.  Conservatively, that's an

1  extra 375 million of brand-brand damages and at least

2  240 million of generic-generic damages.  Now, the DPPs'

3  responses, if a brand purchaser incurs a brand-generic

4  overcharge, it's injured.  Everything else is just a damages

5  question.  Mr. Sorensen said it over and over this morning.

6          And I'd like to explain why that's wrong, both of

7  them, as a matter of common sense and in light of <u>Comcast</u>.  Let

8  me start with common sense.  I'd like to imagine a simpler

9  case, I think I gave this analogy before.  When the plaintiffs

10  claim that a group of farmers engaged in a scheme to fix the

11  prices for apples and oranges.  Under the DPPs' theory, if

12  plaintiffs can use common evidence to prove that purchasers

13  overpaid for oranges, they can also recover damages for apples,

14  even if they never prove that everyone in the putative class

15  overpaid for apples.  That is completely inconsistent with the

16  basic idea set forth in <u>Comcast</u>, that plaintiffs can only

17  recover damages if they suffered an injury.  And if the DPPs

18  were correct, the <u>Comcast</u> plaintiffs could have proved the one

19  theory of injury that was capable of proof using common

20  evidence and then recovered for the other three theories of

21  injury that could not be proved by common evidence.  But the

22  Supreme Court rejected that.

23          Now, I heard Mr. Sorensen say that they have one

24  theory of injury, the overcharge theory.  <u>Comcast</u> also involved

25  just an overcharge injury.  Plaintiffs said they had been

1 overcharged on cable rates.  What mattered to the Supreme Court
2 was the four different ways in which they had been overcharged,
3 and that's the same here.  Brand-generic, brand-brand, and
4 generic-generic may all be types of overcharge, but they rely
5 on different theories of injury and different fact patterns.
6 Brand-generic I mentioned, turns on the idea of switching.
7 That when a generic enters the market, it's cheaper than the
8 brand, and a company switches from the brand to the generic.
9 Brand-brand is completely different.  It's based on the theory
10 that when a brand manufacturer faces competition from generics,
11 it will lower its prices in an effort to compete.  And
12 generic-generic is based on the theory that generic purchasers
13 would have paid less for generics had there been two generic
14 manufacturers on the market instead of one.

15        That these are all theories of overcharge doesn't
16 change the fact that they're all different injury theories.  So
17 proving one doesn't say anything about the other.  Just like in
18 Comcast, if the class wants to recover damages, it needs to
19 first prove injury related to those damages by common evidence.
20        THE COURT:  What about Mr. Sorenson's argument that
21 everyone in the brand-generic group was involved in at least
22 the brand-brand group?
23        MS. ALLON:  Well, but that's my point, Your Honor.
24 If a purchaser made brand-generic purchases and plaintiffs can
25 show through common evidence that he was injured on those

1  brand-generic purchases, he is entitled to pursue damages on
2  the brand-generic claim, but he is not entitled to pursue
3  damages on the brand-brand claim.  This is exactly like the
4  apples and oranges.  Just because they've shown one type of
5  injury doesn't mean that plaintiff can recover damages for a
6  different theory of injury.  That's where you have a Comcast
7  problem.

8           And Your Honor had asked about Nexium on the last
9  status conference and how this case compares to the Nexium
10 decision, and I think there are three important distinctions
11 that I'd like to highlight.  The first is, in Nexium, the
12 defendants did not present this Comcast issue to Judge Young.
13 The briefing focused on whether plaintiffs could use common
14 evidence to prove brand-generic injury.  So --

15          THE COURT:  Didn't Judge Young address Comcast?  His
16 decision came a year after Comcast.

17          MS. ALLON:  It -- I believe his decision did come
18 after Comcast, but he did not address the Comcast issue in the
19 context of whether if you prove classwide injury on one theory,
20 can you get damages on another theory.  That issue was not in
21 front of Judge Young, and he did not address it.

22          THE COURT:  I'm just looking at the Young case.  He
23 found -- well, he certainly addressed Comcast toward the end of
24 the opinion.  But at one point, he said that there's one theory
25 of liability in this case, and that is the defendants were

1   responsible for delaying the entry of generic, and to that

2   extent, it's much like Mr. Sorenson's argument.

3           MS. ALLON:  My point is the defendants there didn't

4   make the argument that we are making.  They only argued about

5   brand-generic damages, and they talked about whether or not you

6   could show common impact on brand-generic because there was a

7   variation of pricing.  That was the argument the defendants

8   made there.  They didn't raise the argument we are making,

9   which is even if you can show brand-generic injury through

10  common evidence, you still can't recover brand-brand damages

11  unless you can show brand-brand injury through common evidence.

12  That issue did not come up in Nexium.  And also, the important

13  thing about Nexium is it was decided before Tyson Foods and

14  before the First Circuit decision in Asacol interpreting

15  Tyson Foods.  And those cases changed the law about how to

16  approach the use of averages to prove liability in class

17  actions.  Nexium took the view that the presence of uninjured

18  class members is not fatal to class certification.  Now, I'm

19  going to get to that in just a minute as to how it relates to

20  our case, but I don't think that rationale would survive today.

21          In Asacol, the First Circuit applied Tyson Foods and

22  said that when injury can depend on an analysis of

23  plaintiff-specific facts, the defendant must be offered the

24  opportunity to challenge each class member's proof.  So it's

25  not okay to say, like Judge Young did, that uninjured class

1  members is not fatal to class certification.

2          The third way I think our case is different than

3  Nexium is that our evidence here that injury is not capable of

4  classwide proof is much stronger than it was in Nexium.  In

5  Nexium, the defendants identified a wide range of prices, but

6  they only pointed to one purchaser that arguably paid less for

7  the brand than it would have for the generic.  There is much

8  more evidence here.  We point to not just 11, but I'll explain

9  19 out of 23 purchasers, 19 out of 23, that may have paid less

10  for the brand in the actual world than the but-for world.

11          THE COURT:  In analyzing that argument, may I

12  consider the volume of those purchases?

13          MS. ALLON:  Your Honor, you may not.  And --

14          THE COURT:  I may not?

15          MS. ALLON:  You may not, and let me explain why.

16  There's two reasons.  The key question is whether injury can be

17  proven through common evidence.  And the amount of brand

18  Niaspan that a particular purchaser purchased has nothing to do

19  with injury.  The fundamental principle in Comcast is that a

20  plaintiff can't recover damages for a type of injury it didn't

21  suffer, and that means you have to be able to identify which

22  brand purchasers suffered brand-brand injury before you can

23  give that purchaser a portion of any brand-brand damages the

24  jury awards.  It doesn't matter if that purchaser spent

25  $200 million on brand Niaspan or $200,000 on brand Niaspan.

1    They can't recover anything unless injury is established.

2            So from a practical perspective, Your Honor, it's the
3    number of brand purchasers that is the key issue because that
4    shows how many separate inquiries the jury would have to do
5    into brand-brand injury.  And I think, frankly, that's what
6    Judge Young was looking at in the <u>Nexium</u> decision.  He wasn't
7    looking at the amount of damages.  He was looking at the number
8    of uninjured class members.  And like I said before, I don't
9    think the First Circuit follows that rule anymore.  It
10   certainly hasn't been adopted in the Third Circuit, but even if
11   it did, it's consistent with focusing on the number of class
12   members, not their amount of damages.  And as I explained
13   before and I'd like to walk through, there are at least 19
14   individuals who will need an individualized inquiry into
15   brand-brand injury.  That's a substantial portion of the entire
16   class.  And it's -- it can't possibly be considered de minimis,
17   even if that rule did apply.

18           I'd like to turn to Slide 4 briefly, and I'd like to
19   make one last point about the number of uninjured purchasers to
20   Your Honor's point.  If Your Honor -- because you ultimately
21   can do whatever you want to do -- decides that you do want to
22   analyze the number or the volume of purchases that these 19
23   potentially uninjured class members made, I'd like to note two
24   important things.

25           The first is that Dr. Leitzinger calculates

1 brand-brand damages based on the column that is the pre-period

2 purchases, not the post-period purchases.  So the post-period

3 purchases reflect what class members bought after generic entry

4 in the actual world.  The DPPs' argument is that brand prices

5 would have been lower during the pre-period.  That means, for

6 example, the 95 million that Walmart bought, the 757 million

7 that Cardinal bought, all of that is the basis for

8 Dr. Leitzinger's post brand-brand damages.  It's not the

9 smaller numbers that you see in the post-period columns, that's

10 first of all, so you have to look at the pre-period columns.

11          And the chart, this chart, understates volume value

12 significantly because Dr. Leitzinger's price analysis only

13 focused on 500-milligram tablets, but he also calculates

14 brand-brand damages on 750-milligram, and 1000-milligram

15 tablets.  When you factor those in, the numbers are much

16 longer.  So first, Your Honor, I think the appropriate inquiry

17 is to look at how many members it affects, not their quantity

18 of purchases, but even if you do look at their quantity of

19 purchases, when you use the right numbers, those volumes are

20 quite significant.

21          There's another important point I'd like to make

22 about Slide 4.  So this was a demonstrative that we put

23 together.  We used Dr. Leitzinger's data, and he --

24          THE COURT:  Excuse me a minute.  Brian?  Did you take

25 that slide deck?

1        Okay.  All right.

2              MS. ALLON:  So this is a demonstrative that we put

3  together.  We took the number directly from -- the data

4  directly from Dr. Leitzinger.  He --

5              THE COURT:  What page of the slide deck?

6              MS. ALLON:  4.

7              THE COURT:  All right.

8              MS. ALLON:  Now, Dr. Leitzinger just presents the

9  classwide figures at the very bottom.  If you look at that, it

10 seems like the price for brand Niaspan was lower after generic

11 entry.  We took the underlying data for each of the brand

12 purchasers, which tells a very different story.  There are five

13 purchasers in yellow at the top.  Those five purchasers did not

14 buy brand Niaspan at all in the actual world after generic

15 entry.  There is no way to tell whether these purchasers would

16 have paid lower prices for brand Niaspan if generic entry was

17 earlier.

18            The next three purchasers, in orange, paid negative

19 prices.  Obviously, they're not buying Niaspan for negative

20 prices.  Dr. Leitzinger admitted that these reflect very, very

21 small purchases and big chargebacks or rebates from other

22 periods, so you also can't tell anything about whether these

23 companies would have paid less for the brand if generic entry

24 was earlier.

25            Then, there's the 11 companies in green that we've

talked about a lot.  They paid higher prices for brand after
generic entry.  You see sizeable increases.  N.C. Mutual is
almost 50 percent higher, PBA Health, over 83 percent higher.
Only four members of the proposed class, in white, paid lower
prices after generic entry.  Now, they have a big impact on
those average numbers Dr. Leitzinger looks at because they
bought a lot of brand Niaspan.  But this is a perfect example
of how Dr. Leitzinger's averages conceal the true story of the
data, and it shows that plaintiffs cannot prove brand-brand
injury on a common basis, not just as to the 11 in green, but
as to the five in yellow, and the three in orange, as well.

Now, the DPPs have only one factual argument to
support their ability to prove brand-brand injury on a
classwide basis, and that's their theory that because brand
discounts were higher after generic entry, it doesn't matter
that class members actually paid in higher prices.  And let's
go to Slide 5.  I'll walk through it pretty quickly.  But this
is the plaintiffs' theory.  So the black line is the brand WAC,
that's the list price.  The blue line is the price the direct
purchaser actually pays, and the gap between the blue and the
black is the discount.

So let's say a purchaser's discount off of WAC was
12 percent on August 15, 2012.  That's before generic entry.
If the WAC was $100 that day, the average actual price is $88.
After generic entry, the purchaser's discount off of WAC goes

1    up to 20 percent.  Okay, so the plaintiffs say, well, in the

2    but-for world, that 20-percent discount would have happened

3    earlier, back when prices were just a hundred dollars, which

4    means brand prices would have been 80 instead of 88.  That's

5    how they get this idea that if the discount is higher after

6    generic entry, the purchasers must have been injured.

7           But if you turn to Slide 6, the problem with this

8    theory is that it depends on the idea that brand WAC does not

9    change based on generic entry.  Their analysis, as Mr. Sorensen

10   admitted, moves the discount earlier in time, but it does not

11   change the brand WAC at all.  Now, this chart shows what

12   happens if, in anticipation of generic entry, the brand

13   increases the WAC at a greater rate.  That's the red dotted

14   line.  The WAC might have been a hundred dollars on August 15

15   in the actual world, but with earlier generic entry, it's

16   higher.  It's up to $120.  So now, if you take that same

17   20 percent discount, but you apply it to the higher WAC, you

18   get a but-for price of $96, which is above the actual price of

19   $88.

20          Plaintiffs' theory assumes generic entry had no

21   impact on WAC.  If it does -- and I'll go through the evidence

22   that it did in just one minute -- they can't just compare

23   discounts before and after generic entry because they also need

24   to account for how the WAC would change in the but-for world.

25          Now, let me walk through the evidence that shows that

1  the plaintiffs' assumption is wrong.  This is on Slide 7.  It

2  is clear from both the documents and the data that the Niaspan

3  brand WAC rose at a greater rate in anticipation of and after

4  generic entry than it did before.  The increases were 5 to 7

5  percent or lower for many years, but then 9.9 percent in

6  October of 2012, January 2013, and May 2013, right before and

7  right after generic entry.  And you can see from this chart

8  that the WAC increased at a greater rate right before and right

9  after generic entry than it had in preceding years.

10        This was no accident.  The documents confirm from

11  AbbVie that this was customary for end-of-life-cycle products.

12  Now, until this morning, the plaintiffs had simply ignored this

13  issue.  They had completely failed to address it, and this

14  morning, for the first time, we heard some argument from

15  Mr. Sorensen, argument is what it is because there was no

16  evidence, argument that no brand WAC increases would happen in

17  the but-for world.

18        So first, let me just start fundamentally, the

19  biggest problem with his analysis is that it assumes that it is

20  the defendants' burden to show that brand WAC increases would

21  have happened in the but-for world, and that's not true.  It is

22  the plaintiffs' burden to prove injury.  So any attempt to

23  shift that burden onto the defendants through the guise of the

24  class action of course violates the Rules Enabling Act.

25        But let me just talk about the specific evidence he

1   cited to, or the arguments he made because I think they all
2   just fundamentally reflect a misunderstanding of how drug
3   companies work.  He made some arguments that it takes a long
4   time to implement brand WAC increases.  Well, there's no
5   evidence of that at all in this record.  He said that if there
6   wasn't enough time, well, then, you can't have an increase.
7   But what the evidence actually shows is there were increases
8   both before and immediately after generic entry.  The increases
9   weren't just right before.

10          He also pointed to a quote from Dr. Stangle where he
11   said, Kos may not have had the time to implement a brand WAC
12   increase.  Now, what Dr. Stangle was doing when he said that --
13   first of all, I hardly think saying "may not" is some sort of
14   concession, but in any event, he was explaining why he took a
15   conservative approach to his damages analysis.  That doesn't
16   mean the defendants can't use that evidence as to injury.
17   Certainly, Dr. Stangle was not making any argument as to
18   injury.

19          Let me talk just for a minute about this at-risk
20   launch scenario, where Mr. Sorensen argued that Kos wouldn't
21   have had enough time.  Well, the plaintiffs' theory of the case
22   is that Kos was expecting an at-risk launch, so under
23   plaintiffs' own theory of the case, if Kos was expecting an
24   at-risk launch by Barr, certainly it had time to implement
25   increases to the brand WAC.  And more fundamentally, the

1  at-risk launch is only one of their theories.  I don't hear the
2  plaintiffs saying that they're only seeking to certify a class
3  as to at-risk launch.  And they have conceded that in the
4  alternative settlement scenario, they have no even argument
5  that there wasn't time or ability for AbbVie or Kos, whoever it
6  may be, to institute brand WAC increases.

7        And finally, the last scenario they talk about is
8  launch after litigation victory, so in this scenario, AbbVie
9  loses at the district court.  That loss is then affirmed on
10 appeal, after which the generic entry enters.  That's the
11 plaintiffs' scenario.  So under that scenario, I think it's
12 perfectly reasonable, if AbbVie loses at the district court,
13 all the time that it's waiting for its appeal to happen, it's
14 probably contingency planning.  And I don't see any reason why
15 we couldn't present or a jury couldn't accept the theory that
16 while it was sitting around mulling over its loss in the
17 district court, probably losing some sleep at night over that
18 loss, it was planning for increased brand WAC in the event it
19 had -- it -- the generic was able to launch.

20       So I think, Your Honor, those arguments, you know,
21 they're new, but that's not my issue with them.  They're really
22 just arguments.  The only evidence in the record is the
23 evidence on Slide 7 that really shows, unequivocally, that
24 Niaspan brand WAC rose at a greater rate in anticipation of and
25 after generic entry than before.  And because that is true,

1  saying that discounts for individual purchasers were higher

2  after generic entry is irrelevant because the plaintiffs'

3  discount comparison does not account for the way manufacturers

4  like AbbVie change the WAC in response to the generic entry.

5  And none of the cases Mr. Sorensen put on a slide or handed up

6  to Your Honor addressed this challenge with respect to

7  plaintiffs' discount analysis.

8          To prove brand-brand injury, plaintiffs need to go

9  class member by class member.  They need to adjust the WAC and

10 then see whether the change in discount would have led the

11 purchaser to pay a lower price.  They never tried to do that,

12 and they certainly couldn't do it using classwide evidence.

13         The DPPs have even bigger problems on generic-generic

14 liability.  I won't spend a lot of time on that.  It

15 presented -- presents the same fundamental issue as in Comcast

16 that we've been talking about, but there's also a separate

17 problem, which is the putative class has 24 members that only

18 ever bought the generic.  They never made any other purchases.

19 So the DPPs have to prove generic-generic injury for those

20 purchasers before they can recover any damages.

21         Mr. Sorensen, I think, seemed to say that, at most,

22 we raise an issue with three purchasers, and while we did, in

23 fact, give three examples where generic only purchasers paid

24 more for the generic when there were two generics on the market

25 than when they were one, it's not our burden to identify every

1  potentially uninjured consumer.  What we did is explained why
2  Dr. Leitzinger's averages do not hold true for each individual
3  class members.  And the key takeaway there is that evidence
4  about average prices is not sufficient to show injury because
5  they have no proof that those averages reflect what happened
6  for each individual generic Niaspan purchaser.  And that means
7  again, every class member needs to show generic-generic injury
8  individually to recover generic-generic damages.

9          Let me address Your Honor's third question, which is,
10 well, what's the path forward if the Court concludes that the
11 DPPs can't show brand-brand or generic-generic injury using
12 common evidence?  I think there are two remedial options.  The
13 first is to deny certification entirely.  The Third Circuit
14 made clear in Hydrogen Peroxide that common issues do not
15 predominate if the fact of injury cannot be established through
16 common proof.

17         Because classwide proof can't show brand-brand or
18 generic-generic injury, we would need separate evidence for 18
19 brand purchasers and 40 generic purchasers, and the jury would
20 have to make injury determinations as to each one.  This is not
21 addressing three individuals in summary judgment briefing.  It
22 would take substantial time and resources, overwhelming the
23 other issues of the case.  So I think that's option Number 1,
24 deny certification entirely.

25         The second option, if Your Honor agrees plaintiffs

68

1  can't show brand-brand or generic-generic injury with classwide

2  evidence, but you don't think that issue predominates, this

3  Court can certify a set of issues for classwide resolution but

4  exclude brand-brand and generic-generic injury.  Rule 23(c)(4)

5  gives this Court discretion to certify a class action with

6  respect to particular issues, and that provision is designed

7  for situations where common issues predominate so a class can

8  be certified, but the Court has to manage individualized issues

9  in the case.  And the Third Circuit addressed 23(c)(4) in the

10 Gates case, and it said it imposes a duty on the Court.  This

11 is at Page 255 of the decision.

12            "To ensure that only those questions which are

13            appropriate for class adjudication be certified.  And

14            it gives the Court ample power to treat common things

15            in common, and to distinguish the distinguishable."

16            So here, this is how it would work.  The Court would

17 certify a class on market definition, whether the settlement

18 was anti-competitive, whether earlier entry would have

19 happened, but for the settlement.  Brand-generic injury.  And

20 brand-generic damages.  That means the Court can conduct a

21 trial that resolves a number of important classwide liability

22 issues, and it can also resolve brand-generic injury and

23 damages.

24            After that's over, if the class prevails on

25 liability, and putative class members want to prove brand-brand

1  or generic-generic injury, this Court could hold separate

2  proceedings where those plaintiffs, either litigating alone or

3  through joinder, could seek to prove that they suffered those

4  injuries, and the amount of damages.  Now, in this second

5  approach, the DPPs would not be pursuing brand-brand or

6  generic-generic damages on a classwide basis.  That would solve

7  the Comcast problem because it would eliminate the risk of

8  awarding damages to the class for a theory of injury that was

9  not proven on a classwide basis.

10        Now, Mr. Sorensen has suggested that they can just

11  present the jury with their supposed common evidence of

12  brand-brand and generic-generic injury, and if the jury doesn't

13  think it's enough, the jury will just reject the argument.

14  That approach doesn't make sense for a couple of reasons.

15  First, it ignores that injury is not an all-or-nothing issue.

16  Even if common evidence doesn't show brand-brand or

17  generic-generic injury, that does not mean no class member

18  incurred those injuries, and that's what creates the

19  predominance problem.

20        When DPPs common proof fails, the case will devolve

21  into individualized inquiries to figure out which purchasers

22  actually suffered those types of injuries.  The Supreme Court

23  addressed this exact issue in the Amgen case, where it

24  explained predominance problems can arise when a failure of

25  proof on a common issue results in a number of individualized

1   issues arising as opposed to the plaintiffs' claims failing

2   across the board.  If plaintiffs can't show brand-brand or

3   generic-generic injury using common evidence, those plaintiffs

4   don't just all go home empty.  They still should have the

5   opportunity to pursue those theories of injury on an individual

6   basis.

7           THE COURT:  How can that be done?

8           MS. ALLON:  Your Honor, I think it can be done in the

9   proceeding I outlined before, which is we conduct the trial on

10  the issues that are common.  There are significant liability

11  issues that will be common to every single class member.  We

12  conduct a trial on all of those issues.  That's market

13  definition, whether the settlement was anti-competitive,

14  whether earlier generic entry would have happened, but for the

15  settlement.  And we can also conduct a trial on a classwide

16  basis on brand-generic injury and brand-brand -- and

17  brand-generic damages.

18          After that trial is over, assuming the class prevails

19  on liability, obviously, any individual class member who wants

20  to pursue brand-brand or generic-generic damages can do so.

21  They could have an individualized proceeding where they prove

22  that they suffered those injuries and the amount of damages

23  they're entitled to.  And that allows this Court to resolve

24  important common issues on a classwide basis, but also make

25  sure the defendants have the right, as the Supreme Court

1  guaranteed, to challenge each class member's proof of injury

2  where that injury depends on individual facts.  We have to be

3  able to do that.  And --

4          THE COURT:  What's -- what case are you referring to?

5          MS. ALLON:  The last case I was referring to was the

6  Asacol case from the First Circuit --

7          THE COURT:  Okay.

8          MS. ALLON:  -- interpreting Tyson Foods.  And I think

9  the last problem with the -- well, two -- two more problems

10 with the plaintiffs' suggestion.  As I mentioned before, it

11 flips the burden of proof.  It is not the defendants' job to

12 identify which putative class members suffered an injury, and

13 which didn't.  The plaintiffs have to prove they suffered an

14 injury before they can recover damages.  And what the DPPs are

15 proposing is, they put evidence about average prices, and then

16 all of a sudden, the burden shifts to us to show which class

17 members don't conform to those averages.  But that changes the

18 burden in a way that is improper under Tyson Foods.  It's a

19 violation of the Rules Enabling Act.

20         And the final problem with plaintiffs' proposal that

21 we just let this all go to the jury is they have no suggestion

22 for how to manageably implement what they're proposing.  There

23 has to be a mechanism for defendants to challenge which

24 purchasers actually suffered a brand-brand or generic-generic

25 injury.  And the DPPs haven't proposed a mechanism through

1  which we can do that, and it also can't limit us to the false

2  choice that either all class members suffered an injury, or all

3  class members did not.

4        The DDPs don't say, does the jury have to rule

5  against their theory if they prove one brand purchaser didn't

6  suffer an injury?  How about two?  How about ten?  They have no

7  suggestion for how that is supposed to be managed, keeping in

8  mind the dictate from the Supreme Court that we be entitled to

9  confront each plaintiff individually where their proof of

10 injury lies on individualized issues.  And they have no

11 explanation for how the jury is supposed to identify which

12 purchasers did or did not suffer brand-brand or generic-generic

13 injury, and how to adjust the damages accordingly.  That

14 requires individualized analysis.  As a result, the only

15 options are either to deny the certification entirely, or at a

16 minimum, rule that defendants cannot pursue brand-brand or

17 generic-generic injury and damages on a classwide basis.

18        Finally, I'd like to briefly address Your Honor's

19 question of whether litigating through joinder is practicable.

20 My answer, not surprisingly, is yes.  And this class here is

21 exactly the kind of unusual class that we had in Modafinil.

22 The total class size is small, just a few purchasers make up

23 the vast majority of damages.  The big three here account for

24 89 percent of alleged damages.  The five largest purchasers

25 account for over 96 percent of alleged damages.

1           As the Third Circuit in <u>Modafinil</u> made clear, the
2  number of class members is not dispositive, and the rules
3  require a fact-based analysis, given the context of the
4  particular case.  Now, the numbers are a starting point, and
5  certainly, courts often certify classes when there are more
6  than 40, but that observation about the general trend doesn't
7  tell you how to resolve particular cases, and that trend is
8  anything but uniform.  We cite in our brief lots of situations
9  where the Court has denied certification for classes of over a
10 hundred members, particularly when those putative class members
11 are, like the class members here, sophisticated, well-funded
12 entities with the financial incentive to litigate.  And it is
13 particularly inappropriate to focus on numbers here, because as
14 the Third Circuit made clear in <u>Modafinil</u>, a class like this
15 one, where a small number of class members make up the vast
16 majority of damages, needs a special justification because it
17 doesn't implicate the usual policy concerns that warrant
18 23(b)(3) class actions.
19          So what are the two factors the Third Circuit looks
20 to, manageability of litigating through joinder and the
21 purchases -- purchaser's incentives to litigate through
22 joinder.  Both factor against certifying a class.
23          First, this is a small and fairly unusual class.
24 It's 42 or 48, depending on how you resolve the dispute over
25 whether companies that have merged should be treated as one

1   class member.  But joinder through 42 or even 48 plaintiffs is

2   practicable.  It is the plaintiffs' burden to identify reasons

3   why joinder would be impractical, and they don't give any.  The

4   parties could coordinate discovery.  We did it in this case.

5   We had two classes, eight opt-outs, assignments from three

6   wholesalers.  You could also coordinate expert work, like the

7   opt-outs did here.  When it comes to trial, we can have

8   bellwethers, we can proceed in groups.  It would allow parties

9   to efficiently move the cases along or settle without depriving

10  defendants of the right to challenge injury for individual

11  purchasers.

12          And in fact, the aftermath of the Modafinil decision

13  shows that litigating through joinder is practicable.  Eighteen

14  of twenty-four putative class members have litigated through

15  joinder, including all of the big three, which make up the vast

16  majority of damages.  And the fact that not everyone decided to

17  litigate doesn't help the plaintiffs.  There's no evidence

18  about why.  The standard is, would joinder be impracticable,

19  not would every single putative class member necessarily go

20  ahead with litigating.

21          Second, the members here all have the ability and

22  financial incentive to litigate through joinder.  Mr. Sorensen

23  made a comment that the members of the class here are small,

24  and I'm having a hard time understanding what he's referring

25  to.  If you look at Slide 14, we explain that virtually all

1 members of the proposed class have the resources to litigate
2 through joinder.  The putative class has some of the largest
3 companies in the United States.  The big three, WalMart, Cigna,
4 and all the other members of the class, have tens of million in
5 annual sales.

6        Not only are these putative class members large, they
7 have positive value suits.  The plaintiffs say it'll cost
8 $3 million to litigate reverse-payment cases, litigating
9 individually, and they use that number to argue that many class
10 members have negative-value suits, but that's incorrect.  The
11 Third Circuit made clear in Modafinil, it's at 253, 257, and
12 258 of the decision, that the question for numerosity is not
13 whether parties have the financial incentive to litigate
14 individually.  It's whether they have the incentive to litigate
15 through joinder.  And our expert calculated that if members of
16 the proposed class split the $3 million in costs, 41 out of 42
17 would have positive value suits.  The only class member that
18 would not have a positive value suit is Professional Drug.
19 It's a named plaintiff, so obviously, it has the incentive to
20 litigate, regardless.

21        Mr. Sorensen made a brief point about the fear of
22 retaliation, the idea that class members won't litigate through
23 joinder for fear of retaliation.  He himself admitted that the
24 King Drug court rejected that same argument.  There is no
25 evidence that manufacturers have ever retaliated, and there's

1   no reason to think there's a greater risk of retaliation on

2   joinder than in the class.

3          Although the DPPs' proposed class ostensibly has a

4   few more members than the class in Modafinil, the core features

5   are the same.  The big three account for the vast majority of

6   damages, and essentially all of the putative class members have

7   positive-value claims.  In this case, litigating through

8   joinder would be practicable, and in light of the many

9   individualized injury issues, it would also be preferable to

10  class action.  So there is no justification for a different

11  result here than in Modafinil.

12         Unless Your Honor has any other questions, I have

13  concluded my presentation.

14         THE COURT:  I do not.  Thank you very much.

15         MS. ALLON:  Thank you, Your Honor.

16         MR. SORENSEN:  Can I briefly respond, Your Honor?

17         THE COURT:  You may.

18     (Counsel confer)

19         MR. SORENSEN:  So, Your Honor, I want to start with

20  this brand WAC price increase issue.  First, in terms of

21  evidence, the evidence we cite that in fact, in a but-for

22  world, the brand would not have changed, is -- we cited

23  evidence.  We cite their expert, who acknowledges that in an

24  at-risk scenario, he's not assuming any change in WAC price,

25  other than what actually happened.  It's their expert.  We cite

1 his report.  That's evidence.  It's not argument.  It's their

2 own expert.

3         In terms of the brand WAC price, Dr. Leitzinger uses

4 the actual brand WAC price.  That is what actually was charged

5 at -- over time.  And then he moves the discount back.  So he's

6 using -- he's not making up these prices, and he's not doing

7 something else.  He's using the actual prices.  They're saying,

8 no, no, no, WAC price would have changed their earlier entry.

9 That's an argument that they're presenting.  They can make that

10 argument to the jury, but notice in this Slide 7 --

11         THE COURT:  I have it.

12         MR. SORENSEN:  Slide 7.  This price hike right back

13 here in '07 which is larger than the other price hikes, this

14 price hike, noticeably larger, right towards the left of the

15 screen, was not taken in anticipation of generic entry because

16 back in '05, the parties had reached what we consider an

17 illegal agreement to keep the generic off until 2013.  So

18 there's no argument that anyone has made that this noticeably

19 higher price hike was due to anticipated generic competition.

20         So when the jury sees that, they don't have to accept

21 the idea that these later price hikes were necessarily caused

22 by anticipated generic competition, this one was not.  I mean,

23 they could try to argue that, I'm not -- you know, that's what

24 their expert says, and he'll tell the jury their story.  He'll

25 say, oh, if -- with earlier generic entry, they would have done

1  this, and I don't know if they'll try to offer some explanation

2  for this price hike or not.  But he admits --

3        THE COURT:  Well, this slide you're referring to

4  shows substantial price hikes before generic entry and after

5  generic entry.

6        MR. SORENSEN:  Yes.  And the price hikes -- again,

7  these are actual prices.  And again, we use actual discounts.

8  Now, they want to shift, I don't know exactly what they want to

9  shift back.  They haven't shown -- if you go to --

10        THE COURT:  Well, you want to shift back.

11        MR. SORENSEN:  No, we want to shift back discounts,

12  the relative discounts.  Now, they want to -- if we go to

13  Slide 6, can we go one back?  They present this slide with this

14  dotted line to show the mathematical possibility that higher

15  brand prices, if -- a bunch more prices back here were much

16  higher, it might mathematically cancel out an increased

17  discount.  And my point about this slide is that it's pure

18  illustration.  This dotted line is not from their expert, it's

19  not some calculation he did to show the effect of moving these

20  prices back.  This is, presumably, lawyers, perhaps with help

21  from their expert.  This is pure illustration.  It's pure

22  demonstrative argument.  It is not evidence -- talk about not

23  evidence of anything, it's not evidence of anything.  These --

24  this is not an actual calculation of their expert of what

25  but-for prices would have looked like.

1          The more -- the most important point, again, Your
2     Honor, is that -- not to go back to the debate between looking
3     at absolute brand prices and discounts, but their other chart,
4     that shows the 11 who had higher prices, and we have our chart
5     that shows they all got better discounts.

6          There's two experts talking about their charts.  This
7     is the same thing that happened in Loestrin.  We had a
8     hearing -- that's the case that just got certified.  Same
9     issue.  We had a hearing in that case.  The Court entertained
10    expert testimony.  Same debate occurred.  Dr. Leitzinger, same
11    expert, testified about his use of discount analysis.  Their
12    expert said, oh, you've got to look at actual prices.  When
13    other arguments remained, and Loestrin was, well, the
14    defendants' contact -- or conduct, has distorted this whole
15    market.  And you can't look at actual prices for that reason,
16    among others.

17         Same argument as here.  We had a chart that showed
18    you the vast difference between the -- what actually happened
19    with illegal delay, what we say was illegal delay, and what
20    would have happened.  The vast difference, among other
21    differences, is that in the but-for world, or without illegal
22    delay, you'd have two generics competing head to head for
23    years, for years, versus just a few months.  The whole -- the
24    market is tainted and distorted.  Same argument that took place
25    in Loestrin.

1          The Court there, in certifying the class, said

2   discuss this, said that we had met our burden, and said, going

3   forward, that argument, then, can be presented to the jury, and

4   the jury can decide.  The same thing here.  We go to the jury,

5   we have a classwide trial, as we've sought to be certified.

6   The defendants try to make this argument.  It's two experts

7   debating this point.  Discounts, prices, discounts, prices, and

8   they decide.  It does not turn that trial into some highly

9   individualized, unmanageable, individual trial.

10          Even assuming, even granting every assumption to the

11  defendants that their expert is permitted to present that chart

12  and go through each of the 11, that does not take very long.

13  You have to be realistic about looking at what a trial actually

14  looks like.  That's what courts are commanding to courts when

15  they certify, take a look at what this trial is really going to

16  look like.  The public record of Nexium is available.  That's a

17  class trial.  We were preparing for Provigil, we were preparing

18  for Solodyn, we're preparing for Namenda.  The constant pattern

19  is that the vast bulk of these trials is completely common, and

20  even if they want to indulge in this looking at the 11, that's

21  a blip in a six-week class trial.  And it's two witnesses.

22          Your Honor, in terms of Comcast, not to belabor that,

23  we have obviously very different views of that case.  And

24  again, I come back to the Supreme Court's statement that a

25  problem that the Supreme Court identified was that with three

1  theories of violation knocked out, the model of damages for the

2  plaintiff is still, quote, "identified damages that are not the

3  result of the wrong."  Not the result of the wrong.  They have

4  one number, and yet four theories are -- four theories of

5  violation are feeding into it, and three are gone.  And the

6  plaintiffs hadn't adjusted their model.

7           There is no argument that the brand purchasers who

8  got better prices, the ones that even they conceded got better

9  prices, that they didn't suffer BB because of delayed generic

10 entry.  They're not pointing to other conduct that is

11 potentially innocent that is feeding into Dr. Leitzinger's

12 model.

13          THE COURT:  And your point is that that distinguishes

14 this --

15          MR. SORENSEN:  Yes.

16          THE COURT:  -- case from --

17          MR. SORENSEN:  That is --

18          THE COURT:  -- Comcast.

19          MR. SORENSEN:  -- fundamentally different than

20 Comcast.  Fundamentally.  The quote of the Supreme Court makes

21 that clear.  The Third Circuit's Modafinil quote, interpreting

22 Comcast as saying that the problem in Comcast was the model

23 reflected -- this is a quote -- quote, "reflected injury from

24 all four alleged anti-trust violations," closed quote.  Four

25 antitrust violations is the way the Third Circuit characterized

1 it.

2          THE COURT:  That was in <u>Modafinil</u>.

3          MR. SORENSEN:  That was in <u>Modafinil</u> at Page 261.

4 So, Your Honor, we think that you're fundamentally misreading

5 <u>Comcast</u>.

6          Again, in the BB, BG and GG are -- contribute to the

7 damage calculation.  As I said, we can prove injury of all

8 three types on a classwide basis, although we don't have to.

9 And this two product issue, there's one product here.  It's

10 extended-release niacin.

11         Very early on in these cases, in fact, in the

12 <u>Cardizem</u> case, the defendants made this apples and orange,

13 two-product argument.  They were arguing way back when that

14 brand and generics are different products.  And the <u>Cardizem</u>

15 case very quickly dispensed with that argument, and it's never

16 gotten any traction in any case ever since.  It -- it's one

17 product, it's extended-release niacin.  And so for that reason

18 and the other reasons, we don't think that their <u>Comcast</u>

19 argument is correct.

20         Let's see what else.  Your Honor, they briefly

21 touched on GG class members.  I won't belabor this.  We've

22 extensively discussed this in our briefing and our last

23 argument.  I'll just mention that again, we do have common

24 evidence for injury as to all GG class members.  We understand

25 that that's our burden, to show that there's a predominantly

1 common way of proving that, and we have done that through

2 research forecasts and data.  And their response has been to

3 point to three potentially uninjured class members.  That's

4 their response.  And every case that has looked at GG class

5 members has certified such classes, most recently in <u>Loestrin</u>,

6 using the same kind of common evidence that Dr. Leitzinger is

7 presenting here.

8        And in terms of injury, just to note that <u>Asacol</u>

9 and -- involved potentially thousands of uninjured class

10 members.  Obviously, that's not what's going on here.  And we

11 have proposed a mechanism by which the defendants, if they are

12 interested in challenging the three generic class members as

13 not being injured, can do so, either after trial or during

14 trial.  After trial during the damages allocation, which is

15 what happened in <u>Tyson Foods</u> on remand, before a magistrate or

16 a special master, or during trial with their question to the

17 jury once they've heard the two experts testify, if they pursue

18 that argument at all.  So we're not saying that it has no

19 place, and we haven't -- it's not that we haven't offered a

20 procedure.  We have.

21        THE COURT:  Well, I think that the defendants were

22 arguing that aggregate damages are affected by this issue.

23        MR. SORENSEN:  Well, they can certainly challenge

24 aggregate damages, and their expert does criticize aggregate

25 damages.  That -- they say the number's too high.  Well, the

84

1  jury is perfectly competent to sort that out.  They'll make

2  their arguments, the aggregate number's too high, we'll say

3  it's not, and the jury will decide.  I cited you several cases.

4  There are more the courts recognized.  Even in complex cases,

5  even with complex economic models, jurors are perfectly

6  competent to make the adjustments as they see fit in light of

7  the evidence.  That's what's going to happen here.

8           It's -- we're not saying they can't challenge the

9  number, and have to accept it.  They can, and I expect that

10 they will.  And if the jury buys it, then so be it.  And if the

11 jury rejects it, the jury rejects it.  But it's not the case

12 that they won't have an opportunity.  They will.

13          Unless Your Honor has other questions, I think -- I

14 mean, I'll stand on the rest in terms of the numerosity issue.

15 If you're --

16          THE COURT:  No, I have no other --

17          MR. SORENSEN:  -- if there's anything else?

18          THE COURT:  I have no other questions.

19          MR. SORENSEN:  Okay.  Thank you, Your Honor.

20          MS. ALLON:  Your Honor, could I just very briefly

21 take two --

22          THE COURT:  Fine.

23          MS. ALLON:  Thank you, Your Honor, I'll be very

24 brief.  The first is just to circle back to what Comcast

25 actually says, Page 31.

1              THE COURT:  Let me go there.  Page?

2              MS. ALLON:  31, Your Honor.

3              THE COURT:  Go ahead.

4              MS. ALLON:  "Respondents proposed four theories of

5    antitrust impact."  That's what we call injury.  It goes

6    through what the four theories are, and then it says, "Each of

7    these forms of impact increase cable subscription rates."

8    That's exactly what the plaintiffs have done here.  They say,

9    plaintiffs paid higher rates for drugs.  Three different

10   theories of how that injury happened:  Brand-generic,

11   brand-brand, generic, generic.  And again, Footnote 3 is the

12   critical footnote, which is:

13              "District Court didn't say the three alternative

14              theories of liability failed to show impact, just

15              that those theories could not be determined in a

16              manner common to all class plaintiffs."

17              So the DPPs say they're claiming one anti-competitive

18   action, that's the settlement, and one type of injury, the

19   overcharge.  That's exactly the same thing as Comcast.  One

20   clustering scheme, that's what the Supreme Court said, one

21   injury, overcharge.  Four different theories about how the

22   anti-competitive injury caused the overcharge.

23              THE COURT:  Where do they say one clustering scheme,

24   four different injuries?

25              MS. ALLON:  It's on Page 30.

1            THE COURT:  All right, I'm there.

2            MS. ALLON:  I actually don't have the page before it,

3    I just have this one page, but I can feed the quote.  From

4    here, where they say -- it's the paragraph that starts with the

5    named plaintiffs, they filed a class-action antitrust suit, and

6    they claimed that the petitioners entered into unlawful swap

7    agreements.  This is the petitioners' clustering scheme.  One

8    theory, harm subscribers by eliminating competition and holding

9    prices for cable services above competitive levels.  It's

10   exactly analogous with what we have here.

11           MR. SORENSEN:  Could you say what page you're on,

12   please?

13           MS. ALLON:  30.  The -- this other point I just

14   wanted to make very briefly, Your Honor, is about the reality

15   of what this trial would look like if we had to talk about

16   brand-brand and generic-generic injury in the context of a

17   class action.  Mr. Sorensen makes it seem like it's just an

18   issue of one expert gets up and says prices, one expert gets up

19   and say discounts, the jury decides.  Well, it's not nearly as

20   simple as that.

21           First of all, we've shown when you look at prices,

22   there's many, many potentially uninjured class members.  We've

23   also shown why the plaintiffs' discount analysis doesn't work.

24   So it's not as simple as a debate between prices and discounts,

25   and it's not as simple as a debate between experts.  We would

1  have the right, if we're challenging individual evidence, to

2  call every single purchaser, examine that purchaser.

3            So for example, if we say Cardinal didn't suffer any

4  injury, we can seek to subpoena Cardinal and seek testimony in

5  front of the jury about how it made its purchasing decisions,

6  how those negotiations went, who were its customers that drove

7  what it chose to purchase, and that would devolve into 19

8  mini-trials.  This is not a one or two-hour interlude, it is

9  exactly what the predominance inquiry was intended to prevent.

10           Thank you, Your Honor.

11           THE COURT:  Thank you.  All right.  I think what

12  we'll do is recess briefly for lunch, and I'm looking at the --

13  again, the letter.  We've talked about all of the direct

14  purchaser issues.  I inquired about -- I think we'll proceed

15  with the end-payor motions after lunch, and the focus should be

16  on ascertainability.  It's not quite 20 minutes of 1.  I don't

17  usually put things to a vote.  How much time do we need for

18  lunch?  Forty-five minutes?

19           MR. SORENSEN:  Sounds good.

20           THE COURT:  Well, except you're not going to have to

21  do much after lunch, Mr. Sorensen.

22           UNIDENTIFIED:  That's fine, Your Honor.

23           THE COURT:  All right.  Let's recess until -- make it

24  20 after, 20 after 1.

25           THE CLERK:  All rise.

1      (Recess taken at 12:38 p.m.)

2      (Proceedings resumed at 1:31 p.m.)

3          THE CLERK:  All rise.

4          THE COURT:  Good afternoon, everyone.  Please be

5  seated.

6          UNIDENTIFIED:  Good afternoon, Your Honor.

7          THE COURT:  We'll continue with the second part of

8  the hearing on the motions for class certification.  But this

9  time, this session will focus on the end-payor plaintiffs.  And

10  I'd like to start with the first question on my letter of

11  July 18th, what is the evidence plaintiffs intend to rely upon

12  in proving by a preponderance that there is a reliable and

13  administratively feasible mechanism for identifying all

14  categories of purchasers excluded from the classes.

15          In that connection, I note that the slide that was

16  used to demonstrate this issue at the first conference did not

17  address each of these categories of exclusions.

18          MR. WEXLER:  Your Honor, we have fixed that.

19          THE COURT:  Good.  I'm looking for that slide.

20          UNIDENTIFIED:  Forget that slide.

21          THE COURT:  I have that slide.

22          MR. WEXLER:  Okay.

23          THE COURT:  I have it marked.

24          MR. WEXLER:  Can I hand this up, Your Honor?

25          THE COURT:  You may.

1          New slide, then?

2          UNIDENTIFIED:  Yes, there's two versions.  This is

3 the one that's most convenient.

4          MR. WEXLER:  They're the same, yeah.  Whichever one

5 is more convenient to use.  We had two different styles, so

6 it's up to you.

7          THE COURT:  I'll take the easier one.

8          MR. WEXLER:  Okay.

9          Slide 8 directly addresses your question.

10          THE COURT:  All right.

11          MR. WEXLER:  But I would like to start, if I could,

12 in discussing what is a reliable and administratively feasible

13 mechanism for identifying members of the class.

14          THE COURT:  Fine.

15          MR. WEXLER:  Okay.

16          A reliable and administratively feasible method for

17 identifying a class means that there are records today from

18 which you can determine class membership in a way that is

19 normally used in a successful class action.  That comes from

20 the Byrd and City Select decisions.  So the question today is

21 if you certify a class, can class membership be determined if

22 this case is successful.  That's it.

23          The Third Circuit, unfortunately, has not been a

24 paragon of clarity, but if Your Honor focuses on the facts of

25 each case and where we have been led through the case law and

1  up through <u>City Select</u>, this is where we end up.  A class is

2  ascertainable if, today, objective records exist at the time of

3  certification and they are the kinds of records that would be

4  consulted if this case is successful and people make claims as

5  purported members of the class.

6          Now there's two rationale, two core rationale, for

7  the ascertainability rule.  One is -- and I discuss it in

8  Slide 2.  The first rationale, Your Honor, was focused on the

9  best notice practicable at our last hearing.  That language

10 through Judge Scirica in <u>City Select</u> is somewhat different now,

11 although there really -- they say the same thing, which is the

12 first rationale is that class members be able to self-identify

13 for purposes of opting out if they so choose.

14         Now, one thing we know, the Third Circuit says

15 affidavits are not objective records.  They're just not.  But

16 the question is, how can a consumer, or a third-party payer,

17 self-identify whether or not they paid for all or part of the

18 purchase price of Niaspan during the class period?  Are there

19 objective records of that?  And there are.  We've put on

20 evidence that there are.

21         The second rationale for the ascertainability

22 requirement is for the defendant to know who was bound by the

23 judgment.  So if, five years from now, someone sues AbbVie for

24 antitrust violations under state law for engaging in a reverse

25 payment settlement agreement, all AbbVie has to do is say, let

1  me see your records.  The records will show whether or not they

2  were a member of the class.  Whether they opted out will be

3  recorded.  They will know who is bound by the judgment.  Those

4  are the two rationale, the core rationale.

5        In Drywall, those two rationale were discussed in a

6  very different context where affidavits, again, were used or

7  people -- the methodology, the way that people today, the day

8  that they were seeking class certification, people were

9  supposed to prove class membership, was to bring in or take a

10  picture of their drywall, which the court said, hey, it's in

11  the wall.  What are you going to do, ask people to knock down

12  their walls and take pictures of -- we don't even know if the

13  stamp on the back of the drywall is still there?  But it was

14  that coupled with affidavits.  Affidavits are not records in

15  the Third Circuit.

16        Nowhere, do we say that class membership is

17  determinable in this case by consulting affidavits.  That was

18  the death knell in Carrera, Marcus, Hayes, Drywall, and

19  Processed Eggs.  That was it.  You can't -- what people said,

20  and I suspect Mr. Senator will get up and say, well, in

21  Carrera, they brought in a claims administrator who said they

22  could weed out fraudulent affidavits.  And so that was at the

23  end of the case.

24        And when I say, it's -- we look at objective records,

25  do they exist today, and are they the kinds of records that are

1  looked at in a successful class action.  I'm not talking about

2  bringing in a claims administrator today, or anybody else, to

3  tell us that these records are reliable.  They are.  They

4  exist.  That's why the Third Circuit held -- it has held that

5  you only need a reliable and administratively feasible method

6  for ascertaining class members where the defendant doesn't have

7  records.  If they have records, the class is ascertainable so

8  long as the class is defined with respect -- or with reference

9  to objective criteria, which we have.

10         But let's go to Byrd.  Let's go to the language --

11  Slide 3, which discusses what the cases reflect are the marks

12  of a reliable and administratively feasible means of

13  ascertaining a class.  In Marcus, Hayes, Carrera, Processed

14  Eggs, and Drywall, there were no databases.  There were no

15  other sources of objective records.  There were some -- in

16  Drywall, there were some big-box store receipts, but they were

17  very incomplete, and no other -- there was no evidence any

18  other retailer had records.  And the class wasn't

19  ascertainable.

20         In Byrd and City Select, there were databases.  There

21  were records.  In Byrd, the Third Circuit made a point about

22  the fact that we knew the names and addresses of one group of

23  class members from which we could consult public records to

24  determine who was a household member.  Those were the records.

25         In City Select, the court didn't say the class was

1  ascertainable, but it sent the case back because on appeal, or

2  it probably -- well, below and on appeal, the court was

3  persuaded by the fact that there existed a database way broader

4  than the class as defined, but from which it was possible, the

5  court didn't know it, to extract the names of class members.

6       Now, the important things about these cases, in City

7  Select, judge -- writing for the court, Judge Scirica said the

8  fact that there's some inquiry that has to be made doesn't mean

9  the class isn't ascertainable.  And in Byrd, the court noted

10  that having to figure out who's in the class is not a

11  mini-trial, and, quote, "indeed must be done in most successful

12  class actions."

13       So here we are, today, do we have records?  We've put

14  on evidence that PBMs.  We've put on evidence from PBMs that

15  they have a recording of every pharmaceutical transaction with

16  which they are involved, including the names of every

17  third-party payer and every consumer, that the records contain

18  plan designs and whatnot.  Large insurers have the same

19  records.

20       Consumers can go to pharmacies.  Pharmacies keep

21  records of every pharmaceutical transaction over the class

22  period.  Our plaintiffs have produced records.  The defendants

23  haven't challenged ascertainability of the named plaintiffs.

24  They have their records.  They haven't said that the records

25  are unreliable, that somehow they're not indicative of whether

94

1   or not these are members of the class or appropriate

2   plaintiffs.  These are the records that exist today.

3          If the case is successful and people make claims,

4   they're going to have to produce their records with their

5   claims, third-party payers and consumers alike.  Now, we've

6   gone further.  It's not just the existence of records or that

7   people will produce them if the case is successful.  We've gone

8   further today.  We have said, today, we can't obtain those

9   records today.  They're not -- they don't have to be made up.

10  Nobody has to create a record.  Nobody has to do anything other

11  than obtain the record.

12         We have put on evidence that we can obtain the

13  record, and we've put on evidence that the records yield the

14  names of class members.  What else can be done?  Nothing.  What

15  else could tell you or the defendant that this class exists and

16  it's an ascertainable class?  I don't see where the case law

17  requires us to do anything more.

18         Now, the only attack is on Ms. Craft.  They've moved,

19  you know, in limine, saying that she says she can read the

20  records and somehow she is not reliable.  But the issue from

21  these cases is whether the records are reliable.  The Third

22  Circuit has been clear.  Affidavits are not reliable.  But

23  these are objective records.  We've put on evidence that

24  they've been used before in cases like this for similar

25  purposes, and we've put on evidence that they are usable in

1  this case in the way that Ms. Craft says.

2          So they can disagree.  They've had their opportunity

3  to say, we don't think that you can ascertain the class.  But

4  we've put on evidence which is what's required.  That's what

5  we've done.  That's what doomed the classes in Wellbutrin and

6  in Provigil, the lack of evidence, firm evidence, that there

7  were records reflecting the names and addresses of class

8  members that would be consulted in a successful class action

9  and could be consulted in a successful class action, which

10  success is at the end of the case, not before.

11          Now, the reason, again, one of the doctrines that's

12  come out of the case law is that the methodology has to be

13  consistent with the efficiencies of a class action, which is

14  why in Byrd -- I don't want to interrupt her.

15          THE COURT:  Well, you're going into a lot of

16  background, but not addressing my question.  And my question

17  dealt with exclusions.

18          MR. WEXLER:  Correct.  I'll be happy to move to them.

19          THE COURT:  Well, I'm -- let's assume arguendo that

20  you can show by a preponderance that you can identify the

21  purchasers of Niaspan.  I'd like to go through whatever --

22          MR. WEXLER:  Certainly.

23          THE COURT:  Again, let's go back to the magic words.

24  I want to be sure -- I want to be certain you have a reliable

25  and administratively feasible mechanism for identifying all

1  categories of purchasers excluded from the class.

2          MR. WEXLER:  Right, and I -- Your Honor, that's one

3  of the reasons why I started with what it means to identify

4  class members because the rationales -- I mean, the rationales

5  don't necessarily apply to exclusions.  But we can do that.

6  We've gone through it here.  We go one by one, and I'm happy to

7  do that.

8          THE COURT:  That's what I want you to do.

9          MR. WEXLER:  And I'm doing it.

10          THE COURT:  And let's start with -- I note that the

11  list in the first of the tape decks -- slots -- tape slots,

12  slide decks covered four, six, eight categories of exclusions.

13  Some satisfactory, some not.  I'm looking for my list of

14  exclusions.

15          I'll find it.

16          MR. WEXLER:  They are on Slide 8, Your Honor.

17          THE COURT:  All of them?

18          MR. WEXLER:  All of them.  The ones that we've

19  identified in the class motion.

20          THE COURT:  Yes.

21          MR. WEXLER:  So if you go to Slide 9, I start out

22  with those that there are records either in the defendants'

23  possession or I think you know who your family members are.

24          THE COURT:  Yes.  Let me get -- bear with me.

25          MR. WEXLER:  Sure.

1          THE COURT:  I have -- all right.  You may proceed.

2          MR. WEXLER:  Okay.

3          So exclusions A, E, I, and J in our class motion,

4   these -- I mean, defendants and their office -- defendants have

5   these records, they know who you are.  They might not know

6   under I who the members of your immediate families are, but I

7   think you would identify them.  I think for these exclusions,

8   under Marcus, there is no need for an administratively -- a

9   reliable and administratively feasible mechanism for

10  identifying these members because there are already records

11  of -- in defendants' possession.

12         THE COURT:  You're talking about A, B, and I?

13         MR. WEXLER:  A, E, I, and J.

14         THE COURT:  All right.

15         MR. WEXLER:  So moving on to Slide 10, we discuss the

16  records that exist with respect to B, all federal or state

17  government entities other than cities, towns, or municipalities

18  with self-funded prescription drug plans.

19         And, again, we refer to the records that have been

20  testified to by our experts that reflect these things.  But

21  also, if you look at the purpose of the rule where one of

22  the -- the first of the core rationales for the rule, which is

23  the ability to self-identify and opt out.  Certainly, these

24  folks, or these entities, can self-identify.  They have their

25  own records internally of whether they fit this category or

1  not, although their need to opt out doesn't exist.  And if

2  defendants want to know if they're sued somewhere down the line

3  by one of these entities and defendants want to know if they

4  were bound by the judgment or excluded from the class, I mean,

5  by definition, they would have been excluded, and defendants

6  could ask for their records and know that.

7         The next exclusion, C, which is on Slide 11, which is

8  all persons or entities who, after September 20, 2013, paid

9  and/or provided reimbursement for branded Niaspan and did not

10 pay and/or provide reimbursement for generic Niaspan, so-called

11 "brand loyalists."  Once again, we have evidence of the

12 electronic records of the identities of persons fitting the

13 exclusion which we have testimony those records can be analyzed

14 to determine if somebody just purchased brand.  And we do have

15 a discussion of this at Pages 23 to 26 of our reply brief.

16         It's worth noting, as we do here, that

17 non-overcharged brand prescriptions are excluded from damages

18 across the entire class.  They're not there.  And they're only

19 calculated with respect to class members who would have

20 switched to generic Niaspan or purchased generic Niaspan at the

21 inflated prices.  And we refer you to Professor Rosenthal's

22 rebuttal report at Paragraph 15.

23         But again, the core rationales for the

24 ascertainability requirement, I'm not sure applies to the

25 exclusion because there's no reason for someone excluded to opt

1  out or want to be notified for purposes of opting out.  It

2  just -- they have records to self-identify.  They can look at

3  them and say, well, I'm not in this class.

4          THE COURT:  How will that work?

5          MR. WEXLER:  Well, if somebody consulted the records

6  and they fell into the category of paying for branded Niaspan

7  but not generic after this period of time, September 20, 2013,

8  they'd say I'm excluded from the class, I can't make a claim.

9          And if the defendants, for this period of time, were

10  sued by somebody who claimed to have purchases after -- I

11  assume that if, let's say, the statute of limitations ran and

12  they wanted to know if they weren't in the class and they blew

13  the statute of limitations, all the defendants have to do is

14  ask for their records of purchases and say, wait a minute, you

15  never purchased a generic in this period.  So they're

16  protected.

17          They won't know who's bound and who's not bound or

18  the timing of it, let's say if there's a statute of limitations

19  defense.  It's there.  And we put on evidence that it's there

20  through the PBMs, Mr. Winkelman, and Ms. Craft.  These records

21  reflect these things.

22          Again, Slide 12 has D, exclusion D, all persons with

23  a tiered copay plan who purchased only generic Niaspan, and

24  also H, flat copayers, that is, consumers who paid the same

25  copayment amount for brand and generic drugs.  This is

1 significant.  We have put on affidavits, declarations from

2 PBMs, evidence that's never been produced in this circuit, in

3 this district from the PBMs themselves saying plan design, we

4 maintain records of plan design including copay tiers and

5 whether people play flat copays or not.  The records exist.

6          THE COURT:  Tiered copays.  Will you explain what you

7 mean by that?

8          MR. WEXLER:  Yes.  Often, a brand has a higher copay,

9 so it's on a higher tier, as opposed to a lower copay tier for

10 a generic.

11          THE COURT:  Is it based on a percentage or --

12          MR. WEXLER:  It's based upon -- no.  It's -- part of

13 the tiered copay is designed to push people into generic drugs

14 so that if people are paying, you know, $50 copay for a brand

15 and the drug goes generic, they get pushed into a $5 copay.  Or

16 the copay goes up on the branded drug as opposed to the

17 generic.  But it's used to encourage buying patterns.  But it's

18 there.  That's the point.

19          The point is plan designs are contained for every

20 third-party payer and their relationship with their consumer

21 client.  Those plan designs are contained in the PBM records,

22 and they're reflected in purchases at the pharmacy.  All of

23 these transactions are electronically stored and determinable.

24 Otherwise, our system would fall apart.  But --

25          THE COURT:  What about flat-pay plans where consumers

1  pay the same for brand and generic drugs?

2          MR. WEXLER:  Right.  That's also determinable through

3  the PBM records.  Plan design -- that was one of the points

4  made in each, I believe it's Exhibits 12, 18 to 21, of my

5  declaration has the declarations of each of the PBMs that we

6  got, OptumRx, Express Scripts, Caremark, and I forget the

7  fourth.  But all of them say they maintain in their database

8  the plan design for every third-party payer client, including

9  it allows the ability to extract data about the plan design,

10  including whether or not there's a flat pay -- flat copay.

11  They say it.  We have evidence of it.  It's there.

12          So if somebody had a flat copay and that was an

13  issue, there's a record of it.  And at the end of the day, if

14  somebody tries to make a claim -- this might -- you know, when

15  we try to determine who's in the class, I mean that's one

16  thing.  But if we want to determine who's out of the class, we

17  will have to ask people who aren't in the class to produce

18  records.  I don't know how we do that if we don't have a class

19  that contains them.  But if we were to play it out, we could

20  demand proof that you don't have a flat copay.  How's that?

21  But it exists.

22          F, fully-insured health plans.  We had a

23  discussion -- this is Slide 13.  We have more evidence than

24  Form 5500s, even though I don't think one complaint about one

25  Form 5500 being vague is sufficient to prove that all these

1 other Form 5500s which are lodged with the --

2          THE COURT:  Well, we have evidence of one that's

3 inconclusive.  What about --

4          MR. WEXLER:  Well, our expert testifies that they use

5 them all the time in cases like this, that they're filed with

6 the IRS and the U.S. Department of Labor.  But Mr. Winkelman

7 testified that PBM internal records also identify fully insured

8 plans.

9          And if you go to the rationale for the

10 ascertainability requirement, and the first one is being able

11 to self-identify for purposes of opting out.  If you have a

12 fully-insured plan, you know it.  You have your own records.

13 What else can -- there's -- it's not like there's -- it's an

14 amorphous problem that it's hard to pin down whether or not --

15 I know if I'm a fully-insured plan or not.  I have records of

16 it.

17          Again, we're looking at ascertaining people in the

18 class.  But if I'm a fully-insured plan and I'm excluded, I

19 know it, which is the purpose of the requirement to be able to

20 self-identify.  And for the same reason, for the defendant to

21 know whether or not somebody's bound, the record exists.

22          Slide 14, pharmacy benefit managers, which is

23 exclusion G.  Defendants try to throw in ASOs as well,

24 administrative services only organizations, that just

25 adjudicate claims.  They have records of whether or not their

1    administrator services only organizations are PBMs.  It's not a

2    secret.  There aren't that many PBMs.  And again, we go to the

3    rationale for the ascertainability rule, which is

4    self-identification and the ability to opt out.

5             THE COURT:  And you say the records, for example,

6    that determine whether an insurance carrier is an ASO.

7             MR. WEXLER:  If an organization acts as an ASO and

8    not an insurance carrier, won't they know it?  I mean, I think

9    that's the point.  If they're only an administrative services

10   only organization, and not -- then they did not pay all or part

11   of the purchase price for Niaspan.  So they would not be in the

12   class definition as it's objectively defined, anyway.

13            We don't specifically exclude ASOs, just like we

14   don't exclude -- we don't have a specific exclusion for anybody

15   who did not buy, or purchase or pay for, Niaspan during the

16   class period.  There's no specific exclusion.  But defendants

17   have raised the prospect that it might be confusing that we

18   don't know if an ASO is in the class or out of the class.  I'm

19   saying there's records of everybody in the class, and there's

20   records of everybody out of the class.

21            I haven't purchased Niaspan.  If somebody asked me to

22   produce my -- if I sue AbbVie, I think I get a document

23   request.  Show me your purchases.  I don't have any.

24            I think, you know, it -- again, it comes down to the

25   fact that we've put on evidence that there's tracking of every

1  pharmaceutical transaction and who pays for it.  It is the most

2  data-rich industry in the world.  And the only thing that

3  defendants have challenged is the difficulty -- what they claim

4  are challenges in reading some of these documents and

5  extracting the information that we're talking about.  And that

6  was specifically rejected in City Select, actually and in Byrd

7  and discussed in Drywall, which explained that the only thing

8  raised by the defendants in those cases was the difficulty in

9  reading the records as a reason to deny class certification

10  because of lack of ascertainability.

11            THE COURT:  Let's go to City Select.

12            MR. WEXLER:  Sure.

13            THE COURT:  That's one of the more recent cases.

14            MR. WEXLER:  Yes.

15            THE COURT:  To which part of the opinion are you

16  referring?

17            MR. WEXLER:  Of course, I don't have that with me.

18            It's actually -- the reference would be in the

19  Drywall decision.  Do you have that?

20            UNIDENTIFIED:  Yeah.

21            MR. WEXLER:  Judge Baylson has a discussion of it.

22            THE COURT:  I note that in City Select, Judge Scirica

23  noted that the plaintiff there had not sought nor obtained the

24  proposed records during class discovery.

25            "We determined that it was inappropriate to certify

1        the class without further inquiry into the nature and

2        extent of the available records and remanded in part

3        for that purpose."

4        MR. WEXLER:  Right.  Well, we've discussed -- we've

5 put on evidence of the nature and the extent of the available

6 records.  What existed in <u>City Select</u> was a huge database, and

7 it was unknown -- this was a junk fax case, and it was

8 unknown -- it contained the names of the class members, but it

9 also contained a whole universe of others that received junk

10 faxes.  So the issue was whether they could identify actual

11 class -- you know, be able to extract the data.  And so it was

12 sent back for that purpose.

13        But we've got evidence, through the Miller

14 declaration and the Craft declaration, that the data can be

15 extracted from the universe of records.  That's the -- you

16 know, that's a distinguishing fact, an important one, and

17 dispositive in our view.

18        THE COURT:  I note that in <u>City Select</u>, Judge Scirica

19 said, among other reasons for the remand, we will remand so

20 that Creditsmarts's database can be produced subject, if

21 appropriate, to a protective order and any other necessary

22 provisions for confidentiality.

23        You haven't done that.  You haven't produced any

24 records.  You haven't obtained -- well, I don't know it.  Well,

25 I don't know whether you've obtained it.

1          MR. WEXLER:  Oh, no, no, no.  We have put on evidence

2   that records are available and the information identifying our

3   class members can be extracted.

4          All the plaintiff had done in City Select was say

5   there's a database.  There was no evidence that the class could

6   be ascertained from within the database.  And Judge Scirica

7   sent it back.  He also says, in discussing the case, that the

8   fact that there's some inquiry to be made on the

9   ascertainability question, or at some point in the proceedings,

10  not on the ascertainability question, but when there's an

11  inquiry -- I cite it at Slide 3 -- that some inquiry is

12  perfectly fine, which is simply to address the point that the

13  fact that there's a data -- there isn't a phone book with a

14  list of class members in any case.

15         And that's why the language in Byrd is so important,

16  that this is typically done.  You have to engage in some

17  inquiry to determine if somebody's in a class or not.  There's

18  nothing wrong with that.  The question is whether there are

19  objective indicia of who is in the class and can you extract

20  the information by conducting the inquiry.  That was not shown.

21  The second part was not shown in City Select, so it was sent

22  back.  But the fact that there would be some inquiry at some

23  point.

24         It's sort of like, in Carrera where the Third Circuit

25  says you're not going to see the model in action because the

1  question was not whether there was a model in action at the

2  time of plan certification because you don't have to

3  have -- you don't have to say, Your Honor, here's the list.

4  You only have to say that it can be done.

5             THE COURT:  Two things.

6             MR. WEXLER:  Yes.

7             THE COURT:  Two questions.  In your view, when does

8  this identification of the class members need to occur?

9             MR. WEXLER:  Well, I'm going to take the language

10 from Byrd which says that this must be done -- it's typical of

11 this being done in most class -- in most successful class

12 actions.  So certainly, if somebody submits a claim, if we're

13 successful, whether by settlement or judgment or otherwise,

14 somebody's going to have to say I'm in the class, and you have

15 to make that determination.  The question is, today, if

16 somebody -- let's -- what ascertainability does is it tries to

17 envision what's going to happen.  So that's why an affidavit

18 isn't enough to the Third Circuit, apparently.

19             THE COURT:  Well, not exactly.  City Select says to

20 the contrary.

21             MR. WEXLER:  Well, affidavits with objective

22 evidence.

23             THE COURT:  Affidavits in combination with records or

24 other reliable and administratively feasible means --

25             MR. WEXLER:  Right.

1           THE COURT:  -- can meet the ascertainability

2   standard.

3           MR. WEXLER:  I agree.

4           THE COURT:  The conclusion that affidavits in

5   combination with the database categorically failed to meet the

6   ascertainability standard was inconsistent with these

7   precedents.  You made a big issue of the fact that you were not

8   relying on affidavits.

9           MR. WEXLER:  Well, we don't --

10          THE COURT:  That seems to be --

11          MR. WEXLER:  I'm sorry.

12          THE COURT:  -- inconsistent with City Select.  You

13  can rely on them.

14          MR. WEXLER:  Well, I -- you know what, Your Honor,

15  I'm glad to hear that, and I agree with you.  And I agree with

16  City Select --

17          THE COURT:  In combination with other evidence.

18          MR. WEXLER:  -- in combination.  But we don't need to

19  here.  That's my point.  We don't need to here.

20          You know, we had a recent case that came down from

21  the Third Circuit involving Comcast.  It's a settlement.  We're

22  up for a final approval in September.  And it went up on the

23  ascertainability issue.  Judge Brody did not certify the class

24  saying it wasn't ascertainable.

25          The Third Circuit reversed saying it's a settlement,

1 and the defendant agreed that it was enough.  You know, that

2 the evidence of ascertainability was enough.

3          Now, in that case, we had a plan for -- Comcast did

4 not have records of former customers, and we had -- we

5 suggested that people could submit claim forms along with

6 bills, cancelled checks, other objective indicia of being

7 within the class.  Judge Brody said that wasn't enough, the

8 class wasn't ascertainable.  The Third Circuit reversed.

9          Now, interestingly, they didn't reverse and say you

10 must -- whatever the evidence of ascertainability is, you have

11 to -- they didn't say whatever the evidence of ascertainability

12 is, you have to ascertain the class before you can certify it

13 at all.  And what Judge Brody did was she proceeded to certify

14 a class for settlement purposes and notice went out.  It was

15 approved and went out, and we're going to final approval in

16 September.

17          But there is no -- there is not a case -- whether it

18 be Marcus, Hayes, Carrera, Drywall, Processed Eggs -- there's

19 no case that denied class certification because the plaintiff

20 failed to ascertain the class at the time of class

21 certification.

22          THE COURT:  You're focused on the timing now.

23          MR. WEXLER:  Well, you had asked me when is it done.

24          THE COURT:  Yes, I had.

25          MR. WEXLER:  Yeah.

1            THE COURT:  How does the <u>Thalomid</u> case impact your

2   argument?

3            MR. KOHN:  Your Honor, could you clarify the

4   question, please?

5            THE COURT:  Yes.  How does the <u>Thalomid</u> case impact

6   your --

7            MR. WEXLER:  They didn't have the evidence we do.

8            THE COURT:  Pardon me?

9            MR. WEXLER:  They didn't put on the evidence we do in

10  <u>Thalomid</u>.

11           THE COURT:  I have the opinion of their -- the -- and

12  I -- what did they not do there that you say you're doing here?

13           MR. WEXLER:  We just have a very robust record that

14  the evidence exists.  We've put on a record of evidence that

15  the documents exist, we can obtain them, and they can be read

16  easily.  Their reliability has been demonstrated by it

17  happening before, by it being done before.  And no one has put

18  on a record like this.

19           THE COURT:  All right.  Well --

20           MR. WEXLER:  There have been -- so, for example --

21           THE COURT:  We'll address that issue.  I --

22           MR. WEXLER:  In <u>Wellbutrin</u>, for example -- I mean, in

23  other cases, people have put on evidence or have tried to put

24  on evidence that there are -- you know, that this is such a

25  data-rich environment.  Unfortunately, there has been sort of a

1  confluence of events.  One is, it's such a data-rich
2  environment that people are kind of in disbelief that whether
3  or not the class could be ascertained was even a question.

4        So I think it took some time on the plaintiffs' side
5  to realize that there were certain steps we had to go through.
6  Well, we've done it.  Couple that with the lack of clarity and
7  the ability to twist around the language, reliable and
8  administratively feasible methodology, when all it means when
9  you look at the cases very closely, which I know Your Honor has
10 done.  I've racked my brain and gone over it a million times to
11 finally reach the conclusion that it means, it's just a
12 class -- it's like, we don't have to put on evidence at this
13 stage of the proceedings of exactly how many class members
14 there are or evidence that claims are identical.  The rule,
15 Rule 23, and class certification jurisprudence is more
16 forgiving than that.

17       We're here to say, hey, we have a finite class of
18 people and entities who purchased and/or paid for part of the
19 purchase price of Niaspan during this class period.  Do we have
20 records of that?  Yes, we do.  Our plaintiffs have produced it
21 covering the class period.  It's doable.  We've done it.  We
22 have evidence that everybody who made such a purchase has a
23 record.  We can get the records.  I mean, it's not like they're
24 in a vault somewhere and even though they exist we can't ever
25 get them.  We tell you exactly how they can be gotten and that

1 they can be read.

2          We do this now so that all of the rationales of the

3 rule are met.  We can say people will be able to give notice

4 and self-identify for purposes of opting out.  Hey, I think I

5 might have taken Niaspan six years ago.  I don't have records

6 at home, I'm going to go to Walgreens to find out, ask for my

7 records.  They can figure it out and opt out or make a claim.

8          The defendant, if they're sued by that same consumer

9 five years from now, can say wait a minute, let me see your

10 records, you've already recovered, you're bound by the

11 judgment, or you were in the class and we won the verdict,

12 you're out.  That's the point of the rule.  That's always been

13 the point of having a class --

14          THE COURT:  Well, you've said that before.

15          MR. WEXLER:  Yeah.

16          THE COURT:  I understand.  That's the way you led the

17 argument.

18          I'm concerned, and was concerned, primarily about the

19 ascertainability issue with respect to exclusions from the

20 class.

21          MR. WEXLER:  Got it.  Yes.

22          THE COURT:  And you've set forth plaintiffs'

23 position.

24          MR. WEXLER:  Okay.  The slide deck addresses the

25 other questions.  If you want to go through them, I'm happy to.

1  Otherwise, you can -- if the slide deck is enough, that's up to

2  Your Honor.

3          THE COURT:  Is there anything else you think should

4  be called to my attention?

5          MR. WEXLER:  Only that in the antitrust injury part,

6  you had raised questions -- and I don't want to leave anything,

7  and I can briefly go through it.

8          THE COURT:  Well, go ahead.

9          MR. WEXLER:  Let me go through.

10          Your second question is addressed beginning at

11  Slide 15, which was does the federal overcharge standard apply

12  to claims under state laws which exclude, which -- I'm sorry,

13  which include an actual economic harm requirement.

14          And the gist of our response is that actual economic

15  harm is the actual damage of sustained standard in both state

16  and federal law.  There is no difference in states that allow

17  this pass-on.  You know, it's just as important to understand

18  the rationale for pass-on in this context as it is in

19  ascertainability because the purpose of pass-on is to prevent

20  two sets of plaintiffs bringing the same claim from both

21  recovering from the defendant so the defendant doesn't have to

22  pay the same damages twice.

23          And that's why in the few states, and we'll say

24  Minnesota does not recognize pass-on.  But even if you look at

25  the New York statute, it's if you pass on part of the

1  overcharge that has to be, you can't recover that part of the

2  overcharge that is passed on.  We are at the end of the chain

3  of distribution.  We don't pass it on to anybody.  We don't

4  resell it.  It's over.

5          In that A&M case, that Michigan case, which discussed

6  pass-on, the plaintiffs failed to put on evidence that the

7  overcharge was passed on to them.  But we have in this case,

8  and I'll refer again to the declaration of Meredith Rosenthal

9  at Paragraph 33.

10         We don't think we have to do that, but where it's

11 been an issue, we've addressed it.  And yardstick theory

12 establishes injury in the overcharge.  But we also establish

13 that it was passed on to the third-party payers -- I'm sorry,

14 to the third-party payers and consumers.

15         Now, premiums, if anything -- we address this at

16 Slide 18 -- they're an example of what is not a pass-on.  And,

17 again, I'll go to the rationale for the rule.  Your Honor

18 probably remembers the tobacco cases.  There were plaintiffs

19 that brought claims -- premium payers brought claims against

20 tobacco companies for injury for increased premium.  And the

21 courts said that injury was too attenuated.  There isn't a

22 premium payer that has brought or can bring a state antitrust

23 class action.  So it's not even possible that there could be

24 pass-on.  They don't have the same claim as we do.  There would

25 not be a duplicate tier of recovery.  If we recover under the

1  state statutes, fine.  They cannot bring those claims.  The

2  defendant will pay once.

3        You know, the <u>ARC America</u> decision establishes that

4  direct purchasers can recover under federal law.  We can

5  recover under state law.  Those are not duplicative claims.

6  They're different claims -- state claims, federal claims --

7  different overcharges.

8        THE COURT:  Different overcharges?

9        MR. WEXLER:  Well, it's the same -- it comes down.

10 It starts with the AWP and WAC price set by the manufacturer,

11 and it comes down to us through the direct purchasers.  But

12 they're different statutory claims.  We don't have a claim

13 under federal law.  They don't have a claim as indirect

14 purchasers under state law.

15       THE COURT:  But under certain circumstances, there

16 could be duplicate recovery.

17       MR. WEXLER:  If -- if you look -- if you -- but not

18 under the same statute.  So I draw the distinction.  I would

19 say it's a duplicative recovery if they're under the same

20 statute, and they're not.  They're different laws, and it's

21 permitted.  The Supreme Court has said it's okay.

22       But within the statutory scheme, you can't have a

23 duplicative recovery.  That's the pass-on point.  And the

24 direct purchaser side, it just stops with the direct

25 purchasers.  But on the indirect purchaser side, if it's passed

1  on, then the intermediaries get dinged for the amount of the

2  pass-on.

3           When it comes down to the consumer who swallows the

4  pill, there's no -- that's the end.  It's the end of the change

5  of distribution.  In any case involving pass-on, we'll discuss

6  it in terms of the chain of distribution.

7           Your third question is addressed at Slide 19.  Oh, in

8  Thalomid, Your Honor, my partner, Mr. Boley, points out that in

9  Thalomid, consumers were lost, but the third-party payers were

10 considered ascertainable.  I don't know what evidence they put

11 on for consumers, but we've done it here.

12          There are also -- I'm going to try and understand the

13 second one.

14          MR. BOLEY:  Well, they did a subclass.  In Thalomid,

15 they did a subclass between TPPs and consumers.

16          MR. WEXLER:  I see.

17          He just pointed out, they didn't subclass in Thalomid

18 between TPPs and consumers, like we do here, but somehow the

19 consumers were lost.

20          Your third question is addressed at Slide 19.  And

21 the third question was what common issues predominate if the

22 Court determines that some states permit a pass-on defense for

23 damages, but not to antitrust impact.  And it is stated here

24 that the answer is yes.  I mean, or the liability and damages

25 trial will be the same.

1    We present our common evidence.  If they have -- if
2    Your Honor says there's some states that permit some form of
3    pass-on, and if they have admissible evidence, which we've seen
4    no evidence that they do, they'll be able to put it on.  But it
5    doesn't change the fact that our common evidence and their
6    ability to challenge our common evidence will exist whether or
7    not a few states permit it or not.

8    One way of dealing with it would be to subclass those
9    states, but it's certainly not going to take away from the
10   efficiencies of trying all of the common issues together.  And
11   you know, you had asked the question earlier today before we
12   broke for lunch about what was the world like before this
13   ascertainability thing, and my first thought was the Warfarin
14   decision.  That's what it looked like.

15   Warfarin is right where we're at.  It's a Third
16   Circuit case that's right where we're at with every requirement
17   except ascertainability.  It's before ascertainability.  But
18   it's really the controlling law on the issues.

19   The fourth question is at Slide 20, which is how can
20   the Court address defendants' individualized challenges to
21   absence of injury in a way that protects defendants' rights.
22   And you touched on that a little bit this morning.  And I think
23   this is where, you know, the timing of the jurisprudence is
24   very important because Hydrogen Peroxide was in 2004, and it
25   predated both Haliburton and Tyson, two Supreme Court

1  decisions.  And regardless, <u>Asacol</u> did not interpret <u>Tyson</u>.  It

2  distinguished <u>Tyson</u>.  And <u>Tyson</u> is a Supreme Court, and that's

3  the law.

4        But in <u>Haliburton</u>, it was clear that the defendant

5  might attempt to pick off the occasional class member here or

6  there through individualized rebuttal does not cause individual

7  questions to predominate.  Just it doesn't.

8        THE COURT:  If you don't produce these records in

9  advance of the trial, how will the defendants be able to

10  identify the -- well, I'll call it the arguably uninjured class

11  members.

12        MR. WEXLER:  If I don't produce what records before

13  trial, how will the --

14        THE COURT:  If you don't ascertain the -- if you

15  don't produce the records and -- the records that we're talking

16  about that you say are available, that don't have to be

17  produced according to you unless the class action is

18  successful, unless the plaintiffs succeed.

19        MR. WEXLER:  Well, but --

20        THE COURT:  Pick either one of the word -- successful

21  in <u>Byrd</u>.

22        MR. WEXLER:  Well, I think "successful" implies that

23  it's at the end of the case, that we obtain the records for

24  purposes of identifying who's in the class, not that we have to

25  at any time before then because we --

1            THE COURT:  Well, I'm saying, how can the defendants

2  know who is uninjured and who is not.

3            MR. WEXLER:  Well, you know, it's interesting how

4  when they walk in here now and say, oh, they're trying to

5  reopen discovery to get all these records, which we are not.

6  Make that clear.  They never asked to -- they never took any

7  steps to subpoena any of the records to determine who's not

8  injured.  They've had a -- the fact that --

9            THE COURT:  This is --

10           MR. WEXLER:  -- discovery's closed --

11           THE COURT:  It's your burden.

12           MR. WEXLER:  Our burden, yes.  And it's our

13  position -- there's a few positions.  If you look at the next

14  slide, first of all, we have lots of common evidence of

15  classwide injury.  That's number one.

16           Number two, we don't have to -- it's not our burden

17  to show that every class member is injured.  <u>Hydrogen Peroxide</u>

18  has been superseded by <u>Haliburton</u> and <u>Tyson</u>.

19           Number three, we don't think there are uninjured

20  class members.  We've put on evidence that everybody is

21  injured.  It's the defendant that's surmising that there might

22  be uninjured people or entities.  There's no evidence that

23  anybody's uninjured.  There are -- go ahead if Your Honor has a

24  question.

25           THE COURT:  No, I just looked at a note from my law

1   clerk about <u>Tyson Foods</u>, which -- and let me read it.  We're

2   talking about uninjured class members.  And a statement,

3   respondents quoting "failure of proof on this common question

4   likely would have ended the litigation."  We're talking about

5   uninjured class members.  And had they produced it, <u>Tyson Foods</u>

6   goes on to say, "Individual questions would have overwhelmed

7   the litigation."

8           MR. WEXLER:  We have no evidence of that here.  We've

9   put on evidence that everyone is injured.

10          THE COURT:  Are you saying there's no -- well, I'll

11  hear from Mr. Senator, I'm certain, on this issue.

12          MR. WEXLER:  We have nothing but surmised that there

13  might be uninjured class members.  We have evidence and our

14  expert took it out of damages of uninjured transactions that

15  are not included in damages.  But there's a couple of things.

16          We've put on evidence that every class member bought

17  at least, or paid for, or purchased, at least one prescription

18  of Niaspan.  That's all that's required for injury.  There's no

19  evidence other than surmise that that isn't true.  But one in a

20  billion chance for a third-party payer not to, 87 percent for

21  consumers to have done so.  And that's just one bit of

22  evidence.

23          If you look at the <u>Warfarin</u> decision, the emphasis in

24  an anti-trust case is on the defendant's conduct, not on

25  individual consumers.  This issue is getting far more traction

121

1  than the court ever envisioned in <u>Warfarin</u>, which basically

2  said individual issues like this do not defeat predominance.

3          We're at class.  We're not at trial.  It's a -- I

4  mean, it's just an overwhelmingly common and predominant issue.

5  And this is where the defendants' rights are protected.  They

6  can -- you ask about the individual records, and if we don't

7  produce them now, how are they going to attack them.  It's not

8  our defense.  They want the right to assert a defense to

9  defend.

10          If you look at <u>Tyson</u> and <u>Haliburton</u>, they have the

11  right to attack our methodology in front of the jury.  They can

12  attack the yardstick used for classwide proof.  That is their

13  due process right.

14          They challenged our ability to ascertain the class.

15  They've exercised their due process right.  The question is, is

16  it more likely than not that we've met our burden for

17  ascertainability.  It will be for the jury to decide, is it

18  more likely than not that we showed classwide impact with our

19  evidence.

20          I mean, I -- it's -- we can raise all kinds of, you

21  know -- surmise about what might have happened or could happen

22  to somebody who might render them uninjured when the reality

23  is, it's the defendant's conduct, that's why we're here, and

24  the uncertainty created by that conduct has to be taken against

25  them, not us.

1          THE COURT:  All right.  I'll take a look at <u>Tyson</u>.

2   It's not -- certainly not on all fours with this case, but it's

3   instructive and you've relied on it.

4          MR. WEXLER:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. SENATOR:  Your Honor, may I ask for a two-minute

7   break before we start?

8          THE COURT:  Absolutely.

9          MR. SENATOR:  Thank you.

10          THE COURT:  But we'll -- we can spend a little more

11  than two minutes.

12          MR. SENATOR:  I'll take more, but I'm only asking for

13  two.

14          THE COURT:  Let me see what's in chambers.  We'll

15  make it ten minutes.

16          MR. SENATOR:  Thank you, Your Honor.

17          THE CLERK:  All rise.

18          THE COURT:  You may go about your business, everyone.

19      (Recess taken at 2:38 p.m.)

20      (Proceedings resumed at 2:55 p.m.)

21          THE COURT:  Be seated, everyone.

22          Mr. Senator, you may proceed.

23          MR. SENATOR:  Thank you, Your Honor.  The Court's

24  first question here points to a critical issue in this case.

25  The class the EPPs want to certify is enormous and also

1 exceedingly complex.  Enormous, more than half a million class

2 members.  The minimum, hundreds of thousands of people and tens

3 of thousands of entities, stretching across the country to

4 include anywhere -- anyone who paid for prescription drugs in

5 26 states over more than a decade.

6            It's not just big, it's complex.  As the Court knows,

7 the class definition goes on for nearly two single-spaced

8 pages.  It contains exclusions that we previously showed were

9 complex and sometimes ambiguous.

10           Now, under Third Circuit law, to satisfy the

11 ascertainability requirement, the EPPs must provide a reliable

12 and administratively feasible methodology to determine who is a

13 member of the class.  That means now just whether a putative

14 class member paid for Niaspan or generic Niaspan but whether

15 the member falls within one of the excluded categories and not

16 just whether this can be done in individual instances, but can

17 it be done in a reliable and administratively feasible way on a

18 classwide basis.  That's the test, a reliable and

19 administratively feasible way to do is on a classwide basis.

20           And the EPPs' methodology has to be specific to this

21 case because the class definition the EPPs have proposed is

22 specific to this case, and it must be based on the data that's

23 specific to this case because that's the data that has to be

24 used to determine who's in the class and who's not.

25           I think now it's become abundantly clear that the

1  EPPs have no data and they have no methodology.  Their pitch is

2  nothing more than saying, we're going to issue a lot of

3  subpoenas, 31 to be exact, sometime later in the case and

4  figure it out later.

5              THE COURT:  Well, he says there are records of all

6  the purchases and all of the data that is needed to determine

7  the exclusions from that class.

8              MR. SENATOR:  I hear him say that.  Where are they?

9  As -- you know, I was just thinking over the break of that ad

10  campaign many years ago.  "Where's the beef?" as Emily Litella

11  would say.  Where are the records?  Where is the methodology?

12             THE COURT:  He says --

13             MR. SENATOR:  We have not seen them.

14             THE COURT:  He says that under Byrd, it doesn't have

15  to be produced at the time of the class certification motion.

16             MR. SENATOR:  Well, let's go to the case law then,

17  Your Honor, because I think it's clear that the records do have

18  to be produced because we, the defendants, have a right to look

19  at them and challenge what they are doing, and our ability to

20  challenge only is possible when we see the actual records.  And

21  I'd like to hand up a slide deck, if I may.

22             Now, let's go to Byrd first.  Byrd is very different

23  from this case.  To begin with, the class definition in Byrd is

24  much simpler than what the EPPs proposed here.  It involved a

25  claim that defendants installed and activated spyware on

1  computers it sold and leased to customers, and the class

2  definition included those customers and customers' household

3  members.  It does not have complex exclusion like EPPs have

4  here.  And the number of class members was just -- or the

5  number of customers was just about -- I believe the number was

6  something like 895 who were involved.

7          So when the class definition is more straightforward,

8  it will generally be more straightforward to develop an

9  administratively feasible methodology to ascertain the class.

10  If, on the other hand, there are numerous exclusions from the

11  class, the methodology will have to address each one of those,

12  and there will have to be records against which one can

13  evaluate whether a particular person or entity falls within the

14  class definition.  So it's not relevant -- or it's not enough

15  to say, there is so much data in this industry.  The question

16  is, what exactly is that data, how is that data kept, and then

17  how will you extract from that data the information you need in

18  order to determine whether a person -- and whether all people

19  fall within the class definition or not, an ascertainable

20  methodology -- or methodology to ascertain class membership on

21  a classwide basis.

22          And, you know, when we hear, well, if there's one

23  person six years down the line, you want to know if they're in

24  the class, go get all their records, you can figure it out.

25  That is not the test.  That is not ascertaining the class on a

1  classwide basis.  The question is, are there records of a sort

2  that you don't have to do that individualized inquiry, but

3  because of the way the records are maintained, the way the

4  records are kept, and what information is recorded, you can do

5  it on a classwide basis in some sort of feasible manner.

6  That's what coming up with a methodology requires.  Show us the

7  data, and show us how you pull out of particular types of

8  reports the information you need.

9         And that is what the EPPs have not done.  They have

10  not showed us the data, and they have not showed us how to pull

11  the information out in a administratively feasible manner from

12  this data that we've, you know, not been shown and just have to

13  accept on sort of a wing and a prayer that there must be a way

14  to do it because -- I think I've heard it now a number of

15  times -- this is a very data-rich environment.

16         Now, in Byrd, the defendant's own records identified

17  exactly which customers it sold and leased the computers to.

18  And again, there were about 895 of them.  So you were starting

19  with a very administratively feasible method because there was

20  a list.  And the only remaining ascertainable issue --

21  ascertainability issue was how to identify the customers'

22  household members.

23         THE COURT:  Household members, yes.

24         MR. SENATOR:  And the opinion doesn't tell us how

25  many household members there were, but you know, you go with

1 some of these figures you read, 2.54 or so average households.

2 You know, whatever number you pick, you're under about 3,000

3 people, maybe significantly under that.

4       So all you have to do in Byrd -- or all the

5 plaintiffs had to do in Byrd was figure out how you -- figure

6 out people who we know share an address with the 895 people,

7 that's what it means to be a household member, and there are

8 obviously records like we use all the time to get IDs and

9 utility bills and other things where a person can show where

10 they live and that they're members of a household.  And when

11 you're just doing it for under 3,000 people, it's just not a

12 big deal.  It's administratively feasible.

13       Now, would the result in Byrd have been the same if

14 you were doing it for half a million people?  It would have

15 been a very different case.  Here, we need records that don't

16 just identify where you live.  They have to identify your

17 purchases and your plan data, what kind of plan you had, and

18 many other factors about what you were purchasing and what --

19 over a period of a decade.  That's very different than figuring

20 out for less than 895 households who the other household

21 members are.

22       THE COURT:  Well, it's very different, and it

23 involves many, many more people.

24       MR. SENATOR:  Correct.

25       THE COURT:  But the standard is set forth, according

1  to the plaintiff, in <u>Byrd</u>, and it doesn't have to be this

2  method that passes mustard does not have to be, according to

3  <u>Byrd</u>, put in place or disclosed in detail until, according to

4  <u>Byrd</u>, plaintiffs are successful, until the end of the trial.

5        MR. SENATOR:  Well, I don't think <u>Byrd</u> holds that

6  whatsoever.  And remember, in <u>Byrd</u> --

7        THE COURT:  Well, they used the words "successful

8  plaintiffs."

9        MR. SENATOR:  They do, but other cases are very clear

10  that you have to be able to go and give class notice, for

11  example.  Now, in Byrd, it was easy to give class notice.  You

12  mail the notice to the household and you say, you know, dear

13  Mr. So and So and your household members, here's the class

14  action, and you've accomplished that class notice.  That's very

15  different from the situation where you don't know which

16  households to even start with.  Here, we have to -- you know,

17  we are -- the class members are entitled to notice, and there's

18  no way they can get that notice without ascertaining who the

19  class is now.  In <u>Byrd</u>, it was ascertained at the time who the

20  households were, so you didn't have that problem.  You could go

21  to that step of giving notice.  Here, you just can't.

22        THE COURT:  Are you saying in this case, notice is

23  required -- I emphasize the word "required" -- in the event in

24  the event I certify the class right away?

25        MR. SENATOR:  Correct.

1            THE COURT:  Within a reasonable time.

2            MR. SENATOR:  Within a reasonable time, absolutely,

3    Your Honor.  We're entitled to class notice and people to be

4    bound if -- you know, we're not going to -- I'll just say bring

5    a summary judgment motion.  Hopefully, it will be successful.

6    Then, we get class notice and people can opt in or out after

7    we've won?  I mean, I'm not expecting anybody to predict who's

8    going to win or lose at this point, but I'm saying the class

9    notice has to come before the substantive proceedings and

10   certainly before trial takes place.

11            And I'd also like to turn to City Select because I

12   think it bears on this issue, too, and it was decided after

13   Byrd and relied on Byrd.  And it really shows that the

14   plaintiffs have to come forward or have to have the data.  The

15   data has to be there at class certification to evaluate whether

16   it really is sufficient to identify the class members.

17            THE COURT:  Well, you address that part of City

18   Select that you think supports that properly.

19            MR. SENATOR:  Right.  So City Select involved a claim

20   that the defendants sent unsolicited faxes to lists of car

21   dealerships generated from a database with about 30,000

22   entries.  And from the opinion, it appears that somewhere

23   between 10- and 20,000 entry -- or, you know, entities with

24   entries on that database received faxes during the relevant

25   period.  And in discovery, the plaintiffs sought and then moved

1  to compel the production of the database.  They said, we want

2  this database because that's the database from which we're

3  going to show who the class is, we're going to come up with a

4  methodology to ascertain the class based on the database.  And

5  they sought it, and they didn't get it, and they moved to

6  compel, and the motion to compel was denied.  And the district

7  court subsequently denied class certification.

8         And on appeal, the circuit, the Third Circuit, said

9  the district court was wrong to deny class certification

10 without allowing plaintiffs to see the database and to attempt

11 to develop a methodology around it.  And the circuit remanded

12 for production and examination of the database so the plaintiff

13 would have the opportunity to try to demonstrate a reliable and

14 administratively feasible method to ascertain class membership.

15        Now, a few important points about City Select.

16 First, it involved a much simpler class definition again than

17 that proposed here.  All auto dealerships that were included in

18 the database in a certain period of time and had fax numbers

19 there and that were sent one or more faxes between about a

20 two-month period that were advertising BMW Bank of North

21 America.

22        Now, the second important fact about City Select is

23 it underscores the need for the plaintiff to present a proposed

24 methodology supported by data that the defendant and the Court

25 can examine.  And why do I say that?  Because the Third Circuit

1  did not hold that a class should have been certified in City

2  Select.  That was not the holding of the circuit.  It held only

3  that the plaintiff had the right to see the database and to try

4  to develop the methodology based on that database and to come

5  back to the Court and say, here is the data and here's our

6  proposed methodology to ascertain the class around that

7  database.

8          And I put a quote on the screen from City Select from

9  Page 442.  City Select was denied an opportunity to review the

10  information in the Creditsmarts's database to determine if it

11  could be used as part of a reliable and administratively

12  feasible means to determine class membership, combined with

13  other records with affidavits or otherwise.

14          That's what they were denied, and therefore the court

15  sent it back for that database to be produced and then a

16  determination to be made.  And the court wasn't even putting

17  its thumb on the scale saying which way that determination

18  should be made.  And again on the slide at the same page, the

19  court said, Page 442:

20          "We take no position on whether the level of

21          individualized fact-finding in this case is

22          administratively infeasible because we are limited by

23          the record before us, which does not include the

24          Creditsmart database."

25          Well, so too here, we are limited by the record

1    before us, which does not include any of these databases that

2    plaintiffs say contain the records from which the class can be

3    ascertained on a classwide basis.

4          THE COURT:  Are you suggesting that the entire

5    database needs to be produced or just specimens?

6          MR. SENATOR:  I'm suggesting that enough needs to be

7    produced for it to be a meaningful examination and

8    understanding of what they propose and whether the records

9    exist.  And I don't think I can say in advance, without having

10   seen anything, what would have been enough or what wouldn't

11   have been enough.  I'm certainly not suggesting some sort of

12   ridiculous size production.  But one thing litigation has

13   taught me is you don't know until you see it, and they've had

14   three and a half years in class discovery to go out and to get

15   records, and they could do it in waves and see what there is

16   and see if there are gaps to be filled in, see if there are

17   really -- if things are quite consistent from one to another so

18   that you don't need a lot.  I don't know the answer to any of

19   those questions because they never went out and got anything.

20         And so all we have are the plaintiffs' assurances,

21   and we know from Carrera that assurances are not enough.

22         THE COURT:  What about the declarations of the PBMs?

23         MR. SENATOR:  Well, I'd like to go to the

24   declarations of the PBMs.  So let's go to the declarations we

25   have so far.  EPPs have issued four subpoenas in this case and

1  we know what happened with those.  They subpoenaed four PBMs in

2  April of 2017, and those were Express Scripts, Caremark, Optum,

3  and Prime, and only Optum and Prime produced any data

4  whatsoever in response to the subpoenas.  They produced only a

5  year later after the close of fact discovery.  So Caremark and

6  Express Scripts produced no data whatsoever, and plaintiffs

7  didn't pursue.  They also didn't pursue discovery -- I'm sorry,

8  depositions of any of the PBMs, including the two that produced

9  some data to explain what the data meant.

10          So I said two of them produced data, Optum and Prime.

11  Well, I'd like to show the data that Prime produced and hand it

12  up to the Court, and it's very easy to do because it's about

13  two pages long, literally just this.  This is the extent of

14  Prime's data production in response to the subpoena.  It's

15  technically five pages.  It's Prime Niaspan Pages 00001

16  through -- I guess it's through 6, so technically six pages,

17  but there's about two pages with data on it.  Then, there's a

18  couple pages that are completely blank and couple pages that

19  have three lines of data on it.  That's it from Prime.

20          And again, there had been no depositions.  There's no

21  testimony from anybody at Prime about what this means.  Of

22  course, at least Prime produced something.  Caremark and

23  Express Scripts produced nothing.

24          Now, Optum produced a little more, or maybe a lot

25  more, but again, no deposition, no testimony about what any of

134

the information it had meant, when there are columns with
various names on them, no testimony about what that actually
showed or didn't show and what the limitations or uses were
that were appropriate for that data.

          And what did the EPPs do with this limited data that
they received from Prime and Optum?  What'd they do with it?
We know what they're supposed to do.  They're supposed to take
the data and try to develop a methodology around it, but they
did nothing with the data, and so there's no methodology
presented to the Court.  And that was abundantly clear at the
last hearing, and it's not been disputed here.  We have the
experts from the plaintiffs' side.  Mr. Miller did not analyze
the data, Mr. Winkelman did not analyze the data, and Ms. Craft
did not analyze the data.

          So that's the state of the evidentiary record.  We
have minimal productions from the PBMs, only anything from two,
and the experts just blinded themselves to it and didn't look
at it and didn't develop a methodology either based on that
data or otherwise.

          THE COURT:  Are the experts permitted to rely on
their familiarity with the type of data that can be produced,
which is what the plaintiffs have argued?

          MR. SENATOR:  I think when an expert comes in and
just says in conclusory fashion like Ms. Craft does -- and we
went through her declaration last time, I won't repeat it, but

1 it was literally two or three sentences.  There is data out
2 there.  You can figure this stuff out.  That's all it said.
3          No, that is not for miserable.  It is not permissible
4 to come in with a exceedingly conclusory declaration that just
5 says it can be done.  I haven't looked at any data specific to
6 Niaspan prescriptions for this time period, but it can be done
7 and I haven't given any explanation whatsoever.  It can be
8 done.  That is clearly not sufficient.  I think they need to
9 look at the actual data, and they can't just say, in general
10 terms, I'm familiar with this data that is generally kept for
11 prescriptions and therefore this sort of thing can be done.
12 I don't think they can do it even with more detail in their
13 declarations without actually looking at the data for this case
14 because they have to see does this data fit their model.
15 They've never looked at Niaspan data.
16          And another thing one learns when you look at data is
17 every set of data you get in some way is unique.  It's very
18 easy to say at a high level, that exists, there are ways to do
19 it.  It's much more difficult when a big pile of data is dumped
20 in your desk or your computer system and then you really try to
21 use it to see if it works and you find all sorts of problems
22 you have to overcome.  And they have plenty of time to do that,
23 to get the data, to look at it to see what the problems are, to
24 see if there are solutions to those problems, and to come in
25 and say, here's what I've done.  And nobody even went to square

1  one in that process.

2         So I don't know exactly where the line is on what

3  somebody needs to do to have a sufficient opinion to assure the

4  Court and assure the parties that this can be done, but I know

5  they are nowhere near in that line because they have done

6  absolutely nothing.  Absolutely nothing.

7         A three-sentence piece of a declaration that just

8  says "it can be done" is not an expert opinion.  We, in our

9  Daubert motion, said that's not even admissible evidence, but

10 even if it were admissible evidence, as we discussed at the

11 last hearing, the Court has to scrutinize that evidence and

12 look at the evidence on the other side and give it the weight

13 it deserves.  And when there is nothing whatsoever behind it

14 and no detail behind it, it deserves no weight whatsoever,

15 regardless of whether it's admissible.  And the case law is

16 very clear.  That is the Court's obligation on class

17 certification, to scrutinize the declarations, and it's not

18 summary judgment where a little bit on one side wins.  The

19 Court looks at all the evidence that's been submitted and

20 makes, you know, a reasoned determination, and no reasoned

21 determination, we would submit here, could say that they have

22 shown either that the records actually exist, and certainly

23 they have not shown that a methodology can be developed.  And

24 if I can go one step further because that's still not enough,

25 they haven't come in with a methodology that they have

1  developed, and that is crystal clear.  There is no methodology

2  here, none.  It's never been presented to the Court.

3        And so even if they had evidence, even if they have

4  records, and even if they had somebody say a methodology can be

5  developed, it's still not enough.  They have to develop the

6  methodology and bring it to the Court and say, here it is, and

7  bring it to us for us to be able to evaluate and say either we

8  agree it can be done, we're not going to challenge it, or we

9  disagree for these reasons and let's have a -- let's tee it up

10  to the Court to present our opposing positions.  But we haven't

11  gotten to that stage because there's no evidence, there's no

12  review of the evidence, and there's no methodology developed

13  based on the evidence.

14        So under City Select, we're at the stage where

15  there's no result except that ascertainability clearly has not

16  been shown by a preponderance of the evidence by the

17  plaintiffs, which is the standard.  As Your Honor states in

18  Question 1 quite correctly, it's the plaintiffs' burden to come

19  forward and show, based on the evidence and based on their

20  proposed methodology, that there is a reliable and

21  administratively feasible mechanism for identifying all

22  categories of purchasers excluded from the classes and included

23  in the classes.

24        Now, although it's -- let me just go to a quote from

25  Carrera that illustrates this.

1          "The court will just be told how the model will

2          operate with the plaintiff's assurances it will be

3          effective.  Such assurances that a party intends or

4          plans to meet the requirements are insufficient to

5          satisfy Rule 23."

6          THE COURT:  What are you reading from now?

7          MR. SENATOR:  I'm reading from <u>Carrera</u> at Page 311.

8     And this was in one of our slides, if we can find it.

9          "<u>Carrera</u> has suggested no way to determine the

10         reliability of such a model."

11         That's Page 311, and then Pages 311 to 312:

12         "Plaintiffs must submit a screening model specific to

13         this case and prove how the model will be reliable

14         and how it would allow Bayer to challenge the

15         affidavits."

16         In that case, it was an affidavit issue because that

17    was the methodology.

18         "Mere assurances that a model can screen out

19         unreliable affidavit will be insufficient."

20         So hereto, mere assurances that it can be done are

21    clearly insufficient.  They have to actually do it, and they

22    have not even gotten to step one in trying to do it.

23         Now, we went through the EPPs' class definition in

24    detail at the hearing in May. and I don't propose to do it

25    again.  I would like to note, though, that as we discussed in

1   our brief, the class definition itself has to be readily

2   discernible, clear, and precise.  That's even before you get to

3   the ascertainability issue.  And there is really a threshold

4   issue here.  This class definition is complex, ambiguous, and

5   imprecise.  And I bring that up in this discussion of

6   ascertainability because even if plaintiffs can meet this

7   standard for a readily discernible, clear, and precise

8   definition, the complexity and difficulty and ambiguities in

9   that definition make it -- that will create an additional

10  hurdle that any methodology that would be proposed would have

11  to overcome.

12         For example, as we've pointed out in our brief, there

13  are multiple ambiguities in the class definition.  It's not

14  clear whether ASO insurers are included or not.  It's not clear

15  whether consumers who get reimbursed by HRA accounts are

16  included or not.  It's not clear why PBMs, although they have

17  express exclusion, have -- PBM payments under Medicare Part D

18  plans are still included in the damages model of Dr. Rosenthal.

19         THE COURT:  The PBMs say that they didn't receive any

20  payments.

21         MR. SENATOR:  PBMs received payments under Medicare

22  Part D.  I'm sorry, PBMs make payments under Medicare Part D.

23         THE COURT:  Well, they say they didn't make any

24  payments.  I said "receive."  I misspoke.

25         MR. SENATOR:  I can go through that.  Well, I'll just

1 refer the Court back to the testimony from Dr. Rosenthal from

2 the prior hearing, and it's in one of our slides from the prior

3 hearing, and she says that there are payments made there that

4 are included in the damages model.  Even the PBMs may be

5 excluded from the class.

6        I'd like to just briefly go through some of the

7 exclusions themselves.  I know I went through them in much more

8 detail, and I don't -- at the last hearing, and I don't propose

9 to do that again, but I'd like to just mention some of them in

10 rather summary form.  And I'd like to also just respond to

11 Mr. Wexler's idea that if you define the class broadly and then

12 make exclusions that you don't have to do any ascertainability

13 analysis about the exclusions as opposed to if you define it

14 narrowly, affirmatively in the first place.

15        I didn't hear any case support for that idea, and

16 it's a pure semantic play.  So, for example, if you take Page 8

17 of his slides where he list the exclusions, you can rewrite any

18 of these as an inclusion.  So, for example, the exclusion were

19 all federal or state government entities.  You could rank the

20 class definition as only private entities.  One's an exclusion,

21 one's an inclusion.  You can do it either way.  But the idea

22 that you can use the artifice of calling it an exclusion to get

23 around the ascertainability analysis has no case support

24 whatever.  And when you just think about it for a second, it

25 just falls apart.  You might as well have a class definition as

1 anyone who's ever used a drug in the first place and then

2 exclude everyone other than Niaspan users.  It doesn't make any

3 sense.  So I'd like to talk about some of the exclusions again

4 just briefly to remind the Court of the failure of proof that

5 we've had from the plaintiffs.

6         Now, let's take the exclusion for -- and this is

7 Mr. Wexler's C -- all persons or entities who, after September

8 20th, 2013, paid and/or provided for reimbursement for branded

9 Niaspan and did not pay and or provide reimbursement for

10 generic Niaspan.  Again, not exactly something that rolls off

11 the tongue that anybody could just say, oh, I know that, but

12 our expert, Mr. Dietz, explains in testimony we went through

13 last time that to determine who falls in this exclusion, it's

14 necessary to re reconstruct each putative class member's

15 prescription payment history over that last five-year period.

16 You've got to match data across different systems because

17 employers, as well as individuals, can change providers and

18 plans over time, and the EPPs have proposed no method to do

19 that.

20         There's a slide of Mr. Dietz's testimony.  It is

21 extremely difficult to track patient usage of Niaspan and

22 generic Niaspan longitudinally during the proposed class

23 period.  Over time, patients do not always pay for prescription

24 drugs consistently.  For example, patients change health plans,

25 change names due to marriage or divorce, use primary and

1  secondary coverage, or vary in cash and insured payments, and

2  health plans change PBMs.  That's Paragraph 54 of the Dietz

3  declaration.

4          THE COURT:  Is that what one of your slides?

5          MR. SENATOR:  Yes.  It's on the one on the screen.

6  I'm sorry, Your Honor.

7          UNIDENTIFIED:  11.

8          MR. SENATOR:  11.

9          THE COURT:  Thank you.

10         MR. SENATOR:  Then, if you go to the second excerpted

11  paragraph there on Slide 11:

12         "Generally, there is no universal patient

13         identification number like a Social Security or

14         Medicare number.  That would be the same across

15         different insurance plans or PBMs."

16         And Mr. Wexler says, well, we're picking at issues,

17  but, first, it's not our job, although we're doing it, to come

18  into the court and explain all the deficiencies or the

19  potential problems they would have to overcome if they came in

20  with data and a methodology.  It's their job.  It's their

21  burden to come in with data and a methodology based on data

22  that will show in an administratively feasible manner how you

23  ascertain the class.  And we've shown these hurdles that if

24  they were to do that, we believe they would face, but of

25  course, if they actually came in with a methodology, then we

1  could evaluate it more specifically -- or specifically.

2         Now, Exclusion D, all persons with a tiered copay

3  plan who purchased only generic Niaspan.  This, similar to the

4  last exclude requires reconstruction of each patient's

5  prescription payment history because you have to look at the

6  whole thing to know if they purchased only generic.  It's not

7  enough to say, ah, found a prescription, they purchased

8  generic, they're in the class.  Then you have to rule out that

9  they also purchased branded, and you have to figure out if

10 they're on a tiered copay plan.  So you have to look over the

11 entire class period at the prescription history and determine

12 whether they purchased brand at some time and then determine

13 from their plans whether they were on a tiered copay plan.  And

14 that might not be apparent from just a purchase.  In fact, I

15 don't see why it would be apparent from their purchase which

16 says the amount they paid for Niaspan, whether it's -- I'm

17 sorry for the generic, whether it's a tiered plan because you

18 don't know then what they would've paid for the brand.  It

19 seems to me you'd have to go back to their plan documents to

20 figure that out.  But again, we don't know because no data has

21 been given and no methodology has been proposed that we can

22 then evaluate.

23        THE COURT:  I think I know how you'll answer this,

24 but I'm going to ask the question anyway.  What about the

25 declaration that states that this information is available?

1  You're going to say it requires more?

2          MR. SENATOR:  I'd like to -- I think we are entitled

3  to see the information or at least enough of the information

4  and a methodology to say not just that it's available, that the

5  information can be extracted in a administratively feasible

6  manner.  For example, one could say there must be records

7  somewhere of everybody's health plan and what in particular

8  years that plan offered and  whether it was a tiered copay

9  plan, you know, at plan description.  I don't know if there are

10 such records.

11         THE COURT:  Well, plaintiffs have said there are.

12         MR. SENATOR:  Okay.  Going back to 2007, I think is

13 the beginning of their class period.  They said there are, they

14 haven't shown that.  They haven't shown any example of that.

15 But we do know that there are tens of thousands of health plans

16 in the United States, so if we have to look at each one of

17 those, I don't see how it would be administratively feasible to

18 do that.  Now, maybe they have a way around that if -- I don't

19 know, but they have to come in with something that we can

20 evaluate even if their records exist.  They have to be --

21 that's just the first step of inquiry.  And until we see the

22 records or some samples of the records and a proposal, there's

23 nothing to evaluate.  There's no proposed methodology.

24         And we don't have to take them and we can't just take

25 them on their word, on their assurances, as the Third Circuit

1 says, that the records exist and it can be done.  That violates

2 the defendants' rights, the defendant's rights that

3 ascertainability has to be shown, affirmatively shown, by the

4 plaintiffs by a preponderance of the evidence.

5          Now just -- I'll just take one more of these

6 exclusions.  The exclusion for all federal or state entities

7 other than cities, towns or municipalities with self-funded

8 prescription drug plans.  Now, the Court may recall that EPP

9 counsel argued at the last hearing that the names of such plans

10 will be obvious.  And he gave the federal employee health

11 benefits plan as an example.  Well, first, that was counsel's

12 argument, not evidence.  They've nowhere submitted a list of

13 such plans.  And as we showed at the hearing, if you just do a

14 casual Google search, it showed the name of the numerous

15 federal health plans that were not apparent from how they were

16 named.  And that's in our prior slide deck.  That wasn't our

17 obligation to do that, but it's an illustration of why one

18 can't just come in and say there's evidence, take our word for

19 it.  We don't have to show you the evidence.  We don't have to

20 show you how to do it.  We don't even have to have a -- on this

21 exclusion, we don't even have to have a expert witness come in

22 and say it can be done, counsel can just come in and say it can

23 be done.  That should be enough.  That sounds reasonable

24 enough.

25          A very cursory inquiry on Google showed it wasn't

1 reasonable and it wasn't true.  And that's what we're being

2 denied by not having the data and not having the proposed

3 methodology to evaluate.  And that's what the courts, the Third

4 Circuit, has said is not sufficient for class certification.

5         THE COURT:  Where did the third circuit say that most

6 recently?

7         MR. SENATOR:  Well, it said it in <u>Carrera</u>, where it

8 said mere assurances are not enough, we have to see the model

9 in action.  This district said in <u>Wellbutrin</u>, when the class

10 was decertified for lack of ascertainability.  There's the

11 <u>Marcus</u> case, as well.  In all these cases, the whole premise is

12 that plaintiff comes in with data and a methodology, and the

13 defendant has the right to challenge it.  And if they don't

14 come in with a methodology, they lose.  If they don't come in

15 with the data on which the methodology is based or don't come

16 in with either data or methodology, they haven't carried their

17 burden.

18         Now, I think it's telling, and I'd just like to go to

19 some of the things they're experts said.  And I'd like to start

20 with Mr. Winkelman because Mr. Winkelman --

21         THE COURT:  Are you're referring to a slide?

22         MR. SENATOR:  I will in a moment, Your Honor, Slide

23 Number

24         UNIDENTIFIED:  13.

25         THE COURT:  13?

1          MR. SENATOR:  Mr. Winkelman, the plaintiffs' expert,

2    acknowledged the shortcomings in the produced data in light of

3    the EPPs' complex class definition.  And he admitted that that

4    data is inadequate to identify members who paid only for brand

5    Niaspan after September 2013.  And I put up on the screen

6    question and answer.

7    "Q   So the data that you have reviewed in this case is not

8    adequate for you to identify patients who bought only brand

9    Niaspan and not generic Niaspan after September 20th, 2013?"

10         And then he says, "I did not.  I did not.  I was not given

11   nor did I review all the data that exists out there."

12   "Q   I'm only asking you about the data that you reviewed in

13   this case.

14   "A   Right.  I have not reviewed any -- the type of information

15   you're describing."

16         Now, let's go to the next slide.  He also did not

17   determine that the produced data was sufficient to identify

18   so-called flat copayers.

19   "Q   So the reports in Exhibit 5 do not have sufficient

20   information to allow you to identify patients who had the same

21   copay for brand drugs and generic drugs, correct?

22   "A   Well, this is a voluminous report with a number of

23   different formats here.  None of these are complete, and they

24   may or may not be adequate.  I haven't studied them in depth,

25   nor was I asked to do that."

1          So if he hasn't studied them, he wasn't asked to do

2     that.  He doesn't even know if they're complete, I submit the

3     Court can't rely on that and say the records there are

4     sufficient and enough to do this.

5          THE COURT:  Well, it's clear from this exchange that

6     you referred to that Winkelman was not given all of the data

7     that exists.

8          MR. SENATOR:  Right, and he's plaintiffs' expert.

9     He's plaintiffs' expert.  They should be giving him the data,

10    and he should be evaluating it, and if they're hiding the data

11    from them and don't want him to evaluate it, that should tell

12    us something.  But regardless of what we can read into that, it

13    certainly tells us that they haven't met their burden.  And, in

14    fact, we went to our expert, Mr. Dietz, and he confirmed that

15    the same data is, in fact, inadequate.

16          And on the next slide, Slide 15, we have Dietz's

17    testimony.

18               "Although Mr. Winkelman points to the data

19               spreadsheets produced in this case as examples of how

20               data can be used to identify putative class members

21               and the amounts they paid, those data spreadsheets

22               for the most part are incomplete.  They do not have

23               sufficient information to identify putative class

24               members."

25               So that's the record.  Our expert did look at the

1  data and found them incomplete.  Mr. Winkelman, plaintiffs'

2  expert, wasn't even shown the records and can't say anything to

3  the contrary.

4          And, in fact, at the last hearing, the EPPs made

5  clear that they were just claiming reliance on Mr. Winkelman

6  for any methodology to ascertain class membership.  Well, I was

7  going to say in light of this, but for whatever reason, they've

8  now disclaimed reliance on him.  And here's the statement by

9  counsel at the last hearing on the next slide.

10          "We don't propose Mr. Winkelman, who supports the

11          first step by saying that the documents exist.  We

12          don't propose him as somebody submitting a

13          methodology."

14          And, of course, the statement that he supports the

15  first step by saying that the documents exist also is not

16  supported because in the testimony I just read from

17  Mr. Winkelman, he says he doesn't even know if the documents

18  are complete or not.

19          So let me just finish it off by talking about the

20  other two EPP experts.  Mr. Miller.  He admits that he has no

21  methodology to identify class members.  On the next slide, he

22  says:

23  "Q   Your declaration did not describe any specific methods,

24  identify people and entities who qualify for this class

25  definition, correct?

1 "A   My declaration is based on my past experience, not on this

2 class definition."

3          So he didn't come up with a methodology for this

4 class definition.

5          And then, that leaves EPPs' third expert, Laura

6 Craft, and she did not review any of the data produced in this

7 case and she has no methodology to identify class members.

8 "Your declaration" -- this is the next slide -- "Your

9 declaration did not describe any particular method using the

10 data produced in this case to identify people and entities that

11 qualify for this class definition.  Is that correct?"

12          Answer:  "I did not describe a specific method."

13          And then, we can go to the next slide.  Craft's

14 conclusory opinion, as we showed at the last hearing, is not

15 based on the data produced in this case at all because she

16 didn't analyze it.

17 "Q   And your declaration did not analyze the data reports

18 produced in this case to determine if they allow identification

19 and proposed class members.  Is that correct?

20 "A   I did not specifically analyze what you're referring to as

21 the data reports that have been produced in this case."

22          So at this point, I think it's crystal clear that the

23 EPPs have no methodology to apply their complex exclusions, let

24 alone a methodology based in the data that's been shown to be

25 reliable and administratively feasible to do on a classwide

1  basis.

2        And te idea that they will issue these 31 subpoenas

3  now at some point in time is just not a methodology.  It's a

4  proposal for how they might go about getting data in order to

5  develop a methodology at some point in the future.  But it

6  comes too late in the process, and it's got no assurance of

7  where it's going to happen -- when it's going to happen and

8  what the result will be.  And I've already discussed what the

9  result was of the four subpoenas they did issue and how they

10  followed up on those subpoenas.  So if the past is any

11  prologue, it doesn't look good.

12        Now, I think I'd like to just say a couple of words

13  about the Express Scripts declaration that Mr. Wexler refers

14  to, which is one of the declarations that was received in

15  response to the subpoena, because I think there's -- even on

16  this one document, there's a bit of overstatement about what it

17  contains, and I'd like to, if I may, hand it up to the Court.

18        And this is the declaration that came from Express

19  Scripts after a subpoena for broad, broad categories of

20  documents, of actual documents, was sent to Express Scripts and

21  then Express Scripts didn't produce anything, any records

22  whatsoever, for anybody to review.  And plaintiffs, unlike in

23  City Select, did not move to compel, and they got this

24  declaration.  And it says, in general terms, that they maintain

25  information about prescriptions transactions, and then they

1   list a bunch of data fields that they say are in the

2   information.

3         It does not say the time period for any of these

4   records.  It doesn't say anybody's checked what the time period

5   is, what's available, what the format is.  And it does not say

6   what any of these terms mean.  And Mr. Wexler says that -- and

7   I don't want to get the -- I don't have the words written down,

8   but we can go back to the transcript when it's out, but that

9   there's some ability to -- declarant has said there's some

10   ability to extract the plan design of a patient, the design of

11   their insurance plan, based on these data fields.  But that's

12   not what the declaration says.  It says in Paragraph 5 that the

13   data -- the second sentence.

14         "The data typically includes the total amount paid by

15         the client's individual member, i.e. the applicable

16         copay, and other aspects that are dependent on the

17         plan design elements, as well as the total amount

18         paid by the client for each prescription

19         transaction."

20         So remember, a lot of important information is

21   contained in what the actual plan design is for a person, does

22   he have a tiered copay plan, for example, does he have flat

23   copays?  This says there is data that are dependent on the plan

24   design elements, but it doesn't go that extra step.  And

25   Mr. Wexler said -- and disclose the plan design elements.

1              So for example, if there's data about a particular
2   person's prescriptions and if you say a $5 copay, well, that
3   tells you what his copay was for the particular drug, but it
4   doesn't tell you -- say it was for the generic, it doesn't tell
5   you what his copay would have been if he had taken a brand drug
6   instead of the generic or taking a generic instead of the brand
7   because he didn't purchase that other drug.  So it's not in the
8   record.  But yet the class definition depends not just on what
9   the copay actually was, but what it would have been for a drug
10  that was not purchased, the comparison of what it would've been
11  for the brand versus the generic.  And that's not said by the
12  Express Scripts declarant to be contained in the data, and why
13  would it be because the data, when it shows the actual
14  transaction, isn't going to show if he had purchased a bunch of
15  different things, what the result would have been under the
16  plan document.

17             THE COURT:  Well, that's the subject of the proposed
18  expert testimony.

19             MR. SENATOR:  That's a subject that if they get the
20  data, they could then -- and they could then come to this
21  report and say, here's the data, here's what's in it, you know,
22  it either has this or doesn't have it -- according to the
23  declaration, it doesn't have information -- here's how, on a
24  classwide basis, we propose to be able to figure this out.
25  They haven't done that.  I have my suspicions about whether it

1   can be done, but one thing I know is it hasn't been done.  So I

2   can't evaluate that in the -- in a concrete form, which the

3   Third Circuit says is a violation of the defendants' rights not

4   to be able to do that.

5         And one more thing we do have on Express Scripts is

6   we have another declaration Express Scripts submitted in the

7   Relafen case, which is one of the cases that plaintiffs' other

8   expert, Mr. Miller, said was within his experience and was what

9   he was testifying based on.  He was testifying based on these

10   four other cases he was -- settlements he was involved in

11   administering.

12         And so let's put up the slide if we could have it

13   here, Slide 24, I think it is --

14         UNIDENTIFIED:  It's 23.

15         MR. SENATOR:  23.  We have the Relafen declaration

16   from Express Scripts, and they address this issue that I was

17   just highlighting about flat copayments, and they talk about

18   the data limitations in the Express Scripts system, something

19   that was not addressed in the very conclusory declaration that

20   the EPPs got from Express Scripts in our case.  And the

21   declaration in Relafen says that the Express Scripts data

22   system does not provide whether the payment is a flat copayment

23   or whether the member's flat copayment would have been the same

24   for a generic as well as brand drug.

25         It also states that in the second box -- I've

1   highlighted in this slide -- that the data system does not

2   permit you to readjudicate a historical claim.

3           "Moreover, when plan changes are entered into ADW,

4           they may overwrite prior changes, and therefore it is

5           not possible to provide accurate historical

6           information.  Therefore, the scope of the historical

7           plan information is severely limited."

8           So in other words, if I have a particular health plan

9   today, and as we know these days, every year, your health plan

10  changes in a little -- in ways, the deductible, the copayments,

11  all these things we've been talking about, the system at

12  Express Scripts in this timeframe is then updated and it

13  changes if you've changed from a flat copayments of some other

14  system, a new entry is put in, and as this declaration says,

15  that overwrites the old entry.  So you can't go back and ask

16  the question, well, what was, you know, just to take my

17  example, Stuart Senator's copay arrangement in 2013 or 2006 or

18  whatever the year is.  It's not there anymore.

19          And, of course, the declaration that they got in our

20  case just glosses over that entire issue.  That's one of the

21  reasons we need to see the actual records and an actual

22  methodology has to be proposed based on those actual

23  records.

24          THE COURT:  I've just been handed this Stocker

25  declaration in which he states he can identify every brand and

1  generic Niaspan purchase.

2          MR. SENATOR:  I'm sorry, which declaration is the

3  court looking at?  This Stocker declaration, Prime Therapeutic,

4  LLC.

5          MR. SENATOR:  May I take a moment to get that one,

6  Your Honor?

7          THE COURT:  Yes, yes.  Do you need the number?

8          MR. SENATOR:  I don't know.

9          THE COURT:  It's 578-26.  It was sealed.  It was

10  filed December 19th, 2018.

11          MR. SENATOR:  I have it, Your Honor.

12          THE COURT:  Okay.

13          MR. SENATOR:  Okay.  I've reviewed it.  And this is

14  similar to

15  the other declaration in saying that it has plan design

16  details.  The <u>Relafen</u> one, they get overwritten, that was the

17  problem there, when a new plan goes into effect.  And the

18  question then is you've got this Prime Therapeutics

19  declaration, which again like the <u>Relafen</u> one that we got in

20  this case is not specific as to time period.  It doesn't talk

21  about any changes over time, doesn't talk about what happens

22  when the plan changes, and doesn't show us, in fact, how

23  these -- how this information is kept and then can be used for

24  our purposes, not for their purposes.  Their purposes are to

25  figure out how much they're supposed to pay on a particular

1    claim.   Sometimes it's called, I think, adjudicating a claim or

2    transaction or something like that.   Our purpose is a

3    historical purpose, to figure out if they're a class member or

4    not.

5             And I'm not saying that any of these folks don't have

6    some records of transactions.   Of course they do, that's what

7    they do.   But the question is, are those records that types of

8    records that can be then used, aggregated with other PBMs'

9    records, and then have the information necessary for this

10   particular class definition with these particular exclusions

11   and this ten-year time period extracted out of it.

12            THE COURT:   Well, what --

13            MR. SENATOR:   And the short answer is we don't know

14   because they haven't given us the records from all the

15   different PBMs.   That's what this whole 31 subpoena plan is

16   supposed to do.   And they haven't then had experts go through

17   it and show how it's done, if it can be done at all.

18            THE COURT:   Well, what the Stocker declaration,

19   the -- that's the Prime declaration -- states in Paragraph 7 is

20   that Prime has readily accessible records in an industry

21   standard format created by the National Council for

22   Prescription Drug Programs by which third-party payers and

23   consumers can be identified on every purchase of Niaspan and

24   generic Niaspan that Prime adjudicates on behalf of its

25   third-party payer clients.

1          MR. SENATOR:  I see that your honor.  And so in the

2    last hearing, we put up what these National Counsel for

3    Prescription Drug Program codes are, and we showed some of them

4    are optional, some of them are standardly used.  What we don't

5    know from here -- and then we also showed, by the way, that

6    that may not be sufficient, and certainly no expert has said if

7    you take those code -- that code information, that that will

8    then be sufficient, and here's how you do it to come up with

9    everybody who's in the exclusions that are in this class

10   definition.

11         So they haven't listed which ones they have and which

12   ones they don't have.  Again, they haven't said for what time

13   period.

14         I'm not disputing that they have some records at

15   Prime.  Of course they do.  But when I'm just -- and we've

16   heard that phrase, the data-rich environment.  The question is

17   nobody's gotten those records and evaluated them and said,

18   across all PBMs, or even the majority of them, and other

19   records that are available, you can aggregate them, you can

20   standardize them, and you can use them for the particular

21   exclusions that are in this class definition, and you can do

22   that in an administratively feasible way.  That's the problem.

23   Nobody's gotten that together.  Nobody's actually looked at the

24   actual data and developed a methodology around it.  That's

25   what's required to be done, and that's what hasn't been done,

1  and that's why they haven't met their burden.

2            THE COURT:  Okay.  Well, in the first -- I gather

3  you're finished on the --

4            MR. SENATOR:  I think I've spent --

5            THE COURT:  You've spent a lot of time.

6            MR. SENATOR:  -- a lot of time on it, Your Honor.

7            THE COURT:  Yes.  Okay.  I'm going back to the

8  letter.  The second question was does the federal overcharge

9  injury standard apply to claims under state laws which include

10 an actual economic harm requirement.

11           MR. SENATOR:  Right.  Now it seems to me that, in a

12 nutshell, the issue raised by the Court in Question 2 and

13 Question 3, to some extent, seems to be this.

14           THE COURT:  Yes.

15           MR. SENATOR:  So we assume that state law defines

16 damages based on a typical netting of payments out and payments

17 in.  That is overcharges in this case that are not offset by

18 reimbursements or avoided costs of some sort, such that the

19 state law and economics would say that the damages that the

20 plaintiff has suffered would be zero.

21           So again, addressing this particular question, so in

22 this construct that I'm coming up with for purposes of this

23 question, it'd be undisputed that under any real world economic

24 model, as well as under applicable state law, the plaintiff has

25 not suffered damages.  But at some point before the overall

1   financial transaction is completed, the plaintiff is out of

2   pocket for some amount of money, even though once the financial

3   transaction is over, the money will be right back where it came

4   from.

5           So, you know, for example, the plaintiff has to, well

6   plaintiff has to pay $10 and then gets the $10 back.  Financial

7   transactions over, he's not damaged.  But for a time period, he

8   was out of pocket $10.  And maybe it doesn't happen in that

9   literal fashion, but in some ledger book somewhere, in some

10  accounts statement somewhere, at some point in time, the

11  plaintiff's listed as out some amount of money, even though

12  once the transaction is complete, there'll be an offsetting

13  ledger entry and he won't be -- he won't have suffered any

14  damages.

15          Now, we know that when a plaintiff is suing for a

16  violation of the Sherman Act, we don't look at at least one

17  part of the netting out of payments and reimbursements or

18  debits and credits.

19          THE COURT:  No.  You look just at the payment of an

20  inflated price.

21          MR. SENATOR:  Right.  We blind ourselves to certain

22  reimbursements that may have been received by reselling the

23  product under the Sherman Act.  And so the question raised by

24  the Court is for purposes of one aspect of the Rule 23

25  predominance analysis.  When you've got a claim under state

1  law, not under the Sherman Act, should the court nevertheless

2  use that Sherman Act direct purchaser rule for determining

3  injury, even though under the state law, the person hasn't

4  suffered or the plaintiff hasn't suffered any recoverable

5  damages.

6          Now, when I started thinking about this issue, it

7  seemed to me that a Third Circuit case that didn't arise under

8  the Sherman Act was particularly relevant, and I'd like to call

9  the Court's attention to that.  And I brought a copy.  That's

10 called Harnish v. Widener University School of Law, 833 F.3d

11 298.

12         This seems to me to raise a similar issue but drawing

13 on the damages rules that apply to federal securities class

14 actions.  So this was a putative class action brought under New

15 Jersey and Delaware fraud law.  It was brought against a law

16 school that allegedly posted misleading rates of employment for

17 its graduates.  And the plaintiffs brought a putative class

18 action alleging that the university was able to charge higher

19 tuition because of its false employment statistics and it's

20 essentially the fraud on the market theory that's used in

21 federal securities class actions.  And the Third Circuit found

22 this damages theory of inflated tuition pricing was not

23 cognizable under the state law.  And then, it found, the Third

24 Circuit found that because this was not a cognizable damages

25 theory under state law, the plaintiffs could not there -- say

1  that this was nevertheless a theory under which they could

2  prove injury on a classwide basis for purposes of Rule 23's

3  predominance requirement.

4         So can I put up a -- the slide about this, and I

5  actually got two.  This is, I think --

6         UNIDENTIFIED:  37.

7         MR. SENATOR:  -- 37.  If we can go back to the prior

8  one.

9         "Plaintiffs gloss over the fact that when courts

10        speak of damages, they are often referring to two

11        distinct concepts, the fact of damage and the

12        measured amount of damages.  The fact of damage,

13        often synonymous with injury or impact, is frequently

14        an element of liability requiring plaintiffs to prove

15        that they have suffered some harm traceable to the

16        defendant's conduct.  Only if the fact of damage is

17        established does a court reach the question of remedy

18        and the exact calculation of each plaintiff's

19        damages.  While obstacles to calculating damages may

20        not preclude class certification, the putative class

21        must first demonstrate economic loss.  That is the

22        fact of damage on a common basis."

23        And that's Pages 305 to 306 in the case.  And then if

24  we go to Slide 38, just a little down on Page 308:

25        "The crucial, overarching issue in the case, proving

1              that each class member suffered damages as a result

2              of Widener's actions" --

3    -- Widener's the law school --

4              -- "still must be shown to be susceptible to

5              classwide proof."

6         And then at Page 313:

7         "The state courts have refused to recognize either

8         the fraud on the market theory or the price inflation

9         theory outside the federal securities fraud context."

10        And then so this is key:

11        "And because the fact of damage and ascertainable

12        loss having a causal relationship with Widener's

13        conduct is a crucial issue in the case, the inability

14        to resolve it in a classwide fashion will cause

15        individual questions to predominate over common ones,

16        which preclude class certification."

17             So I understand this is not an antitrust case, but it

18   is a Rule 23 case, and it seems to me the proposition the case

19   stands for is that when you're evaluating the issue of whether

20   a plaintiff can prove injury by classwide evidence for purposes

21   of Rule 23's predominance test, you evaluate that based on the

22   type of damages the substantive law says that the plaintiff can

23   recover.

24             And this is exclusively a Rule 23 question.  It's not

25   a Sherman Act or a Clayton Act question.  In a state -- and

1  going back to our situation, in a state antitrust claim, the

2  Sherman Act and the Clayton Act don't even come into play.

3  They -- they're not the laws at issue.  It's only the state

4  laws at issue and Rule 23.

5            And so the question is, what does the state law

6  provide about damages, and that then tells you what constitutes

7  injury for purposes of the Rule 23 predominance analysis.

8            THE COURT:  So you were saying the federal overcharge

9  injury standard is inapplicable under those circumstances.

10           MR. SENATOR:  It's inapplicable because it's a

11 standard of a federal law, and this is a state law.  And the

12 question is what's the standard under Rule 23.  So you never

13 get to the federal Sherman Act or Clayton Act.  They don't have

14 anything to do with the case.  The case is about the state law

15 and Rule 23, and that's it.

16           THE COURT:  Have any cases adopted your theory here?

17           MR. SENATOR:  Well, one thing I was thinking about is

18 you can look at this as a Comcast problem.  Now, Comcast said

19 that the theory by which you show impact on a classwide basis

20 must match the damages theory.  And I'd like to -- I don't have

21 it -- this in the hard-copy slides, but I put it -- the

22 amendment to the slide on the screen, and it says in this Page

23 35 of Comcast:

24            "The district court and the court of appeals saw no

25            need for respondents to tie each theory of antitrust

1              impact to a calculation of damages.  That reasoning

2              flatly contradicts our cases requiring a

3              determination that Rule 23 is satisfied."

4         And when you think about it, there in the Sherman Act

5    and the Clayton Act, the courts -- the Supreme Court made a

6    policy choice of what should constitute injury that constitutes

7    recoverable damages for violations of the Sherman Act.  And as

8    the court knows is Section 4 of the Clayton Act, 15 U.S.C. 15,

9    says:

10             "Any person who shall be injured in his business or

11             property may sue and shall recover threefold damages

12             sustained by him."

13        And then, in Illinois Brick, the Supreme Court said

14   that the legislative purpose of a private attorney general

15   statute is better served by holding direct purchasers to the

16   injury or to the full extent of the overcharge paid by them and

17   by attempting to apportion overcharge among all that may have

18   absorbed the part of that.  That is an interpretation of

19   section four of the Sherman -- of the Clayton Act that the

20   Supreme Court made.  It is not an interpretation of Rule 23 or

21   the Federal Rule of Civil Procedure.  It applies to Rule 23 and

22   Sherman Act and Clayton Act cases only because that's the

23   substantive law under the Sherman Act and Clayton Act that the

24   claim is brought.

25        And by contrast, as the Harnish case teaches, where

1 the substantive law issue defines the plaintiff's injury and

2 recoverable damages differently than the Sherman Act or the

3 Clayton Act defines those, Rule 23 follows the substantive law

4 that's relevant to the case.  It's -- the law of the federal

5 Clayton Act is simply irrelevant.  It's not as though the

6 Clayton Act has now been imported into Rule 23 for any claim

7 that's now brought as a federal class action that involves some

8 sort of netting of overpayments and reimbursements, that we're

9 going to have this new Rule 23 standard.  No, we have that

10 standard in a federal antitrust case because that's what the

11 federal antitrust laws says.

12          THE COURT:  What about these state/federal

13 harmonization provision?

14          MR. SENATOR:  Well, that, to me, goes to the question

15 of what does the state law actually provide.  So in some

16 states -- and it differs by states, and the language is

17 different.  Some have it, some don't.  Some say "may."  Some

18 say "shall."  Some of the federal antitrust laws can have some

19 persuasive force in interpreting what the state law means.  But

20 once you fixed what the state law means, then that determines

21 what the standard is that has to be met under Rule 23 for

22 injury.

23          And there are some other cases that bear on this.  I

24 have a California case, the JPMorgan case v Superior Court, 113

25 Cal.App.4th 195.  And this is a case where some members of the

1   proposed class -- I'll just put up the quote and I'll read it.

2            "Some members of the proposed class use loss

3            mitigation techniques, such as hedging, to protect

4            against increases in copper prices, as well as

5            passing on any inflated prices in subsequent resales.

6            When the trial court merely relied on the expert

7            evidence to assume causation of the fact of injury,

8            it failed to account for these other legitimate

9            factors in the record going toward whether classwide

10           proof of injury could be accomplished, particularly

11           as to causation.  An evidentiary showing by the

12           defense may support a pass-on defense due to the

13           factual showing of changes made in the products

14           during the distribution change and the multiple roles

15           played by the proposed class members.  Therefore,

16           this was not a case in which classwide proof at

17           illegality and impact could readily be proved such

18           that individual damage issues should also be

19           appropriately handled in the class-action context."

20           So now here is a state court, State Court of

21  California, again saying we look at the substantive law of the

22  state and they have not just pass-on here, but they also talk

23  about hedging and other loss mitigation techniques.  And these

24  are in this context recognized or available offsets.  And they

25  say for class certification purposes, therefore you have to --

1   and for determining predominance and showing fact of injury or

2   impact, whatever words one gives it, you have to look to that

3   state law and look to the state law of what constitutes

4   recoverable damages and what doesn't.

5            Now I understand that we have a dispute with

6   plaintiffs over the extent to which the pass-on defense in an

7   antitrust claim is currently applicable under California

8   substantive law, and I'm not meaning to comment on that in this

9   discussion.  But the JPMorgan case, the California case, stands

10  for the broader proposition that whatever that state damages

11  rule is, it's also the rule to be applied to whether the

12  plaintiff has shown impact for purposes of the class-action

13  predominance analysis.

14           Okay.  And -- I know it's, uh, we, we've cited to A&M

15  v. Microsoft case to -- on the Michigan Court of Appeals

16  explanation of the standard of actual economic harm in

17  Michigan, and this Court, in its prior ruling, found that there

18  is that actual economic harm standard in Michigan, as well.

19  And therefore -- I use that as just another example.  So now,

20  that's fixed.  That's what an economic harm is -- or that's

21  what damages are in Michigan, their actual economic harm.

22           THE COURT:  You're talking about my ruling on the

23  discovery issue.

24           MR. SENATOR:  I am.  And the A&M Supply Company case

25  that comes out the same way from the Michigan Court of --

1  Appellate Court.   And what I'm saying is, so now that's an

2  interpretation of the substantive Michigan law, and that's

3  fine.   And now that's substantive -- interpretation of the

4  substantive Michigan Law, then in turn defines what, quote,

5  "injury" is for purposes of the Rule 23 predominance analysis

6  here.

7          Now, if there's a state where the substantive law is

8  different, where pass-on isn't a defense, maybe because of

9  their relying on the harmonization provision -- I don't think

10  that would be the right reasoning, but let's just say purposes

11  of argument, for illustration here, that they're relying on the

12  harmonization provision and they think that federal antitrust

13  law should dictate that result in their state.   Now, the

14  substantive law of that state has been set.   And then, you look

15  at what that substantive law is to determine what is injury

16  under that law.   But you're not looking to the Sherman Act to

17  determine that because it's -- you're looking to the state law

18  to determine that because it's ultimately a Rule 23 question,

19  not a Sherman Act question.   That's a Rule 23 question.   What's

20  injury for purposes of Rule 23's predominance requirement?

21  They have to show injury on classwide basis.

22          So here we believe, and we believe we've shown, that

23  the relevant state laws follow that broad principle of looking

24  at economic loss, actual economic loss.   But I don't want to

25  reargue that point because the point Your Honor raised in the

1  question is how does that then affect the injury analysis, and

2  that's what I was really -- under Rule 23, and that's what I

3  was really concentrating on here.  My point is again that the

4  injury analysis -- analysis of what constitutes injury under

5  Rule 23 follows that state --

6             THE COURT:  State law.

7             MR. SENATOR:  -- substantive law of what constitutes

8  recoverable damages.  Now --

9             THE COURT:  Before you leave this subject, what is

10  the best case that you found in your research on this issue in

11  support of your position?

12             MR. SENATOR:  I would say that both Harnish and the

13  quote I've had -- I put up on the screen from that.  And I

14  think Comcast always -- also informs that, also informs the

15  issue, and then the California Court of Appeal case.

16             If I could turn briefly to your Question 3, which is

17  somewhat a variance of Question 2, would common issues

18  predominate if the Court determines that some states permit a

19  pass-on defense as a defense to damages but not to antitrust

20  impact.  And my first response is that I respectfully dispute

21  the premise of the question because as outlined, impact flows

22  from damages, so I don't think it's appropriate to come up with

23  a scenario where those two would be divorced from each other.

24             THE COURT:  Well, impact can occur in a limited

25  sense.  Damages are a separate issue, regardless of how the

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  court rules on impact.

2        MR. SENATOR:  Well, but when we talk about impact, I
3  mean all sorts of conduct can have all sorts of impacts in our
4  lives and otherwise.  And the laws developed around what are, I
5  guess they call them legally compensable impact impacts and
6  settled on economic loss in a broad sense, sometimes defined
7  more broadly than other times, but as what constitutes
8  impact -- I'm sorry, what constitutes recoverable damage that
9  can be adjudicated in courts.  And it would be very strange to
10  have a different standard for injury and say, well, we can call
11  something injury and therefore satisfy Rule 23 but not have it
12  constitute damages for purposes of recovery in a case.  And I'm
13  just thinking, well, what would that situation look like?
14  Because you'd have all these people injured by supposedly
15  anti-competitive conduct with a claim to which they were
16  entitled to zero damages.

17        So I thought, well, what would happen in this case?
18  Would you send a class notice to a whole bunch of people,
19  saying that they're -- they may be injured, but of course, that
20  doesn't mean that they have any damages?  Or at the end of the
21  case, would you say, it's been determined if they're
22  successful, you've been injured in this case, unfortunately
23  you're not entitled to any money recovery because you haven't
24  been damaged financially?  It would become a very strange
25  class-action mechanism to divorce injury from compensable

1  damages and have this system where you have all these class

2  members and people can decide whether to opt out or not and who

3  want to submit claims at the end of the successful class action

4  or settlement who then have zero damages.  And to say the

5  least, I think that would not instill confidence in the

6  class-action mechanism to have that divorce of injury from

7  damages for those reasons.

8          And it's also unclear what legal framework -- or

9  where the legal framework is that this analysis would come

10 from.  I certainly haven't had found any case that employs that

11 framework, and I've looked pretty extensively.  No state, as

12 far as I can tell, appears to have said this in its case law,

13 and no federal court has adopted this approach of not just

14 breaking the link between recoverable damages under the

15 substantive law and what constitutes proof of injury under Rule

16 23.  I just -- I haven't seen that, and I don't see any policy

17 rationale for it, and I see pretty good policy rationales

18 against it.

19          And if there is -- you know, if that is -- link is

20 going to be broken, I also don't see why the federal Sherman

21 acts standard for injury should be the standard that governs as

22 opposed to any other standard for injury.  I mean, after all,

23 we've got a state law claim.  It's not a federal Sherman Act

24 claim.  So why -- and you've got Rule 23 that you're

25 interpreting, so why pick the federal Sherman Act standard

1  under the Supreme Court's <u>Illinois Brick</u> interpretation of

2  Section 4 of the Clayton Act.  Where does that come from as

3  having some sort of prime place in a Rule 23 general analysis

4  of what constitutes injury?  I just don't see how one gets

5  there.

6          THE COURT:  Does <u>Solodyn</u> impact this discussion?

7          MR. SENATOR:  I'm not sure of the answer to that

8  question, but I'm looking back on the case right now, Your

9  Honor.

10         THE COURT:  And I haven't looked at it recently.  I

11 just got a note saying does <u>Solodyn</u> impact this decision.

12         MR. SENATOR:  I'm sorry, I don't want to answer

13 without knowing the answer, and I don't know the answer.

14         THE COURT:  Where's the opinion?  I'm not sure these

15 cases deal with -- I think we're going to have to figure that

16 out.

17         I think what we're talking about, what you've been

18 explaining is the -- first of all, the antitrust injury --

19 federal antitrust injury law is to the effect that antitrust

20 injury occurs on the first overcharge and regardless of what

21 happens there.  Antitrust impact occurs at the moment the

22 purchaser incurs an overcharge.

23         MR. SENATOR:  And what I'm saying is when it uses the

24 word "antitrust impact," that means impact under the

25 substantive law of the Clayton Act and the Sherman Act.  And

1    I -- you know, I can accept that for a Clayton Act and Sherman

2    Act claim.  But I'm saying, but -- that may be true for the

3    Clayton Act and Sherman Act, but that doesn't mean that that

4    same rule applies under a state antitrust law that has a

5    different --

6              THE COURT:  Well, that -- but --

7              MR. SENATOR:  -- damages rule.

8              THE COURT:  And --

9              MR. SENATOR:  And that doesn't make that compensable.

10             THE COURT:  And what you're saying is what -- that

11   answers the first question.  You answered that before.  But the

12   third question -- I'm sorry, the second question.  The third

13   question is would common issues predominate if the Court

14   determines that some states permit a pass-on defense as a

15   defense to damages but not to antitrust impact, and your answer

16   to that is --

17             MR. SENATOR:  My answer was I don't understand how

18   that framework would work because what the damages are defines

19   what the impact is.  And I don't understand where it would come

20   from to say under a particular state law, here's how they

21   define what you can recover, but nonetheless, you were injured

22   just by initially paying it overcharge.

23             THE COURT:  What is your -- and I'm sure you have a

24   quick answer to this.  What is your response on the way in

25   which the actual damages issue -- well, that's state law and

1   you've already answered that.  I guess the question is --

2   relates to a pass-on defense.  I'm trying to dramatize the

3   point, and I'm having difficulty doing it.  In states that

4   permit a pass-on defense, is there an inconsistency between --

5   well, I guess you're going to answer that by saying the state

6   level cases are determined under state law and federal law is

7   not implicated.

8             MR. SENATOR:  Federal Sherman Act law is not

9   implicated.  Of course, Rule 23 is implicated if it's brought

10   in federal court.

11             THE COURT:  Okay.  Rule 23, but you pick up state

12   substantive law.

13             MR. SENATOR:  Right.

14             THE COURT:  So the fact that there's a pass-on

15   defense would have no impact.

16             MR. SENATOR:  I'm sorry, would have no impact on

17   what?

18             THE COURT:  On the question of the need to establish

19   antitrust injury or antitrust impact.

20             MR. SENATOR:  I would think the -- if the state

21   substantive law encompasses a pass-on defense -- in other

22   words, if it says that if you pass on the overcharge, it's not

23   compensable damage -- I think that would follow from that --

24             THE COURT:  But under state --

25             MR. SENATOR:  -- under state law.  That is also not

1  injury.

2            THE COURT:  There's no actual injury.

3            MR. SENATOR:  There's no national injury.  Those two

4  go hand in hand.

5            THE COURT:  And I think what I've been doing in some

6  of my questions is commingling federal and state level on this

7  issue, with which you disagree.

8            MR. SENATOR:  Yes, Your Honor.

9            THE COURT:  All right, last question.  How can the

10 Court address defendants' individualized challenges to the

11 absence of injury in a way that protects defendants' rights?

12            MR. SENATOR:  I'd like to start my response to that

13 one not -- by respectfully taking slight issue with the Court's

14 phrasing of the question because it's clear that it's the

15 plaintiffs' burden to satisfy the class certification

16 requirements of Rule 23, including showing by a preponderance

17 of the evidence that common issues predominate over individual

18 ones.  I think the answer to that question is the way the Court

19 protects defendants' rights is by holding plaintiffs to their

20 burden of proof.  That's how you protect our rights.

21            THE COURT:  In real life at a trial, what would I

22 have to do?

23            MR. SENATOR:  So in our view, it's not for the

24 defendants to have to make individualized challenges and then

25 for the Court to have to try to address those challenges,

1 although we do have concrete ways that we have shown that the

2 plaintiffs' models, that their damages model fall short for

3 individual -- the individual injury analysis.  Instead, it's

4 for the plaintiffs to show that they can prove injury by

5 classwide proof.  And if they can't do that, then they

6 shouldn't be allowed to continue to have a class certified.

7 And if the class is certified and then it becomes clear that

8 they can't do it at trial, the class should be decertified

9 because that's what Rule 23 requires.  And if that doesn't

10 happen, then it's a Rules Enabling Act problem because Rule 23

11 cannot modify substantive rights.

12         Class actions -- and this is Asacol -- do not create

13 a class entity or reapportion substantive claims.  And we're

14 entitled to have our individual defenses heard.  And if that

15 can't be done in the class-action device because of the

16 particular case, the answer is not to try to come up with a

17 bunch of ways to take detours in the class-action trial.

18         THE COURT:  I'm not suggesting that.  I'm just asking

19 how you contemplate this could be done, protecting your

20 individual rights to challenge, for example, injury sustained

21 by class members.

22         MR. SENATOR:  Well, I think again that the plaintiffs

23 have to show that it -- there is injury on a classwide basis.

24 We have nevertheless already shown that -- or pointed to their

25 failure of proof in that regard.  And I think the way the Court

1 therefore protects our individual rights is to deny class

2 certification.

3          THE COURT:  We're not -- I'm not getting the answer

4 to the question.  If you have a challenge to class members on

5 the ground that they've suffered no antitrust injury, how do

6 you propose raising that challenge?

7          MR. SENATOR:  Well, if we assume that the class has

8 been granted and that we're then at trial --

9          THE COURT:  To be at trial in a class action, yes.

10          MR. SENATOR:  Right.  And we're at trial and our

11 motion to decertify has been denied, and I think we need to be

12 entitled to put on evidence and cross-examine the witness, or

13 witnesses, on those individual issues, individual injury, of

14 individual damages, of all those sorts of things.  We need to

15 be able to do that.

16          And again, I don't think it's -- I think it's

17 particularly unwieldy, which is why -- or one reason why the

18 class action to us does not sense here, but I think that to

19 protect our rights, we have to be able to do that at trial.  I

20 think that's the only answer if the class is going to go

21 forward.

22          THE COURT:  Right.

23          MR. SENATOR:  And I apologize.  Has that now

24 answered --

25          THE COURT:  Yes.

1            MR. SENATOR:  -- the Court's question?  Okay.  I did

2    want to just make one further point on the Questions 2 and 3.

3    I didn't want to lose sight of the fact that at the prior

4    hearing, I believe we showed that even under the federal

5    overcharge standard that injury could not be shown on a

6    classwide basis.  Even if the plaintiffs are correct that the

7    federal overcharge standard is the applicable standard for

8    injury, we have shown that -- I won't go through the proof

9    again, but we had shown that that can not be done on a

10   classwide basis. But -- and I just didn't want to lose sight of

11   that showing we believe we made as a threshold manner, which,

12   therefore would be one that needs to get to these very

13   interesting questions of what

14   would happen on the actual economic harm standard.  But if we

15   do get to those questions, I believe we have the answers I'm

16   already gone through.

17            THE COURT:  Thank you.

18            MR. SENATOR:  Thank you, Your Honor.

19            MR. WEXLER:  May I speak briefly?

20            THE COURT:  Yes.  Yes, Mr. Wexler.

21            MR. WEXLER:  First, Your Honor, ascertainability,

22   just to respond to a couple things Mr. Senator just said, it's

23   very important.  And in listening to his argument, it became

24   more clear that the rationale behind the rule are really

25   important.  The ability to self-identify and opt out and

1  whether the defendant can know who's bound by a judgment.  I
2  mean, we have put on evidence of records.  Our methodology is
3  this.  The evidence exists, we can get it, and they can be --
4  it can be read, and there is nothing that Mr. Senator said
5  other than citing to Mr. Dietz saying there would be challenges
6  involves, it disputes that.  Wanting to see us put it into
7  action, the fact of the matter is in Carrera, I think he
8  misquoted it by saying that the court will -- needs to see it
9  implemented because the Third Circuit specifically says in
10 Carrera that the court will not see it implemented, will not
11 see the model in operation.  That can only mean one thing.  You
12 have to explain, like we've tried to do to Your Honor, what we
13 can do to satisfy Carrera's responsibility requirement that the
14 class can be ascertained.  The Court decides whether we've met
15 our burden, whether it's more likely than not that we can show
16 that, and then we move on to 23(a)(1), (2), (3), (4), and
17 23(b).  I think it's that straightforward.  I think that the --
18 again, it's unfortunate that the case law has been so unclear
19 or the language is unclear, but we're on the ground and I think
20 this is where it's developed.

21         And I will point out, just to follow up my speaking
22 of the rationale, Mr Senator never mentions it.  Not once.
23 It's whether we have come here and given you a phonebook with
24 everybody's name in it, and that's not what we're supposed to
25 do.

1        He made the comment that we need it in order to give
2   the best notice practicable, but no case has said that that's
3   the purpose of the rule.  The purpose  -- and one of the
4   rationales initially was to facilitate the best notice
5   practicable, and we have given notice in countless cases
6   before.  They're attached to my declaration.  I don't recall
7   the exhibit number, but we gave you a list of cases where we
8   have given notice.  And the notice firm typically gives direct
9   notice to 12- to 13,000, maybe 14,000 third-party payers,
10  direct notice we give, and then it becomes important -- this is
11  where ascertainability really helps.  It becomes important to
12  know the demographics of those who take Niaspan so that the
13  appropriate publication notice can be given.
14        Now in Relafen, in reference to Mr. Miller's
15  affidavit, Relafen), which was a 2001 case, Judge Young decided
16  in the allocation phase that the party should issue these
17  subpoenas to pharmacies and PBMs and whatnot because he wanted
18  to distribute money to the class.  He wanted them to get
19  checks, and that's how -- you know, that process was used for
20  that reason.  We did something similar in the AWP litigation.
21  But when we settled the track two defendants, we were going --
22  Judge Saris wanted us to give money directly to the class.  And
23  when we went to to subpoena CMS and CMS told us it would cost
24  $18 million to get the information, Judge Saris said no, that's
25  not for the class's benefit, that's too expensive because it

1  comes out of the class's recovery.

2         And so we gave publication notice and we did what we

3  had to do to follow up and make sure that people got their

4  claims in.  It was a very extended claims period, but the best

5  notice practicable means that.  It's notice that complies with

6  the federal guidelines that at least 80 percent reach.  You

7  have to take into account what the potential recovery is

8  because it does if there is a recovery coming from the class.

9  There's lots of factors that go into this, but the fact that

10 there are 500,000 or 600,000 class members, all of whom are

11 ascertainable, all of whom were harmed, our ability to locate

12 them and give notice to them, the expense will be great, but

13 proportional to the damages that the defendants have caused in

14 this case.

15         Interestingly, on the exclusions, the -- we were

16 criticized for having an overly broad class definition with

17 lots of exclusions that are difficult to follow, and yet

18 Mr. Senator stands up here and says, yeah, that the -- you

19 didn't exclude ASOs, but they could -- they might make

20 paying -- you know, it's -- either way, it's not good enough.

21 And as I said  in our last hearing, this process of excluding

22 class members is borne of a lot of defense activity saying you

23 can't know if this person is in the class or out.  So to

24 simplify it, we say exactly who's in and who's out.  Now, we're

25 criticized that it's too broad and vague and -- again, it's --

1  it goes both ways.  And to know if you're excluded, going back

2  to the rationale for the rule, if you fit an exclusion, you're

3  out.  Your Honor, if you take Niaspan, you will not be in this

4  class.  You are excluded.  You read the exclusions, you're not

5  in, sorry.

6          There was a lot of discussion.  Go ahead.  You have a

7  question.

8          THE COURT:  You raised the question of the cost of

9  class identification.  Do you have any idea what that would be

10  in this case?

11          MR. WEXLER:  I can tell you -- I can estimate the

12  cost of class notice, which would probably be over a million

13  dollars.  But to go through the process, if we were to want to

14  issue checks like Judge Young did in <u>Relafen</u>, it would probably

15  be more, but I don't recall what the exact recovery was in

16  <u>Relafen</u>, but I would assume we justified it.

17          With regard to the data that Mr. Senator referred to,

18  the data produced in this case was the plaintiffs' data.  And

19  if there's one thing we can draw a conclusion from is that the

20  plaintiffs are ascertainable from their data.  So to say that

21  our experts didn't look at the plaintiffs' data to decide if

22  the rest of the class was ascertainable takes it out of the

23  realm of what's realistic.  It showed -- the data showed that

24  these are class members, that the plaintiffs are members of the

25  class they seek to represent.  There's been no challenge to

1  those records.  And the records that were handed up to you as

2  being incomplete or whatnot were just responses to discovery.

3  It was not intended to be evidence of ascertainability.

4          So, I mean, it -- that's a different issue.  Maybe it

5  could.  I think if it was evidence of ascertainability, if we

6  had to to show -- give you the phone book, we'd have to list

7  the name.

8          THE COURT:  Well, the evidence that was referenced in

9  the depositions was the evidence that you presented to your

10 experts.

11         MR. WEXLER:  It was the evidence that they put in

12 front of the experts.  And then, the -- yes, they put the

13 evidence in front of our experts and said, did you read this

14 and can you tell from this whether the rest of the class is

15 ascertainable.

16         THE COURT:  But this was data that you had

17 obtained --

18         MR. WEXLER:  Correct.

19         THE COURT:  -- in discovery.

20         MR. WEXLER:  Correct.  But that data belong to our

21 clients', whom they have not challenged the veracity or

22 reliability of those records as demonstrating -- as doing

23 anything but demonstrating that the named plaintiffs are part

24 of the class.  So that included our two consumer plaintiffs,

25 one of whom said produce records.  They sent -- they were asked

1  how did you get them, and he said, I didn't remember, I you had

2  to go to CVS and ask for my prescription history, and they

3  printed it out for me, and we produced it.  That's what --

4  that's all this is about.

5          When our third-party payer clients, typically small

6  union health and welfare funds, we say we need all the data

7  that shows your purchases.  Of course, we acquire a lot of it

8  before we ever file, but we need your purchases where it was

9  purchased, how much, you know, we produce the data that's

10 requested.  No one has challenged those records.  No one has

11 challenged the ability to read them for purposes of our

12 clients.  So it stands to reason that if we were able to obtain

13 the universe of records based on Ms. Craft's declaration, she

14 would be able to prepare the phone book, and at the end of the

15 case, if it's successful and people have to make claims and we

16 give notice that they -- you know, this is what's required with

17 your records so that we know you're part of the class, that's

18 what they'll have to do.

19         Now, the individual challenge to those, the

20 defendants have exercise their Seventh Amendment right by

21 opposing class certification, opposing your ability to

22 ascertain the class, spending two days of oral argument before

23 Your Honor.  They've had their right to challenge.  What we put

24 forth is our reliable and administratively feasible

25 methodology.

1          THE COURT:  Well, they answer by saying you haven't
2    identified the class members and they can't determine whether
3    there are, for example, any substantial numbers of class
4    members who've not been injured, no antitrust injury.
5          MR. WEXLER:  We've put on -- we've carried our burden
6    of putting on evidence that we can ascertain them, as required
7    by the Third Circuit.  Whether they want to see, do they really
8    want to?  Did they -- they know these records exist.
9    Mr. Senator said, we subpoenaed these PBMs and all we got were
10   these declarations and some incomplete data.  Well, a lot of
11   third-party subpoenas are resolved through a negotiated
12   process.  Mr. Senator never took a deposition of one PBM and
13   said, now wait a minute, you say that you have plan design
14   here, how do I know that -- can you go in there and can you
15   look at your database and tell me that somebody's copay,
16   whether it's tiered or flat.
17         Now, Mr. Senator would say, that's not my burden.
18         THE COURT:  Yes, that's exactly what he said.
19         MR. WEXLER:  But we -- but what I'm saying to Your
20   Honor is we met our burden.  We said, this is what we will do,
21   this is what can be done today if Your Honor required it.  The
22   class is ascertainable today.
23         We're not going to do it.  The Third Circuit doesn't
24   require us to give you a phone book today.  It doesn't -- it --
25   I know it's hard intellectually to wrap your mind around it.

1  I've had trouble, but it is -- you can't reconcile the fact
2  that what Carrera repeatedly says is you don't have to give a
3  list now, you have to say that you can.  Then, when it says
4  assurances aren't enough, assurances in that case were a claims
5  administrator was going to, somewhere down the line after class
6  certification, weed out fraudulent affidavits.  The fact was
7  the affidavits themselves had no indicia of reliability on
8  their own.  So it took a -- it was going to be farmed out to a
9  third party.

10        These records, in and of themselves, have indicia of
11  reliability.  They're used in the whole industry, which would
12  collapse without them.

13        One -- quickly on Questions 2 and 3, the cases
14  Mr. Senator cites with regard to Question 2 specifically speak
15  directly to reselling the product.  The argument that somehow
16  we should be looking -- that state law somehow differs from
17  federal law because of Rule 23, the last I heard under Shady
18  Grove, Rule 23 is procedural.  It is not substantive.

19        Every state is harmonized with federal antitrust law.
20  There is not one case on point involving end-payor plaintiffs
21  like us where the court didn't ascribe a federal overcharge
22  standard to the state law claims.  I mean, Nexium comes to
23  mind.  All the other cases come to mind.  It's all -- it's the
24  basis for virtually every motion to dismiss in response, that
25  one purchase is enough for impact.  And all the states have

1  adopted it.

2          The argument presumes some difference because of a

3  potential pass-on, except if pass-on applies to reselling the

4  drugs, which is what the cases say, we don't pass on.  So

5  whatever impact that might have is not on end payors.  If it

6  applies, if there's pass-on, we don't pass on.  So how -- if we

7  incur the overcharge, there is no different measure of

8  damages -- or impact, rather.

9          And just as a follow, impact, as Your Honor knows, is

10 not the same as damages.  It's not economic loss.  Impact is

11 the overcharge.

12         And unless Your Honor has any questions, I have

13 nothing else to add.

14         THE COURT:  I don't have any further questions.

15         MR. WEXLER:  Thank you very much.

16         THE COURT:  Thank you.

17         MR. SENATOR:  Your Honor, could I just mention one

18 sentence, I guess two sentences, about Solodyn?

19         THE COURT:  That's fine.

20         MR. SENATOR:  Maybe just one.  We believe that

21 Solodyn, which is in the First Circuit, has now been supplanted

22 by Asacol.

23         THE COURT:  Thank you.

24         All right.  It's been a long day.  It's about

25 five o'clock.  I'll now turn to deciding these motions.  I'm

1  going to defer, until I decide them, on scheduling any further

2  proceeding, so I'll take them under advisement.

3         Is there anything else that we need to accomplish

4  today, Mr. Wexler?

5         MR. WEXLER:  No, Your Honor.

6         THE COURT:  Mr. Senator.

7         MR. SENATOR:  No, Your Honor.

8         MS. ALLON:  No, Your Honor.

9         THE COURT:  Thank you.

10        MR. SORENSON:  No, Your Honor.

11        THE COURT:  Oh, I hardly saw you back there,

12  Mr. Sorenson.

13        With that, I'll adjourn these proceedings.  Thank you

14  all very much.

15        THE CLERK:  All rise.

16        UNIDENTIFIED:  Thank you, Your Honor.

17    (Proceedings concluded at 4:59 p.m.)

18

19

20

21

22

23

24

25

190

**C E R T I F I C A T I O N**

1

2

3        I, Alicia Jarrett, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9

10   

11   ALICIA JARRETT, AAERT NO. 428     DATE:  July 29, 2019

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25