**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: <br> **NIASPAN ANTITRUST LITIGATION** | MDL NO. 2460 |
| THIS DOCUMENT RELATES TO: <br> ALL ACTIONS | MASTER FILE NO. 13-MD-2460 |

DuBois, J.                                     August 13, 2019

## M E M O R A N D U M

### I.      INTRODUCTION

This multidistrict litigation concerns what has come to be known as a "pay-for-delay," or "reverse payment," settlement—a practice in which a brand-name drug manufacturer brings a patent-infringement action against a generic drug manufacturer and then compensates the generic drug manufacturer for its agreement to delay entering the market with a competing generic version of the brand-name drug.  In this case, two putative classes—the Direct-Purchaser Plaintiffs ("DPPs") and the End-Payor Plaintiffs ("EPPs")—aver that the brand-name manufacturer of the drug Niaspan, Kos Pharmaceuticals, Inc. ("Kos"), entered into anticompetitive settlement agreements in March of 2005 with the generic manufacturer of that drug, Barr Pharmaceuticals, Inc. ("Barr"), in order to terminate patent-infringement litigation brought by Kos against Barr in the District Court for the Southern District of New York.  Kos was later acquired by defendant AbbVie Inc. ("AbbVie"), and Barr was later acquired by defendant Teva Pharmaceuticals, Inc. ("Teva").

Presently before the Court is Direct Purchaser Class Plaintiffs' Motion for Class Certification.  For the reasons that follow, DPPs' Motion is granted.

## II. BACKGROUND

The background of this case is set forth in detail in the Court's Memorandum and Order of September 5, 2014. *See In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735 (E.D. Pa. 2014). This Memorandum recites only the facts and procedural history relevant to this Motion for Class Certification.

Defendant AbbVie, a drug manufacturer that was spun off from Abbott Laboratories ("Abbott") in January 2013, markets and sells Niaspan, a brand-name prescription drug, primarily used in the treatment of lipid disorders. In the early 1990s, Kos, acquired by AbbVie in December 2006, developed a therapeutically-effective time-release version of niacin, Niaspan, which does not cause the side effects previously associated with niacin. Kos obtained a series of U.S. patents on time-release niacin and marketed the drug using the trademark Niaspan. Niaspan has been marketed and sold by AbbVie (and AbbVie's predecessor corporations) since September of 1997.

In October 2001, Barr, acquired by Teva in January 2009, filed an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration ("FDA") seeking authorization to manufacture and sell a generic equivalent of certain dosages of Niaspan. The ANDA process provides for streamlined FDA approval of a bioequivalent generic version of an FDA-approved brand-name drug. As part of the ANDA process, Barr filed certifications with the FDA stating that its generic drug did not infringe any of the patents covering Niaspan and/or that the patents were invalid or unenforceable.

In March 2002, Kos initiated the first of a series of patent-infringement lawsuits against Barr in the Southern District of New York, alleging infringement of its Niaspan patents. After three years of litigation, on April 12, 2005, Kos and Barr entered into several related settlement

agreements terminating the litigation. These agreements constitute the alleged "pay for delay" or "reverse payment" settlement that is the subject of this litigation.

DPPs allege that defendants' conduct constituted unlawful restraint of trade in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. They contend that absent the alleged reverse payments, Barr (or later Teva) would have launched generic Niaspan earlier than September 2013, the date on which Barr launched its generic, and Kos (or later Abbott or AbbVie) would have launched an authorized generic[1] at or about the same time. DPPs proffer three possible scenarios of earlier market entry: (1) at risk in June 2005, while the *Kos v. Barr* patent litigation was pending, (2) after Barr would have prevailed in the patent litigation in September 2007, or (3) as a result of reaching a no-reverse-payment settlement with Kos permitting a correspondingly earlier date (March 2009) for Barr's generic to enter the market.

On December 19, 2018, DPPs filed a Motion for Class Certification. In their Motion, DPPs seek certification of the following class:

> All persons or entities in the United States and its territories who purchased brand name Niaspan directly from any defendant, and generic Niaspan (extended-release niacin) at any time during the period April 5, 2009 through June 26, 2014; or who purchased generic Niaspan (extended-release niacin) directly from any defendant during that time period; or who purchased brand name Niaspan directly from any defendant at any time after April 5, 2009 but ceased operations before generic Niaspan entered in September 2013. Excluded from the class are the defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.

Direct Purchaser Class Plaintiffs' Motion for Class Certification ("DPPs' Mot.") 2.

The proposed class consists of forty-eight class members, six of which have since been acquired by other class members.[2] Direct Purchaser Class Pls.' Mem. L. Supp. Mot. for Class Cert. ("DPPs' Mem.") 17; Mem. L. Opp'n to Direct Purchaser Plaintiffs' Motion for Class

---

[1] An authorized generic is a generic drug that is marketed by the holder of the approved New Drug Application ("NDA")—the manufacturer of the brand-name drug. *See In re Niaspan Antitrust Litig.*, 42 F. Supp. at 741.

[2] Defendants argue that the six class members which have since been acquired should not be considered separate class members. Defs.' Opp'n 38. This argument is addressed *infra*.

Certification ("Defs.' Opp'n") 38. Twenty-one class members purchased brand and generic Niaspan from defendants. Direct Purchaser Pls.' Mem. L. Supp. Mot. for Class Certification ("DPPs' Reply") 6. Two class members, King Drug Co. of Florence, Inc. and Professional Drug Company Inc., purchased brand Niaspan but ceased business operations before generic Niaspan became available in 2013. Defs.' Opp'n 27; DPPs' Reply 6. Twenty-five class members purchased only generic Niaspan directly from defendants. DPPs' Mem. 32–33.

DPPs also move the Court to appoint plaintiffs Rochester Drug Co-Operative, Value Drug, and Professional Drug Co. as class representatives and to appoint Berger Montague PC, Garwin Gerstein & Fisher LLP, and Hagens Berman Sobol Shapiro LLP as Co-Lead Counsel for the Class pursuant to Fed. R. Civ. P. 23(c)(1)(B) and 23(g).

Defendants responded to the Motion on February 25, 2019; DPPs filed a Reply on March 25, 2019. The Court held Hearings on DPPs' Class Certification Motion on May 14 and July 23, 2019. The Motion is ripe for decision.

## III.    LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 248 (3d Cir. 2016). Subsection (a) of Federal Rule of Civil Procedure 23 sets out four prerequisites for a class action—numerosity, commonality, typicality, and adequacy. Subsection (b) provides additional requirements for each type of class action. To obtain certification under Rule 23(b)(3), as plaintiffs seek to do in this case, the moving party must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." These requirements are referred to, respectively, as predominance

and superiority. Rule 23(b)(3) also contains an implied, judicially-created requirement that the identities of class members are ascertainable. *See In re Domestic Drywall Antitrust Litig*., 322 F.R.D. 188, 200 (E.D. Pa. 2017) (citing *Carrera v. Bayer Corp*., 727 F.3d 300, 305 (3d Cir. 2013)).

"The party seeking certification bears the burden of establishing each element of Rule 23." *In re Modafinil Antitrust Litig*., 837 F.3d at 248. "[T]rial courts 'must engage in a rigorous analysis and find each of Rule 23[ ]'s requirements met by a preponderance of the evidence before granting certification.' They must do so even if it involves judging credibility, weighing evidence, or deciding issues that overlap with the merits of a plaintiff's claims." *Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 304 (3d Cir. 2016) (citing *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 316–25 (3d Cir. 2008)). This Rule 23 analysis also requires courts to "determine the nature of the evidence, and how plaintiffs would present this evidence at trial." *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. at 221. However, "a court should not address merits-related issues 'beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof.'" *Harnish*, 833 F.3d at 305.

The Third Circuit has "repeatedly emphasize[d] that [a]ctual, not presumed conformance with Rule 23 requirements is essential." *Gonzalez v. Corning*, 885 F.3d 186, 192 (3d Cir. 2018) (internal quotations omitted). "When courts harbor doubt as to whether a plaintiff has carried her burden under Rule 23, the class should not be certified." *Mielo v. Steak 'n Shake Operations, Inc*., 897 F.3d 467, 483 (3d Cir. 2018).

## IV.    DISCUSSION

DPPs argue that they have satisfied their burden of establishing each Rule 23 requirement by a preponderance of the evidence. The Court considers each requirement in turn.

## A. *RULE 23(A) REQUIREMENTS*

DPPs must initially satisfy the four prerequisites detailed in Rule 23(a): numerosity, commonality, typicality, and adequacy. The Court concludes that each requirement is satisfied.

### i. *Numerosity*

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." The numerosity determination "calls for an inherently fact-based analysis that requires a district court judge to 'take into account the context of the particular case,' thereby providing district courts considerable discretion in making numerosity determinations." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016) (quoting *Pa. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014)). The non-exhaustive list of relevant factors that are appropriate for district court judges to consider when determining whether joinder would be impracticable includes "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages." *In re Modafinil Antitrust Litig.* at 252–53. "[J]udicial economy and the ability to litigate as joined parties are of primary importance." *Id*. at 253. "While '[n]o minimum number of plaintiffs is required to maintain a suit as a class action,' [the Third Circuit] has said that 'generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.'" *Id*. at 249–50.

DPPs contend that the putative class contains forty-eight members, creating a presumption that joinder is impracticable. DPPs' Mem. 17–18. They further argue that the class has widespread geographic dispersion, that many class members do not have large enough claims to make an individual suit practicable, and that some class members may not sue for fear of

retaliation by defendants. *Id.* at 18–20. Defendants respond that the putative class contains only forty-two members and that joinder is practicable because "[a]ll, or virtually all, of the members of the proposed class have the resources and financial incentives to litigate through joinder." Defs.' Opp'n 40.

For the reasons below, the Court concludes that the numerosity requirement is satisfied.

### 1. Number of Class Members

Defendants contend that DPPs' calculation of forty-eight class members wrongly includes "six entities that have been acquired by other members of the proposed class." Defs.' Opp'n 38. They argue that "[a]s a practical matter, Parents and subsidiaries will not make different litigating decisions because they have a 'unity of interests.'" *Id.* at 39.

DPPs correctly note that courts have consistently rejected this argument. *See, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.*, No. 13-2472, 2019 WL 3214257, at *10 (D.R.I. July 2, 2019); *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 207 (S.D.N.Y. 2018) ("I join with other courts that have considered this issue and have ruled that where there is distinct and separate injury, a corporate relationship with another class member does not defeat individual member status."); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-02503, 2017 WL 4621777, at *4 (D. Mass. Oct. 16, 2017) (holding class members with common corporate parents are considered distinct entities for class certification purposes); *Am. Sales Co., LLC v. Pfizer, Inc.*, No. 14-361, 2017 WL 3669604, at *8 (E.D. Va. July 28, 2017) (allowing subsidiaries to vindicate their own antitrust injuries).

The Court agrees with DPPs that the six class members subsequently acquired by other class members should be treated as separate entities in the numerosity analysis. However, even assuming *arguendo* that there were only forty-two class members, the result would not change.

A class size of forty-eight members, or forty-two members, raises a presumption that joinder is impracticable. *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, 250–251 (3d Cir. 2016).

### 2. *Practicality of Joinder*

The Court next turns to the other relevant numerosity factors—judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, and the geographic dispersion of class members. A review of those factors does not rebut the presumption that joinder is impracticable.

Judicial economy will be served by allowing this case to proceed as a class action. If this case proceeds through joinder, the Court faces the prospect of individual plaintiffs represented by dozens of different attorneys with the potential for a multitude of summary judgment briefs espousing an array of arguments and additional complications at trial. *See* July 23, 2019, Hr'g Tr. 40:21–41:11.

The Court finds that the claimants' ability and motivation to litigate as joined plaintiffs is a neutral factor in determining whether joinder would be impracticable. DPPs assert that non-recoverable expert costs in complex antitrust cases "can easily exceed $3 million." DPPs' Mem. 18–19. Even assuming that DPPs recover the full amount of trebled prospective claims based on their damages expert's highest aggregate overcharge estimate, they argue that twenty-seven class members would have claims below $3 million. *Id.* However, defendants correctly note that DPPs err in their claims valuation because "the numerosity rule does not envision the alternative of individual suits; it considers only the alternative of joinder." *In re Modafinil Antitrust Litig.*, 837 F.3d at 258. DPPs offer no assessment as to how expert costs could be economically shared through joinder. DPPs' Reply 28.

Defendants argue that contrary to DPPs' representation, "[a]ll, or virtually all, of the members of the proposed class have the resources and financial incentives to litigate through joinder." Defs.' Mem. 40. They rely upon their expert, Dr. Daniel Rubinfeld, who determined that "if the putative class members split those costs evenly, 41 of the 42 'would have trebled claims in excess of their share of expected litigation costs.'" *Id*. at 41. The Court is not persuaded by defendants' argument. To assess whether bringing a claim is economical, a claimant must consider not only the trebled value of the maximum possible recovery, but also the possibility that a lawsuit will result in a less favorable outcome—either through partial recovery or no recovery at all. Dr. Rubinfeld's calculation is fundamentally flawed due to his failure to take the likelihood of litigation success into account. Thus, the Court concludes that neither party has provided a persuasive analysis of DPPs' financial motivation to litigate through joinder.

DPPs also assert that some class members might not be motivated to litigate through joinder out of fear of retaliation by defendants. They highlight dicta from the Supreme Court in which the Court "recognize[d] that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977). DPPs allege that this fear of retaliation explains why in a similar reverse payment case, several plaintiffs chose not to pursue their claims through joinder after the court denied their motion for class certification. DPPs' Mem. 18 n.84 (citing *King Drug Co. of Florence, Inc. v. Cephalon, Inc*., No. 06-1797 (E.D. Pa.)). However, DPPs do not provide any evidence that the putative class members in this case fear retaliation or that participation through joinder sparks greater fear of retaliation than does participation through a class action. *See King Drug Co. of Florence, Inc. v. Cephalon, Inc*., No. 06-1797, 2017 WL 3705715, at *10

(E.D. Pa. Aug. 28, 2017) ("Direct Purchasers have again failed to offer any concrete evidence to support their concern about the hypothetical risk of retaliation.").

The Court also finds relevant, though less significant, DPPs' widespread geographic diversity as a factor favoring finding joinder impracticable. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig*., No. 14-02503, 2017 WL 4621777, at *5 (D. Mass. Oct. 16, 2017) ("[G]eographic dispersion suggests joinder is impracticable, even when putative class members are corporate entities."). In this case, DPPs are scattered across the United States and Puerto Rico. *See* Rebuttal Rep. Jeffrey J. Leitzinger, Ph.D ("Leitzinger Rebuttal") Ex. 4.

Finally, contrary to defendants' assertion, the Third Circuit *Modafinil* decision does not require a ruling denying class certification on this ground. In *Modafinil*, the district court certified a direct purchaser class of "twenty-two large and sophisticated corporations" in a similar 'pay-for-delay' case. *In re Modafinil Antitrust Litig*., 837 F.3d 238, 242 (3d Cir. 2016). The Third Circuit vacated the class certification ruling and remanded the case, holding that "the District Court abused its discretion in analyzing the two most important numerosity factors when it considered the late stage of the litigation as relevant to the judicial economy factor and failed to properly consider the ability and motivation of the plaintiffs to proceed as joined, as opposed to individual, parties." *Id*. at 259. The panel also observed that three class members "ma[d]e up over 97% of the total value of the class claims," and observed that the class members "appear likely to have the ability and incentive to bring suit as joined parties," a factor the district court did not consider. *Id*. at 258.

In this case, three class members—the same three wholesalers involved in *Modafinil*—account for a large percentage of the total value of class claims—89% of DPPs' aggregate overcharge damages. Defs.' Opp'n 3. However, there are two critical distinctions between this

case and *Modafinil*. First, in contrast to the district court in *Modafinil*, this Court has considered the factors of judicial economy and the ability and motivation of DPPs to proceed by joinder in determining that joinder is impracticable. *See In re Modafinil Antitrust Litig.*, 837 F.3d at 242 (holding the *Modafinil* vacatur and remand did "not foreclose the possibility of class status in [that] case, or where [a] putative class is of similar composition."). Second, unlike the twenty-two member putative class in *Modafinil*, the sheer size of the forty-eight member DPP putative class raises a presumption of impracticable joinder and poses a far greater challenge to judicial economy if the case were to proceed through joinder.

In short, the Court concludes that considerations of the number of class members, judicial economy and the geographic dispersion of class members render joinder impracticable. The question whether the putative class members have the ability, motivation and financial resources to litigate through joinder favors neither party on the present state of the record. Accordingly, the Court determines that DPPs have established numerosity by a preponderance of the evidence.

### ii. Commonality

To satisfy Rule 23(a)(2), there must be "questions of law or fact common to the class." Satisfaction of the commonality requirement requires that plaintiffs demonstrate that their claims "depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Commonality does not require an identity of claims or facts among class members; instead, [t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2011).

The Court agrees with DPPs that "commonality is easily met." *See* DPPs' Mem. 21. Common issues in this case include, *inter alia*, (1) whether defendants conspired to suppress generic competition to Niaspan; (2) whether, pursuant to a reverse payment agreement, Barr (and, later, Teva) agreed to delay its entry into the market with generic Niaspan; and (3) whether the alleged reverse-payment agreement is illegal under the antitrust rule of reason.[3] The commonality element is thus satisfied.

### iii. *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The Third Circuit has a "low threshold" for satisfying typicality. *See In re Nat'l Football League Players Concussion Injury Litig*., 821 F.3d 410, 428 (3d Cir. 2016). To conduct the typicality inquiry, the court must examine "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *In re Blood Reagents Antitrust Litig*., No. 09-2081, 2015 WL 6123211, at *26 (E.D. Pa. Oct. 19, 2015) (DuBois, J.).

DPPs argue that typicality is satisfied because "Defendants' scheme impaired generic competition market-wide, and [DPPs] seek overcharges for themselves and the Class based on the same factual allegations and legal theories." DPPs' Mem. 22. Defendants do not contest that

---

[3] The rule of reason is the "usual standard applied to determine whether a challenged practice unreasonably restrains trade." *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 315 (3d Cir. 2010). Under the rule of reason standard, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited." *Id*.

DPPs have satisfied the typicality requirement, and the Court agrees that the typicality requirement is satisfied.[4]

### iv. Adequacy

Rule 23(a)(4) requires plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." "Whether adequacy has been satisfied 'depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'" *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 477 (E.D. Pa. 2009). "Only a fundamental conflict will defeat adequacy of representation." *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 223 (3d Cir. 2012), *judgment vacated on other grounds*, 570 U.S. 913 (2013).

DPPs argue that class counsel are qualified and that the named plaintiffs, Rochester Drug Co-Operative, Value Drug, and Professional Drug Co., adequately represent the class. DPPs' Mem. 22–26. Defendants disagree, arguing that there is a conflict between the named plaintiffs, all of which purchased brand Niaspan, and the class members which purchased only the generic. Defs.' Opp'n 32. According to defendants, class members which purchased brand Niaspan would prefer an overcharges theory of injury, whereas the generic-only purchasers "could theoretically pursue much larger lost-profits damages." *Id*. In support of their argument, defendants present calculations by their expert, Dr. Rubinfeld, who examined six generic-only purchasers and "concluded that these six purchasers would have larger lost-profits claims than overcharge claims." *Id*. at 33. They argue that DPPs failed to consider whether pursuing an overcharge theory was actually best for the generic-only class members. *Id*.

---

[4] The Court notes that defendants argue DPPs have not satisfied the Rule 23(a)(4) adequacy requirement, and that "[t]he adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 626 (1997). To the extent that defendants' adequacy challenge also challenges typicality, the Court rejects the challenge for the reasons explained *infra*.

DPPs reject Dr. Rubinfeld's calculations as speculative and contend that "[t]he notice and opt-out mechanism of Rule 23 is perfectly suited to address the hypothetical possibility that a particular class member may wish not to participate." DPPs' Mem. 25–26; DPPs' Reply 25–26.

The Court agrees with DPPs and is confident that the named plaintiffs will fairly and adequately protect the interests of the class. Even assuming Dr. Rubinfeld's calculations employ reasonable assumptions, he concludes only that six generic wholesalers "*may have a different view on the best damages methodology to pursue* than other putative class members, including the Named Plaintiffs." Expert Rep. Daniel L. Rubinfeld ("Rubinfeld Rep.") ¶ 54. Dr. Rubinfeld's opinion on this issue must be viewed as mere speculation, particularly in light of the fact that "[l]ost profits damages are disfavored, at least in part because they are more difficult to prove than overcharge damages." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc*., 424 F.3d 363, 374–75 (3d Cir. 2005).

Furthermore, defendants' challenge does not raise the type of "fundamental conflict" necessary to defeat adequacy. In this case, "[a]ll of the class members have the same financial incentive for purposes of the litigation—i.e. proving that they were overcharged and recovering damages based on that overcharge." *In re K-Dur Antitrust Litig*., 686 F.3d at 223. The cases relied upon by defendants are inapposite because they address far more substantial conflicts. For example, courts have found a "fundamental conflict" where some members have suffered injuries from asbestos and some were only exposed to the product, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 626 (1997), or where named plaintiffs had an incentive to place themselves in a small "reimbursement group" and place as many other class members in a "residual group," *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 188 (3d Cir. 2012).

In contrast, the possibility that a few plaintiffs in this case may prefer pursuing a lost profits damages theory rather than the standard overcharge theory does not create the type of fundamental conflict required to defeat adequacy. *See Castro v. Sanofi Pasteur Inc*., 134 F. Supp. 3d 820, 845 (D.N.J. 2015) ("That some plaintiffs 'may prefer' alternative damages theories does not create a conflict."). The Court concludes that any such putative class members which would prefer to pursue a lost profits damages theory can adequately protect their rights by opting out of the class. *See In re Lidoderm Antitrust Litig*., No. 14-02521, 2017 WL 679367, at *15 (N.D. Cal. Feb. 21, 2017) (concluding that even if some plaintiffs "'might' prefer a lost profit measure of damages as opposed to overcharges . . . these hypothetical class members could protect any such interest by opting out of the class."). Accordingly, Rochester Drug Co-Operative, Value Drug, and Professional Drug Co. are appointed class representatives for the DPPs.

The Court also concludes that proposed class counsel—Berger Montague PC, Garwin Gerstein & Fisher LLP, and Hagens Berman Sobol Shapiro LLP—are qualified, experienced, and able to conduct the proposed litigation. As Interim Co-Lead Counsel, they have ably and vigorously litigated this case consistent with the Court's Order dated December 23, 2013 (Document No. 36) by which they were appointed. Accordingly, they are appointed Co-Lead Counsel for the DPPs.

## B.  *RULE 23(B)(3) REQUIREMENTS*

DPPs must also satisfy the predominance and superiority requirements expressly detailed in Rule 23(b)(3) as well as the implied ascertainability requirement. *See In re: Domestic Drywall Antitrust Litig*., 322 F.R.D. 188, 200 (E.D. Pa. 2017). The Court concludes that each Rule 23(b)(3) requirement is satisfied.

### i. *Predominance*

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  "Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'  What the rule does require is that common questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 469 (2013) (emphasis in original).

"An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotations and citations omitted).

The elements of DPPs' antitrust claims are "(1) a violation of the antitrust laws—here, §[§] 1 [and 2] of the Sherman Act, (2) individual injury resulting from that violation, and (3) measurable damages."  *See In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 311 (3d Cir. 2008).

The predominance challenges focus on the second element—antitrust injury, also called antitrust impact.  In antitrust class actions, "impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof."  *In re Modafinil Antitrust Litig*., 837 F.3d 238, 262 (3d Cir. 2016).  Antitrust injury requires each individual plaintiff to show at least some "fact of damage" resulting from the alleged violation.  *Id*.  "[A] plaintiff's "burden of proving the fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful

conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *9 (E.D. Pa. Oct. 19, 2015) (DuBois, J.) (citing *Danny Kresky Enter. Corp. v. Magid*, 716 F.2d 206, 209–10 (3d Cir. 1983).

Proof of antitrust impact is analytically distinct from proof of antitrust damages. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001) ("Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)."). Unlike proof of injury, "imperfect damages calculations are more often forgiven in the antitrust context." *In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, No. 12-00995, 2018 WL 6567709, at *5 (D.N.J. Dec. 12, 2018); *Eastman Kodak Co. of New York v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."). "The relaxed measure of proof is afforded to the amount, not the causation of loss—the nexus between the defendant's illegal activity and the injuries suffered must be reasonably proven." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993).

DPPs argue that common questions predominate because the parties will present common fact and expert evidence addressing, *inter alia*, "(1) whether Kos (and later . . . AbbVie) made large reverse payments to Barr (and later, Teva); (2) whether Kos's (and, later . . . AbbVie's) reverse payments were for a purpose other than to delay generic competition for Niaspan; (3) whether Kos, Abbott, and AbbVie possessed market or monopoly power over Niaspan; (4) whether Defendants' reverse payment agreement violated the rule of reason; and (5) whether, but

for the reverse payments, generic competition would have begun earlier and if so, when." DPPs'
Reply 3–4. They also argue that the testimony of their expert, Dr. Jeffrey Leitzinger, provides
evidence of antitrust injury on a classwide basis through common evidence and that aggregate
damages for the class can be reliably measured through common evidence. DPPs' Mem. 29–34,
38–42.

Defendants counter that Dr. Leitzinger's evidence does not present common classwide
proof of antitrust injury and that DPPs' proof of antitrust injury would require an individualized
analysis that overwhelms common questions and defeats predominance. Defs.' Opp'n 17–31.
Specifically, defendants challenge (1) DPPs' common evidence to show antitrust injury for class
members which purchased brand and generic Niaspan from defendants and class members which
purchased brand Niaspan but ceased business operations before generic Niaspan became
available, (2) DPPs' common evidence to show antitrust injury for class members which
purchased only generic Niaspan; (3) DPPs' claim that they need not provide common evidence
of injury separately for each damages theory. *Id.*

The Court first reviews DPPs' classwide evidence of antitrust injury based on the expert
testimony of their expert, Dr. Jeffrey Leitzinger. The Court then considers each of defendants'
predominance challenges in turn.

### 1. *Dr. Leitzinger's Testimony*

DPPs rely on Dr. Leitzinger's expert testimony to provide proof of classwide injury. Dr.
Leitzinger concludes that, assuming defendants unlawfully delayed generic competition and that
two generics would have launched earlier through the one of the three market entry scenarios,
"there is evidence . . . which is common to members of the Class, which shows that all members

of the Class likely paid at least some overcharge."  Expert Rep. Jeffrey J. Leitzinger, Ph.D.

("Leitzinger Rep.") ¶ 19.  He opines that

> The onset of generic competition at an earlier date would have reduced the amounts paid for extended-release niacin by direct purchasers in three ways: i) much of the Niaspan purchase volume during the Delay Period would have been replaced with generics at much lower prices ["brand-generic theory"]; ii) the remaining Niaspan purchases during the Delay Period would have occurred at lower average prices ["brand-brand theory"]; and iii) generics purchased following actual generic entry would have had still-lower prices by virtue of the fact that, in the but-for world generic competition would have started earlier and there would have been an additional generic seller up through June 2014 ["generic-generic theory"].

*Id*. ¶ 40.

According to Dr. Leitzinger, the twenty-one class members which purchased brand and generic Niaspan from defendants incurred overcharges under the brand-generic, brand-brand, and generic-generic damages theories.  *Id*. ¶¶ 33–37.  He also opines that the two class members which purchased brand Niaspan but ceased business operations before generic Niaspan became available would have purchased generic Niaspan had it been available, and therefore paid overcharges under the brand-generic and brand-brand theories.  *Id*. ¶ 34 n.61.  Finally, he concludes that the twenty-five class members which purchased generic Niaspan but had not previously purchased brand Niaspan directly from defendants incurred overcharges under the generic-generic theory.  *Id*. ¶¶ 36–37.

To calculate generic pricing in alternative hypothetical scenarios with earlier generic competition, Dr. Leitzinger combined defendants' and other generic manufacturers' forecasts of generic pricing.  *Id*. ¶ 41.  He estimated average generic discounts from the brand wholesale acquisition cost ("WAC") based on the discounts shown within a given company's forecasts for sub-periods corresponding to the number of assumed generic competitors.  *Id*. ¶ 42.  He then averaged the but-for generic price forecasts across five companies to obtain a single but-for generic price for each sub-period.  *Id*.  He opines that "actual generic pricing experience is not a

useful benchmark for this purpose" because the actual pricing experience was distorted by the delayed generic entry. *Id.* ¶ 43.

To calculate brand pricing in alternative hypothetical scenarios with earlier generic competition, Dr. Letizinger modeled brand pricing based on the average ratio of brand discounts to generic price discounts relative to brand WAC during the period following the June 2014 launch of Zydus, an authorized generic. *Id.* ¶ 46. He then applied the average discount, 68% of the generic discount, to model the but-for brand prices during the assumed overcharges period. *Id.*

As a preliminary matter, DPPs contend that defendants' failure to challenge Dr. Leitzinger's testimony under *Daubert*[5] means that any challenges defendants now raise "simply 'go to the weight' a jury may give it." DPPs' Reply 5 & n.14. DPPs rely on the Supreme Court majority's observation in *Tyson Foods* that "Petitioner . . . did not raise a challenge to respondents' experts' methodology under *Daubert*; and, as a result, there is no basis in the record to conclude it was legal error to admit that evidence. Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016).

The Court is unpersuaded by DPPs' argument. A *Daubert* challenge concerns the admissibility of evidence and does not affect the Court's independent obligation under Rule 23 to engage in a rigorous analysis to determine whether DPPs' have established by a preponderance of the evidence that antitrust injury is capable of classwide proof. As the Third Circuit has advised, "opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded under *Daubert*

---

[5] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

or for any other reason." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2009). Whether or not a *Daubert* challenge is filed, "[I]t remains the task of district courts, through application of the rule's requirements to the facts and claims before it, to determine what constitutes a 'question[ ] of law or fact common to class members.'" *Gonzalez v. Corning*, 885 F.3d 186, 201 (3d Cir. 2018); *see also Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 304–05 (3d Cir. 2016) ("The court's Rule 23(b)(3) finding necessarily entails some analysis of whether the proposed class-wide evidence will actually be sufficient for the class to prevail on the predominant issues in the case.").

DPPs' motion for class certification turns in large part on whether DPPs have shown that they can prove classwide injury through common evidence or whether they will need to rely upon individualized proof. *In re Modafinil Antitrust Litig.*, 837 F.3d at 262. Thus, the Court must consider defendants' challenges to Dr. Leitzinger's testimony in determining whether DPPs have shown proof of antitrust injury or impact will involve common—and not individualized—evidence.

### 2. Common Evidence of Antitrust Injury for Class Members Which Purchased Brand Niaspan

DPPs argue that Dr. Leitzinger has common evidence that the twenty-one class members which purchased brand and generic Niaspan from defendants and the two class members which purchased brand Niaspan before going out of business can prove antitrust injury through brand-generic overcharges. DPPs' Mem. 30–34.

Dr. Leitzinger relies on extensive common evidence to conclude that purchasers of brand Niaspan paid an overcharge because earlier generic entry would have resulted in class members buying generic Niaspan instead of the more expensive brand Niaspan. His evidence includes academic and government research that upon generic entry, generics overwhelmingly replace

brand sales and are priced lower than the brand price, and that brand manufacturers will "engage in direct price competition with generic manufacturers through 'authorized generics.'" Leitzinger Rep. ¶¶ 20–21, 23.  Dr. Leitzinger also considered internal projection forecasts by defendants and other generic manufacturers, each of which forecasted that generic Niaspan would be priced at a substantial discount relative to brand Niaspan and that generic Niaspan would substantially displace brand Niaspan.[6]  *Id*. ¶¶ 24–30.  Finally, Dr. Leitzinger relied on the actual Niaspan experience, in which generic Niaspan was originally priced at a 33% discount to brand Niaspan, and after a little over a year, generic Niaspan had captured 80% of all Niaspan prescriptions.  *Id*. ¶ 31.

Courts have consistently ruled that this type of common evidence of brand-generic overcharges is sufficient to establish antitrust injury on a classwide basis.  *See, e.g.*, *In re K-Dur Antitrust Litig*., 686 F.3d 197, 220 (3d Cir. 2012); *In re Wellbutrin Sr Direct Purchaser Antitrust Litig*., No. 04-5525, 2008 WL 1946848, at *8 (E.D. Pa. May 2, 2008); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig*., No. 14-02503, 2017 WL 4621777, at *7 (D. Mass. Oct. 16, 2017).  This Court agrees with those cases.

Dr. Leitzinger also opines "based on common evidence of the expected effects of generic competition, as well as the role of King Drug and Professional Drug Co., as wholesalers[], that King Drug and Professional Drug Co. would likely have purchased some generic Niaspan had it become available before they went out of business."  Leitzinger Rep. ¶ 34 n.61.  He further observes that "King Drug's President, Keith Elmore, provided a Declaration stating . . .  King Drug would have purchased generic Niaspan had it been on the market while King Drug was in

---

[6] For example, brand manufacturer Kos's internal projections predicted that generic entry would result in 85% generic substitution within six months at a 40% price discount.  *Id*. ¶ 25.

business [and] Professional Drug Company's General Manager, Mr. Pitalo, testified that it purchased generic drugs to meet the needs of its customers." *Id.*

Defendants focus their brand-generic predominance challenge on DPPs' ability to prove through common evidence that King Drug and Professional Drug Co. incurred brand-generic injury. Dr. Rubinfeld found that "half of the wholesalers that directly purchased branded Niaspan and remained in business after September 2013 did not purchase generic Niaspan directly during the class period." Rubinfeld Rep. ¶ 45. As a result, defendants argue, "[n]o common evidence can show that King Drug and Professional Drug Co. would not have fallen into the large set of direct brand purchasers that never bought generic Niaspan directly from a manufacturer." Defs.' Opp'n 28.

DPPs respond that a jury could credit Dr. Leitzinger's conclusion that both companies would likely have purchased some generic Niaspan had it become available at a lower price before they went out of business. They also argue that if both companies are required to provide additional evidence through individual testimony, common questions would still predominate. DPPs' Reply 38 n.167.

The Court agrees with DPPs that even if additional individualized evidence from King Drug and Professional Drug Co. were required, such evidence would not predominate over common questions. *See King Drug Co. of Florence v. Cephalon, Inc*., 309 F.R.D. 195, 205 (E.D. Pa. 2015) ("To the extent that including King Drug as a class member would give rise to individualized evidence on the issue of whether it would have purchased generic Provigil, that individualized evidence would be minimal and would not defeat predominance."), *vacated and remanded on other grounds sub nom. In re Modafinil Antitrust Litig*., 837 F.3d 238 (3d Cir. 2016).

The Court concludes that DPPs have met their burden of showing that they have classwide evidence of antitrust injury with respect to the twenty-one class members which purchased brand and generic Niaspan from defendants and the two class members which purchased brand Niaspan before going out of business.

### 3. Common Evidence of Antitrust Injury for Class Members Which Purchased Only Generic Niaspan

Defendants also contend that DPPs lack common evidence to prove antitrust impact for the twenty-five class members which purchased only generic Niaspan from defendants. The Court disagrees with defendants on this issue.

Dr. Leitzinger concludes that generics purchased following actual generic entry would have been priced lower if generic competition started earlier and there was an authorized generic entrant prior to June 2014, the date of the entry of the authorized generic, Zydus. To support his conclusion, Dr. Leitzinger relies on evidence including (1) extensive research, including a study that found that average generic prices were approximately 16% lower when two generics (an authorized generic and a competing generic) were launched and competed during the 180-day exclusivity period as compared to prices when only one generic was on the market without competition from an authorized generic;[7] (2) a forecast from Abbott that "within a year following generic entry, the generic would be used to fill 80 percent of the prescription volume at a price 30 percent below the brand price with one generic on the market [and] 50 percent below the brand price with two generics on the market"; (3) internal documents from Teva anticipating

---

[7] "[T]o encourage generic entry and to compensate ANDA filers for the expense and risk of a potential infringement lawsuit, federal law grants the first generic manufacturer to file a[n] . . . ANDA application (i.e., the "first-filer") a 180–day period of exclusive marketing rights." *In re Niaspan Antitrust Litig*., 42 F. Supp. 3d 735, 741 (E.D. Pa. 2014). "[T]he 180–day period is exclusive only with respect to other ANDA applicants . . . [but] does not prohibit the holder of an approved NDA from marketing . . . its own [generic] version of its drug." *Id*. (internal quotations omitted).

greater price discounts with more generics; and (4) in the actual Niaspan experience, when there was only a single generic version of Niaspan on the market from September 2013 to March 2014, the generic price was 33% below the brand WAC price, but with additional generic entrants in March 2014 and June 2014, generic prices dropped to 74% below brand price. Leitzinger Rep. ¶¶ 27, 29, 31. Joseph Suarez, Kos's Director of Financial Analysis, and Dr. Bruce Stangle, one of defendants' experts, also agreed that they expected generic Niaspan prices to fall with additional generic competitors. DPPs' Reply 18–19.

Defendants challenge Dr. Leitzinger's conclusions as to the generic-only purchasers, contending that "Dr. Leitzinger's averages are not an appropriate method of proving class-wide injury because they mask considerable variation in the prices that direct purchasers paid for . . . generic Niaspan." Defs.' Opp'n 17-31. Specifically, they argue that the prices paid for generic Niaspan were highly variable and that DPPs' evidence of generic-generic overcharge relies exclusively on analyses of changes in *average* prices that masks the actual prices. *Id.* at 23–27. Defendants contend that although Dr. Leitzinger observed variability in the prices that direct purchasers paid for generic Niaspan, he "did not undertake any analysis of variability between purchasers, did not conduct any purchaser-specific analysis of generic prices relative to brand WAC, and did not undertake a class member-by-class member analysis of how generic Niaspan prices changed when the market went from one generic to two, or from two to three." *Id.* at 14 (internal citations and quotations omitted). On this issue, defense expert Dr. Rubinfeld calculated that three of the generic-only purchasers paid more for generic Niaspan when there were two generics available than when there was one. Rubinfeld Rep. ¶¶ 49–50.

"The use of averages in a common impact analysis is controversial, and courts have come down on both sides of the issue at the class certification stage . . . Essentially, the case law seems

to compel the court to view averages as at least somewhat suspect, but not as fatally flawed so long as (1) the differentiation among the data being averaged is not so great as to make the use of averages misleading; and (2) there are other indicia that the averages are not concealing the true story of the data." *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *18 (E.D. Pa. Oct. 19, 2015) (DuBois, J.) (citing *In re Processed Egg Prod. Antitrust Litig.*, 81 F. Supp. 3d 412, 428 (E.D. Pa. 2015)).

The Court concludes that in this case, the use of averages to prove common impact does not conceal significant differences in the data, and that DPPs have met their burden of showing that they have common evidence to show at trial that generic purchasers experienced antitrust impact. Dr. Leitzinger relies on extensive evidence that generic prices decrease with increased competition. A jury can credit Dr. Leitzinger's opinion that the "actual generic pricing experience is not a useful benchmark" for determining what would have happened absent delayed generic entry because the actual pricing experience was distorted by the delayed entry. Leitzinger Rep. ¶ 43. This conclusion is consistent with those of courts which have considered this issue in other alleged reverse payment cases. *See, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.*, No. 13-2472, 2019 WL 3214257, at *14 (D.R.I. July 2, 2019) ("Defendants' analysis . . . focuses in on the actual price a few months following generic entry with two and three generic competitors on the market, thereby failing to consider the effect of sustained, robust generic competition."); *In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, No. 12-00995, 2018 WL 6567709, at *6 (D.N.J. Dec. 12, 2018) ("[O]ne can't assume . . . that purchase patterns in the actual world over a specific period of time tell us about what purchase patterns would have been in a but-for world where generic entry happened much earlier."); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-02503, 2017 WL 4621777, at *8 (D. Mass.

Oct. 16, 2017) (same); *In re Lidoderm Antitrust Litig.*, No. 14-02521, 2017 WL 679367, at *10 (N.D. Cal. Feb. 21, 2017) (same).

The Court further concludes that defendants' individualized challenges to the three generic-only class members which allegedly paid more for generic Niaspan when there were two generics available than when there was one presents the type of "case in which a very small absolute number of class members might be picked off in a manageable, individualized process at or before trial." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.").

In sum, DPPs have met their burden of showing that they have common evidence of antitrust injury with respect to the twenty-five class members which purchased only generic Niaspan directly from defendants.

### 4. Antitrust Injury and Multiple Theories of Overcharge Damages

Defendants argue that DPPs "raise three distinct theories of overcharge injury, each of which Dr. Leitzinger describes in his reports" as brand-generic, brand-brand, and generic-generic overcharge theories. Defs.' Opp'n 11. They assert that under *Comcast v. Behrend*, 569 U.S. 27, 38 (2013), for DPPs to recover antitrust damages under any given theory of overcharge, "they first need to prove that members of the proposed class suffered those injuries." *Id.* at 30. Specifically, they contend that "Plaintiffs cannot prove only brand-generic injury on a class-wide basis and then use that injury as a hook for recovering damages on unrelated theories of harm." *Id.* They argue that proving the three theories will entail individualized inquiries. *Id.* at 17.

The Court finds defendants' reliance on *Comcast* unpersuasive. In *Comcast*, the plaintiffs advanced four distinct theories of liability, each of which proffered a different model of antitrust impact. *Comcast*, 569 U.S. at 31. In *Comcast* plaintiffs' "damages model 'did not isolate damages resulting from any one theory of antitrust impact,' and simply 'assumed the validity of all four theories of antitrust impact.'" *In re Modafinil Antitrust Litig.*, 837 F.3d at 261 (citing *Comcast*, 569 U.S. at 32, 36).

*Comcast*'s critical lesson is that the damages model must "translate the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast*, 569 U.S. at 38 (emphasis in original). The Supreme Court offered the "unremarkable premise" that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. As such, it instructed that "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" *Id.*

Defendants' contention that a class member must separately prove injury for brand-generic, brand-brand, and generic-generic damages misapprehends the purpose of the antitrust injury requirement underlying the *Comcast* decision. The antitrust injury requirement ensures that "one pursuing antitrust recovery must establish that the damages suffered were caused by the defendant's participation in a scheme repugnant to the antitrust laws." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993); *see also Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 305 (3d Cir. 2016) ("The fact of damage, often synonymous with "injury" or "impact," is frequently an element of liability requiring plaintiffs to prove that they

have *suffered some harm traceable to the defendant's conduct*.") (emphasis added). In other words, the purpose of the antitrust injury requirement is to prove that the theory of unlawful conduct, i.e. the theory of liability, was in fact responsible for causing harm to plaintiffs.

Unlike in *Comcast*, which had four theories of antitrust liability, in this case, the jury will be presented with a single liability theory—defendants' unlawful conduct delaying generic competition. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47, 59 (D. Mass. 2013) ("[T]he Direct Purchasers here advance a single, class-wide theory of harm: Defendants' unlawful conduct delayed the entry of lower-priced generic Nexium, clearly differentiating this case from the facts in *Comcast*, which rejected a damages model because it failed solely to incorporate the court's accepted theory of liability." (internal citation removed)).

Dr. Leitzinger's aggregate damages model properly captures damages only attributable to DPPs' single theory of unlawful conduct, and therefore his damages methodology only "identifies damages that are . . . the result of the wrong." *Comcast*, 569 U.S. at 37; *see also In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 217 (S.D.N.Y. 2018) (concluding plaintiffs met their burden to "demonstrate that Dr. Lamb's methodology identifies only damages that result from Defendants' wrong – i.e., it must isolate damages that inhere from a valid theory of antitrust impact from those that do not.").

If DPPs prevail and are awarded overcharge damages, any recovered damages will flow directly from the jury finding that defendants caused an injury through the unlawful delay in generic entry. *See* July 23, 2019, Hr'g Tr. 9:7–15 ("[E]very dollar in Dr. Leitzinger's damage model . . . is directly traceable to allegedly unlawful conduct. There is not a dollar in those models, in those numbers, that reflects potentially lawful conduct.")

In short, DPPs advance a single liability theory of unlawful conduct delaying generic competition that resulted in three types of overcharges. DPPs satisfy their burden of proving antitrust injury with common evidence that they incurred some overcharge damages attributable to that theory of unlawful conduct and can thereafter seek several types of overcharge damages arising from that theory. The Court thus concludes that DPPs' liability theory matches their damages model and is consistent with the *Comcast* decision.

5.  *Challenges to Common Evidence of Additional Damages Theories*

Defendants contend that DPPs lack common evidence to show that the class members that purchased brand Niaspan experienced brand-brand overcharges, and therefore cannot seek brand-brand overcharge damages.

DPPs reply that they have common evidence to show injury through brand-brand overcharges, but they need not rely on brand-brand overcharges to prove classwide antitrust injury "because all Class members who purchased brand Niaspan also purchased generic Niaspan, and so already suffered antitrust injury in the form of a brand-generic overcharges, which can be proven through common evidence." DPPs' Mem. 10–11.

The Court agrees that DPPs need not show classwide injury through brand-brand overcharges because all class members claiming brand-brand damages will present evidence of injury through brand-generic overcharges. Defendants may raise their challenges to DPPs' evidence of brand-brand overcharge damages at or before trial and argue that DPPs overstate the extent of damages arising from the delay in generic entry. Such challenges to damages calculations will not defeat class certification. *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993) ("Once proof of impact is established, the actual amount of damages may result from a reasonable estimate, as long as the jury verdict is not the product of

speculation or guess work." (internal quotations omitted)); *see also In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1268 (10th Cir. 2014) ("[A] jury can reduce an expert's calculations on damages even when unable to run the exact numbers and calculations of [a damages] model with mathematical certainty." (internal quotations omitted)).

Similarly, defendants may challenge DPPs' estimation of generic-generic damages for those class members which purchased both brand and generic Niaspan and argue to a jury that even if defendants are found to have harmed DPPs through unlawful delay in generic entry, they should not award generic-generic damages. However, the possibility of such challenges does not preclude class certification.

### ii. Superiority

Rule 23(b)(3) requires plaintiffs to show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Like numerosity, "[t]he superiority analysis required under Rule 23(b)(3) . . . calls for an inquiry into judicial economy and places great weight on whether the individual members can bring their own claims." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 253 n.11 (3d Cir. 2016). "However, superiority, unlike numerosity, considers alternatives to class actions other than joinder." *Id*.

DPPs contend that "[c]ertification avoids up to 48 individual suits, prevents inconsistent results, and allows Class members with smaller claims an opportunity for redress they would likely otherwise be denied." DPPs' Mem. 46.

Defendants' sole objection to superiority is that DPPs have not shown that joinder is practicable, an argument the Court rejected *supra* in considering numerosity.

The Court concludes that the superiority requirement is satisfied.

### iii. Ascertainability

The ascertainability "inquiry is two–fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd v. Aaron's Inc*., 784 F.3d 154, 163 (3d Cir. 2015).

The ascertainability requirement is easily satisfied with respect to the DPPs. As defendants concede in their response, "all of the putative class members have been identified by the Plaintiffs' and Defendants' experts." Defs.' Opp'n 43.

## V. CONCLUSION

For the reasons set forth above, the following class is certified pursuant to Rule 23(a) and Rule 23(b)(3):

> All persons or entities in the United States and its territories who purchased brand name Niaspan directly from any defendant, and generic Niaspan (extended-release niacin) at any time during the period April 5, 2009 through June 26, 2014; or who purchased generic Niaspan (extended-release niacin) directly from any defendant during that time period; or who purchased brand name Niaspan directly from any defendant at any time after April 5, 2009 but ceased operations before generic Niaspan entered in September 2013. Excluded from the class are the defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.

The Court appoints Rochester Drug Co-Operative, Value Drug, and Professional Drug Company Inc. as class representatives. Berger Montague PC, Garwin Gerstein & Fisher LLP, and Hagens Berman Sobol Shapiro LLP are appointed Co-Lead Counsel for the DPPs.

An appropriate Order follows.