UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: | . Case No. 2:13-md-02460-JD<br>.<br>. U.S. Courthouse |
| NIASPAN ANTITRUST<br>LITIGATION | . 601 Market Street<br>. Philadelphia, PA 19106<br>.<br>. January 6, 2021 |
| . . . . . . . . . . . . . . . . | . 11:31 a.m. |

TRANSCRIPT OF TELEPHONE CONFERENCE
**BEFORE THE HONORABLE JAN E. DUBOIS**
**UNITED STATES DISTRICT COURT JUDGE**

TELEPHONIC APPEARANCES:

For the Direct            Berger Montague
Purchaser Plaintiffs'     By:  DAVID F. SORENSEN, ESQ.
Class:                         NICHOLAS URBAN. ESQ.
                          1818 Market Street, Suite 3600
                          Philadelphia, PA 19103
                          (215) 875-5705

                          Garwin Gerstein & Fisher, LLP
                          By:  DAN LITVIN, ESQ.
                          1501  Broadway Street, Suite 1416
                          New York, NY 10036
                          (212) 398-0055

                          Hagens Berman Sobol Shapiro, LLP
                          By:  HANNAH SCHWARZSCHILD, ESQ.
                          55 Cambridge Parkway, Suite 301
                          Cambridge, MA 02142
                          (617) 482-3700

APPEARANCES CONTINUED.


Audio Operator:           Michael Cosgrove, ESR


TRANSCRIBED BY:           Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com

        Proceedings recorded by electronic sound
   recording, transcript produced by transcription service.

```
TELEPHONIC APPEARANCES:   (Continued)

For the AbbVie          Munger, Tolles & Olson, LLP
Defendants:             By:  STUART N. SENATOR, ESQ.
                             JEFFREY Y. WU, ESQ.
                        350 S. Grand Avenue, 35th Floor
                        Los Angeles, CA 90071
                        (213) 683-9528

                        Faegre Drinker Biddle & Reath, LLP
                        By:  PAUL H. SAINT-ANTOINE, ESQ.
                        One Logan Square
                        18th and Cherry Streets
                        Philadelphia, PA 19103
                        (215) 988-2990

For the TEVA            Kirkland & Ellis, LLP
Defendants:             By:  DEVORA W. ALLON, ESQ.
                        601 Lexington Avenue
                        New York, NY 10022
                        (212) 446-5967

For Walgreens Co.,      Kenny Nachwalter, P.A.
Safeway Inc., Heb       By:  SCOTT E. PERWIN, ESQ.
Grocery Company, L.P.,  Four Seasons Tower, Suite 1100
The Kroger Co., and     1441 Brickell Avenue
Albertson's LLC:        Miami, FL 33131
                        (305) 373-1000

For the End-Payor       Wexler Wallace, LLP
Purchaser Class:        By:  KENNETH A. WEXLER, ESQ.
                        55 West Monroe Street, Suite 3300
                        Chicago, IL 60603
                        (312) 346-2222

                        Spector Roseman & Kodroff, PC
                        By:  JEFFREY L. KODROFF, ESQ.
                        2001 Market Street, Suite 3420
                        Philadelphia, PA 19103
                        (215) 496-0300

For the End-Payor       Cohen Milstein Sellers Toll, PLLC
Purchaser Class:        By:  SHARON K. ROBERTSON, ESQ.
                        88 Pine Street, 14th Floor
                        New York, NY 10005
                        (212) 838-7797
```



```
TELEPHONIC APPEARANCES:   (Continued)

For the Giant Eagle      Marcus & Shapira
Plaintiffs:              By:  BRIAN HILL, ESQ.
                         One Oxford Centre, 35th Floor
                         Pittsburgh, PA 15219
                         (412) 338-5213


For C'S and Rite         Hangley Aronchick Segal & Pudlin
Aid Headquarters, Corp:  By:  BARRY L. REFSIN, ESQ.
                         One Logan Square, 27th Floor
                         Philadelphia, PA 19103
                         (215) 496-7031
```

1      (Proceedings commence at 11:31 a.m.)

2           THE CLERK:  Hi.  This is Lisa from Judge DuBois'

3 chambers.  Before I pass you to the judge, I'm going to do a

4 roll call.  If everybody could let me know who's on the line.

5 I'll say the party.  You just tell me who's on the line.

6           For the direct purchaser plaintiffs' class, who do I

7 have?

8           MR. SORENSEN:  This is David Sorensen of Berger

9 Montague.

10           MR. LITVIN:  This is Dan Litvin, Garwin Gerstein &

11 Fisher.

12           MS. SCHWARZSCHILD:  This is Hannah Schwarzschild,

13 Hagens Berman Sobol Shapiro.

14           THE COURT:  I'm sorry, Hannah.  Could you say your

15 last name again?

16           MS. SCHWARZSCHILD:  Schwarzschild.

17           THE CLERK:  Schwarzschild.  Okay.

18           MR. URBAN:  And Nick Urban with Berger Montague.

19           THE CLERK:  Okay.  Is that everybody for the direct

20 purchaser class?  Okay.

21           Then counsel for the AbbVie defendants.  Who do I

22 have on the line?

23           MR. SENATOR:  Hi.  It's Stuart Senator and Jeffrey Wu

24 from Munger, Tolles & Olson.

25           THE CLERK:  Jeffrey Wu.

1              MR. SAINT-ANTOINE:  And you also have Paul

2    Saint-Antoine from Faegre Drinker Biddle & Reath.

3              THE CLERK:  Okay.  And I assume that's everybody for

4    the AbbVie defendants.

5              Then next on my list is the TEVA defendants.

6              MS. ALLON:  Hi.  You have Devora Allon from Kirkland

7    & Ellis.

8              THE CLERK:  Okay.  Then counsel for Walgreens,

9    Kroger, Safeway, Heb Grocery, Albertson's plaintiffs?

10             MR. PERWIN:  Scott Perwin from Kenny Nachwalter.

11   Good morning.

12             THE CLERK:  Good morning.

13             Okay.  Then for the C'S/Rite Aid plaintiffs?

14             MR. REFSIN:  It's Barry Refsin from Hangley

15   Aronchick.

16             THE CLERK:  Okay.  For the Giant Eagle plaintiffs?

17             MR. HILL:  Brian Hill with Marcus & Shapira.

18             THE CLERK:  Okay.  And the end payor purchaser class,

19   who do I have?

20             MR. KODROFF:  Jeffrey --

21             MR. WEXLER:  Ken Wexler for -- sorry about that,

22   Jeff.

23             THE CLERK:  I'm sorry.  I heard Mr. Kodroff and, I

24   believe, Mr. Wexler.

25             UNIDENTIFIED:  You got it.

1          UNIDENTIFIED:  Yes.

2          THE CLERK:  Okay.  And is that everybody, or is there

3  anybody else?

4          MS. ROBERTSON:  Sharon Robertson, Cohen Milstein.

5          THE CLERK:  Okay.  And is there anybody else on the

6  line that has not responded or been called?  Okay.  That's

7  perfect.

8          If you'll hold, I will let the Judge know you're on

9  the line and ready.

10      (Pause)

11          THE COURT:  This is Judge DuBois.  Good afternoon.

12  Not quite.  Good morning.

13          UNIDENTIFIED:  Good morning, Your Honor.

14          UNIDENTIFIED:  Good morning, Judge.  Happy New Year.

15          THE COURT:  And --

16          UNIDENTIFIED:  And happy new year.

17          THE COURT:  We're going to conduct a conference to

18  address issues raised by the recently-filed motion of end-payor

19  plaintiffs for leave to file a reply expert report by Laura

20  Craft in the Niaspan Antitrust Litigation, NBL Number 13-2460.

21  We're not recording this telephone conference.

22          I'm concerned about the issues raised only because we

23  addressed them.  They were addressed during the telephone

24  conference in which we adopted the current scheduling order.

25  We talked about expert witness discovery and whether more was

1  needed.  And now I'm faced with a decision, as it's framed,

2  that would turn on whether the end-payor plaintiffs had notice

3  of these issues and either neglected to address them or

4  purposely decided not to address them.

5          And superimposed on all of this are the COVID-19

6  precautions.  We haven't tried a civil case in this court

7  since, I guess, mid-March.  I tried one of the 10 or 11 civil

8  cases that were tried in 2020.

9          But we are so backed up, the chances of trying cases

10  like this one in the -- I don't even want to say immediate

11  future.  I don't want to say in the future.  But the chances of

12  trying this case relatively soon -- I'm talking about even a

13  year or two -- are somewhere between slim and nil.  And I'm

14  trying to figure out a way to address them, because in

15  connection with the COVID precautions, I don't agree with the

16  prospect of requiring lawyers to hurry up and then wait for an

17  indefinite period of time for resolution of a dispute.

18          With that in mind, and without going through the

19  reams of material you've dropped on me -- I gather you thought

20  I needed some reading material to fill in the blank spaces in

21  my time.  And I can assure you, there are very few of those.

22          But passing that for the moment -- and I don't have

23  the report.  I certainly want to see the Laura Craft report.

24  But from the perspective of the defendants, what would be

25  required to respond to the plaintiffs' submission of the Laura

1  Craft report?

2          MR. SENATOR:  Your Honor, this is Stuart Senator for

3  the AbbVie defendants.  And the short answer to that is, we

4  don't know, because we have not seen the document.  But we

5  anticipate that it would require both Mr. Dietz's review and

6  analysis -- Mr. Dietz being the defendants' expert on

7  ascertainability issues -- and then potentially a deposition --

8  a supplemental deposition of Ms. Craft and further, then,

9  submission to the Court.  I don't know what -- how extensive

10  Mr. Dietz's response, if any, would have to be and what the

11  plaintiffs would want to do in response to that.

12          But, more broadly, our view, as set forth, is that

13  this entire exercise of showing an ascertainability methodology

14  is, as both parties agree, plaintiffs' burden.  They have to

15  show in the data and evidence how they can use that in a

16  administratively feasible methodology to identify the class

17  members.

18          And if they haven't done that, if there are holes in

19  that, this shouldn't be a sort of whack-a-mole-type situation

20  where we point out a hole, and then they attempt to backfill

21  it.  Instead, it should be a situation where they set forth in

22  their motion, now their second motion, and in their expert

23  reports, now their sixth or seventh expert report, how they

24  propose to go about using the data that is available and --

25  with a concrete methodology.  And if they haven't done that,

1 that's the end of the inquiry where --

2          THE COURT:  Well, I'm --

3          MR. SENATOR:  -- it's not --

4          THE COURT:  I don't want -- I don't want to reopen,

5 for now, this discussion, the entire issue of ascertainability.

6 I ruled on that, and I gather that, in response to my ruling --

7 I haven't tracked each of the issues I raise, but I -- my

8 recollection is -- I didn't go back and reread my opinion of

9 the (indiscernible) ascertainability issues I raised and then

10 rules against the plaintiffs on.  Only two remain.

11          And I -- you don't have to tell me that plaintiffs

12 bear the burden of proving ascertainability.  And I can still

13 hear plaintiffs' counsel -- I think it was Mr. Wexler -- saying

14 we've read all of the ascertainability opinion in which your

15 colleagues have rejected class certification and end-payor

16 plaintiffs' motions, and we've addressed all those issues, and

17 we've met them, and we don't have to be any more specific.  And

18 here we are, months and months and months later, and we're

19 still talking about being more specific.

20          You haven't exactly answered my question.  And I say

21 that, because end-payor plaintiffs say they're merely

22 responding as to what is in -- is it Dr. Dietz?  Or it's

23 Mr. Dietz, isn't it?

24          MR. SENATOR:  It's Mr. Dietz.  Correct.

25          THE COURT:  Mr. Dietz.  They say they're merely

1 responding to what Mr. Dietz said.

2         MR. SENATOR:  Well, our view of that is: not true.

3 They -- as -- I won't repeat myself, but they went in -- they

4 had the burden of setting forth all these elements.  Mr. Dietz

5 said, you didn't do X.  You didn't do Y.  You left this out.

6 You left that out.

7         More to the point, quite frankly, we said that, the

8 lawyers, in our brief before it even gets to Mr. Dietz.  We

9 just said, look, there are these deficiencies.  And now they've

10 come in and said, oh, well, we'd like to address this one.

11 We'd like to address that one.

12         And our response is, you needed to set it out.  These

13 were all known issues for the past two years.  You've already

14 brought it to the Court.  The Court's expressed its views.

15 We've had a full hearing.  And if you can't come in in your

16 opening report as required by the scheduling order and set

17 forth all these issues, it's not up to us to point out the

18 deficiencies so then you, the plaintiffs, can come back and

19 say, oh, we can meet this one, we can meet that one, we can

20 meet the other one.

21         It's -- you know, the process has to end somewhere.

22 And the Court, in its generosity, gave the EPPs a second

23 chance.  But at a certain point, enough has to be enough.

24 There have been six reports from the plaintiffs on

25 ascertainability.  And we can't keep --

1          THE COURT:  Well, how about Laura Craft?  How many
2     reports from Craft?  My recollection is two.  Is that correct?
3          MR. SENATOR:  Craft has had -- by my counting, I
4     would say three.  Because she's had, first, her -- she was
5     initially a reply expert in the initial motion.  Then she did
6     her opening report in -- or her supplemental report, as she
7     calls it -- in August of 2020.  And then she did this
8     additional supplement in late October/early November.  I don't
9     remember the precise date of 2020 where she supplemented
10    further following her deposition.
11          THE COURT:  And I haven't seen that.  What was the
12    date of that last report?
13          MR. SENATOR:  I believe it was November 4th, Your
14    Honor.  It's -- it was the document that resulted in our filing
15    our supplemental opposition and -- in -- I believe it was late
16    November of 2020.
17          THE COURT:  And what is the date of the Dietz report
18    to which this report at issue, the Craft report, is
19    challenging?  What is the date of that report?
20          MR. SENATOR:  November 6, 2020, Your Honor.
21          THE COURT:  And the Craft report again, the one --
22    the last one you have?  Not the one that's being challenged.
23          MR. SENATOR:  The last major one was August 25, 2020,
24    and then there was this supplement that was November 5, 2020.
25          THE COURT:  (Indiscernible).

1        MR. SENATOR:  So it was sent to us the day before the

2   Dietz report was due.

3        THE COURT:  Would the defendants object to a reply or

4   a rebuttal report that was limited to the issues raised by

5   Dietz in his report that had not been addressed by Craft before

6   then?  (Indiscernible).

7        MR. SENATOR:  We do object to that.  We do object to

8   that, Your Honor, because what Dr. Dietz did was merely point

9   out the deficiencies in Ms. Craft's and EPP's (audio

10  interference) and Ms. Craft's prior work, the holes that were

11  in the methodology that she proposed.  And, again, they have a

12  methodology they have to put forth.  If there are holes in that

13  methodology, then that's a reason their motion should be

14  denied.

15       And, you know, obviously, we pick and choose what to

16  present to the Court to make our most straightforward showing.

17  And it shouldn't be this game of, well, once we show one point,

18  they try to come up with something on that one point.  And then

19  we have to show another point, and then they have to come up

20  with something on it.  That's not the litigation process.

21  Certainly, not the orderly litigation process.

22       And indeed, in Your Honor's memorandum opinion

23  denying the first motion for class certification without

24  prejudice, the Court, a number of times, called attention to

25  this ad hoc method of the EPPs of putting forth this sort of

1  Swiss cheese analysis.  And then when we show a hole, they try

2  to come back with a sort of late potential band-aid.  And we

3  explain why that potential band-aid doesn't work.  They try to

4  come back with another potential band-aid.

5          And it's this, you know, lack of following the actual

6  process that the Court called an ad-hoc approach that was

7  totally inappropriate to a showing of class certification.

8          MR. WEXLER:  Your Honor --

9          THE COURT:  I'm --

10         MR. WEXLER:  -- can I respond?

11         THE COURT:  -- that response to my question,

12 Mr. Senator.  I'm looking at the memorandum of law in support

13 of the end-payor plaintiffs' motion.  What they say is, they

14 need this reply expert report because defendants and their

15 expert, Dietz, raised for the first time in defendants'

16 memorandum opposing their renewed motion certain issues which

17 Mr. Dietz addressed in the supplemental report and expert

18 witness testimony and then argued that addressed -- I don't

19 recall whether I've addressed Optum.  That name is certainly

20 not unfamiliar to me, but I don't remember whether I addressed

21 it in the opinion that's at issue.

22         MR. SENATOR:  The answer to that question --

23         THE COURT:  Go ahead.

24         MR. SENATOR:  The answer to that question, Your

25 Honor, is, yes, you did address it, and we did address it.  And

1   we've addressed it from the beginning of this whole process.

2   As the Court may recall, OptumRX is the one PBM that produced

3   data beyond that of a named plaintiff regarding Niaspan

4   transactions, the single PBM that actually produced data in

5   response to the EPP subpoenaed in the discovery period.

6           And we've had, I think, two major contentions

7   regarding that all along.  The first one is that it was just

8   inexplicable that Ms. Craft never reviewed that data in

9   reaching her opinions.  She didn't -- and coming up with her

10  methodology that was centrally based on supposed PBM data.  And

11  we found it inexplicable that you could base a methodology on

12  PBM data without actually looking at the Niaspan PBM data that

13  we had in this case.

14          And we made that point in our opening brief -- or our

15  opposition brief to the prior class certification motion.

16  Indeed, we moved to exclude Ms. Craft's opinions in their

17  entirety.  And one of the bases of that motion was that

18  Ms. Craft hadn't reviewed the Optum data.  And the Court denied

19  the exclusion but, obviously, granted -- or also denied the

20  class certification motion.

21          And the Court discussed -- as we point out in our

22  opposition filed two days ago, the Court discussed the fact

23  that the EPPs hadn't done anything with any actual PBM data.

24  We also brought this issue up at oral arguments on class

25  certification, and we've cited to Your Honor in our brief filed

1 on Monday and two days ago specific slides that we put up for

2 the Court -- and, obviously, we've lodged those entire slide

3 presentations pursuant to Your Honor's request with the Court,

4 so they're in the court file -- that specifically discuss all

5 of this, that discuss the ASO issue and discuss OptumRx.

6 　　　　So both of these issues were front and center in our

7 opposition.  They were considered by the Court in its

8 consideration and ruling on the motion.  And then they were

9 known issues to the EPPs when they prepared their opening

10 papers on the motion for class certification -- the renewed

11 motion for class certification.

12 　　　　THE COURT:  Well, I recall --

13 　　　　MR. SENATOR:  And, indeed --

14 　　　　THE COURT:  I recall my opinion mentioning the fact

15 that -- based on your argument, that Craft did not review

16 certain documents.  And I think they were the PBM documents.

17 But I'm not a hundred percent certain what I said on that

18 issue.  I didn't go back and read the opinion.

19 　　　　Well, I --

20 　　　　MR. WEXLER:  Your Honor?  This is Ken Wexler.

21 　　　　THE COURT:  (Indiscernible).

22 　　　　MR. WEXLER:  Can I respond to something?

23 　　　　THE COURT:  Just --

24 　　　　MR. WEXLER:  Okay.

25 　　　　THE COURT:  -- let me finish, and then I'll let you

1  respond.

2         MR. WEXLER:  Uh-huh.

3         THE COURT:  I read quickly the defendants' opposition
4  to the motion, and I read your memorandum in support of the
5  motion, Mr. Wexler.  But your idea of waiting until the last
6  minute to the deadline to file a motion was ill-advised, to say
7  the least.  We're wasting time.  That schedule was really
8  worked on.  I went back to read the transcript, having more
9  trouble making heads or tails of some of the transcript.  I
10 hope the transcription was hard to understand and not what was
11 said during the telephone conference.

12        But the bottom line, what concerns me most is that we
13 addressed all of these issues.  We tried to anticipate
14 everything.  The schedule is a tight one.  And we specifically
15 talked about expert witness testimony and rebuttal testimony.

16        But I'll hear from you now, Mr. Wexler.

17        MR. WEXLER:  Thank you, Your Honor.  If we go back to
18 the transcript and what we discussed in terms of briefing on
19 our -- on the EPPs' renewed motion for class certification, I
20 don't think I could have been more clear than I was in that
21 conference that our motion would be in a memorandum, and the
22 expert reports would be limited to the concerns that Your Honor
23 raised in your opinion from June 2nd of 2020.  And I was true
24 to my word.

25        THE COURT:  Give me that -- in the transcript, give

1  me a page reference.

2          MR. WEXLER:  I'm going to ask one of my colleagues on

3  the phone to find it, because I said it repeatedly.

4          THE COURT:  I don't recall that.  And I can --

5          MR. WEXLER:  Okay.

6          THE COURT:  So I'm looking now at what I recall of

7  what Mr. Senator said.  He said -- and I'm on Page 39.  "I

8  assume with that, there's no further expert reports" --

9          MR. WEXLER:  Yes.

10          THE COURT:  -- "no rebuttal expert reports or further

11  evidence to be introduced at that stage."  And that page is

12  referring to --

13          MR. WEXLER:  Your --

14          THE COURT:  -- this.  And the answer --

15          MR. WEXLER:  And at Page -- I'm sorry.

16          THE COURT:  Let me finish.

17          MR. WEXLER:  I'm sorry.  I can't hear you, so I'm

18  sorry to interrupt.

19          THE COURT:  Oh, I --

20          MR. WEXLER:  I mean, I can't see you.

21          THE COURT:  I'll talk into the phone.  I don't -- the

22  answer was, "I don't think so.  Not on this record we're

23  developing today."  All right.

24          MR. WEXLER:  Yes.

25          THE COURT:  Now tell me what --

1        MR. WEXLER:  If you go back to Page 5 at Lines 23 to
2   25, I said, "The expert reports we intend to submit" -- and
3   then I put in brackets, "will be limited to those issues that
4   Your Honor raised as concerns."  And that's what they were.
5   They were a couple of concerns raised on applying the
6   methodology to specific exclusions to -- applicable to this new
7   class that we -- we're pleading.  And they were specific issues
8   that Your Honor raised relating to averages and (indiscernible)
9   injury.  We had an expert report directed to that.  There were
10  issues Your Honor raised relating to the absence of a trial
11  plan which, I supposed, because we have consumers in the class
12  before the -- that one -- well, it was no longer applicable.
13  We submitted one.  There were certain state law issues that
14  Your Honor raised.

15        That is what our renewed motion for class
16  certification addressed.  We did not go over old ground.  That
17  was a promise I made to Your Honor at that hearing.

18        So when Mr. -- in the response to our renewed motion,
19  when they submitted the report of Mr. Dietz, the -- there were
20  issues raised that we did not raise not because we're playing a
21  game of whack-a-mole but because we told Your Honor our motion
22  was going to address the concerns Your Honor had directly and
23  that it would be limited to that.  So when Mr. Dietz and
24  defendants raised ASOs or that the methodology didn't address
25  ASOs or she didn't look at Optum data, the -- what this is,

1  this is just pure rebuttal report that we want to file to the

2  issues that they raised which are not part of our motion.

3           And the word "OptumRX" is not used in Your Honor's

4  opinion.  These things are not concerns Your Honor raised, so

5  we didn't address them.

6           THE COURT:  And what you're saying is you narrowed

7  your case and -- in your submission after my ruling denying

8  your initial motion for class certification.  Because you --

9           MR. WEXLER:  Yes.

10          THE COURT:  -- limited the issues, you did not

11  address all the issues.  And some of the issues raised by the

12  defense, at least some of them, were issues that, although they

13  were in the case to start with, they were not in the case as

14  you concede the case in connection with your amended motion.

15          MR. WEXLER:  Well, there's -- they're not -- they

16  were not issues that Your Honor thought were issues, whether

17  they were raised or not before.  So there was no need, from our

18  perspective, to address them.

19          MR. SENATOR:  Your Honor, this is Stuart Senator.  We

20  just fundamentally disagree with that.  Your Honor's opinion

21  did talk about particular class exclusions, but Your Honor's

22  opinion was much broader than that and talked about the lack of

23  a comprehensive, case-specific methodology based on the

24  evidence in this case.

25          And two elements of that were the fact that

1  plaintiffs hadn't set forth how they were going to look at the

2  data and come up with class membership.  There were also --

3  obviously, the specific exclusions were talked about

4  specifically in Your Honor's opinion, but the basis for the

5  denial and the concerns expressed were not limited to those

6  very specific exclusions.

7       It was that the six-step supposed methodology was not

8  specific to this case, was not set forth in a way that we could

9  meaningfully test it, was not based on the evidence in this

10  case based on the actual Niaspan transaction that -- and that's

11  what we pointed out in our opposition brief in the renewed

12  motion that they still hadn't done that.  That Ms. Craft had

13  come from a six-step methodology to a nine-step methodology,

14  but it was still a methodology not specific to this case.  It

15  still didn't look at the actual data that was produced in this

16  case and the actual data of the PBMs.

17       The same complaint we had before and the same

18  complaint that the Court sustained in its memorandum opinion.

19  And when the Court says in its memorandum --

20       MR. WEXLER:  The Court was not --

21       MR. SENATOR:  When the Court says in its memorandum

22  opinion that it's not based on the evidence, that they didn't

23  look at the -- at any of the transactional data, the Court

24  doesn't need to use the words "OptumRX" when that's the

25  transactional data at issue to make clear that that is the

1    issue.  And for Ms. Craft, after having been moved to be
2    excluded and otherwise criticized for not looking at the Optum
3    data then to put in a report in August, after having the
4    benefit of the Court's memorandum opinion, and still not look
5    at the data is inexplicable.

6             And then, as the icing on the cake, she knows that
7    it's a problem, and the EPPs know that it's a problem before
8    defendants did anything.  Because before her deposition, to
9    prepare for her deposition, all of a sudden, she did look at
10   the OptumRX data.  And then she came to the -- and she did
11   consider the ASO issue.  Because she came to her deposition
12   armed to talk about the OptumRX data and to talk about ASOs and
13   EPPs and TPAs.

14            She came to her deposition to do that before the
15   Dietz report and before our opposition to the renewed motion.
16   In other words, she knew full well and EPPs knew full well that
17   they had left this central issue out of their motion and out of
18   Ms. Craft's report, that they had just papered over it.  And
19   they decided to wait until her deposition and let her just
20   bring it up there.

21            And as we set forth in our brief filed on Monday and
22   previously, when she brings it up there, she brings it up not
23   in response to pointed questions by defendant counsel.  She
24   brings it up voluntarily, of her own accord.  She just injects
25   the issue in, because she wants to get that point into the

1  record that she hasn't made in her report.  And she knows

2  that's a problem.  So we --

3            MR. WEXLER:  You know, this is wild --

4            MR. SENATOR:  -- completely disagree with this

5  presentation.

6            MR. WEXLER:  You can -- Mr. Senator can disagree, but

7  this is just wild accusations that are going on, Your Honor.

8  She's an expert.  Of course she understands what ASOs are.  She

9  looked at the plaintiffs' data.  She testified to that.

10           The OptumRX data, the TPAs, ASOs, Dietz did not use

11  those words in his prior opinion and neither did the Court.  I

12  promised the Court that we would file a motion that was limited

13  to the issues Your Honor raised.  And all we've done is filed a

14  renewed motion for class certification.

15           If you look at the recent Hargrove decision -- which,

16  of course, the defendants don't cite in their response to our

17  class motion.  This is a decision by the Third Circuit that

18  came out after Your Honor's ruling in June of 2020.  The Court

19  said that the best course of action is to treat a motion -- a

20  renewed motion or an amended motion for class certification

21  like any other motion for class certification and to apply the

22  usual Rule 23 standard.  And it went on to explain the concerns

23  about parties getting a second opportunity to not override the

24  language in Rule 23(c)(1)(C) which allows for multiple bites at

25  the apple throughout the litigation.

1          We're not doing anything wrong here, and there's
2    nothing untoward about something being raised in response to
3    our expert reports that isn't in our motion, that isn't
4    addressed by our initial expert reports.  There's nothing
5    untoward, and there's nothing unusual about the party with the
6    burden of proof having an opportunity to submit a rebuttal.
7    And that's all we're asking to do.
8          And if --
9          MR. SENATOR:  I would just --
10         MR. WEXLER:  -- Mr. Senator is so sure that -- you
11   know, there's got to be an end sometime.  I would say that it
12   ends with the party with the burden of proof, not with the
13   party defending against the burden of proof.  It ends with the
14   plaintiff.
15         MR. SENATOR:  I would --
16         MR. WEXLER:  We should be submitting our rebuttal,
17   and then -- and we're done.  If they want a deposition of --
18         MR. SENATOR:  Well, I would just point out --
19         MR. WEXLER:  -- Ms. Craft on that, if they want a
20   deposition, that's fine with us.  Have at it.  But there should
21   be no more paper after this.  This is just typical --
22         MR. SENATOR:  I would --
23         MR. WEXLER:  -- procedure.
24         MR. SENATOR:  I would just point out that there was
25   an entire period of expert discovery.  It included opening

1  reports.  It included opposition reports.  It included

2  reply/rebuttal reports.  That period ended for the reports in

3  October of 2018 with Ms. Craft's rebuttal report, the rebuttal

4  report that she did submit.  Then there were depositions.  And

5  then there was motion practice.

6          We are not here contesting the filing of a renewed

7  motion and second bite at the apple.  But the discovery period

8  has long since passed.  Nonetheless, the Court specifically

9  grant -- granted leave in conjunction with the supplemental

10  motion to file a further single supplemental expert report.

11  And that was done.  And that's that.

12          MR. WEXLER:  It was done based on the record.  And

13  what happened was, the defendants came back and expanded the

14  record by submitting an expert report that addressed issues

15  that our expert did not address.  And all we wanted to is -- is

16  rebut those points.  It just --

17          THE COURT:  Well --

18          MR. WEXLER:  It --

19          THE COURT:  I haven't --

20          MR. WEXLER:  It's a --

21          THE COURT:  I haven't looked at the Dietz report.  Is

22  it your position that the Craft report at issue does nothing

23  more than rebut what you consider to be new issues raised in

24  the --

25          MR. WEXLER:  Yes.  It --

1              THE COURT:  -- Dietz report?

2              MR. WEXLER:  Yes.  Yes.  Raised in his report and

3  expanded on in his deposition.  He -- that's all it is.  And

4  I --

5              MR. SENATOR:  Your Honor, if I could --

6              MR. WEXLER:  -- I will not be -- I will -- we

7  meticulously -- we asked for the defendants' consent to file

8  this just like every other party in this case has done before.

9  They said no.

10             We told them before we filed this -- which, by the

11 way, we were under a very compressed time period.  We told them

12 before we filed that we would not attach it at their request.

13 We would not attach the report to our reply brief.  We would

14 not include cites to the report in our reply brief which is

15 something that, if you permit us to file, we'd like to add

16 those back in.  And we didn't do that.

17             We told them we would file a motion like everybody

18 else for leave to file the reply report.  And, in turn, we get

19 tagged the night before our brief is due with an emergency

20 motion or -- and a letter saying we need an emergency hearing.

21             And all we have done, Your Honor -- I mean, there's

22 been a lot of effort made to paint us with a paintbrush that

23 doesn't look so good.  But we have not waited.  We are simply

24 responding, and we have filed an excellent motion that I think

25 Your Honor is going to grant.

1          I think, Your Honor, the <u>Hargrove</u> decision is
2  extremely helpful to us.  And it's a recent Third Circuit
3  decision in terms of what our burden is.
4          But, I mean, this isn't a game of -- this is not a
5  game.  It's not only not a game of whack-a-mole; it's not a
6  game.  And we haven't treated it as such.
7          We simply want to have Your Honor -- when you conduct
8  your rigorous analysis of what the <u>Hargrove</u> decision says --
9  it's a new motion for class certification -- that your record
10  is complete.  I mean, otherwise, what -- so what happens?
11  We -- you deny this motion, and then somehow we're -- we lose
12  class  certification, because we're not permitted to rebut this
13  evidence.  It's not appropriate, I -- in our view.
14          THE COURT:  Well, I read <u>Hargrove</u> a while ago.  I'm
15  going to reread it.  I wasn't focused on this issue.  I think
16  it's the last word by the Court of Appeals on ascertainability.
17  Is that a --
18          MR. WEXLER:  Yes.
19          THE COURT:  -- correct statement, Mr. Wexler?
20          MR. WEXLER:  That's my understanding.  Yes.
21          THE COURT:  All right.  Well, I think maybe -- well,
22  first of all, I'm not going to rule today.  I thought I was,
23  but I'm not going to.  I want you, Mr. Wexler, to provide me
24  with a copy of the Craft report at issue.  And --
25          MR. WEXLER:  Okay.

1              THE COURT:  Mr. Senator, I'd like -- I -- I'm (audio
2    interference) probably do, but I'll -- I'd like you to send me
3    a copy of the Dietz report at issue.  The Craft report,
4    according to Mr. Wexler, responds to issues raised in the Dietz
5    report that Mr. Wexler, I think, is saying might have been in
6    the case at one time but he did not think we're in the case
7    when (indiscernible) because of the narrowing of the
8    definitions of putative class.

9              Do I need anything else to reach a decision in your
10   judgment, Mr. -- in addition to what I have, Mr. Wexler?

11             MR. WEXLER:  No.  Except I would in Hargrove direct
12   your attention to Footnote 8 in terms of discovery and
13   what's -- what discovery is permitted in this kind of a motion.
14   But outside of that, no, I don't think there's anything else to
15   see.

16             THE COURT:  I'll ask you the same question in a
17   minute, Mr. Senator.

18             I don't think Hargrove was discussed in the telephone
19   conference when we adopted this new schedule.  Is it -- what
20   was the day Hargrove was decided?

21             UNIDENTIFIED:  September 9th.

22             MR. WEXLER:  If anyone knows, I -- September 9th?
23   Okay.

24             UNIDENTIFIED:  I believe so.

25             THE COURT:  That was after our --

1          MR. WEXLER:  Yes.  And it came out, I remember, like
2    the day after we filed our motion, but we didn't want to burden
3    the Court with more paper.  We figured we'd deal with it on
4    reply.  But it wasn't in the response.

5          THE COURT:  All right.  And, Mr. Senator, I want you
6    to provide me with a copy of the Dietz report.

7          MR. SENATOR:  Yes.  Your Honor, we've actually filed
8    that.  It's -- and I could send you a -- just a direct courtesy
9    copy.  It was filed under seal.  It's Exhibit 1 to my
10   declaration of November 6th which bears Docket Number 725-1.

11         THE COURT:  Well, we can download that.

12         MR. SENATOR:  Okay.

13         THE COURT:  All right.  Now, because of this
14   development, I think -- let me get the schedule.

15         MR. SENATOR:  Your Honor, while you do that, if I can
16   just correct myself.  I believe my declaration is filed in a
17   public version and in a sealed version.  So I believe the
18   sealed version that would have the Exhibit 1 may be 726-1
19   instead of 725-1.

20         THE COURT:  Well, I'll let my law clerk -- I'm not
21   sure if he's on the line -- to obtain that declaration and the
22   Dietz report and download it, print it.

23         I'm looking at the schedule.  Have end-payor
24   plaintiffs complied with Paragraph 4?  (Indiscernible) before
25   December 18th, they were to have filed <u>Daubert</u> motions and

1 responses to defendants' <u>Daubert</u> motions and were granted leave

2 to file a surreply in further support of their amended motion

3 to class certification.

4    MR. WEXLER:  There were no <u>Daubert</u> motions.

5    THE COURT:  Pardon me?

6    MR. WEXLER:  I don't believe there were any <u>Daubert</u>

7 motions filed.

8    THE COURT:  I'm just reading the schedule.  I

9 don't --  I didn't have the docket --

10    MR. WEXLER:  Yeah.

11    THE COURT:  So we're on schedule.  The next thing,

12 according to the schedule, is January 11th when defendants are

13 required to file and serve responses to end-payor plaintiff

14 Daubert motions and were granted leave to file and serve

15 replies in further support of their <u>Daubert</u> motions, correct?

16    MR. WEXLER:  Oh, there haven't been any.  Yeah.

17   (Simultaneous speaking)

18    MR. SENATOR:  Your -- yes, Your Honor.  Paragraph --

19 Paragraphs 5 and 6 are moot, because neither side ended up

20 filing Daubert motions.

21    THE COURT:  All right.  So we're -- but for this

22 issue, the amended motion to class certification by end-payor

23 plaintiffs is fully briefed.

24    MR. WEXLER:  Correct.

25    MR. SENATOR:  Yes, Your Honor.

```
 1                THE COURT:  All right.

 2                MR. WEXLER:  All we need is a hearing.  But that's,

 3   obviously, at Your Honor's convenience.

 4                THE COURT:  I just said fully briefed.  And

 5   hearings --

 6                MR. WEXLER:  Yes.

 7                THE COURT:  -- present a problem.  We have to do

 8   them -- I think we'd have to do a Zoom hearing.  I'm not

 9   gathering --

10                MR. WEXLER:  No.  No.  I understand.

11                THE COURT:  -- people from all over the country --

12                MR. WEXLER:  Yeah.

13                THE COURT:  -- to Philadelphia to attend oral

14   argument with the COVID precautions and such.  And --

15                MR. WEXLER:  Yes, Your Honor.

16                THE COURT:  -- I haven't -- as a matter of fact, I

17   haven't been in my courtroom since mid-March.  It's been used

18   in the trial of a number of criminal cases we've tried.  We've

19   only tried about three or four criminal cases and no civil

20   cases since mid-March.  It takes over five courtrooms to try a

21   criminal case now to maintain social distance.

22                All right.  Well, I want the Craft report that's been

23   challenged, and I think that will give me enough, that plus the

24   Dietz report.  And --

25                MR. SENATOR:  Your Honor, if I can just ask?  We have
```

1 not seen that Craft report either.  Obviously, I know

2 Mr. Wexler will send it to us when he sends it to Your Honor.

3 But if we have something to say in response to that, something

4 very short, can we do that in short order?

5                    THE COURT:  Yes.  Yes.

6                    MR. SENATOR:  Thank you.

7                    MR. WEXLER:  Your Honor, I -- just for the record,

8 even though we're not being recorded, I object to that.  I

9 don't think that the defendants should have the last word on

10 the plaintiffs' motion.  It's Your Honor's discretion,

11 obviously, so I'll shut up.

12                    THE COURT:  It is.  And if you hadn't --

13                    MR. WEXLER:  If I hadn't told myself to shut up, you

14 would have told me.

15                    THE COURT:  Well, yeah.  I -- the bottom line, if

16 this issue hadn't been raised in this rather strange way -- I

17 addressed the question of expert reports and was told at the --

18 when we adopted the schedule that -- and concluded there would

19 be no more expert reports other than the one we had already

20 scheduled.  And because, in my judgment, granting the motion is

21 not the kind of pro forma exercise you think it is, Mr. Wexler,

22 I'm going to give Mr. Senator an opportunity to respond to the

23 report.

24                    It's a challenged report.  You claim it's proper

25 rebuttal.  He says no.  And I'll have to decide.  And so get me

1 the report.

2          Any such challenge, Mr. Senator, I want within a

3 week.

4          MR. SENATOR:  Yes, Your Honor.

5          THE COURT:  All right.  Is there any other good news

6 you want to drop on me in the new year?

7                 (Discussion on unrelated matters)

8                  (Off the record at 12:22 p.m.)

9                 (Proceedings resumed at 12:23 p.m.)

10          MR. WEXLER:  -- goes without saying, if it -- if it's

11 problematic, we will be back -- if what Mr. Senator responds

12 with is problematic, we'll be -- we'll bring it to your

13 attention.

14          THE COURT:  Okay.  You'll -- I'm not going to issue

15 an amended schedule.  You know, we'll leave it this way.  And

16 if it's, quote, to use your word, "problematic," I know you'll

17 be back, Mr. Wexler.

18          MR. WEXLER:  Good.  Okay.  Thank you.

19          THE COURT:  All right.  Well, is there anything else

20 that needs to be said?  I've heard from some of you.  I know

21 there are many, many more of you on the line.  Is there

22 anything else that needs to be said by anyone on the line?  I'm

23 hearing nothing.

24          With that, I'll end the conference.  Thank you for

25 making yourselves available on short notice.  And my best

1  wishes for a better 2021 than 2020.

2        (Concluded at 12:24 p.m.)

3                          * * * * *

4

5

6

7

8

9

10

11

12

13

14

15                  **C E R T I F I C A T I O N**

16

17        I, Liesl Springer, court-approved transcriber,

18  certify that the foregoing is a correct transcript from the

19  official electronic sound recording of the proceedings in the

20  above-entitled matter, and to the best of our ability.

21

22

23  _____

24  LIESL SPRINGER, AAERT NO. 685    DATE:  January 12, 2021

25  ACCESS TRANSCRIPTS, LLC