**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | : | **MDL 2460** |
| | : | |
| **NIASPAN ANTITRUST LITIGATION** | : | **Master File No. 13-md-2460** |

# MEMORANDUM OPINION

**Savage, J.** **October 30, 2026**

Brand drug manufacturers enjoy a 20-year period of no competition, allowing them to charge higher prices for a patented drug than they could with competition. When a generic manufacturer enters the market, the brand's monopoly ends. A brand manufacturer and a generic manufacturer may agree to delay the generic's entry into the market so the brand can continue to enjoy non-competitive higher prices, and they can share the profits generated during that delay.

Drug manufacturers enter into "reverse payment agreements" which require the brand manufacturer to pay the generic manufacturer for purported services in return for delayed generic entry into the market. To avoid antitrust laws forbidding anticompetitive conduct, the drug manufacturers have devised deals made to appear economically rational. This is a reverse payment pharmaceutical case alleging pay to delay the entry of a generic drug into the market. It involves a deal between a brand drug manufacturer and a generic manufacturer inviting antitrust scrutiny.

The question in this case is: did the deal to settle a patent infringement case that resulted in the delay of the generic's entry in the market violate antitrust law or was it a lawful, rational business arrangement?

Plaintiffs, wholesalers who purchased the drug Niaspan directly from the manufacturer, Kos Pharmaceuticals, Inc., and retailers who purchased Niaspan from

wholesalers, brought this antitrust action against brand manufacturer Kos and generic manufacturer Barr Pharmaceuticals, Inc., and their respective successors. The plaintiffs contend the agreement between Kos and Barr to settle a patent infringement action was a reverse payment that violated antitrust laws. They claim Kos paid Barr to delay generic Niaspan's entry into the market, eliminating competition at the expense of the plaintiffs, who paid anticompetitive prices higher than they otherwise would have paid.

The defendants jointly move for summary judgment. They argue that the plaintiffs lack antitrust standing because they have not shown that the reverse payment settlement caused them injury or damages. Teva, Barr's successor, filed a separate motion, contending that the payment Barr received was not large, unjustified, and unexplained, triggering antitrust scrutiny. The plaintiffs move for partial summary judgment, seeking a ruling that the relevant antitrust market is limited to Niaspan and generic Niaspan sold in the United States and its territories.

We conclude that the undisputed evidence shows that the settlement caused plaintiffs the injury necessary to establish antitrust standing. There is a genuine dispute as to whether the reverse payment settlement violated antitrust laws because it was a payment to delay the entry of the generic into the market to eliminate competition. There are also material issues of fact as to the relevant antitrust market. Therefore, we will deny the motions for summary judgment.

## Regulatory Background

Reverse payment cases in the pharmaceutical industry arise at the intersection of patent law, antitrust law, and regulatory law. To understand the context, we start with the regulatory background.

Before it can market and sell a new drug, a brand manufacturer must obtain approval from the Food and Drug Administration ("FDA") by filing a New Drug Application ("NDA") that presents the preclinical and clinical data demonstrating the drug's safety and efficacy. 21 U.S.C. § 355(a). The process is lengthy, expensive, and complex.[1] *See In re Lipitor Antitrust Litig.*, 868 F.3d 231, 240 (3d Cir. 2017).

To shortcut the lengthy and expensive approval process to market a generic version of an approved drug, a generic manufacturer may file an Abbreviated New Drug Application ("ANDA") with the FDA. 21 U.S.C. § 355(j). The ANDA process allows the generic manufacturer to rely on the brand manufacturer's safety and efficacy studies the FDA had approved when it granted the brand's NDA. *See id.* § 355(j)(2)(A). To take advantage of the ANDA process, the generic manufacturer must establish that the generic and the brand drugs have the same ingredients and are bioequivalent.[2] *Id.* § 355(j)(2)(A)(ii), (iv).

There is an advantage to being the first generic manufacturer to file an ANDA. As an incentive to encourage manufacturers to enter the generic market, the first-to-file generic manufacturer is given a 180-day exclusivity period during which no other generic manufacturer can enter the market. *Id.* § 355 (j)(5)(B)(iv).

Even with ANDA approval, the generic manufacturer cannot market the drug until

[1] The average NDA approval takes over ten years and costs over $1 billion. Colleen Kelly, *The Balance Between Innovation and Competition: The Hatch-Waxman Act, the 2003 Amendments, and Beyond*, 66 Food & Drug L.J. 417, 418 (2011); Olivier J. Wouters, *et al.*, Estimated Research and Development Investment Needed to Bring a New Medicine to Market, 2009-2018, 323 JAMA 844 (2020).

[2] Drugs are bioequivalent when they are pharmaceutical equivalents or pharmaceutical alternatives, and the rates and extents of absorption are not significantly different. Bioequivalence is the absence of a significant difference in the rate and extent of the active ingredient that reaches the systemic circulation. The two drugs have the same clinical effects. *See* 21 U.S.C. § 355(j)(8)(B); Shein-Chung Chow, *Bioavailability and Bioequivalence in Drug Development*, 6 Wiley Interdiscip. Rev. Comput. Stat. 304, 304 (2014).

the brand manufacturer's patent expires. There is an exception to this exclusivity period. When the generic manufacturer seeks to market the generic prior to the expiration of the patent, it must certify that the brand's patent is invalid or will not be infringed by the generic. *Id.* § 355(j)(2)(A)(vii)(IV). The filing of the certification, known as the Paragraph IV certification, is deemed patent infringement. 35 U.S.C. § 271(e)(2)(A). The brand manufacturer then has 45 days to file an infringement action. *Id.* § 355(j)(5)(B)(iii). If it does, the FDA may not approve the generic's ANDA for 30 months or until the generic manufacturer obtains a final judgment of non-infringement or invalidity, whichever occurs earlier. 21 U.S.C. § 355(j)(5)(B)(iii). If the patent litigation is not resolved within 30 months, the FDA may approve the generic and the generic manufacturer may market the generic "at risk" of losing the patent case and incurring damages for infringement. *In re Lipitor*, 868 F.3d at 241 (citing *King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d 388, 396 (3d Cir. 2015)); 35 U.S.C. § 271(e)(4)(C).

This case arises within this regulatory framework.

**Factual Background**

Kos Pharmaceuticals, Inc., later acquired by Abbott Laboratories, had five patents covering Niaspan, its brand-name time-release cholesterol-reducing drug.[3] Four patents had expiration dates of September 20, 2013, and one expired May 27, 2017.[4]

---

[3] The five Niaspan patents at issue in the underlying patent litigation were the '930 patent, the '715 patent, the '691 patent, and '967 patent, and the '428 patent. Defs.' Statement of Material Undisputed Facts in Supp. of Their Mot. for Summ. J. ¶ 7, ECF No. 798 ["Defs.' SMF"]; Pls.' Resp. to Defs.' Statement of Material Undisputed Facts and Additional Statement of Material Facts in Opp'n to Defs.' Joint Mot. for Summ. J. ¶ 7, ECF No. 851-1 ["Pls.' SMF"]. Kos also asserted two patents it acquired from Upsher-Smith (the '145 and '181 Slo-Niacin patents). For purposes of this motion, Kos is not relying on the '145 and '181 patents. *See* Mem. of L. in Supp. of Defs.' Joint Mot. for Summ. J. ["Defs.' Joint Br."] 5 n.2, 22, ECF No. 798.

[4] Defs.' SMF ¶ 7; Pls.' SMF ¶ 7.

The FDA approved Niaspan in 1997 and Kos launched it that same year.[5] In late 2001 and 2002, Barr filed ANDAs for generic versions of Niaspan.[6] In response to Barr's Paragraph IV certifications that Kos's patents were invalid or not infringed, Kos filed a timely patent infringement action in the District Court for the Southern District of New York.[7] The patent litigation triggered the statutory stay of final FDA approval of Barr's generic until March 30, 2005.[8]

In May 2003, the FDA tentatively approved Barr's ANDA.[9] It could not grant final approval until the statutory stay expired on March 30, 2005.[10] Having received tentative approval, Barr anticipated final approval soon after March 30, 2005.

In early 2005, with no end of the patent litigation in sight, industry prognosticators reported that Barr planned to launch its generic product when the statutory thirty-month stay ended on March 30, 2005.[11] In response, on March 7, 2005, Kos filed a motion for a temporary restraining order and a preliminary injunction to enjoin Barr's launching its

---

[5] Defs.' SMF ¶ 6, Pls.' SMF ¶ 6.

[6] Defs.' SMF ¶¶ 14, 17; Pls.' SMF ¶¶ 14, 17.

[7] Barr filed four Paragraph IV certifications, prompting Kos to file four patent infringement actions. After Barr filed a fifth Paragraph IV certification, it filed a declaratory judgment action against Kos seeking a finding that the '691 patent was invalid or otherwise unenforceable. The five lawsuits were consolidated. Defs.' SMF ¶¶ 14–22; Pls.' SMF ¶¶ 14–22. We refer to them in the singular.

[8] The parties dispute the day the stay expired. Defendants claim it expired on March 31, 2005. They cite a letter from Kos's lawyer stating the "stay period expired on March 30, 2005," and the DPP Complaint which states FDA approval was stayed "until March 31, 2005." Defs.' SMF ¶ 20. Plaintiffs claim the stay "expired on March 30, 2005, not March 31, 2005" and cite the same letter from Kos's lawyer. Pls.' SMF ¶ 20.

[9] Letter from Gary Buehler, Director, Office of Generic Drugs, Center for Drug Evaluation and Research, FDA, to Barr Lab'ys, Inc. re ANDA 76-250, (referencing "the Tentative Approval letter issued by this office on May 9, 2003") (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2005/076250ltr.pdf).

[10] *Id.*

[11] Defs.' SMF ¶ 31; Pls.' SMF ¶ 31.

generic.[12] In Barr's briefing, Barr executives confirmed that Barr intended to launch its generic on March 30, 2005.[13]

On March 18, the court held a preliminary injunction hearing.[14] On March 30, with the court about to rule, Kos and Barr announced they were in discussions to settle the patent litigation.[15] On April 12, 2005, the parties settled.[16] The terms of that settlement are at the core of this antitrust action.

The settlement consisted of three related agreements: a Settlement and License Agreement ("the Licensing Agreement"); a Co-Promotion Agreement ("the Co-Promotion Agreement"); and a License and Manufacturing agreement ("the Manufacturing Agreement").[17] The net effect of these agreements was that Barr agreed to delay entering the market until September 20, 2013 in return for what the plaintiffs contend was a roughly $170 million payment.[18]

Under the Licensing Agreement, Barr agreed not to enter its generic into the market until September 20, 2013.[19] In return, Kos granted Barr an exclusive right to market generic Niaspan beginning September 20, 2013. Kos also agreed not to market

---

[12] Defs.' SMF ¶ 32; Pls.' SMF ¶ 32.

[13] Paul Bisaro's Decl. in Supp. of Barr Lab'ys' Opp'n to Kos Pharms.' Mot. for a Prelim. Injunction (attached as Ex. 23 to Decl. of Christopher M. First in Supp. of Pls.' SMF, ECF No. 851-2 ["First Decl."]) ["Bisaro Decl."] ¶ 9; Christine Mundkur's Decl. in Supp. of Barr Lab'ys' Opp'n to Kos Pharms.' Mot. for a Prelim. Injunction (attached as Ex. 25 to First Decl.) ["Mundkur Decl."] ¶¶ 4, 7.

[14] Defs.' SMF ¶ 33; Pls.' SMF ¶ 33.

[15] Defs.' SMF ¶ 48; Pls.' SMF ¶ 48.

[16] Defs.' SMF ¶ 49; Pls.' SMF ¶ 49.

[17] Defs.' SMF ¶ 50; Pls.' SMF ¶ 50.

[18] Pls.' SMF ¶ 87.

[19] Defs.' SMF ¶ 51; Pls.' SMF ¶ 86; Settlement and License Agr. ¶ 5 (attached as Ex. 49 to Decl. of Jonathan S. Meltzer in Supp. of Defs.' Joint Mot. for Summ. J., ECF No. 798-3 ["Meltzer Decl."]) ["Settlement and License Agr."].

an authorized generic version of Niaspan after Barr entered the market.[20] Barr agreed to pay Kos royalties based on Barr's gross profits from sales of generic Niaspan.[21]

The Co-Promotion Agreement obligated Barr's affiliate Duramed to promote Niaspan and Advicor, another Kos drug, to obstetricians, gynecologists and other women's health medical professionals.[22] Kos agreed to pay Barr royalties based upon sales of Niaspan and Advicor regardless of how much of those sales was generated by Barr.[23] Royalties would cease upon entry of another generic into the Niaspan market.[24]

The Manufacturing Agreement required Kos to pay Barr an initial lump sum payment followed by quarterly payments for Barr's readiness as a backup supplier of Niaspan and Advicor.[25] The initial payment was $4 million, followed by installment payments of $1.5 million on June 30, 2005 and September 20, 2005, and then either $750,000 or $1 million quarterly thereafter, depending on when Barr got FDA approval of its Advicor ANDA.[26] Kos's obligation to make the quarterly payments would end upon the earlier of Barr's sale of its generic drug to a third party or September 19, 2013.[27]

Since the 2005 settlement was reached, the rights to the generic and the brand have been transferred to other companies. Through a series of mergers and transfers,

---

[20] Defs.' SMF ¶ 51; Pls.' SMF ¶ 87; Settlement and License Agr. ¶ 4.

[21] Defs.' SMF ¶ 51; Pls.' SMF ¶ 87; Settlement and License Agr. ¶ 6.

[22] Defs.' SMF ¶ 52; Pls.' SMF ¶ 52(a); Co-Promotion Agr. (attached as Ex. 51 to Meltzer Decl.) 1–2.

[23] Defs.' SMF ¶ 52; Pls.' SMF ¶ 52(a).

[24] Co-Promotion Agr. § 3.1; Settlement and License Agr. ¶ 5.

[25] Defs.' SMF ¶ 52; Pls.' SMF ¶ 52(b); License and Manufacturing Agr. Art. 7 (attached as Ex. 50 to Meltzer Decl.).

[26] License and Manufacturing Agr. §§ 7.1–7.2.

[27] License and Manufacturing Agr. §§ 1.14, 11.1, 11.2(c).

AbbVie, Inc. now owns the rights to Niaspan, and Teva Pharmaceuticals Industries, Ltd. owns Barr's generic Niaspan.[28]

Generic Niaspan entered the market on September 20, 2013, the first date it could under the agreement Teva's predecessor had reached with Kos.[29] It enjoyed the statutory six-month exclusivity period.[30] When that ended on March 21, 2014, Lupin Pharmaceuticals introduced its generic Niaspan, followed by two more manufacturers three months later and another on November 25, 2015.[31]

In April 2013, the first of several putative class action lawsuits was filed against defendants.[32] The class is comprised of the Direct Purchaser Plaintiffs ("DPPs"), wholesalers who purchased brand and generic Niaspan directly from the defendants.[33]

A number of Retailer Plaintiffs (Albertson's, CVS, Giant Eagle, HEB, Kroger, Rite Aid, and Walgreen) are pursuing individual claims that have been consolidated with the DPP class action for pretrial purposes.[34] Retailers in the pharmaceutical space typically do not purchase brand drugs directly from the manufacturer. They purchase them from

---

[28] Defs.' SMF ¶¶ 60–62, Pls.' SMF ¶¶ 60–62.

[29] Defs.' SMF ¶ 63, Pls.' SMF ¶ 63.

[30] Defs.' SMF ¶¶ 63–64, Pls.' SMF ¶¶ 63–64.

[31] Defs.' SMF ¶¶ 67–69; Pls.' SMF ¶¶ 67–69.

[32] *United Food & Commercial Workers Union and Midwest Health Benefits Fund v. AbbVie, Inc., et al.*, Civil Action No. 2:13-01747 (E.D. Pa. 2013). The Judicial Panel on Multidistrict Litigation ("Panel") transferred eight of these actions to Judge Jan E. DuBois of the Eastern District of Pennsylvania, who consolidated them with nine related actions already pending in the Eastern District of Pennsylvania. Transfer Order, Sept. 17, 2013, ECF No. 1; Practice and Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407(a), Dec. 23, 2013, ECF No. 37. On September 8, 2021, the Panel reassigned the litigation. Order Reassigning Litigation, Sept. 8, 2021, ECF No. 767.

[33] Second Consolidated Amended Class Action Complaint ["DPP Compl."] ¶¶ 24–26, ECF No. 181.

[34] *See* Order, March 25, 2015, ECF No. 168; Order, May 5, 2015, ECF No. 194; Order, Apr. 4, 2016, ECF No. 294; Order, Apr. 4, 2016, ECF No. 295.

wholesalers, who act as middlemen. In other words, retailers are "indirect purchasers" of brand drugs.

Under antitrust law, retailers do not have standing to sue for indirect purchases. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728 n.7 (1977). Here, Retailer Plaintiffs' claims are based on an assignment from wholesalers who purchased Niaspan directly from the manufacturers and resold it to the Retailer Plaintiffs.[35]

DPPs and Retailer Plaintiffs (collectively "plaintiffs") claim the defendants, through the reverse payments, unlawfully delayed generic competition from entering the market and competing against Niaspan.[36] They allege the settlement agreements are anticompetitive "reverse payments" made to delay generic Niaspan's entry into the market in violation of antitrust law.[37] Plaintiffs allege They contend the settlement was not economically rational and instead was designed to increase profits by limiting competition.[38]

Moving jointly for summary judgment, the defendants argue that the plaintiffs cannot prove the reverse payment settlement caused the requisite injury or damages to establish antitrust standing. They argue even if the plaintiffs can establish standing, they cannot prove that the reverse payment settlement violated antitrust laws. They also claim

---

[35] Defs.' SMF ¶ 70; Pls.' SMF ¶ 70. For example, pursuant to the agreement between Retailer Plaintiff CVS and its wholesale supplier Cardinal Health, Cardinal "conveys, assigns and transfers to CVS all rights, title and interest in and to all causes of action it may have against Defendants . . . relating to Cardinal's purchase of Niaspan and/or its generic equivalent that was subsequently resold to CVS." Defs.' SMF ¶ 70; Pls.' SMF ¶ 70 (quoting Meltzer Decl. Ex. 69).

[36] DPP Compl. ¶¶ 179–88.

[37] *Id.* ¶¶ 102–13.

[38] *Id.* ¶¶ 106, 111.

that the alleged damages are artificially inflated as a matter of law. The Teva defendants[39] ("Teva") also separately argue that the payment Kos received from Barr was not, as a matter of law, "large," "unjustified," and "unexplained" under the rule of reason.[40]

The plaintiffs have moved for partial summary judgment on a discrete issue. They contend that, as a matter of law, the relevant antitrust market over which the defendants had the ability to control prices and exclude competition is limited to brand Niaspan and its generic equivalent.

**Standard of Review**

In examining a motion for summary judgment, we view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. *Peroza-Benitez v. Smith,* 994 F.3d 157, 164 (3d Cir. 2021) (citing *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015)). Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Revock v. Cowpet Bay W. Condo. Ass'n,* 853 F.3d 96, 112 (3d Cir. 2017) (citing *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 659 (3d Cir. 1993)).

Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury. *In re Asbestos Prod. Liab. Litig. (No. VI),* 822 F.3d 125, 135–36 (3d Cir. 2016) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). Bare assertions, conclusory allegations, or suspicions are not sufficient to defeat

---

[39] The "Teva defendants" include Barr Pharmaceuticals Inc., Teva Pharmaceuticals Inc., Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., Teva Women's Health, Inc. (f/k/a Duramed Pharmaceuticals Inc.), and Duramed Pharmaceuticals Sales Corp. *See* Teva Defs.' Mem. of L. in Further Support of the Joint Mot. for Summ. J. ["Teva's Br."] 1, ECF No. 974.

[40] As we explain below, the rule of reason is a test used to determine whether conduct imposes an "unreasonable restraint" on competition in violation of antitrust law. *Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018).

summary judgment. *Jutrowski v. Twp. of Riverdale,* 904 F.3d 280, 289 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.,* 765 F.3d 260, 268–69 (3d Cir. 2014)).

**Standing**

Proving that the defendants engaged in anticompetitive conduct is not enough to establish an antitrust violation. The plaintiffs must also prove that they suffered injury caused by the conduct. *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 163–64 (3d Cir. 2017). To establish causation, plaintiffs must demonstrate that they were injured "by reason of" the anticompetitive conduct. *Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223, 232 (3d Cir. 2013) (quoting 15 U.S.C. § 15); *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529, 535 (1983). Stated differently, they must prove that the defendants' anticompetitive actions were the factual and the proximate cause of injury. *See In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 268 (3d Cir. 2018) (citing *Assoc. Gen. Contractors of Cal.*, 459 U.S. at 535–36). Thus, to establish standing, the plaintiffs must prove that they paid higher Niaspan prices as a result of the settlement that delayed the entry of the generic into the market.

Plaintiffs assert that absent the unlawful settlement agreement, generic Niaspan would have entered the market earlier, resulting in lower, more competitive prices at an earlier date.[41] They assert injury in the form of "overcharges"—the difference between what plaintiffs paid for brand Niaspan and what they would have paid for the generic if not for the delay in generic entry.[42]

---

[41] Pls.' Opp'n to Joint Mot. for Summ. J. ["Pls.' Opp'n to Joint Mot."] 6, ECF No. 820.

[42] *Id.* 8–9.

Plaintiffs proffer three alternative causation theories. They maintain that in the absence of the reverse payment: (1) Kos would have failed to obtain a preliminary injunction, allowing Barr to launch "at risk" in 2005 (the "at-risk" theory); (2) Barr would have entered the market after obtaining a favorable final judgment in the patent litigation in 2007 (the "litigation success theory"); or (3) Kos and Barr would have agreed to an alternative settlement with an earlier generic entry date (the "alternative settlement" theory).[43]

Defendants argue that plaintiffs' first two causation theories fail because they cannot establish that Barr would have prevailed in the patent litigation or the preliminary injunction proceedings.[44] As to the third causation theory, defendants contend that plaintiffs have not produced evidence demonstrating that Kos and Barr would have agreed to an earlier entry date without any reverse payment.[45] Defendants contend that the evidence does not show that the settlement caused a delay in generic Niaspan's entry under any theory. Thus, they argue, plaintiffs cannot establish the injury necessary for antitrust standing.[46]

"Litigation Success" and "At-Risk" Theories

Plaintiffs' "at-risk" and "litigation success" theories are both predicated on Barr's having prevailed in the underlying patent litigation. The "at-risk" causation theory is that, had Kos and Barr not made the reverse payment settlement, Barr would have defeated Kos's motion for a preliminary injunction and launched its generic Niaspan at risk in June

[43] *Id.* 6–7.

[44] Defs.' Joint Br. 9–10.

[45] *Id.* 28.

[46] *Id.* 1.

of 2005.[47] The "litigation success" causation theory is that absent the settlement, Barr would have obtained a final judgment which would have been upheld on appeal, allowing it to launch generic Niaspan in September 2007.[48]

If Kos had obtained a preliminary injunction and favorable final judgment by demonstrating its patents were valid and infringed by Barr's generic Niaspan, the higher prices plaintiffs paid until the legal entry of generic Niaspan would have been caused by the normal operation of patent law—not by any anticompetitive conduct by defendants.

Defendants argue that the plaintiffs cannot show that Barr would have prevailed in the patent litigation or that it would have entered the market at risk. In short, they contend the plaintiffs cannot prove the settlement caused injury or damages by delaying the entry of lower-priced generic Niaspan into the market. They argue that there is no evidence "from which a reasonable jury could conclude that it is 'more likely than not' that Barr would have shown the patents were invalid."[49] They contend the plaintiffs have not produced evidence that the patents were invalid because (1) the clinical trials were invalidating prior "public uses;" (2) the patents were "obvious;" or (3) the patents were "anticipated" by prior art over-the-counter niacin patents.

To prove that the reverse payment agreement caused them harm by unreasonably diminishing competition, the plaintiffs must demonstrate that "but for" the agreement they would have paid lower drug prices. This necessarily requires asking what would have been the outcome of the patent litigation. If the result would have been that the patents

---

[47] Pls.' Opp'n to Joint Mot. 7.

[48] *Id.*

[49] Defs.' Joint Br. 9–10 (quoting *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 167 (3d Cir. 2017)).

were invalid or not infringed, the generic would have entered the market without delay and the plaintiffs would have paid lower prices. Plaintiffs maintain that it was the specter of defeat in the litigation that motivated Kos to make the reverse payments.

Because the settlement prematurely terminated the patent litigation, no one knows with absolute certainty what the outcome would have been. The plaintiffs construct a "but for world," step-by-step, using experts in relevant fields of patent, antitrust and economics. Relying on one another, the experts create the Niaspan market that would have existed at the time the settlement was made had there been no reverse payment.

The parties agree that in order to establish standing pursuant to plaintiffs' "litigation success" theory, plaintiffs must demonstrate Barr was "more likely than not" to prevail against Kos in the patent litigation.[50] They disagree as to whether the preponderance of the evidence standard also applies to plaintiffs' "at-risk" theory. Defendants argue it does.[51]

Plaintiffs contend that the at-risk theory only requires "some evidence" Barr "could have won the patent litigation."[52] The theory is premised on Barr's chances of defeating Kos's motion for a preliminary injunction.[53] To do so, plaintiffs argue, Barr only needed to show a "substantial question" as to the validity or infringement of Kos's patents, which

---

[50] *Id.* 9–10; Pls.' Opp'n to Joint Mot. 17. Defendants contend that Barr would have had to prove invalidity of Kos's patents by a "clear and convincing evidence" standard, and suggest in their briefing that plaintiffs must meet this standard to defeat summary judgment. Defs.' Joint Br. 9; Defs.' Reply Mem. of L. in Supp. of Defs.' Joint Mot. for Summ. J. ["Defs.' Reply"] 2–3, ECF No. 871. At oral argument, defense counsel clarified the defendants' position, stating that while the "clear and convincing evidence" standard will apply to plaintiffs' invalidity theories at trial, the preponderance of the evidence standard applies at summary judgment. *See* Tr. of Oral Arg., Jan. 21. 2025 ["Oral Arg. Tr."] 7:1–18; 84:21–85:4, ECF No. 986.

[51] Defs.' Joint Br. 9–10.

[52] Pls.' Opp'n to Joint Mot. 17–18.

[53] *Id.* 18.

is a lower standard of proof than would be required for Barr to obtain a final judgment.[54] Therefore, according to plaintiffs, it would be "illogical" to apply the same standard of proof to both the "at-risk" and the "litigation success" theories of causation.[55]

Even if Barr had defeated Kos's motion for preliminary injunction and launched at-risk, it still had to obtain a final judgment to prove that its launch was lawful. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 63 (citing *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 764 (E.D. Pa. 2015) ("[A]n 'at risk' launch is unlawful absent a later finding of patent invalidity or non-infringement."), *aff'd* 868 F.3d 132 (3d Cir. 2017)). If Kos had lost the preliminary injunction motion but later obtained final judgment in its favor, Barr's at-risk launch would have been patent infringement. As we have stated, antitrust standing requires a showing that the generic manufacturer's launch would have been legal. *In re Wellbutrin*, 868 F.3d at 165. Therefore, to demonstrate standing under both the "at-risk" and "litigation success" theories of causation, plaintiffs must establish that Barr "more likely than not" would have prevailed.[56]

---

[54] *Id.*

[55] *Id.*

[56] When asked at oral argument if he considered the "some evidence" standard to be a lower standard of proof than "more likely than not," plaintiffs' counsel responded, "No, I think it's more likely than not that they could have won." Oral Arg. Tr. 67:13–19.

Plaintiffs cite *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1186–90 (N.D. Cal. 2017) ("*Lidoderm*") for their proposition that the "some evidence" standard applies to an "at-risk" theory of antitrust standing. However, *Lidoderm* draws no distinction between the "some evidence" standard and the *In re Wellbutrin* standard:

> "Some evidence" is not the same as requiring plaintiffs to prove that the generic defendant *would have* won, only that it *could have. See also In re Wellbutrin*, 868 F.3d at 169 ("On this record, then, no reasonable jury could conclude that Anchen would have been more likely than not to prevail.").

*Lidoderm*, 296 F. Supp. 3d at 1155.

*Validity of Kos's Patents in the Underlying Litigation*

Having determined the burden of proof that applies to plaintiffs' "at-risk" and "litigation success" theories of standing, we address whether the plaintiffs have produced sufficient evidence showing it was more likely than not that Barr would have defeated Kos's claims of patent infringement.

In the patent litigation, Barr had to prove the invalidity of the patents. It asserted three separate theories of invalidity. It argued that Kos's patents were invalid because (1) Niaspan's clinical trials were invalidating prior "public uses" of the claimed inventions; (2) Kos's patents were "anticipated" by OTC niacin products that were on the market before Kos filed for patent protection; and (3) Kos's patents were "obvious" in light of the preexisting niacin products.[57]

Public Use

A patent is invalid if the claimed invention was "in public use or on sale in this country, more than one year prior to the date of the application for patent." 35 U.S.C. § 102(b).[58] A public use is "any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1379 (Fed. Cir. 2004) (quoting *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002)). The public use bar applies where use of the invention was accessible to the

[57] Defs.' SMF ¶¶ 24–34; Pls.' SMF ¶¶ 24–34.

[58] Section 102(b) has since been amended by the America Invents Act ("AIA"), Pub. L. No. 112-29, § 3(b), 125 Stat. 284 (2011). Because the relevant inquiry is whether Barr would have prevailed in the underlying litigation, we apply the law as it existed in 2005.

public or commercially exploited. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005).

Kos filed its first Niaspan patent, the ’428 patent, on September 20, 1993.[59] Therefore, to invalidate all ’128 patent claims on a public use theory, including the claims in Kos’s earliest ’428 patent, Barr had to demonstrate a public use before September 20, 1992.[60]

In years prior to September 20, 1992, Kos conducted a number of Niaspan clinical trials.[61] It is undisputed that the clinical trials used Kos’s patented Niaspan formulas.[62] Kos’s named inventor, David Bova, testified that the purpose of the studies was to obtain FDA approval so that Niaspan could “be sold in the United States.”[63]

Barr argued in the patent litigation—as the plaintiffs do here—that Kos’s clinical trials constituted an invalidating public use of Niaspan.[64] Barr briefed the public use issue extensively in its opposition to Kos’s motion for a preliminary injunction.[65] During the hearing on the motion, the district court described the public use issue as the “most significant and possibly the decisive issue[]” in the underlying litigation.[66]

---

[59] Pls.’ SMF ¶¶ 111–12.

[60] *Id.* ¶ 112; Defs.’ Reply 5.

[61] *See* Defs.’ SMF ¶¶ 38–40; Pls.’ SMF ¶ 103.

[62] Pls.’ Opp’n to Joint Mot. 19; Defs.’ Mem. of L. in Supp. of Defs.’ Mot. to Exclude the Ops. and Proposed Test. of Martin Adelman, Diane Burgess, and John Kane 6, ECF No. 787.

[63] Bova Dep. Tr. (attached as Ex. 12 to First Decl.) 78:10–79:18.

[64] Defs.’ SMF ¶ 34; Pls.’ SMF ¶ 84.

[65] Defs.’ SMF ¶ 34; Pls.’ SMF ¶ 34. In its preliminary injunction motion, Kos asserted infringement of just one claimed invention, claim 1 of the ’691 patent. *See* Barr Lab’ys’ Mem. in Supp. of its Opp’n to Kos’ Mot. for a Prelim. Injunction (attached as Ex. 36 to Meltzer Decl.) [“Barr’s Opp’n to Kos’s Prelim. Injunction Mot.”] 2. Therefore, the preliminary injunction briefing from the underlying litigation focuses only on the validity of that claim.

[66] Defs.’ SMF ¶ 34; Pls.’ SMF ¶ 34.

Plaintiffs proffered expert Martin Adelman, a patent lawyer and law professor, to opine on the strengths of Barr's defenses in the patent litigation.[67] He reviewed the preliminary injunction record in the underlying litigation, including the opinions of Barr and Kos's experts.[68]

In his report, Adelman opined that the Niaspan clinical trials were "very likely" to be found a public use because Kos distributed roughly 175,000 Niaspan tablets to 1,200 patients without imposing confidentiality obligations.[69] He noted patients were told that they were taking a sustained release nicotinic acid formulation intended to treat hyperlipidemia without adverse side effects, the doses they were taking, and the identity of the manufacturer.[70] In light of this evidence, Adelman opined that Barr had "at least a 90% chance of prevailing over Kos's assertion of the Kos Patents based on Barr's public use defense."[71]

---

[67] *See* Expert Report of Martin Adelman (attached as Ex. 1 to Meltzer Decl.) ["Adelman Report"]. Plaintiffs have substituted Professor John R. Thomas for Adelman, who is no longer available to testify. *See* Mem. in Supp. of Pls.' Unopposed Mot. to Substitute Prof. John R. Thomas for Prof. Martin J. Adelman as Testifying Expert ["Adelman Substitution Br."] 1–2, ECF No. 1012-1; Order, Sept. 29, 2026, ECF No. 1016 (granting plaintiffs' unopposed motion to substitute Thomas for Adelman). The parties have agreed that Thomas will fully adopt Adelman's expert report and deposition testimony, and will not offer any additional or different opinions concerning the topics covered in Adelman's report at trial. *See* Adelman Substitution Br. 2.

[68] *See* Mem. in Supp. of Pls.' Unopposed Mot. to Substitute Prof. John R. Thomas for Prof. Martin J. Adelman as Testifying Expert 1–2, ECF No. 1012-1.

[69] Adelman Report ¶¶ 91, 104.

[70] *Id.* ¶¶ 91, 104–05.

[71] *Id.* ¶ 12. Adelman's opinion that Barr had an 81% chance of prevailing overall is based on his opinion that Barr had a 90% chance of prevailing over Kos's assertion of the Upsher-Smith patents, and a 90% chance of prevailing over Kos's assertion of the Kos patents based on the public use defense. *Id.* As we have noted, defendants are not relying on the Upsher-Smith patents for purposes of summary judgment. *See supra*, n.3.

*Commercial Exploitation*

The public use bar applies where the inventor commercially exploits the invention more than a year before filing for the patent. *TP Lab'ys, Inc. v. Pro. Positioners, Inc.*, 724 F.2d 965, 973 (Fed. Cir. 1984). The bar is intended to discourage an inventor from reaping commercial benefits from his invention for longer than a year before filing a patent application. *Id.*; *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1147 (Fed. Cir. 1983).

Defendants argue that plaintiffs have not demonstrated that Barr would have proven public use based on commercial exploitation.[72] They contend that Kos's use of the clinical trials to obtain FDA approval does not constitute commercial exploitation.[73] They insist Kos "did not advertise, sell or otherwise commercially market Niaspan before the critical date."[74]

Plaintiffs contend that the clinical trials were conducted after Niaspan had been "reduced to practice (i.e., shown to work for its intended purpose)" in December 1990.[75] According to plaintiffs, because Kos had already determined Niaspan was effective, the purpose for the clinical trials could not have been experimental.[76] So, they argue, the purpose for the clinical studies must have been commercial.[77]

---

[72] Defs.' Joint Br. 14–16.

[73] *Id.*

[74] Defs.' Joint Br. 16.

[75] Pls.' Opp'n to Joint Mot. 28.

[76] Plaintiffs also contend that Kos would not have been able to invoke the "experimental use" doctrine. *See id.* Under this doctrine, proof that use of an invention was "experimental" negates application of the public use bar to patent validity. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379–80 (Fed. Cir. 2005). Because defendants have not raised the experimental use issue in their motion for summary judgment, we do not address whether Kos would have successfully invoked the experimental use doctrine.

[77] Pls.' Opp'n to Joint Mot. 28.

Defendants dispute that all of Kos's patents were reduced to practice by the time of the clinical trials.[78] Even if they were, that Kos continued to test its Niaspan invention in various dosages after determining it worked does not necessarily mean that it was commercially exploited. There is "no authority" for the proposition that "testing or improvement of an invention, even after 'reduction to practice' constitutes 'commercial exploitation' by the inventor—simply because the testing is aimed toward ultimately making the invention commercially viable." *Diodem, LLC v. Lumenis Inc.*, No. CV03-2142 GAF (RCx), 2005 WL 6220720, at *13 (C.D. Cal. Sept. 16, 2005) (citing *D.L. Auld*, 714 F.2d at 1147).

Plaintiffs have not produced evidence Kos profited from its use of Niaspan in the clinical trials. Kos received no compensation from the Niaspan clinical studies.[79] The patients did not pay for the Niaspan they were given.[80] There is nothing showing the trials were part of a marketing campaign or efforts to develop a consumer market for Niaspan. Nor is there evidence Kos ever marketed or sold Niaspan at any point before the earliest critical date on September 20, 1992.

Because plaintiffs have not identified any commercial benefit flowing from Kos's clinical trials, they cannot show Barr could have prevailed on a claim that Kos's clinical trials were invalidating public uses based on commercial exploitation.

---

[78] Defs.' Reply 10 n. 3.

[79] Decl. of David J. Bova in Supp. of Kos Pharms., Inc.'s Mot. for a Temporary Restraining Ord. and Prelim. Inj. Against Def. Barr Lab'ys, Inc. (attached as Ex. 35 to Meltzer Decl.) ¶ 20.

[80] *Id.*

*Public Accessibility*

A prior use is "publicly accessible" if it discloses "inventions that the public reasonably has come to believe are freely available." *Dey, L.P. v. Sunovion Pharms., Inc.,* 715 F.3d 1351, 1355 (Fed. Cir. 2013) (quoting *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1198 (Fed. Cir. 1994)). Whether an invention is "'accessible to the public' . . . depends, at least in part, on the degree of confidentiality surrounding its use." *Id.* (quoting *Invitrogen*, 424 F.3d at 1382).[81] Although the presence or absence of a confidentiality agreement is relevant to the issue of public accessibility, it alone is not dispositive. *Bernhardt*, 386 F.3d at 1379; *Invitrogen*, 424 F.3d at 1381. In the absence of a formal confidentiality agreement, we ask whether there were "circumstances creating a similar expectation of secrecy." *Dey*, 715 F.3d at 1357.

In determining whether an invention was publicly accessible, relevant factors include the nature of the activity that occurred in public, knowledge of the public use, whether individuals other than the inventor conducted the testing, the number of tests, and the length of testing. *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002). We also consider the extent to which the inventor "retained control over the use of the [invention] and the future dissemination of information about it." *Beachcombers v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1160 (Fed. Cir. 1994).

The applicability of the public use bar is a question of law based on the underlying facts. *Invitrogen*, 424 F.3d at 1378. It is "replete with factual considerations, such as the (disputed) extent to which study participants were informed of and able to disclose the

[81] *Dey, L.P. v. Sunovion Pharms., Inc.*, 715 F.3d 1351 (Fed. Cir. 2013) was decided after the preliminary injunction proceedings against Barr. It applied the same public use principles that governed in 2005 when Kos and Barr reached their settlement.

pertinent details of the claimed prior art." *Dey*, 715 F.3d at 1357. Therefore, whether a clinical trial constitutes a public use must be analyzed on a case-by-case basis.

For example, in *Dey,* the Federal Circuit considered whether clinical trials constituted a public use that invalidated the inventor's drug patent. *See id.* at 1352. Participants were given treatments to take home and self-administer. *Id.* at 1353. Though they were instructed to return unused medication, some of the thousands of vials distributed during the trials were not returned. *Id.* at 1354. Investigators were subject to confidentiality, but participants were not. *Id.* at 1354, 1357. Although participants were told the active chemical compound and dosages being tested, they were not told the name of the drug or formulation they were receiving. *Id.* at 1357. The Federal Circuit held that based on the evidence, crucial issues of fact remained in dispute as to whether the inventor took sufficient precautions to preclude the public from obtaining information about its patented drug. *Id.* at 1356. Thus, the Federal Circuit determined that summary judgment was not appropriate as to the public use defense. *Id.* at 1358.

The defendants claim that Adelman's reliance on the lack of a patient confidentiality obligation is not sufficient to create an issue of fact as to public accessibility.[82] They argue that plaintiffs cannot demonstrate Niaspan was publicly accessible because the undisputed facts show the trials were "carefully controlled."[83] They contend that while medical ethics prohibited Kos from subjecting the trial participants to confidentiality obligations, all others involved in the trials were subject to confidentiality.[84] Defendants insist that plaintiffs' "1,200 study participants" figure is

---

[82] Defs.' Joint Br. 17.

[83] *Id.* 12.

[84] *Id.*

overbroad because it includes clinical trials that occurred after the earliest critical date.[85] They claim that only 90 to 172 patients received Niaspan before the earliest critical date of September 20, 1992, which they claim is too small a number to support a finding of public accessibility.[86]

Defendants concede that patients were told the active ingredient was niacin and that Niaspan was a "sustained-release product."[87] They contend that is not enough. They emphasize that patients were not told the specific formulations and dissolution profiles that were claimed in Kos's patents.[88] Specifically, defendants claim patients were not told the formulation consisted of nicotinic acid, hydroxypropyl methylcellulose, povidone, and stearic acid.[89] Because the public could not discern these limitations, defendants argue, the invention was not accessible to the public.[90] In sum, according to defendants, because the clinical trials were carefully controlled and did not disclose all formula limitations, Barr could not have established that Niaspan was accessible to the public.[91]

Plaintiffs rely on more than the lack of patient confidentiality.[92] They claim that the trials involved the distribution of substantial amounts of Niaspan to over 1,000 patients, many of whom were not subject to confidentiality.[93] They contend that many patients were given "unfettered" use of the Niaspan product, including, in some cases, a year's

---

[85] Defs.' Reply 5.

[86] *Id.* 5–6.

[87] Defs.' Joint Br. 12; Defs.' Reply 4.

[88] Defs.' Joint Br. 12–13; Defs.' Reply 4–5, 7.

[89] Defs.' Reply 4–5, 8.

[90] *Id.* 8–9.

[91] Defs.' Joint Br. 11–14.

[92] Pls.' Opp'n to Joint Mot. 19.

[93] *Id.* 20.

supply, and that Kos released extensive information about Niaspan's claims limitations through the clinical trials and "made no attempt" to control its distribution.[94] By way of example, plaintiffs cite to a specific consent form that discloses every limitation of claim 1 of the '428 patent and does not instruct the patients not to share the product or product information with others.[95]

The parties agree that the earliest filing date for the Niaspan patents is September 20, 1993.[96] Consequently, the earliest "critical date" for purposes of applying the public use bar is one year earlier—September 20, 1992. Therefore, we focus on the clinical trials that Kos conducted before September 20, 1992.

It is undisputed that the 91/02, 91/04, and 91/05 studies began before September 20, 1992, and more than 90 patients received Niaspan before that date.[97] The parties agree that almost none of the patients were subject to any confidentiality restrictions.[98] Only one testing site in one study, the 91/04 study, imposed any restriction on the subjects' ability to share information or the medication with others. The informed consent form at that location contained a "Confidentiality of Medications and Study" provision, which read:

---

[94] *Id.* 20–21.

[95] *Id.*

[96] Pls.' SMF ¶¶ 111–12; Defs.' Reply 5.

[97] The parties agree that the 91/02 and 91/04 study, comprising of 90 patients, began before September 20, 1992. Pls.' SMF ¶ 103; Defs.' Reply 5; Pls.' Opp'n to Joint Mot. 5. They also agree that a third study, the 91/05 study involving 82 patients, also began before September 20, 1992. Pls.' SMF ¶ 103; Defs.' Reply 5. However, defendants dispute that all 82 patients would have received Niaspan before the critical date, as two of the six treatment centers did not start enrolling patients until November 1992. Defs.' Reply 5. Plaintiffs claim that a fourth study, the 91/09 study involving 723 patients, began on January 28, 1992. Pls.' SMF ¶ 103. But defendants point out that the 91/09 study did not enroll its first patient until November 1992. Defs.' Reply 6 n.1.

[98] Pls.' SMF ¶ 109; Defs.' SMF ¶¶ 38–39; Expert Rep. of Robert S. Frank, Jr. Pursuant to Fed. R. Civ. P. 26(a)(2)(B) (attached as Ex. 2 to Meltzer Decl.) ¶ 83.

> All medications provided to me during these studies are the property of these studies['] sponsor. I agree not to provide any of this medication to anyone else. I recognize that this is important in order to prevent unsupervised use of this medication and to maintain the confidentiality of this study for its sponsor. I further agree to keep all information relating to the conduct of this study disclosed to me through my participation in this study confidential.[99]

The existence of a nondisclosure agreement at one testing site suggests that Kos could have imposed confidentiality at all sites, but did not. Consequently, the trial subjects in the other studies were free to share information about Niaspan or the medication itself with anyone.

The lack of confidentiality alone is not dispositive. It is only one factor in the public accessibility determination. We also consider the extent to which Kos controlled the distribution of Niaspan and disclosed information about it.

Clinical trial participants received extensive information about the drug they were receiving. They were told Niaspan's trade name, the dosages, that the trials were testing a new formulation of niacin designed to release slowly over time, the reason for the new design was to reduce cholesterol while reducing the side effects that typically accompany niacin treatments, and that the sustained release niacin was to be taken once daily at bedtime with a snack.[100]

Participants were given medication to take home and administer themselves.[101] In the 91/02 study, they were given 100 tablets per visit.[102] They were instructed to return

[99] First Decl. Ex. 8 at 545756.

[100] Pls.' SMF ¶¶ 105–06. Defendants did not file a statement of facts in response to Plaintiffs' Additional Statement of Material Facts. When a party fails to dispute another party's assertions of fact, those facts can be considered undisputed. Fed. R. Civ. P. 56 (c)(1), (e)(2). Plaintiffs' undisputed statements regarding the clinical trials are supported by the record. Therefore, any assertion of fact regarding Kos's clinical trials which defendants do not specifically deny in their reply briefing is deemed undisputed.

[101] Pls.' SMF ¶ 104.

[102] *Id.*; First Decl. Ex. 60 5221–26.

unused medication, but many failed to do so.[103] Participants in the 91/04 and 91/05 studies were able to continue taking Niaspan for a full year after the studies concluded.[104]

Considering more than 90 patients were given Niaspan, the lack of confidentiality restrictions, the lack of controls over the medication distributed, and the extent of the information disclosed, the district court in the patent litigation could have found, contrary to the defendants' contention, that Kos's clinical trials were not "carefully controlled."[105]

Plaintiffs' expert Adelman opined that "Kos's clinical trials involved abundant disclosure without secrecy to patients under circumstances that provided the patients with all the information they needed to practice the invention themselves."[106] He notes that patients were "free to purchase any of the over-the-counter nicotinic acid products and practice the method themselves even after they stopped participating in the clinical study."[107] The undisputed evidence shows that patients in Kos's clinical studies were free to disclose information about Niaspan to whomever they wished, including those skilled in the art. As Barr argued in its preliminary injunction opposition:

> [H]undreds of patients took the drug home in labeled "blister cards"—packages that identified dosage levels, the "sustained-release" dosing regimen, the drug's name as "Niaspan," and the manufacturer as Kos. While at home, the packages were accessible to family, friends, and anyone the patients wanted to talk to about the clinical trial. With such a wide distribution, some of those with access could easily have been competitors, pharmacists, chemists, or pharmacologists.[108]

[103] First Decl. Ex. 60 at 4874, 5221–26

[104] Pls.' SMF ¶ 107; Defs.' Reply 6; First Decl. Ex. 64 at 29948; First Decl. Ex. 63 at 26634.

[105] *See* Defs.' Joint Br. 12.

[106] Adelman Report ¶ 107.

[107] *Id.* ¶ 105.

[108] Barr's Opp'n to Kos's Prelim. Injunction Mot. at 6.

Adelman reviewed the evidence of Kos's clinical trials as it applied to each of the five asserted patents. He concluded Barr was "very likely to prevail in showing that Kos had publicly used [the patent claims] more than a year before the earliest available filing date for those claims, rendering them invalid."[109] Adelman opined that Barr had "at least a 90% chance of prevailing over Kos's assertion of the Kos Patents based on Barr's public use defense."[110] This exceeds the "more likely than not" standard that plaintiffs must meet to establish standing. In *In re Wellbutrin*, Adelman's opinion that the generic manufacturer was 80% likely to succeed in the underlying patent litigation was enough to defeat the defendant's motion for summary judgment in the subsequent antitrust action. *See* 868 F.3d at 169–70. His opinion here, based upon an analysis of all the factors in the litigation, satisfies the requirement that the antitrust plaintiffs have produced evidence, beyond speculation and aspiration, that it was more likely than not that Barr would have won the patent litigation.

Questions of fact remain as to the extent of control Kos exerted over the administration of the medication and the dissemination of information about Niaspan through its clinical trials. Based on the information trial participants were given about Niaspan, the existing niacin formulas that were on the market, and the lack of constraints on participants sharing information and medication with whomever they wished, a reasonable factfinder could conclude that Kos made Niaspan "publicly accessible" through its clinical trials.[111] Based on this evidence, a jury could conclude it was more

---

[109] Adelman Report ¶¶ 157, 167, 177, 189, 194.

[110] *Id.* ¶12.

[111] Defendants also argue that Barr would have failed to demonstrate public use because the only case it cited finding a clinical trial to be an invalidating public use, *SmithKline Beecham Corp. v. Apotex Corp.,* 365 F.3d 1306 (Fed. Cir. 2004), was vacated by the Federal Circuit. The vacatur of *SmithKline* and

likely than not that Barr would have shown Kos's clinical trials were invalidating public uses of Niaspan, and Barr would have prevailed on its public use defense in the underlying patent litigation. *See id.* at 169. Therefore, we deny summary judgment on defendants' claim that plaintiffs cannot prevail on public use.

Having concluded that there is ample evidence of Barr's likely success on its public use theory, we need not discuss whether Barr would have prevailed on its additional bases for invalidity—anticipation and obviousness. At oral argument, defense counsel agreed that "if summary judgment is denied on prior use, we never get to obviousness or anticipation" because "the public use issue cuts across all of the patent claims[.]"[112] Moreover, as we noted in our discussion of defendants' *Daubert* motion to exclude Martin Adelman, Diane Burgess, and John Kane as experts, whether Niaspan was anticipated or made obvious by OTC prior art niacin products depends on factual determinations to be resolved by the jury.[113]

The evidence supporting Barr's "public use" defense and Adelman's opinion that, based on that evidence, the defense gave Barr at least a 90% chance of prevailing is sufficient to establish Barr more likely than not would have prevailed at the preliminary injunction stage or obtained a final judgment.

Plaintiffs have also established their benchmark market entry dates under the "at-risk" and "litigation success" theories. There is ample evidence to show that Barr would have launched at risk by June 9, 2005. In the injunction proceedings, Barr expressly

---

Barr's reliance on it is irrelevant. *SmithKline* involved the experimental use exception to the public use bar, which is not at issue here.

[112] Oral Arg. Tr. 24:2–6.

[113] See our memorandum opinion discussing the parties' *Daubert* motions ["Mem. Op. on *Daubert* Mots."], filed concurrently with this opinion.

announced its intention to launch on March 30, 2005.[114] Barr made statements of its intention to launch and its assessment of the patent litigation outcome in sworn declarations in the injunction proceedings.[115] Several Barr executives submitted declarations in opposition to Kos's motion for preliminary injunction that revealed Barr's intentions. Barr COO Paul Bisaro declared that "Barr is preparing to launch its generic version of Niaspan on March 30, 2005."[116] He stated that Barr had already spent $850,000 "on raw active ingredient and other associated costs for that preparation, such as the costs of test batches, inactive ingredients, manpower, and other resources."[117] He explained that, if it did not launch at the expiration of the 30-month stay, Barr would lose approximately $2 million because inventory it had already built would be destroyed due to the product's limited shelf life.[118] Barr Vice President Christine Mundkur represented that Barr's generic Niaspan batches "will be sold to the public if Barr is permitted to launch its product on March 30, 2005."[119] Barr Vice President of Sales and Marketing Timothy Catlett declared that Barr expected to generate roughly $240 million in profit between April 2005 and April 2006 from generic Niaspan.[120]

Industry analyst reports in December 2004 and January 2005 announced that Barr was "signaling an intention to launch a generic Niaspan 'at risk,' perhaps as early as

[114] Pls.' SMF ¶¶ 47(b), 96; Tr. of Oral Argument on Kos's Mot. for a TRO and Prelim. Injunction 29:4–25 (attached as Ex. 37 to Meltzer Decl.).

[115] Pls.' SMF ¶¶ 47(b), 96.

[116] Bisaro Decl. ¶ 9.

[117] *Id.* ¶¶ 11, 12.

[118] *Id.* ¶ 12.

[119] Mundkur Decl. ¶ 7.

[120] Timothy Catlett's Decl. in Supp. of Barr Lab'ys' Opp'n to Kos Pharms.' Mot. for a Prelim. Inj. (attached as Ex. 24 to First Decl.) ¶¶ 14–15.

March 2005."[121] By March 24, 2005, Barr had prepared pricing, packaging, and shipping information for generic Niaspan and began soliciting pre-orders from customers.[122]

Plaintiffs have also sufficiently established their benchmark market entry date under the "litigation success" theory. Adelman opines that Barr's win in the district court was likely to have been upheld on appeal in September 2007,[123] clearing the way for Barr to enter the market.

In summary, there is sufficient evidence to support a finding that, absent the settlement agreement, Barr would have successfully entered the market by launching at risk in 2005, or after obtaining a favorable final judgment in the patent litigation in 2007. Thus, plaintiffs have shown under the "at-risk" and "litigation success" theories that they suffered damages in the form of overcharges as a result of the defendants' settlement agreement, giving them standing.

Alternative Settlement Theory

Plaintiffs' third theory of causation is the "alternative settlement" theory. They contend Kos and Barr could have agreed to a lawful alternative settlement that would have resulted in earlier generic entry, and would have been mutually profitable to both Kos and Barr.[124] Stated differently, but for the allegedly illegal settlement, Kos and Barr could have entered into a lawful settlement that would have benefited them both and not caused unlawful harm to consumers.[125]

---

[121] First Decl. Ex. 15; First Decl. Ex. 16.

[122] First Decl. Ex. 27.

[123] *See* Adelman Report ¶¶ 15, 226.

[124] Pls.' Opp'n to Joint Mot. 6.

[125] *Id.* 5–6.

Plaintiffs offer the expert reports of Einer Elhauge, an antitrust law professor, and Dr. Keith Leffler, an economics professor, who opine on what date generic entry would have been mutually profitable for Kos and Barr instead of continuing litigation.[126] Elhauge opines that it would have been economically rational for the parties to enter into a "no-payment" settlement with a generic entry date of March 14, 2009.[127] Leffler opines the date would have been between November 17, 2005 and November 16, 2008.[128]

In *In re Wellbutrin*, the Third Circuit set the standard for the alternative settlement theory of causation. 868 F.3d at 166–67. The plaintiffs there pursued a license-based theory of antitrust standing. *See id.* They argued that in the absence of the challenged settlement, the parties would have agreed to a license arrangement permitting earlier entry of the generic drug. *Id.* As support, the plaintiffs pointed out that the parties were negotiating a license agreement in the days leading up to settlement and had agreed on all but one term. *Id.* at 167. The plaintiffs contended that, based on those negotiations, a reasonable jury could infer the defendants would have reached a license agreement absent the contested settlement. *Id.* The Third Circuit determined that the argument was too speculative to create an issue of fact as to the alternative license date theory of causation. *See id.* It reasoned that it is not enough to show that the parties *may* have been able to reach an alternative agreement. *Id.* The parties must point to "specific or concrete" evidence permitting a jury to reach a conclusion that, absent the allegedly unlawful agreement, the parties *would* have reached a lawful one. *Id.* Therefore, in order to withstand summary judgment on an alternative settlement theory of causation, plaintiffs

---

[126] Elhauge Report ¶¶ 2–3, 5; Leffler Report ¶¶ 1, 11(E).

[127] Elhauge Report ¶ 2.

[128] Leffler Report ¶ 11(E).

must "produce evidence from which a reasonable jury could conclude that it is more likely than not that" the parties would have agreed to alternative settlement terms in the but-for world. *Id.*

Here, the defendants contend that plaintiffs' alternative settlement theory is speculative and unsupported by the evidence. They argue that plaintiffs, like the plaintiffs in *Wellbutrin*, have failed to offer "specific or concrete" evidence that Kos would have agreed to alternative settlement terms.[129] They argue there is no evidence showing Kos would have considered a license date prior to September 20, 2013, or that it would have done so "without the contemporaneous business deals that supplemented its cash flows."[130] They note that the first settlement meeting did not occur until a year and a half into the patent litigation in February 2004.[131] They claim there was no "breakthrough" in settlement negotiations until March 2005.[132] They contend there is no evidence that settlement would have occurred absent the Co-Promotion and Manufacturing Agreements and a September 20, 2013 generic entry date.[133]

Defendants argue that plaintiffs' experts Elhauge and Leffler's opinions are flawed for the reasons set forth in their *Daubert* motions.[134] Even if the opinions are admissible, defendants argue, they are limited to what would have been economically rational for Kos and Barr to do in the but-for world.[135] Therefore, according to defendants, Elhauge and

---

[129] Defs.' Joint Br. 29.

[130] *Id.* 28.

[131] *Id.* 29.

[132] *Id.*

[133] *Id.*

[134] We rejected the defendants' arguments. *See* Mem. Op. on *Daubert* Mots. 20–28.

[135] Defs.' Joint Br. 31–32.

Leffler's economic rationality models are insufficient to create an issue of fact as to whether Kos and Barr would have reached an alternative settlement.[136]

Plaintiffs counter that Elhauge and Leffler's opinions are hypothetical, not speculative.[137] They claim their opinions are restrained by the assumption of economic rationality.[138]

Plaintiffs argue that they need not produce evidence that the parties considered terms of a settlement that never came to pass.[139] The "breakthrough" in settlement negotiations that defendants cite—linking the September 20, 2013 license date to the Co-Promotion and Manufacturing Agreements—is the reason plaintiffs contend the settlement is unlawful.[140] Plaintiffs characterize this as defendants' attempt to evade "damages for their illegal conduct [by saying] they contemplated acting only illegally."[141]

Plaintiffs are not required to produce evidence showing that Kos and Barr discussed a possible alternative no-payment settlement. Because the causation question depends on a but-for world, "it is not surprising that no evidence shows that defendants were contemplating anything other than the actual [s]ettlement." *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1190 (N.D. Cal. 2017) ("*Lidoderm*"); *see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,* No. CV 14-md-02503, 2018 WL 563144, at *23 (D. Mass. Jan. 25, 2018) ("Defendants would have this causation theory rise and fall

[136] *Id.* 32.

[137] Pls.' Opp'n to Joint Mot. 14.

[138] *Id.*

[139] *Id.* 13.

[140] *Id.* 14–15.

[141] *Id.*

solely on whether there is evidence that, essentially, the but-for scenario in question actually occurred. As the Court has stated, that is not and cannot be the standard."); *In re Androgel Antitrust Litig. (No. II)*, No. 1:09-MD-2084-TWT, 1:09-CV-955-TWT, 2018 WL 2984873, at *17 (N.D. Ga. June 14, 2018) ("If Solvay and the Generics 'were acting unlawfully to eliminate competition throughout their settlement negotiations, then it is unreasonable to expect a paper trail signifying rational, lawful business choices.'" (quoting *In re Solodyn*, 2018 WL 563144, at *21)); *In re Glumetza Antitrust Litigation*, No. C 19-05822 WHA, 2021 WL 3773621, at *18 (N.D. Cal. Aug. 25, 2021) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created . . . [the parties] have no reason to contemplate action they might have taken in the but-for world which never came to pass." (emphasis removed)).

In the absence of direct evidence that Kos and Barr contemplated an alternative settlement, plaintiffs offer the expert reports of Elhauge and Leffer. The plaintiffs in *In re Wellbutrin* had no expert to support their alternative license agreement theory of causation. *In re Wellbutrin* does not address whether expert opinion regarding economically rational generic entry dates creates a triable issue of fact as to causation. We conclude that it does.

Elhauge and Leffler do not opine that Kos and Barr would have entered into an alternative no-payment settlement agreement with a generic entry date earlier than September 20, 2013. Nor could they. What the parties would have done in the but-for world is for a jury to decide.

Elhauge and Leffler opine on what would have been mutually profitable for the parties in the but-for world. Their opinions are restrained by the assumption of rational economic behavior. They conclude that it would have been economically rational for Kos and Barr to have agreed to earlier generic entry without a reverse payment. In reaching their conclusions, they applied record evidence regarding the strength of the patents, the parties' respective bargaining power, and the profitability of generic entry compared to continued litigation. Their opinions create an issue of fact as to plaintiffs' alternative settlement theory of causation. *Lidoderm*, 296 F. Supp. 3d at 1164; *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 200 (S.D.N.Y. 2018).

The alternative settlement theory shows there was an earlier entry date than the actual date that would not have caused harm to the plaintiffs from overcharges. That the defendants did not consider an earlier date does not affect the calculation of the break-even date for showing harm. In the real world, the delayed generic entry caused the plaintiffs to pay higher prices for a longer period of time. Thus, the alternative settlement theory proves injury required to establish antitrust standing.

Plaintiffs have produced sufficient evidence of causation to support antitrust standing. A jury could conclude that but for the reverse payment settlement, Barr would have achieved earlier generic entry by launching at risk in 2005, launching after prevailing on final judgment in the patent litigation, or agreeing to an earlier alternative no-payment generic entry date. Therefore, because plaintiffs have produced evidence that the overcharges they paid were caused by Kos and Barr's anticompetitive conduct, we will deny defendants' summary judgment motion based on lack of antitrust standing.

**Liability**

The Supreme Court has warned that "large and unjustified" reverse payments raise antitrust concerns. *Fed. Trade Comm'n v. Actavis*, 570 U.S. 136, 158 (2013).[142] An "unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival," thus "suggest[ing] that the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market." *Id.* at 157. Eliminating the risk of patent invalidation by paying the challenger to stay out of the market is anticompetitive. *In re Lipitor*, 868 F.3d at 250–52 (quoting *Actavis*, 570 U.S. at 157). Doing so harms consumers by keeping prices at supracompetitive levels for longer than the patent strength would otherwise allow. *Id.*

Not all reverse payment settlements violate antitrust laws. Nor are they presumptively unlawful. But, when such an agreement unreasonably diminishes competition, it may violate antitrust laws. *Actavis*, 570 U.S. at 141–42. Reverse payment settlements are unlawful when they violate the "rule of reason." *Id.* at 158–59.

Applying the rule of reason, the factfinder weighs all of the circumstances to determine whether the defendants' conduct imposed an unreasonable restraint on competition. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541, (2018); *King Drug*, 791 F.3d at 412 (quoting *United States v. Brown Univ.*, 5 F.3d 658, 668–69 (3d Cir.1993)). If genuine issues of material fact remain after discovery, the rule of reason analysis is for

[142] The Supreme Court has observed, "Apparently most if not all reverse payment settlement agreements arise in the context of pharmaceutical drug regulation, and specifically in the context of suits brought under statutory provisions allowing a generic drug manufacturer (seeking speedy marketing approval) to challenge the validity of a patent owned by an already-approved brand-name drug owner." *Actavis*, 570 U.S. at 141.

the factfinder. *King Drug*, 791 F.3d at 411. Because the rule of reason analysis is highly fact-intensive, it is not readily resolved at summary judgment. *See In re Wellbutrin*, 868 F.3d at 170 n.64 (citing *Poller v. Columbia Broad Sys., Inc.*, 368 U.S. 464, 473 (1962)).

Burden Shifting Under the Rule of Reason

The rule of reason analysis involves a three-step burden shifting framework. The plaintiffs bear the initial burden of proving the agreement had a "substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express*, 585 U.S. at 541. If plaintiffs meet this burden, the burden shifts to the defendants to show procompetitive justification for the payment. *Id.* Lawful justifications include saved litigation costs or fair value for services. *Actavis*, 570 U.S. at 156. It is not justified if the payment was motivated by "a desire to maintain and to share patent-generated monopoly profits" with the alleged infringer. *Id.* at 158. If the defendants satisfy their burden, the plaintiffs must rebut the defendants' proffered justification by demonstrating that this "procompetitive efficiency" was available through less anticompetitive means. *Am. Express*, 585 U.S. at 542.

To prove anticompetitive effect, the plaintiffs must "prove payment for delay, or, in other words, payment to prevent the risk of competition" within the relevant market. *King Drug*, 791 F.3d at 412 (citing *Actavis*, 570 U.S. at 156). Whether the payment had anticompetitive effects depends on "its size, its scale in relation to the payor's anticipated future litigation costs, independence from other services for which it might represent payment, and the lack of any other convincing justification." *Id.*

Teva argues that under *Actavis*, plaintiffs "must establish a large and unexplained reverse payment before the rule-of-reason's ordinary burden shifting regime is

triggered."[143] Plaintiffs insist they have no such threshold burden, and need only show a "payment for delay, or, in other words, payment to prevent the risk of competition."[144] They argue that the burden shifts to defendants to establish lawful justifications for the payment at the second step of the rule of reason analysis.[145]

Courts have rejected the notion that *Actavis* requires plaintiffs to establish that a reverse payment was "large and unjustified" before proceeding to the rule of reason analysis. *See In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 316 (D.R.I. 2019); *King Drug Co. of Florence v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 414 (E.D. Pa. 2015); *see also Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 492–95 (5th Cir. 2021) (applying the rule of reason without requiring a threshold showing that the payment was "large and unjustified"). Whether the payment is "large" and "unjustified" is part of the analysis. *See Cephalon*, 88 F. Supp. at 413–16.

*Actavis* provides no support for its contention that a defendant may avoid antitrust scrutiny by identifying a justification for the payment. *See In re Nexium (Esomeprazole) Antitrust Litig.,* 42 F. Supp. 3d 231, 263–64 (D. Mass. 2014) ("Nowhere in *Actavis* does the Supreme Court suggest that fair market value is a silver bullet against antitrust scrutiny."), *aff'd,* 842 F.3d 34 (1st Cir. 2016). Nor does it "place the initial burden on the [p]laintiffs to prove, in their prima facie case, that a transaction was for something other than fair market value." *Id.* A legitimate justification for the payment is what the defendants must show at the second stage of the rule of reason analysis. The first step

[143] Teva Defs.' Reply Mem. of L. in Further Supp. of the Joint Mot. for Summ. J. ["Teva's Reply"] 1; *see also* Teva's Br. 1.

[144] Pls.' Opp'n to Teva's Mot. for Summ. J. ["Pls.' Opp'n to Teva's Mot."] 3, ECF No. 835 (citing *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 412 (3d Cir. 2015)).

[145] *Id.* 6.

requires only that the plaintiffs "prove that the challenged restraint has a 'substantial anticompetitive effect' within the identified market." *Elad v. Nat'l Collegiate Athletic Ass'n*, 160 F.4th 407, 414 (3d Cir. 2025).

The defendants do not explicitly deny that the settlement had a substantial anticompetitive effect. Undoubtedly, the delayed generic entry extended Kos's Niaspan monopoly, resulting in supracompetitive prices.

Because the first step of the rule of reason requires plaintiffs to establish "substantial anticompetitive effect" that harms consumers "within the identified market," plaintiffs must first identify the relevant market. *Id*. It is "essential" that the relevant market be "precisely defined." *Id.* (citing *Am. Express*, 585 U.S. at 542–43). The plaintiffs move for partial summary judgment, seeking to define the relevant market as a matter of law.[146]

The relevant market has two components, the geographic market and the product market. *See United States v. United States Sugar Corp.*, 73 F. 4th 197, 207 (3d Cir. 2023). The geographic market encompasses the "area in which a potential buyer may rationally look for the goods or services he seeks." *See Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 253 n.13 (3d Cir. 2022) (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005)). A product market consists of the "commodities reasonably interchangeable by consumers for the same purposes." *Novak v. Somerset Hosp.*, 625 F. App'x 65, 67 (3d Cir. 2015) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).

---

[146] *See* Pls' Mem. in Supp. of Mot. for Partial Summ. J. as to the Relevant Antitrust Market ["Pls.' Partial Summ. J. Br."], ECF No. 790.

The parties agree the geographic market is the United States and its territories.[147] They sharply disagree on the scope of the product market. The plaintiffs contend the product market is limited to brand Niaspan and generic Niaspan.[148] The defendants' broader definition includes all cholesterol management therapies, prescription and non-prescription niacin products, statins, and non-statins.[149]

To determine whether products are in the same product market, the Third Circuit applies a two-step inquiry: (1) is the defendant's product interchangeable with other products in the market (functional interchangeability); and (2) if so, does a price change in the defendant's product instigate a demand for a substitute product (cross-price elasticity of demand). *Mylan Pharms., Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 436–37 (3d Cir. 2016). Cross-price elasticity of demand "measures the responsiveness of the demand for one product to changes in the price of a different product." *Id.* at 437. If a price increase in one product decreases that product's sales and increases sales for another product, those products share cross-price elasticity of demand. *Id.* Cross-price elasticity between products must be "significant" in order for them to share a product market. *FTC v. AbbVie Inc.*, 976 F.3d 327, 372 (3d Cir. 2020) (citing *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1064 (3d Cir. 1978)).

The Third Circuit treats interchangeability and cross-price elasticity of demand as separate components. A product may be interchangeable without sharing significant cross-price elasticity of demand with another. This is another way of saying that to be

---

[147] *Id.* 7; Expert Rep. of Thomas G. McGuire (attached as Ex. 4 to Senator Decl.) ["McGuire Rep."] ¶ 5.

[148] Pls.' Partial Summ. J. Br. 1–3, 11–13.

[149] Defs.' Mem. of L. in Opp'n to Pls.' Mot. for Partial Summ. J. as to the Relevant Antitrust Market ["Defs.' Opp'n to Pls.' Mot. for Partial Summ. J."] 21–22, 24–27, ECF No. 848.

included in the same market, products must be both functionally interchangeable and economically substitutable. Mere interchangeability is not enough. *Mylan Pharms*, 833 F.3d at 437.

To get to their respective definitions of the product market, the plaintiffs' and the defendants' experts analyzed cross-price elasticity of demand. Plaintiffs argue that the undisputed evidence shows that generic Niaspan is the only product that evidences substantial positive cross-price elasticity of demand with brand Niaspan, a prerequisite for inclusion in the relevant market.[150] Stated differently, non-Niaspan drugs—those other than brand and generic Niaspan—are not included in the relevant market because they do not have the requisite cross-price elasticity of demand with Niaspan.

Moving for summary judgment on the relevant market, the plaintiffs have the burden to present facts to define the relevant product market consisting of only those products that are functionally interchangeable and share cross-price elasticity of demand. The defendants may present a broader market by offering evidence that they contend allow the factfinder to reasonably conclude that the market includes another product or products because they also have significant cross-price elasticity of demand with Niaspan.

Plaintiffs do not dispute that there are many therapeutic alternatives to Niaspan, including statins, cholesterol absorption inhibitors, bile acid, sequestrates, fibrates, omega-3 fatty acids, and niacin-based products.[151] They contend that these alternative

[150] Pls.' Partial Summ. J. Br. 15–16.

[151] Defs.' Resp. to Pls.' Statement of Purportedly Undisputed Facts in Supp. of Mot. for Partial Summ. J. as to the Relevant Antitrust Market ¶ 19, ECF No. 921; Pls.' Reply Statement of Undisputed Facts in Support of Mot. for Partial Summ. J. as to the Relevant Antitrust Market and Responses and Objections to Defs.' Purported Add'l Facts Material to Pls.' Mot. ["Pls.' Reply SMF"] ¶ 19, ECF 878-1.

cholesterol therapies do not exhibit substantial cross-price elasticity of demand with Niaspan.[152]

Plaintiffs' expert Dr. Thomas McGuire conducted a number of economic analyses to support his conclusion that the relevant product market consists of only brand and generic Niaspan. Performing econometric regression analyses of the price and sales trends of generic Niaspan and sixteen other cholesterol drugs, he concluded that none of them exhibited significant cross-price elasticity of demand with generic Niaspan.[153] He also conducted a regression analysis based on "natural experiments" of the launches of other generic cholesterol drugs. He found that price drops in non-Niaspan drugs caused by their generic launches did not decrease demand for generic Niaspan, suggesting that generic Niaspan is not an economic substitute for those drugs.[154] McGuire's application of the Hypothetical Monopolist Test guidelines published by the U.S. Department of Justice and the Federal Trade Commission supported his conclusion that only brand Niaspan and its generic equivalent belong in the antitrust product market.[155]

Countering the plaintiffs' proposed relevant antitrust market as defined by McGuire, the defendants offer a more inclusive market suggested by their economics

[152] Pls.' Reply SMF ¶ 19.

[153] McGuire Rep. ¶¶ 124–33.

[154] *Id.* ¶¶ 145–46.

[155] *Id.* ¶¶ 100–05. The Hypothetical Monopolist Test begins with the most narrow definition of a product market and asks what would happen if a hypothetical monopolist over that market imposed a "small but significant and nontransitory increase in price" (SSNIP). U.S. Dep't of Justice and Federal Trade Comm'n, Horizontal Merger Guidelines § 1.11 (April 2, 1992). If the price increase causes the hypothetical monopolist to lose enough sales that the price increase is not profitable, the next-best substitute product is added to the market. *Id.* The process continues until the hypothetical monopolist profitably imposes a SSNIP. The relevant antitrust market is the smallest group of products that satisfies this test. *Id.*; *see also* U.S. Dep't of Justice and Federal Trade Comm'n, *Horizontal Merger Guidelines* § 4.1.1 (Aug. 19, 2010).

McGuire found that a hypothetical monopolist over a market consisting only of brand and generic Niaspan could impose a SSNIP without losing profits. McGuire Rep. ¶¶ 104–05. Therefore, he concluded no other products belong in the antitrust product market. *Id.* at ¶ 105.

expert, Dr. Pierre-Yves Crémieux. Although the defendants criticize McGuire's analysis and methodology, they do not move to strike him as an expert. Instead, they propose a broader alternative market.

We have determined that Crémieux will not be permitted to opine as to the own- and cross-price elasticity of Niaspan.[156] That his elasticity analysis and opinions are excluded does not mean that McGuire's opinions and conclusions regarding the relevant market are undisputed. His analysis and opinions are subject to credibility and plausibility assessments by the factfinder. They will be tested against the evidence at trial.

Although McGuire's economic analysis is material to the determination of the antitrust product market, it is not the only relevant evidence of cross-price elasticity. A manufacturer's internal documents and testimony regarding its pricing practices and the products it considers to be price competitors may inform the cross-price elasticity in the market. *See FTC v. AbbVie*, 329 F. Supp. 3d 98, 132–33 (E.D. Pa. 2018), *aff'd in relevant part*, 976 F.3d 327 (3d Cir. 2020).

There is ample evidence that the relevant market is broader than Niaspan and its generic equivalent. Internal Kos documents reveal that Kos priced Niaspan to compete with other prescription cholesterol drugs. Kos's 2003 financial review included a Competitive Pricing Overview.[157] The Overview compared the price of Niaspan to the prices of thirteen other branded cholesterol therapies.[158] Niaspan was priced as the

---

[156] *See* Mem. Op. on *Daubert* Mots. 48–52.

[157] Decl. of Stuart N. Senator in Opp'n to Pls.' Mot. for Partial Summ. J. as to the Relevant Antitrust Market ["Senator Decl."] Ex. 17 ABB-NIA00744807 at 817, ECF 848-2.

[158] *Id.*

fourth cheapest drug of the group.[159] Kos reported on earnings calls that Niaspan's price remained "highly competitive with other cholesterol products."[160]

That Kos (and later Abbott) considered other prescription cholesterol drugs to be Niaspan competitors is revealed in the testimony of their corporate officers. For example, Kos CEO Adrian Adams testified that Niaspan was priced "within the broader landscape of other products that physicians have available to them to treat dyslipidemia disorders."[161] CFO Christopher Kiritsy testified that Kos was "mindful of the other cholesterol products" in making pricing decisions as to Niaspan.[162] According to Kiritsy, Kos was "very considerate of the fact that [Niaspan] had to be priced at a discount to that of statins" and priced it "very competitively" with respect to statins and fibrates.[163] Kos specifically tracked the pricing of statins, such as Lipitor, Zocor, and Pravachol, and fibrates, such as Tri-Core.[164]

There is also evidence that Niaspan was priced to compete with other products for formulary placement and consumer prescriptions.[165] Kos's Executive Vice President for

---

[159] *Id.*

[160] Expert Rep. of Pierre-Yves Crémieux, Ph.D. (attached as Ex. 1 to Senator Decl.) ["Crémieux Rep."] ¶ 63 (quoting Q4 2003 Kos Pharmaceuticals Earnings Conference Call Final Transcript, *CCBN Street Events*, February 18, 2004 at 6).

[161] Senator Decl. Ex. 5 333:25–334:12.

[162] *Id.* Ex. 9 234:5–15

[163] *Id.* 234:22–235:2.

[164] *Id.* 235:3–10.

[165] Formularies are lists of drugs that a health plan covers, which are sorted into "tiers" based on patient cost-sharing (i.e. copayments or coinsurance). Patrick J. Kennedy, et al., The Kennedy Forum, *A Consumer Guide to Drug Formularies: Understanding the Fundamentals of Behavioral Health Medications* 3 (Aug. 2017), https://perma.cc/PLC2-ATBJ. Drugs in the highest tiers have the highest patient cost-sharing. *Id*. The purpose of the formularies is to incentivize prescribers and health plan members to select cost-effective medications. *Id*. Pharmacy Benefit Managers (PBMs) typically negotiate drug prices and manage formularies. *Id.*; House Committee on Oversight and Reform Minority Staff, *A View from Congress: Role of Pharmacy Benefit Managers in Pharmaceutical Markets* 3 (Dec. 10, 2021), https://perma.cc/N8KK-

Commercial Operations Richard King testified that in order to determine the rebates it would offer to secure Niaspan's favorable placement on formularies, Kos considered the rebates being offered by its competitors.[166] When Niaspan did not receive preferred formulary placement, Kos offered direct-to-consumer discounts in the form of co-pay coupons.[167] The purpose of the coupons was to "motivate the patient to stay on [Niaspan] rather than switching to a formulary approved statin."[168]

In addition to prescription cholesterol therapies, Niaspan was in price competition with over-the-counter dietary supplement niacin (DSN) products, such as Slo-Niacin. Defense expert Dr. Tyler J. Gluckman reports that cardiologists, including himself, "often recommended [DSNs] to patients who were concerned about the cost of prescription Niaspan."[169] Surveys sponsored by Kos and Abbott showed that cost was a leading factor causing physicians and pharmacists to recommend DSNs to patients in place of prescription Niaspan.[170] Kos representatives testified at deposition that they considered over-the-counter niacin to be a competitor, and that Niaspan prescriptions "were being diverted to" DSNs because they were "cheap" and "accessible."[171]

Healthcare providers such as the U.S. Department of Veteran Affairs (VA) and Kaiser Permanente replaced Niaspan with Slo-Niacin on their formularies as a cost-

FGJ2 ["Minority House Rep."]. Manufacturers offer rebates or discounts to PBMs to obtain favorable formulary placement for their drugs. Minority House Rep. 3.

[166] King Dep. (attached as Ex. 8 to Senator Decl.) 346:20–347:19.

[167] Senator Decl. Ex. 23 ABB-NIA-PAT01338288 at 305 (setting forth sales strategies in Kos's 1997 Marketing Plan for Niaspan).

[168] *Id.*

[169] Expert Rep. of Dr. Tyler J. Gluckman, M.D. (attached as Ex. 2 to Senator Decl.) 2.

[170] Senator Decl. Ex. 16 ABB-NIA00711411 at 419; Senator Decl. Ex. 15 ABB-NIA00711207 at 214; Senator Decl. Ex. 19 ABB-NIA00918187 at 25–29, 45; Senator Decl. Ex. 20 ABB-NIA01251802 at 4.

[171] King Dep. 334:17–21; Berg Dep. (attached as Ex. 6 to Senator Decl.) 329:11–330:2.

saving measure.[172] The VA's switch to Slo-Niacin prompted Abbott to roll back price increases in an unsuccessful attempt to recapture Niaspan sales to the VA.[173]

In summary, defendants have produced testimony and documentary evidence that Niaspan's price is substantially constrained by competition with other prescription and nonprescription cholesterol therapies. This evidence creates an issue of fact as to whether Niaspan has significant cross-price elasticity of demand with non-Niaspan products. Even without the cross-price elasticity analysis performed by the defendants' expert Crémieux, a factfinder could conclude that increasing the price of Niaspan causes Niaspan to lose sales to other, lower-price cholesterol drugs.

Because we cannot conclude that the relevant product market is limited to brand and generic Niaspan, we deny plaintiffs' motion for partial summary judgment seeking to define the relevant market as brand and generic Niaspan sold in the United States and its territories.

In a separate motion for partial summary judgment, Teva argues that the payment did not violate antitrust law because it was "justified" by lawful settlement considerations.[174] This argument goes to the second step of the rule of reason analysis.

Teva argues that the settlement was justified by the "certainty, avoided litigation costs, and minimized litigation risk."[175] It contends that "litigation costs" include not only legal fees but also "litigation-adjacent" costs, such as diverted attention of employees and

---

[172] *See* Senator Decl. Ex. 18; Senator Decl. Ex. 27; Senator Decl. Ex. 28.

[173] Senator Decl. Ex. 25 ABB-NIA-PAT04728329 at 36; Senator Decl. Ex. 22 ABB-NIA-PAT00590167 at 70.

[174] Teva's Br. 5–8.

[175] *Id.* 1.

public relations burdens.[176] As proof, Teva points to Kos's market value having increased by $380 million after it announced it was in settlement discussions with Barr.[177] The announcement Teva claims resulted in the market value surge is a March 30, 2005 news release stating that Kos and Barr were in discussions to settle the patent litigation. The release stated that the "[t]erms and status of the settlement discussions will not be disclosed by the parties until such time as a definitive agreement is reached."[178]

Teva argues that because the market did not yet know whether Kos would maintain its monopoly, the increase in market value could not possibly have derived from its retention of patent-generated monopoly profits.[179] Rather, Teva contends, the increase in Kos's market price reflects the value of eliminating the costs and uncertainty of continued litigation with Barr.[180] Defense expert Crémieux claims that "beyond simple accounting costs," the uncertainty of litigation makes it "difficult for firms to strategically plan, invest resources, and conduct business operations."[181] He opines that eliminating this uncertainty conferred significant value to Kos and Barr that is not reflected in plaintiffs' experts' accounting of the saved litigation costs.[182] According to Teva, this value justified the settlement.

---

[176] *Id.* 4–5.

[177] *Id.* 5–6; Teva Defs.' Statement of Material Undisputed Facts in Supp. of their Mem. of L. in Further Supp. of the Joint Mot. for Summ. J. ["Teva's SMF"] ¶ 8 (citing Crémieux Rep. Fig. 19, p. 103).

[178] News Release dated Mar. 30, 2005 (attached as Ex. 6 to Decl. of Alexandra I. Russell in Supp. of the Teva Defs.' Mem. of L. in Further Supp. of the Joint Mot. for Summ. J., ECF No. 799-2).

[179] Teva's Br. 6.

[180] *Id.* 6–7.

[181] Crémieux Rep. ¶ 194.

[182] *Id.* ¶¶ 194–97.

That Kos's investors considered the announcement of the settlement valuable does not prove that the settlement was lawful. It is evidence that investors expected the settlement to be profitable and that its monopoly would continue to some extent. There is no question that the settlement was profitable to Kos. Why else would it have entered into the agreements?

Why did Kos's investors expect the settlement to increase profitability? What instigated the investor response to news of the settlement is a disputed issue of fact and cannot be resolved at summary judgment.

Certainty and minimized litigation risk are not alone justification for a reverse payment. In *King Drug*, the district court had concluded that the defendants' reverse payment was justified because "although the settlement amount was likely greater than litigation costs, the consideration which the parties exchanged . . . was reasonably related to the removal of the uncertainty created by the dispute." 791 F.3d at 411 (quotations omitted). The Third Circuit rejected that conclusion, finding that it was "in tension with *Actavis* in that, without proper justification, the brand cannot pay the generic simply to eliminate the risk of competition." *Id.* The same reasoning applies here.

The "risk" was that Barr would succeed in invalidating Kos's patent and enter the Niaspan market, thereby increasing competition and decreasing Kos's monopoly-generated profits. Paying to eliminate risk of patent invalidity or noninfringement is precisely the anticompetitive harm that subjects reverse payments to antitrust scrutiny. *Actavis*, 570 U.S. at 157–58; *In re Lipitor* 868 F.3d at 251 (explaining that the *Actavis* court's "main concern was the use of reverse payments to avoid the risk of patent invalidation or a finding of noninfringement"). Because avoiding the risk of patent

invalidation is the anticompetitive harm underlying plaintiffs' claim, Teva cannot rely on it to justify the reverse payment settlement.

Avoiding litigation costs may provide a lawful justification for a reverse payment. *Actavis*, 570 U.S. at 156. Whether the saved litigation costs justify the reverse payment in this case is disputed. Plaintiffs submit the expert report of Peter Hardigan, who estimates that Kos and Barr each saved approximately $7 million in litigation costs as a result of the settlement.[183] The plaintiffs' valuation of the reverse payment is over $170 million.[184] Based on this disparity, a reasonable jury could conclude that the settlement was not justified on the basis of avoidance of litigation costs. It may find instead that the payment's true objective was to delay Barr's entry into the Niaspan market and to maintain supracompetitive prices. If so, the payment would be unjustified under *Actavis*.

The jury could find that Kos believed it would lose the patent litigation, and entered into the settlement agreement solely to delay Barr's imminent entry into the market. There is evidence that Kos, recognizing Barr's at-risk launch would be successful, was preparing to compete with Barr in the generic Niaspan market in 2005. Kos was preparing to launch its own version of generic Niaspan (an "authorized generic" or "AG" version of Niaspan) to cut its losses caused by Barr's entry. Kos prepared financial forecasts projecting revenues if it launched an AG version of Niaspan simultaneously with a Barr launch in 2005.[185] It projected that if it launched AG Niaspan, Kos would capture 48% of the generic

---

[183] Expert Rep. of Peter Hardigan (attached as Ex. 1 to Decl. of Scott E. Perwin in Supp. of Pls.' Resp. to Teva Defs.' Statement of Material Undisputed Facts in Supp. of the Teva Defs.' Separately Filed Mot. for Summ. J, and Pls.' Add'l Statement of Facts in Dispute Relevant to Teva's Separately Filed Mot., ECF No. 822) ¶ 25.

[184] Pls.' SMF ¶ 87.

[185] Ciano Dep. Tr. (attached as Ex. 36 to First Decl.) 58:23–60:15; Expert Rep. of Luis A. Molina (attached as Ex. 45 to First Decl.) ["Molina Rep."] ¶ 47.

sales and earn over $100 million in revenue on the AG in the first year.[186] Kos executive Peter Ciano testified that Kos was forecasting AG revenues in anticipation of making an authorized generic to counter Barr's probable launch.[187] Kos solicited proposals from four potential distributors for AG Niaspan.[188] By March 2005, Kos had prepared a draft distribution agreement with Sandoz, a distributor, and Sandoz had begun soliciting pre-orders for AG Niaspan.[189] Thus, there is ample evidence that, fearing the imminent loss of its monopoly, Kos entered into the settlement to delay fair competition.

Whether the payment was justified and not an agreement to delay the generic's entry into the market must be resolved by the factfinder. We cannot determine, as a matter of law, that the reverse payment was justified by lawful considerations such as saved litigation costs. A jury must make that determination. Therefore, we will deny Teva's motion for partial summary judgment on the issue of whether the payment was "large," "unjustified," and "unexplained."[190]

No-AG Agreement

Under the Hatch-Waxman Act, the first generic manufacturer to file an ANDA application containing a paragraph IV certification earns a 180-day period of exclusivity, during which the FDA may not approve a competing generic version of the drug. *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1305 (D.C. Cir. 2010) (citing 21 U.S.C. § 355(j)(5)(B)(iv)). The 180-day period is "exclusive" as to other generic manufacturers

[186] Molina Rep. ¶ 47 (citing ABB-NIA01311148, ABB-NIA01311149).

[187] First Decl. Ex. 36, Ciano Dep. Tr., 60:17–22.

[188] First Decl. Ex. 36, Ciano Dep. Tr., 60:23–61:6.

[189] First Decl. Ex. 36, Ciano Dep. Tr., 61:8–10, 95:10–23, 98:15–101:9, 102:7–103:25.

[190] *See* Teva's Br. 1.

only. The manufacturer of the brand-name drug may launch its own generic version—an "authorized generic" (AG)— during the ANDA filer's 180-day exclusivity period. *In re Lipitor*, 868 F.3d at 241. Thus, the brand and the first generic may compete in the 180-day exclusivity period to the exclusion of all other generics.

Under the Licensing Agreement, Kos agreed not to launch an AG version of Niaspan after Barr's launch of its generic on September 20, 2013.[191] In exchange, Barr agreed to pay Kos royalties based on sales of generic Niaspan.[192] Plaintiffs contend that this "no-AG" agreement was a reverse payment to induce Barr to delay its generic launch in violation of antitrust laws.

Reverse payments are not limited to cash. *King Drug*, 791 F.3d at 403. By agreeing not to launch an AG, a brand manufacturer sacrifices significant profit. *Id.* at 405. Conversely, the generic manufacturer receives considerable value from marketing its drug in a "generic monopoly instead of a generic duopoly." *Id.* Because a no-AG agreement, like a cash payment, confers value from the brand manufacturer to the generic manufacturer, it may raise an inference that the brand manufacturer sought to induce the generic challenger to abandon its patent challenge and delay its entry into the market. *Id.* at 396, 405.

For this reason, a "no-AG agreement, when it represents an unexplained large transfer of value from the patent holder to the alleged infringer, may be subject to antitrust scrutiny under the rule of reason." *Id.* at 403; *see also AbbVie*, 976 F.3d at 256–57; *In re*

---

[191] Pls.' SMF ¶ 87; Defs.' SMF ¶ 51.

[192] Pls.' SMF ¶ 87; Defs.' SMF ¶ 51.

*Lipitor*, 868 F.3d at 252. This is especially true when there are additional financial benefits conferred on the generic manufacturer.

In denying defendants' motion to dismiss, Judge DuBois rejected the notion that the no-AG agreement was not a reverse payment because it did not involve a cash payment from Kos to Barr. *In re Niaspan Antitrust Litigation*, 42 F. Supp. 3d 735, 750 (E.D. Pa. 2014).[193] Defendants had argued that the agreement was immune from antitrust scrutiny because it simply granted Barr an exclusive license to market generic Niaspan prior to the expiration of Kos's patent as permitted by patent law. *Id.* Judge DuBois disagreed, holding that the no-AG agreement was a reverse payment because it may have had the same effect as a cash payment to induce the generic manufacturer not to compete. *Id.* at 750–52.

Defendants now claim that discovery has revealed that Kos made more money from the royalties than it would have by launching its own generic.[194] They cite plaintiffs' experts Elhauge and Leffler, who estimate that the no-AG agreement had a net positive value to Kos of $17.8 million and $7.7 million, respectively.[195] Because Kos did not sacrifice any profit, defendants argue, the no-AG agreement cannot be considered a reverse payment under *King Drug*.[196] Defendants contend that the agreement was a

---

[193] Judge DuBois issued his opinion before the Third Circuit held that no-AG agreements can constitute reverse payments in *King Drug.*

[194] Defs.' Joint Br. 33.

[195] *Id. See also* Elhauge Report ¶ 42(c); Leffler Report ¶ 73 n.95; Crémieux Rep. 81 n.273 (explaining that the $7.7 million benefit to Kos associated with the no-AG agreement is reflected in Leffler's "AltSettleAnalysisNIASPAN" model, but "is not reported in the text of his report")).

[196] Defs.' Joint Br. 33.

lawful exclusive license in exchange for royalties, an arrangement specifically contemplated by patent law.[197]

Characterizing the no-AG agreement as an exclusive license does not insulate it from antitrust scrutiny. That "the Patent Act expressly authorizes licensing does not necessarily mean it also authorizes reverse payments to prevent generic competition." *King Drug*, 791 F.3d at 407. A patentee generally has the right to grant a license under patent law, but it does not have "the right to give a challenger a license along with a promise not to produce an authorized generic—i.e., a promise not to compete—in order to induce the challenger to 'respect its patent and quit [the competitor's] patent invalidity or noninfringement claim without any antitrust scrutiny.'" *Id.* (citing *Actavis*, 570 U.S. at 151 (alterations in original)). In short, a patentee may not grant a license as part of an unlawful agreement.

The Licensing Agreement is a typical licensing agreement permitted under patent law. Considered alone, it does not invite antitrust scrutiny. But, it does not stand alone. It is a component of a tripartite settlement package. Therefore, it must be analyzed together with the other parts.

A jury could reasonably conclude that the no-AG agreement was part of the overall value conferred by Kos to Barr in exchange for Barr's agreement not to compete in the Niaspan market until September 20, 2013. Therefore, the no-AG agreement cannot be severed from the settlement package in applying the rule of reason.

Nor is the no-AG agreement insulated from scrutiny simply because Kos received royalty payments. Parties cannot "shield their settlements from antitrust review by simply

[197] *Id.* 34–35.

including a token payment by the purportedly infringing generic manufacturer." *In re Lipitor*, 868 F.3d at 258. Royalties do not preclude a finding "that the no-AG agreement was entered into in exchange for the delayed entry" of generic Niaspan. *Id.*

A jury may find that the package of agreements was a large and unjustified reverse payment to Barr. According to plaintiffs' experts, Kos's promise not to launch an AG was worth $13.8 million to $63 million to Barr.[198] They estimate that Kos paid $150.8 million more than the fair value of services it received from Barr pursuant to the Co-Promotion Agreement.[199] Under the Manufacturing Agreement, Kos made payments valued at $22.6 million, which plaintiffs' experts opine was unreasonable.[200]

Kos's motivation for agreeing not to launch an AG is disputed. Defendants contend it did so in exchange for royalties.[201] Plaintiffs counter that it was in return for royalties and the other benefits of the tripartite agreement to keep Barr out of the Niaspan market for more than eight years after it was prepared to launch at risk.[202] This dispute is for a jury to decide. Thus, we cannot conclude that the no-AG agreement was lawful.

**Damages**

Plaintiffs allege they paid three categories of overcharges as a result of delayed competition from generic Niaspan. They claim that they overpaid for brand Niaspan which would have been cheaper with earlier generic entry ("brand-brand damages"); overpaid

---

[198] Pls.' SMF ¶ 87; Leffler Rpt. ¶ 64; Elhauge Report ¶ 42(c).

[199] Pls.' SMF ¶ 87; Expert Rep. of John R. Tupman, Jr. (attached as Ex. 12 to Decl. of Alexandra I. Russell in Supp. of Defs.' Mots. to Exclude the Ops. and Proposed Test. of Plaintiffs' Expert Witnesses ["Russell Daubert Decl."], ECF No. 795) ["Tupman Rep."] 2–3.

[200] Pls.' SMF ¶ 87; Tupman Rep. 20 n.115; Expert Rep. of James Bruno (attached as Ex. 37 to First Decl.) ¶ 20(b).

[201] Defs.' SMF ¶ 51.

[202] Pls.' SMF ¶ 86.

for generic Niaspan which would have been cheaper with earlier generic entry ("generic-generic damages"); and overpaid for brand Niaspan because they could not switch to the lower-priced generic version during the delay period ("brand-generic damages").[203]

Defendants argue that plaintiffs' calculation of their brand-generic and generic-generic damages are artificially inflated. They contend that plaintiffs' experts applied inflated generic penetration rates and included damages after the date the alleged anticompetitive harm ceased.

As a matter of industry practice, entities such as retail pharmacy chains buy brand-name drugs from direct-purchaser wholesalers.[204] When the generic becomes available, some of these entities purchase the generic drug directly from the manufacturer, "bypassing" the wholesaler.[205] A direct-purchaser wholesaler's loss of resale volume when the generic drug becomes available is referred to as "generic bypass." *See Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 303 (D.D.C. 2007); *see also Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1191 (11th Cir. 2003); *In re Niaspan Antitrust Litig.*, No. 13-MD-2460, 2015 WL 4197590, at *1, n.3 (E.D. Pa. July 9, 2015).

In this case, defendants sought discovery concerning the DPPs' resale of Niaspan in order to calculate generic bypass. *In re Niaspan*, 2015 WL 4197590, at *1. Defendants asserted that the DPPs' damages must be offset by the resales that they would not have made if generic Niaspan had launched earlier. *Id.* DPPs argued that allowing discovery

---

[203] Defs.' Joint Br. 7; Pls.' SMF ¶ 71.

[204] Pls.' SMF ¶ 72; Defs.' Reply 20.

[205] Pls.' SMF ¶ 72; Defs.' Reply 20. Consequently, wholesalers which would lose sales to bypass benefit from delayed generic entry. *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 368 (D. Mass. 2004).

of such sales would be inconsistent with Supreme Court precedent precluding the reduction of damages to account for generic bypass. *Id.*

In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, the Supreme Court held that a direct purchaser is entitled to the full amount of an anticompetitive overcharge, even if it passed on some of the cost of the anticompetitive pricing to indirect purchasers down the supply chain. 392 U.S. 481, 493–94 (1968). The Supreme Court has explained that the enforcement of antitrust law is better served by “holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.” *Illinois Brick*, 431 U.S. at 746. Under *Hanover Shoe,* “a party may recover for an antitrust overcharge whether or not the party experienced a net loss or a net gain (*i.e.*, by passing on the overcharge to other parties).” *In re Niaspan*, 2015 WL 4197590, at *1, n.4 (quoting *In re Wellbutrin Sr Direct Purchaser Antitrust Litig.*, Civ. A. No. 04–5525, 2008 WL 1946848, at *6 (E.D. Pa. May 2, 2008)).

The *Hanover Shoe* Court explained that reducing the direct purchasers’ recovery would allow defendants to “retain the fruits of their illegality.” *Hanover Shoe*, 392 U.S. at 494. It held that “[a]s long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows.” *Id.* at 489. It also noted the practical difficulties in determining how prices, sales, and profits would have been different in a world without the overcharge. *Id.* at 492–93; *see also Illinois Brick*, 431 U.S. at 742–43 (holding that the “drastic simplifications” of the economist’s hypothetical model “generally must be abandoned” because “attention to ‘sound laws of economics’ can only heighten the

awareness of the difficulties and uncertainties involved in determining how the relevant market variables would have behaved had there been no overcharge").

*Hanover Shoe* did not address a generic-bypass defense. It involved the "passing-on" defense, in which an antitrust defendant argued that purchasers' damages should be reduced if they passed on some of the overcharge to their customers in the form of higher prices. *Hanover Shoe*, 392 U.S. at 494. Numerous courts have nonetheless rejected the "generic bypass" defense as inconsistent with the Supreme Court's reasoning in *Hanover Shoe*. *See In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-MD-2343, 2014 WL 2002887, at *4–6 (E.D. Tenn. May 15, 2014); *In re Prograf Antitrust Litig.*, No. 1:11-md-02242-RWZ, 2014 WL 7641156, at *4 (D. Mass. Dec. 23, 2014); *Meijer*, 246 F.R.D. at 304; *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 369–70 (D. Mass. 2004).

"[T]he *Hanover Shoe* rule [is] that a direct purchaser may recover the full amount of the overcharge, even if he is otherwise benefitted" by the delay of generic bypass. *Meijer*, 246 F.R.D. at 304. In other words, direct purchasers' recoverable overcharges include those paid on units that would have been bypassed in the but-for world. *In re Niaspan*, 2015 WL 4197590, at *2 (quoting *In re Relafen*, 346 F. Supp. 2d at 369).

In denying defendants' discovery request, Judge DuBois joined those courts in determining generic bypass reductions are inconsistent with *Hanover Shoe*, noting that "the focus of the antitrust laws is limited to the anticompetitive sale."[206] *Id.* at *1 (quoting *In re Skelaxin*, 2014 WL 2002887, at *5); *see also Meijer*, 246 F.R.D. at 303–04. As Judge DuBois has already determined, "courts and juries will not be forced down the rabbit hole of hypothetical issues antitrust violators may raise to minimize their liability." *In re*

[206] *See* Order, July 9, 2015, ECF No. 233.

*Niaspan*, 2015 WL 4197590, at *1 (quoting *In re Skelaxin*, 2014 WL 2002887, at *1). Judge DuBois's ruling is the law of the case, and we see no reason to disregard it.[207]

Generic Penetration Rate

To calculate plaintiffs' brand-generic damages, plaintiffs' experts Dr. Jeffrey Leitzinger and Dr. Keith Leffler used a "generic penetration rate."[208] The generic penetration rate is the estimated amount of market share that a generic captures from the branded drug after the generic enters the market. A higher penetration rate reflects a higher percentage of generics that would have been purchased in the but-for world, and thus the higher the claimed overcharges are in the actual world.

*Direct Purchaser Plaintiffs*

Leitzinger used a single, class-wide generic penetration rate based on all purchases by the DPPs of brand and generic Niaspan directly from the manufacturer.[209]

[207] Defendants argue that Judge DuBois's ruling is not the law of the case because it was limited to resolving a discovery dispute concerning the "pass-on" defense and downstream discovery. Judge DuBois explained that "[t]he premise of defendants' argument is that the amount of damages sustained by DPPs must be offset by the amount of any purchases of Niaspan that would not have been made in a 'but-for' world in which generic competition existed." *In re Niaspan Antitrust Litig.*, No. 13-MD-2460, 2015 WL 4197590, at *1 (E.D. Pa. July 9, 2015). That is generic bypass, not the passing-on defense. Judge DuBois explained defendants were aiming to assert a "generic bypass" defense and explicitly rejected that defense. At the hearing on the issue, he stated, "I think I have to address the law applicable to the case." Hr'g Tr., June 8, 2015 116:14–15, ECF No. 217. He foresaw the importance of the issue and its effect on this case, explaining, "I will be advancing, at least on one issue, some of the arguments that would be made at the summary judgment stage." *Id.* 116:16–19. He left no question that his ruling concerned generic bypass, and that it would be the law of the case.

Defendants contend that, even if Judge DuBois's ruling on generic bypass is the law of the case, we should reconsider it. But, they have not demonstrated the "extraordinary circumstances" that warrant a court's reconsideration of an issue decided earlier in the course of litigation. They present no new evidence, no new case law, and no new argument on the "generic bypass" issue. We will not reconsider the ruling.

[208] Defs.' SMF ¶ 71; Pls.' SMF ¶ 71.

[209] Defs.' SMF ¶ 72; Pls.' SMF ¶ 72; Expert Rep. of Jeffrey J. Leitzinger, Ph.D. (attached as Ex. 8 to Meltzer Decl.) ["Leitzinger Rep"] ¶ 48.

Defendants argue that the DPPs' use of a class-wide generic penetration rate to calculate brand-generic damages is improper as a matter of law.[210] According to defendants, some DPPs never purchased brand Niaspan.[211] They purchased only the generic once it became available, and therefore never suffered brand-generic damages.[212] However, they have a generic penetration rate of 100% because the entirety of their purchases were generic.[213] Defendants argue that grouping these "generic only" DPPs with DPPs who suffered brand-generic damages impermissibly inflates the DPPs' class-wide generic penetration rate because it includes in the overall average the 100% penetration rates for entities who did not suffer those damages.[214]

Plaintiffs counter that Judge DuBois rejected defendants' contention that Leitzinger's class-wide generic penetration rate was improper when he certified the DPP class.[215] Plaintiffs also dispute defendants' claim that the so-called "generic only" purchasers never purchased brand Niaspan. They argue that these purchasers bought brand Niaspan indirectly, and then bypassed the wholesaler when the generic became available.[216] Therefore, plaintiffs argue, defendants are effectively proposing a generic bypass reduction, which Judge DuBois has already prohibited.[217]

---

[210] Defs.' Joint Br. 37–38.

[211] *Id.* 38.

[212] *Id.* 36–37.

[213] *Id.*

[214] *Id.* 36–39.

[215] Pls.' Opp'n to Joint Mot. 38–39.

[216] *Id.* 38; Pls.' SMF ¶ 72.

[217] Pls.' Opp'n to Joint Mot. 38.

The parties disagree as to whether the so-called "generic-only" members of the DPP class never purchased brand Niaspan or purchased it indirectly. Defendants contend these buyers never purchased brand Niaspan at all.[218] Plaintiffs contend they bought brand Niaspan indirectly, through a wholesaler.[219]

Expert opinions from both sides suggest it is more likely that the generic-only purchasers were buying brand Niaspan indirectly (from wholesalers) before the generic version became available. Defendants' own expert, Dr. Daniel L. Rubinfeld, opines that the "generic-only" class members likely purchased branded Niaspan indirectly. He states:

> [T]here are 24 Generic-Only Purchasers in the putative class who purchased generic Niaspan directly from the manufacturers but did not purchase branded Niaspan directly from AbbVie. Many of these entities (e.g., Publix, Ahold) are retail pharmacy chains that likely purchased branded Niaspan through a wholesaler but bypassed that wholesaler for generic Niaspan. The six generic-only wholesalers that are part of the putative class are another source of generic bypass. Pharmacy customers that purchase branded drugs through a full-line wholesaler may instead purchase some generic drugs through a generic-only wholesaler, bypassing their full-line wholesaler. [220]

In other words, the purchases of generic Niaspan by the "generic-only" buyers are the bypassed units. Excluding these units from the class-wide generic penetration rate—as defendants suggest—would constitute a bypass reduction. As Leitzinger explains:

> "In effect, [the] proposed adjustment amounts to a claim that Class members buying brand volumes during the generic delay period are not entitled to overcharges associated with brand volumes that would have been converted to lower-priced generics purchased by those who would

[218] Defs.' Joint Br. 36–37.

[219] *See* Pls.' Opp'n to Joint Mot. 38 ("DPP Class damages should not be reduced to account for the fact that some brand purchasers were 'bypassed' by generic-only Class members who purchased generic Niaspan directly (but purchased brand Niaspan indirectly.").

[220] Expert Rep. of Daniel L. Rubinfeld (attached as Ex. 53 to First Decl.) ["Rubinfeld Rep."] ¶ 83 n. 88.

> have bought only generics directly. This, of course, does amount to Class bypass as the term is normally used[.]"[221]

In short, Rubinfeld and Leitzinger agree that there is at least some evidence that "generic-only" purchasers in the DPP class were indirect purchasers of brand Niaspan. Consequently, their generic purchases are bypassed units. Excluding these units from the DPPs' brand-generic damages would deprive the class of brand-generic damages arising from bypassed units. Therefore, because defendants' proposed exclusion of the 'generic-only' DPPs' purchases from the brand-generic damages calculation constitutes an impermissible bypass reduction, we deny defendants' motion to the extent it seeks summary judgment on the DPPs' brand-generic damages claim.

Defendants argue that using the class-wide rate violates the principle that damages "must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). They argue that plaintiffs' liability theory for brand-generic damages is that some of the DPPs would have substituted some of their brand purchases for the lower-priced generic.[222] By including entities that did not make any brand purchases in the actual world and thus did not suffer brand-generic damages, defendants argue, plaintiffs' brand-generic damages methodology is inconsistent with its theory of liability in violation of *Comcast*.[223]

We conclude that the DPPs' use of a single generic penetration rate does not violate *Comcast*. Judge DuBois already determined Leitzinger's aggregate damages

---

[221] Rebuttal Rep. of Jeffrey J. Leitzinger, Ph.D. (attached as Ex. 51 to First Decl.) ["Leitzinger Rebuttal Rep."] ¶ 33, 36.

[222] Defs.' Joint Br. 37.

[223] *Id.* 37–39.

model is an appropriate way to measure class-wide damages. As he explained, *Comcast* is distinguishable from this case. *Comcast* involved four separate theories of liability and offered the "unremarkable premise" that a damages model must measure only the damages attributable to that theory of harm. 569 U.S. at 38. Here, "the jury will be presented with a single liability theory—defendants' unlawful conduct delaying generic competition." *In re Niaspan*, 397 F. Supp. 3d 668, 688–89 (E.D. Pa. 2019). Thus, Judge DuBois held that Leitzinger's aggregate damages model properly captures damages attributable to DPPs' single theory of unlawful conduct" and does not run afoul of *Comcast*. *Id.* at 689.

The defendants also contend it violates the Rules Enabling Act's directive that the federal rules "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072. Defendants argue that under the Rules Enabling Act, the DPPs cannot use a Rule 23 class action to claim brand-generic damages beyond those that each DPP would be entitled to in an individual proceeding.[224] Because the DPPs who purchased both brand and generic Niaspan would be required to rely on their own generic penetration rate in an individual proceeding, defendants argue, they cannot include the "generic-only" purchasers' rate to calculate brand-generic damages on behalf of the whole class.[225]

Contrary to defendants' contention, Leitzinger's aggregate model of damages does not violate the Rules Enabling Act. The Rules Enabling Act prohibits any interpretation of federal rules of procedure that would "abridge, enlarge[,] or modify any substantive right." *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 350

[224] *Id.* 38–39.

[225] *Id.*

(3d Cir. 2021) (quoting 28 U.S.C. § 2072(b)). Leitzinger did not calculate the damages attributed to any one class member. He calculated damages on behalf of the DPP class as a whole. Using an aggregate measure is an appropriate method of calculating class-wide damages. *See In re Loestrin 24 Fe Antitrust Litig.*, 1:13-md-2472, 2019 WL 3214257, at *16 (E.D. Pa. July 2, 2019) (holding that Leitzinger's use of a single generic penetration rate is a "widely accepted" method of measuring class-wide damages); *see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, Civ. No. 14-md-02503, 2017 WL 4621777, at *9–10 (D. Mass. Oct. 16, 2017). Therefore, because Leitzinger purposely used a class-wide rate, his calculation of the DPPs' brand-generic damages is not impermissibly inflated.

*Retailer Plaintiffs*

Because *Hanover Shoe* entitles direct purchasers to the full amount of the overcharge, duplicative recovery could result if indirect purchasers farther down the supply chain were also able to recover overcharge damages. *See Illinois Brick*, 431 U.S. at 730. Accordingly, "a direct purchaser of a product has standing to sue under federal antitrust statutes whereas an indirect purchaser does not." *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 266 (3d Cir. 2016) (citing *Illinois Brick*, 431 U.S. at 746–47).

Retailer Plaintiffs' claims are based on an assignment of rights from wholesalers who purchased Niaspan directly from the manufacturers and resold it to the Retailer

Plaintiffs.[226] The wholesalers assigned all claims "relating to [wholesaler's] purchase of Niaspan and/or its generic equivalent that was subsequently resold to [retailers]."[227]

To calculate the Retailer Plaintiffs' damages on the assigned claims, Leffler used the Retailers' generic penetration rate.[228] It is undisputed that the Retailers' generic penetration rate is higher than that of the wholesaler assignors.[229]

Defendants argue that because the Retailer Plaintiffs are proceeding on assignment from the wholesalers, Leffler should have used the wholesalers' generic penetration rate.[230] They argue that Retailers, as assignees, are limited to the damages that the assignors themselves could recover.[231] Because the Retailers' generic penetration rate is higher than that of the wholesalers, defendants argue Leffler's use of the Retailers' generic penetration rate inflates their damages beyond the scope of the assignment.[232]

The agreement assigns overcharge damages for the wholesalers' purchases of Niaspan "that were subsequently sold to" the retailers. In other words, the scope of the assignment agreement is limited to purchases by the retailers. Consequently, the best measure of damages on the assigned claims is the purchasing habits of the retailers. Using a generic penetration rate based on all Niaspan purchases by the wholesalers

---

[226] Defs.' SMF ¶ 70; Pls.' SMF ¶ 70. Although some of the Retailers' damages arise from their own purchases of brand and generic Niaspan directly from the manufacturer, the majority of their damages are based on the assigned purchases. *See* Expert Rep. of Bruce Stangle. Ph.D. (attached as Ex. 3 to Meltzer Decl.) ¶ 101; Leffler Rep. ¶ 82.

[227] Defs.' SMF ¶ 70; Pls.' SMF ¶ 70 (quoting Meltzer Decl. Ex. 69).

[228] Defs.' SMF ¶ 75; Pls.' SMF ¶ 75; Leffler Rep. ¶ 83.

[229] Defs.' SMF ¶ 76; Pls.' SMF ¶ 76.

[230] Defs.' Joint Br. 39–40.

[231] *Id.*

[232] *Id.*

(including those that were not resold to the Retailers) would capture purchases that were not assigned. Therefore, we do not conclude that Leffler's use of the Retailers' generic penetration rate improperly inflates the Retailers' brand-generic damages.

Damages End Date

Leitzinger calculated the DPPs' overcharges on purchases made through June 26, 2014.[233] Leffler calculated the Retailer plaintiffs' overcharges through October 31, 2017.[234] The generic entered the market on September 20, 2013.[235]

Defendants argue plaintiffs have inflated their damages by including purchases made after the alleged restraints on generic competition had been removed.[236] They maintain that the anticompetitive harm that caused brand-generic damages ceased immediately upon generic entry on September 20, 2013, and that generic-generic damages ended when the second generic entered the market on March 21, 2014.[237] According to the defendants, brand-generic damages and generic-generic damages should be limited to the purchases made before September 20, 2013, and March 21, 2014, respectively.[238]

Plaintiffs argue that the anticompetitive effects of defendants' conduct did not cease immediately upon generic entry.[239] They contend that they are entitled to recover

[233] Leitzinger Rep. ¶ 6 n.5.

[234] Leffler Rep. Table 2.

[235] Defs.' SMF ¶ 63, Pls.' SMF ¶ 63.

[236] Defs.' Joint Br. 41–42.

[237] *Id.*

[238] *Id.*

[239] Pls.' Opp'n to Joint Mot. 40–42.

all damages proximately caused by defendants' conduct, including overcharges paid for a period after generic entry.

When plaintiffs stopped paying overcharges as a result of the defendants' conduct is disputed. Leffler and Leitzinger opine that it takes time after generic entry for prices to fall to competitive levels.[240] As defendants' own expert Dr. Bruce Stangle has acknowledged in other cases, it takes "some time for market prices to reach competitive levels following generic entry" and "some time for the generic substitution rate to reach its maximum level after generic entry." *King Drug Co. of Florence v. Cephalon, Inc.*, 309 F.R.D. 195, 205–06, 206 n.9 (E.D. Pa. 2015), *vacated on other grounds*, *In re Modafinil Antitrust Litig.*, 837 F.3d 238 (3d Cir. 2016); *see also In re Modafinil*, 837 F.3d at 250 n.8 ("[T]he experts of both parties agreed that it takes several months before prices fall to competitive levels after generic entry."). Therefore, we will not hold that plaintiffs' brand-generic damages stopped accruing on September 20, 2013 and that their generic-generic damages stopped accruing on March 21, 2014.

## Conclusion

Plaintiffs have shown the requisite injury to establish antitrust standing. There are genuine disputes as to whether Kos and Barr's settlement was an unlawful payment to delay fair market competition. There are also material issues of fact as to the relevant antitrust market. Accordingly, we will deny the parties' motions for summary judgment.

[240] Reply Expert Rep. of Keith Leffler, Ph.D. (attached as Ex. 31 to Russell Daubert Decl.) ¶ 72; Leitzinger Rebuttal Rep. ¶¶ 24–28.