IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE:** | : | **MDL 2460** |
| | : | |
| **NIASPAN ANTITRUST LITIGATION** | : | **Master File No. 13-md-2460** |

**MEMORANDUM OPINION**

**Savage, J.** **October 30, 2026**

As in every action challenging a pharmaceutical reverse payment settlement agreement between a brand drug manufacturer and a generic drug manufacturer as violating antitrust law,[1] this case is laden with a multitude of expert reports and opinions. The parties proffer experts in the fields of economics, antitrust law, patent law, and even negotiation theory. Remarkably—but not unexpectedly—the competing experts agree on almost nothing, coming up with divergent and inconsistent opinions. So, it is no surprise that we have ten *Daubert* motions challenging these experts, who regularly appear in reverse payment cases.

As "gatekeeper," the trial judge must ensure that expert testimony is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). *Daubert* and its progeny have established a three-prong test for the admissibility of expert testimony. The proponent of the testimony must demonstrate: (1) the expert's qualifications; (2) the reliability of the proffered testimony; and (3) the opinions fit the issues in the case. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). The key to admissibility of expert testimony is reliability. The expert must have good grounds

[1] The factual and procedural backgrounds of this case are set forth in detail in our memorandum opinion on the parties' respective motions for summary judgment ["Mem. Op. on Summ. J. Mots."], filed concurrently with this opinion. To understand the parties' arguments and our analyses of the *Daubert* motions, one must read the summary judgment opinion.

for his opinions. The focus is on methodology and not on the conclusions. Credibility decisions arise after admissibility has been determined. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). Consequently, even though there may be better grounds or there are some flaws in the methods used, expert testimony is admissible if the grounds are reliable. There must be a "fit" between the grounds and the conclusions in the case. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000).

We must decide who are qualified as experts in their respective fields, whether their opinions are reliable, and whether their opinions fit the facts of the case. Only those who pass this scrutiny will play a role in the trial.

**Patent Law and the Drug Approval Process**

*Defendants' Motion to Exclude Thomas*

Defendants challenge the proffered expert testimony of John R. Thomas, a law professor and author in the field of patent law and the Hatch-Waxman Act.[2] They contend because he has never worked in the pharmaceutical industry, he is not qualified to opine on the ability of other generic drug manufacturers to have entered the market earlier had there been no settlement agreement.[3] They also argue that his testimony regarding the meaning and purposes of the Hatch-Waxman Act is impermissible legal opinion.[4] They contend he "recount[s] how the Hatch-Waxman Act works" and analyzes its policy, but fails to apply his analysis to the facts of the case and instead merely implies that the

---

[2] Defs.' Mem. of L. in Supp. of Defs.' Mot. to Exclude the Ops. and Proposed Test. of John R. Thomas ["Defs.' Br. as to Thomas"] 1, ECF No. 791; Expert Rep. of John R. Thomas (attached as Ex. 27 to Decl. of Alexandra I. Russell in Supp. of Defs.' Mots. To Exclude the Ops. and Proposed Test. of Pls.' Expert Witnesses, ECF No. 795 ["Russell Daubert Decl."]) ["Thomas Rep."] ¶¶ 10–16.

[3] Defs.' Br. as to Thomas 6–7.

[4] *Id.* 4–5.

defendants engaged in strategic behavior subverting the Hatch-Waxman Act's generic drug policy goals.[5]

Contrary to the defendants' contention, Thomas is eminently qualified to testify as an expert on patent law and the Hatch-Waxman Act. In addition to a law degree, he has a Master of Laws in Patent and Intellectual Property Law.[6] He has taught college courses, authored, and lectured on patent law and the Hatch-Waxman Act.[7] He has written numerous reports for Congress on the intersection of patents and FDA marketing exclusivities, the Hatch-Waxman Act, and pharmaceutical patent law.[8] He has testified before congressional committees about pharmaceutical patent law.[9] He has been an instructor at the PTO Patent Academy, training PTO examiners.[10]

Based on these qualifications, he has been qualified and served as an expert witness in numerous patent cases.[11] He has been appointed as a Special Master in patent cases, including ones involving the Hatch-Waxman Act.[12] Investors and others have sought his advice bearing on the timing of potential generic market entry in patent cases implicating the Hatch-Waxman Act.[13] Just because he has not worked in the pharmaceutical industry does not mean he is not qualified to opine on the matters addressed in his expert report.

---

[5] *Id.* 5–6.

[6] Thomas Rep. ¶ 14.

[7] *Id.* ¶¶ 10, 15–16.

[8] *Id.* ¶ 12.

[9] *Id.*

[10] *Id.* ¶ 11.

[11] *Id.* ¶ 16.

[12] *Id.* ¶ 13.

[13] *Id.* ¶ 16.

Defendants' contention that Thomas should be precluded from testifying about the Hatch-Waxman Act framework and regulations because his testimony constitutes impermissible legal conclusions is wrong. First, Thomas does not offer legal conclusions. He does not opine that the defendants violated the Hatch-Waxman Act. He objectively explains how the statutory scheme and the drug approval process work, providing context for the jury. His explanation will assist the jury in understanding this complex field of the generic drug approval process.

Thomas does not—and will not be permitted to—offer opinions that the defendants violated antitrust and patent laws. He may offer background information only. He may not opine on the application of the law to this case.

Thomas is not opining that the defendants "subverted" the goals of Hatch-Waxman. Nonetheless, defendants are fearful that a jury could infer that they did from Thomas's testimony that suggests they did.[14] The defendants' concern is not unjustified. To avoid any unintended inferences, Thomas may not testify that where "competitors within the pharmaceutical industry . . . choose to bypass or subvert the legislative framework, they potentially engage in strategic behavior that defies the policy goals embodied in the Hatch-Waxman Act."[15] Further, a cautionary jury instruction, if requested, will alleviate the defendants' concern that the jury could infer or conclude from his testimony that they violated the law.

---

[14] *See* Defs.' Br. as to Thomas 6 (arguing that Thomas's testimony "casts aspersions by implication" as to the defendants' challenged conduct).

[15] *See* Thomas Rep. ¶ 31.

## Antitrust Standing

*Defendants' Motion to Exclude Adelman, Burgess, and Kane*

The plaintiffs claim that, but for the reverse payment, Barr would have prevailed in the underlying patent litigation and launched generic Niaspan earlier.[16] They have proffered three experts, Martin Adelman, Dr. Diane Burgess, and Dr. John Kane, who opine on the strength of Barr's invalidity defenses in the patent litigation to show Barr would have defeated Kos's motion for preliminary injunction and obtained a favorable final judgment.[17]

Plaintiffs engaged Adelman, a patent lawyer and law professor,[18] to determine how "a reasonably competent patent counsel advising a client as part of that litigation" would have advised the client of its chances of prevailing.[19] Adelman prepared an expert report and the defendants deposed him.[20] He has become unavailable to testify, and plaintiffs have designated John R. Thomas as his substitute.[21] Thomas will fully adopt Adelman's expert report and his deposition testimony, and "will not affirmatively offer any additional

[16] *See* Pls.' Opp'n to Joint Mot. for Summ. J. ["Pls.' Opp'n to Joint Mot."] 6–7, ECF No. 820. Plaintiffs argue that, in the absence of the reverse payment, Kos would have failed to obtain a preliminary injunction, allowing Barr to launch "at risk" in 2005 (the "at-risk" theory), or Barr would have entered the market after obtaining final judgment in the patent litigation in 2007 (the "litigation success theory"). *See id.* 7.

[17] Pls.' Opp'n to Defs.' Mot. to Exclude the Ops. and Proposed Test. of Martin Adelman, Diane Burgess, and John Kane ["Pls.' Opp'n to Defs.' Mot. as to Adelman, Burgess, and Kane"] 1–3, ECF No. 829.

[18] Expert Rep. of Martin Adelman (attached as Ex. 1 to Russell Daubert Decl.) ["Adelman Rep."] ¶¶ 2–7.

[19] *Id.* ¶ 11.

[20] *See* Mem. in Supp. of Pls.' Unopposed Mot. to Substitute Prof. John R. Thomas for Prof. Martin J. Adelman as Testifying Expert ["Adelman Substitution Br."] 1–2, ECF No. 1012-1.

[21] *Id.* Thomas provided an expert report for plaintiffs regarding the Hatch-Waxman Act and the ability of other generic drug manufacturers to have entered the market earlier absent the settlement agreement. Defendants have filed a separate *Daubert* motion to limit his testimony on those issues. We discuss that motion above.

or different opinions concerning the topics covered in the Adelman Report" at trial.[22] The parties have agreed that our ruling on the defendants' *Daubert* motion to exclude Adelman's testimony will apply equally to Thomas's substituted opinions.[23] Thus, we must address the *Daubert* motion to exclude Adelman's expert opinions.

Public Use Invalidity

Adelman opined that Barr had at least a 90% chance of winning on its public use defense and the patent court would not have enjoined it from launching its generic.[24] He concluded that Barr's defenses were so substantial that it was "very likely to prevail on the merits" and was "virtually certain" to defeat Kos's motion for a preliminary injunction.[25]

Burgess and Kane opine on the technical aspects of Kos's patents.[26] Burgess, a pharmaceutical scientist,[27] evaluated the patents' formulation-related limitations.[28] Kane, a medical doctor and biochemist,[29] evaluated the treatment-related limitations.[30] Burgess and Kane conclude that the formulation- and treatment-related limitations of the asserted patents were publicly used in the clinical trials.[31] They also conclude that they were

---

[22] *See* Adelman Substitution Br. 2.

[23] *Id.*

[24] Adelman Rep. ¶ 90.

[25] *Id.* ¶ 131; *see also id.* ¶¶ 157, 167, 177, 189, 194.

[26] Pls.' Opp'n to Defs.' Mot. as to Adelman, Burgess, and Kane 1.

[27] Expert Rep. of Diane J. Burgess, Ph.D. (attached as Ex. 3 to Russell Daubert Decl.) ["Burgess Rep."] ¶¶ 2–11.

[28] *Id.* ¶ 13; Pls.' Opp'n to Defs.' Mot. as to Adelman, Burgess, and Kane 15.

[29] Expert Rep. of Dr. John P. Kane (attached as Ex. 2 to Russell Daubert Decl.) ["Kane Rep."] ¶ 4.

[30] *Id.* ¶ 1; Pls.' Opp'n to Defs.' Mot. as to Adelman, Burgess, and Kane 15.

[31] *See* Kane Rep. ¶ 172; Burgess Rep. ¶ 16.

invalid as anticipated and/or obvious in light of prior art in the form of over-the-counter ("OTC") niacin products.[32]

Defendants move to preclude these experts, arguing that Adelman's premise that the absence of confidentiality obligations in clinical trials renders the clinical trials "public use" is legally incorrect.[33] They assert that the lack of a confidentiality agreement in clinical trials does not establish public use, citing *Dey, L.P. v. Sunovion Pharmaceuticals, Inc.*, 715 F.3d 1351 (Fed. Cir. 2013).[34] They contend that because Burgess and Kane relied on Adelman's faulty public use analysis, their opinions are necessarily flawed.[35]

Even though defense expert Robert Frank agrees Adelman used the correct two-prong public use test,[36] the defendants still argue that he used an incorrect test.[37] Defendants are correct that the absence of a formal confidentiality agreement with study participants alone does not render a clinical trial public use. But, that is not exactly what Adelman said. As we discuss in our summary judgment opinion, Adelman explained that the lack of a confidentiality agreement is just one of several factors supporting his conclusion that the clinical trials were public uses.[38]

---

[32] Kane Rep. ¶¶ 35, 54, 138, 172; Burgess Rep. ¶¶ 17–18.

[33] Defs.' Mem. of L. in Supp. of Defs.' Mot. to Exclude the Ops. and Proposed Test. of Martin Adelman, Diane Burgess, and John Kane ["Defs.' Br. as to Adelman, Burgess, and Kane"] 4–5, ECF No. 787.

[34] *Id.*

[35] *Id.* 5–6.

[36] Expert Rep. of Robert S. Frank, Jr. Pursuant to Fed. R. Civ. P. 26(a)(2)(B) (attached as Ex. 2 to Decl. of Jonathan S. Meltzer in Supp. of Defs.' Joint Mot. for Summ. J. ["Meltzer Decl."], ECF No. 798-3) ¶¶ 176–77.

[37] *See* Defs.' Reply Mem. of L. in Supp. of Defs.' Mem. of L. in Supp. of Defs.' Mot. to Exclude the Ops. and Proposed Test. of Martin Adelman, Diane Burgess, and John Kane 2–3, ECF No. 967 ("Mr. Adelman applied a 'markedly incorrect' test." (quoting *Herbert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996))).

[38] *See* Mem. Op. on Summ. J. Mots. 25–28.

In reaching his opinion that Barr had a 90% chance of succeeding on its public use defense in the patent litigation, Adelman considered the absence of a confidentiality agreement with 1,200 clinical trial participants who were aware of various components of the drug, which disclosed the invention.[39] He also noted the participants were informed that Niaspan is a sustained-release formulation of niacin, how much niacin was in each tablet, dosages taken, dosing schedules, the trademark names, and the manufacturer.[40] Notably, the participants were given a year's supply of the drug to use after the conclusion of the study without restriction.[41] They were also told they could use the alternative over-the-counter ["OTC"] sustained-release niacin product.[42]

Adelman reviewed the parties' submissions in the TRO proceedings, deposition testimony in the case, the patent judge's comments during argument, the discovery in the patent litigation, the transcript of the TRO hearing, the expert reports in those proceedings and in this litigation, and the declarations.[43] He opined that "[b]ased upon the state of the law at the time of the settlement between Kos and Barr, in my opinion, the clinical trials constituted public use[.]"[44] On the strength of Barr's public use invalidity defense,

---

[39] Adelman Rep. ¶ 91.

[40] *Id.* ¶¶ 91, 155.

[41] *Id.* ¶ 155.

[42] *Id.* ¶¶ 105, 155. Niaspan conducted several clinical trials, not all of which were conducted before the critical date for all asserted patents. In our summary judgment analysis, we discuss only those clinical trials which were conducted before the earliest critical date (i.e., only the clinical trials which can constitute public uses of all of the asserted patents). Here, we refer more generally to Adelman's discussion of all the clinical trials.

[43] *Id.* ¶ 16, Ex. B.

[44] *Id.* ¶ 97.

Adelman opined that the patent court was "virtually certain to deny Kos's motion for a preliminary injunction[.]"[45]

Adelman's public use opinions are based on the totality of the circumstances and a careful review of the record in the patent litigation. Thomas, as Adelman's replacement, will be permitted to opine that there was a 90% likelihood that Kos's clinical trials would have been determined to be invalidating public uses of Niaspan.

Prior Art Invalidity

Plaintiffs claim that, in addition to public use invalidity, Barr would have shown Kos's patents were invalid as anticipated or made obvious by prior art in the form of OTC niacin products.[46]

A patent is invalid if it is anticipated or made obvious by a "prior art" reference. *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1343 (Fed. Cir. 2010). For a claimed invention to be anticipated, a single prior art reference must "disclose each and every element" of the claimed invention, and the elements must be "arranged or combined in the same way as in the claim." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). The disclosure in the prior art may be either "express" or "inherent." *TriMed*, 608 F. 3d at 1343. A limitation is inherent if it is the "natural result flowing from" the prior art's explicit disclosure." *Arbutus Biopharma Corp. v. ModernaTX, Inc.*, 65 F.4th 656, 662 (Fed. Cir. 2023). Expert testimony is generally required to support an anticipation defense. *Koito*

---

[45] *Id.* ¶ 131.

[46] The arguments concerning anticipation and obviousness were made in the context of the defendants' joint motion for summary judgment. Because we conclude in our summary judgment opinion that there is sufficient evidence of Barr's likely success on its public-use theory, we did not discuss the merits of Barr's anticipation and obviousness defenses there. Because the issues of anticipation and obviousness may be presented at trial, Burgess and Kane's expert opinions must be vetted. We discuss the anticipation and obviousness arguments here because the issues of fact they raise are relevant to whether Burgess and Kane's opinions fit the facts of the case.

*Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) ("Typically, testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference." (quoting *Schumer Lab. Comput. Sys., Inc.*, 308 F.3d 1304, 1315–16 (Fed. Cir. 2002))).

A patent is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014). Unlike anticipation, obviousness can be based on a combination of prior art references. The plaintiffs must demonstrate "that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Id.*

In the patent litigation, Barr's expert, Dr. Joseph Robinson, testified in support of Barr's prior art invalidity defense. The defendants argue that Robinson "did not find that the OTC prior art anticipated all of the claims of the '428 patent or rendered them obvious, and Adelman is not qualified to fill this technical gap."[47] Contrary to the defendants' contention, Adelman's prior art opinions need not be limited to those offered by Robinson in the patent litigation. The patent litigation ended before summary judgment and trial. Any competent patent attorney would have developed similar arguments and presented

[47] *See* Defs.' Br. as to Adelman, Burgess, and Kane 10.

the theories of prior art invalidity as Adelman, Burgess, and Kane do, had the patent litigation continued.

Defendants argue Adelman is not qualified to opine that the OTC prior art applies to all of the relevant claims because he is only a lawyer.[48] Adelman is an attorney who practiced and taught patent law for years. He is qualified to opine as to what a reasonably competent patent attorney would advise a client about its chances of prevailing in a patent case.

Burgess and Kane offer technical opinions as to whether the OTC niacin products are invalidating prior art to the Niaspan patents. Burgess compared the formulation-related limitations contained in the asserted Niaspan patents to the features of the OTC products. Kane did the same with the patents' treatment-related limitations. Burgess concluded that "the claims of the . . . Patents that were asserted against Barr in the Niaspan Patent litigation were invalid as anticipated and/or obvious in view of certain [OTC] niacin products."[49] Kane opines that "each treatment-related limitation[] of the patent claims asserted in the Patent Litigation were . . . found in the prior art, and obvious in light of the prior art."[50]

Defendants argue that Burgess and Kane's anticipation opinions are unreliable because, even considering their respective opinions regarding the treatment- and formulation-related limitations together, they have failed to opine on all asserted patent

---

[48] *Id.* 8–9.

[49] Burgess Rep. ¶ 17.

[50] Kane Rep. ¶ 172.

claims.[51] Defendants contend that because of these omissions, their opinions do not fit the facts of the case or assist the trier of fact.[52]

As to the ‘715 patent, defendants argue that plaintiffs’ patent experts offer no prior art reference as to claims 2, 4, 6, 8, 10, and 12.[53] They argue that the experts cannot rely on Robinson’s opinions to fill this gap because Robinson also failed to opine on the urinary metabolite profile ranges specified in those claims.[54]

Plaintiffs argue that their experts need not opine as to claims 2, 4, 6, 8, 10, and 12 of the ‘715 patent. They contend that Robinson already opined that the urinary metabolic ranges in claims 1, 5, 7, 9, and 11 were disclosed by the Slo-Niacin prior art.[55] According to plaintiffs, Robinson did not need to address the “narrower” limitations in claims 2, 4, 6, 8, 10, and 12 because the differences between them and the prior art are either non-existent (such that they inherently anticipate the Niaspan limitations) or are so small that they “create[] a prima facie case of obviousness.”[56]

---

[51] Defs.’ Br. as to Adelman, Burgess, and Kane 6, 14. In their *Daubert* briefing, both parties refer to the prior art arguments in their summary judgment brief. Therefore, we refer to both the summary judgment and *Daubert* briefing in our discussion of prior art invalidity.

[52] *Id.* Defendants argue that all three of the experts’ opinions should be excluded because none of them offer an opinion as to every claimed Niaspan invention. But, none of the three experts were retained to opine on every claim limitation. As we have explained, Adelman does not offer technical opinions. Burgess offered technical opinions as to the formulation-related limitations, and Kane opined as to the treatment-related limitations. Accordingly, we address the claims defendants contend are missing or inadequate even when considering the experts’ opinions together.

[53] Mem. of L. in Supp. of Defs.’ Joint Mot. for Summ. J. [“Defs.’ Joint Br.”] 20, ECF No. 798; Defs.’ Br. as to Adelman, Burgess, and Kane 8–10.

[54] Defs.’ Joint Br. 20–21; Defs.’ Br. as to Adelman, Burgess, and Kane 8–10.

[55] Pls.’ Opp’n to Joint Mot. 33; Pls.’ Opp’n to Defs.’ Mot. as to Adelman, Burgess, and Kane 10.

[56] Pls.’ Opp’n to Defs.’ Mot. as to Adelman, Burgess, and Kane 11–12 (citing *Ortho-McNeil Pharm., Inc. v. Teva Pharms. Indus.*, 344 Fed. App’x 595, 600–01 (Fed. Cir. 2009) (finding that the difference between a prior art 1:10 ratio and a 1:7:1 ratio was “so slight” that it created a prima facie case of obviousness)).

Whether Slo-Niacin's metabolite limitations were similar enough to the limitations in the '715 Niaspan patent to constitute inherent disclosure or *prima facie* obviousness is a question of fact. For example, claim 2 of the '715 patent requires nicotinic acid of "about 12%" and Pathway 2 metabolites of "about 88%."[57] According to Robinson, Slo-Niacin produced 17.5% nicotinic acid and 82.5% Pathway 2 metabolites in female patients.[58] Whether the use of the word "about" renders these differences slight enough to conclude that Slo-Niacin "disclosed" the '715 urinary metabolic limitations is a factual issue.

The purported gaps in plaintiffs' experts' opinions regarding the '715 patent do not warrant exclusion of their opinions for lack of fit or unhelpfulness to the jury. They raise factual disputes about whether Slo-Niacin sufficiently disclosed the limitations in Niaspan's patents. A reasonable jury could conclude that it did. Indeed, the differences between the Slo-Niacin patents and Niaspan were so minimal that Kos alleged in the patent litigation that Barr's generic version of Niaspan infringed the Slo-Niacin patents, which Kos had acquired.[59] Thus, plaintiffs' patent experts will be permitted to opine that the OTC prior art invalidated the '715 patent.

Defendants also argue that plaintiffs' experts have failed to identify an adequate reference for claims 7, 11, 12, and 13 of the '428 patent, and claims 8, 10, 14, 24, 26, 30, 82, 123, 125, 129, 139, 141, and 145 of the '930 patents.[60] Burgess opines that Slo-Niacin taught these limitations, which instruct the use of povidone or stearic acid, or

---

[57] Defs.' Br. as to Adelman, Burgess, and Kane 8; Pls.' Opp'n to Defs.' Mot. as to Adelman, Burgess, and Kane 10–11.

[58] Expert Rep. of Dr. Joseph R. Robinson (attached as Ex. 8 to Russell Daubert Decl.) ¶ 284.

[59] Defs.' Joint Br. 5 n.2; Pls.' Resp. to Defs.' Statement of Material Undisputed Facts and Additional Statement of Material Facts in Opp'n to Defs.' Joint Mot. for Summ. J. ["Pls.' SMF"] ¶ 140, ECF No. 851-1

[60] Defs.' Joint Br. 20, 24; Defs.' Br. as to Adelman, Burgess, and Kane 12. Because these claims are formulation-related, Kane did not opine on them.

both.[61] The '145 patent for Slo-Niacin listed povidone as one of several possible binders and stearic acid as one of two possible lubricants.[62] According to its product label, Slo-Niacin uses alternate lubricants and binders instead of stearic acid and povidone.[63] Defendants argue that because Slo-Niacin did not use povidone or stearic acid, it could not have anticipated Niaspan's use of them.[64]

Burgess does not opine that the Slo-Niacin product label disclosed Niaspan's claimed inventions. She opines that the Slo-Niacin patents disclosed them. The '145 patent expressly recommends the use of stearic acid and povidone as possible ingredients. Burgess testified, "[I]f I was a person of skill in the art and I was wanting to make this product, I wouldn't just look at the label; I would go look at the relevant patents or other information I could find about Slo-Niacin."[65]

Burgess's anticipation opinions reach all the formulation-related limitations. They fit the facts of the case and will help the jury determine whether the Slo-Niacin patents invalidated the Niaspan patents. Burgess may opine that the Niaspan patents were anticipated by the OTC prior art.

---

[61] Reply Expert Rep. of Diane J. Burgess, Ph.D. (attached as Ex. 10 to Russell Daubert Decl.) App'x 1; '428 patent claims 10–13, Meltzer Decl. Ex. 38 at ABB-NIA00128020.

[62] '145 patent (attached as Ex. 7 to Decl. of Christopher M. First in Supp. of Pls.' Resp. to Defs.' Statement of Material Undisputed Facts and Additional Statement of Material Facts in Opp'n to Defs.' Joint Mot. for Summ. J. ["First Decl."], ECF No. 851-2), at ABB-NIA-PAT01070351.

[63] Slo-Niacin Product Label, First Decl. Ex. 70 at ABB-NIA-PAT00023561; Diane J. Burgess, Ph.D. Dep. Tr. (attached as Ex. 4 to Russell Daubert Decl.) ["Burgess Dep."] 61:20–23, 70:12–17.

[64] Defs.' Joint Br. 24.

[65] Burgess Dep. 67:6–13.

Defendants also argue that Burgess's opinions as to obviousness should be excluded as unreliable and unhelpful to the factfinder.[66] They argue that Burgess has failed to identify a specific combination of prior art references that renders the Niaspan patents obvious or explain why a person of ordinary skill in the art would have combined them.[67] They argue that how and why a person would combine prior art references requires expert testimony that plaintiffs have not provided.[68]

Plaintiffs disagree that expert testimony is required to demonstrate exactly how or why the prior art references could have been combined to render Niaspan obvious.[69] They argue that only "common sense and logic are required to see the wisdom in combining favorable aspects of prior art products and references directed to the same objective (*i.e.*, sustained release) for the same drug (*i.e.*, niacin)."[70]

In *KSR Int'l Co. v. Teleflex Inc.*, the Supreme Court instructed courts to adopt an "expansive and flexible approach" to the obviousness question. 550 U.S. 398, 415 (2007). Under *KSR*, the obviousness determination "may include recourse to logic, judgment, and common sense, in lieu of expert testimony." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239 (Fed. Cir. 2010); *see also Perfect Web Techs., Inc. v. InfoUSA, Inc.,* 587 F.3d 1324, 1329 (Fed. Cir. 2009).

---

[66] Defs.' Br. as to Adelman, Burgess, and Kane 12–13. Defendants limit their obviousness attacks to Burgess because they argue she is the only one offering an opinion regarding the '428 and '930 patents. *See id.*; Defs.' Joint Br. 25–26

[67] Defs.' Br. as to Adelman, Burgess, and Kane 13; Defs.' Joint Br. 25–27.

[68] Defs.' Br. as to Adelman, Burgess, and Kane 13; Defs.' Joint Br. 25–27.

[69] Pls.' Opp'n to Joint Mot. 35.

[70] *Id. See also* Pls.' Opp'n to Defs.' Mot. as to Adelman, Burgess, and Kane 14 n.9.

Whether there was a motivation to combine the prior art references in a particular way is a question of fact. *Wyers*, 616 F.3d at 1239; *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1366–67 (Fed. Cir. 2012). It depends on the teachings of prior art references, the demands and problems known to the marketplace, and the background knowledge of a person skilled in the art. *KSR*, 550 U.S. at 418–20 ("One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims."); *see also Wyers*, 616 F.3d at 1240 (holding that where "all of the limitations of the patent were present in the prior art references, and the invention was addressed to a 'known problem,'" the invention is obvious).

The obviousness analysis does "not necessarily require explication in any reference or expert opinion." *Perfect Web Techs*, 587 F.3d at 1329; *see also Innogenetics, N.V. v. Abbott Lab'ys,* 512 F.3d 1363, 1374 (Fed. Cir. 2008) ("[A]n expert is not the only source for evidence that it would be obvious for one skilled in the art to combine references to reach the claimed method."). However, expert testimony is "sometimes essential" in matters involving complex technology. *Wyers*, 616 F.3d at 1240 n.5. An expert who offers an obviousness opinion must do more than "list[] a number of prior art references and conclude[] that one skilled in the art would find the claims obvious." *Meyer Intel. Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1375 (Fed. Cir. 2012).

Burgess does more than list prior art references and offer a conclusory opinion that one skilled in the art would find Niaspan obvious. She provides a detailed claims chart to demonstrate that every treatment-related limitation in Niaspan was present in the OTC

prior art.[71] She defines a person of ordinary skill in the art, using the definition Kos provided in the underlying litigation.[72] She describes the niacin products with varying time-release formulas that were already on the market, opining that the "large number and wide variety of commercially-marketed Niacin Products demonstrate that the 'invention' recited by the asserted claims of the [Niaspan] Patents was neither new nor nonobvious."[73]

Burgess testified that combining the prior art references set forth in her detailed claims chart to arrive at Niaspan would be "intuitive" to "someone [who] was wanting to make [Niaspan]."[74] In other words, Burgess properly "invoked the common sense of one skilled in the art as evidence of motivation to combine prior art references." *See Meyer*, 690 F.3d at 1376. We find no fault with her reliance on common sense, combined with her detailed opinions comparing the OTC teachings to Niaspan's claimed inventions. Therefore, she will be permitted to offer her opinions as to obviousness.

Defendants also argue that Kane's opinions are unreliable and do not fit the record because he relies on his own experience treating patients with OTC niacin products in the 1980s and 1990s.[75] Because he has no treatment records from this time and was not a witness in the underlying patent litigation, defendants argue his opinion about prior use of niacin products is uncorroborated and should be excluded.[76]

---

[71] Burgess Dep. 69:22–25.

[72] Burgess Rep. ¶¶ 111–12.

[73] *Id.* ¶ 181; *see also id.* ¶¶ 158–81.

[74] Burgess Dep. 69:22–70:7.

[75] Defs.' Br. as to Adelman, Burgess, and Kane 14.

[76] *Id.*

Kane's clinical experience, as well as his experience as a researcher conducting clinical trials, makes him qualified to opine that the treatment-related limitations in Niaspan were practiced in public and in prior art. But, it does not form the basis of his opinion. His opinions are based on the record in the underlying patent litigation. Thus, Kane's opinions fit the facts of the case and will be permitted.

*Defendants' Motion to Exclude Molina*

Defendants contend that Luis Molina's opinion that Kos was ready and financially incentivized to launch its own authorized generic Niaspan on April 1, 2005 is unreliable and rests on speculation of Kos's intent or state of mind.[77] First, they claim that he did not perform the requisite analysis of what a company in Kos's position would have been financially incentivized to do in the hypothetical world,[78] arguing that his expert opinion lacks a reliable methodology and relies solely upon his experience in the pharmaceutical industry.[79] So, the defendants contend, he does not tie the facts of this case to his experience.[80] Second, the defendants maintain that Molina, who bases his opinion on "what a reasonable pharmaceutical company would do" under the circumstances, improperly speculates about the subjective intent and motivations of other drug manufacturers.[81]

Molina's opinions are from the perspective of one with years of experience in the pharmaceutical industry. During his twenty years with Pfizer, he participated in launching

---

[77] Defs.' Mem. of L. in Supp. of Defs.' Mot. to Exclude the Ops. and Proposed Test. of Luis Molina ["Defs.' Br. as to Molina"] 3, ECF No. 792.

[78] *Id.*

[79] *Id.* 3–6.

[80] *Id.* 4–5.

[81] *Id.* 6–7 (citing Molina Dep. Tr. (attached as Ex. 40 to Russell Daubert Decl.) 47:4–7).

17 authorized generics and 30 other generics.[82] His experience informs his opinions about how a reasonable pharmaceutical company would act in similar circumstances and what Kos did in anticipation of Barr's launching its generic.[83]

Molina tied his experience to the facts in this case. Through his experienced eyes, he reviewed and analyzed internal documents and data from Kos and its successors to determine whether their behavior was consistent with common business practices of brand pharmaceutical companies preparing to launch an authorized generic in response to an ANDA.[84] His opinion on why Kos did what it did is not the product of an unreliable methodology. It is based on the evidence of what Kos did, not what it may have done. He applied his experience to the facts he assembled from the undisputed records. Stated differently, his findings and opinions are founded on the evidence of what Kos and its successors did, not what he suspected they intended to do.

The internal documents support his opinion that Kos was ready, able, and financially incentivized to launch its AG on April 1, 2005. Those documents, which included competitors' intelligence reports, financial projections, and technical documents, revealed Kos's and its successors' business plans.[85] They projected that Kos would lose 86% of Niaspan brand prescriptions within three months of Barr's launch.[86] Kos's stock dropped 13% after news of Barr's intended launch.[87] The documents predicted that

---

[82] Expert Rep. of Luis A. Molina (attached as Ex. 39 to Russell Daubert Decl.) ["Molina Rep."] ¶¶ 6, 21.

[83] *See* Molina Rep. ¶ 23.

[84] *Id.* ¶¶ 23, 55–92, 101.

[85] *Id.* ¶ 23.

[86] *Id.* ¶ 58.

[87] *Id.* ¶ 60.

Barr's generic entry into the market would result in significant loss of Niaspan brand revenue, dropping from $447 million to $165 million. Introducing an AG would recover $100 million of that loss.[88]

Kos did not ignore the warnings. It responded by developing, manufacturing, and preparing to market Niaspan AG. It put together a plan to do so. It geared up the manufacturing process, manufacturing 44 batches of Niaspan AG for potential shipment in April 2005.[89] It had developed labels and package inserts.[90] The Head of Technical Operations advised the CEO that Niaspan AG was ready to go in April 2005 if Barr launched its generic.[91]

The defendants do not dispute the facts Molina cites. They do not mention them at all. They may interpret them differently, but that is not a ground for challenging Molina's methodology as unreliable under *Daubert*. That is a matter for cross-examination at trial.

The defendants' *Daubert* challenge lacks merit. Molina's methodology applying his experience to the facts disclosed in Kos's own internal documents is reliable and not speculative. Those documents support his opinion that Kos was ready and financially incentivized to launch an authorized generic on April 1, 2005. Therefore, he may testify consistent with his report.

*Defendants' Motion to Exclude Elhauge and Leffler*

Plaintiffs seek to establish Kos and Barr's settlement caused them harm in overcharges by showing Kos and Barr could have agreed upon an earlier generic entry

---

[88] Pls.' Opp'n to Defs.' Mot. to Exclude the Ops. and Proposed Test. of Luis Molina 5 (citing Molina Rep. ¶¶ 47–48), ECF No. 834.

[89] Molina Rep. ¶ 90.

[90] *Id.* ¶¶ 86–89.

[91] *Id.* ¶¶ 76, 91–92.

date that would have been economically beneficial to both without an illegal reverse payment.[92] They rely on two experts to dispel the notion that the defendants entered into the reverse payment agreement to avoid litigation expenses and avert risk.

Dr. Einer Elhauge, an antitrust law professor, performed an economic analysis to determine whether Kos and Barr could have agreed, without any payment from Kos to Barr, to an earlier entry date that would have been economically beneficial to both.[93] He opines that, with a no-payment deal, it would have been economically rational for Barr to enter the market four-and-a-half years earlier, on March 14, 2009.[94] Based on the terms of the reverse payment agreement, he calculates the parties' actual bargaining strength and uses that calculus to arrive at the alternate no-payment entry date that would have made economic sense to both Kos and Barr.[95]

Dr. Keith Leffler, an economics professor,[96] also considered whether there was a no-payment alternative agreement that would have made an earlier generic drug entry economically rational.[97] He opines that it would have been in the economic interests of Kos and Barr to negotiate an agreement, absent a payment, with an entry date between November 17, 2005 and November 16, 2008.[98]

---

[92] We explain the plaintiffs' "alternative settlement" theory of causation in our summary judgment memorandum opinion. *See* Mem. Op. on Summ. J. Mots. 30–35.

[93] Expert Rep. (Corrected) of Professor Einer Elhauge (attached as Ex. 32 to Russell Daubert Decl.) ["Elhauge Rep."] ¶¶ 1, 5.

[94] *Id.* ¶ 2.

[95] *Id.* ¶¶ 63–69.

[96] Expert Rep. of Keith B. Leffler, Ph.D. (attached as Ex. 33 to Russell Daubert Decl.) ["Leffler Rep."] ¶ 1.

[97] *Id.* ¶ 8.

[98] *Id.* ¶ 11(E).

The defendants argue that Elhauge and Leffler's opinions are inadmissible because they rest on fundamentally unreliable assumptions of what the defendants' assessment of the chances of prevailing in the patent litigation was.[99] Essentially, they argue Elhauge and Leffler speculate as to why the defendants entered into the settlement. They claim (and the plaintiffs agree) that to determine what instigated the settlement agreement and motivated the defendants, one must consider how Kos and Barr viewed the prospects of the patent litigation, which is a subjective inquiry.[100] According to the defendants, such an inquiry is impossible and any theory that rests on that assumption cannot be tested objectively.[101]

The defendants have the evidence bearing on their motivation which they contend is missing. But, they will not reveal it. What predictions and probabilities the defendants' attorneys and their experts conveyed to them in the patent litigation has not been disclosed because the defendants have refused, invoking attorney-client and work product privileges.[102] The defendants then fault the plaintiffs for having failed to factor the defendants' assessments regarding the probable outcome of the patent litigation into their "but-for world" construct.

What a party perceived its chances of prevailing in the patent case were can be discerned or reasonably inferred from the size of the reverse payment, the party's

---

[99] Defs.' Mem. of L. in Supp. of Defs.' Mot. to Exclude the Ops. and Proposed Test. of Einer Elhauge and Keith Leffler ["Defs.' Br. as to Elhauge and Leffler"] 6, ECF No. 794

[100] *Id.* 4–6; Retailer Pls.' Opp'n to Defs.' Mot. to Exclude Dr. Keith Leffler's Ops. and Proposed Test. Concerning an Alternative No-Payment Entry Date ["Retailer Pls.' Opp'n to Defs.' Mot. as to Leffler"] 4–5, 9, ECF No. 832; Direct Purchaser Class Plaintiffs' Opp'n to Defs.' Mot. to Exclude the Ops. and Proposed Test. of Professor Einer Elhauge ["DPPs' Opp'n to Defs.' Mot. as to Elhauge"] 6, ECF No. 842.

[101] Defs.' Br. as to Elhauge and Leffler 6.

[102] Retailer Pls.' Opp'n to Defs.' Mot. as to Leffler 5–6; DPPs' Opp'n to Defs.' Mot. as to Elhauge 6.

conduct, and its reaction to known facts. Although there may be no direct evidence of a party's state of mind, circumstantial evidence may reveal it. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 760 (4th Cir. 2023); *Moore v. Vislosky*, 240 Fed. App'x 457, 468 (3d Cir. 2007).

Elhauge and Leffler had objective evidence from which they reasonably deduced what factors Kos and Barr considered when they entered into the reverse payment agreement. They did so by taking into account how rational drug makers react to patent litigation.[103]

Elhauge opines that the reverse payments here cannot be justified as avoidance of litigation costs or risk aversion. He reasons that the parties could have avoided those costs and risks by reaching a no payment settlement that would have equalized the costs, and the saved litigation costs would not have decreased prices and could not have offset the anti-competitive effects. Further, Kos significantly increased its expected profits.[104]

Elhauge explains that because litigation costs are fixed (not marginal), they are not likely to be passed down to the purchaser in the form of higher prices.[105] Consequently, avoiding litigation costs would not result in lower prices.[106] Even if reduced litigation costs were passed to consumers, the size of the reverse payment was larger than the amount of saved costs, so prices still would not have been lowered.[107]

---

[103] *See* Retailer Pls.' Opp'n to Defs.' Mot. as to Leffler 8–9; DPPs' Opp'n to Defs.' Mot. as to Elhauge 6–7.

[104] Elhauge Rep. ¶ 4.

[105] *Id.* ¶ 106

[106] *Id.*

[107] *Id.*

The defendants argue Elhauge and Leffler are not qualified because they have no background in the pharmaceutical industry, patent law, licensing, negotiations or probability theory.[108] So, they contend, Elhauge and Leffler have no specialized knowledge in the valuation of patent litigation, patent licensing, or negotiating settlements of patent disputes.[109]

Elhauge and Leffler need not be experts in patent law to render the opinions they do in the fields of antitrust law and economics. Indeed, the defendants do not challenge Elhauge's and Leffler's qualifications in their respective fields of expertise. For patent law implications, Elhauge and Leffler rely on Adelman's analysis and opinions.[110]

Experts are permitted to rely on another expert's opinion in formulating their own. *See, e.g.*, *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 286 F.R.D. 266, 271 (W.D. Pa. 2012) (citing *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002)). In technical fields, it is common "for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *Dura Auto*, 285 F.3d at 613. While experts may not simply "parrot" the ideas of another, they may "use a mix of objective data and subjective analysis from another expert" to develop their opinions. *In re Suboxone Antitrust Litig.*, No. 13-MD-2445, 2020 WL 6887885, at *5 (E.D. Pa. Nov. 24, 2020) (citation omitted). That is what Elhauge and Leffler did.

---

[108] Defs.' Br. as to Elhauge and Leffler 1–4.

[109] *Id.* 4.

[110] *See* Elhauge Rep. ¶¶ 51–53; Leffler Rep. tbl. 1. As explained above and in the summary judgment opinion, plaintiffs have substituted Professor John R. Thomas for Adelman, who is no longer available to testify. *See* Adelman Substitution Br. 1–2. Thomas will fully adopt Adelman's expert report and deposition testimony, and will not offer any additional or different opinions concerning the topics covered in Adelman's report at trial. *Id.* at 2.

Elhauge and Leffler used Adelman's opinions about the probability of Barr's success as a stand-in for the parties' subjective expectations about the outcome of the patent litigation.[111] They multiplied the parties' probabilities of success by the litigation costs and profits resulting from success to determine the value of continued litigation compared to settlement for each party.[112] Based on these calculations, Elhauge and Leffler determined alternative generic entry dates that would have been economically rational without a reverse payment.[113]

Elhauge and Leffler's reliance on Adelman's evaluation of the patent litigation is proper because it "presume[s] the existence of rational economic behavior in the hypothetical free market." *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 235 (E.D. Pa. 2017) (quoting *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985)). Their opinions are "derived from the economic information available to Defendants at the time of the settlement agreements, and [they] opine on what a rational, objective actor would have considered in light of that information." *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1797, 2015 WL 5783603, at *6 (E.D. Pa. Oct. 5, 2015). Defendants' contention that Adelman's analysis ignores contrary evidence invites cross-examination, not exclusion of Elhauge and Leffler's opinions. *See In re Glumetza*, Civ. No. 19-05822, 2021 WL 3773621, at *18 (N.D. Cal. Aug. 25, 2021).

To the extent the defendants contend that Adelman's opinions, upon which Elhauge and Leffler's opinions rest, are inadmissible, we have decided that issue. We

---

[111] Elhauge Rep. ¶¶ 51–56; Leffler Rep. tbl. 1; Reply Expert Rep. of Keith Leffler, Ph.D. (attached as Ex. 31 to Russell Daubert Decl.) ["Leffler Reply Rep."] ¶ 53.

[112] Elhauge Rep. ¶¶ 51–56; Leffler Rep. ¶¶ 72–74.

[113] Elhauge Rep. ¶ 69; Leffler Rep. ¶ 11(e).

have ruled that Adelman's opinions (which, as we explain above, will be proffered by Thomas) are admissible.[114] Thus, Elhauge and Leffler may rely on Adelman's knowledge and expertise regarding the patent issues and their implications in formulating their own antitrust and economic opinions.

The defendants also challenge the reliability of Elhauge and Leffler's methodology. They incorrectly characterize their analyses as analogizing patent litigation to a lottery for determining the probable outcome of the patent case.[115] What Elhauge and Leffler did was take into consideration the actual reverse payment agreement, the parties' own profit projections, and the potential outcomes of the patent litigation to determine alternative entry dates that would be profitable for both parties. Admittedly, the outcome of the patent litigation is beyond their expertise. So, they properly relied on Adelman, a patent expert. These factors form the basis of their opinions which the jury is free to believe or disbelieve.

The defendants also argue that Elhauge and Leffler's use of a "bargaining power" analysis to determine mutually profitable alternative entry dates is untested and unreliable.[116] The "bargaining power" analysis involves calculating each party's share of the gains from settlement in the actual world, and determining an alternative no-payment settlement that would have produced the same share of joint gains in the but-for world.[117] The approach is based on the assumption that the parties would have had the same

---

[114] See our discussion of the defendants' *Daubert* motion as to plaintiffs' experts Martin Adelman, Dr. Diane Burgess, and Dr. John Kane, above.

[115] Defs.' Br. as to Elhauge and Leffler 8–10.

[116] Defs.' Br. as to Elhauge and Leffler 11–12.

[117] Elhauge Rep. ¶¶ 60–64; Keith Leffler, Ph.D. Dep. Tr. (attached as Ex. 29 to Russell Daubert Decl.) ["Leffler Dep."] 305:10–25.

bargaining power in the but-for world as they did when negotiating the actual settlement.[118]

The defendants assert Elhauge and Leffler failed to identify empirical support for use of the bargaining power analysis.[119] They contend Elhauge and Leffler's assumption that the ratio of financial returns in a complex business deal would have been exactly the same in a differently structured hypothetical deal is untested.[120] They contend the unreliability of Elhauge and Leffler's opinions is apparent because they used similar methodologies and arrived at vastly different alternative no-payment entry dates.[121]

Defendants' attacks on Elhauge and Leffler's assumptions regarding the parties' bargaining power in the but-for world and the divergence in their alternative entry dates are issues for cross-examination. They do not warrant exclusion of their opinions. *See, e.g.*, *In re EpiPen*, No. 17-MD-2785-DDC-TJJ, 2021 WL 2577490, at *18 (D. Kan. June 23, 2021) ("Defendants' attacks against Prof. Elhauge's assumption that the parties' bargaining power in the actual settlement would translate to a 'but-for' settlement go to the weight the trier of fact should assign his opinion when making a credibility determination. But, the court doesn't find that this assumption renders Prof. Elhauge's analysis so unreliable that the court must exclude his opinion.").

---

[118] Elhauge Rep. ¶ 67. Elhauge admits that he conducted a bargaining power analysis. *See id.* ¶ 61. Leffler explained that he has used a bargaining analysis in the past but declined to do so in this case. Leffler Dep. 305:22–25; Leffler Rep. ¶ 80 n.105. Leffler explained that he could have used the bargaining power analysis to identify a specific alternative entry date within the range of economically rational dates he identified, but that he chose not to because it would have had a negligible effect on overall damages.

[119] Defs.' Br. as to Elhauge and Leffler 11.

[120] *Id.* 11–12.

[121] *Id.* 3, 11–12.

Elhauge and Leffler are no strangers to reverse payment litigation. Many courts have permitted them to rely on objective evaluations of the likely outcome of patent litigation as an input for the parties' subjective expectations of their chances of success. *In re EpiPen*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1873989, at *53 n.57 (D. Kan. Feb. 27, 2020) (Elhauge); *In re Namenda*, 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018) (Elhauge); *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1186–91 (N.D. Cal. 2017) (Elhauge and Leffler); *In re Glumetza*, 2021 WL 3773621, at *20 (Leffler); *In re Androgel Antitrust Litig. (No. II)*, No. 1:09-CV-955-TWT, 2018 WL 2984873, at *16 (N.D. Ga. June 14, 2018) (Elhauge and Leffler).

We find no reason to exclude Elhauge and Leffler's opinions as to economically rational alternative generic entry dates. Thus, we will deny the defendants' *Daubert* motion.

*Plaintiffs' Motion to Exclude Sebenius*

To rebut plaintiffs' experts Elhauge and Leffler, the defendants proffer Dr. James Sebenius, a professor of business administration who teaches deal-making and negotiation courses.[122] Sebenius questions the reliability of their opinions bearing on the actual and the hypothetical Kos-Barr negotiations.[123] He criticizes Elhauge and Leffler's conclusions as unreliable because he contends they are inconsistent with negotiation

[122] Expert Rep. of James Sebenius, Ph.D. (attached as Ex. M to Decl. of Caitlin G. Coslett in Supp. of Pls.' Motions to Exclude Certain Test. of Defs.' Experts Edward J. Buthusiem, Ph.D., Pierre-Yves Crémieux, Ph.D., James Sebenius, Ph.D., and Bruce E. Stangle, Ph.D. ["Coslett Decl."], ECF No. 784) ["Sebenius Rep."] ¶ 1.

[123] *Id.* ¶ 24.

theory, the empirical evidence, and his experience.[124] He accuses them of erroneously assuming Barr was interested in negotiating for the earliest possible entry date.[125]

Moving to exclude certain parts of Sebenius's testimony, plaintiffs argue his opinions about Barr's negotiation strategy do not fit the case because he was not provided information regarding Barr's specific generic Niaspan strategy and was only aware of its general negotiation strategy, which he concedes Barr did not apply in every case.[126] They also contend he ignored evidence that Barr was seeking the earliest possible entry date.[127]

Sebenius, who has no experience in negotiating a reverse payment settlement, relied upon a limited interview and the deposition testimony of Fred Killion, Barr's general counsel.[128] As with other defense experts, Killion did not discuss Barr's actual strategy in the Niaspan settlement negotiations for fear of waiving privileges protecting those strategy discussions.[129] The defense experts discussed only Barr's general strategy in

---

[124] *Id.*

[125] *Id.* ¶¶ 24, 38–40.

[126] Mem. in Supp. of Pls.' Mot. to Exclude Certain Test. of Defs.' Expert James Sebenius ["Pls.' Br. as to Sebenius"] 9–10, ECF No. 800.

[127] *Id.*

[128] Sebenius Rep. ¶ 39. In their opposition to the plaintiffs' *Daubert* motion, the defendants do not identify any other information on which Sebenius based his opinion. They state that he conducted the Killion interview in addition to "extensive evaluation of other relevant facts and circumstances," and that he used "information gleaned from the Killion interview, as well as the other evidence in this case and his own expertise in negotiation." Defs.' Mem. of L. in Opp'n to Pls.' Mot. to Exclude Certain Test. of Defs.' Expert James Sebenius, Ph.D. 4, ECF No. 845. But, they don't identify the other "facts and circumstances" or "evidence" he purportedly considered. In the section of their brief where they argue that his opinions "have a proper basis," they just state he "relied on information about Barr's general business strategy that he was 'made aware of' during the Killion interview." *Id.* 7. They contend he "used what he learned in th[e] [Killion] interview to evaluate Elhauge and Leffler's methodologies and concluded that their methodologies were flawed[.]" *Id.* 2.

[129] "JS Notes from Killi[o]n Call 8/22/18" (attached as Ex. N to Coslett Decl.); Dep. Tr. of James K. Sebenius, Ph.D. (attached as Ex. O to Coslett Decl.) ["Sebenius Dep."] 83:15–85:14.

other cases.[130] Nonetheless, Sebenius assumed what Barr's Niaspan strategy was in this case.[131] He was not apprised of Barr's specific strategy to achieve 180-day exclusivity or the earliest possible entry date.[132] He did not learn what the actual strategy was.[133] Yet, in his deposition he suggested, without confirming, that the strategy was not its usual.

Sebenius refers to Killion's deposition once, writing: "Killion testified that Barr told financial analysts that it was planning an at-risk launch as part of 'an ongoing campaign strategy . . . to put downward pressure on Kos' stock, and basically bring Kos to the . . . settlement table.'"[134] Killion's deposition testimony seems to support that Barr had a unique strategy for Niaspan that involved the earliest-possible at-risk launch:

> Q. Do you have a recollection of Mr. Downey speaking with individuals outside the company about a potential at-risk launch of generic Niaspan?
>
> A: I do.
>
> Q. Okay. And what's your recollection of that?
>
> A: [ … ] [W]e were thinking about launching a generic version of Niaspan. And this was a little bit unusual. Normally if you're going to launch a product at risk, you don't put a big sign in the yard saying, "Coming soon," but there was an ongoing campaign strategy, whatever you want to call it, to put downward pressure on Kos's stock, and basically bring Kos to the table, to the settlement table.[135]

---

[130] Sebenius Dep. 84:21-85:14.

[131] *Id.* 86:21-87:9.

[132] *Id.* 85:11-14.

[133] *Id.* 90:8-91:2.

[134] Sebenius Rep. ¶ 40.

[135] Fred Killion Dep. Tr. (attached as Ex. 21 to Meltzer Decl.) 37:10–38:12.

Sebenius stated as fact that "Barr was especially focused on obtaining the 180-day exclusivity period at an opportune time, not necessarily at the earliest possible time."[136] He did not identify or suggest what that time was.

Despite acknowledging he did not know what the specific strategy was in this case, Sebenius formed his opinions based on his assumption of what it was. According to Sebenius, Barr's usual strategy was to prioritize having a 180-day exclusivity period at an ideal time, not necessarily the earliest-possible generic entry.[137] He admitted he assumed Barr followed its general strategy in this case:

> Q. So, Professor Sebenius, would it be fair to say, then, that you inferred from Mr. Killi[o]n's description of Barr's general business strategy that that strategy . . . applied to the Niaspan case specifically?
>
> A. Based on a great deal of experience, a firm's general business strategy in a particular area, carefully articulated, would certainly have bearing on a situation that fits that description.
>
> Q. So you inferred from the general to the specifics of this case; is that correct?
>
> A. That's correct.[138]

Because Sebenius cannot demonstrate that Barr employed its general negotiating strategy, and was not informed what it was in this case, his opinion regarding what its strategy was in this case is not reliable. It is not founded on established facts, but on speculation. Indeed, it seems to contradict evidence he ignored.

Plaintiffs accuse Sebenius of ignoring evidence that Barr sought the earliest possible entry date. Sebenius did not consider Barr Vice President Paul Bisaro's

---

[136] Sebenius Rep. ¶ 24.

[137] *Id.*¶ 39.

[138] Sebenius Dep. 86:21–87:9.

declaration in the preliminary injunction proceedings, in which he informed the court that Barr was prepared to launch generic Niaspan on March 30, 2005.[139] Nor did he consider a 2004 Bank of America Analyst Report summarizing a call with Barr CEO Bruce Downey.[140] According to that report, Downey discussed "the internal thought process behind a potential at-risk launch" and indicated that "there is incentive to get to the market as quickly as possible, as a significant profit opportunity exists post 180-day exclusivity."[141] Sebenius relied on only 11 documents selected by defense counsel.[142] He did not review many documents upon which Elhauge relied.[143]

Plaintiffs are correct that there is substantial evidence showing that Barr wanted to launch its generic as soon as possible. Barr announced its intention to enter the market on March 30, 2005—the earliest date it could.[144] Was that representation to the patent court not truthful? That is a matter for cross-examination and for the jury to decide.

Because Sebenius did not know what Barr's strategy actually was, was specifically barred from inquiring about what it was, and ignored evidence of what it was, he cannot opine on it. Nor can he base his opinions on it.

---

[139] Paul Bisaro's Decl. in Supp. of Barr Lab'ys' Opp'n to Kos Pharms.' Mot. for a Prelim. Inj. (attached as Ex. Q to Coslett Decl.) ["Bisaro Decl."] ¶ 9.

[140] Coslett Decl. Ex. P at TEV-NIA00216145.

[141] *See id.*

[142] Sebenius Rep. App'x B (listing 15 produced documents, among other information, on which Sebenius claims to have based his report); Pl.'s Br. as to Sebenius (noting four of the 15 produced documents listed in Sebenius's report are duplicates).

[143] Sebenius Dep. 27:24–28:10; Pls.' Br. as to Sebenius 5 n.5.

[144] *See* Bisaro Decl. ¶ 9.

**“Large and Unjustified” Settlement**

*Defendants’ Motion to Exclude Tupman*

Plaintiffs retained John Tupman, a former pharmaceutical manufacturer executive, to assess the fair value of the Co-Promotion Agreement and to determine whether it was typical of co-promotion agreements in the industry.[145] Tupman used three approaches to value the Co-Promotion Agreement: (1) profit-based; (2) cost-based; and (3) comparables-based.[146] The defendants move to exclude only Tupman’s opinions on the profit-based approach.

Tupman’s profit-based approach “values agreements using the economic returns expected to be generated by the agreement.”[147] Tupman explains that pharmaceutical companies often use the profit-based approach to value a business deal by calculating the present value of the expected revenues, minus the expenses.[148] To determine the revenue and expenses Kos expected to generate from the Co-Promotion Agreement, Tupman relies on financial projections created by Kos analyst Joe Suarez for a presentation to the Kos Board of Directors on March 30, 2005 illustrating the impact of the proposed settlement with Barr.[149]

Tupman identifies the projected incremental revenues and expenses attributed to the Co-Promotion Agreement Suarez had included in his analysis.[150] He concludes that

---

[145] Expert Rep. of John R. Tupman (attached as Ex. 12 to Russell Daubert Decl.) [“Tupman Rep.”] 1–2.

[146] *Id.* 3.

[147] *Id.* 67.

[148] *Id.*

[149] *See* Russell Daubert Decl. Ex. 14 at ABB-NIA01296398.

[150] Tupman Rep. 67–68.

the Co-Promotion Agreement, standing alone, had a present negative value of $104.8 million to Kos.[151] In other words, Tupman determined that at the time Kos entered into the settlement with Barr, it expected to lose money on the Co-Promotion Agreement.[152]

The defendants move to exclude Tupman's opinions based on the profit-based approach because he relied on the Suarez projections without testing them. Yet, they do not seek to exclude the Suarez projections from evidence. Nor do they seek to bar Suarez or other fact witnesses from testifying about them.[153] Rather, the defendants argue that Tupman's use of the Suarez projections is unreliable, inconsistent with his own methodology, and will not assist the jury.[154]

The defendants argue Tupman failed to follow his own methodology because he testified that profit-based forecasts can involve a "waterfall" approach that identifies and models all the features of the product environment, including pricing, the number of patients diagnosed with the relevant condition, the number of patients with a prescription, the alternative products, and the penetration rate the manufacturer achieves.[155] Instead of following this "waterfall" methodology by attempting to quantify these market features himself, Tupman relied on Kos's contemporaneous financial projections.[156] Because

---

[151] *Id.* 68.

[152] *Id.*

[153] Defs.' Reply Mem. of Law in Supp. of Defs.' Mot. to Exclude the Ops. and Proposed Test. of John Tupman Relating to the "Profit-Based" Approach ["Defs.' Reply as to Tupman"] 5, ECF No. 866.

[154] Defs.' Mem. of L. in Supp. of Defs.' Mot. to Exclude the Ops. and Proposed Test. of John Tupman Relating to the "Profit Based" Approach ["Defs.' Br. as to Tupman"] 5–9, ECF No. 788-1

[155] *Id.* 2, 5; John Tupman Jr. Dep. Tr. (attached as Ex. 13 to Russell Daubert Decl.) ["Tupman Dep."] 52:13–55:13.

[156] Defs.' Br. as to Tupman 2, 5; Tupman Dep. 72:11–21.

Tupman did not follow his own methodology, defendants argue, his profit-based opinion is unreliable.[157]

Tupman did not abandon his methodology. He testified that revenue models can be "built different ways" based on the situation, product, and therapeutic area.[158] He testified that the "waterfall" model can be used "[i]n some cases," but not all.[159] Tupman did not use the "waterfall" approach in this case. He "reduced [the profit-based approach] to a question of the net present value of the incremental profit expected from a proposed deal."[160] He used Kos's own estimates as an input for the revenues and costs expected to be generated from the Co-Promotion Agreement. This is consistent with his own description of the profit-based methodology for valuing transactions he applied in this case.

The defendants also argue that Tupman's profit-based opinion is unreliable because he relied on the Suarez projections—Kos's own projections—without conducting any independent verification or investigation into the details surrounding its creation.[161] They argue that Tupman does not know the reason the Suarez projection was created and that he assumed it was done to model the incremental revenues generated by the Co-Promotion Agreement.[162] Tupman testified that he did not know the assumptions Suarez made for his inputs, including price, penetration rate, or sales units.[163] The

[157] Defs.' Br. as to Tupman 5.

[158] Tupman Dep. 52:17–20.

[159] *Id.* 53:5–8.

[160] Tupman Rep. 67.

[161] Defs.' Br. as to Tupman 5.

[162] *Id.* 3, 8.

[163] Tupman Dep. 85:16–87:9.

defendants argue because he did not know the purpose of the analysis or the assumptions used to generate it, and did no independent verification, his reliance on the Suarez projections renders his analysis unreliable.[164]

Tupman did not blindly rely on the Suarez projections. Contrary to the defendants' contention, Tupman investigated their purpose, inputs, and validity.

Suarez created the projections at the request of Kos's Chief Financial Officer Chris Kiritsy "to review the [B]arr deal."[165] Kiritsy asked Suarez to "show the difference on revenue . . . with our current plan (with settlement) vs. if [B]arr launch[ed] at risk and prevailed."[166] Suarez testified that he made the presentation to show the board "the differences between what we were projecting and what might occur with the Barr settlement."[167] Tupman explained that he understood why the analysis did not isolate the effects of the Co-Promotion Agreement alone "because if they had, with the board, it would have shown that that transaction itself was losing money without the context of a change in the timing of the generic entry."[168] But, Tupman testified that based on his years of experience evaluating these transactions in the pharmaceutical industry, assessing the overall deal would necessarily have required Suarez to model the incremental profits resulting from the co-promotion efforts.[169] Indeed, Tupman confirmed

[164] Defs.' Br. as to Tupman 1, 5–8.

[165] Russell Daub. Decl. Ex. 15 at ABB-NIA01292528.

[166] Russell Daubert Decl. Ex. 16 at ABB-NIA01292164.

[167] Joseph Suarez Dep. Tr. (attached as Ex. 2 to Coslett Decl.) 195:3–13.

[168] Tupman Dep. 69:3–9.

[169] *Id.* 76:24–77:19

that Suarez's analysis included the marketing expenses, royalties, and incremental revenues associated with the Co-Promotion Agreement.[170]

Tupman explained why, based on his own experience as a pharmaceutical executive, he found it appropriate to rely on Kos's contemporaneous financial projections. He explained that it is reasonable to assume an analyst preparing a presentation at the request of the CFO for presentation to the Board of Directors would use "the best information he had available[.]"[171]

To confirm that the Suarez projection was not an outlier, Tupman reviewed other projections created by Kos after the deal.[172] He reviewed Kos forecasts created on April 24, 2005 and May 9, 2005 which demonstrated that Kos continued to anticipate losses from the Co-Promotion Agreement.[173]

Tupman did not rely solely on the profit-based analysis of the Suarez projections. The profit-based approach is only one of three approaches he used to assess the fair value of the Co-Promotion Agreement. He also conducted cost-based and comparables-based analyses, both of which bolstered his conclusion that Kos expected to spend more on the Co-Promotion Agreement than it would receive in return.[174] In other words, Tupman independently verified Suarez's financial projections.

In summary, Tupman relied on projections created by Kos's own analyst. We have explained why it was rational to rely on those projections. The defendants offer no facts

---

[170] *Id.* 66:7–15.

[171] *Id.* 77:4–19, 290:1–9.

[172] *Id.* 290:21–291:3.

[173] Tupman Rep. 49.

[174] *Id.* 68–69.

showing that the Suarez numbers were unreliable. Therefore, Tupman's reliance on the Suarez projection does not render his opinion unreliable.

The defendants also argue that Tupman's profit-based opinions should be excluded because they will not help the jury.[175] They argue that Suarez's analysis speaks for itself and does not require expert insight because Tupman merely subtracts the projected costs from the expected revenues set forth in the analysis.[176] According to the defendants, such "basic arithmetic" can be done by the jury without the aid of expert testimony.[177]

Tupman did not conduct mere basic arithmetic. The Suarez projections assessed the revenues and expenses generated by the overall settlement. Tupman used his expertise to isolate the revenues and expenses attributable to the Co-Promotion Agreement.[178] He used those numbers to calculate the profit Kos expected to generate from the Co-Promotion Agreement and discounted it to its expected present value.[179] These calculations go beyond the ken of the average juror. Tupman's opinions will assist the jury to determine whether Kos received fair value for co-promotion services in exchange for the royalties Kos agreed to pay Barr under the Co-Promotion Agreement.

*Plaintiffs' Motion to Exclude Buthusiem*

Defense expert Edward Buthusiem, a former in-house lawyer at a pharmaceutical company, opines that the Co-Promotion Agreement and the Manufacturing Agreement

---

[175] Defs.' Br. as to Tupman 8–9.

[176] Defs.' Reply as to Tupman 2–5.

[177] *Id.*

[178] Tupman Rep. 68.

[179] *Id.* 68 n.310.

were "commercially reasonable and fairly valued."[180] Plaintiffs argue his analysis does not use the market-based measures required by *Actavis*, his valuation does not fit the facts of the case, and his methodology is flawed.[181]

The Co-Promotion Agreement required Barr's affiliate Duramed to promote Niaspan and Advicor, another Kos drug, to women's health medical professionals, including obstetricians and gynecologists.[182] In return, Kos agreed to pay Barr royalties based on the sales of the two drugs.[183] Royalties would cease once another generic version of Niaspan entered the market.[184]

To value the Co-Promotion Agreement, Buthusiem calculated the number of eligible patients in the market and the percentage of eligible patients Kos was likely to capture as a result of Barr's co-promotional efforts.[185] He then forecasted the incremental revenue generated by the agreement, subtracted incremental expenses to determine incremental profits, and discounted the profits to their net present value.[186] Based on these calculations, Buthusiem modeled a number of scenarios (varying based on pricing and efficacy of co-promotional efforts) to determine the conditions necessary for Kos to generate profit from the Co-Promotion Agreement.[187]

---

[180] Expert Rep. of Edward J. Buthusiem Reflecting Sept. 21, 2018 Errata (attached as Ex. A to Coslett Decl.) ["Buthusiem Rep."] ¶¶ 5, 26–27.

[181] Mem. in Supp. of Pls.' Mot. to Exclude the Expert Ops. of Edward J. Buthusiem Regarding "Fair Value" ["Pls.' Br. as to Buthusiem"], ECF No. 872.

[182] Defs.' Statement of Material Undisputed Facts in Supp. of Their Mot. for Summ. J. ["Defs.' SMF"] ¶ 52, ECF No. 798; Pls.' SMF ¶ 52(a); Co-Promotion Agr. (attached as Ex. 51 to Meltzer Decl.) 1–2.

[183] Defs.' SMF ¶ 52; Pls.' SMF ¶ 52(a).

[184] Co-Promotion Agr. § 3.1; Settlement and Licensing Agreement (attached as Ex. 49 to Meltzer Decl.) ¶ 5.

[185] Buthusiem Rep. ¶¶ 121–22.

[186] *Id.* ¶ 123.

[187] *Id.* ¶ 124.

Buthusiem posited that in order to break even, Kos had to apply a 5% annual price increase and generate 8.6 new patients using the drug per OB/GYN.[188] He modeled five other scenarios in which Kos would have done better than break even "to illustrate the continuum of upside potentially available to Kos, with potential expected net profits ranging from $27 million to $58 million in net present value."[189] Based on this analysis, Buthusiem concluded that "it would be reasonable to expect that Kos could do better than break even" on the Co-Promotion Agreement.[190]

Buthusiem describes his method for valuing the Co-Promotion Agreement as a version of the "profit-based approach" described by plaintiffs' expert Tupman.[191] Rather than using Kos's contemporaneous financial projections as an input for his profit-based model as plaintiffs' expert Tupman did, Buthusiem made his own calculations of the market opportunity and expected revenue from the Co-Promotion Agreement.[192] He did not consider the Suarez analysis prepared for Kos's Board of Directors in 2005.[193] He explained that he disagreed with the assumption that the Suarez analysis projected revenue associated specifically with the Co-Promotion Agreement.[194] He testified that

---

[188] *Id.*

[189] *Id.* ¶ 125.

[190] *Id.*

[191] *Id.* ¶ 138.

[192] *Id.*

[193] As we explain above, the "Suarez analysis" refers to a presentation of financial projections given by Kos analyst Joe Suarez to the Kos Board of Directors on March 30, 2005 to illustrate the impact of the proposed settlement with Barr. *See* Russell Daubert Decl. Ex. 14 at ABB-NIA01296398. Plaintiffs' expert John Tupman relied on financial projections from the Suarez analysis to assess the fair value of the Co-Promotion Agreement. *See generally* Tupman Rep. The defendants argue Tupman's reliance on the Suarez analysis renders his opinion unreliable. *See* Defs.' Br. as to Tupman 5. As we explain above in our opinion denying the defendants' motion to partially exclude Tupman's opinions and testimony, we disagree.

[194] Edward J. Buthusiem Dep. Tr. (attached as Ex. F to Coslett Decl.) ["Buthusiem Dep."] 190:5–19.

even if contemporaneous projected revenue models for the Co-Promotion Agreement did exist, they would not be "material to [his] analysis because [he] basically did the analysis from the bottom[] up and created [his] own incremental revenue net present value model" for the Co-Promotion Agreement.[195] In other words, according to the plaintiffs, the factors he used in valuing the agreement were the product of his own creation.

Plaintiffs argue Buthusiem's "profitability" analysis of the Co-Promotion Agreement is inconsistent with *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), which instructs that an antitrust defendant may demonstrate a reverse payment is lawfully justified if it reflects "fair value for services" that the generic has promised to perform.[196] Plaintiffs argue that "fair value" is a market-based standard that requires an assessment of what objective market participants not involved in the patent litigation would pay for the same services.[197] Plaintiffs argue that Buthusiem's assessment of whether the deal is "profitable" or "reasonably . . . expected to deliver positive value to Kos" is not market-based.[198] They argue that his failure to use market-based measures such as the cost of obtaining the services from an alternative source or comparable market transactions render his opinion unreliable.[199]

*Actavis* teaches that a reverse payment is justified if it reflects "fair value" for services. 570 U.S. at 157. It does not define fair value. Nor does it set forth a method

---

[195] *Id.* 191:3–8.

[196] Pls.' Br. as to Buthusiem 3–4.

[197] *Id.* 4–5.

[198] *Id.* 2, 5–6 (citing Buthusiem Dep. ¶ 75:6–14).

[199] *Id.* 6.

for calculating it. Buthusiem testified that "there is no standard way of measuring fair value" and that it "is very dependent on [the] facts and circumstances of each case."[200]

Buthusiem's profitability-based method is similar to the "profit-based approach" used by Tupman.[201] Both sides' experts subtracted the co-promotion expenses from incremental revenues to determine Kos's expected profits.

Unlike Tupman, Buthusiem did not supplement his profitability-based method with cost and comparables analyses.[202] But, that does not render his opinion unreliable. Buthusiem explained why he considered the cost and comparables approaches to be inappropriate methods of valuing the Co-Promotion Agreement. As to the comparables approach, Buthusiem explained that promotional agreements vary too widely from one example to the next to provide meaningful comparisons.[203] He stated that Tupman's cost approach—which compared the payments to Barr to the cost Kos would incur from performing the co-promotion services itself—is based on the flawed assumption that Kos was equipped to market drugs in a healthcare sector in which it had no preexisting presence or relationships.[204] Buthusiem's "fair value" opinion regarding the Co-Promotion Agreement is not unreliable because he focused on profitability and positive value to Kos. Plaintiffs can scrutinize his reasons for disregarding the cost and comparables approach on cross-examination.

---

[200] Buthusiem Dep. 74:18–75:5.

[201] Buthusiem Rep. ¶ 138.

[202] Tupman used three approaches to value the Co-Promotion agreement: (1) a profit-based approach; (2) a cost-based approach; and (3) a comparables-based approach. The defendants have moved to exclude Tupman's opinions founded on the profit-based approach. *See* Defs.' Br. as to Tupman 1–2.

[203] Buthusiem Rep. ¶¶ 137, 153–65.

[204] *Id.* ¶¶ 138, 142–52.

Plaintiffs also argue that Buthusiem's valuation of the Co-Promotion Agreement does not fit the facts of the case. They contend that his rejection of Kos's projected revenue models in favor of his own "speculative hindsight analysis" warrants the exclusion of his opinion.[205]

The defendants counter that Buthusiem properly disregarded the Suarez analysis. As they argued in their motion to exclude Tupman, they contend that Kos CFO Chris Kiritsy requested that Suarez compare the proposed Barr settlement to a Barr generic launch—not necessarily that he model incremental revenues from the Co-Promotion Agreement.[206] They argue that the Suarez analysis is "unsubstantiated" because its purpose and scope are unknown.[207] Therefore, according to the defendants, it was appropriate for Buthusiem to conduct his own analysis rather than rely on contemporaneous documents.[208]

There is a gross difference between Buthusiem's analysis and Kos's own internal documents about what Kos expected to gain or lose on the Co-Promotion Agreement. The Suarez analysis projected $70.8 million in incremental revenue from the Co-Promotion Agreement.[209] Buthusiem opines that the Co-Promotion Agreement would have generated roughly $435.87 million in incremental revenue to Kos.[210] That difference explains why the defendants want to distance themselves from the Suarez analysis.

---

[205] Pls.' Br. as to Buthusiem 8.

[206] Defs.' Mem. of L. in Opp'n to Pls.' Mot. to Exclude the Expert Ops. of Edward J. Buthusiem Regarding "Fair Value" ["Defs.' Opp'n to Pls.' Mot. as to Buthusiem"] 7, ECF No. 853.

[207] *Id.*

[208] *Id.* 7–8.

[209] Tupman Rep. 68; Buthusiem Dep. 228:18–229:20.

[210] Buthusiem Rep. ¶ 123(a)(vii), Ex. CP.2, row 65; Buthusiem Dep. 228:1–12.

We have already determined that Tupman properly relied on the Suarez projections.[211] The best measure of Kos's expectations of profitability is its own contemporaneous financial projections. To the extent Buthusiem claims he was unsure of the purpose and meaning of the Suarez projections, he could have asked those who retained him. The defendants have that information. As we explained in our review of Tupman's methodology, the defendants have not produced any evidence showing why the profit-based analysis is an unreliable measure of the incremental revenues expected to be generated by the Co-Promotion Agreement.

The critical inquiry is whether Kos expected the Co-Promotion Agreement to generate positive value at the time it entered into the settlement agreement. If it did not, a jury may find that the payments it made under the Co-Promotion Agreement were not made in exchange for fair value of co-promotion services. It may determine instead that Kos made the payments to delay Barr's entry into the Niaspan market.

Buthusiem may not testify about what Kos believed was the value of the Co-Promotion Agreement. He may give his own opinion as to what he believes it was. His valuation is relevant to the issue of whether the payment was fair value. Plaintiffs may expose any flaws in his analysis and address its reliability on cross-examination.

Buthusiem also opines it was reasonable for Kos to pay Barr a royalty on *all* sales of Niaspan and Advicor in exchange for promotional services to OB/GYNs—rather than a royalty on only those sales generated by OB/GYNs—in part because of the "halo effect."[212] The "halo effect" describes an OB/GYN's referring patients with dyslipidemia

---

[211] See our discussion of the defendants' *Daubert* motion as to plaintiffs' expert John Tupman, above.

[212] Buthusiem Rep. ¶ 114(a).

to specialists for treatment of conditions outside the OB/GYN's core practice who would in turn prescribe Niaspan or Advicor.[213] Buthusiem opines that it was "to be expected that many targeted OB/GYNs would screen and then refer their patients to another specialist for treatment as a result of Barr's promotional efforts."[214] He explains that based on this halo effect, "it was reasonable to anticipate that many prescriptions resulting from Barr's promotional efforts would be linked to non-promoted physicians."[215] According to Buthusiem, because the halo effect is "difficult, if not impossible" to track and quantify, it was a "logical and reasonable choice" to compensate Barr based on overall sales rather than only sales generated by promoted OB/GYNs.[216]

Plaintiffs argue that Buthusiem's opinion lacks fit because of its reliance on the halo effect. They argue there is no evidence Kos ever considered the halo effect, and Buthusiem did not attempt to quantify its size with respect to Niaspan and Advicor.[217] Because Buthusiem has not demonstrated any connection between the halo effect and the facts of this case, plaintiffs argue, it could not possibly assist the jury and must be excluded.[218]

The relevant inquiry is whether Kos received fair value for services under the Co-Promotion Agreement. A general discussion of the halo effect without any application of it to the facts of the case has no bearing on this question. There is no evidence Kos considered the halo effect in structuring the Co-Promotion Agreement to compensate Barr

[213] *Id.*

[214] *Id.*

[215] *Id.*

[216] *Id.* ¶ 114(b).

[217] Pls.' Br. as to Buthusiem 8–9.

[218] *Id.* 9.

for overall sales. Therefore, because his opinions regarding the halo effect are not tied to the facts of this case, Buthusiem may not opine that it was commercially reasonable to structure the Co-Promotion Agreement to generate royalties on all sales of Niaspan and Advicor because of the halo effect.

Under the Manufacturing Agreement, Kos agreed to make an initial lump sum payment followed by quarterly payments to Barr in return for Barr's readiness as a backup supplier of Niaspan and Advicor.[219] The initial payment was $4 million, followed by installment payments of $1.5 million on June 30, 2005 and September 20, 2005, and then either $750,000 or $1 million quarterly thereafter, depending on when Barr got FDA approval of its Advicor ANDA.[220] Kos's obligation to make the quarterly payments would end when Barr sold its generic drug to a third party or on September 19, 2013, whichever was earlier.[221]

To value the Manufacturing Agreement, Buthusiem calculated lost profits in the event Kos's facilities suffered a catastrophic event or was unable to keep up with the demand for Niaspan. He calculated lost profits in a number of scenarios and concluded that in 15 of the 18 model scenarios, Kos could expect to lose more than it would pay Barr under the Manufacturing Agreement.[222] Buthusiem opined that because the payments were a fraction of the losses Kos could have sustained in the event of a production

---

[219] Defs.' SMF ¶ 52; Pls.' SMF ¶ 52(b); License and Mfg. Agr. (attached as Ex. 50 to Meltzer Decl.) Art. 7.

[220] License and Mfg. Agr. §§ 7.1–7.2.

[221] *Id.* §§ 1.14, 11.1, 11.2(c).

[222] Buthusiem Rep. ¶ 249.

shortfall, the Manufacturing Agreement was a "reasonable and prudent risk mitigation strategy" by Kos.[223]

Plaintiffs argue that Buthusiem's valuation opinion of the Manufacturing Agreement is unreliable because it did not adhere to any standard valuation method.[224] They argue that Buthusiem should have reviewed comparable market transactions to determine what a company generally pays for backup supply agreements instead of valuing the agreement up to the full amount of the covered potential loss.[225]

Buthusiem did not opine that it would have been reasonable for Kos to pay up to the full amount of the loss. He explained that Kos faced a real risk of supply interruption based on its "aging" production facility, lack of a backup manufacturing site, and the growing demand for Niaspan and Advicor.[226] He explained why Barr was a particularly well equipped backup supplier because it already had the regulatory approval and facilities required to manufacture niacin products.[227] He calculated the losses Kos would face if it was unable to keep up with demand at its own facilities, finding that, for example, being out of stock for one quarter in 2013 would result in "a profit loss eight times higher than the aggregate payments under the LMA."[228] Based on the risks and the value of mitigating them, Buthusiem opined that the Manufacturing Agreement was commercially reasonable and fairly valued.[229]

---

[223] *Id.* ¶ 251.

[224] Pls.' Br. as to Buthusiem 9–10.

[225] *Id.* 10.

[226] Buthusiem Rep. ¶¶ 202–21.

[227] *Id.* ¶¶ 265–70.

[228] *Id.* ¶ 242.

[229] *Id.* ¶ 27(a).

Plaintiffs' contention that the risk was small and did not justify the costs are factual disputes for the jury. Buthusiem will be permitted to opine as to the fair value of the Manufacturing Agreement.

**Relevant Antitrust Market**

*Plaintiffs' Motion to Exclude Crémieux*

To rebut plaintiffs' argument that the relevant market is limited to brand and generic Niaspan, defendants proffer the opinion and testimony of economist Dr. Pierre-Yves Crémieux,[230] who conducted analyses measuring own- and cross-price elasticities.[231] He concluded that the price of Niaspan is limited by prices of other prescription cholesterol-management drugs, and that demand for Niaspan is responsive to its own price and the price of other cholesterol-management drugs.[232] Crémieux opines that the relevant market for Niaspan "includes a broad range of prescription cholesterol-management therapies" beyond Niaspan and its generic equivalent.[233]

Moving to exclude Dr. Crémieux's opinions on own- and cross-price elasticities of demand, plaintiffs argue the analysis he used in determining market power and economic sustainability is fundamentally flawed, rendering his opinions unreliable. They contend that it rests upon the wrong price input, which is not based on prices paid, but on co-

[230] Expert Rep. of Pierre-Yves Crémieux (attached as Ex. K to Coslett Decl.) ["Crémieux Rep."] ¶¶ 1–2.

[231] *Id.* ¶ 17. Crémieux explains that these prescription cholesterol-management therapies include statins, fibrates, cholesterol absorption inhibitors, bile acid sequestrants, and omega-3 fatty acids. *Id.* ¶ 17b. He concluded that in addition to other prescription cholesterol-management drugs, Niaspan also competed with non-prescription products containing the same active ingredient as Niaspan, niacin, but that are formulated differently. *Id.* ¶ 17a. These include immediate-release, sustained-release, and controlled-release formulations of niacin, which differ from Niaspan's extended-release formulation. *Id.*

[232] *Id.* ¶ 17b.

[233] *Id.*

pays.[234] They also argue the Optum database upon which he relied is unreliable because it is based on a small, unrepresentative sample, and that Crémieux intentionally excluded data after 2011 Q1.[235] They also seek to strike those opinions founded on assumptions Crémieux made from his interview with Barr's general counsel, Fred Killion.[236]

Crémieux relied on Optum Health Care Solutions, Inc.'s databases[237] to construct his regression model to measure the own-price elasticity of Niaspan and cross-price elasticity of demand between Niaspan and other cholesterol-management drugs.[238] In doing so, he used consumer co-pays and co-insurance payments as the price factor.[239]

Crémieux input only the consumer's out-of-pocket expenses. The Optum pricing data does not include third-party payor prices paid. In short, he did not use market prices to assess own- or cross-price elasticity of demand. Consequently, his analysis is skewed and is unreliable in defining the relevant product market.

Insured consumers do not see prices. Nor do they set co-pays. The plan sets the co-pays and chooses what drugs to include in its formularies. Of course, the co-pay is what the consumer pays, but it is not the negotiated price the third-party payor paid and the drug seller charged.

---

[234] Pls.' Mem. of L. in Supp. of Mot. to Exclude Portions of Dr. Pierre-Yves Crémieux's Proposed Testimony 6–8, ECF No. 781 ["Pls.' Br. as to Crémieux"].

[235] *Id.* 8–9.

[236] *Id.* 10.

[237] The OptumHealth Care Solutions, Inc. database includes de-identified administrative claims for commercially insured individuals covered by 84 self-insured Fortune 500 employers across the U.S. *See* Crémieux Rep. 22 n.73. It includes information for services provided from Q1 1998 through Q1 2017, including information on diagnoses and prescription drug claims for employees, their spouses and dependents, and retirees. *Id.*

[238] Crémieux Rep., Appendix D at D-1.

[239] *Id.*

The Optum data are limited to an insignificant number of consumers. The dataset is based on self-funded health plans of 84 self-insured Fortune 500 companies.[240] Even though 43.1 million people had at least one prescription for a cholesterol drug in 2015,[241] Crémieux limited his inquiry to a subset of only 37,000 individuals who filled a prescription for Niaspan in 1998 through 2017 and were continuously eligible for benefits.[242]

Crémieux also underrepresented the population taking cholesterol drugs over age 65. The age 65 and older population in the Optum data is 7.5 percent compared to the actual 15.2 percent of the national population.[243] Yet, this underrepresented cohort of the population accounts for almost one half of all adults receiving treatment for high cholesterol.[244] By relying on data that underrepresents the 65 and older population, Crémieux's analysis reflects a false low demand for Niaspan because it fails to account for the majority of people who take the drug. This failure renders his opinion unreliable.

Crémieux ended his analysis at the first quarter of 2011, two years before the generic entry.[245] As a result, his analysis ignores the effect the generic entry had on demand for non-Niaspan drugs. He explained that the period after the first quarter of 2011 was "polluted" and "not relevant."[246]

---

[240] Crémieux Rep. 22 n.73.

[241] *See* Rebuttal Rep. of Thomas G. McGuire (attached as Ex. J to Coslett Decl.) ["McGuire Rebuttal Rep."] ¶ 11, 11 n.12.

[242] Crémieux Rep. ¶ 44.

[243] Press Release Number CB17-100, *The Nation's Older Population Is Still Growing, Census Bureau Reports*, U.S. Census Bureau (June 22, 2017), https://perma.cc/Q9US-NC8K.

[244] *See* McGuire Rebuttal Rep. ¶ 12.

[245] Crémieux Rep. ¶¶ 44, 76.

[246] Pierre-Yves Crémieux Dep. Tr. (attached as Ex. L to Coslett Decl.) 40:10–13.

Crémieux explained that there was a structural change in demand for Niaspan beginning in 2011 driven by two events.[247] The first was a study from the National Institute of Health ("NIH"), which showed that using Niaspan in combination with a statin does not significantly lower the risk of heart attack or stroke compared to use of a statin alone.[248] The second was that Abbott began decreasing promotion on all its dyslipidemia treatments, which caused Niaspan sales to decline substantially from 2011 until the entry of generic Niaspan in 2013.[249]

Crémieux made no attempt to quantify the effect each structural change had on demand. Nor did he attempt to control for these demand-influencing factors in his model. He simply dropped the data from his analysis.

To the extent Crémieux relied on his understanding of Barr's general strategy in the settlement negotiations to criticize plaintiffs' experts Elhauge and Leffler, he may not comment on this assumed strategy.[250] As we have ruled on other *Daubert* motions, the experts may not testify about Barr's settlement negotiation strategies in the patent litigation. Simply put, no expert knows what Barr's strategy was. For example, Crémieux concedes the basis for his understanding of Barr's timing of entry derives from what Killion told him Barr's general strategy was in other patent cases without telling him what it was in this case.[251]

---

[247] Crémiuex Rep. ¶¶ 44, 76, n.140.

[248] *Id.* ¶ 44.

[249] *Id.*

[250] *See id.* ¶¶ 223–24.

[251] *Id.*

For these reasons, Crémieux may not opine as to the own- and cross-price elasticities of Niaspan. Nor may he opine or comment on Barr's settlement negotiation strategy.[252]

**Damages**

*Defendants' Motion to Exclude Leitzinger and Leffler*

Dr. Jeffrey Leitzinger is an acknowledged economics expert in the field of damages in the context of anticompetitive conduct in generic drug competition.[253] In calculating damages on behalf of DPPs, he used four models, each using a different generic entry date provided by the plaintiffs.[254] His "at-risk launch" date is June 9, 2005, which is plaintiff's expert Dr. Einer Elhauge's "conservative" estimate of when Barr would have been ready to launch following the expiration of the stay on March 30, 2005.[255] Leitzinger's "litigation victory" date is September 13, 2007, when Adelman concluded the Federal Circuit would have affirmed Barr's victory in the patent litigation on appeal.[256] He uses two dates for the "no payment settlement" benchmark, March 19, 2008 and February 1, 2009, explaining that he understood plaintiffs would "offer other expert testimony and

[252] Our ruling does not mean that the relevant product market is limited, as the plaintiffs contend, to brand and generic Niaspan. As we explain in our summary judgment opinion, there is ample evidence that the relevant market is broader. *See* Mem. Op. on Summ. J. Mots. 41–46. The issue must be resolved by the factfinder.

[253] Expert Rep. of Jeffrey J. Leitzinger, Ph.D. (attached as Ex. 36 to Russell Daubert Decl.) ¶¶ 1–4.

[254] *Id.* ¶ 39 tbl. 1, 39 n.66.

[255] Elhauge Rep. ¶ 43. Elhauge, a professor of antitrust law, submitted an expert report in this case in support of plaintiffs' standing argument. He performed an economic analysis to determine whether an alternate agreed-upon entry date would have been economically rational for Kos and Barr. The defendants have filed a separate *Daubert* motion to exclude Elhauge's opinions proffered in this case, which we discuss above.

[256] Adelman Rep. ¶ 15.

evidence in support of these dates." Elhauge opined, on behalf of the DPPs, that no-payment generic entry would have occurred on March 14, 2009.[257]

Dr. Keith Leffler, an economics professor with years of experience performing economic analysis in antitrust and patent cases in the pharmaceutical industry,[258] opines on the overcharges to the Retailer Plaintiffs based on three alternative entry dates.[259] He uses the same at-risk launch date as Leitzinger—June 9, 2005.[260] For his litigation success scenario, Leffler opines that Barr would have entered on October 1, 2007 "following a decision from the Federal Circuit in Barr's favor."[261] Leffler's no-payment settlement entry date is December 1, 2008.[262] He opined that it would have been economically rational for Kos and Barr to have agreed to a generic entry date between November 17, 2005 and November 16, 2008.[263] Leffler started calculating damages beginning December 1, 2008, because it is the first full month after the latest entry date rational to both parties.[264]

Defendants do not contend that Leitzinger and Leffler used the wrong method. Instead, they claim they misapplied it. They argue both experts skewed brand-generic damages by using an inflated generic penetration rate.

---

[257] Elhauge Rep. ¶ 69.

[258] Lefler Rep. ¶¶ 1–3.

[259] *Id.* ¶¶ 11(F), 80.

[260] *Id.* ¶¶ 11(F), 80.

[261] *Id.* ¶ 80.

[262] *Id.* ¶ 80.

[263] *Id.* ¶ 11(E).

[264] *Id.* ¶¶ 11(F) n.9, 80 n.105.

The generic penetration rate is the percentage of brand Niaspan purchases that convert to generic purchases after generic entry.[265] It is used to calculate "brand-generic" damages—the overcharges resulting from what was paid for purchases of brand Niaspan and what would have been paid for the lower-priced generic if the generic had been on the market. The higher the generic penetration rate, the higher the brand-generic overcharges.

Defendants argue that Leitzinger's damages model rests on improper assumptions that do not fit the case.[266] They contend he used an inflated generic penetration rate when he included generic purchases by class members who did not purchase the brand in calculating brand-generic damages.[267]

The DPPs counter that the defendants' argument that Leitzinger, in calculating damages, improperly included purchases of generic Niaspan by class members who purchased the generic directly and not the brand directly, is a bypass argument.[268] So, the DPPs maintain, the defendants' contention is precluded by Judge DuBois's ruling.[269]

---

[265] Defs.' SMF ¶ 71; Pls.' SMF ¶ 71.

[266] Defs.' Mem. of L. in Supp. of Defs.' Mot. to Exclude the Opinions and Proposed Damages Testimony of Jeffrey Leitzinger and Keith Leffler ["Defs.' Br. as to Leitzinger and Leffler"] 4–5, ECF No. 793.

[267] *Id.* As we explain in our summary judgment opinion, "generic bypass" is a direct purchaser's loss of resale volume when the generic drug becomes available, caused by their customers' "bypassing them" and purchasing the generic directly from the generic manufacturer once it enters the market. *See* Mem. Op. on Summ. J. Mots. 55. In other words, it represents the quantity of brand purchases that would not have been replaced by generic purchases in the but-for world.

Defense expert Stangle calculates the proposed reduction to Leitzinger's damages model, reducing Leitzinger's proposed damages by 3%. Expert Rep. of Bruce E. Stangle, Ph. D. (attached as Ex. S to Coslett Decl.) ["Stangle Rep."] ¶ 95.

[268] Direct Purchaser Class Plaintiffs' Opp'n to Defs.' Mot. to Exclude the Opinions and Proposed Damages Testimony of Dr. Jeffrey Leitzinger ["DPPs' Opp'n to Defs.' Mot. as to Leitzinger"] 4–6, ECF No. 860.

[269] *Id.* 6–7.

As we explain in our summary judgment opinion, defendants' proposed reduction to Leitzinger's brand-generic damages is an impermissible bypass adjustment. Thus, Leitzinger's calculation of brand-generic damages on behalf of the DPPs will be permitted.

The defendants also argue that Leffler, in calculating the Retailer Plaintiffs' brand-generic damages, improperly used the higher generic penetration rate of the Retailer Plaintiffs instead of the wholesalers who are absent DPPs and assigned their claims to the Retailer Plaintiffs.[270] As a result, they argue, Leffler's model grants Retailer Plaintiffs a larger recovery than the assignors themselves could recover.[271] The Retailer Plaintiffs counter that the segment of the wholesalers' business subject to assignment concerns the wholesalers' purchases that were later resold to the Retailer Plaintiffs.[272] They argue the correct substitution rate is the Retailer Plaintiffs' substitution rate because that is the rate that applies to the assigned claims.[273]

As we explain in our summary judgment opinion, the wholesalers assigned their overcharge damages for purchases of Niaspan that were subsequently sold to the Retailers.[274] The purchases by the wholesalers that were not resold to the Retailers are properly excluded.

---

We explain in our summary judgment opinion that Judge DuBois already determined in this case that reducing damages to account for generic bypass is inconsistent with Supreme Court precedent. His ruling is the law of the case. *See* Mem. Op. on Summ. J. Mots. 57–58, 58 n.207.

[270] Defs.' Br. as to Leitzinger and Leffler 6; *see also* Mem. Op. on Summ. J. Mots. 63–65.

[271] Defs.' Br. as to Leitzinger and Leffler 6.

[272] Retailer Pls.' Opp'n to Defs.' Mot. to Exclude Certain Ops. and Proposed Test. of Dr. Keith Leffler Concerning His Overcharge Calculations ["Retail Pls.' Opp'n as to Leffler"] 2–4, ECF No. 831.

[273] *Id.* 3.

[274] *See* Mem. Op. on Summ. J. Mots. 63–65.

The defendants criticize Leitzinger and Leffler for including brand purchases made after Barr's generic entry and generic purchases after Lupin Pharmaceuticals' generic entry.[275] They argue their models improperly include damages for brand purchases made after actual generic entry.[276] The defendants' argument incorrectly assumes that prices drop immediately upon the generic's introduction into the market. They do not.

Generic substitution takes time to take effect after generic entry. As Leffler explains, "getting inventory in place can take some time, awareness of the substitution possibility may take some time, and some patients may want to check with their physician before accepting a generic."[277] By Barr's own admission, it was not expecting generic substitution to take full effect immediately after launch. In response to Kos's motion for a preliminary injunction, Barr representative Timothy Catlett stated that it would "begin to build up its substitution rate" following its generic launch and "would not, of course, start immediately at a 90% substitution rate[.]"[278]

---

[275] Defs.' Br. as to Leitzinger and Leffler 7–9. Defendants argue plaintiffs have inflated their damages by including purchases made after the alleged restraints on generic competition had been removed. *See* Defs.' Joint Br. 41–42. They maintain that the anticompetitive harm that caused brand-generic damages ceased immediately upon generic entry on September 20, 2013, and that generic-generic damages ended when the second generic entered the market on March 21, 2014. *Id.* Therefore, they contend, brand-generic damages and generic-generic damages should be limited to the purchases made before September 20, 2013, and March 21, 2014, respectively. *Id.*

[276] Defs.' Br. as to Leitzinger and Leffler 7–8.

[277] Leffler Reply Rep. ¶ 70.

[278] Rebuttal Rep. of Jeffrey J. Leitzinger, Ph.D. (attached as Ex. 6 to Decl. of Caitlin G. Coslett in Supp. of Pls.' Opp'ns to Defs.' *Daubert* Motions ["Coslett Opp'n Decl."], ECF No. 850) ["Leitzinger Rebuttal Rep."] ¶ 24, n.36 (citing Timothy Catlett's Decl. in Supp. of Barr Lab'ys' Opp'n to Kos Pharms.' Mot. for a Prelim. Inj. (attached as Ex. 24 to First Decl.)).

Immediately following generic entry in the actual world, generic Niaspan accounted for 66% of extended-release niacin sales.[279] A year later, generic Niaspan's share of the market had increased to 80%.[280]

Like generic substitution, prices adjust over time after generic entry. As Leitzinger points out, "the market adjustment to a new competitive price level is not instantaneous."[281] It takes "several months before prices fall to competitive levels after generic entry." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 250 n.8 (3d Cir. 2016).

Because it takes time to achieve generic substitution and competitive pricing, purchasers continue to pay overcharges as a result of anticompetitive conduct for a period of time after the generic enters the market. *Id.* ("Because Drogueria Betances made its brand modafinil purchases only one month after generic entry, it is conceivable that it paid an overcharge."); *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 573 F. Supp. 3d 459, 474 (D. Mass. 2021) (finding "genuine dispute of material fact as to whether [defendant's] alleged behavior resulted in artificially inflated drug prices even after there were generic options in the market"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III Ltd.*, 246 F.R.D. 293, 300 n.5 (D.D.C. 2007) (finding it "reasonable" for plaintiffs to assert that "class members suffered overcharges even after Barr began selling generic Ovcon 35").

When damages end after generic entry is a disputed fact.[282] Leitzinger and Leffler can assist the jury in making that determination and calculating damages. The

---

[279] Leitzinger Rebuttal Rep. ¶ 27.

[280] *Id.*

[281] *Id.* ¶ 25.

[282] *See* Mem. Op. on Summ. J. Mots. 65–66.

defendants have raised issues that are for cross-examination, not a basis for excluding these experts. Therefore, we will deny the defendants' motions to preclude them.

*Plaintiffs' Motion to Exclude Stangle*

The defendants offer Dr. Bruce Stangle, an economist,[283] who opines that the plaintiffs' damages experts, Leffler and Leitzinger, inflated overcharge damages in four ways.[284] First, he contends Leitzinger fails to account for generic bypass, thus permitting DPPs to recover overcharges on brand Niaspan purchases that would not have been replaced by generic purchases in the but-for world.[285] Second, Stangle argues Leitzinger's generic penetration rate for DPPs is flawed because he includes DPPs who never purchased brand Niaspan, and thus did not suffer brand-generic damages.[286] Third, brand sales would have fallen as a result of AbbVie's reduced brand promotion in response to another generic's earlier entry.[287] Fourth, Leitzinger fails to account for the effect of rebates on the but-for generic price.[288]

Stangle's adjustment for DPPs whose customers would have bought generics directly from the generic manufacturer in the but-for world reduces Leitzinger's damages model by 41–43%.[289] The adjustment to Leitzinger's generic penetration rate reduces the

[283] *See* Stangle Rep. ¶¶ 1–2.

[284] *Id.* ¶¶ 29, 34–37. Defendants claim Stangle proposes four adjustments. *See* Defs.' Mem. of L. in Opp'n to Pls.' Mot. to Exclude Certain Test. of Defs.' Expert Bruce E. Stangle, Ph.D. ["Defs.' Opp'n to Pls.' Mot. as to Stangle"] 1–3, ECF No. 846. Plaintiffs characterize it as three. Mem. of L. in Supp. of Pls' Mot. to Exclude Certain Test. of Defs.' Expert Bruce E. Stangle, Ph.D. ["Pls.' Br. as to Stangle"] 2–3, 3 n.7, ECF No. 782. This is because defendants characterize Stangle's bypass adjustment and generic penetration rate adjustment as separate issues, while plaintiffs argue that they are effectively both a generic bypass adjustment.

[285] Stangle Rep. ¶¶ 96–98.

[286] *Id.* ¶¶ 94–95.

[287] *Id.* ¶¶ 62–67.

[288] *Id.* ¶¶ 76, 84–86.

[289] *Id.* ¶ 98.

DPPs' damages by 3%.[290] The adjustment for decreased marketing reduces Leitzinger's damages by 3–18% and Leffler's damages by 5–15%.[291] The rebate adjustment reduces Leitzinger's damages by 38–40%.[292]

Plaintiffs contend that Stangle's first proposed adjustment is a classic "generic bypass" argument that is not permissible and has already been precluded by Judge DuBois.[293] We agree.

Stangle admits he makes a bypass adjustment.[294] In his report, under the heading "Dr. Leitzinger fails to account for generic bypass," he criticizes Leitzinger for failing to account for the fact that "much of the brand Niaspan actually purchased by wholesalers would have instead been generic Niaspan purchased directly by pharmacies."[295] Stangle reduces Leitzinger's damages by 41–43% "by adjusting downward the volume to which the Brand-Generic overcharge is applied during the period of alleged delay, to account for purchases that would have been made by generic-only purchasers in his but-for world."[296] This reduction is generic bypass.

Judge DuBois precluded the defendants from relying on generic bypass to reduce damages. *See In re Niaspan Antitrust Litig.*, No. 13-MD-2460, 2015 WL 4197590, at *2 (E.D. Pa. July 9, 2015). As we explain in our summary judgment opinion, that is the law

---

[290] *Id.* ¶ 95.

[291] *Id.* ¶ 67.

[292] *Id.* ¶ 86.

[293] Pls.' Br. as to Stangle 6–7 (citing *In re Niaspan Antitrust Litig.*, 2015 WL 4197590, at *1).

[294] Bruce Stangle, Ph. D., Dep. Tr. (attached as Ex. T to Coslett Decl.) ["Stangle Dep."] 83:19–84:7.

[295] Stangle Rep. 53, ¶ 97.

[296] *Id.* ¶ 98.

of the case and there is no cause to reconsider it.[297] Thus, we shall preclude Stangle from testifying that plaintiffs' damages must be reduced by 41–43% to account for generic bypass.

As for Stangle's adjustment to Leitzinger's class-wide generic penetration rate, it is another bypass reduction. Excluding the DPPs who defendants allege never bought brand Niaspan and purchased only the generic (the so-called "generic-only" purchasers)[298] from the class-wide generic penetration rate would deprive the DPPs of brand-generic overcharges paid on bypassed units. That exclusion would violate Judge DuBois's ruling that plaintiffs' damages cannot be reduced to account for the bypass effect. Thus, Stangle will not be permitted to opine that Leitzinger's generic penetration rate should be adjusted to reduce damages by 3%.

Stangle also concludes that sales of brand Niaspan would have decreased as a result of Kos or Abbott's reduced promotion of the brand in response to an earlier generic entry.[299] So, he opines, "[i]t is not appropriate to calculate overcharges on purchases that would not have occurred in the but-for-world."[300]

Stangle states that "branded manufacturers typically reduce marketing and promotion expenditure" in anticipation of generic entry.[301] Specific to this case, he cites a Kos presentation prepared in anticipation of Barr's entry, which proposes reducing

---

[297] *See* Mem. Op. on Summ. J. Mots. 57–58, 58 n.207.

[298] As we explain in our summary judgment opinion, the parties disagree on whether the so-called "generic-only" members of the DPP class purchased brand Niaspan. Defendants contend the "generic-only" DPPs never purchased it. Plaintiffs contend they purchased it indirectly, through a wholesaler. Expert opinions on both sides suggest generic-only purchasers were likely buying brand Niaspan indirectly (from wholesalers) before the generic became available. *See* Mem. Op. on Summ. J. Mots. 60–61.

[299] Stangle Rep. ¶¶ 62–67.

[300] *Id.* ¶ 35.1.

[301] *Id.* ¶ 62.

marketing expenses, samples, and sales representatives in the field.[302] Kos predicted that the proposed reduction in marketing would cause total Niaspan prescriptions to fall by 1% per month.[303] Based on this premise, he concludes that "it is reasonable to assume Kos or Abbott would also have stopped marketing Niaspan in response to but-for generic entry."[304]

Plaintiffs maintain that because the injury was complete when the wholesalers purchased the drug, any attempt to minimize damages by showing a reduction in promotional efforts in response to generic entry violates *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968).[305] We agree.

Plaintiffs are entitled to the full amount of the overcharge. *See Hanover Shoe*, 392 U.S. at 493–94. Their injury was complete when they purchased Niaspan at the anticompetitive price, and their damages cannot be reduced or offset to account for changes in promotional activity that may or may not have taken place in the but-for would. *See In re Niaspan Antitrust Litig.*, 2015 WL 4197590, at *1 ("[A] direct purchaser may recover the full amount of the overcharge, even if he is otherwise benefitted, because the antitrust injury occurs and is complete when the defendant sells at the illegally high price . . . . That is, the focus of the antitrust laws is limited to the anticompetitive sale." (quoting *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-MD-2343, 2014 WL 2002887, at *5 (E.D. Tenn. May 15, 2014))).

---

302 *Id.* ¶ 64 n.120.

303 *Id.* ¶ 64.

304 *Id.* ¶ 63.

305 Pls.' Br. as to Stangle 7–8. We discuss the *Hanover Shoe* holding and reasoning in our summary judgment opinion. *See* Mem. Op. on Summ. J. Mots. 56–58.

Stangle's opinion that plaintiffs' damages must be reduced to account for hypothetical decreased promotional activity is inconsistent with *Hanover Shoe* and will not be allowed. *See Skelaxin*, 2014 WL 2002887, at *6 (precluding evidence that the manufacturer "would have spent less on promotional advertising for Skelaxin had a generic alternative entered the market and thus Plaintiffs would have sold fewer units").

Stangle's fourth opinion is that Leitzinger should have deducted rebates paid to third-party payors.[306] He is wrong. The rebates were not paid to the DPPs, but to downstream purchasers.[307] To the extent a minimal amount of the payments made it to DPPs, Stangle agrees Leitzinger accounted for them.[308] Rebates not paid to DPPs cannot be used to reduce the price DPPs paid. *See In re Glumetza*, 2021 WL 3773621, at *11. Therefore, Stangle may not opine that Leitzinger failed to account for rebates.

Citing the interview of Barr's general counsel Fred Killion, Stangle opines that Barr generally did not seek the earliest possible entry date in settlement negotiations.[309] For reasons we have already explained, expert opinion based on the Killion interview is speculative and does not fit the facts of the case.[310] Stangle may not testify about Barr's negotiation strategy in the patent litigation.

---

[306] Stangle Rep. ¶ 86.

[307] *Id.* ¶¶ 80, 81, 86 (citing American Bar Association, *Pharmaceutical Industry Antitrust Handbook*, Second Edition, 2018).

[308] *Id.* ¶ 86 n.174; Stangle Dep. 70:22-73:4.

[309] Stangle Rep. ¶ 51.

[310] See our discussion of the plaintiffs' *Daubert* motion as to defendants' expert Dr. James Sebenius, above.